1  TERRENCE P. MCMAHON (State Bar No. 71910)
   tmcmahon@mwe.com
2  ANTHONY DE ALCUAZ (State Bar No. 65599)
   adealcuaz@mwe.com
3  McDERMOTT WILL & EMERY LLP
   275 Middlefield Road, Suite 100
4  Menlo Park, CA 94025-4004
   Telephone:  (650) 815-7400
5  Facsimile:  (650) 815-7401

6  Attorneys for Defendants
   FAIRCHILD SEMICONDUCTOR INTERNATIONAL, INC.,
7  FAIRCHILD SEMICONDUCTOR CORPORATION, and
   SYSTEM GENERAL CORPORATION

8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                     SAN JOSE DIVISION

12  POWER INTEGRATIONS, INC., a           Case No. C 09-5235 JW (PVT)
    Delaware corporation,
13                                        ELECTRONIC CASE FILING
              Plaintiff,
14                                        **DEFENDANTS' AND
       v.                                COUNTERCLAIMANTS' OPENING CLAIM
15                                        CONSTRUCTION BRIEF**
    FAIRCHILD SEMICONDUCTOR
16  INTERNATIONAL, INC., a Delaware       Date:      March 25, 2011
    Corporation, FAIRCHILD               Time:      9 a.m.
17  SEMICONDUCTOR CORPORATION, a          Location:  Courtroom 8, 4th Floor
    Delaware Corporation, and SYSTEM      Before:    Hon. Judge James Ware
18  GENERAL CORPORATION, a Taiwanese
    corporation,
19
              Defendants.
20

21  AND RELATED COUNTERCLAIMS.

22

23

24

25

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

## I.      INTRODUCTION

Defendants and counterclaimants Fairchild Semiconductor International, Inc., Fairchild Semiconductor Corporation and System General Corporation (collectively "Fairchild") have asserted a single straightforward method claim of U.S. Patent No. 5,747,977 (the "'977 patent"). Fairchild proposes only three terms for construction in the single claim asserted (Claim 6). Fairchild's claim construction arguments are consistent with the patent specification and often rely on the ordinary and customary reading of claim terms.

Plaintiff and counter-defendant Power Integrations is playing a different game, and proposes that the Court construe ten (10) terms from this single claim. Power Integrations' motives for proposing ten terms for construction become clear when its proposed constructions are examined. Power Integrations' constructions import numerous limitations, often including language not found or reasonably inferred from the intrinsic evidence, in an attempt to fashion non-infringement positions not supported by a fair reading of Claim 6 or the intrinsic evidence. Fairchild has no choice but to discuss all of the claim terms at issue in this opening brief, yet it is clear that many of these terms can and should be construed by the Court through an ordinary meaning construction of the claims.

Fairchild's proposed constructions rely exclusively on intrinsic evidence, along with a few supporting citations to technical art-specific dictionaries such as the IEEE (Institute of Electrical and Electronics Engineers) dictionary and expert opinion, which may be of assistance to the Court in confirming the meaning of these terms. In the end, the Court should adopt Fairchild's constructions because they rely on the solid intrinsic record provided by the claims, specification and file history.

## II.     LEGAL STANDARD

Claim construction is a matter of law, to be decided exclusively by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996). Claim construction "follow[s] the methodology set forth in [the] *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)." *Cytologix Corp. v. Ventana Med. Sys.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005). Claim construction is a fluid process, wherein the Court may consider a number of

extrinsic sources of evidence so long as they do not contradict the intrinsic evidence. *Intel Corp. v. Wi-LAN, Inc.*, Case No. C 08-04555 JW, 2011 U.S. Dist. LEXIS 3376, *6 (N.D. Cal. Jan. 7, 2011) (Ware, J). However, greater weight should always be given to the intrinsic evidence. *Id.* (citing *Phillips*, 415 F.3d at 1324).

A court generally gives the patent's claims their ordinary and customary meaning. *Intel*, 2011 U.S. Dist. LEXIS 3376, at *6-*7. In construing the ordinary and customary meaning of a patent claim, a court does so from the viewpoint of a person of ordinary skill in the art as of the filing date of the patent application. *Id.* at *7. A court considers that a person of ordinary skill in the art would consult the claim language and the rest of the intrinsic record, including any surrounding claims, the drawings, and the prosecution history. *Id.* (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1324 (Fed. Cir. 2002)). A person of ordinary skill in the art would give a term its widely accepted meaning, unless a specialized definition is stated in the patent specification or was stated by the patentee during prosecution of the patent. *Id.* The Federal Circuit has often acknowledged the fine line between reading a claim in light of the patent specification and importing a limitation from the patent specification into the claims where a limitation is not specially defined as part of the term. *See, e.g. Decisioning.com v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1307 (Fed. Cir. 2008). Indeed, "[w]here a specification does not require a limitation, that limitation should not be read from the specification into the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988).

Claims are primarily construed using intrinsic evidence such as the language of the claims, the patent specification and the prosecution history, though extrinsic evidence should be consulted where the intrinsic record fails to provide a clear definition. *Pitney Bowes v. Hewlett Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). The Court need not consider extrinsic evidence if the words of a claim are clear on their face. *Interactive Gift Express Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

## III. ARGUMENT

### A. "an inductor"

| Disputed Term in Context | Fairchild Construction | Power Integrations Construction |
|---|---|---|
| drawing power from an input source including alternately charging an inductor with a current and discharging the inductor into a storage device for forming a voltage | "an inductor" means one or more windings on a core[1] | "an inductor" means an inductive coil having two terminals |

#### 1. The Parties Dispute Whether "An Inductor" Claims One or More Windings / Coils

The primary dispute between the parties as to the term inductor is whether "an inductor" should be construed as "one or more" inductors/windings/coils, as Fairchild claims, or whether "an inductor" is limited to "one" inductor/winding/coil, as Power Integrations claims. The parties have proposed very similar constructions of the components of "an inductor" in Claim 6. *See* Declaration of Jeremy T. Elman ("Elman Decl."), Exh. 1 ('977 Patent), at 8:19-22.[2] Fairchild proposes to use "windings," while Power Integrations proposes a "coil." Windings or coils are essentially synonymous (and Fairchild would accept either term). *See, e.g.*, Dkt. 104, Exh. B, at 1-2 (Power Integrations' definition of coil is "[a] number of turns of wire . . . ."). Therefore, it is undisputed that "an inductor" is composed of either windings or a coil.

Fairchild contends that the use of "an inductor" in the claim language expressed a specific intent to claim "one or more," and the construction should not be limited to only "one." The Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008) (citing *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)). Claim 6 in the '977 patent contains the transitional phrase "comprising." *See* Elman Decl., Exh. 1, at

---

[1] Fairchild has dropped the word "magnetic" during briefing to make its construction simpler.
[2] Exhibit 1 will be referenced throughout this Brief to refer to the asserted '977 Patent.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

8:17-38. A person of ordinary skill in the art would thus give "an inductor" its widely accepted meaning of "one or more."

Power Integrations' construction ignores the open-ended use of "an" and does not give effect to all terms in the claim, contradicting well established Federal Circuit law. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("Claims must be 'interpreted with an eye toward giving effect to all terms in the claim.'") (citations omitted). As the Federal Circuit has clarified, the rule providing that "an" means "one or more" should be followed except in limited circumstances where exceptions apply. *See Baldwin Graphic*, 512 F.3d at 1342-43 ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to this rule are extremely limited: a patentee must evince[] a clear intent" to limit 'a' or 'an' to 'one.'"). No such exception applies here because the patent never claims or discloses "one inductor." While Claim 6 does refer subsequently to "the inductor," *Baldwin Graphic* clearly explains that subsequent use of the definite article "the" does not limit the prior "a" or "an" usage. *See id.* ("The subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning.") Therefore, the term "an inductor" should not be limited to a single winding used to form a single inductor.

2. **The Intrinsic Evidence Does Not Limit An Inductor to a Single Winding or Single Coil**

Fairchild's construction is also correct because the claim language that surrounds the terms "an inductor" is not limited to a single winding on a single inductor. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) (". . . the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms"). Claim 6 includes "charging an inductor with a current" and then "discharging the inductor into a storage device for forming a voltage." *See* Elman Decl., Exh. 1, at 8:19-22. "[A]n inductor" in Claim 6 is used for the step of "drawing power," which includes the energy flowing into an inductor ("charging an inductor") and energy flowing out of an inductor ("discharging the inductor"). *See id.* The claim also recites that energy is stored because "an inductor" <u>alternately</u>

charges and discharges. *See id.* There is no limitation on the number of windings or inductors for charging, discharging and storing in Claim 6. *See id.*, at 8:17-38. There can be one or more inductors (each containing one or more windings).

Moreover, while the specification does teach an embodiment of a single inductor having at least two terminals, nothing in Claim 6 or the specification requires a single inductor having only two terminals. *Phillips*, 415 F.3d at 1323 (". . . although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"); *see also* Elman Decl., Exh. 2 (Rebuttal Report of Dr. Jonathan R. Wood Concerning Claim Construction of U.S. Patent 5,747,977) ("Wood Report"), ¶ 4 ("[n]owhere does the '977 patent require that an inductor have only two terminals.").

### 3. The Extrinsic Evidence Does Not Limit An Inductor to a Single Winding or Single Coil

Fairchild's construction is also supported by technical dictionaries and expert testimony, which can be used when the specification, as here, does not define the term. *Intel,* 2011 U.S. Dist. LEXIS 3376, at *8-*9 ("the Court may consult a technical art-specific dictionary" to "consider[] that one of skill in the art would give the term its ordinary and customary meaning in that technical field"). The IEEE dictionary, a technical art-specific dictionary, defines "inductor" as a device consisting of one or more windings on a core. *See* Elman Decl., Exh. 3, (IEEE Standard Dictionary of Electrical and Electronics Terms) ("Inductor (1) (general). A device consisting of one or more associated windings, with or without a magnetic core, for introducing inductance into an electric circuit."). Fairchild's expert, Dr. Jonathan Wood, agrees that inductors store and deliver energy through "one or more windings" on a core. *See* Elman Decl., Exh. 2, Wood Report, ¶ 2 (". . . it is evident that an inductor can accept energy, that an inductor stores energy in the form of a current, and that an inductor can deliver energy into another device. This energy-storage capability of an inductor exists when only one conductor is wound around a magnetic core, and it clearly continues to exist even if a second conductor is wound around the core."); ¶ 3 (". . . the essence of an inductor is the ability of the inductor to store and deliver energy. This essence is not removed by the addition of another winding to the device. In other

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

words, when an inductor is made by wrapping a winding around a magnetic core, it self-evidently is still an inductor when a second winding is wrapped around the core.").

Fairchild's construction is consistent with well-established case law, intrinsic evidence that does not limit this claim language, and extrinsic evidence that "inductor" means "one or more windings." The Court should adopt Fairchild's construction.

**B.** **"alternately charging an inductor with a current and discharging the inductor into a storage device"**

| Disputed Term in Context | Fairchild Construction | Power Integrations Construction |
|---|---|---|
| drawing power from an input source including <u>alternately charging an inductor with a current and discharging the inductor into a storage device</u> for forming a voltage | charging one or more windings on a core and discharging one or more windings on a core into a storage device | charging an inductor by applying a voltage across it and discharging the same inductor so that current flows from the inductor into a storage device such as a capacitor |

Much of the Court's construction of this term will depend on the construction of "an inductor," above. If Fairchild's construction of "an inductor" is adopted, the plain meaning of the terms "alternately charging" and "discharging" should also be adopted. Power Integrations again misconstrues "an inductor" by seeking to limit "an inductor" to a single inductor with a single winding by seeking to limit this claim term to the "discharging the same inductor." This is wrong because the '977 patent claims "an inductor," which means "one or more." *See supra*, at 4-5. Claim 6 can include one or more inductors (each containing one or more windings). *Id*.

Power Integrations' proposed construction goes further astray when it adds the limitation "such as a capacitor" to the term "a storage device" since nothing in the patent requires that a storage device be anything other than a storage device and provides no support for limiting the claimed storage device to a capacitor. Power Integrations' improper attempt to import the "capacitor" into the claims underscores the correctness of Fairchild's straightforward proposed construction. *Phillips*, 415 F.3d at 1323 (". . . although the specification often describes very

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").

### C. "error signal representative difference"

| Disputed Term in Context | Fairchild Construction | Power Integrations Construction |
|---|---|---|
| forming an <u>error signal representative difference</u> between the voltage and a desired voltage | a signal representative of a difference between the voltage and a reference voltage | A signal formed by comparing the voltage on the storage device with a desired voltage, where the signal represents how far apart those voltages are |

### 1. The Intrinsic Evidence Supports That This Claim Term Should Be Construed As "Representative Of A Difference"

Fairchild's proposed construction applies the ordinary and customary meaning of this claim term as it is used in Claim 6. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (words of a claim are generally given their "ordinary and customary meaning"); *Intel*, 2011 U.S. Dist. LEXIS 3376, at *6-*7. A person of ordinary skill in the art at the time of the invention would have understood that the applicant claimed a signal that <u>represents</u> a difference between the voltage and a desired voltage. The key word in this term is "representative," which is a commonly understood way of expressing that the signal is not limited to <u>the</u> difference between two signals, but may be representative of such a difference.

The specification explains in the background section of the '977 patent that electronic circuits first measure the level of electric current (voltage), <u>compare</u> it with a desired level, and <u>then</u> develop a response to that measurement to achieve the desired level. *See* Elman Decl., Exh. 1, at 1:15-20 ("For switching mode power converters the output voltage is controlled by an electronic circuit which measures a level of electric current within the circuit, compares that measured level to a predetermined desired level, and develops a response to that measurement elsewhere in the circuit in order to more accurately achieve the desired level."). The '977 patent's "response" to that measurement is the claimed error signal, which in Claim 6 is <u>representative</u> of a difference between the voltage and the desired voltage.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

The specification explains how that "response" – the error signal - is developed "in the switching mode power converter of the present invention." *See id.*, at 5:35-36. A portion of the voltage is input into the error amplifier. *See id.*, at 5:36-38 (". . . a portion of the voltage across the load device RL is measured by the potentiometer PT1 and input into the error amplifier 10."). The error amplifier then compares the voltage to a reference (desired) level. *See id.*, at 5:38-39 ("The error amplifier 10 then compares the voltage output from the potentiometer PT1 with the reference voltage REF . . . ."). The error signal is then developed when the error amplifier takes the difference between the voltage and the reference voltage and multiplies it by the gain of the error amplifier. *See id.*, at 5:40-41 ("The error amplifier 10 . . . will output the difference between the two inputs [voltage and reference voltage] multiplied by the gain of the error amplifier 10.").

This output is referred to in the specification as VEAO (voltage of the error amplifier output), and is what the applicant intended by an "error signal representative of a difference." *See id.*, at 5:42-43 (referring to the output of the error amplifier as "VEAO"). The specification explains that the error signal – VEAO – is compared to the "modulating ramp reference signal" and to the "light load threshold level." *See id.*, at 5:42-44. This disclosure confirms that the VEAO is the "error signal" of Claim 6 because the "error signal" in Claim 6 is compared to the "ramp signal" in step (e) and also compared to the "light load threshold level" in steps (f) and (g), same as in the specification. *See id.*, at 8:23-38. Thus, the specification explains that the "error signal representative of a difference" (VEAO) is formed by taking the difference between the voltage and a reference voltage and multiplying it by the gain of the error amplifier. The error signal is therefore representative of a difference, but is not just "the difference" between the voltage and a desired voltage.

> 2. **Power Integrations Incorrectly Limits The Error Signal to A Comparison Used in the Prior Art**

The "background" section of the '977 specification explains that switching mode power converters, such as the device in the '977 patent, compare the voltage VEA to the reference voltage REF. *See id.*, at 1:65 – 2:2 ("A predetermined fraction of that [output] voltage is measured from the potentiometer PT1 forming the voltage VEA which is input into the negative

terminal of the voltage error amplifier 10 and is compared to the reference voltage REF."). This comparison "determines how close the actual output voltage VOUT is to the desired output voltage." *See id.*, at 2:3-4. Power Integrations contends that this comparison forms the "error signal" from Claim 6. *See* Dkt. 104, Exh. B, at 4 (claiming that the error signal "represents how far apart" the voltage is from the desired voltage). This is misleading. This "background" comparison does not form the error signal, and makes no reference to forming the "VEAO," which is the error signal in Claim 6.

        3.      **Fairchild's Construction Should Be Adopted In Light of the Necessary Correction of a Typographical Error Which Omitted the Words "of a"**

A typographical error in Claim 6 caused the omission of the words "of a" from this claim term ("error signal representative [of a] difference"). *See* Elman Decl., Exh. 1, at 8:23-24. Fairchild's construction including an error signal representative "of a difference" correctly reflects the applicant's consistent usage in the prosecution history. *See* Elman Decl., Exh. 4 (prosecution history of '977 parent application), at 51 (page 5 of 10/11/96 response to Office Action amending Claim (formerly Claim 15) to read "forming an error signal representative of a difference between the voltage and a desired voltage."; *id.*, at 75 (page 3 of 2/24/97 response to Office Action stating that the claim term is "forming an error signal representative of a difference between the voltage and a desired voltage."). The issued patent omitted the "of a" language, and this apparently went unnoticed by both the Patent Office and the applicant when the patent issued. *See* Elman Decl., Exh. 1, at 8:23-38. Element (c) of Claim 1, however, does contain the correct "of a" language that was intended in this claim term in Claim 6. *See id.*, at 7:32-35. This error can, and should be, corrected by the Court. *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005).

Power Integrations' contention that the error signal is only "how far apart" the voltage is from the desired voltage misconstrues the typographical error to be "the difference." The error signal VEAO is not described in the intrinsic record as being limited to "the difference" between the voltage and a desired voltage, and is instead a "response" developed by using the difference of two inputs (voltage and reference voltage) multiplied by another factor (the gain). *See* Elman

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

Decl., Exh. 1, at 5:35-44.  The Court should adopt Fairchild's claim construction, which is consistent with the "error signal" disclosed in the present invention and which properly corrects the typographical error in the claim term.

### D.  "monitoring the voltage and the error signal"

| Disputed Term in Context | Fairchild Construction | Power Integrations Construction |
|---|---|---|
| monitoring the voltage and the error signal | plain and ordinary meaning<br><br>alternatively, in the event the Court wants to construe this term, Fairchild proposes:<br><br>"assessing the voltage and the [signal representative of a difference between the voltage and a reference voltage]" | independently measuring both the voltage on the storage device and the error signal |

### 1.  The Intrinsic Evidence Supports Fairchild's Ordinary Meaning Construction of the "Monitoring" Step

The interpretation of this claim involves little more than the application of the widely accepted meaning of these seven commonly understood words.  *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such case involves little more than the application of the widely accepted meaning of commonly understood words.").  There is a single act of "monitoring" in step 6(d).  *See* Elman Decl., Exh. 1, at 8:27.

The '977 specification discloses a switching mode power converter that performs the monitoring step as in step (d) of Claim 6, and distinguishes step (d)'s monitoring from other steps.  *See id.*, at 6:23-26 ("The logical AND gate 54 monitors the operation of the switching mode power converter <u>and</u> determines when the load device is in a light load period <u>and</u> when the triggering pulse voltage VSW1 should be disabled.") (emphasis added); *see also* 3:62-65 (". . . the switching mode power converter of the present invention monitors the level of power being supplied to the load device <u>and</u> will disable the switch . . . .") (emphasis added); 4:40-44 ("The switching mode power converter illustrated in FIG. 5 is identical to the circuit illustrated in FIG.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1 except for the addition of a light load monitoring <u>and</u> triggering pulse disabling logic circuitry.") (emphasis added).  The language of the specification confirms that the monitoring step is only monitoring, and is distinct from "determining", "disabling" and other steps. Monitoring is a commonly understood word with a widely accepted meaning, and Fairchild requests that the Court adopt an ordinary and customary meaning of this term.

If the Court determines that a construction not using the word "monitoring" is appropriate, Fairchild proposes that the synonym "assessing" from an art-specific dictionary be used instead of monitoring.  *See* Elman Decl., Exh. 5 (The Wiley Electrical and Electronics Engineering Dictionary) ("monitor . . . 3. A device or instrument which is utilized to sample, measure, assess, regulate, observe, or control a process or system.").  This alternative construction is also proper because the switching mode power converter passively assesses the voltage and error signal before other steps occur (such as determining, disabling, or triggering).

## 2. The Court Should Reject Power Integrations' Attempt to Inject Four Separate Limitations Into This Claim Term

Power Integrations' construction would introduce four separate additional limitations into this straightforward seven word term – (1) independently, (2) measuring, (3) both, and (4) the storage device.  None of these limitations is required by the claims of the '977 patent – "independent" and "measuring" are not even mentioned in the patent -- and all of them should be rejected.  *See Phillips*, 415 F.3d at 1312 ("if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . , we should never know where to stop") (citations omitted) (ellipses in original).

First, nothing in this claim element requires or contemplates "independent" monitoring (or "measuring") of (1) voltage and (2) error signal.  The specification discusses only one monitoring step.  *See, e.g.*, Elman Decl., Exh. 1, at 3:62-65 (". . . the switching mode power converter of the present invention monitors the level of power being supplied to the load device . . . .").  Second, Claim 6 does not require or contemplate "measuring."  Measuring requires a quantitative analysis of the voltage and error signal.  There is no measure of the output of the voltage or the error signal associated with the monitoring step, just the monitoring itself (which is why this term has

an ordinary and customary meaning). *See e.g.*, *id.*, at 6:23-26 ("The logical AND gate 54 monitors the operation of the switching mode power converter . . . ."). Third, contrary to Power Integrations' proposed construction, Claim 6 does not require that the voltage and error signal are "both" independently measured. In fact, Power Integrations' argument that "both" need to be "measured" cannot be correct because the voltage need not reach a certain level to re-enable step of drawing the power if the error signal reaches a certain level (and vice versa). *See id.*, at 8:31-38 (steps (f) and (g)). That is, either signal reaching a certain level will re-enable the step of drawing power. Lastly, Power Integrations' proposed construction attempts to rewrite the claim so that the voltage is being "independently measured on the storage device," but the patent does not disclose, much less require, that the voltage being monitored is "on the storage device." *See id.*, at 8:27. If anything, the voltage is disclosed in the specification as being "across a capacitor", not "on the storage device." *See id.*, at 6:23-26. In any event, the claim language does not require that voltage is measured "on the storage device."

Fairchild's construction should be adopted because it comports with the ordinary and customary meaning of this seven-word claim term as opposed to Power Integrations' attempt to improperly import four unsupported limitations.

**E.** **"comparing the error signal to a ramp signal for controlling a duty cycle"**

| Disputed Term in Context | Fairchild Construction | Power Integrations Construction |
|---|---|---|
| comparing the error signal to a ramp signal for controlling a duty cycle for alternately charging the inductor and discharging the inductor | comparing the [signal representative of a difference between the voltage and a reference voltage] to a signal for which a portion of each cycle is increasing for controlling switching | using a comparison between the error signal and a ramp signal to implement pulse width modulation of the switching signal in order to regulate the output, wherein "a ramp signal" means a signal that increases over time from a low to a high level (or decreases from a high to a low level) in a repeating fashion, and expressly excludes a signal that represents the current in a power switch |

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1.    **Fairchild's Straightforward Construction Is Supported by the Intrinsic Evidence**

The plain meaning of this term is comparing one thing (the error signal) to another thing (a ramp signal) for "controlling a duty cycle." Fairchild previously proposed that the Court construe "error signal" as a signal representative of a difference between the voltage and a reference voltage, *supra*. Fairchild now proposes that the Court construe "a ramp signal" and "controlling a duty cycle" with an ordinary and customary meaning consistent with the claim language. Power Integrations, on the other hand, proposes a 70-word construction which imports steps requiring "using", "implementing pulse width modulation", and "regulat[ing]", and which imports two further limitations into the definition of "ramp signal" – "in a repeating fashion" and "exclude[ing] a signal that represents the current in a power switch." Power Integrations' 70-word construction should be rejected because it improperly seeks to rewrite clear claim language by importing numerous limitations not found in the claim and not supported by the intrinsic record. *Phillips*, 415 F.3d at 1312.

a.    **Fairchild's Construction of Ramp Signal**

Fairchild's proposed construction of "ramp signal" is "a signal for which a portion of each cycle is increasing for controlling switching." This is supported by the commonly understood meaning of "ramp," such as a ramp for walking up an incline or something which is increasing ("ramping up"). *See* Elman Decl., Exh. 1, at Fig. 2 (showing a "ramp"). The '977 specification discloses that "[w]hen the switch SW1 is on, the inductor current IL will ramp up." *See id*., at 2:40-41. The ramp "reaches" a certain voltage when the switch is "on" during each cycle. *See id*., at 2:43-44 ("The effective duty cycle of the trailing edge modulation is determined during the on time of the switch."); 2:34-35 (ramp "reaches" a certain voltage). Thus, Fairchild's ordinary and customary meaning of a ramp signal is "a signal for which a portion of each cycle is increasing" because a ramp signal goes "up" when the switch is "on" during each cycle.

b.    **Fairchild's Construction of Controlling a Duty Cycle**

The construction of "controlling a duty cycle" as "controlling switching" is based on an ordinary and customary meaning of the words "controlling" and "duty cycle." *Vitronics*, 90 F.3d

at 1582; *Intel,* 2011 U.S. Dist. LEXIS 3376, at \*6-\*7. Power Integrations agrees that the prosecution history, which a person of skill in the art would read as part of the intrinsic evidence, defines "controlling a duty cycle" as "controlling switching." *See* Dkt. 104, Exh. B, at 18 ("Per prosecution history: 'controlling a duty cycle' means 'controlling switching'"). The specification discloses that the "on time of the switch" determines the "effective duty cycle." *See* Elman Decl., Exh. 1, at 2:43-46. Thus, the switching controls the duty cycle and vice versa. The specification defines the relationship between "duty cycle" and "switch" by using the phrase the "duty cycle of the switch," further confirming that a person of ordinary skill in the art would understand that controlling the duty cycle is controlling switching. *See id.*, at 2:43-62: 5:67-6:3. Thus, controlling a duty cycle should be construed as "controlling switching."

    2. **Power Integrations' Tortured Construction Should Be Rejected**

        a. **Ramp Signal**

The parties agree that a "ramp signal" is a signal that increases. Fairchild's construction proposes an ordinary and customary meaning of this simple claim term. Power Integrations' proposed construction of "a ramp signal" is a whopping 39 words – "a signal that increases over time from a low to a high level (or decreases from a high to a low level) in a repeating fashion, and expressly excludes a signal that represents the current in a power switch." There is no support for this lengthy construction with its imported limitations. *Phillips*, 415 F.3d at 1312.

The doctrine of claim differentiation also contradicts Power Integrations' proposed limitation of a ramp signal to one that increases or decreases in a "repeating fashion." Claim 6 uses the term "ramp signal," while Claim 1 uses the narrower term "periodic ramp signal." *Compare* Elman Decl., Exh. 1, at 8:28 (Claim 6) *with* Exh. 1., at 7:36-37 (Claim 1). The use of "periodic" in Claim 1 supports the inference that the applicant intended a different meaning in Claim 6. *See Mycogen Plant Sci., Inc. v. Monsanto Co.*, 243 F.3d 1316, 1329 (Fed. Cir. 2001) ("Under the doctrine of claim differentiation, 'there is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims'.") (citations omitted). Simply put, the use of "periodic" in Claim 1 means that the applicant did not intend the ramp signal in Claim 6 to be limited to a repeating signal.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    Power Integrations' attempted reliance on the prosecution history to assert that a ramp

2    signal excludes "a signal that represents the current in a power switch" is also misplaced, as it

3    relies upon a misreading of the prosecution history. A prosecution history may only limit the

4    scope of the claims where there is "clear disavowal" of claim scope that narrows the scope of the

5    claims. *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004) (citation

6    omitted). A "clear disavowal" arises when a patentee distinguishes a piece of prior art by clearly

7    amending the scope and language of a claim in reaction to a Patent Office rejection, excluding the

8    features of the prior art found in the claim. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 978-

9    79 (Fed. Cir. 1999). Here, the '977 applicant did not unambiguously disavow that the claimed

10   ramp signal could not be a signal that represents the current. Power Integrations cites the '977

11   applicant's responses to overcome three prior art references where the applicant distinguished the

12   <u>comparison</u> of an error signal to a ramp signal in now-Claim 6 from the prior art <u>comparison</u>.

13       More specifically, the applicant distinguished over the Pace et al. reference by

14   distinguishing the entire Claim 6 (original Claim 15). *See* Elman Decl., Exh. 4, at 79 (page 7 of

15   2/24/97 response to Office Action) ("As explained above, claim 15 recites forming an error signal

16   which is a difference between the output voltage and a desired output voltage; and comparing the

17   error signal to a ramp signal for controlling switching. In contrast, and also, as explained above,

18   Pace et al. control switching based upon a level of current through the transistor 50."). Thus, the

19   applicant said that A (forming an error signal) + B (error signal is representative) + C (error

20   signal) compared to D (ramp signal) is different from Pace's switching based upon a current

21   level. The applicant never unambiguously excluded Pace's switching from the ramp signal in

22   now-Claim 6. *See, e.g.*, *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1361 (Fed. Cir.

23   2008) ("The Guiochon declaration may, therefore, be a clear and unmistakable disavowal of the

24   particular particles used in Afeyan, but it is not a disavowal of all polymeric particles.").

25       The '977 applicant distinguished over the Hall et al. comparison by showing that "Hall et

26   al. disclose that the error signal (54) is mixed by a multiplier (18) with a signal representative of

27   the input current (53) and compares (19) the product to a signal representative of the switch

28   current (57) for controlling switching." *See* Elman Decl., Exh. 4, at 57 (page 11 of 10/11/96

response to Office Action). In other words, the applicant stated that, in Hall et al., A (error signal) is mixed by a multiplier with B (signal representative of input current) and then compares (A x B) with a signal representative of the switch current (C). The applicant therefore stated that Hall et al. compared A x B to C, unlike now-Claim 6's comparison. This statement was not an unambiguous exclusion of a signal representative of a switch current (C) from Claim 6's ramp signal. *Elkay*, 192 F.3d at 978-79.

Lastly, Power Integrations cites the applicant's statement distinguishing Claim 6 (original Claim 15) over the Henze reference. *See* Elman Decl., Exh. 4, at 76 (page 4 of 2/24/97 response to Office Action) ("Thus, rather than comparing an error signal to a ramp signal to control switching, as recited in claim 15 of the present application, Henze compares a digitally sampled and integrated error signal to a signal representative of the A.C. line voltage to control switching."). Here, the items being compared in Henze - a "digitally sampled and integrated error signal" to a "signal representative of the A.C. line voltage" - is not the same as now-Claim 6, as would be required for a disavowal. *Elkay*, 192 F.3d at 978-79. For Power Integrations' argument to be correct, the applicant would have had to unambiguously exclude a "signal representative of a switch current," which the applicant did not do.

### b. Controlling a Duty Cycle

The Court should reject Power Integrations' attempt to construe "controlling a duty cycle" as "using a comparison between the error signal and a ramp signal to implement pulse width modulation of the switching signal in order to regulate the output." Perhaps the most obvious flaw in Power Integrations' proposed construction is the attempt to import "implement[ing] pulse width modulation" into Claim 6. There is simply no support in the intrinsic evidence for the inclusion of the general technique of pulse width modulation, and the specification certainly does not provide any reason that would require the importation of this limitation. *Specialty Composites*, 845 F.2d at 987. Specifically, pulse width modulation is disclosed in the "background" section as "conventional" (col. 2:5), and a general technique to maintain a constant output voltage (col. 1:55-57). *See* Elman Decl., Exh. 1, at 1:55-2:5. The comparison in Claim 6 for "controlling a duty cycle," however, is specific and no mention is made in the claim term or

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

the invention section of the specification of the technique of pulse width modulation. *See id.*, at

2:43-57. The disclosure in column 2 may or may not fall within the technique of pulse width

modulation, but Claim 6 does not require "implement[ing]" that prior art technique and should

not be so construed. *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1343-44 (Fed.

Cir. 2005) (" . . . it would be peculiar for the claims to cover prior art that suffers from precisely

the same problems that the specification focuses on solving.").

Lastly, Claim 6 claims "controlling a duty cycle for alternately charging the inductor and

discharging the inductor." Elman Decl., Exh. 1, at 8:28-30. Power Integrations' construction

argues for an additional limitation requiring that pulse width modulation be used to "regulate the

output." This proposal contradicts the express wording of Claim 6 and should not be accepted.

*See id.* The ultimate result of the claimed steps may or may not be to "regulate the output," but

the claims do not require the additional step of "regulation" or "regulating" as Power Integrations

contends. *See id.* The Court should reject Power Integrations' repeated attempts to import the

limitations of the prior art pulse width modulation techniques and the results into this claim term.

**F. "a light load threshold level**

| Disputed Term in Context | Fairchild Construction | Power Integrations Construction |
|---|---|---|
| disabling the step of drawing power from the input source when the error signal falls below a light load threshold level and the voltage stored by the storage device exceeds a high threshold level | a level below which a light load exists[3] | a reference level to which the error signal is compared to determine the presence or absence of a light load condition |

1.     **The Intrinsic Evidence Supports Fairchild's Construction**

Fairchild's proposed construction aligns perfectly with the claim language. *Ariad*

*Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347 (Fed. Cir. 2010) (en banc) ("Claims define

and circumscribe, the written description discloses and teaches."). Claim element 6(f) uses the

term a "light load threshold level" for disabling the step of drawing power occurs when a light

---

[3] Fairchild amended its construction from its prior submission to the Court to resolve any confusion regarding what the "level" is in this claim term. The light load exists below the "threshold level."

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

load exists. *See* Elman Decl., Exh. 1, at 8:32-33 ("f. disabling the step of drawing power from the input source when the error signal falls below a light load threshold level . . . ."). Consistent with the ordinary and customary meaning of the words used (light, load, threshold and level), Fairchild construes a light load threshold level to be a "level below which a light load exists."

The '977 specification teaches that the step of drawing power is disabled when the power falls below the "light load threshold level," and the step of drawing power is re-enabled once it rises above the "light load threshold level." *See* Elman Decl., Exh. 1, at Abstract; 3:18-29 ("When the power being supplied to the load falls to a predetermined light load threshold level . . . the switching mode power converter will reduce the amount of power being drawn from the input source by disabling the triggering pulse . . . the triggering pulse is re-enabled once the power being supplied to the load device rises above the light load threshold level . . . ."). Thus, the claim term defines what that "level" is, and Fairchild has construed it using an ordinary and customary meaning based on the intrinsic evidence as "a level below which a light load exists."

### 2. Power Integrations' Attempt to Insert At Least Three Unsupported Limitations Into this Element Should Be Rejected

Power Integrations agrees that the "threshold level" is a level. Power Integrations, however, imports at least three limitations into its proposed construction of this claim term, including both a "compar[ing]" and a "determin[ing]" step as well as requiring that the claimed "threshold level" also be a "reference level." None of these limitations are supported or required by the language of the claims or the intrinsic evidence. In fact, nowhere in Claim 6 or the disclosures in the specification discussing this level do the words "comparing", "determining", or "reference" occur. *See Phillips*, 415 F.3d at 1312 ("if we once begin to include elements not mentioned in the claim, in order to limit such claim . . . , we should never know where to stop") (citations omitted) (ellipses in original). The term is a "level," nothing more.

First, "light load threshold level" does not require "comparing." *See* Elman Decl., Exh. 1, at 8:31-34. While the disclosed invention may use the "light load threshold level" for some purpose (see steps (f) and (g) at 8:31-38), the claimed level itself does not perform that function and a construction of "light load threshold" including a comparison or some other function would

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

contradict the plain meaning of the claim language.  *See id.*, at 8:31-34.  Second, the "light load threshold level" does not "determine" the presence or absence of a light load condition.  *See id.*  Power Integrations is not proposing a construction of "light load threshold level," but rather creating a new element that requires steps or actions that use a "light load threshold level."  If the steps or functions that Power Integrations claims should be imported into this term are elsewhere claimed in Claim 6, Power Integrations should have sought construction of those terms.  If they are not, then importing them into the claims is not proper.  *See SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1331 (Fed. Cir. 2010) ("There exists no method step in any of the disputed claims that requires 'enabling' or 'activating' the devices that perform these claim limitations. Nor is there a step which requires 'downloading' the data into the GPS receiver. Appellants, in essence, ask us to read such limitations into the claims. We decline to do so.").  Lastly, Power Integrations' seeks to limit the "light load threshold level" to a "reference level," which has no support in the claims or the specification.  Rather, Power Integrations limits the claimed levels to specific reference levels to support a non-infringement argument that the accused products lack a "reference" level.  This litigation-induced construction should be rejected because it again improperly attempts to rewrite the clear meaning of Claim 6 and is not required by the intrinsic record.

Power Integrations may point to the phrase a "predetermined light load threshold level" in the summary of the invention in column 3:18 or 4:28-29 to argue that the claimed level must be a "reference."  *See* Elman Decl., Exh. 1, at 3:18 – 4:29.  Claim 6, however, does not claim a "predetermined light load threshold level," it claims a "light load threshold level."  *See id.*, at 8:31-34.  This militates against a construction that limits the claimed level to a predetermined or reference level because doing so would import into the claims a limitation from the specification, which was plainly omitted from the claims.  *Specialty Composites*, 845 F.2d at 987.  Moreover, when the applicant wanted to refer to a level as a "reference level," it did so.  *See, e.g.*, Elman Decl., Exh. 1, at 2:55 (referring to "expected reference level" for an error amplifier).

In comparison with Power Integrations' effort to modify and rewrite the plain claim language, Fairchild proposes a construction that is consistent with the intrinsic evidence and is an ordinary and customary meaning of this term.

## G.  "a high threshold level"/ "a low threshold level"

| Disputed Terms in Context | Fairchild Construction | Power Integrations Construction |
|---|---|---|
| disabling the step of drawing power from the input source when the error signal falls below a light load threshold level and the voltage stored by the storage device exceeds <u>a high threshold level</u> / re-enabling the step of drawing power from the input source when either the error signal rises above the light load threshold level or the voltage stored by the storage device falls below <u>a low threshold level</u> | a level higher than a low threshold level / a level lower than a high threshold level | a reference level that is higher than the level of the low threshold level / a reference level that is lower than the level of the high threshold level |

While some question exists regarding the necessity to construe this phrase, the parties appear to be mostly in agreement as to the proper construction. Both parties agree that "a high threshold level" is "higher than" a "low threshold level." Both parties also agree that "a low threshold level" is "lower than" a "high threshold level." Like the above constructions, Fairchild's construction reflecting these agreements is an ordinary and customary reading of the claims. *Vitronics*, 90 F.3d at 1582; *Intel,* 2011 U.S. Dist. LEXIS 3376, at *6-*7.

The parties dispute two aspects of this element. First, Power Integrations insists on importing into the element the requirement that the high or low "threshold" level is not just a level but also a "reference" level. Second, Power Integrations construes the terms as "<u>the</u> low threshold level" and "<u>the</u> high threshold level" despite the claim language "<u>a</u> low threshold level" and "<u>a</u> high threshold level" and despite the fact that there is no antecedent basis for "<u>the</u> low" or "<u>the</u> high" threshold level. Both disputes exist for the same infringement-induced reason: Power Integrations wishes to impermissibly limit the claimed levels to specific reference levels, rather than to "a" low or high threshold level as explicitly claimed.

Claim 6 is not limited to a high or low "reference" level; there are no such limits on the "high" and "low" thresholds in Claim 6. *See* Elman Decl., Exh. 1, at 8:31-38. The two claimed

- 20 -

1   high and low "levels" refer to each other; one being higher than the other. *Id*. In the '977

2   specification, the step of drawing power is disabled when the voltage exceeds a high threshold

3   level (and when the error signal falls below a light load threshold level). *See, e.g.*, *id.*, at 3:12-23.

4   This high threshold level is not limited in the patent. The same is true for the low threshold level,

5   as the step of drawing power is re-enabled when the voltage falls below a low threshold level (or

6   the error signal rises above the light load threshold level). *See, e.g.*, *id.*, at 3:26-29. A person of

7   ordinary skill in the art would also understand that the applicant made clear during prosecution

8   that a low threshold is simply "lower than the high threshold." *See* Elman Decl., Exh. 4, at 57

9   (page 11 of 10/11/96 response to Office Action) ("Therefore, unlike claims 1 and 15 [claim 6], as

10  now amended, Hall et al. do not disclose, nor suggest, that after disabling switching, the output

11  voltage must fall <u>below a low threshold that is lower than the high threshold</u> before 'switching

12  can be re-enabled'.") (emphasis added). Power Integrations has cited no language in the patent

13  that supports limiting these threshold levels to a "reference level," and its construction should be

14  rejected. *See* Dkt. 104, Exh. B, at 21-24, 29-33.

15      Power Integrations also incorrectly urges the Court to construe these terms as "<u>the</u> low

16  threshold level" and "<u>the</u> high threshold level." The claim language is "<u>a</u> low threshold level"

17  and "<u>a</u> high threshold level." It is axiomatic that claim language defines the scope of a term.

18  *Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent

19  define the invention to which the patentee is entitled the right to exclude.'"). There is no

20  antecedent basis in Claim 6 for construing "a low threshold level" and "a high threshold level" to

21  require "the" instead of "a" before low/high threshold level. *See* Elman Decl., Exh. 1, at 8:16-38.

22      Power Integrations also cites various sections of the prosecution history and extrinsic

23  evidence (such as Wikipedia) to argue that these terms relate to something called "hysteresis."

24  *See* Dkt. 104, Exh. B, at 21-24, 29-33. The word "hysteresis" is not in Claim 6, nor is it disclosed

25  in the specification. *See* Elman Decl., Exh. 1. Power Integrations' citations to statements from

26  Wikipedia and other sources for the understanding of one of skill in the art in 1995 about a term

27  not included in the claim or in either parties' construction of that term should be disregarded. *See*

28  *MySpace, Inc. v. GraphOn Corp.*, Case No. C-10-0604 EDL, 2010 U.S. Dist. LEXIS 124205, at

1  *28 (N.D. Cal. Nov. 23, 2010) (Wikipedia "does not address the meaning of the claims of the

2  patents from the viewpoint of a person skilled in the art as of 1995").

3      The parties largely agree on the plain meaning of this term but the Court should reject

4  Power Integrations' attempts to insert a "reference level" into the claim language and to change

5  the claim language from "a" to "the."  Instead, the Court should be guided by the ordinary and

6  customary meaning of "high" and "low," and should adopt Fairchild's straightforward proposed

7  constructions that a high threshold level is higher than a low threshold level, and a low threshold

8  level is lower than a high threshold level.

9  **H.**    **"disabling the step of drawing power from the input source when the error
          signal falls below a light load threshold level and the voltage stored by the**
10         **storage device exceeds a high threshold level" / "re-enabling the step of**
           **drawing power from the input source when either the error signal rises above**
11         **the light load threshold level or the voltage stored by the storage device falls**
           **below a low threshold level"**

12

| Disputed Term in Context | Fairchild Construction | Power Integrations Construction |
| --- | --- | --- |
| disabling the step of drawing power from the input source when the error signal falls below a light load threshold level and the voltage stored by the storage device exceeds a high threshold level / re-enabling the step of drawing power from the input source when either the error signal rises above the light load threshold level or the voltage stored by the storage device falls below a low threshold level | plain meaning of previously construed terms

alternatively, to the extent the Court wishes to construe this term, Fairchild proposes:

"turning off switching when the [signal representative of a difference between the voltage and a reference voltage] falls below a [load level lower than a heavy load] and the voltage stored by the storage device exceeds a [level higher than a low threshold level]" / "turning on switching when either the [signal representative of a difference between the voltage and a reference voltage] rises above the [load level lower than a heavy load] or the voltage stored by the storage | determining if the error signal falls below the light load threshold and also determining if the voltage stored by the storage device exceeds the high threshold level, and preventing switching only when both conditions are met at the same time / determining if the error signal is above the light load threshold and also determining if the voltage stored by the storage device falls below a low threshold level, and re-enabling switching when either condition is met |

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

| | device falls below a [level lower than a high threshold level]" | |
|---|---|---|

### 1. The Intrinsic Evidence and Other Construed Terms Support Fairchild's Construction

Fairchild seeks an ordinary and customary meaning construction of these two steps (disabling/re-enabling) which uses the previously construed terms, including "error signal [representative difference]", "light load threshold level" and "high/low threshold level." These two steps use many of the previously construed terms to perform the steps of disabling and re-enabling the step of drawing power. *See* Elman Decl., Exh. 1, at 8:17-38. Fairchild alternatively proposes that the disabling step can be construed as "turning off" and that re-enabling be construed as "turning on." *See* Dkt. 104, Exh. B, at 25, 33.

#### a. "Disabling" Step

Fairchild proposes that disabling the step of drawing power (step f) means that the drawing of power is disabled (or turned off) when (1) the error signal falls below the light load threshold level and (2) the voltage exceeds a high threshold level. A plain reading of Claim 6 reveals that the drawing of power is disabled if both conditions are met. *See* Elman Decl., Exh. 1, at 8:31-34. This step is also confirmed in the specification, which explains that the "triggering pulse voltage VSW1 is disabled for a number of clock pulses" when the following "conditions are true": "the output of the logical AND gate 54 is at a logical high voltage level" and the "output VEAO of the error amplifier 10 is below the light load threshold level." *See* Elman Decl., Exh. 1, at 6:23-41. In other words, the drawing of power is turned off when both the AND gate 54 is above a high voltage level and the error signal is below the light load threshold level.

#### b. "Re-Enabling Step"

Fairchild proposes that re-enabling the step of drawing power (step g) means that the drawing of power is re-enabled (or turned on) when (1) the error signal rises above the light load threshold level or (2) the voltage falls below a low threshold level. A plain reading of Claim 6 reveals that the drawing of power is re-enabled if either one of these two conditions are met. *See*

Elman Decl., Exh. 1, at 8:35-38.  The plain claim language is also confirmed by the specification, which explains that the drawing of power is re-enabled "at the trailing edge of the next clock pulse after either the voltage across the capacitor C1 falls below the low capacitor threshold voltage or the output VEAO of the error amplifier 10 rises above the light load threshold value." *See id.*, at 6:57-61.  In other words, the drawing of power is turned on when either the voltage is below the low voltage level OR the error signal is above the light load threshold level.

2.   **Power Integrations' Attempt to Import Numerous Limitations Should Be Rejected**

Power Integrations imports limitations beyond ordinary and customary meaning of the words disabling and re-enabling.  Although the claim discloses no such limitation, Power Integrations contends that two separate "determinations" are performed before the drawing of power is disabled, and another two separate "determinations" before the drawing of power is re-enabled.  *See* Dkt. 104, Exh. B, 25-29, 33-37.  In so doing, Power Integrations imports limitations in the form of additional unclaimed steps of "determining."  Common understood usage of "disabling" and "re-enabling," not to mention the plain language of the patent itself, compels rejection of this proposal because no "determining" is required in these steps.  Claim 6 does not require a "determination," only disabling and re-enabling.  *See* Elman Decl., Exh. 1, at 8:35-38.  A method for disabling and re-enabling is disclosed in columns 6-7 of the patent, but never requires that any "determining" occur.  *See id.*, at 6:23-7:6.

Even if a "determination" was required as part of the steps (and it is not), only one "determination" must occur.  The re-enabling step, as discussed above, occurs when (1) the error signal rises above the light load threshold level <u>or</u> (2) the voltage falls below a low threshold level.  Both the error signal rising and the voltage falling need not occur, as either one will re-enable the step of drawing power.  *See id.*, at 6:57-61 (the power is re-enabled "after <u>either</u> the voltage across the capacitor C1 falls below the low capacitor threshold voltage <u>or</u> the output VEAO of the error amplifier 10 rises above the light load threshold value") (emphasis added).  Power Integrations' construction <u>requiring</u> two "determinations" ("determining . . . and also determining") therefore cannot be right.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    As with the other terms in the '977 patent, Fairchild's proposed construction is based on a

2    plain reading of the claims and is confirmed by the specification.

3    **IV.    <u>CONCLUSION</u>**

4    For the above-stated reasons and those contained in the parties' Joint Claim Construction

5    Statement, Fairchild requests that the Court adopts its above constructions for the '977 Patent.

6    Dated:  February 18, 2010                    By:  /s/ Anthony de Alcuaz

7                                                 Terrence P. McMahon
                                                   Anthony de Alcuaz
8                                                 McDERMOTT WILL & EMERY LLP
                                                   275 Middlefield Road, Suite 100
9                                                 Menlo Park, CA  94025-4004
                                                   Telephone:      (650) 815-7400
10
                                                   Attorneys for Defendants
11                                                FAIRCHILD SEMICONDUCTOR
                                                   INTERNATIONAL, INC.,
12                                                FAIRCHILD SEMICONDUCTOR
                                                   CORPORATION, and
13                                                SYSTEM GENERAL CORPORATION

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I electronically filed Defendants Fairchild Semiconductor International, Inc., Fairchild Semiconductor Corporation, and System General Corporation's Opening Claim Construction Brief and Declaration of Jeremy T. Elman in support of brief with the Clerk of the Court for the United States District Court, Northern District of California, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

Dated: February 18, 2010                    /s/ Linda Rohrer
                                             Linda Rohrer

DM_US 27702201-1.060948.0021

McDermott Will & Emery LLP
Attorneys at Law
Menlo Park