Volume 1

Pages 1 – 211

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

POWER INTEGRATIONS, INC.,    )
a Delaware corporation,      )
                             )
          Plaintiff,         )
                             )
  VS.                        )        NO. C 09-05235 MMC (MEJ)
                             )
FAIRCHILD SEMICONDUCTOR      )
INTERNATIONAL, INC., a       )
Delaware corporation, et al.)
                             )
          Defendants.        )        San Francisco, California
_____)        Thursday, February 6, 2014


TRANSCRIPT OF TRIAL PROCEEDINGS

APPEARANCES:

For Plaintiff:          FISH & RICHARDSON, P.C.
                        500 Arguello Street, Suite 500
                        Redwood City, California  94063
                   BY:  FRANK SCHERKENBACH, ESQ.
                        HOWARD G. POLLACK, ESQ.
                        MICHAEL R. HEADLEY, ESQ.



Reported by:            BELLE BALL, CSR #8785, CRR, RDR
                        Official Reporter, U.S. District Court


(Appearances continued, next page)

APPEARANCES, CONTINUED:


For Defendants:          MC DERMOTT, WILL & EMERY
                         500 North Capitol Street N.W.
                         Washington, D.C.  20001
                   BY:   BLAIR M. JACOBS, ESQ.
                         ARTEM N. SOKOLOV, ESQ.
                         CHRISTINA A. ONDRICK, ESQ.
                         and
                         MC DERMOTT, WILL & EMERY
                         28 State Street
                         Boston, Massachusetts 02109
                   BY:   LEIGH J. MARTINSON, ESQ.

Also Present:            MARK GERARD, ESQ.
                         PRESIDENT at THE LITIGATION GROUP
                         Orange County, California Area

Reported by:             BELLE BALL, CSR #8785, CRR, RDR
                         Official Reporter, U.S. District Court

PROCEEDINGS

| | | |
|---|---|---|
| 09:02:27 | 1 | **THURSDAY, FEBRUARY 6, 2014**                    **9:05 A.M.** |
| | 2 | P R O C E E D I N G S |
| | 3 |         **THE CLERK:**  All rise.  This Court is now in session. |
| | 4 | The Honorable Maxine M. Chesney presiding. |
| 09:05:08 | 5 |     Please be seated. |
| | 6 |     Calling Civil Case No. 09-5235, Power Integrations versus |
| | 7 | Fairchild Semiconductor. |
| | 8 |     Will Counsel please step forward, and state your |
| | 9 | appearances for the record? |
| 09:05:26 | 10 |         **MR. SCHERKENBACH:**  Good morning, Your Honor. |
| | 11 |         **THE COURT:**  Good morning. |
| | 12 |         **MR. SCHERKENBACH:**  Frank Scherkenbach, Fish & |
| | 13 | Richardson, for Power Integrations. |
| | 14 |     I also have with me Howard Pollack, Michael Headley and |
| 09:05:33 | 15 | actually Mr. Balu Balakrishnan, who is the president and CEO |
| | 16 | of the company. |
| | 17 |         **THE COURT:**  Okay.  Good.  Thank you. |
| | 18 |     Very good.  And for Fairchild Semiconductor? |
| | 19 |         **MR. JACOBS:**  Good morning, Your Honor.  Blair Jacobs |
| 09:05:46 | 20 | from McDermott, Will & Emery.  It is good to see you.  I have |
| | 21 | Leigh Martinson with me today; Art Sokolov, also from |
| | 22 | McDermott; Christina Ondrick; and Mark Gerard. |
| | 23 |         **THE COURT:**  Thank you. |
| | 24 |         **MR. JACOBS:**  Thank you. |
| 09:06:04 | 25 |         **THE COURT:**  Okay.  Let's see.  Mr. Sokolov's first |

PROCEEDINGS

```
09:06:06   1   name is?
           2              MR. SOKOLOV:  Artem, A-R-T-E-M, Your Honor.
           3              THE COURT:  Okay.  Thank you.  All right.  Well, we
           4   have some work we might be able to do before we begin jury
09:06:18   5   selection.  I assume both sides are ready to proceed.
           6        I want to go over a few things with you just in general
           7   relating to jury selection.  But as you are aware, there are
           8   some significant legal issues that have to be resolved.  And
           9   when we resolve them, that is part of the question I have.  In
09:06:43  10   going over some of the papers you have provided me recently,
          11   some of which were somewhat perplexing, so I want to talk to
          12   you about that.
          13        But your joint preliminary statement seems fine.  And in
          14   that you have skirted the issue of the '700 patent, which is
09:06:59  15   fine, so I don't see any problem in reading the joint
          16   preliminary statement that you have given me.
          17        Then, I received -- hold on -- just paper after paper
          18   concerning the witness list, which started to really bug me.
          19        First of all, we had an independent list in the joint
09:07:30  20   statement from Power Integrations only.  Then, we had a
          21   Fairchild list, and then we had another Fairchild list.  All
          22   along you told me you were going to give me a joint list.
          23        Finally, I got something called "List of Potential
          24   Witnesses" that was filed by Power Integrations that I think
09:07:45  25   may cover all the witnesses, but I'm not sure.
```

PROCEEDINGS

09:07:50  1     And I got a little tired of trying to cross-reference a

2   non-alphabetized list. Each one of you gave me a list. They

3   weren't even in alphabetical order. So I'd sit there trying

4   to figure out:

09:08:00  5        "Is this guy on this list? Is this one on this.

6   list?"

7     I decided to give up and complain to you when you showed

8   up this morning. In the meantime, I got this, as I say, joint

9   list or list that I think may be joint because it is longer

09:08:14 10   than all the others. And that is the one that starts with

11   Mr. Balakrishnan and ends with Edmund Yuh. Or I'm not sure

12   how he pronounces it. And there are a lot of names that are

13   very similar, the names on here. And I'll do my best to just

14   pronounce them.

09:08:31 15     But is that correct? Let me ask Mr. Headley since he

16   signed this list.

17           **MR. HEADLEY:** Yes, Your Honor.

18           **THE COURT:** Fine.

19           **MR. HEADLEY:** We are going to -- that is the super

09:08:39 20   set list.

21           **THE COURT:** Okay. Then, I will essentially consider

22   it to have supplanted Fairchild's proposed witness -- or I'm

23   sorry -- Fairchild's list that was filed earlier and your list

24   and your other list, and their other list that was filed

09:08:57 25   earlier, and, the joint statement list, and use this one.

PROCEEDINGS

09:09:01  1    Okay.  So that's one.

      2        Then, I have various questions for voir dire.  And those

      3    came in with sort of sequential submissions.  At this point, I

      4    have an old set from Fairchild, a new set from Fairchild and a

09:09:25  5    set from Power Integrations.  And I assume Fairchild is

      6    relying on their new set.

      7        And I'll do whatever I'm going do with those.  Then, okay.

      8    There's -- as far as legal issues -- oh, yes.  Let me go to

      9    the joint proposed preliminary instructions for a moment.

09:09:52 10    Those turned out not to be totally joint, because you

     11    disagreed at various points with how the Court should describe

     12    the case.

     13        I'm considering not describing it, because you can do that

     14    in your opening statements, to the extent you haven't agreed.

09:10:10 15    And I haven't had a chance, because all these things kept

     16    coming in last-minute, to compare totally the dueling

     17    instruction No. 2, which has three patents in Power

     18    Integrations' proposal and four in Fairchild's.

     19        Is there any other difference in that, other than 3 and 4,

09:10:31 20    really, and the numbers?

     21            **MR. HEADLEY:**  Yes, Your Honor.  Fairchild had

     22    proposed inclusion of equitable issues in their statement.

     23            **THE COURT:**  Oh, well, I just may not use it

     24    because -- oh, I see.  Yes.  I think I noted that earlier.

09:10:54 25    It's not up to me to describe the case, argue the case or

PROCEEDINGS

09:10:57   1   otherwise.  And as far as I'm concerned I'll already have told

2   them generally what it's about, and that ought to be good

3   enough.  So in the past I've just avoided that particular

4   point by not giving that instruction.

09:11:07   5       If I have a chance, I may look at them again and see.  But

6   I have to tell you that we have been printing things out right

7   and left.  Yes, you may give us chambers copies.  By the time

8   we get them it is practically time to conduct the hearing.  So

9   I'm going to say that, because I have a feeling you folks are

09:11:25  10   going to have one or more of your various minions out there

11   working on your cases at 2:00 and 3:00 in the morning.

12       Well, I'm not going to be working at 2:00 and 3:00 in the

13   in the morning.

14       And when I get up and come here, I don't expect to be

09:11:38  15   papered with a million of papers that somebody thinks I'm

16   going to address immediately.  So unless it is really

17   something that couldn't have been done earlier, it is going to

18   be put to the side.  If you do file something during the

19   trial, the rule is going to be that you are to file -- or not

09:11:53  20   file, but submit a chambers copy essentially simultaneously.

21       Obviously, you won't be able to do that if somebody

22   E-files something at 3:00.  But they can file it first thing

23   next morning or deliver it first thing next morning, and

24   that's what you are going to have to do.

09:12:10  25       Now we have, as I say, some things that are dangling.

PROCEEDINGS

09:12:20   1    I've got still before me the motion regarding the supplemental

2    expert reports filed by Mr. Malackowski and Dr. Wood.

3        And I also have the motion for reconsideration of the '700

4    patent.  I do not have a written opposition to the motion for

09:12:40   5    reconsideration.  And I wanted to ask Mr. Scherkenbach or

6    Mr. Pollack or Mr. Headley how you intend to deal with that.

7        I'm not going to hear it this very second.  I just want to

8    find out how we are dealing with it.

9            **MR. SCHERKENBACH:**  We did file it, Your Honor --

09:12:59   10           **THE COURT:**  He is looking at his watch.

11           **MR. SCHERKENBACH:**  Well, no, just the date.  I'm

12    sorry.  It's hard to know what month it is, truthfully.  We

13    filed it February 4th, by my records, as Document -- I'm

14    sorry.  February 5th, document 460.  I have an additional

09:13:15   15    copy.

16           **THE COURT:**  Well, if you do I'm going to send my

17    chambers staff in to get it forthwith.  We don't have a

18    chambers copy.

19           **MR. SCHERKENBACH:**  I can hand up a copy as filed.

09:13:25   20           **THE COURT:**  All right.  You can hand up a copy.  I'll

21    take that.  But I would like to know why they didn't find it

22    if it has been filed.

23        (Document handed up to the Court)

24           **THE COURT:**  That certainly is entitled, and it says

09:13:34   25    "Document 460."  There's also an exhibit.  That's part of

PROCEEDINGS

09:13:37   1   this, I gather?  The exhibit that you handed me?

2       **MR. JACOBS:**  It is, it is.

3       **MR. SCHERKENBACH:**  It is, Your Honor.

4       **THE COURT:**  Okay.  I don't know why they didn't find

09:13:46   5   it.  But maybe in the welter of documents, I'll give them the

6   benefit of the doubt for the moment.

7       Okay.  Well, I am going to have to read that, because I

8   mentioned earlier -- and let me say something again:  Do not

9   submit anything that is typed on both sides.  Rules of Court.

09:14:08   10   Okay?  One side of the paper.  Not two.

11       If you have to cut down another tree, you've cut down

12   enough already, probably not all productively.  And, frankly,

13   it's not my problem at this point.  So one side.  It is not an

14   idiosyncratic rule.  It is in the civil local rules of this

09:14:29   15   district.

16       Now, the next point is that on that motion -- and I will

17   need to read your opposition, because I mentioned earlier in

18   my view it is essentially an equitable motion.  The argument

19   being made in the papers is that the amended contentions did

09:14:52   20   not change -- well, didn't add anything that was necessary to

21   the earlier contentions; that the earlier contentions

22   contained the very item that was called out as being new in

23   the amended contention that I didn't allow.

24       Now, that may be the case.  But it was not argued in the

09:15:22   25   papers at the time that the motion was briefed.  I've already

PROCEEDINGS

09:15:29   1   agreed that the order that I issued had some less than clear

2   points.  However, the bottom line was that summary judgment

3   was granted.  And summary judgment was granted for the

4   following reason:  As to the minimum on time, I thought that a

09:15:48   5   triable issue had been raised.  The lack of clarity in the

6   order was saying that triable issue was raised as to

7   infringement.  It should have just said:  "Triable issue was

8   raised as to minimum on time.  Minimum on time was in a

9   parenthetical after that, but it wasn't the best way to say it

09:16:06   10   clearly.

11       As to the amended contentions, those were pointed to the

12   sampling circuit.  And the argument in the papers had been

13   that a resistor couldn't do it, or whatever the item was that

14   was identified.  And that was the argument all the way through

09:16:26   15   the motion that was made for summary judgment.

16       There never was an argument straightforwardly made.  In

17   fact, I don't think it was ever made in any way that said the

18   following:

19           "You're wrong.  We can rely on our original

09:16:41   20   contention.  Our original contention has a sampling circuit

21   with a comparator, and this gloppity glop flip-flop thing.

22   And all of that makes up something that is a sampling

23   circuit."

24       Nobody said that.  And, in fact, just to add to it, at the

09:16:57   25   hearing on the matter it was stated:

PROCEEDINGS

09:17:00  1          "We need the amended contentions because we can't
        2   make it with what we have in our earlier contentions."
        3       That was made because we were hearing simultaneously both
        4   the motion to reconsider Magistrate Judge James's order not
09:17:15  5   allowing the amended contentions, and at the same time to
        6   address the question of the summary-judgment motion.
        7       So an argument could have easily been made that we should
        8   be allowed to amend.  But even if we can't, we can make it on
        9   our earlier ones, and that wasn't done.
09:17:36 10       So my order was really saying that if you could have used
       11   your amended contention you could have made out sampling
       12   circuit.  But you can't use it, so you have lost.
       13       Now it turns out that Fairchild is saying:
       14          "Oh, no.  We had it there all along."
09:17:50 15       And maybe you do.  It wasn't really described fully in the
       16   diagrams.  And as you know there is case law that's probably
       17   been quoted to you, or at least you have seen or you have used
       18   yourself to say:
       19          "On summary judgment the Court isn't required to just
09:18:06 20   go poring through all the documents trying to make out
       21   parties' argument and find the evidence that supports it."
       22       So we are back to what I call "inequitable argument."  In
       23   other words, that:
       24          "The evidence was there, but it wasn't pointed out to
09:18:20 25   the Court, and we're asking that you consider it now."

PROCEEDINGS

```
09:18:23    1        And my point at the time was:

            2            "I'll have to see if the equities on the other side

            3    outweigh that."

            4        So that's where we are.  There is the argument the order

09:18:33    5    threw people off.  But if it did -- and I've already said it

            6    could have been a better order -- but if it did, then it

            7    behooved whoever cared about it to come in and ask for

            8    clarification.

            9        It isn't like Judge Ware who has gone off and you are

09:18:48   10    fighting over what his claim construction means.  I'm here.

           11    Somebody could have easily have said:

           12            "Hey, what did you mean here?  Because at Point A

           13    you say this and at Point B, the end line, you say something

           14    else."

09:19:00   15        Or at least that you thought that I said something else.

           16    And I would have said:

           17            "Oh, you are right.  But here is the point."

           18        And then, we could he have taken it up then.  If we took

           19    it up then would the equities have been any different?  I

09:19:12   20    don't know because I haven't read the papers yet.  So I'll

           21    have to do that.

           22        Now, the other matter has to do with the experts.  And we

           23    may have a little time to talk about it because I think you

           24    have experienced -- I'm pleased you were all here on time.  We

09:19:32   25    have got rain, and it ties up traffic.  Particularly first
```

PROCEEDINGS

09:19:36  1    rains tend to do that.  And the jury office has gotten some

2    number of calls from jurors saying that they are going to be

3    late, and that it will be harder for them to get here on time.

4    And that may actually benefit us.

09:19:50  5        So I want to go over my quick list.  We have talked about

6    the witness lists now.  I want to take up, if I can, the

7    expert reports.  There -- apparently, someone asked Ms. Lucero

8    if they could take the exhibits away every day.

9        If you are going to be bringing these things into the

09:20:06 10    loading dock in hundreds of boxes, they can't just be running

11    in and out every day.  We did get you a witness room, which I

12    understand you have an agreement to share sequentially,

13    depending on who is putting on their case-in-chief.  And

14    Ms. Lucero went to a fair amount of effort to get that room

09:20:28 15    for you.  We actually had to fight off another court.  We

16    actually had to oust another court.  But, with some

17    cooperation.

18        So you can thank her for going to bat for you on that.

19        The -- okay.  You know, I don't think the witness list I

09:20:54 20    actually got ultimately was timely, but at least it's joint.

21    Okay.

22        Be sure to mark your chambers copies "Chambers Copies."

23    In the main, you have been doing that, but there were one or

24    two that came from one or the other of you that actually were

09:21:11 25    chambers copies, but maybe the envelope was marked, but not

PROCEEDINGS

09:21:15   1   the document.

2   So be sure the copy itself gets marked so you are getting

3   full credit.

4   I have not yet gotten a chambers copy of the recent filing

09:21:27   5   concerning deposition objections and counter designations.  We

6   are going to have to talk at some length about when those

7   witnesses are going to be presented.  There are hundreds of

8   objections and counters.  And the idea of having to go through

9   all of those is going to be really daunting.

09:21:51   10   Oh, there's a renewed motion, or at least a motion to rule

11   on the renewed motion, regarding Mr. Wei or Dr. Wei.  He's

12   Dr. Wei?  Yeah, Dr. Wei.  I did rule on it, and I brought the

13   minute order from -- well, it is here somewhere.  I have the

14   minute order, but I'm having trouble locating it.

09:22:22   15   Is this it?  Yes.

16   Item number 4 in the minute order reads as follows.  This

17   is a list of the Plaintiff's motions in limine:

18   "To preclude Dr. Wei's opinions and testimony relying

19   on testing by Fairchild Engineers, Eddie Chueh and Wei-Hsuan

09:22:40   20   Huang (and renewed motion)--denied.  On condition Dr. Wei is

21   made available for second deposition."

22   So I believe that's already been ruled on.  And so, I'm

23   going to deny the request to rule on it again as moot, and

24   also the order provided didn't have a condition on which the

09:23:09   25   denial was made, which was to make Dr. Wei available.

PROCEEDINGS

09:23:11   1   I don't know if that's been done yet, by the way.  Has it
          2   been?  It has been.
          3        **MR. SCHERKENBACH:**  He's being deposed on Friday.
          4        **THE COURT:**  Right.  Thank you.  It may be good just
09:23:22   5   at the beginning also that we have all of you state your
          6   appearances each time, just to help the reporter until she
          7   gets familiar with everyone.
          8        Okay.  Okay.  Yes.  Then, we also have the deferred part
          9   of Fairchild's Motion No. 2, Motion in Limine No. 2, regarding
09:23:46  10   in this instance the ITC findings.  And I received a motion
         11   with supplemental showing and a proposed cautionary
         12   instruction or admonition from Power Integrations.  And now
         13   I'm trying to find that, also.  Not sure what I've done with
         14   it.
09:24:09  15        In any event, it hadn't been my intention to revisit
         16   Delaware, or even to go there in the first instance, or ever
         17   go to Delaware.
         18        But in any event, on the Delaware issue, the only question
         19   would be if Fairchild was unwise enough to make some really
09:24:29  20   sweeping comment like:
         21        "We never -- we never knowingly infringe anybody's
         22   patent or copy their technology," and then maybe a finding by
         23   Delaware to the contrary might be appropriate.  But they're
         24   not going to do that.
09:24:46  25        The real question is what they are going to put in.  And

PROCEEDINGS

09:24:48   1   in reading over the papers, my, at least tentative thought or

2   ruling, is essentially as follows.  It can't be a one-way

3   street.  In other words, if Fairchild does propose to put in

4   testimony regarding individuals' opinions who they have relied

09:25:10   5   on, it does not appear appropriate to allow that to just sit

6   without Power Integrations being able to the counter with:

7            "Well, what about this other opinion you received,

8   the opinion from the ITC?"

9        So, if Fairchild wants to put in reliance, it seems to me,

09:25:28  10   then, that the other evidence should come in, with some kind

11   of cautionary instruction.  If Fairchild doesn't like what was

12   proposed by Power Integrations, I'm certainly willing to look

13   at that further.  The real, I think, question is what

14   Fairchild wants to put in and whether it is going to go over

09:25:49  15   the line into reliance on somebody's opinion or not, because

16   I'm not going to let this ITC ruling in as an affirmative

17   piece of evidence.  It's only going to be used to counter, if

18   at all.

19        So, if Mr. Jacobs, or anyone else on your team there, has

09:26:15  20   an offer as to what you were going to do or plan to do, at

21   least in the absence of this ruling, maybe we ought to clear

22   that up now just to avoid problems.

23        And, in particular, with like opening statements.

24   Otherwise, certain things will just be the subject of the

09:26:30  25   protective order until we get it nailed down.

PROCEEDINGS

09:26:33   1        Mr. Jacobs, go ahead.

2            **MR. JACOBS:**  Thank you.  So, Your Honor, I think that

3        as of right now we don't know how the evidence will play out,

4        but we do not intend to rely on opinions of counsel, things of

09:26:43   5        that nature.

6            Instead, our focus is going to be more on objective

7        factors, such as positive results during this litigation and

8        things of that -- and how that would impact the mind set of

9        Fairchild in reasonable actions.

09:26:58  10        So, this, this case, what's happened in this case, not

11        revisiting opinions that they might have had in the past and

12        things of that nature.

13            So that's what we --

14            **THE COURT:**  Give me an example.  Okay?  What's

09:27:10  15        happened in this case that -- if this is not a secret in some

16        way -- what's happened in this case that may have led

17        Fairchild to believe that their product either wasn't accused

18        or was not going to be -- because there's a complaint filed

19        saying you infringed.  Okay?

09:27:28  20        So then where do you go from there?

21            **MR. JACOBS:**  Federal Circuit has ruled that positive

22        claim constructions supporting noninfringement positions in

23        and of themselves can nullify completely within the mind set

24        of an accused defendant.

09:27:43  25        So, those types of things.  Objective results that are out

PROCEEDINGS

09:27:47  1   there.  Now, they go to weight.  Certainly they can cross the

2   witnesses if they want to on that.

3          THE COURT:  Fine.

4          MR. JACOBS:  But we are not going to be saying:

09:27:54  5          "The lawyer told you that this was very positive, and

6   here's what the lawyer told you," because I understand that

7   might open the door.

8          THE COURT:  Okay.  Who counts, by the way?  In other

9   words, whose state of mind counts toward willfulness?  It

09:28:10 10   can't just be anybody along the chain who might have a few or

11   knows something.

12          MR. JACOBS:  That is a good point.  It is a

13   reasonable business decision maker.  So the courts have said

14   essentially -- it is kind of like torts, if you think about

09:28:24 15   it, going back to probable cause and whatnot.  It is a

16   reasonable business decision maker within an organization.

17      So, obviously, we have a 30(b)(6) witness who they have

18   deposed.  And we will be -- I think they are actually going to

19   call him during their case-in-chief and ask him some questions

09:28:40 20   trying to establish willfulness, I would suppose.

21      And then, on redirect of that, you know, we will ask him

22   some questions within the confines of what they asked him.

23   That's typically the way we try to get the evidence in with

24   regard to willfulness.  And then, the standard is not that

09:28:56 25   individual, necessarily.  It is a reasonable person.

PROCEEDINGS

09:28:59   1          THE COURT:  Right.  But, okay.  So let's say you have

2    got someone that qualifies as a reasonable business decision

3    maker.  All right?  And if they said:

4          "Okay.  We didn't rely on anything the lawyers said,

09:29:12   5    but we relied on what our engineers told us."

6       At that point, it may be appropriate for Power

7    Integrations to say:

8          "Wait a minute, okay?  You are talking to your

9    engineers?  How about this Court that told you something

09:29:23  10    different?"

11       So, again, it can't just be lawyer reliance.  It may be

12    able to get evidence in in some way or another, but if it

13    starts looking like someone's state of mind is affected by

14    what they were told by someone about the technology, you may

09:29:41  15    run into a problem.

16       So, just be thinking about that, because, otherwise, it

17    may come back to bite you.

18          MR. JACOBS:  Understood, Your Honor.  However, it

19    wouldn't be fair on the other hand to create a Hobson's choice

09:29:54  20    for a defendant so that they can't say that they didn't

21    believe at all that they didn't infringe.  And if they did,

22    they sprung the door open on all this prejudicial evidence.

23          THE COURT:  No.  I agree with that.  In other words,

24    in the most recent motion that was filed, that if I go through

09:30:11  25    these papers I can find, I felt that Power Integrations' idea

PROCEEDINGS

| | | |
|---|---|---|
| 09:30:16 | 1 | of door-opening testimony was broader than would really be |
| | 2 | fair. |
| | 3 | If someone said: |
| | 4 | "We acted in good faith," I don't think that opens the |
| 09:30:26 | 5 | door to the ITC, let alone Delaware.  But then the question |
| | 6 | is:  Following that, why they say it. |
| | 7 | Okay?  In other words, somebody goes: |
| | 8 | "I acted in good faith." |
| | 9 | And you say: |
| 09:30:38 | 10 | "Okay.  Why was that?" |
| | 11 | "Well, we didn't know there was a patent." |
| | 12 | "Well, wrong.  You do know there's a patent, and you |
| | 13 | don't need the ITC or Delaware to be told that." |
| | 14 | So that particular issue is not an issue. |
| 09:30:49 | 15 | Next question: |
| | 16 | "Well, you knew that you were infringing." |
| | 17 | "No, we didn't." |
| | 18 | Okay.  And then, comes the questioning.  And so I think |
| | 19 | that if you don't put it out there in a way that creates |
| 09:31:02 | 20 | dueling opinions by people that your people rely on, you are |
| | 21 | probably going to be in a safe harbor here.  But it's going to |
| | 22 | be sitting there. |
| | 23 | **MR. JACOBS:**  Sure. |
| | 24 | **THE COURT:**  And I just -- and Mr. Scherkenbach is |
| 09:31:15 | 25 | like on the edge of his chair.  He is just waiting to pounce |

PROCEEDINGS

```
09:31:19   1    with this.

           2            MR. JACOBS:  Yes, yes.

           3            THE COURT:  Because it is very helpful to their side

           4    if they get --

09:31:26   5            MR. JACOBS:  It raises a question for me.  I think I

           6    know the answer, but I want to clarify.  They can't spring the

           7    door through cross.  I mean, we will prepare our witnesses

           8    very carefully, but they can't spring the door through cross.

           9        I mean, we don't plan on doing it on redirect.  But as I

09:31:41  10    mentioned, they are going to call these witnesses in the first

          11    instance as hostile witnesses in their case.

          12            THE COURT:  If they -- if what they ask is something

          13    that wasn't coming out and that they are creating, the basis

          14    for them to put in their evidence, that would not be fair.

09:32:03  15            MR. JACOBS:  Okay.

          16            THE COURT:  We will just have to wait and see how

          17    that plays out.  I'm afraid it may turn out to be a

          18    battleground.  At the moment, however, there is a protective

          19    order that there is to be no reference to the ITC or this

09:32:14  20    Delaware litigation by anybody in any way, shape or form,

          21    unless and until the Court has a hearing outside the presence

          22    of the jury and approves any part of that.

          23        Okay.  So it's off limits at the moment.  Okay.  With the

          24    understanding just ruled on.

09:32:30  25        Okay.  So that is my ruling on the motion.
```

PROCEEDINGS

09:32:38   1      And Ms. Lucero kindly brought out all the papers for me,

           2   and as a result I may have to take a minute to see where they

           3   are.  Okay.  So I can get the correct designation.

           4      Well, I'm going to find it, and I will give it to you.

09:33:03   5      By the way, the renewed motion to exclude that I have came

           6   really by way of a letter.  Normally, I would not consider a

           7   letter brief, so try not to write letters.

           8      Anyway, that is denied as moot, and I don't know if it

           9   even has a docket number.  Okay.

09:33:31  10      Now, if we have some time -- I guess we do -- to the talk

          11   just briefly about the motion to strike the supplemental

          12   expert report.

          13      On Mr. Malackowski, I don't think he should be able to

          14   come up with his whole new theory of royalties here.  The idea

09:33:56  15   that something that Power Integrations' principal said in some

          16   deposition doesn't seem to add anything to me, whether --

          17   obviously, Power Integrations thought it was a good way to go.

          18   They had their own expert using this analytical model,

          19   Dr. Putnam.

09:34:19  20      So, it didn't seem appropriate for Fairchild at this late

          21   stage to be coming up with a whole new analysis.

          22      To the extent he's pointing out an error in Mister -- or

          23   Dr. Putnam's report, that is going to come out long before he

          24   ever gets on the stand, I assume.  It's going to be brought

09:34:40  25   out by Power Integrations, itself, isn't it?  That he has a

PROCEEDINGS

09:34:46   1   calculation error, Dr. Putnam?

2              **MR. HEADLEY:**  Michael Headley here.

3          We certainly anticipate that coming up on cross, but we

4      are concerned about that Rule 26 violation for their expert

09:34:58   5   saying things that he didn't even find significant enough to

6      comment on in his report.

7              **THE COURT:**  You didn't even point this out before,

8      blah, blah, blah.  I mean, you can cross-examine.  The point

9      is it is going to be out there long before -- and it is really

09:35:14  10   not such so much an opinion.  I mean, from what I understand

11     anybody could look at it and see whatever the problem is, but

12     maybe I'm wrong about that.

13         I figured you would ask him about it in order to avoid --

14     you could certainly ask him about it, even if their witness

09:35:29  15   couldn't say anything.

16         You know, it really isn't an opinion.  It is just a

17     comment.

18             **MR. HEADLEY:**  Well, he didn't comment in his expert

19     report on it or --

09:35:37  20             **THE COURT:**  Well, I understand.  But you know there

21     is an error.  Who found it out?

22             **MR. HEADLEY:**  Not their expert, and that is our --

23             **THE COURT:**  Who did?

24             **MR. HEADLEY:**  They pointed this out, the dispute with

09:35:45  25   respect to import percentages in a motion --

PROCEEDINGS

09:35:48  1          THE COURT:  Okay.  A lawyer pointed that out to a

2     lawyer.  Right?

3          MR. HEADLEY:  They -- right.

4          THE COURT:  And then, somebody from your office

09:35:54  5     talked to Dr. Putnam.  Right?

6          MR. HEADLEY:  Right.  He will address this during

7     direct.  And I understand that it will be in the courtroom.

8     We are just concerned about Mr. Malackowski amplifying his

9     opinions that are not disclosed --

09:36:07  10         THE COURT:  Look, we can't spend a lot of time on

11    really what is a meaningless matter, in my opinion.  It is not

12    even an opinion.  If he wants to comment, he can't -- it isn't

13    an opinion.  Nobody disagrees.  I mean, it's just something

14    that if -- I don't even know what he's going to say.  Because

09:36:22  15    you are going to have your expert, I assume, readjust to take

16    this error into consideration.

17         MR. HEADLEY:  We will address it, Your Honor.

18         THE COURT:  Yeah.  I just don't see it.

19    Okay, according to Ms. Lucero's note, we have some jurors

09:36:36  20    available.  But I'm just going to take a moment on Dr. Wood.

21    Okay.

22         So, really, I'm granting as to the substantive change with

23    Mr. Malackowski's second --

24         MR. JACOBS:  One point of clarification.  Yes.  Blair

09:37:00  25    Jacobs.

PROCEEDINGS

09:37:02   1        Mr. Malackowski also conformed his findings to the Court's

        2   ruling that certain products were dropped from the case.

        3        **THE COURT:**  To the extent he's removed products for a

        4   calculation that he would have to remove to be meaningful, I

09:37:13   5   think that that's okay.  But granted as to his new analytical

        6   model.  Let's just put it that way.  And denied otherwise.

        7        And then, as to Dr. Wood, it seemed to me that the real

        8   objection was to anything he had to say about the '700, which

        9   is up in the air at the moment.

09:37:40   10        I think that we should call in the jury, and at that

        11   point, we will see who we have got here.  You will get

        12   settled.

        13        If anyone has to use the facilities before we start with

        14   the jury, you ought to do it now.

09:37:58   15        (A hand is raised.)

        16        **THE COURT:**  Okay.  We got one hand on that.

        17        So take five minutes, and then Ms. Lucero will let them

        18   know that we need the jury down here.

        19        Okay.  Thank you.  All right.  And we are in recess, so

09:38:12   20   just move around and do whatever you are doing.

        21        (Recess taken from 9:41 to 9:56 a.m., during which, the

        22   Jury Venire was sworn)

        23        (The following proceedings were held in open court, in the

        24   presence of the Jury Venire)

09:56:53   25        **THE CLERK:**  All rise.  This Court is now in session.

JURY VOIR DIRE

```
09:56:56   1   The Honorable Maxine M. Chesney presiding.

           2        Please be seated.

           3                    **JURY VOIR DIRE**

           4        **THE COURT:**  All right.  Good morning, ladies and
09:57:10   5   gentlemen.  As I believe you know, you have been summoned here

           6   as prospective jurors for a case.  I don't know if you were

           7   apprized of whether it was a criminal or civil case.  It is a

           8   civil case, a case in which one party is bringing a case

           9   against another.  Not the government or the state bringing a
09:57:29  10   case alleging a criminal conduct.

          11        I appreciate that you made your way here in the inclement

          12   weather, and basically on time, which we very much appreciate.

          13        I know that this is not convenient for anyone.

          14   Nevertheless, it is a process that really goes to the heart of
09:57:52  15   our justice system.  And we rely on good citizens such as

          16   yourself to put that process in place.

          17        The way we are going to proceed this morning is to call a

          18   number of you forward to be seated in the jury box.  And, we

          19   are not going to -- if you look at the jury box here there is
09:58:19  20   more than 12 seats.  All right?

          21        We are not going to have a jury of more than 12 people, in

          22   fact it will not be a jury of 12 people.  It will be a lesser

          23   number, which is allowed here for civil cases in Federal

          24   Court.
09:58:30  25        But we are going to fill up the jury box because I'm going
```

09:58:33   1    to be asking you some number of questions.  And after that

2    process the lawyers will have an opportunity to excuse without

3    stating any particular reason a limited number of you.  And

4    the jurors who are left are going to be our jury.

09:58:53   5        So just so that you understand and for the lawyers'

6    assistance, also, because courts all handle these things a

7    little differently and courtrooms are also set up a little

8    differently.

9        We are going to call the back row seats 1 through 7, with

09:59:09  10    1 being closest to me and then moving outboard toward

11    yourself, so 7 is at the end there closest to you.

12        Then the front row would be 8 to 14, with 8 being close to

13    me, and then moving out again towards you to 14.

14        When your name is called, I think the easiest way for you

09:59:24  15    to come up is just to come through those swinging gates, and

16    then to make your way up to the jury box.  And for the front

17    row, I believe there's room between the court reporter and the

18    Box there for you to get -- to get in.

19        (Reporter interruption)

09:59:45  20        **THE COURT:**  Then you may have to come in at the far

21    end and move across to the seats.  But no one will be walking

22    over anyone, so it will still work.

23        Once you are seated, then you will find on your seats a

24    little reminder sheet which has things like your name; where

10:00:03  25    you live; just the city where you live; the kind of work you

JURY VOIR DIRE

10:00:09  1   do; your marital status; your spouse or domestic partner's

2   occupation; your children.  Just not as a test, really, if you

3   can remember everyone's birthdays.  But just their ages,

4   generally.  And their occupation, if they are working, even if

10:00:34  5   they are not living at home.

6        And then, some questions about prior jury service.  We

7   don't need to know how your case came out, like who won.  But

8   we would like to know whether it was civil or criminal and

9   whether a verdict was reached.

10:00:45  10       Also if you have served as a grand juror before, we would

11   like to know that.  And then, just a brief statement, if you

12   have served in the military, your -- the branch of service and

13   your rank when you were discharged.

14       So, those are all pretty easy.  And then I'm going to tell

10:01:04  15   you something about the case also, at the beginning.  And it

16   will be very, very brief.  I'm not intending to give you all

17   the facts of the case in any way, shape or form.

18       This will be a very brief statement that the lawyers have

19   agreed generally describes the case.  So you can understand

10:01:22  20   it's not a traffic accident, for example, or something

21   involving a family dispute or otherwise.

22       So, now, your names used to be -- I don't know how many of

23   you are old enough to remember this, but in the old days, the

24   Clerk of the Court -- in this case, it's Ms. Lucero, our

10:01:44  25   courtroom clerk -- used to have what was called a "drum."  And

10:01:48   1   there would be names of jurors that were put in the drum.  And

        2   then, very dramatically, the clerk would spin the drum and

        3   pull out a name.  A little bit like bingo except perhaps not

        4   with the same thought in mind.

10:02:03   5       We don't do that anymore.  A computer actually creates the

        6   drum.  And the lawyers don't know where your names are on the

        7   list.  But Ms. Lucero does.  She has the results of the drum,

        8   so to speak.

        9       So when your name is called, it is because you came out of

10:02:20  10   the drum in this order.  And, the first person again, please

       11   make your way up to the back row, first seat, closest there to

       12   the court reporter.  Okay.

       13           THE CLERK:  Robert Allen Burr, B-U-R-R.

       14           THE COURT:  Okay.  Mr. Burr, come up, then, and take

10:02:44  15   that first seat.

       16           THE CLERK:  Mary Kathleen Hartwig, H-A-R-T-W-I-G.

       17           THE COURT:  Ms. Hartwig, right next to Mr. Burr,

       18   please.

       19           THE CLERK:  Tai Dang, D-A-N-G.

10:03:11  20           THE COURT:  Okay.  Everybody is getting the idea

       21   here, so I won't keep repeating it.

       22           THE CLERK:  Carol Wong, W-O-N-G.

       23       Joseph Tuminello, T-U-M-I-N-E-L-L-O.

       24       Gina Zapparelli, Z-A-P-P-A-R-E-L-L-I.

10:03:46  25       Jennifer Castillo, C-A-S-T-I-L-L-O.

JURY VOIR DIRE

10:03:55   1       **THE COURT:**  Okay.  And that will -- once Ms. Castillo

2   comes up, that will fill up the top row.

3       All right.  Now, we will move to the front row, again,

4   starting closest to me with the next juror.

10:04:07   5       **THE CLERK:**  Andrew De Graca, D-E G-R-A-C-A.

6       T. Anthony Coffey, C-O-F-F-E-Y.

7       Brenda Kay Fonacier, F-O-N-A-C-I-E-R.

8       Lilia Rangel, R-A-N-G-E-L.

9       Douglas Cunningham, C-U-N-N-I-N-G-H-A-M.

10:05:04  10       Mark Okawachi, O-K-A-W-A-C-H-I.

11       **THE COURT:**  And then lastly for that row?

12       **THE CLERK:**  John Mortimer, M-O-R-T-I-M-E-R.

13       **THE COURT:**  Thank you.

14       Ms. Lucero, actually, have the jurors yet been sworn?

10:05:30  15       **THE CLERK:**  Yes, they have.

16       **THE COURT:**  Very good.  All right.

17       All right.  Please be seated, Mr. Mortimer.

18       All right.  These are the first 14 jurors called forward.

19       Now, I'm going to be asking the jurors a number of

10:05:44  20   questions that deal with their experiences with the subject

21   matter of the case, if any.  Any views they may have about the

22   subject matter of the case.

23       And, I would ask those of you who have not yet been called

24   forward to please pay close attention to the questions asked,

10:06:06  25   and the answers that the other jurors give.  And the reason I

JURY VOIR DIRE

```
10:06:09   1   say this is that at any given time, one or more of the jurors
           2   currently seated in the box may be excused, and we will then
           3   be randomly selecting someone from the drum, so to speak, to
           4   take their place, which could be any one of you or more.
10:06:27   5       At that point, what we don't want to do is have me ask you
           6   every single question that's already been posed to all of the
           7   jurors, because that would take an inordinate amount of time
           8   and be more tedious than I am sure you are going to think this
           9   process is, anyway.
10:06:50  10       So when you -- if anyone is excused and you take their
          11   place, I'll ask you:
          12           "Did you hear the questions?"
          13       Hopefully you will say:  "Yes."
          14       By the way, if you can't hear whatever is going on here,
10:06:59  15   please raise your hand whenever that situation occurs so that
          16   we can try and adjust or correct for it?
          17       But assumedly you are going to say "yes," and then I'm
          18   going to ask you:
          19           "Did you have any answers to the questions that we
10:07:12  20   should be hearing about?"
          21       In other words, ordinarily:
          22           "Did you answer 'yes' to any of the questions that
          23   were asked?"
          24       And then, you can tell us "yes" or "no," and we will
10:07:21  25   follow up, as appropriate.  And hopefully, that will speed
```

JURY VOIR DIRE

10:07:23  1   things up.

2        Those of you in the box, if I ask a general question, I'm

3   going to ask you to respond in the first instance just by

4   raising your hand, and then keeping it up long enough for me

10:07:33  5   to make a note of who raised their hand.

6        In the courtroom, if you are saying to yourself:

7            "Oh, yes.  I have an answer to that.  I've heard of

8   that person, or I know something about this case," or

9   whatever, don't raise your hand because we don't know who you

10:07:49 10   are out there right now by name.

11        So, just keep that in mind.  If you have anything to jot a

12   little note on -- jurors in the box you don't have to do that

13   because you are going to be responding immediately, and I'm

14   going to talk to you about it.

10:08:03 15        But those of you in the courtroom, if you have a little

16   paper, anything, make a note.  You will be surprised how many

17   times these questions go by.  And then, if you are called into

18   the box you say:

19            "Oh, my goodness.  Which one was it that I had a

10:08:13 20   question or I knew something about?"

21        So, if you don't have anything, don't worry about it.

22   Make your best mental note.  If you have something to jot

23   down, that would be great.

24        Okay.  Now, I'm going to tell you something very briefly

10:08:27 25   about the case.  And I don't want you to be scared when you

JURY VOIR DIRE

10:08:35  1    hear about it, okay, because it involves to a certain extent

2    technical subject matter.  But it is the lawyers' job to make

3    all of this clear to the juries and, frankly, interesting.

4        All right?  So, that's what their task is going to be.

10:08:49  5    Now, they are going to have to keep everyone interested,

6    including me.  So, let me read you very briefly an agreed-upon

7    statement by the parties as to what this case is about so you

8    have a general idea.

9        This is a case about patent infringement.  Each side is

10:09:09  10   accusing the other of infringement.  The plaintiff and

11   counter-claim defendant in this case is Power Integrations,

12   Incorporated, which I will refer to ordinarily as "Power

13   Integrations," or maybe "PI," but probably "Power

14   Integrations."

10:09:29  15       The Defendants and counterclaim Plaintiffs in this case

16   are Fairchild Semiconductor International, Incorporated,

17   Fairchild Semiconductor Corporation, and System General

18   Corporation.  And I will usually refer to all the Defendants

19   together and refer to them as "Fairchild."

10:09:53  20       So you have Power Integrations and Fairchild.  And I may

21   be asking you some questions in a little while about whether

22   you have had any dealings with any of those companies,

23   including System General, or know anyone who's worked for

24   them, for example, including yourself, if you have.

10:10:12  25       Now, the technology that these patents are concerned with,

JURY VOIR DIRE

10:10:14  1    the technology at issue in this case relates to semiconductor

2    integrated circuits.  Now, this make you feel better:  Also

3    known as "chips."  So computer chips.  They are used in power

4    supplies for consumer electronics like computers, laptop

10:10:38  5    computers, LCD monitors and printers.

6        The specific technology at issue in this case relates to a

7    particular kind of power supply chip that is known as a

8    "controller."

9        And these chips act as brains of the power supply.  So the

10:10:56  10   brains of the power supply.  The parties will explain the

11   relevant technical background and details to you during their

12   presentations.

13       And before the trial begins we will also show you a video

14   that the Federal Government has prepared regarding the patent

10:11:11  15   system to give you some background and guidance, as well.  And

16   this video is actually pretty interesting and gives a clear

17   picture of how our system of patents works here in the United

18   States.  And every country is a little different.  And so it

19   works here in the U.S.  And it will be helpful, I think, to

10:11:32  20   anyone who is not intimately familiar with that process

21   already.

22       All right.  So ladies and gentlemen in the courtroom, that

23   is what the case is about.  Jurors here, that is what the case

24   is about.

10:11:51  25       Now, I'm going to go over with you various questions, but

10:11:54  1   I want to introduce to you the people who will be representing

2   the parties in the case.  As you can expect, in every case

3   there are going to be lawyers representing the two sides of

4   the case.  And I want to make sure that none of you are

10:12:15  5   particularly familiar with the firms, or if you do know them

6   it wouldn't make any difference.

7       So we will start here.  And Power Integrations, which is

8   the plaintiff, the party that is bringing the suit, and then

9   they are also to a certain extent the Defendant, because they

10:12:30  10   are defending against the claims that are brought by Fairchild

11   against them.

12       Each has patents, and they're each suing the other on

13   their own patents.  So, for Power Integrations, they are

14   represented by the law firm of Fish & Richardson, PC.

10:12:48  15       Let me just ask quickly:  Is there anyone in the courtroom

16   who has any particular familiarity with this law firm?  Has

17   either retained a lawyer in the firm; has had a case of their

18   own in which Fish & Richardson was involved; knows anyone who

19   has worked for them in any capacity?  It could be

10:13:09  20   administrative assistant, lawyer, paralegal?  Anything of that

21   nature?

22       (No response)

23           **THE COURT:**  Okay.  Now, we have representing Fish &

24   Richardson a number of lawyers.  And we will start with Frank

10:13:23  25   Scherkenbach.  And I'll just ask him to stand for a moment.

10:13:26    1          We also have Howard Pollack.

            2          Michael Headley.

            3          And also sitting at counsel with them is Balu

            4   Balakrishnan, who is a principal at Power Integrations.

10:13:42    5          Thank you.

            6          All right.  Now, I wonder, actually, would all of you mind

            7   just standing for a minute and facing the jurors in the

            8   courtroom?  I don't know if you did that earlier.  I want to

            9   make sure they can see you, as well.

10:13:54   10          (Request complied with by counsel.)

           11          **THE COURT:**  Okay, thank you.  That is good.  Okay.

           12          Here is another easy question.  Okay.  They don't get a

           13   lot harder, frankly.  But these are the easy ones.

           14          Okay.  Do any of you believe that you know any of the

10:14:05   15   people who were just introduced to you?

           16          (No response)

           17          **THE COURT:**  Have you heard anything about them?

           18          (No response)

           19          **THE COURT:**  Okay, fine.  All right.  Now, we are

10:14:13   20   going to turn to the other side of the courtroom.

           21          And, again, now we are dealing with the defendant in this

           22   case, the party against whom the lawsuit was filed.  But also,

           23   the party who is bringing counterclaims against the plaintiff.

           24   And that involves Fairchild Semiconductor International,

10:14:33   25   Semiconductor Corporation and System General Corporation.

JURY VOIR DIRE

| | |
|---|---|
| 10:14:37 | 1 |

1      I'm going to refer to them as "Fairchild."  It takes too

2  long to read all the names.

3      They are recommended by Blair Jacobs.

4      Well, before I do that, the law firm is McDermott, Will &

10:14:47  5  Emery, LLP.  So let me ask that question first.

6      Do any of you know anything about the firm or have had any

7  dealings with it, of any sort?

8      (No response)

9      **THE COURT:**  All right.  Now, we will start with

10:14:59  10  Mr. Jacobs.  Sorry.

11      All right.  So we have Blair Jacobs, and we have

12  Leigh Martinson.  I'm going to hopefully say these names

13  correctly.

14      We have Artem Sokolov and Mark Gerard.  And also Christina

10:15:21  15  Ondrick.

16      And did you have a principal here from your firm today or

17  not for jury selection?

18      **MR. JACOBS:**  Not for jury selection.

19      **THE COURT:**  Okay.  They are not required to be here.

10:15:34  20  Thank you.

21      Would you also face the courtroom?

22      (Request complied with by counsel.)

23      **THE COURT:**  Thank you.  And I would like to ask

24  them -- I think they can sit down.

10:15:40  25      Do any of you recognize any of these individuals?

JURY VOIR DIRE

```
10:15:44   1          (No response)

           2              THE COURT:  Okay.  And keep these questions in mind,

           3    also, those of you in the courtroom.

           4          Now, here's a list of witnesses.  Okay.  A lot of these

10:15:55   5    names may be common.  And so, if you know someone with the

           6    name but aren't sure if it's the person who's involved in our

           7    case, when I ask you if you recognize a name, raise your hand,

           8    and then I'll try and tell you more about the person.

           9          And, I think that will work the best.  Or I may have to

10:16:15  10    ask counsel, frankly, to give me some information about them.

          11          I asked counsel to give me almost an over-inclusive list.

          12    In other words, a list of anyone who might be called.  And so

          13    not all these people will probably be called, but certainly

          14    some of them will be.

10:16:34  15          And the order in which I read them has no significance as

          16    to their relative importance in the case or to whom I call

          17    them.  They're just a mixed list of names that I have been

          18    given.

          19          And I'll read -- maybe I'll read five or so, and then I'll

10:16:50  20    stop and just say:

          21              "Do you recognize any of those names?"

          22          And, I might give you alternative pronunciations on some

          23    of the names because I'm not sure the person pronounces the

          24    name one way or the other.

10:17:05  25          All right.  Now, you met Mr. Balakrishnan, and so he is
```

JURY VOIR DIRE

| | | |
|---|---|---|
| 10:17:08 | 1 | here at counsel table, and he may be a witness. |
| | 2 | All right.  Mike Matthews. |
| | 3 | Okay.  Thank you, Mr. Balakrishnan. |
| | 4 | Mike Matthews. |
| 10:17:17 | 5 | Ben Sutherland. |
| | 6 | Arthur Kelley. |
| | 7 | Jonathan Putnam. |
| | 8 | Okay.  Let me stop.  Any of those names sound familiar? |
| | 9 | (No response) |
| 10:17:26 | 10 | **THE COURT:**  No?  Okay.  And, again, ladies and |
| | 11 | gentlemen, keep these names in mind if something rings a bell. |
| | 12 | Some of the names I'll spell also for you. |
| | 13 | Justin -- I believe it is Chiang.  It's spelled |
| | 14 | C-H-I-A-N-G. |
| 10:17:44 | 15 | KE Hong, H-O-N-G. |
| | 16 | John Tomlin. |
| | 17 | Silvestro Fimiani. |
| | 18 | Cliff Walker. |
| | 19 | And Alex Djenguerian, D-J-E-N-G-U-R-I-A-N. |
| 10:18:01 | 20 | And I'll stop there.  Any of those names?  Do you know |
| | 21 | anyone by any of those names? |
| | 22 | (No response) |
| | 23 | **THE COURT:**  Okay.  Still no response?  And if I don't |
| | 24 | indicate there is one the record should just indicate "no |
| 10:18:13 | 25 | response."  Okay. |

JURY VOIR DIRE

| | | |
|---|---|---|
| 10:18:16 | 1 | Bruce Renouard, R-E-N-O-U-A-R-D. |
| | 2 | Peter Vaughn. |
| | 3 | Doug Bailey. |
| | 4 | Eric Verity. |
| 10:18:26 | 5 | James Go. |
| | 6 | Let me stop there.  Any names sound familiar? |
| | 7 | (No response) |
| | 8 | **THE COURT:**  Nope.  Let's see, Jonathan R. Wood. |
| | 9 | Gu-Yeon Wei, W-E-I. |
| 10:18:40 | 10 | James Malackowski. |
| | 11 | Jeffrey Hwang, or it could be Hwang.  It's H-W-A-N-G. |
| | 12 | And then, Ta-Yung, who goes by Tom Yang, Y-A-N-G. |
| | 13 | Okay.  Do any of those names sound familiar? |
| | 14 | (No response) |
| 10:19:01 | 15 | **THE COURT:**  Okay.  Still no response. |
| | 16 | Gary Lin, L-I-N. |
| | 17 | Kenny Chan. |
| | 18 | Steve McGown. |
| | 19 | Eddie Chueh.  And I believe that is how he pronounces it. |
| 10:19:16 | 20 | It is spelled C-H-U-E-H. |
| | 21 | Then WH Haung or Haung, H-U-A-N-G. |
| | 22 | Tom Beaver. |
| | 23 | Do any of those names sound familiar? |
| | 24 | (No response) |
| 10:19:30 | 25 | **THE COURT:**  Okay.  Helena Chang. |

JURY VOIR DIRE

| | | |
|---|---|---|
| 10:19:33 | 1 | Richard Chang. |
| | 2 | Kevin Chao, C-H-A-O. |
| | 3 | Yulin Chen. |
| | 4 | Hang-Seok Choi. |
| 10:19:44 | 5 | Any of those names? |
| | 6 | (No response) |
| | 7 | **THE COURT:**  Richard Chung. |
| | 8 | Robert Conrad. |
| | 9 | Hubertus Engelbrechten. |
| 10:19:55 | 10 | Sang-Tae Im, I-M. |
| | 11 | Andrew Khor, spelled K-H-O-R. |
| | 12 | (No response) |
| | 13 | **THE COURT:**  No response. |
| | 14 | Richard Kim. |
| 10:20:08 | 15 | Allan Lam. |
| | 16 | Eric Lan or Lan, L-A-N. |
| | 17 | Leon Li or Li, L-I. |
| | 18 | Chandler Lin. |
| | 19 | Okay.  Still no response. |
| 10:20:21 | 20 | And then, lastly, Sophia Lin. |
| | 21 | Ruihong Lu, L-U. |
| | 22 | Frank Lum.  Yes?  No? |
| | 23 | Sorry.  That's not the end. |
| | 24 | Mark Norman. |
| 10:20:37 | 25 | Jack Padula. |

JURY VOIR DIRE

10:20:39  1        Any of those names?

        2        (No response)

        3            **THE COURT:**  All right.  Now, three more.

        4        Shawn Slayton.

10:20:46  5        Robert Wiles.

        6        Edmond Yuh or Yuh, Y-U-H.

        7            **THE COURT:**  All right, ladies and gentlemen.  That

        8    was a pretty long list.  Out in the courtroom, also.  So

        9    please make a note if any of those names sounded familiar to

10:20:59 10    you, and we will clear up whether it is the same person or

       11    not, if you get called into the box.

       12        By the way, if you know someone it doesn't automatically

       13    mean you are disqualified.  It depends on the nature of your

       14    relationship with them.

10:21:13 15        All right.  Now, I think I've covered those things.

       16        Now, very briefly, I want to just make clear, though I'm

       17    sure you understand this, in the trial of this case, both

       18    parties are entitled to have a fair, unbiased and unprejudiced

       19    jury, an impartial jury.

10:21:37 20        And it will be the jury's task to decide the case based

       21    solely on the evidence that's presented here in the courtroom.

       22    If you do have any views about the subject matter, anything

       23    that you may have read or thoughts you that you may have about

       24    the jury system or otherwise, certainly not everybody comes

10:21:57 25    here as a blank slate.  Obviously we all have opinions.

JURY VOIR DIRE

10:22:00  1      But, the idea here is that you need to be able to put

2  aside whatever you might have learned outside the courtroom

3  and decide the case based only on the presentations made here.

4  And the reason for that is the parties have absolutely no way

10:22:12  5  of dealing with whatever you might have heard out of here.

6      They can only really rely on what they present here in the

7  courtroom.  And, in that respect, your job really is the same

8  as mine.  Most cases are tried to a jury, but some are tried

9  to judges, in a limited number.  And in those instances, just

10:22:36 10  hear the case and you decide the facts as you find them to be.

11      And there may be disputed facts here.  I assume there will

12  be.

13      And it would be your job to decide them.  The only

14  difference between your job and mine, really -- well, one is I

10:22:51 15  signed up for it, and you didn't.  But, another -- another

16  main difference is that at the end of a trial, if I were

17  conduct it myself, I would choose the law.  And once I had

18  decided what the facts were, resolved any factual disputes,

19  decided what facts there were and what were important to my

10:23:12 20  decision, then I would apply the law that I've chosen to those

21  facts to come out with the result.

22      The one difference here is that you are not entitled to

23  pick out to law yourself.  In other words, you can't say:

24      "I don't think that is the right law" or "My

10:23:28 25  understanding of the law is different."

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

10:23:29  1    You have to really apply the law that I give you.  And,

2    again, this is what the parties are relying on.  This is the

3    framework in which the case is being tried.

4        So, if for any reason, you would think that in this

10:23:42  5    particular area -- though I'm not sure why you would.  But if

6    anyone had a view that they couldn't apply the law as I give

7    it to you and without knowing in advance also what it is, you

8    should let me know that.

9        Also, if for any reason you have a bias or a prejudice

10:23:56 10    that might bear on a decision you would make, you need to let

11    us know that.  Sometimes people have concerns that don't turn

12    out to be problems.  But it's best to clear the air.

13        And, I'll just ask this question.  I think I already know

14    the answer.  But have any of you heard anything about this

10:24:20 15    case or think you know anything about it?

16        (No response)

17            **THE COURT:**  Okay.  You didn't know any of the people

18    involved so I felt you probably wouldn't have heard of it.

19        Have you or anyone in your family or someone very close to

10:24:34 20    you ever sued anyone, at least to your knowledge ever sued

21    anyone or made some kind of a claim, even if it didn't go all

22    the way to court, in connection with a matter that would be

23    similar to this?

24        This case is in the area of what we'll call "intellectual

10:24:51 25    property."

JURY VOIR DIRE

10:24:52  1       So, I'll cover within that patents, copyright, trademark,

2   anything of that nature that you or someone close to you has

3   been involved in, in either making a claim or bringing a

4   lawsuit?

10:25:06  5       (No response)

6          THE COURT:   Okay.  Well, to your knowledge, have you

7   or anybody close to you ever had -- been on the receiving end

8   of a complaint or claim in an area such as this?

9       (No response)

10:25:17 10          THE COURT:   Had a claim brought against you or them?

11      (No response)

12          THE COURT:   Okay.  Are any of you or anyone very

13  close to you -- again, as I say family or very close personal

14  friends -- involved in a lawsuit currently of any kind, just

10:25:31 15  right now?

16      (No response)

17          THE COURT:   Involved in any kind of litigation?

18      (No response)

19          THE COURT:   Okay.  Is there anyone who feels they

10:25:39 20  could not follow the law as I give it to you, taking it at the

21  moment that you don't know what that law will be, but knowing

22  the subject of the litigation?

23      (No response)

24          THE COURT:   Okay.  No response.

10:25:52 25      There are various areas of expertise that will be coming

```
10:25:57   1    into play in this case.  And I want to go over with you some

           2    of those areas and find out if you have yourself or anyone

           3    close to you experience in those fields.

           4        Hang on a minute because I want to cover them, as called

10:26:21   5    out to me earlier.

           6        Do you or anyone -- again, that same close circle -- have

           7    any education or job training or work experience related to

           8    patents?

           9        (No response)

10:26:32  10         THE COURT:  Okay.  Electronics.  That's a little

          11    broader.  Electronics.

          12        (A hand is raised)

          13         THE COURT:  Okay.  I have a hand.  Let's see how good

          14    my list is.

10:26:43  15        Are you Mr. Mortimer?

          16         PROSPECTIVE JUROR MORTIMER:  That's correct.

          17         THE COURT:  Okay.  And, sir, would that be that be

          18    yourself or someone that you know well?

          19        We have a mic, and I just --

10:26:51  20         PROSPECTIVE JUROR MORTIMER:  I'm sorry.

          21         THE COURT:  No.  You were fine.  We should have given

          22    this earlier or at least had it ready.

          23        This mic is not terribly sensitive, so you do have to

          24    speak into it.  It won't pick you up if you don't.

10:27:06  25        Go ahead, please.
```

JURY VOIR DIRE

10:27:06   1   **PROSPECTIVE JUROR MORTIMER:**  I have a very close

2   friend of mine, 30 plus years.  He is a regional district

3   manager for American Power Conversion.

4   **THE COURT:**  Okay.  And what do they do?

10:27:17   5   **PROSPECTIVE JUROR MORTIMER:**  They make backup power

6   supply modules, as well as air conditioning units for computer

7   systems.

8   His job as regional district manager is to cover the

9   Federal Government, Department of Defense, Federal Aviation

10:27:34 10   Administration, Dallas-Fort Worth Airport, Departments of

11   Education in and around Texas, Oklahoma, that area.

12   **THE COURT:**  Pretty big region.

13   **PROSPECTIVE JUROR MORTIMER:**  Yes, ma'am.

14   **THE COURT:**  Okay.  And is he in sales?  Is he in the

10:27:56 15   technological side of this company?  Do you know what his job

16   entails?

17   **PROSPECTIVE JUROR MORTIMER:**  He is a supervisor of

18   salesmen and also oversees product distribution.

19   **THE COURT:**  Okay.  Do you know, does he have training

10:28:07 20   in engineering or in the technical side?

21   **PROSPECTIVE JUROR MORTIMER:**  Not to my knowledge.

22   **THE COURT:**  Okay.  And, is this a field that you

23   discuss in any way with him on a regular basis?

24   **PROSPECTIVE JUROR MORTIMER:**  Oh, yeah.  I mean, I've

10:28:23 25   known him for many years.

10:28:26  1          THE COURT:  Does it involve just the idea of selling

       2    the product?  Or --

       3          PROSPECTIVE JUROR MORTIMER:  Well, he had previously

       4    discussed with me some aspects of, you know, research, some of

10:28:36  5    the projects that had gone on that American Power Conversion

       6    were involved in, like, you know, tempest testing and --

       7          THE COURT:  Okay.  How about patents?  Discuss at all

       8    whether they have sought patents or his work in that regard?

       9          PROSPECTIVE JUROR MORTIMER:  No, I don't believe he's

10:28:51 10    involved with patents with the company.

      11          THE COURT:  Okay.  Are you in any way trained or

      12    educated in the field of either electronics or engineering?

      13          PROSPECTIVE JUROR MORTIMER:  No, Your Honor.

      14          THE COURT:  Okay.  If experts were to testify in this

10:29:07 15    case, would you be deciding the merits of their opinions

      16    pretty much on weighing then what happens here in the

      17    courtroom?  Or would it be based on something you heard out of

      18    the courtroom?

      19          PROSPECTIVE JUROR MORTIMER:  I would do my best to

10:29:20 20    weigh what is spoken here.

      21          THE COURT:  Okay.  I want to just alert you.  You

      22    can't go out and talk to your friend about it during the

      23    course of the trial.

      24          PROSPECTIVE JUROR MORTIMER:  Oh, I understand that,

10:29:30 25    Your Honor.

JURY VOIR DIRE

```
10:29:30   1        THE COURT:  Okay.  Right now all of you -- nobody's
           2   yet been sworn to hear this particular case.  You have been
           3   sworn to give truthful answers, but no one's been sworn to
           4   hear this particular case.  When you are sworn you won't be
10:29:43   5   able to talk to anybody about the case while it is going on.
           6   At the end of the case, you can.
           7        But if you know someone who could be helpful, nonetheless,
           8   you have to resist talking to them.
           9        PROSPECTIVE JUROR MORTIMER:  (Nods head).
10:29:54  10        THE COURT:  Okay.  Did anyone else raise their hand
          11   besides Mr. Mortimer?
          12        (A hand is raised)
          13        THE COURT:  Yes.  Ms. Castillo?
          14        PROSPECTIVE JUROR CASTILLO:  (Nods head).
10:30:01  15        THE COURT:  And what's the connection that you have?
          16        PROSPECTIVE JUROR CASTILLO:  I used to work for
          17   Agilent Technologies.
          18        THE COURT:  Okay.
          19        PROSPECTIVE JUROR CASTILLO:  I was a supervisor for
10:30:10  20   their inspection of their wafers.
          21        THE COURT:  Okay.  You were a supervisor?
          22        PROSPECTIVE JUROR CASTILLO:  Supervisor for the
          23   inspection of their wafers that came through, different
          24   processes.
10:30:20  25        THE COURT:  Their wafers.  Yes.  Okay.
```

JURY VOIR DIRE

10:30:23  1        What did your job entail, if you could tell us?

       2            **PROSPECTIVE JUROR CASTILLO:**  Mainly testing, putting

       3    the wafers on inspection machines and making sure that they

       4    ran through processes.  Making sure that everyone was doing

10:30:36  5    their job correctly in their certain bays.  And then, this

       6    process through the computer tested the wafer to make sure

       7    that was being set up at that stage of the wafer.

       8            **THE COURT:**  Did you have anything to do with the

       9    creation of the waiver in any way?

10:30:55 10            **PROSPECTIVE JUROR CASTILLO:**  Just helping oversee it,

      11    just making sure that the wafer was built properly.

      12            **THE COURT:**  Do you have training in the line of

      13    computers or electronics or engineering?

      14            **PROSPECTIVE JUROR CASTILLO:**  Just what I did at

10:31:07 15    Metronic.  Metronic gave me classes in computers and --

      16            **THE COURT:**  Okay.  And in what way would you --

      17            **PROSPECTIVE JUROR CASTILLO:**  It helped me just to

      18    learn about the basic fundamentals of how to work with the

      19    computer, and what I needed to do to get the jobs done.

10:31:27 20            **THE COURT:**  Not so much, though, the details.

      21            **PROSPECTIVE JUROR CASTILLO:**  The details inside, no.

      22            **THE COURT:**  Now, you have worked for a couple of

      23    high-tech companies, Metronic, certainly, and also Agilent.

      24    You are not at either of those now?

10:31:39 25            **PROSPECTIVE JUROR CASTILLO:**  No.

```
10:31:39   1            THE COURT:  Where are you now?
           2            PROSPECTIVE JUROR CASTILLO:  Now I'm at Redwood
           3  Toxicology Laboratories.
           4            THE COURT:  Okay.  And that is a medical facility?
10:31:46   5            PROSPECTIVE JUROR CASTILLO:  Yes, testing facility.
           6            THE COURT:  Okay.  Let's go back to the other work
           7  for just a second.
           8      Were you involved in any way -- I'm sure that they have
           9  patents of one sort or another, those companies.  Were you
10:31:59  10  involved in any way in any kind of patent litigation?
          11            PROSPECTIVE JUROR CASTILLO:  No, just testing.
          12            THE COURT:  Okay.  There is going to be -- I'm sure
          13  there is going to be testimony here about how these particular
          14  circuits work and what the patent says about this kind of
10:32:20  15  technology.
          16      Is this something that you feel you can rely on listening
          17  to the experts here in court?
          18            PROSPECTIVE JUROR CASTILLO:  Yes.
          19            THE COURT:  Okay.  All right.
10:32:30  20      And, Mr. Mortimer, you said you would try to do your best.
          21  Do you have some reason to think you have information that
          22  comes from outside the courtroom?
          23            PROSPECTIVE JUROR MORTIMER:  No, Your Honor.
          24            THE COURT:  Okay.  Well, okay.  So we are going to
10:32:42  25  hope everyone does their best in that respect, but I do want
```

JURY VOIR DIRE

10:32:46  1   to say if somebody really is knowledgeable in a field,

2   sometimes that can be very hard if you are judging from not

3   the same perspective as the rest of the jurors.  So that is

4   why we ask these questions.

10:32:58  5       Now, did anyone else raise their hand beside those two

6   jurors?

7       (No response)

8           **THE COURT:**  Okay.  Don't forget these questions out

9   there, ladies and gentlemen.

10:33:05 10       All right.

11       Now, here is another field or a group of subjects.  Do any

12   of you have any education, work experience or job training or

13   anybody that you know really well related to the following

14   subjects:  Power supplies, batteries, power conversion or

10:33:26 15   power chargers?

16       (A hand is raised.)

17           **THE COURT:**  Does this go back, Mr. Mortimer, to your

18   friend or to others?

19           **PROSPECTIVE JUROR MORTIMER:**  That is the same person.

10:33:35 20           **THE COURT:**  Same area?

21           **PROSPECTIVE JUROR MORTIMER:**  Yes.

22           **THE COURT:**  And if I asked you questions similar to

23   what I just did on the other subject, would your answer be any

24   different?  In other words, would you be able to listen to the

10:33:46 25   testimony here in the courtroom about those subjects?

10:33:48   1           **PROSPECTIVE JUROR MORTIMER:**  Yes.

         2           **THE COURT:**  Okay.  There may be some testimony about

         3   sales.  If the jurors were to find infringement of one or more

         4   patents -- and I don't know if you will or not -- but if you

10:34:01   5   were, then the holder of that patent would be seeking damages

         6   of one sort or another.  And that may overlap with the subject

         7   of sales of one product or another.

         8      Your friend does have something to do with sales, as I

         9   understand it, going around the region.

10:34:17  10           **PROSPECTIVE JUROR MORTIMER:**  That's correct,

        11   Your Honor.

        12           **THE COURT:**  Again, I would ask that if you could

        13   consider that these companies are not that company and

        14   essentially to decide this case on the merits of their

10:34:26  15   presentations?  And can you do that?  In other words,

        16   understand that these are different, different markets,

        17   different companies?

        18           **PROSPECTIVE JUROR MORTIMER:**  I understand they're --

        19   they're different companies, yes.

10:34:37  20           **THE COURT:**  Okay.  And you could decide this case on

        21   the evidence presented here?

        22           **PROSPECTIVE JUROR MORTIMER:**  Yes, I'd do my best.

        23           **THE COURT:**  Okay.  Because we can't have you thinking

        24   back to what your friends -- what is your friend's name?

10:34:50  25           **PROSPECTIVE JUROR MORTIMER:**  His name is James.

10:34:52    1            THE COURT:  Okay.  So let's say you can't say:

        2            "Gee, what would James have said about this?  Or what

        3    did James tell me, you know, about what he's doing selling in

        4    Texas or selling to the government or selling whatever?"

10:35:05    5        You have to -- I don't know that the products he's selling

        6    are really the same.  Maybe counsel, if they want to pose some

        7    questions through me, and want to follow up on that they

        8    could.  If not, we will leave that as it is.

        9        And it sounds like it's distinct, but they may know

10:35:21   10    differently.  I'm not -- not personally an expert in this

       11    field.  Okay.

       12        Are there any of you who have ever applied for a patent?

       13    Or anyone really close to you that you know?

       14        (No response)

10:35:40   15            THE COURT:  Or anybody for whom you worked?

       16        (No response)

       17            THE COURT:  Okay.  Did you ever invent anything?

       18        (No response)

       19            THE COURT:  Let's see.  By the way, we do have

10:35:55   20    corporations here on each side of the case.  And they are

       21    treated as people in the law.  In other words, they're

       22    entitled to the same unbiased and impartial jury.

       23        If any of you have some view about corporations, in

       24    general, that you feel might bias you against these particular

10:36:16   25    corporations, you should let me know that.  Or any bias as to

10:36:23   1   these plaintiffs and defendants and counter claimants and

       2   counter defendants, would you raise your hand now if you feel

       3   that way?

       4       (No response)

10:36:31   5           THE COURT:  Okay.  Have any of you ever worked for a

       6   company that's -- had as one of its tasks the development of

       7   new products?

       8       (A hand is raised)

       9           THE COURT:  Okay.  Oh, you have?  Ms. Castillo.

10:37:11  10   Well, is that back at Agilent?

      11           PROSPECTIVE JUROR CASTILLO:  Agilent and Metronic,

      12   both.

      13           THE COURT:  Were Agilent -- were they a spinoff of

      14   Hewlett-Packard?

10:37:22  15           PROSPECTIVE JUROR CASTILLO:  Yes.

      16           THE COURT:  Okay.  Thank you.  Maybe I should just

      17   ask you:  Does anyone have any views about the U.S. patent

      18   system, just in general, that would bear on how you would hear

      19   a case involving a claim of patent infringement?

10:37:42  20       (No response)

      21           THE COURT:  Has anyone had any particular job

      22   training in computer science or know anyone close to you who

      23   has?

      24       Let's see.  We have Ms. Hartwig, yes.

10:38:06  25           PROSPECTIVE JUROR HARTWIG:  (Inaudible).

JURY VOIR DIRE

10:38:07  1          THE COURT:  Well, hand that mic down to you.

        2      Thank you, Mr. Tuminello.  All right.

        3          PROSPECTIVE JUROR HARTWIG:  I work with software

        4  development.

10:38:14  5          THE COURT:  Okay.  And for whom do you work?

        6          PROSPECTIVE JUROR HARTWIG:  Sedgwick.

        7          THE COURT:  And they do -- oh, I'm sorry.  A law

        8  firm?

        9          PROSPECTIVE JUROR HARTWIG:  No.

10:38:22 10          THE COURT:  Oh, okay.  Because there's -- there's a

       11  law firm.

       12          PROSPECTIVE JUROR HARTWIG:  No.  They are a

       13  third-party vendor who handles workers' compensation claims,

       14  liability claims, general liability claims.  And I work in the

10:38:37 15  IT department.

       16          THE COURT:  Okay.  And you are -- you work on

       17  developing software.

       18          PROSPECTIVE JUROR HARTWIG:  Well, yeah.  We don't do

       19  so much developing.  We have third-party vendor software that

10:38:48 20  we use and convert data, that kind of thing.

       21          THE COURT:  Okay.

       22          PROSPECTIVE JUROR HARTWIG:  There is some --

       23          THE COURT:  Doesn't sound like it overlaps with our

       24  subject matter.

10:38:58 25          PROSPECTIVE JUROR HARTWIG:  Probably not.

JURY VOIR DIRE

10:38:59  1          THE COURT:  Do you think it would?

2          PROSPECTIVE JUROR HARTWIG:  No, probably not.

3          THE COURT:  Okay, thank you.

4      What I would like to do before I go too much further,

10:39:28  5  before I forget I would like you to give us this general

6  information.  Somebody is going to have to be first, and that

7  is going to have to be Mr. Burr.

8        Now, where is the mic?  Do you want to hand that mic to

9  him?

10:39:36 10    Let me just give you a couple of -- oh, we had hand.  I'm

11  sorry. I missed you.  I'm going to ask you to pronounce your

12  name.

13          PROSPECTIVE JUROR FONACIER:  Brenda Fonacier.

14          THE COURT:  Okay, Fonacier?

10:39:47 15          PROSPECTIVE JUROR FONACIER:  (Nods head).

16          THE COURT:  Okay.  By the way, if anybody is

17  mispronouncing your name that just can really grate on

18  someone's nerves.

19          PROSPECTIVE JUROR FONCIER:  There is always more than

10:39:56 20  one way.

21          THE COURT:  Okay.  So if anybody here finds like I'm

22  mispronouncing their name, please just politely correct me.

23          PROSPECTIVE JUROR FONCIER:  Thank you.

24          THE COURT:  We don't want to mispronounce your name

10:40:05 25  or anybody's.  Go ahead.  This was on the question of computer

JURY VOIR DIRE

```
10:40:09  1    software or --

          2         PROSPECTIVE JUROR FONACIER:  You mentioned someone

          3    close to you?

          4         THE COURT:  Yes.

10:40:14  5         PROSPECTIVE JUROR FONACIER:  My husband is a software

          6    engineer.

          7         THE COURT:  And for whom does work?

          8         PROSPECTIVE JUROR FONACIER:  Right now he is

          9    self-employed, but he is not working, unfortunately.

10:40:22 10         THE COURT:  Ooh.

         11         PROSPECTIVE JUROR FONACIER:  So he is doing other odd

         12    jobs, doing some websites and other things like that.  But

         13    he's probably worked for a lot of companies in the Silicon

         14    Valley.

10:40:35 15         THE COURT:  Okay.  Do you want to rattle off a few?

         16         PROSPECTIVE JUROR FONCIER:  Apple, Microsoft and the

         17    other company we just heard, Agi --

         18         THE COURT:  Okay.

         19         PROSPECTIVE JUROR FONCIER:  I can't remember.

10:40:42 20         THE COURT:  Okay.  Is this a field that  -- the work

         21    he does, would you say it is highly technical?

         22         PROSPECTIVE JUROR FONACIER:  I'm in healthcare, so

         23    highly technical.  When I think of that, it is different from

         24    his work.

10:40:56 25         THE COURT:  Okay.
```

10:40:57   1       **PROSPECTIVE JUROR FONACIER:**  So I suppose, he mostly

2   did coding, software writing.  Am I doing that?  I'm trying to

3   stay away from it.

4       **THE COURT:**  It is not your fault.  I think we have

10:41:07   5   something of an antiquated system here.  This courthouse was

6   built a long time ago in not a particularly attractive

7   architectural period.  But in any event --

8       (Laughter)

9       **THE COURT:**  Yeah.  It was built a long time ago.

10:41:23  10   And, they have tried over the years to bring it up to speed,

11   in terms of our technology.  But it hasn't always worked well.

12       No, it is not your fault at all.

13       Okay.  So is this something -- what he does, do you

14   understand it very well?  Or --

10:41:41  15       **PROSPECTIVE JUROR FONACIER:**  Hmm, not very well.  I

16   appreciate, I guess, when we have conversations over the years

17   but.  Probably he understands what I do much more.

18       **THE COURT:**  Now, during the case, if you were chosen,

19   you are not going to be able to talk to him about this, as

10:41:54  20   tempting as it might be.  Understand that?

21       **PROSPECTIVE JUROR FONACIER:**  I do.

22       **THE COURT:**  Okay.  When he worked for these other

23   companies, do you know, did he ever get involved in patent

24   litigation?  These are all companies.  I'm sure --

10:42:04  25       **PROSPECTIVE JUROR FONACIER:**  I never heard any

10:42:05   1    discussion of that, no.

2              **THE COURT:**  Okay.  And he himself was never an

3    inventor on a patent as far as you know.

4              **PROSPECTIVE JUROR FONACIER:**  No.

10:42:19   5    **THE COURT:**  As you sit here now, do you think you

6    would be able to approach this case essentially with an open

7    mind?

8              **PROSPECTIVE JUROR FONACIER:**  Yes, ma'am.

9              **THE COURT:**  Okay.  Why don't you hand the mic back to

10:42:28  10   Mr. Burr?

11             And just a quick word of reassurance here.  We are not

12   trying to pry into your personal life by these questions.  And

13   if anybody finds something that they would rather not say for

14   some reason, please just let us know that, and we can always

10:42:42  15   take it up separately, away from the public.

16             We are just looking for the city you live in, the work you

17   do.  If you have recently changed fields or employment, you

18   might tell us what your most recent employment was before

19   that.

10:43:02  20   Organizations, not -- not that, you know, you get these

21   things in the mail where they are asking you for

22   contributions, but if you are active in some organization.

23             Hobbies.

24             Your marital status.  Again, spouse's or domestic

10:43:17  25   partner's occupations.

JURY VOIR DIRE

10:43:19   1        We talked about children, et cetera, et cetera.  So let's

2   start with Mr. Burr.  And just give us your name, and then go

3   down the list as best you can.

4            PROSPECTIVE JUROR BURR:  My name is Robert Burr.

10:43:31   5   Excuse me.  I live in San Leandro, California.

6            THE COURT:  Okay.

7            PROSPECTIVE JUROR BURR:  I'm retired.

8            THE COURT:  Okay.  From what field?

9            PROSPECTIVE JUROR BURR:  I was director of laboratory

10:43:42   10   pathology and nuclear medicine.

11            THE COURT:  Okay.  That sounds very impressive.

12            PROSPECTIVE JUROR BURR:  Thank you.

13            THE COURT:  Well, is this -- well, is this things

14   like MRIs and CT-scans and other --

10:44:00   15            PROSPECTIVE JUROR BURR:  Yes.

16            THE COURT:  What medical facility were you associated

17   with?

18            PROSPECTIVE JUROR BURR:  St. Mary's Medical Center

19   here in San Francisco.

10:44:07   20            THE COURT:  In the city, okay.  Very good.  And you

21   have been retired for how long?

22            PROSPECTIVE JUROR BURR:  Six years.

23            THE COURT:  Okay.  Didn't look like you should have

24   been retiring yet.  Okay.  All right.

10:44:21   25            PROSPECTIVE JUROR BURR:  Thank you.

JURY VOIR DIRE

| | | |
|---|---|---|
| 10:44:22 | 1 | **THE COURT:**  Mr. Burr, let's see.  That is your |
| | 2 | occupation. |
| | 3 | Any organizations that you are particularly active in? |
| | 4 | **PROSPECTIVE JUROR BURR:**  No. |
| 10:44:29 | 5 | **THE COURT:**  How about hobbies? |
| | 6 | **PROSPECTIVE JUROR BURR:**  I like to fly fish, and I |
| | 7 | build things. |
| | 8 | **THE COURT:**  What kind of things? |
| | 9 | **PROSPECTIVE JUROR BURR:**  I'm building a 150-square |
| 10:44:40 | 10 | foot workshop on my property. |
| | 11 | **THE COURT:**  When you get that all built, what are you |
| | 12 | going to build out of your workshop? |
| | 13 | **PROSPECTIVE JUROR BURR:**  Cabinets, wooden cabinets. |
| | 14 | Also I repair guitars. |
| 10:44:58 | 15 | **THE COURT:**  I assume you have read A River Runs |
| | 16 | Through It. |
| | 17 | **PROSPECTIVE JUROR BURR:**  Yes. |
| | 18 | **THE COURT:**  Married, not married? |
| | 19 | **PROSPECTIVE JUROR BURR:**  I'm married. |
| 10:45:04 | 20 | **THE COURT:**  And your spouse is employed outside the |
| | 21 | home or not? |
| | 22 | **PROSPECTIVE JUROR BURR:**  She is unemployed at this |
| | 23 | moment. |
| | 24 | **THE COURT:**  Outside the home, right? |
| 10:45:17 | 25 | **PROSPECTIVE JUROR BURR:**  Right. |

JURY VOIR DIRE

10:45:17  1          THE COURT:  She is working inside the home.

       2          PROSPECTIVE JUROR BURR:  Yes.

       3          THE COURT:  What did she do outside the home?

       4          PROSPECTIVE JUROR BURR:  She was director of a

10:45:23  5  laboratory also.

       6          THE COURT:  At St. Mary's or a different medical

       7  facility?

       8          PROSPECTIVE JUROR BURR:  No.

       9          THE COURT:  Which one?

10:45:30 10          PROSPECTIVE JUROR BURR:  It is Reproductive

      11  Technologies in Berkeley, California.

      12          THE COURT:  Okay.  How about family?  Children?

      13          PROSPECTIVE JUROR BURR:  We have three children.

      14  Ages 36, 34, and 32.

10:45:46 15          THE COURT:  Okay.  Their occupations, generally?

      16          PROSPECTIVE JUROR BURR:  My oldest son teaches

      17  English in Japan.  My daughter works for Blanchard

      18  Construction as project manager.  And my youngest son is

      19  attending the junior college in Santa Rosa.

10:46:06 20          THE COURT:  Very good.  Okay.  How about prior jury

      21  service?  Have you served before?

      22          PROSPECTIVE JUROR BURR:  Not served.  I've gotten as

      23  far as the jury box, and then been excused.

      24          THE COURT:  Okay.  So, we're looking at, if you were

10:46:24 25  selected, just so that we can shorten it up a little bit.  If

10:46:29  1    you were selected as a juror to hear and decide a case or were

2    selected as an alternate -- in state court they have alternate

3    jurors in civil cases.  We do not.   And in both the state and

4    Federal Court here in California there could be alternate

10:46:47  5    jurors in criminal cases.

6         So, if you were selected as either one of the first group

7    of jurors or an alternate juror to hear and decide the case,

8    even if the case didn't go all the way to verdict for some

9    reason or, even if you were an alternate you weren't

10:47:02 10    substituted in, we would want to know that.  Ever served as a

11    grand juror?

12              **PROSPECTIVE JUROR BURR:**  No.

13              **THE COURT:**  Okay.  Military service?

14              **PROSPECTIVE JUROR BURR:**  I was in the United States

10:47:11 15    Air Force for four years.

16              **THE COURT:**  Thank you.  Okay.  Is there anything

17    about this case that strikes you as being problematic for you

18    to serve on for any reason?

19              **PROSPECTIVE JUROR BURR:**  No.

10:47:28 20              **THE COURT:**  Okay.  If Robert Burr were selected as a

21    juror, would both sides receive a fair trial?

22              **PROSPECTIVE JUROR BURR:**  I believe so.

23              **THE COURT:**  Okay, thank you.  I'm going to go over to

24    Ms. Hartwig.

10:47:42 25              **PROSPECTIVE JUROR HARTWIG:**  Mary Hartwig.  I live in

JURY VOIR DIRE

10:47:44   1   Foster City.  I'm a software adviser.

           2           THE COURT:  All right.

           3           PROSPECTIVE JUROR HARTWIG:  I don't really have time

           4   for organizations because I work long hours.  Not much for

10:48:00   5   hobbies other than reading.  I am married.  My husband is

           6   retired, but he works as an usher at the Giants Stadium.

           7       And he used to be in the IT world also, only on the

           8   hardware side.

           9       No children.  And, I have never been on a jury.  I have

10:48:25  10   been close a few times.

          11           THE COURT:  Okay.

          12           PROSPECTIVE JUROR HARTWIG:  No grand jury and no

          13   military service.

          14           THE COURT:  Now, your husband, his current occupation

10:48:39  15   while retired is kind of a fun occupation.

          16           PROSPECTIVE JUROR HARTWIG:  Yeah.

          17           THE COURT:  Particularly if the team gets back on its

          18   feet.  As far as what he did before he retired, who did he

          19   work for, most recently before he retired?

10:48:56  20           PROSPECTIVE JUROR HARTWIG:  I think it was Washington

          21   Mutual.

          22           THE COURT:  Okay.  And, now you say "in hardware," so

          23   what did he do to your understanding.

          24           PROSPECTIVE JUROR HARTWIG:  Well, he did more network

10:49:07  25   and, and from the hardware side, networking.  Hardware, you

JURY VOIR DIRE

```
10:49:12   1   know, servers.
           2            THE COURT:  Okay.  You didn't feel your work would
           3   affect your ability to sit on this case.  Do you feel his work
           4   would have any bearing?
10:49:23   5            PROSPECTIVE JUROR HARTWIG:  No.
           6            THE COURT:  All right.  So you could serve fairly and
           7   impartially for both sides?
           8            PROSPECTIVE JUROR HARTWIG:  I believe so.
           9            THE COURT:  Okay, then we will go over to the next
10:49:30  10   juror.
          11        Okay, very good.  We will have your name.
          12            PROSPECTIVE JUROR DANG:  Hi, good morning, everybody.
          13   My name is Tai Dang.  I live in Millbrae, in California.
          14            THE COURT:  Yes.
10:49:44  15            PROSPECTIVE JUROR DANG:  And I work in the Postal
          16   Service, 24 years.
          17            THE COURT:  That's quite a career.  What did you do
          18   for the Postal Service?
          19            PROSPECTIVE JUROR DANG:  To get the large person
10:50:03  20   account, yeah.
          21            THE COURT:  Large customer's accounts.  Okay, very
          22   good.
          23        How about do you belong to any organizations that you are
          24   active in?
10:50:09  25            PROSPECTIVE JUROR DANG:  I don't believe so.
```

JURY VOIR DIRE

```
10:50:12   1              THE COURT:  How about hobbies?

           2              PROSPECTIVE JUROR DANG:  Hobby, I like to surf on the

           3   web.

           4              THE COURT:  Okay.

10:50:18   5              PROSPECTIVE JUROR DANG:  Yeah.

           6              THE COURT:  Okay.  Now, I just want to point

           7   something out to all of you.  I'm going to give you a more

           8   formal instruction later, particularly if you are chosen to

           9   serve here.  You are not going to be able to go on the

10:50:31  10   Internet and try and inform yourself about the subject of this

          11   case.

          12       It's very easy to go to Google, or whatever, and plug in

          13   patents, or whatever you want to do, or plug in the names of

          14   these companies, and you cannot do that.

10:50:45  15       You are essentially precluded from doing that.  So that

          16   part of your hobby, you couldn't use if you are chosen.  But

          17   if you want to go look up other things, that's okay.

          18       All right.  So, all right.  Any other hobbies we ought to

          19   know about?  Nope?

10:51:05  20              PROSPECTIVE JUROR DANG:  Hmm, swimming, yeah.

          21              THE COURT:  Swimming?

          22              PROSPECTIVE JUROR DANG:  Uh-huh.

          23              THE COURT:  Okay.  How about marital status?

          24              PROSPECTIVE JUROR DANG:  I'm married.

10:51:15  25              THE COURT:  And what does your wife do?
```

JURY VOIR DIRE

10:51:17   1          **PROSPECTIVE JUROR DANG:**  My wife work at the Wells

2    Fargo Bank as the manager.  And no children.

3       I have been served jury duty 15 years ago.

4          **THE COURT:**  It was a long time ago.  Did you actually

10:51:35   5    hear a case then?

6          **PROSPECTIVE JUROR DANG:**  Yes, I was in the jury box.

7          **THE COURT:**  Don't tell me the verdict, but did you

8    actually reach a verdict in that case?

9          **PROSPECTIVE JUROR DANG:**  Yes.

10:51:44  10          **THE COURT:**  Okay.  And was it what we would call a

11    civil case where private individuals are engaged in a dispute

12    or a criminal case where the government is accusing someone of

13    committing a crime?

14          **PROSPECTIVE JUROR DANG:**  Civil case.

10:51:58  15          **THE COURT:**  Civil case.

16          **PROSPECTIVE JUROR DANG:**  Yes.

17          **THE COURT:**  And 15 years ago is a long time.  Do you

18    happen to remember the subject matter?

19          **PROSPECTIVE JUROR DANG:**  No.

10:52:08  20          **THE COURT:**  No.  Okay.  Is there anything about that

21    experience that you feel would -- would bear on how you would

22    approach this case, as a new case?

23          **PROSPECTIVE JUROR DANG:**  I learn a lot about the

24    American law, United States law.

10:52:24  25          **THE COURT:**  Okay.

JURY VOIR DIRE

| | | |
|---|---|---|
| 10:52:29 | 1 | **PROSPECTIVE JUROR DANG:**  And it's very, very, very -- |
| | 2 | I would call this, is very fair. |
| | 3 | **THE COURT:**  It is very fair.  It strives to be fair, |
| | 4 | and that's why in questioning all of you, even though it takes |
| 10:52:39 | 5 | a lot of time, it's important.  Because everyone has to be |
| | 6 | satisfied that whatever way the case comes out, it was reached |
| | 7 | fairly.  Okay?  You are never required to commit yourself to |
| | 8 | decide a case in a particular way.  But, to decide it fairly. |
| | 9 | I'm pleased that you had a good experience.  I'm very -- |
| 10:53:06 | 10 | **PROSPECTIVE JUROR DANG:**  The reason I say that, in my |
| | 11 | country we never have that trial.  Yeah. |
| | 12 | **THE COURT:**  From what country did you come here? |
| | 13 | **PROSPECTIVE JUROR DANG:**  Vietnam, Saigon. |
| | 14 | **THE COURT:**  From Vietnam? |
| 10:53:15 | 15 | **PROSPECTIVE JUROR DANG:**  Yes. |
| | 16 | **THE COURT:**  Okay.  And you are now an American |
| | 17 | citizen? |
| | 18 | **PROSPECTIVE JUROR DANG:**  Yes. |
| | 19 | **THE COURT:**  Okay.  I think that is a very fine |
| 10:53:27 | 20 | endorsement of what I was trying to convey earlier. |
| | 21 | Have you ever served as a grand juror? |
| | 22 | **PROSPECTIVE JUROR DANG:**  No. |
| | 23 | **THE COURT:**  No.  That is a body that does |
| | 24 | investigative work on various civic matters and also in |
| 10:53:43 | 25 | criminal matters has a question of whether they should indict |

10:53:48  1    people on particular crimes.  It's a way that a criminal case

2    can get started.  Okay.  It's a special kind of jury.

3         And how about military?  Have you served military?

4              **PROSPECTIVE JUROR DANG:**  No, no.

10:54:01  5              **THE COURT:**  All right.  And, if we asked you to serve

6    on this jury, Mr. Dang, could you do that and be a fair juror?

7              **PROSPECTIVE JUROR DANG:**  I think I -- yes.

8              **THE COURT:**  Okay.  Any reason that you doubt that in

9    any way or have a question about that?  You kind of held your

10:54:18 10    breath in for a minute.

11              **PROSPECTIVE JUROR DANG:**  Uh --

12              **THE COURT:**  Are you worried about something?

13              **PROSPECTIVE JUROR DANG:**  About my job.

14              **THE COURT:**  Oh, well, let me ask you about that.

10:54:28 15              **PROSPECTIVE JUROR DANG:**  Yeah.

16              **THE COURT:**  It was my understanding that you had an

17    opportunity to express concerns when you were back at the jury

18    office.  You are paid, are you not, while you serve as a

19    juror?

10:54:40 20              **PROSPECTIVE JUROR DANG:**  Uh, yeah, yes.

21              **THE COURT:**  Okay.

22              **PROSPECTIVE JUROR DANG:**  Yes.

23              **THE COURT:**  I mean, the United States government is

24    not going to stop your salary.  Right?

10:54:49 25              **PROSPECTIVE JUROR DANG:**  Yes.  True.

JURY VOIR DIRE

10:54:51  1              THE COURT:  Do you work in the Millbrae facility

        2  or --

        3              PROSPECTIVE JUROR DANG:  No, Burlingame.

        4              THE COURT:  Burlingame.

10:54:59  5              PROSPECTIVE JUROR DANG:  Yes.

        6              THE COURT:  All right.  Now, are you worried that

        7  it's not going to function appropriately?

        8              PROSPECTIVE JUROR DANG:  Correct.  Yes.  I have no

        9  cover, put it like that.

10:55:09 10              THE COURT:  Well, you know, we all want the mail to

       11  go through.

       12              PROSPECTIVE JUROR DANG:  Yes.

       13              THE COURT:  However, I think that this is not the

       14  kind of concern that rises to the level of an excuse.

10:55:24 15              PROSPECTIVE JUROR DANG:  Okay.

       16              THE COURT:  So I'm sorry.  But I hope you won't worry

       17  too much if you are chosen.  That you keep your mind on the

       18  case.  Because I think you can tell that it is a case that you

       19  have to pay attention to.

10:55:35 20         Okay.  I'm going to go over to Ms. Wong.

       21              PROSPECTIVE JUROR DANG:  Thank you.

       22              THE COURT:  Thank you.

       23              PROSPECTIVE JUROR WONG:  Hi.  Good morning.  My name

       24  is Carole Wong.  And I live in Daly City.  I am retired.

10:55:48 25         I don't belong to any organizations.

JURY VOIR DIRE

10:55:51  1        My hobbies are reading, cooking.

       2        Marital status, divorced.

       3        Children, I have a son, 26 years old.

       4             **THE COURT:**  What does he do?

10:56:08  5             **PROSPECTIVE JUROR WONG:**  He works at Target as a

       6   cashier.

       7        And I have no prior jury service.

       8             **THE COURT:**  Okay.

       9             **PROSPECTIVE JUROR WONG:**  And no military service.

10:56:17 10             **THE COURT:**  All right.  Let me ask you a couple of

      11   quick questions.  Before you separated from your former

      12   husband, what was the nature of his business or profession?

      13             **PROSPECTIVE JUROR WONG:**  Oh, he was -- oh, he still

      14   is a grocery store owner.

10:56:33 15             **THE COURT:**  Okay.  And, from what business or

      16   profession did you retire?

      17             **PROSPECTIVE JUROR WONG:**  I was an administrative

      18   assistant.  My last job was with Franciscan Wines.

      19             **THE COURT:**  Okay.  Are they any good?

10:56:53 20             **PROSPECTIVE JUROR WONG:**  Oh, yes, very good.

      21   Although I'm not a wine drinker but --

      22             **THE COURT:**  Yeah, I don't think I've tried Franciscan

      23   Wines, but okay.  And so you have been listening to, I hope,

      24   the various questions.  You didn't have any responses to any

10:57:08 25   of the questions that were asked about the particular case.

JURY VOIR DIRE

```
10:57:11   1   Can you think of any reason why you shouldn't serve on this
           2   jury?
           3               PROSPECTIVE JUROR WONG:  No.
           4               THE COURT:  All right.  Thank you.  Then, we are
10:57:16   5   going to go to the next juror.
           6               PROSPECTIVE JUROR WONG:  Thank you.
           7               THE COURT:  Thank you.
           8               PROSPECTIVE JUROR TUMINELLO:  Hello.
           9               THE COURT:  Hello.
10:57:21  10               PROSPECTIVE JUROR TUMINELLO:  Joseph Tuminello,
          11   San Francisco.
          12               THE COURT:  Okay.  What part of town do you live in,
          13   sir?
          14               PROSPECTIVE JUROR TUMINELLO:  Mt. Davidson.
10:57:28  15               THE COURT:  Okay.  That is very nice.  Okay.  And,
          16   how about some of these other --
          17               PROSPECTIVE JUROR TUMINELLO:  Occupational status?
          18               THE COURT:  Yes.
          19               PROSPECTIVE JUROR TUMINELLO:  I'm a businessman.  I'm
10:57:37  20   retired.  I volunteer at City College in the wood shop,
          21   cabinet-making shop.  I'm still active in business, but I am
          22   retired.
          23       And when I say "active," it is a question I have for you.
          24   You asked about:
10:57:57  25               "Have you ever been involved in a lawsuit involving a
```

JURY VOIR DIRE

10:58:00   1   patent infringement case?"

2        THE COURT:  Or trademark, copyright, something --

3        PROSPECTIVE JUROR TUMINELLO:  Well, I've owned shares

4   in companies that have been involved in such cases, and you

10:58:09   5   didn't touch on that.

6        THE COURT:  No, I didn't.  I don't think that that

7   would be a problem.

8        PROSPECTIVE JUROR TUMINELLO:  Okay.  Just wanted to

9   let you know.

10:58:20  10        THE COURT:  No, no, I'm glad you asked.  And maybe I

11   should ask:  Has anyone here ever owned any shares in

12   companies that I've mentioned as being involved -- I don't

13   know if they do issue stock publicly, but in case they do, is

14   there anyone who has that ownership interest of that sort,

10:58:38  15   stock in any of these companies?

16        (No response)

17        THE COURT:  Okay.  Let me go back to the business

18   that you have retired from, but are still active in.

19        PROSPECTIVE JUROR TUMINELLO:  Okay.  I was an options

10:58:48  20   trader on the floor of the Pacific Stock Exchange.  And after

21   that I managed my own investments, including property.

22        THE COURT:  Okay.  Property.  Okay.  So this is

23   something you can retire from but still do.

24        PROSPECTIVE JUROR TUMINELLO:  Sure.

10:59:02  25        THE COURT:  Yes.  Okay.  In the trading that you did,

JURY VOIR DIRE

10:59:05  1    or what have you, did you have -- you had no contacts of any

       2    sort with these --

       3            PROSPECTIVE JUROR TUMINELLO:  I don't think these

       4    companies existed when I was doing it.

10:59:14  5            THE COURT:  Pardon me?

       6            PROSPECTIVE JUROR TUMINELLO:  I don't think they

       7    existed when I was doing it.

       8            THE COURT:  Oh, okay.  I'm going to ask you -- I know

       9    it feels a little bit like you are kind of a nightclub singer,

10:59:23 10    but could you put the microphone just a little closer.

      11            PROSPECTIVE JUROR TUMINELLO:  Closer?  Is that all

      12    right?

      13            THE COURT:  Okay.  Thank you.  How about

      14    organizations and hobbies?

10:59:33 15            PROSPECTIVE JUROR TUMINELLO:  Aircraft Owners'

      16    Pilots' Association.

      17            THE COURT:  What kind of plane do you own?

      18            PROSPECTIVE JUROR TUMINELLO:  I own a Citabria.

      19            THE COURT:  A what?

10:59:41 20            MR. SCHERKENBACH:  Citabria.  It is a two-seat

      21    Aerobatic airplane.

      22            THE COURT:  Okay.  And you have been flying for some

      23    time, I guess.

      24            PROSPECTIVE JUROR TUMINELLO:  Yeah.  About 25 years.

10:59:49 25            THE COURT:  Okay.  Other than that particular field

| | | |
|---|---|---|
| 10:59:55 | 1 | of activity, any other hobbies or does that much pretty much |
| | 2 | take up your time? |
| | 3 | **PROSPECTIVE JUROR TUMINELLO:** The woodworking, yeah. |
| | 4 | **THE COURT:** That's right. And your volunteering at |
| 11:00:04 | 5 | City College. |
| | 6 | **PROSPECTIVE JUROR TUMINELLO:** Right. |
| | 7 | **THE COURT:** How about marital status? |
| | 8 | **PROSPECTIVE JUROR TUMINELLO:** Married. |
| | 9 | **THE COURT:** And is your wife working outside the |
| 11:00:14 | 10 | home? |
| | 11 | **PROSPECTIVE JUROR TUMINELLO:** No, no. She's retired. |
| | 12 | She was a homemaker. |
| | 13 | **THE COURT:** And before that what was her business? |
| | 14 | **PROSPECTIVE JUROR TUMINELLO:** She was also in the |
| 11:00:21 | 15 | securities business. |
| | 16 | **THE COURT:** Okay. Trading as you were or -- |
| | 17 | **PROSPECTIVE JUROR TUMINELLO:** Yeah, she did. |
| | 18 | **THE COURT:** Okay. Children? |
| | 19 | **PROSPECTIVE JUROR TUMINELLO:** No. Negative. |
| 11:00:30 | 20 | **THE COURT:** Okay. How about prior jury service? |
| | 21 | **PROSPECTIVE JUROR TUMINELLO:** Yes. I was on a |
| | 22 | criminal case about 25 years ago. And, the case, sat on the |
| | 23 | trial for four days and then the -- |
| | 24 | **THE COURT:** Settled? |
| 11:00:43 | 25 | **PROSPECTIVE JUROR TUMINELLO:** -- the Defendant |

JURY VOIR DIRE

11:00:44  1    pleaded guilty.

2         **THE COURT:**  Okay.  Yeah.  I'm glad you told me about

3    it, though, because apparently you heard some evidence in the

4    case --

11:00:50  5    **PROSPECTIVE JUROR TUMINELLO:**  Yes.

6         **THE COURT:**  -- before it resolved.  That is not

7    actually all that unusual either in the course of a case or

8    often at the earlier stages perhaps than yours settled.

9         I don't want to hear too much about the case, but do you

11:01:05  10   recall the crime that was charged?

11        **PROSPECTIVE JUROR TUMINELLO:**  Yeah, it was a drug

12   case.

13        **THE COURT:**  Drugs?  Okay.

14        **PROSPECTIVE JUROR TUMINELLO:**  And the evidence was

11:01:11  15   lost, and when they found the evidence, they pleaded guilty.

16        **THE COURT:**  Okay.  All right.  That doesn't seem like

17   it would have any bearing here.

18        Grand jury ever?

19        **PROSPECTIVE JUROR TUMINELLO:**  No, negative.

11:01:20  20        **THE COURT:**  Military?

21        **PROSPECTIVE JUROR TUMINELLO:**  No.

22        **THE COURT:**  Okay.  And then, if asked to serve on

23   this jury and knowing the job description do you have any

24   reason to think you wouldn't be qualified?

11:01:32  25        **PROSPECTIVE JUROR TUMINELLO:**  No.

JURY VOIR DIRE

```
11:01:33    1              THE COURT:  Okay.  We are going to go over to
            2    Ms. Zapparelli?
            3              PROSPECTIVE JUROR ZAPPARELLI:  Yes, hi.
            4              THE COURT:  Hi.
11:01:38    5              PROSPECTIVE JUROR ZAPPARELLI:  Gina Zapparelli.  I
            6    live in Santa Rosa.  I work as an athletic trainer at a
            7    physical therapy clinic in Novato.
            8         Hobbies are mostly sporting activities and some reading.
            9         I'm not married.  I do have a longtime partner.  And I
11:01:58   10    have a no through 8 through 11.
           11              THE COURT:  Okay.  Your partner's business or
           12    profession?
           13              PROSPECTIVE JUROR ZAPPARELLI:  Extreme Cleaning.  So
           14    she does cleanup after hoarders, biohazards, crime scenes.
11:02:10   15              THE COURT:  I saw a movie about that.
           16              PROSPECTIVE JUROR ZAPPARELLI:  Sunshine Cleaning.
           17              THE COURT:  Yes.  All right.  Okay.  That's a hard
           18    job.
           19              PROSPECTIVE JUROR ZAPPARELLI:  Yeah, it's gross.
11:02:24   20              THE COURT:  Okay.  If anybody hasn't seen the movie
           21    it is -- it's a good movie.
           22         In any event, you had "no" answers to any of the other
           23    questions.
           24              PROSPECTIVE JUROR ZAPPARELLI:  No.
11:02:37   25              THE COURT:  And you have very, I think, succinctly
```

JURY VOIR DIRE

11:02:43  1   and appropriately answered the questions on the list or

2   addressed the matters on the list.

3       Is there anything you feel we ought to know about Gina

4   Zapparelli beyond what you have already told us before I go on

11:02:55  5   to the next juror?

6           **PROSPECTIVE JUROR ZAPPARELLI:**  No.  I know nothing

7   about technology, so hopefully that is okay.

8           **THE COURT:**  That's fine.  As I said, it is the

9   attorneys' job to make it all crystal clear.

11:03:04 10      Okay.  So we will go over to Ms. Castillo.

11          **PROSPECTIVE JUROR CASTILLO:**  Hello.  I am Jennifer

12  Castillo.  I live in Santa Rosa, California.

13          **THE COURT:**  Okay.  Do you know Ms. Zapparelli?

14          **PROSPECTIVE JUROR CASTILLO:**  Actually, no.

11:03:20 15          **THE COURT:**  All right.

16          **PROSPECTIVE JUROR CASTILLO:**  It is funny, though,

17  that we are both from Santa Rosa sitting next to each other.

18          **THE COURT:**  Maybe you can carpool in.  Keep going.

19          **PROSPECTIVE JUROR CASTILLO:**  True.  I work for

11:03:29 20  Redwood Toxicology as of the last two-and-a-half years.  I'm a

21  lab technician, I do test work for all the specimens that come

22  in from multiple hospitals, jails, and so forth.

23          **THE COURT:**  Are these just -- when you say "jail," so

24  there may be various kinds of -- well, are these bodily

11:03:52 25  substances, or are they --

11:03:55 1                **PROSPECTIVE JUROR CASTILLO:**  Yes.

2                **THE COURT:**  Okay.  And, for example, if somebody went

3     and got a blood test, your lab would get that?

4                **PROSPECTIVE JUROR CASTILLO:**  Yes.

11:04:03 5          **THE COURT:**  Run the various screens.

6                **PROSPECTIVE JUROR CASTILLO:**  Yes.

7                **THE COURT:**  Are you the person that does that?

8                **PROSPECTIVE JUROR CASTILLO:**  I do the testing.  I

9     don't do the data for it.  I only input the data of the test

11:04:15 10    results.  So I don't see who the person is or where the

11    company it's coming from.

12               **THE COURT:**  But if somebody, they had to have a

13    glucose screen or something like that, you would come up with

14    a number?

11:04:28 15               **PROSPECTIVE JUROR CASTILLO:**  It would come up with a

16    number, and it would go to the specific person that needed to

17    test it.

18               **THE COURT:**  Or cholesterol, things like that?

19               **PROSPECTIVE JUROR CASTILLO:**  Not cholesterol.  More

11:04:38 20    amphetamines and pregnancy tests and stuff like that.

21               **THE COURT:**  All right.  Are you involved in

22    litigation in any way as a result of that?

23               **PROSPECTIVE JUROR CASTILLO:**  No, no.

24               **THE COURT:**  You don't get called to court?

11:04:48 25               **PROSPECTIVE JUROR CASTILLO:**  No.  We have in-between

11:04:49  1   people for that.

2               **THE COURT:**  Okay.  All right.  You didn't feel that

3   your connection with high-tech companies in the past would

4   preclude you from serving on this jury.

11:05:05  5      Let's see.  Where are we?  Maybe organizations and

6   hobbies?  Do you want to tell us about that?

7               **PROSPECTIVE JUROR CASTILLO:**  I belong to the Hispanic

8   Chamber of Commerce, the Filipino Chamber and also just the

9   school PTA for R. L. Stevens.

11:05:19 10              **THE COURT:**  Okay.  Marital status?

11              **PROSPECTIVE JUROR CASTILLO:**  Single.

12              **THE COURT:**  And is there anyone that you share your

13   home with, be roommate or --

14              **PROSPECTIVE JUROR CASTILLO:**  Not at the moment.  Just

11:05:35 15   my children.

16              **THE COURT:**  Okay.  And can you give us a quick

17   run-down on --

18              **PROSPECTIVE JUROR CASTILLO:**  My oldest is 21, Julian,

19   and he works for Oliver's as a sous chef.

11:05:44 20      My son Jesus, he works -- or he doesn't work yet.  He is

21   in high school still.  Hopefully soon.  He is a senior.

22      And then, my youngest is a seven, a first-grader at R. L.

23   Stevens.

24              **THE COURT:**  Okay.  Where you do some work, help out.

11:06:05 25              **PROSPECTIVE JUROR CASTILLO:**  Yes.

JURY VOIR DIRE

```
11:06:05   1              THE COURT:  The restaurant that you mentioned, where
           2   is this restaurant?
           3              PROSPECTIVE JUROR CASTILLO:  Oliver's?  It is
           4   actually a store.  But he is a sous chef for their back end
11:06:14   5   that does a lot of catering events.
           6              THE COURT:  And is that --
           7              PROSPECTIVE JUROR CASTILLO:  In Santa Rosa and
           8   Rohnert Park.
           9              THE COURT:  Okay.  Prior jury service?
11:06:26  10              PROSPECTIVE JUROR CASTILLO:  No.
          11              THE COURT:  And military?
          12              PROSPECTIVE JUROR CASTILLO:  No.
          13              THE COURT:  You have heard my questions about your
          14   ability to serve on this jury.  Would your answers be any
11:06:37  15   different at this point?
          16              PROSPECTIVE JUROR CASTILLO:  No.
          17              THE COURT:  Why don't we hand the microphone forward
          18   to Mr. Mortimer, and well pull back in this direction
          19   afterwards.
11:06:46  20              PROSPECTIVE JUROR MORTIMER:  Good morning,
          21   Your Honor.  My name is John Mortimer.  I also live in Santa
          22   Rosa.
          23              THE COURT:  Oh, my goodness.  You know, it's funny
          24   how people will say in a single household, like one person
11:06:58  25   wants to serve, and they never get called.  And the person who
```

11:07:01  1    doesn't want to serve, they get called.  Or, it just seems

       2    like whatever they did to randomly get people.  I don't know

       3    if you live anywhere near each other up there, but, anyway,

       4    you are all sitting right there.

11:07:15  5        Is there anyone else from Santa Rosa?  Maybe you could get

       6    one of those vans that goes around to come down here.

       7        (No response)

       8            **THE COURT:**  Okay.  Go ahead, Mr. Mortimer.

       9            **PROSPECTIVE JUROR MORTIMER:**  I am a registered nurse

11:07:25 10    I've had several jobs as an RN, including owning my own

      11    business as a legal nurse consultant.

      12        I belong to an orchid society.  I fish, grow orchids and

      13    am a novice guitar player.

      14        I'm married.  My spouse is also a registered nurse.

11:07:46 15        I have a stepdaughter who is 40 years old and works for

      16    the Academy of Motion Picture Arts and Sciences.

      17            **THE COURT:**  That is surprising, but okay.

      18        And is that the organization that gives out the oscars?

      19            **PROSPECTIVE JUROR MORTIMER:**  Yes, ma'am, it is.

11:08:06 20            **THE COURT:**  Okay.

      21            **PROSPECTIVE JUROR MORTIMER:**  I have been called for

      22    jury service, but I have never been selected.  No grand jury

      23    service, and I have never served in any branch of the

      24    military.

11:08:20 25            **THE COURT:**  Okay.  Do you have a specialty in

JURY VOIR DIRE

| | | |
|---|---|---|
| 11:08:22 | 1 | nursing?  Any particular field? |
| | 2 | **PROSPECTIVE JUROR MORTIMER:**  I recently was -- |
| | 3 | received my accreditation as a case manager. |
| | 4 | **THE COURT:**  And, you currently at a particular |
| 11:08:35 | 5 | hospital? |
| | 6 | **PROSPECTIVE JUROR MORTIMER:**  Santa Rosa Memorial |
| | 7 | Hospital. |
| | 8 | **THE COURT:**  And do you work in a particular unit? |
| | 9 | **PROSPECTIVE JUROR MORTIMER:**  Care Management |
| 11:08:44 | 10 | Department. |
| | 11 | **THE COURT:**  And what about your wife? |
| | 12 | **PROSPECTIVE JUROR MORTIMER:**  She is a case manager |
| | 13 | for a hospice. |
| | 14 | **THE COURT:**  Again, a tough job.  Okay.  Was there |
| 11:08:57 | 15 | anything else that you feel we ought to know about your |
| | 16 | background or -- |
| | 17 | **PROSPECTIVE JUROR MORTIMER:**  I worked extensively |
| | 18 | with attorneys in -- in my own business, which I applied and |
| | 19 | received a trademark from the United States government, as a |
| 11:09:14 | 20 | legal nurse consultant. |
| | 21 | I consulted with attorneys, some here in San Francisco, on |
| | 22 | medical malpractice cases. |
| | 23 | **THE COURT:**  Let's go into that a little bit, if we |
| | 24 | could.  Now, you have a business where you consult. |
| 11:09:32 | 25 | **PROSPECTIVE JUROR MORTIMER:**  I did have a business. |

JURY VOIR DIRE

11:09:33   1                  THE COURT:  Yes.

       2                  PROSPECTIVE JUROR MORTIMER:  I ran -- ran for

       3       approximately five, five-and-a-half years.

       4                  THE COURT:  And the nature of the consultation or

11:09:41   5       consulting you did was in what field?

       6                  PROSPECTIVE JUROR MORTIMER:  I was a legal nurse

       7       consultant, and my job was to analyze medical records for

       8       attorneys involved in medical malpractice cases.

       9                  THE COURT:  Got it.  Okay.  And for that business you

11:09:59  10       wanted to have a trademark to go --

      11                  PROSPECTIVE JUROR MORTIMER:  Yes, I did.

      12                  THE COURT:  -- to identify your business?

      13                  PROSPECTIVE JUROR MORTIMER:  Yes, I did.

      14                  THE COURT:  What was it called?

11:10:08  15                  PROSPECTIVE JUROR MORTIMER:  It was called "Nursing

      16       Judgment."

      17                  THE COURT:  So it was the words --

      18                  PROSPECTIVE JUROR MORTIMER:  The words "Nursing

      19       Judgment," and also an emblem of a lamp that I was awarded.

11:10:17  20                  THE COURT:  And you retained someone to get the

      21       trademark for you?

      22                  PROSPECTIVE JUROR MORTIMER:  I applied for it myself.

      23                  THE COURT:  Oh, you did?

      24                  PROSPECTIVE JUROR MORTIMER:  Yes.

11:10:25  25                  THE COURT:  And you were issued the trademark?

11:10:27  1          **PROSPECTIVE JUROR MORTIMER:**  Eventually, yes.  It did

        2  take a little bit, but, yes, I was granted.

        3          **THE COURT:**  And was there ever any litigation

        4  involving that?  Did somebody try and stop you from doing it

11:10:35  5  or --

        6          **PROSPECTIVE JUROR MORTIMER:**  No.  The Patent and

        7  Trademark Office just -- they wanted some -- basically, it was

        8  just clarification on like what we did, you know, what -- the

        9  emblem that I wanted to -- not -- the trademark to use as a

11:10:53 10  sign for my business.

       11          **THE COURT:**  And was there anyone who you ever claimed

       12  was infringing your trademark in any way or using it

       13  improperly?

       14          **PROSPECTIVE JUROR MORTIMER:**  Not to my knowledge, no.

11:11:04 15          **THE COURT:**  You worked with lawyers, you say,

       16  extensively because they were retaining you to review records

       17  to give them an opinion as to whether or not someone operated

       18  within the standard of care for the particular medical field.

       19          **PROSPECTIVE JUROR MORTIMER:**  Yes, Your Honor.  That's

11:11:19 20  correct.

       21          **THE COURT:**  Okay.  Were these legal offices based in

       22  Santa Rosa or in the Bay area?

       23          **PROSPECTIVE JUROR MORTIMER:**  I had clients -- well,

       24  prior to my moving out West here I had clients in

11:11:34 25  Massachusetts.  When I moved out West here I had clients all

JURY VOIR DIRE

```
11:11:40   1   the way from Cloverdale down to San Francisco.

           2            THE COURT:  And, not the firms that we have here?

           3            PROSPECTIVE JUROR MORTIMER:  I don't recall.  I try

           4   to leave the information like the black and white, because

11:11:55   5   that -- that's just how I preferred to --

           6            THE COURT:  All right.  Is there anything that you

           7   have learned about the law in that particular field that you

           8   believe would overlap with what we're dealing with here?

           9   Right now this is on the med-mal, the medical malpractice

11:12:12  10   idea.

          11            PROSPECTIVE JUROR MORTIMER:  Not as far as the law

          12   goes.

          13            THE COURT:  Anything else?

          14            PROSPECTIVE JUROR MORTIMER:  Well, I learned some

11:12:22  15   things about lawyers.

          16            THE COURT:  Okay.  Now, all right.  This is what I

          17   want to say about that.  Okay?  Okay.  In every group there

          18   are going to be people who you might like less than others,

          19   and people who might be more honorable than others.  The main

11:12:48  20   thing is that if you had -- now, did you have any good

          21   experiences?

          22            PROSPECTIVE JUROR MORTIMER:  Oh, I had good

          23   experiences.  I mean, overall, I had generally good

          24   experiences --

11:12:59  25            THE COURT:  Good.
```

11:13:00  1        **PROSPECTIVE JUROR MORTIMER:**  -- with lawyers.  They

2    were very -- the positives were much more than --

3        **THE COURT:**  All right.  But some negatives.  I mean,

4    that's fine.

11:13:09  5        **PROSPECTIVE JUROR MORTIMER:**  There were some

6    negatives, yes, ma'am.

7        **THE COURT:**  Okay.  But the main thing that I think

8    that I want to make clear is these lawyers here can't be

9    responsible for what somebody else did.

11:13:21 10        **PROSPECTIVE JUROR MORTIMER:**  I understand, yes.

11        **THE COURT:**  And the same -- somebody may have had a

12    bad experience with a nurse at a hospital.  You wouldn't want

13    them to hold that against you.  I'm sure you are a great

14    nurse.

11:13:31 15        **PROSPECTIVE JUROR MORTIMER:**  (Nods head).

16        **THE COURT:**  Okay.  So, you may have had a little view

17    of how sausage is made, okay?  But this is a different

18    situation here.  So, everybody would have to be assured that

19    you would just judge them on their own presentations.  Can you

11:13:52 20    do that?

21        **PROSPECTIVE JUROR MORTIMER:**  Um, trying to leave my

22    prior experience, I would be -- may be a little difficult.

23        **THE COURT:**  Which part of your prior experience?

24        **PROSPECTIVE JUROR MORTIMER:**  I don't know how

11:14:11 25    specific you --

11:14:13   1                THE COURT:  You mean, with lawyers?

            2                PROSPECTIVE JUROR MORTIMER:  Yes, ma'am.

            3                THE COURT:  Well, I might want to talk to you about

            4     it.  I mean, but maybe not in front of all the other jurors is

11:14:21   5     what you are thinking.

            6                PROSPECTIVE JUROR MORTIMER:  That's up -- your

            7     discretion, Your Honor.

            8                THE COURT:  Well, you know, I think it may be better

            9     if we did it separately.  But I'm wondering was it so bad that

11:14:32  10     you feel that you couldn't hear any case, then, because almost

           11     every case has a lawyer, at least on one side.

           12                PROSPECTIVE JUROR MORTIMER:  Oh, I understand.  It is

           13     just between, you know, my experience working with lawyers as

           14     well as, you know, some of my family's experience with the

11:14:52  15     criminal justice system and et cetera.

           16                THE COURT:  Well, that is different again.

           17                PROSPECTIVE JUROR MORTIMER:  Oh, yes, I know.  This

           18     is -- this is a civil case.

           19                THE COURT:  But I gather that somebody had something

11:15:00  20     that they had to work with a lawyer involving a criminal case.

           21                PROSPECTIVE JUROR MORTIMER:  Yes.

           22                THE COURT:  Or a criminal investigation and something

           23     bad happened there.

           24                PROSPECTIVE JUROR MORTIMER:  My brother-in-law was a

11:15:10  25     law enforcement official, and he was on trial for involuntary

11:15:13   1   manslaughter of a minor with an automatic weapon.

2        **THE COURT:**  Now, wait a minute.  Your brother was a

3   police officer, Sheriff?

4        **PROSPECTIVE JUROR MORTIMER:**  My brother-in-law, he

11:15:25   5   was Chief of Police.

6        **THE COURT:**  In Santa Rosa?

7        **PROSPECTIVE JUROR MORTIMER:**  No, it was back East.

8   It was in a town called Pelham, Massachusetts.  He was Chief

9   of Police there.

11:15:35  10        **THE COURT:**  Okay.  Westchester county.  Oh --

11        **PROSPECTIVE JUROR MORTIMER:**  No.

12        **THE COURT:**  Oh, Massachusetts, not New York.

13        **PROSPECTIVE JUROR MORTIMER:**  That's correct.

14        **THE COURT:**  And he was accused of --

11:15:47  15        **PROSPECTIVE JUROR MORTIMER:**  Manslaughter.

16        **THE COURT:**  Manslaughter.  And the person that was

17   shot and killed was armed.

18        **PROSPECTIVE JUROR MORTIMER:**  No, it was a

19   seven-year-old child.

11:15:56  20        **THE COURT:**  Oh, a seven-year-old.  Oh, okay.  I don't

21   know.  Why don't we wait on this for a moment or two, if not

22   more?  And let me go to the next juror, rather than get too

23   bogged down in it, because there are a number of things that

24   are giving you some concern.  And I -- I think we will either

11:16:13  25   take it up separately at the break or in some way.  Perhaps

```
11:16:17    1    not require that you talk about it all publicly.

            2         Okay.  Let's go to the next juror.

            3         Your name, sir?

            4              PROSPECTIVE JUROR OKAWACHI:  Mark Okawachi.

11:16:26    5              THE COURT:  All right.

            6              PROSPECTIVE JUROR OKAWACHI:  And I live in Albany,

            7    California.  I'm a physician's assistant for Kaiser.

            8         Hobbies, woodwork and photography.

            9         Single.

11:16:40   10              THE COURT:  All right.  Anyone that you share your

           11    residence with?

           12              PROSPECTIVE JUROR OKAWACHI:  Just a ten-year-old lab.

           13              THE COURT:  Pardon me?  A lab?  Okay.

           14         Let's see.  Where are we, then?

11:16:56   15              PROSPECTIVE JUROR OKAWACHI:  Prior -- no children.

           16    Prior jury service.  Haven't been on a jury.

           17              THE COURT:  Okay.

           18              PROSPECTIVE JUROR OKAWACHI:  Prior jury service,

           19    haven't served but filled in questionnaires.  Completed one

11:17:08   20    questionnaire, and then they settled the case with the

           21    information from the questionnaire.

           22              THE COURT:  All right.  Grand jury?

           23              PROSPECTIVE JUROR OKAWACHI:  No, just superior.

           24              THE COURT:  And military service?

11:17:19   25              PROSPECTIVE JUROR OKAWACHI:  No military service.
```

JURY VOIR DIRE

11:17:20   1    **THE COURT:**  Okay.  Now, we have a lot of woodworkers

2    on this jury.  Also some number of people involved in the

3    medical field.  And where -- you are at --

4    **PROSPECTIVE JUROR OKAWACHI:**  Oh, San Rafael.

11:17:34   5    **THE COURT:**  In San Rafael Kaiser?

6    **PROSPECTIVE JUROR OKAWACHI:**  (Nods head).

7    **THE COURT:**  Okay.  You had "no" answers to any of the

8    other questions.  As you sit there now do you feel that you

9    could give a fair hearing to both parties in this case?

11:17:48  10    **PROSPECTIVE JUROR OKAWACHI:**  I could.  I do have one

11    comment.  My older brother is an attorney for a tech company

12    in Silicon Valley.

13    **THE COURT:**  Okay.

14    **PROSPECTIVE JUROR OKAWACHI:**  And he does corporate

11:17:56  15    contract law.  But --

16    **THE COURT:**  All right.  Now, is he in-house with that

17    company?  In other words, he's --

18    **PROSPECTIVE JUROR OKAWACHI:**  Yes.  He works for that

19    company.

11:18:05  20    **THE COURT:**  And which company is that?

21    **PROSPECTIVE JUROR OKAWACHI:**  Well, you know, he's

22    worked for so many, but I'm not sure.  He's for Atmel and Mips

23    and Apple and Sun.

24    **THE COURT:**  And at this particular time is he with

11:18:22  25    one of those --

JURY VOIR DIRE

11:18:25   1           **PROSPECTIVE JUROR OKAWACHI:**  Yes, but I'm not sure

       2   which one.

       3           **THE COURT:**  And he's doing?

       4           **PROSPECTIVE JUROR OKAWACHI:**  Contract.

11:18:30   5           **THE COURT:**  Contract work.  And is there any -- I

       6   assume you have talked to him about his work.  Is there

       7   anything that you have discussed with him that has any kind of

       8   overlap with our subject matter here?

       9           **PROSPECTIVE JUROR OKAWACHI:**  No.

11:18:42  10           **THE COURT:**  Okay.  He's not with a law firm.

      11           **PROSPECTIVE JUROR OKAWACHI:**  No, he works in-house.

      12           **THE COURT:**  In-house, okay.  Okay.

      13      Okay.  If you are selected you won't be able to kind of

      14   consult with him during the course of the case.  Afterwards

11:18:57  15   would be fine.

      16      All right.  Then, we will go over to the next jury.

      17      Mr. Cunningham.

      18           **PROSPECTIVE JUROR CUNNINGHAM:**  My name is Doug

      19   Cunningham, and I live on Bethel Island.

11:19:11  20           **THE COURT:**  Okay.  That would be in the Delta?

      21           **PROSPECTIVE JUROR CUNNINGHAM:**  Yes.

      22           **THE COURT:**  Okay.  And?

      23           **PROSPECTIVE JUROR CUNNINGHAM:**  I'm an occupational

      24   health and safety manager.

11:19:20  25           **THE COURT:**  Okay.

JURY VOIR DIRE

| | | |
|---|---|---|
| 11:19:22 | 1 | **PROSPECTIVE JUROR CUNNINGHAM:** And the organization, |
| | 2 | Safety Center in Sacramento. |
| | 3 | Hobbies: Golf. |
| | 4 | I'm married. And, my wife works for Safeway as a grocery |
| 11:19:35 | 5 | clerk. |
| | 6 | **THE COURT:** Okay. |
| | 7 | **PROSPECTIVE JUROR CUNNINGHAM:** I have one daughter |
| | 8 | who is 28, and she is unemployed. And my prior jury service |
| | 9 | is I served as a juror on a criminal case in Contra Costa |
| 11:19:49 | 10 | County, and also recently last year as an alternate on a civil |
| | 11 | case in Contra Costa. |
| | 12 | **THE COURT:** Okay. And your name is coming up a lot. |
| | 13 | **PROSPECTIVE JUROR CUNNINGHAM:** I'm hitting the |
| | 14 | lottery. |
| 11:20:04 | 15 | And no grand jury service and no military service. |
| | 16 | **THE COURT:** Okay. I want to thank you for the times |
| | 17 | you have served already. On the criminal case don't tell me |
| | 18 | the verdict, but did the jury reach one? |
| | 19 | **PROSPECTIVE JUROR CUNNINGHAM:** Yes. |
| 11:20:19 | 20 | **THE COURT:** And do you recall the crime that was |
| | 21 | charged there? Just the general nature of the crime. |
| | 22 | **PROSPECTIVE JUROR CUNNINGHAM:** Assault. |
| | 23 | **THE COURT:** Assault. And on the civil case, you |
| | 24 | didn't participate in the verdict. |
| 11:20:32 | 25 | **PROSPECTIVE JUROR CUNNINGHAM:** Correct. |

JURY VOIR DIRE

```
11:20:32   1          THE COURT:  Don't tell it to me, but was a verdict
           2   reached?
           3          PROSPECTIVE JUROR CUNNINGHAM:  Yes.
           4          THE COURT:  And do you -- can you just briefly
11:20:39   5   describe -- this is pretty recently, I gather -- the nature of
           6   the dispute in that case?
           7          PROSPECTIVE JUROR CUNNINGHAM:  It was a lady had
           8   slipped in a large big-box establishment --
           9          THE COURT:  Okay.
11:20:54  10          PROSPECTIVE JUROR CUNNINGHAM:  -- on a wet floor and
          11   injured her knees.  So it was an injury case.
          12          THE COURT:  All right.  So personal injury, a
          13   slip-and-fall in a store.
          14          PROSPECTIVE JUROR CUNNINGHAM:  (Nods head).
11:21:04  15          THE COURT:  Okay.  Is there anything about those
          16   experiences that you feel would affect your ability to serve
          17   here, other than that you feel that you have been called more
          18   than your share?
          19          PROSPECTIVE JUROR CUNNINGHAM:  No.
11:21:18  20          THE COURT:  Okay.  Anything else that I should ask
          21   you about, or that would bear on your ability to serve here?
          22          PROSPECTIVE JUROR CUNNINGHAM:  I do -- occupational
          23   healthy and safety I do teach lock out and tag out, things
          24   like that.  You mentioned electrical, but it has nothing to do
11:21:35  25   with patents or anything like that.
```

JURY VOIR DIRE

| | | |
|---|---|---|
| 11:21:36 | 1 | And I -- I teach health and safety for the FAA.  I work |
| | 2 | for TASK, which is on a Lockheed-Martin contract.  And I teach |
| | 3 | them health and safety, FAA people.  So we always deal with |
| | 4 | batteries, too, for remote air-to-ground.  They have a -- a |
| 11:21:57 | 5 | generator in case of power failure, so they run off batteries. |
| | 6 | **THE COURT:**  Do you work with power converters at |
| | 7 | all? |
| | 8 | **PROSPECTIVE JUROR CUNNINGHAM:**  I probably do, but I |
| | 9 | wouldn't know it if I was in the phone booth with it so -- |
| 11:22:14 | 10 | **THE COURT:**  All right.  Do they still have phone |
| | 11 | booths?  Okay.  All right.  Thank you very much. |
| | 12 | We will go to the next juror now. |
| | 13 | **PROSPECTIVE JUROR RANGEL:**  My name is Lilia Rangel. |
| | 14 | I live in Orinda, in Contra Costa County.   I am |
| 11:22:29 | 15 | self-employed, do administrative work and also jewelry design. |
| | 16 | Not affiliated with organizations. |
| | 17 | Hobbies:  I like to travel and bargain shop.  I'm single, |
| | 18 | and I have no children.  I have never served on a jury nor a |
| | 19 | grand jury.  And I do not have military service. |
| 11:22:50 | 20 | **THE COURT:**  So mostly "no's." |
| | 21 | Let me go back to the administrative work for a moment. |
| | 22 | You are self-employed.  So what type of administrative work |
| | 23 | are you doing?  Where are you now or where -- |
| | 24 | **PROSPECTIVE JUROR RANGEL:**  I work with office |
| 11:23:01 | 25 | support, office management for a small entrepreneur. |

JURY VOIR DIRE

11:23:04  1            THE COURT:  Okay.  And also jewelry design.

        2            PROSPECTIVE JUROR RANGEL:  On my own, yeah.

        3            THE COURT:  Okay.  The -- let me just think for a

        4    moment.  You said something else that caught my attention but

11:23:20  5    I can't remember.  Oh, I know what I wanted to ask you.  I

        6    missed where you live.

        7            PROSPECTIVE JUROR RANGEL:  Orinda.

        8            THE COURT:  Oh, Orinda.  Thank you.

        9            PROSPECTIVE JUROR RANGEL:  Uh-huh.

11:23:29 10            THE COURT:  Is there any reason why you could not

       11    serve on this jury?

       12            PROSPECTIVE JUROR RANGEL:  No.

       13            THE COURT:  Okay.  Then, I am going to go over to the

       14    next juror.

11:23:38 15       Thank you.

       16            PROSPECTIVE JUROR FONACIER:  Hi.  I don't think I need

       17    the microphone.  I am Brenda Fonacier.  I'm from San Ramon.

       18    I'm a registered dietitian for Kaiser Permanente about 24

       19    years.

11:23:49 20       Organizations, mostly professional ones.  National

       21    Organizations for Nutrition.  California Dietetic Association.

       22    American Heart.

       23       Hobbies:  Yoga and weightlifting, taking care of my

       24    family.

11:24:02 25       I'm married.  My spouse, as I said, is an unemployed

```
11:24:05   1    software engineer.

           2              THE COURT:  Right.

           3              PROSPECTIVE JUROR FONACIER:  Right now.  We have a

           4    child that is 25, and she's in marketing at Yelp! down here,

11:24:14   5    somewhere.  I never come to the City.  So she is around

           6    somewhere, wherever Yelp! is here.

           7              THE COURT:  Slow down just a little bit.

           8       Okay.  So you said she is working?

           9              PROSPECTIVE JUROR FONACIER:  She is working at Yelp!

11:24:27  10    as a --

          11              THE COURT:  Oh, at Yelp!  Okay.

          12              PROSPECTIVE JUROR FONACIER:  She still lives with us,

          13    so I see her often.  But a different job again than I have, so

          14    I don't know a lot about it.

11:24:39  15              THE COURT:  How about jury service?

          16              PROSPECTIVE JUROR FONACIER:  Yeah, about -- before

          17    '95, I sat for three months on a -- I'll have to explain it a

          18    little bit, because I'm not sure if it was civil or not.  A

          19    young man got hurt on like an oil rig.

11:24:55  20              THE COURT:  All right.

          21              PROSPECTIVE JUROR FONACIER:  I don't remember if

          22    it --

          23              THE COURT:  Was he suing someone for the injuries he

          24    received?

11:25:01  25              PROSPECTIVE JUROR FONACIER:  It was an injury case.
```

11:25:04  1          THE COURT:  It sounds like a civil case.

      2          PROSPECTIVE JUROR FONACIER:  That's all I remember.

      3          THE COURT:  Although I suppose on occasion a criminal

      4  charge could be brought for -- it would be -- it would be

11:25:17  5  pretty hard to come up with.  It is probably civil.

      6      Don't tell me what the verdict was, but did the jury reach

      7  one?

      8          PROSPECTIVE JUROR FONACIER:  It was settled early.  I

      9  don't remember how long.

11:25:28 10          THE COURT:  Okay.  And, you did hear, though, some

     11  amount of the case?

     12          PROSPECTIVE JUROR FONACIER:  Oh, yeah.

     13          THE COURT:  Did you say you served for three months?

     14          PROSPECTIVE JUROR FONACIER:  Three months almost.

11:25:37 15          THE COURT:  And then, they settled.

     16          PROSPECTIVE JUROR FONACIER:  Yeah.  I think a week

     17  shy, I'm guessing, because it was before '95, 1995 so -- I

     18  don't remember what year, in Martinez.

     19          THE COURT:  All right.  That was the one case that

11:25:50 20  you served on?

     21          PROSPECTIVE JUROR FONACIER:  Uh-huh.

     22          THE COURT:  All right.

     23          PROSPECTIVE JUROR FONACIER:  And then, military

     24  service, I was active duty for four years in the United States

11:25:59 25  Air Force and reserve during college.

| | | |
|---|---|---|
| 11:26:03 | 1 | **THE COURT:**  Okay.  Two Air Force people. |
| | 2 | Before your -- well, was your husband working for a |
| | 3 | company before or -- his current situation or was he |
| | 4 | self-employed or -- |
| 11:26:20 | 5 | **PROSPECTIVE JUROR FONACIER:**  He was a self-employed |
| | 6 | contractor for, like I said, many Silicon Valley companies. |
| | 7 | And then, the last position he had was with Wells Fargo. |
| | 8 | **THE COURT:**  Okay. |
| | 9 | **PROSPECTIVE JUROR FONACIER:**  The last couple of |
| 11:26:29 | 10 | contracts probably were -- I remember were more with banks, |
| | 11 | the banking industry versus down in the valley, but -- |
| | 12 | **THE COURT:**  All right.  Is there anything about your |
| | 13 | prior jury experience which frankly sounds like it would be |
| | 14 | kind of frustrating, in a way, to have spent all that time, |
| 11:26:44 | 15 | and then not been asked to actually decide the case. |
| | 16 | But anything about that that would bear on your ability to |
| | 17 | serve on this case? |
| | 18 | **PROSPECTIVE JUROR FONACIER:**  No.  I don't even |
| | 19 | remember a lot of it, but -- |
| 11:26:58 | 20 | **THE COURT:**  Thank you.  I'll go to Mr. Coffey.  I. |
| | 21 | Hi. |
| | 22 | **PROSPECTIVE JUROR COFFEY:**  Hi.  My name is Anthony |
| | 23 | Coffey.  I live in San Carlos.  I'm a portfolio manager for |
| | 24 | Franklin Templeton Investments in San Mateo.  I'm a chartered |
| 11:27:14 | 25 | financial analyst and a member of the CFA society. |

11:27:18   1          Hobbies:  I'm a runner and a cyclist.  And I coach

           2    runners.

           3          I'm single.  No children.  No prior jury service.  No

           4    military service.

11:27:33   5          **THE COURT:**  Okay.  All right.  You are another one of

           6    our jurors who really doesn't have a lot of responses to the

           7    questions that we have asked and has very appropriately

           8    responded to those you had answers to.  Is there anything

           9    about this case that you feel would make it difficult for you

11:27:49  10    to be a fair or impartial juror?

          11          **PROSPECTIVE JUROR COFFEY:**  The only thing, it is a

          12    long time ago, but my prior job was I worked for a litigation

          13    consulting firm, and I do remember working on a patent case

          14    back then.

11:28:07  15          **THE COURT:**  Okay.  Your prior job you say was in a

          16    litigation consulting firm.  And what was the nature of the

          17    consulting then that your company, your firm --

          18          **PROSPECTIVE JUROR COFFEY:**  The name of the company

          19    was Analysis Group, and our firm would be brought in to

11:28:21  20    provide expert testimony on economic issues related to a

          21    particular case.

          22          **THE COURT:**  Okay.  So what kind of economic issues

          23    might be -- oh, I don't know -- raised that you would have to

          24    deal with?

11:28:39  25          **PROSPECTIVE JUROR COFFEY:**  It could be a lot of

JURY VOIR DIRE

```
11:28:40   1   different things.  You know, the one that was on a patent was
           2   actually, you know, was microphones (indicating).  It was a
           3   wireless microphones, some technology that was involved in the
           4   microphone ware.  We were hired by one of the -- one side of
11:28:58   5   the case to come in and do basically economic analysis of the
           6   microphone industry.
           7           THE COURT:  Okay.  Were you asked in any way, or your
           8   company, to calculate damages or royalties?
           9           PROSPECTIVE JUROR COFFEY:  Yeah.  That is the type of
11:29:15  10   thing we would work on.
          11           THE COURT:  Okay.  Now, there would be in all
          12   likelihood some testimony in this case in that area.  This is
          13   your -- your area, essentially, I guess.  Or --
          14           PROSPECTIVE JUROR COFFEY:  Well, yeah.  It was a long
11:29:30  15   time ago.  I --
          16           THE COURT:  How long ago are we --
          17           PROSPECTIVE JUROR COFFEY:  25 years.
          18           THE COURT:  25 years ago.  But, still, it is your
          19   training, right?  That you were able to -- did you use
11:29:43  20   computer analyses for this, or are how did you --
          21           PROSPECTIVE JUROR COFFEY:  Yeah, you know, like
          22   creating spreadsheets and that sort of thing.
          23           THE COURT:  Okay.  You have a degree in what?
          24           PROSPECTIVE JUROR COFFEY:  My undergraduate degree is
11:29:56  25   in math and economics, and I have an MBA, as well.
```

JURY VOIR DIRE

11:30:00  1           THE COURT:  Okay.  Where did you take your degrees,

2       by the way?

3               PROSPECTIVE JUROR COFFEY:  Undergraduate Harvard, MBA

4       at UCLA.

11:30:10  5           THE COURT:  Okay.  Now, Franklin -- is that like

6       Franklin Funds?  Is that what has?

7               PROSPECTIVE JUROR COFFEY:  Yes.

8               THE COURT:  And then, do you make decisions about

9       what investments the fund should --

11:30:21 10           PROSPECTIVE JUROR COFFEY:  Yeah.  I'm the portfolio

11      manager.

12              THE COURT:  All right.  Yeah.  I'm just -- I'm a

13      little concerned.  I want to make sure that we are in all

14      likelihood going to have testimony from -- from the experts

11:30:36 15      who may have done their own analyses about, if there's

16      infringement, what the losses would be to the patent holder.

17          When you were involved in the case that had the microphone

18      issue, you know, it sounds like something that might have been

19      similar to what could be the type of testimony.

11:31:01 20          It wouldn't be the same figures, or anything like that,

21      but the experts may have different opinions about what type of

22      a model to apply and sort of an analytical model, in coming up

23      with a result.

24          Is this something that you could decide without bringing

11:31:24 25      your own prior experience to bear on it?  I'm a little

JURY VOIR DIRE

11:31:28  1    concerned about that.

2         **PROSPECTIVE JUROR COFFEY:**  Yeah.  I think so but --

3         **THE COURT:**  Okay.

4         **PROSPECTIVE JUROR COFFEY:**  You know --

11:31:33  5    **THE COURT:**  I might wait to see if Counsel might want

6    me to follow up at all in one way or the other, and I'll go

7    over the next juror.  And, actually, our last juror at the

8    moment.

9         Okay.  Go ahead, please.

11:31:44 10    **PROSPECTIVE JUROR DE GRACA:**  My name is Andrew De

11   Graca, and I live in San Bruno.  I'm the Water Quality

12   Director for the San Francisco Public Utilities Commission.

13        **THE COURT:**  Okay.

14        **PROSPECTIVE JUROR DE GRACA:**  I'm involved in a lot of

11:31:56 15   professional organizations.  My hobby probably is coaching my

16   daughter's soccer team.

17        I'm married.  My wife is a civil engineer.

18        Children, 16-year-old boy, 14-year-old girl.

19        I served on a criminal jury.  There was no verdict.  No

11:32:17 20   grand jury.  No military service.

21        **THE COURT:**  Okay.  On your criminal jury, don't get

22   too detailed, but what was the nature of the crime charged, if

23   you recall?

24        **PROSPECTIVE JUROR DE GRACA:**  It was a doctor accused

11:32:25 25   of molesting his patients.

11:32:27  1        THE COURT:  Okay.  And, when you say "no verdict," is

2  this what is sometimes called a hung jury?

3        PROSPECTIVE JUROR DE GRACA:  Yes.

4        THE COURT:  Was there anything about what I'm sure

11:32:37  5  was a frustrating experience of ending up with a hung jury,

6  but is there anything about that case that you feel would bear

7  on your ability to serve here on this case?

8        PROSPECTIVE JUROR DE GRACA:  No.

9        THE COURT:  And for whom does your wife work?

11:32:53 10        PROSPECTIVE JUROR DE GRACA:  She also works for the

11  City of San Francisco.

12        THE COURT:  Okay.  All right.  Now, let me just -- I

13  received a note from the clerk.  Could I see you for a minute.

14     (Off-the-Record discussion between the Court and Clerk)

11:33:21 15        THE COURT:  So was there anything about the nature of

16  the work you do or your wife does that you feel overlaps with

17  the subject matter of this case in any way?

18        PROSPECTIVE JUROR DE GRACA:  Not the technical part

19  of it.  For one of the organizations I serve on the board for

11:33:35 20  the American Waterworks Association.

21        THE COURT:  Uh-huh.

22        PROSPECTIVE JUROR DE GRACA:  And I recently heard a

23  standards appeal, and so that might have been somewhat similar

24  in terms of plastic pipe companies arguing about something.

11:33:51 25        THE COURT:  What would be standards of appeal?

11:33:54  1        **PROSPECTIVE JUROR DE GRACA:**  There is standards in

2    terms of different products used in water and waste water.

3    And so in this particular case it was looking at plastic pipe.

4    And so two different types of plastic pipe.  People were

11:34:00  5    arguing that -- and I had to serve on basically a jury of five

6    people to figure out what was the right answer.

7        **THE COURT:**  So they actually have something of a

8    jury, in effect.

9        **PROSPECTIVE JUROR DE GRACA:**  It is rare, but, yes.

11:34:11 10    And if they want to fight it it can happen.

11        **THE COURT:**  Are the jurors who hear that, then,

12    people who are knowledgeable in the technical field?

13        **PROSPECTIVE JUROR DE GRACA:**  No.  We are just on the

14    board executive committee, so they picked five of us.

11:34:28 15        **THE COURT:**  So there were people who maybe had

16    expertise in a particular area who gave conflicting

17    opinions.

18        **PROSPECTIVE JUROR DE GRACA:**  To some extent, yes.

19        **THE COURT:**  And you had to resolve who was more

11:34:39 20    reliable or credible.

21        **PROSPECTIVE JUROR DE GRACA:**  Yes.

22        **THE COURT:**  And you may have to do that in this case

23    if you serve.  That would be not an unusual thing for jurors

24    to have to do in order to make determinations where there is

11:34:53 25    conflicting just ordinary facts or more technical facts.  But

11:35:00  1   the subject itself of what effect, I guess, these pipes have

        2   on water quality, that is stuff leaches out of them or

        3   something?

        4         PROSPECTIVE JUROR DE GRACA:  It is the wall thickness

11:35:14  5   and different --

        6         THE COURT:  That doesn't sound like what we are

        7   dealing with.

        8         PROSPECTIVE JUROR DE GRACA:  No.

        9         THE COURT:  So the job may be kind of similar in a

11:35:21 10   way, but then you already had an even more similar job by

       11   serving on a Superior Court jury.

       12         PROSPECTIVE JUROR DE GRACA:  (Nods head).

       13         THE COURT:  Okay.  All right.  Well, then, I think

       14   that would be okay.

11:35:33 15      All right.  Now, we have -- let me just ask, has anything

       16   come to anybody's mind that you need to bring up that you may

       17   not have covered?

       18      (No response)

       19         THE COURT:  Okay.  Now, the next stage of the case

11:35:49 20   is -- well, first of all, I want to ask:  How long have we

       21   been out here?  Maybe I'll ask that first.

       22      (Off-the-Record discussion between the Court and Clerk)

       23         THE COURT:  Quarter to 10:00.  Hmm. what I was going

       24   to do is have counsel, if they wanted me to follow up with one

11:36:14 25   or more jurors or to ask a followup question with anyone to

11:36:22  1    hand me a written question.

        2        Maybe I should do that before we take a break.  Then while

        3    they're writing that -- sometimes I have been accused of not

        4    being sensitive enough to the need to take breaks for other

11:36:36  5    reasons.

        6        And, what I want to do once I get those is take a brief

        7    break, and then have you come back.  And we will go to the

        8    next stage, which could be challenges for cause or what are

        9    called "peremptory challenges."

11:36:50 10        Those of you who have served or have been called for jury

       11    service may have heard that word.  Each side has a very

       12    limited number of challenges that they can raise without

       13    having any reason.  And even if you try and figure out what

       14    they are thinking it usually is not a productive exercise.

11:37:08 15        But, in any event, that would be the next step.  And I

       16    want to give them a chance to see if there's anything you want

       17    me to follow up, because they are far more intimately familiar

       18    with the issues in their case than I am.  I just have a

       19    general overview.

11:37:27 20        While we're in the break -- okay, let me say this to

       21    everybody.  None of you has yet been chosen.  However, I would

       22    ask you to please not discuss the case during the break.  In

       23    other words, I would like you to come back to the courtroom in

       24    the same state of mind that you are left it so that we don't

11:37:48 25    have to go over anything else.

11:37:50   1          So when you walk out don't turn to the person next to you

2    and say:

3              "What do you think?"  Just, you know, keep quiet as

4    far as that.  You can be personable, but don't talk about the

11:38:00   5    case, and then we won't have to backtrack at all with that.

6          And I will take a little longer break with you than I take

7    with the lawyers.  Because I would like to take about five

8    minutes after I excuse you to just ask them a couple of

9    questions about the proceedings.  And then -- so I may give

11:38:24  10    you 20 minutes, and then five of those I'll spend with them.

11    Something like that.  And then, they will have a break, too.

12          Mr. Scherkenbach, it looks like you are writing the

13    Gettysburg Address here.

14          (Document handed up to the Court)

11:39:15  15          **THE COURT:**  Okay.  And Mr. Jacobs?

16          (Document handed up to the Court).

17          (The Court examines documents)

18          **THE COURT:**  Okay.  Well, okay.  Let me ask this

19    question one of the attorneys would like to ask all of you,

11:39:36  20    and then I'll go to a couple of individual followups.

21          Do any of you have any beliefs about Asian companies or

22    Asian people or other minorities that would make it difficult

23    for you to be fair and impartial here?

24          (No response)

11:39:55  25          **THE COURT:**  Okay.  There is no response.  Then both

JURY VOIR DIRE 110

```
11:39:59  1    lawyers, okay.  Both sides would like me to follow up with

       2    Mr. Mortimer.  If we can go down to Mr. Mortimer for a minute.

       3    He is all the way at the end, for a minute.

       4        Okay.  They -- all the way at the end.

11:40:14  5        They really want to know what your past experience was

       6    that is concerning you.  So, why don't you go ahead and tell

       7    us, if you -- unless it discloses something very private.  If

       8    it does, then I'll take it up privately.  Otherwise, they just

       9    want to hear it.

11:40:29 10        PROSPECTIVE JUROR MORTIMER:  Regarding my work at --

      11    excuse me, my work as a legal nurse consultant or my personal

      12    and family experience?

      13        THE COURT:  Apparently you had some unsatisfactory

      14    association with the attorneys or bad experience or something

11:40:46 15    that led you to question someone's honor or integrity.  Then,

      16    they just want to know what it is.

      17        PROSPECTIVE JUROR MORTIMER:  Oh, sure.

      18        THE COURT:  Okay.

      19        PROSPECTIVE JUROR MORTIMER:  When I had my own

11:41:00 20    business I did have a couple of instances where the attorneys

      21    did not pay their bill in full.

      22        THE COURT:  Okay.  Well, that could set someone off.

      23    I feel badly about that.  Did you have to go to court?

      24        PROSPECTIVE JUROR MORTIMER:  No.  I did not.

11:41:16 25        THE COURT:  Okay.  Did you ever get paid or did you
```

JURY VOIR DIRE                                        111

```
11:41:18  1    just say --
          2              PROSPECTIVE JUROR MORTIMER:  Not -- not in full.
          3         THE COURT:  Not in full.  Okay.  All right.  So then
          4    you didn't do consulting work for them anymore.
11:41:28  5              PROSPECTIVE JUROR MORTIMER:  That's correct,
          6    Your Honor.
          7         THE COURT:  Okay.  Well, as far as I know, there
          8    isn't any credit problems with these law firms.
          9       Okay.  And I assume other law firms did pay their bills
11:41:45 10    appropriately at one time.
         11              PROSPECTIVE JUROR MORTIMER:  Yes.  And some were
         12    actually very organized, too.
         13         THE COURT:  Right.  Okay.  And then, how about --
         14    what else was -- was bothering you?
11:41:56 15              PROSPECTIVE JUROR MORTIMER:  Oh, it was my
         16    brother-in-law's involvement with a criminal proceeding in the
         17    death of a child.
         18         THE COURT:  And do you feel -- his case was tried or
         19    did he enter a plea?
11:42:10 20              PROSPECTIVE JUROR MORTIMER:  He was tried.
         21         THE COURT:  He went to trial?
         22              PROSPECTIVE JUROR MORTIMER:  Yes.
         23         THE COURT:  He was convicted?
         24              PROSPECTIVE JUROR MORTIMER:  No, he was not.
11:42:16 25         THE COURT:  Did you feel that was the wrong result?
```

11:42:19   1          **PROSPECTIVE JUROR MORTIMER:**  No, I believe that was

2      the right result.

3          **THE COURT:**  What was it about the way that the case

4      was handled that upset you or disturbed you or you felt was

11:42:28   5      not appropriate?

6          **PROSPECTIVE JUROR MORTIMER:**  District Attorney prior

7      to the ongoing proceedings was confident on conviction.  And,

8      my brother -- my -- the original attorneys that he had hired

9      wanted him to plead.  My wife and I found him a separate

11:42:54  10      attorney, experienced in gun death, which he used, and he was

11      subsequently acquitted.

12          **THE COURT:**  Okay.  So, you didn't like the attitude

13      of the District Attorney.

14          **PROSPECTIVE JUROR MORTIMER:**  That's correct, Ma'am.

11:43:11  15          **THE COURT:**  Kind of cocky and maybe obnoxious in some

16      way.  All right.

17          But we don't have a criminal case here.  We don't have a

18      District Attorney.  We don't have a prosecuting attorney.  We

19      have two companies that disagree as to whether their

11:43:27  20      respective products infringed their respective patents.  I

21      can't see how that other experience is distressing, as

22      distressing as I'm sure it was for your family.

23          I mean, this is a very, very serious prosecution that was

24      brought.  It's a sad case, just on the facts.  Yes, criminal

11:43:48  25      lawyers often encourage their clients to plead guilty, often

11:43:53   1   because they don't feel that they have a winning case.  And

           2   there are times when the client just says:

           3          "I would rather go to trial and take my chances."

           4   And that's an appropriate disagreement.

11:44:04   5     Or it's possible he got bad advice from the first lawyer.

           6   Fortunately, you found him a lawyer who did a good job, and

           7   the right result, as you see it, has been accomplished.

           8       So, the end result was a good result.  Gee, I just don't

           9   see how these things really come into play in our case.  If

11:44:27  10   you do, I would want to hear why you think it does.  Because I

          11   wouldn't want anyone to be worried if you serve on the jury

          12   that they're going to be held responsible for the deadbeat

          13   lawyers or the District Attorney or the bad lawyer in the

          14   criminal case.

11:44:46  15          **PROSPECTIVE JUROR MORTIMER:**  All I can say is that it

          16   just brings back a lot of -- it does bring back some rather

          17   unpleasant --

          18          **THE COURT:**  Okay.  It brings back bad memories.  But

          19   these memories really don't seem to overlap with our case.

11:45:01  20   That's the thing.

          21          **PROSPECTIVE JUROR MORTIMER:**  (Nods head).

          22          **THE COURT:**  One of the reasons is I just hate to lose

          23   you automatically as a juror when you obviously are qualified

          24   to serve, because of things that really have no connection to

11:45:16  25   the case.  Unless you feel it would cause you to favor one

11:45:19  1   side or the other here, and it doesn't sound like it is going

2   to do that.  Or would it?

3          PROSPECTIVE JUROR MORTIMER:  I'm not familiar with

4   one or the other side.

11:45:27  5          THE COURT:  Right.  At most you would be biased

6   against everybody.  That cancels itself out in a way.

7      I don't know.  What I'm going to let you do is think about

8   it.  I don't want you to feel uncomfortable being on the jury.

9   All right?  And I'll ultimately pose a question to you.  Okay?

11:45:55 10  But before I do that I'm going to talk to Mr. Coffey briefly,

11  because that is one of the questions.

12     And, how long ago was it that you worked in this analysis

13  group, Mr. Coffey?

14         PROSPECTIVE JUROR COFFEY:  I worked there from 1984

11:46:10 15  to 1987.  And then, while I was in graduate school I also

16  continued to work part-time.

17         THE COURT:  Okay.  Was that back east or was that out

18  here?

19         PROSPECTIVE JUROR COFFEY:  I began working for them

11:46:26 20  when I lived in Boston, and then I transferred to their Los

21  Angeles office and worked there, as well, and then I went to

22  grad school in Los Angeles.

23         THE COURT:  I was going to ask you why you are

24  wearing a Red Sox cap.

11:46:39 25         PROSPECTIVE JUROR COFFEY:  Yes.

11:46:39   1          THE COURT:   Okay.   And then, what was your specific

2    role in the patent case, the microphone case?

3          PROSPECTIVE JUROR COFFEY:   Yeah.   I was an analyst.

4    You know, I was -- so like the principals of the firm would be

11:46:50   5    the actual expert witnesses.   And they would kind of design

6    the analysis they wanted to do.   And, you know, I would be

7    the person who kind of executed that.

8          THE COURT:   Okay.   So you did not choose the model.

9    You worked with what they gave you.   You put the figures in.

11:47:09  10          PROSPECTIVE JUROR COFFEY:   Yeah, I just -- you know,

11    they say:

12          "I want you to research this," or, you know, "Create

13    this spreadsheet," or whatever, and I would do that.

14          THE COURT:   Okay.

11:47:18  15          PROSPECTIVE JUROR COFFEY:   And I was just out of

16    college so it was -- I wasn't like directing things at all.

17          THE COURT:   All right.   I don't know if, for example,

18    one expert in this case might choose a model that was more

19    like something you worked with, and another expert might have

11:47:37  20    a different model.   Can you put that old experience aside and

21    just listen to the merits of the testimony given by the people

22    here?

23          PROSPECTIVE JUROR COFFEY:   I think so.

24          THE COURT:   Okay.   You never testified as an expert.

11:47:51  25          PROSPECTIVE JUROR COFFEY:   Oh, no, they would never

11:47:51  1    have someone like me testify.  I was -- I was just out of

       2    college, like I said.  I was too young.

       3         **THE COURT:**  Okay.  Mr. Scherkenbach, what does

       4    "other" mean at the end?

11:48:05  5         **MR. SCHERKENBACH:**  I don't -- I'm satisfied.  He

       6    answered my questions.

       7         **THE COURT:**  All right.  Thank you.

       8       Now, ladies and gentlemen, you can think about this over

       9    the next 20 minutes, Mr. Mortimer.  I'm going to excuse the

11:48:16 10    jury for 20 minutes.  That means come back at five after

      11    12:00.

      12       Counsel, please stand by.

      13       Remember my admonition about not discussing the case.

      14         **PROSPECTIVE JUROR HARTWIG:**  Judge, can I speak to you

11:48:28 15    privately?

      16         **THE COURT:**  Can you speak to me privately?  Yes, if

      17    you stand back from the other jurors.  Just wait here.

      18       (Jury venire was excused)

      19       (The following proceedings were held outside of the

11:48:49 20    presence of the jury venire)

      21         **THE COURT:**  Ms. Hartwig, just have a seat in your

      22    seat.  And can we make sure that all the other jurors have

      23    left.  But the lawyers have to be here, too.  Is that all

      24    right?

11:49:20 25       (Reporter interruption)

11:49:30   1          THE COURT:  Hold on, hold on.  Counsel, we are in

         2   session.  Thank you.

         3      All right.  We are proceeding at this time outside the

         4   presence of the other jurors, with Juror No. 2, Mary Hartwig,

11:49:44   5   who asked to speak to the Court privately.  What is the

         6   concern?

         7          PROSPECTIVE JUROR HARTWIG:  Well, it is a little

         8   embarrassing, but it was your comment about your breaks.

         9   And --

11:49:53  10          THE COURT:  Okay.  Do you need lots of breaks?

        11          PROSPECTIVE JUROR HARTWIG:  Yes, I would.  Or I

        12   wouldn't be able to drink a thing, you know.

        13          THE COURT:  This is almost a catch-22.  You are here

        14   because you have to go use the facilities.

11:50:04  15          PROSPECTIVE JUROR HARTWIG:  Yes.

        16          THE COURT:  And you are staying later to tell me you

        17   have to use the facilities.

        18          PROSPECTIVE JUROR HARTWIG:  Yes.

        19          THE COURT:  Ordinarily, we would take a break after

11:50:10  20   about an hour-and-a-half  Would that be too long?

        21          PROSPECTIVE JUROR HARTWIG:  That probably would be

        22   okay.

        23          THE COURT:  That would be okay?  The best I can say

        24   is if you are chosen, and if we are running a little past and

11:50:20  25   you need a break, you just raise your hand and say:

JURY VOIR DIRE

11:50:22   1          "I need a break."  It is not really embarrassing, and

2    a lot of people have concerns.

3              **PROSPECTIVE JUROR HARTWIG:**  Okay.

4          **THE COURT:**  Okay?  Thank you.

11:50:30   5          **PROSPECTIVE JUROR HARTWIG:**  Okay.

6          **THE COURT:**  Go take your break.

7        (Prospective Juror Hartwig was excused to take her break.)

8          **THE COURT:**  So, Counsel, stand by, because I do need

9    to ask you about a couple of things here.

11:50:37  10      Okay.  Thank you.

11        (The following proceedings were held outside of the

12    presence of the Jury venire)

13          **THE COURT:**  The person who just came in as court

14    reporter, so it is not a problem.  Okay.  All right.  Very

11:50:55  15    briefly, I don't know what Mr. Mortimer is concerned about,

16    unless he just doesn't want to serve.  But, he -- I don't

17    know.  It seems like he could serve.  And so, I just wanted to

18    bring up a little bit of a concern about him.

19        I think we should let him say whatever he is going to say.

11:51:18  20    If he ends up saying "I can't be fair," I might just excuse

21    him, because I don't know what's bothering him.  But

22    something.  If any of you feel differently or you want me not

23    to excuse him, that's okay, too.

24        I mean, I don't really have a strong feeling.  He's the

11:51:36  25    only one who's really expressed some doubts.  Either of you

11:51:40   1   have any preferences either way on this?

2          **MR. SCHERKENBACH:**  Frank Scherkenbach.  I generally

3   agree with that.  I do appreciate the Court, though, coming

4   back to him and asking him one more time if he feels truly

11:51:53   5   comfortable serving.

6          **THE COURT:**  I'll do that.  If he says "no" I may just

7   excuse him, because it sound as like he just had bad

8   experiences, really annoying him having to be here thinking

9   about them.

11:52:05  10      But, perhaps the one with the brother-in-law, which I'm

11   sure was very disturbing to the family.  But, okay.

12      And then we have -- I don't know about your technology,

13   what about Mr. Coffey and the -- he had a minor role in

14   dealing with economic analysis.  But it sounds like damages,

11:52:25  15   so he didn't pick the way to do it.

16      He just carried it out and said he was kind of a flunky,

17   in so many words.  So, you know, really, at that time he has

18   no pride of anything.  In his discussion, seems very

19   self-effacing and low key.  So if you think it might be

11:52:43  20   helpful to have somebody who understands numbers, but isn't

21   going to be prejudiced, maybe he would be okay to have.  I

22   leave that to you to you tell me at this point.

23          **MR. SCHERKENBACH:**  We don't see any problem with Mr.

24   Coffey or, in fact, with any of the jurors.  I don't see

11:53:00  25   cause.

JURY VOIR DIRE

120

11:53:01   1        THE COURT:  They are a nice group.

2        MR. SCHERKENBACH:  No issue with cause for Mr.

3    Coffey.  His answer satisfied me.

4        THE COURT:  Or cause, if I'm just asking you now:  Do

11:53:09   5    you anticipate cause for anybody other than if Mr. Mortimer

6    expressed extreme views, and I didn't excuse him?

7        MR. JACOBS:  Fairchild does not, Your Honor.

8        MR. SCHERKENBACH:  Neither from Power Integrations.

9        THE COURT:  All right, thank you.  Go take your

11:53:21  10    break.

11        (Thereupon, a recess was taken.)

12        THE COURT:  We are back at 12:10.

13        We are missing one.

14        (The following proceedings were held in the presence of

12:11:36  15    the Jury)

16        THE COURT:  We are missing Mr. Coffey.  I thought I

17    was pretty clear about coming back here before the break.

18        Let me ask a couple of questions.  Is there anyone who saw

19    Mr. Coffey during the break in the jury box?  How about in the

12:11:55  20    courtroom?  Did anyone -- who's coming in?  It's not him.

21        Did anyone who's out in the courtroom see Mr. Coffey, the

22    gentleman with the Boston Red Sox baseball cap?  Did anybody

23    see him during the break or happen to notice where he went?

24        (No response)

12:12:17  25        THE COURT:  Did anyone go down to the second floor

12:12:19   1    where they have a -- and you didn't see him down there

2    apparently.

3              UNIDENTIFIED MAN:  (Shakes head).

4         THE COURT:  I assume people went to the men's room

12:12:28   5    and didn't see him there.  Gee, I'm not quite sure what to do.

6    We have to have him back here.

7         Mr. Jacobs?

8              MR. JACOBS:  We are missing one other, Your Honor.

9         THE COURT:  Oh, I didn't see.  Oh, we are also

12:12:38  10    missing Mr. Tuminello.  Maybe they are together.  Yes.  But

11    we don't know where.  That's the problem.

12        Mr. Tuminello is a little harder to describe because he is

13    not wearing a baseball cap.  But if anybody happened to make

14    his acquaintance or knows who I was talking about, he was

12:13:04  15    sitting in the back, that third seat over, had kind of a

16    tannish, I think, type jacket.  Kind of an -- yes, sir.

17             UNIDENTIFIED PROSPECTIVE JUROR:  So the first

18    gentleman he was -- (Inaudible) I didn't see him exit.

19             THE COURT:  You did see him?

12:13:22  20             UNIDENTIFIED PROSPECTIVE JUROR:  Yes, in the men's

21    room.

22             THE COURT:  But you didn't see him come out.  Oh,

23    well.  The gentleman --

24        (Reporter interruption)

12:13:31  25             THE COURT:  The gentleman, he didn't give his name.

12:13:32  1    You can just put "juror."  Okay.

       2         (Reporter interruption)

       3         **THE COURT:**  Oh, he -- essentially what he said is

       4    that he saw Mr. Coffey go into the men's room, the fellow with

12:13:43  5    the baseball cap.  He saw him go into the mens' room.  He

       6    didn't seem come out.

       7         **UNIDENTIFIED PROSPECTIVE JUROR:**  Correct.

       8         **THE COURT:**  It is possible he's there.  Has anybody

       9    talked to him, like struck up a little conversation with him

12:13:57 10    about anything, and would not feel uncomfortable going to the

      11    men's room and asking if he was there?

      12         (No response)

      13         **THE COURT:**  I can't send Ms. Lucero.

      14         **UNIDENTIFIED PROSPECTIVE JUROR:**  I'll be happy to go,

12:14:20 15    Your Honor.

      16         **THE COURT:**  Okay, thank you very much.  Even if we

      17    find him that's only one juror out of our two.  If somebody

      18    says there's one, we will see if that's correct.

      19         (A pause in the proceedings)

12:14:44 20         **THE CLERK:**  Mr. Coffey is on his way.

      21         **THE COURT:**  Well, that's good.  What about

      22    Mr. Tuminello?  No one's seen him.  We were doing so well.

      23         **THE JURY COMMISSIONER:**  He said he was in the

      24    cafeteria (Inaudible).

12:15:00 25         **THE COURT:**  All right, thank you everyone.

JURY VOIR DIRE

```
12:15:03    1        Okay.  Mr. Coffey, we have been trying to find out if you

            2   were okay.  If you will have a seat, please.  Were you at the

            3   second floor cafeteria?

            4             PROSPECTIVE JUROR COFFEY:  Yes.

12:15:25    5        THE COURT:  Did you happen to see Juror No. 3,

            6   Mr. Tuminello, down there?

            7             PROSPECTIVE JUROR COFFEY:  I think so, yes.

            8        THE COURT:  And, the question is:  Is he still there?

            9   And if he is, why?  I'm thinking that we might --

12:15:37   10        (Off-the-Record discussion)

           11        THE COURT:  Just be generally at ease, talk among

           12   yourselves.  I'll step off the bench, so you won't feel

           13   particularly constrained in that regard.  But please remember,

           14   don't talk about the case and don't leave.  Okay?  And, those

12:16:13   15   of you in the courtroom, please don't leave.  And you have all

           16   been very patient.

           17        We have actually had a relatively expeditious process to

           18   this point.  And, I would hate to get totally bogged down by

           19   people who -- who were overcome by hunger at the cafeteria.

12:16:36   20        So I'm going to step off the bench, and just abide by that

           21   general instruction.

           22        Thank you.

           23        (A pause in the proceedings)

           24             THE CLERK:  Remain seat and come to order.

12:19:10   25        (The following proceedings were held in the presence of
```

12:19:10   1   the Jury venire)

2            **THE COURT:**  All present, Mr. Tuminello, you were MIA.

3            **PROSPECTIVE JUROR TUMINELLO:**  Yeah.  Sorry, I had to

4   have --

12:19:20   5            **THE COURT:**  I understand.  Ms. Lucero thinks people

6   thought they would never get any lunch so they were trying to

7   fortify themselves on the break.

8        Okay.  All right.  Now, we have you back.  I will ask for

9   the record:  Does either side wish to exercise one or more

12:19:36  10   challenges for cause?

11            **MR. SCHERKENBACH:**  No, Your Honor, not for Power

12   Integrations.

13            **THE COURT:**  Thank you.

14            **MR. JACOBS:**  And neither for Fairchild, Your Honor.

12:19:45  15            **THE COURT:**  Thank you.  Then, the next stage is what

16   we call "peremptory challenges."  And as I say, ladies and

17   gentlemen, each side has a limited number of -- counsel m,and

18   just so you know, I want to make this clear.  You each have

19   three challenges that you can exercise peremptorily.

12:20:07  20        And, ladies and gentlemen, if you are excused, I want to

21   thank you very much now for your willingness to serve.  And

22   just when you hear your name, then you can go back to the jury

23   office and just report that you were excused from the trial.

24        Now, just so that everybody understands, each side has

12:20:29  25   three challenges, peremptorily.  If you pass a challenge and

12:20:35   1   the other side does not pass, you can come back and pick that

2   challenge up afterwards.  Sometimes called "banking a

3   challenge."

4       But if you pass and the other side passes, then you have a

12:20:49   5   jury.  If there are more jurors left in the jury box than we

6   have chosen for this jury, the number being eight, then the

7   jurors with the eight lowest seat numbers will be your jury.

8   All right?  Okay.

9       Now, if everyone understands that, I'm going to turn to

12:21:12  10   Power Integrations first and ask for Power Integrations' first

11   peremptory challenge.

12       **MR. SCHERKENBACH:**  Power Integrations thanks and

13   would excuse Mr. Tuminello.

14       **THE COURT:**  All right.  Mr. Tuminello, thank you very

12:21:24  15   much.  Please go back to the jury office.  Okay.

16       And, we would then go to the first peremptory challenge on

17   behalf of Fairchild.

18       Mr. Jacobs?

19       **MR. JACOBS:**  Your Honor, Fairchild thanks and would

12:21:42  20   respectfully excuse Juror No. 2, Ms. Hartwig.

21       **THE COURT:**  Ms. Hartwig, thank you very much.  Please

22   go back to the jury room and explain you were excused.  Thank

23   you.

24       Returning to Power Integrations, for Power Integrations'

12:22:02  25   second peremptory challenge.

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

JURY VOIR DIRE

```
12:22:05   1          MR. SCHERKENBACH:  Yes, Your Honor.  Power

           2   Integrations thanks and would excuse Mr. Burr.

           3          THE COURT:  That would be Juror No. 1?

           4          MR. SCHERKENBACH:  Yes.

12:22:10   5          THE COURT:  All right.  Mr. Burr, thank you very

           6   much, sir.  And you are excused, and should report back to

           7   tell the jury office.

           8       Then, returning to Fairchild's second peremptory

           9   challenge?

12:22:26  10          MR. JACOBS:  Your Honor, Fairchild thanks and would

          11   respectfully excuse Juror No. 7, Ms. Castillo.

          12          THE COURT:  Ms. Castillo, thank you very much.

          13   Please report back to the jury room to state you were excused.

          14       Each side has one peremptory challenge remaining.  This

12:22:52  15   would be Power Integrations' third and final.

          16          MR. SCHERKENBACH:  Your Honor, Power Integrations

          17   thanks and would excuse Mr. Coffey.

          18          THE COURT:  Mr. Coffey, thank you.  At this time

          19   please go back to the jury office.  Okay.  And that is then

12:23:10  20   taking us to Fairchild's third and final.

          21          MR. JACOBS:  Your Honor, Fairchild thanks and would

          22   respectfully excuse Juror No. 14, Mr. Mortimer.

          23          THE COURT:  Okay.  Mr. Mortimer, actually, I was

          24   going to go back to him and didn't.  Does that affect -- does

12:23:38  25   that affect your decision?
```

12:23:40   1          MR. JACOBS:  It does, Your Honor.  I was hoping you
       2     would ask the questions ahead of time.
       3          THE COURT:  Okay, because I got so thrown off by our
       4     jurors that were missing.
12:23:48   5      Let me ask, Mr. Mortimer, you had time to think about
       6     this.  Are you satisfied, if you were chosen, that you could
       7     hear this case, or not, sir?
       8          PROSPECTIVE JUROR MORTIMER:  Um, with respect to the
       9     Court, both sides as well as the men and the women who work
12:24:05  10     for them deserve my full and undivided attention and for the
      11     entire length of the trial.  And I could not at this time
      12     guarantee that I could fulfill that.  And (Inaudible) --
      13          THE COURT:  Why do you say that, sir?
      14          PROSPECTIVE JUROR MORTIMER:  That's just how I feel,
12:24:26  15     Your Honor.
      16          THE COURT:  Okay.  I want to see very briefly, if I
      17     could, counsel at the bench with the court reporter if she can
      18     get over there.  If not --
      19      (Sidebar discussion held on the Record:)
12:25:02  20          THE COURT:  Mr. Jacobs, I would have appreciated your
      21     calling this to my attention.  It was not my understanding
      22     that we wanted to get rid of him.  If you would have just
      23     mentioned that when we came back it would have been a lot
      24     easier.
12:25:16  25      How do you jointly or individually suggest we proceed at

12:25:19  1    this point?

2              **MR. JACOBS:**  I apologize, Your Honor.  I would

3    respectfully move that we excuse jury 15 (sic) for cause.

4              **THE COURT:**  But then what are you going to do?

12:25:27  5    People have excused jurors with the understanding that he was

6    still in the panel.

7              **MR. JACOBS:**  I'm happy to resolve this, to use our

8    last challenge, as well.

9              **MR. SCHERKENBACH:**  I think under the circumstances

12:25:40  10   that is the only fair thing to do, Power Integrations,

11   because --

12             **THE COURT:**  It's a problem.  That is the only thing.

13   I'm sorry.  I was going to ask him.

14             **MR. JACOBS:**  (Nods head).

12:25:50  15   **THE COURT:**  I hadn't really felt that anybody was

16   that concerned about him, but I was going to ask him, but

17   then, we had all these people didn't show up.  And, frankly,

18   they were people who (Inaudible) --

19             **MR. JACOBS:**  That is understandable.

12:26:04  20   **THE COURT:**  Okay.  Then, maybe we will just go ahead

21   and use the ones I --

22             **MS.. ONDRICK:**  We are fine with that.

23             **THE COURT:**  I mean, the other possibility is just to

24   give everybody another challenge.  But I would have to get

12:26:14  25   more people into the box, and I don't know that that really

12:26:18  1    works that well.

2         I mean M, we don't have enough people.  We would have put

3    more into the group.

4             MR. JACOBS:  We are fine with the process, excusing

12:26:26  5    juror 14.

6             THE COURT:  All right, thank you.

7             MR. SCHERKENBACH:  Thank you.

8         (Conclusion of sidebar discussion; the following

9    proceedings were held in the presence and hearing of the

12:26:29 10    Jury:)

11             THE COURT:  All right.  Then, Mr. Mortimer, you have

12    been excused, and thank you.

13         All right.  The peremptory challenges have now been

14    exercised.  I want to make sure that all of you who are seated

12:26:50 15    here, which are eight jurors currently in the box, are able to

16    serve for the duration of the trial, which you understand

17    is -- could take through the end of the month.  Is there

18    anyone who has any problem in that regard?

19         (A hand is raised)

12:27:07 20             THE COURT:  Yes?  Mr. Cunningham -- no.

21             PROSPECTIVE JUROR CUNNINGHAM:  I was scheduled to

22    take a trip to Arizona, training, it's business.  So, I could

23    cancel that if I have to.

24             THE COURT:  When is it set for, sir?

12:27:26 25             PROSPECTIVE JUROR CUNNINGHAM:  Monday to travel down

12:27:27  1   and Tuesday --

2            THE COURT:  This coming Monday?

3            PROSPECTIVE JUROR CUNNINGHAM:  (Nods head).

4            THE COURT:  Oh, that would be a major problem.  If it

12:27:31  5   were a one-week trial it would be a problem.  Is it something

6   that could be rescheduled?

7            PROSPECTIVE JUROR CUNNINGHAM:  No, it is a one-time

8   training.

9            THE COURT:  So then what happens?

12:27:39 10            PROSPECTIVE JUROR CUNNINGHAM:  Well, I guess I could

11   get the individual training through somebody else.

12            THE COURT:  Okay.  I would have liked to have known

13   that before we went all the way through this where we of could

14   have adjusted or extended your service.  I think you are going

12:27:55 15   to have to cancel at this point.  Sorry about that.

16            PROSPECTIVE JUROR CUNNINGHAM:  Fine.

17            THE COURT:  All right.  That was the one concern.

18   Okay.  Let me go -- yes.

19            PROSPECTIVE JUROR CUNNINGHAM:  Where would I have let

12:28:07 20   them know that?

21            THE COURT:  When they were asking for reasons why

22   someone would ask to be excused or deferred in the jury room.

23   It is my understanding they did make that inquiry.  And also

24   when I asked you if there was any problem, you could have --

12:28:24 25            PROSPECTIVE JUROR CUNNINGHAM:  Yeah.  You talked

12:28:24   1   about vacation travel, stuff that didn't really say "business

       2   travel."

       3           THE COURT:  Well, you know, it just depends.  They

       4   might not have been able to grant that request, but then if

12:28:34   5   you had brought it up here I guess I would have addressed it.

       6       Well, I hope that you are able to at least find some

       7   substitute for it.

       8           PROSPECTIVE JUROR CUNNINGHAM:  Yeah.

       9           THE COURT:  I think at this point, you're here.

12:28:47  10           PROSPECTIVE JUROR CUNNINGHAM:  I didn't want to do

      11   that, anyway.

      12           THE COURT:  All right.  Now, what I'm going to do, in

      13   this regard, is kind of get you more in an ordinary format.

      14   So the three people in the back row, would you all move over

12:29:04  15   so that you have Mr. Dang in that first seat, followed by

      16   Ms. Wong, and then Ms. Zapparelli.

      17       And then, we will have -- let's see.  I guess the way that

      18   if we were doing this sort of logically, then Mr. De Graca,

      19   would you sit next to Ms. Zapparelli, if that's okay.

12:29:28  20       Okay.  It is a little hard to get through there, sorry.

      21   And then we will take the four in the front row and move them

      22   over.  Okay.  And just come over in the order you have been

      23   seated here.

      24       (Request complied with by the jurors.)

12:29:45  25           THE COURT:  Okay.  If at any time during the

JURY VOIR DIRE                                                    132

12:29:47  1   proceedings anyone has any trouble hearing or seeing anyone,

        2   you would then please let us know.  Any displays, any

        3   witnesses, hearing any testimony.  I'm going to ask you now to

        4   stand, to be sworn as jurors in this case.

12:30:03  5        (Jury Panel sworn in)

        6        **THE COURT:**  Please be seated.  Ladies and gentlemen

        7   in the courtroom, I want to extend the appreciation of not

        8   only the Court, but the lawyers and parties in this case for

        9   your attendance here, your patience with our proceedings, your

12:30:36 10   willingness to serve.

       11        As it turned out, there were really no challenges that

       12   required that we go further than we did with the first 14

       13   jurors.  So, at this time, I'm going to ask you to go back to

       14   the jury room.  Tell them that you have been excused, and

12:30:56 15   thank you very much.

       16        (Jury venire excused)

       17        **THE COURT:**  All right.  The other jurors have left.

       18        Now, I did ask Counsel during the break, and I'm going to

       19   ask you now.  And if there's any question you can confer

12:31:37 20   briefly off the record.

       21        I'm going to be giving the jurors some number of

       22   instructions, preliminary to the trial.  We are not going to

       23   have opening statements today, as I understand.  Is that

       24   correct?

12:31:49 25        **MR. SCHERKENBACH:**  Correct.

```
12:31:49   1            THE COURT:  All right.  So, then, the question is
           2   whether with we should take a brief break for lunch, let the
           3   jurors have lunch, come back and do the preliminary
           4   instructions and the video, which I believe counsel have, do
12:32:07   5   you not?  The patent video?  Or not?
           6            MR. SCHERKENBACH:  I -- we have it.  I don't think we
           7   are equipped to play it today.  Our intention was to play it
           8   right before opening statement.
           9            THE COURT:  Oh, you weren't.  Really.  So then the
12:32:21  10   question is maybe I should just proceed to do the preliminary
          11   instructions without a lunch break if the jurors can hang in
          12   for that.  You would then be excused for the day, and you
          13   would come back tomorrow.
          14            MR. SCHERKENBACH:  I think that --
12:32:32  15            THE COURT:  I think that might be the best.
          16            THE CLERK:  Monday.
          17            MR. SCHERKENBACH:  Monday.
          18            MR. JACOBS:  Monday, Your Honor.
          19            THE COURT:  Oh, I'm sorry.  No, don't come tomorrow.
12:32:42  20   Sorry.  No.  No.  Don't come tomorrow.  I'll be here, they
          21   won't be.  And we won't be able to do anything.
          22        Okay.  Sorry.
          23        Now, I forgot.  We were picking our jury in the prior
          24   week.
12:32:54  25        What I'm going to do is give you some preliminary
```

12:33:00  1    instructions.  These you will have as a general guideline for

      2    the case.  On Monday, the parties are going to bring a video

      3    presentation that was prepared, I believe, by the Federal

      4    Judicial Center.  But if not, by some agency of the Federal

12:33:16  5    Government that describes in general terms -- and helpfully, I

      6    think -- the way the patent system works.  Because it may have

      7    some bearing on how you analyze the issues in the case.

                           **JURY INSTRUCTIONS**

      9    **BY THE COURT:**

12:33:30 10       What I'm going to tell you now, you don't have to take any

     11    notes on or anything.  Just sit back and listen.  At the end

     12    of the case I will be giving you also very detailed

     13    instructions about the particular laws that will apply to the

     14    issues.  These are more general in nature.

12:33:50 15       And now that you have been sworn in, these instructions

     16    are intended to introduce you to the case and the law that you

     17    will be applying to the evidence that you hear.  Also because

     18    it is patent trial, I will perhaps give you a few preliminary

     19    instructions regarding patents.

12:34:10 20       Now, as far as the case, I've told you it involves patent

     21    infringement.  Infringement is essentially an assertion that

     22    someone is making or using or selling a product that is

     23    covered by a patent, but they haven't received permission to

     24    do so.  It's very general.

12:34:32 25       I'm going to tell you something about your general duties,

JURY INSTRUCTIONS

12:34:37  1   because you are going to have to decide this case based on the

2   evidence that's presented.  And you alone are the judges of

3   the facts.  Not myself, in any way.  You are the ultimate

4   determiners of the facts.

12:34:52  5       We talked about my giving you the law at the end, but you

6   will be the determiners of the facts.  And you will have to

7   apply those facts to the law as I instruct you at the end of

8   case and you have follow the law whether you agree with it or

9   not.  And you agreed to do that.

12:35:12 10       You should not allow any bias, sympathy or prejudice that

11   you may feel toward one side or the other influence your

12   decision in any way.  And also don't let anything I say or do

13   during the course of the trial influence you at all.  Nothing

14   I say or do is intended to indicate or should be taken by you

12:35:33 15   as indicating what your verdict should be.  That -- that is

16   something solely within your hands.

17       The evidence that you will be using from which to find the

18   facts will consist of the testimony of witnesses, documents,

19   and other things that have been admitted into evidence.  And

12:35:51 20   the evidence may also include certain facts that are agreed to

21   by the parties.

22       And if that happens, that's sometimes called "a

23   stipulation."  And it means that you are to take those facts

24   as being conclusively proved.  In other words, they don't have

12:36:07 25   to present evidence on it.  The parties have agreed those

12:36:09  1   facts are just to be taken as a given.

2         Certain things, however, are not evidence and shouldn't be

3   considered by you.  And those are the statements and arguments

4   and questions by the lawyers.  Those, standing alone, are not

12:36:22  5   evidence.

6         Objections to questions are not evidence.  Lawyers have an

7   obligation to their clients to make an objection when they

8   think the testimony or exhibits being offered are not

9   admissible under the Rules of Evidence.  There are Rules of

12:36:39 10   Evidence that apply in Federal Court.

11         You shouldn't be -- you should not be influenced by a

12   lawyer's objection or by my ruling on the objection.  If I

13   sustain or uphold an objection and find the matter is not

14   admissible then you should ignore the question or the

12:36:59 15   document.  If I overrule the objection and I allow the matter

16   in evidence then this is something that you should treat as

17   evidence, and you may consider it.

18         Sometimes I may instruct you that an item of evidence is

19   to be only for a limited purpose.  And if I do that then I

12:37:17 20   will tell you what that purpose is, and then you must follow

21   that instruction, and only consider the evidence for that

22   limited purpose.

23         And I'll clarify that for you at the time that it happens,

24   if I do.  There are also times when I may strike evidence.  In

12:37:33 25   other words, something is put before you, and someone asks

JURY INSTRUCTIONS

12:37:38  1    that it be stricken once they've heard it or seen it.  And at

2    that point, I may grant that request.  And if I do, then you

3    are to do your best to essentially ignore it and pretend that

4    you never heard it or you saw it.

12:37:55  5        Other things that aren't evidence, anything you hear or

6    see outside the courtroom, even if it involves participants in

7    this trial, lawyers or witnesses or parties, you are not to

8    consider that as evidence.  You can only decide the case based

9    on what's presented here in court.

12:38:13 10        You will be shown most likely charts, possibly animations

11   to help illustrate the testimony of witnesses.

12       These are sometimes called "demonstrative exhibits."

13       They are not necessarily themselves evidence or admitted

14   in evidence, but simply used to explain evidence more

12:38:33 15   graphically or to help you understand it.

16       At the close of the trial, in all likelihood, whatever has

17   been admitted will be available for you to review in greater

18   detail and at greater leisure.

19       There are two kinds of evidence.  This is something that I

12:38:49 20   think is commonly misunderstood.  But there are two kind of

21   evidence, direct and circumstantial.

22       Direct evidence is direct proof of a fact, such as the

23   testimony of an eyewitness.  And circumstantial evidence is

24   proof of facts from which you may infer or conclude that other

12:39:08 25   facts exist.

12:39:13   1       A typical example -- I don't know why people use it,

2   because we don't live in Alaska.  But they often use this

3   example.  If a witness gets on the stand and says:

4            "I saw a polar bear walking outside in the snow,"

12:39:23   5   well that is direct evidence that a polar bear walked in the

6   snow.

7       If the witness testifies:

8            "I saw footprints in the snow, and I'm familiar with

9   polar bear footprints," you can infer from that, if you

12:39:38  10   believe the witness is sufficiently familiar, you can infer a

11   polar bear walked in the snow outside wherever they saw the

12   footprints.

13       So one is direct:  "I saw it."

14       The other is:  "I saw something" from which you can infer

12:39:52  15   the other fact.

16       The part that people often don't understand is that the

17   law does not make a distinction, generally, between these two

18   kinds of evidence.  Sometimes you will hear someone say:

19            "Oh, there was just circumstantial evidence."

12:40:10  20   Circumstantial evidence may be more reliable than what an

21   eyewitness personally saw, given what the situation is.  It's

22   up to you to decide the value and weight of the evidence and

23   the credibility of the witness who is testifying.

24       And so, that doesn't really depend on whether the evidence

12:40:35  25   is direct or circumstantial or a combination of direct and

12:40:39  1    circumstantial.  Everything is entitled to the same level of

2    evaluation by you.  And then, you make the decision what's

3    more reliable.

4         And, frankly, in judging the facts it is going to be up to

12:40:56  5    you, in some instances, if there is a dispute to decide what

6    witness to believe and what witnesses not to believe, and how

7    much of a witness's testimony to accept or reject.  You could

8    accept all of it, none of it or some of it.  That will be up

9    to you.

12:41:12  10       You may take notes to help you remember the evidence, and

11   we will provide you with notepads.

12        If you do take notes keep them to yourself until you and

13   your fellow jurors are ready to go and decide the case in the

14   jury room.  Don't let note taking distract you.  If you have

12:41:28  15   become a stenographer, in effect, you may miss a lot of the

16   cues that are very helpful in evaluating the testimony:  The

17   demeanor of the witness, the manner in which they give their

18   testimony.  All the kinds of things that you use in ordinary

19   life when you are talking to people, hearing people.

12:41:51  20       If you get involved in note-taking, you will miss those,

21   in all likelihood.  We do have a certified court reporter

22   whose job is to take everything down.

23        At the end of the trial, if you either couldn't remember

24   as a group what a witness said, or you had a real disagreement

12:42:15  25   about what the witness said, and if it was important, we could

12:42:18  1   try to find that evidence or testimony for you.

2   Sometimes it takes a while but we -- we can do that.  So

3   keep that in mind.

4   In the meantime, it can be very helpful to jot down points

12:42:30  5   that you think may be important later.  When you leave each

6   day you should leave your notes in the jury room.  They won't

7   be read by anyone, but you cannot take them home with you.

8   And at the end of the case they will be destroyed.

9   Whether or not you take notes you should rely on your own

12:42:45 10   memory of the evidence.  Notes are only to assist your memory.

11   In fact, if at the end of the case one juror remembered

12   something and didn't write it down, and one juror remembered

13   it differently and wrote it down it doesn't necessarily mean

14   the person who wrote it down got it right.  So again, these

12:42:59 15   are for your own use to assist you.  You should not be overly

16   influenced by either the notes of your own taking, anybody

17   else's or the process.

18   You are going to hear in this case in all likelihood

19   testimony that was taken before trial from witnesses who will

12:43:18 20   not be here at the trial.

21   That testimony would have been taken in most instances, at

22   least, in the form of a deposition.  A deposition is sworn

23   testimony of a witness taken before trial.  The witness is

24   placed under oath to tell the truth.  And the lawyers for each

12:43:37 25   side may ask that witness questions.  The questions and

JURY INSTRUCTIONS

12:43:41   1   answers are recorded.  Sometimes they are videotaped.

2   The deposition of a person can be used at trial under

3   certain circumstances.  For example, if that person is

4   unavailable to testify at trial.  And, if so, then that

12:43:58   5   deposition may be used in place of their live testimony.

6   You should consider deposition testimony presented to you

7   in court in place of live testimony insofar as possible in the

8   same way as if the witness had been present here to testify.

9   If deposition testimony is read to you by the attorneys,

12:44:16  10   don't place significance on the manner or tone of the reader

11   because they aren't actually the person who gave the

12   testimony.

13   Language other than English may be used in this trial.  In

14   particular, there may be testimony given in Mandarin Chinese

12:44:35  15   with a translation.

16   The evidence to be considered by you is only that provided

17   through the official court translators or interpreters.

18   Although some of you may know Mandarin -- and we didn't

19   actually ask whether anyone know it -- it is important that

12:44:52  20   all jurors consider really the same evidence.

21   Therefore, you must accept the English translation and

22   disregard any different meaning.  And, you must not make any

23   assumptions about any witness or party based solely upon the

24   use of an interpreter to assist that witness or party.

12:45:09  25   I might ask, is there anyone who is conversant or fluent

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

12:45:15  1    in Mandarin on the jury?

       2         (No response)

       3         **THE COURT:**  Okay.  So we probably don't have to worry

       4    about that.  But, as I say, everyone has to be on the same

12:45:22  5    page with the translation.

       6         Let me just check something here.  It has to do with the

       7    burden of proof.

       8         Well, let me see if I can describe this to you.  In any

       9    legal action, facts must be proved by a certain required

12:46:06 10    standard of evidence.  And this is known as "the burden of

      11    proof."

      12         Those of you who have participated in any way in a

      13    criminal case -- and even if you haven't -- are generally

      14    familiar with what's called "proof beyond a reasonable doubt."

12:46:21 15    And that's in all the TV shows it's also the criminal

      16    standard.

      17         It is a higher standard and requirement that is applicable

      18    to a civil case such as this.

      19         In a civil case, a patent case such as this, there are

12:46:37 20    actually two different burdens.  And the one that I'll address

      21    in the first instance is called the-preponderance-of-evidence

      22    standard.

      23         In a patent infringement case, the parties asserting or

      24    claiming patent infringement has the burden of proving

12:46:59 25    infringement by a preponderance of the evidence.

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

12:47:02  1        That means that the party asserting infringement has to

2        produce evidence that when considered in light of all the

3        facts, leads you to believe that what that party claims is

4        more likely true than not.  Okay, more likely true than not.

12:47:19  5        And to put it differently, if you were to put the parties'

6        evidence on opposite sides of a scale and the evidence

7        supporting the claims of the party asserting infringement is

8        considered, in order for that party to have proved

9        infringement, they have to make the scale tip at least

12:47:36  10       somewhat in their favor.

11               Now, there is a second standard or burden that will come

12       into play in this case.  And it is called "clear and

13       convincing evidence."

14               And that falls essentially between preponderance of the

12:47:57  15       evidence and beyond a reasonable doubt.  And, by the way, you

16       are going to hear all of this at the end of the case, too.

17       But to the extent that you are trying to evaluate the evidence

18       and how strong it is, or how you are evaluating the case as it

19       comes in, you should have some idea of these standards and

12:48:15  20       burdens.

21               Now, there is an assertion that the patents that are at

22       issue in this case are not valid patents.

23               Now, because patents are presumed to be valid because they

24       have been issued by the patent and trademark office -- and you

12:48:36  25       are going to hear something about that and see something about

12:48:38  1   it in the video.  But because they have been issued by a

          2   government entity, an agency, the standard of challenging them

          3   is higher than a preponderance.

          4       Under those circumstances, the party challenging the

12:48:54  5   validity of the patent -- in other words, arguing the patent

          6   is not valid.  It should not have been issued, okay?  They

          7   have the burden of proving by clear and convincing evidence

          8   that the patent is invalid.

          9       Clear and convincing evidence is evidence that produces an

12:49:11 10   abiding conviction that the truth of a factual contention is

         11   highly probable.  Well, that sounds a little confusing.  But,

         12   essentially, particularly using the word "conviction" that

         13   starts sounding like a criminal case.

         14       But, essentially, you have to have a belief that the truth

12:49:31 15   of the fact that is being contended is highly probable.  Just

         16   not more likely than not, but highly probable.

         17       And so, proof by clear and convincing evidence is a higher

         18   burden of proof than preponderance.

         19       Okay.  And, again, reasonable doubt, proof beyond a

12:49:52 20   reasonable doubt is not an issue here.  This is a civil case.

         21       Now, this next instruction I'm going to give you is very

         22   important.  And it is long, and I'm not going to repeat it

         23   every time we break.  Assuming Counsel agree, I can just

         24   remind you.

12:50:08 25           **MR. SCHERKENBACH:**  (Nods head).

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 12:50:09 | 1  | **MR. JACOBS:**  (Nods head).                          |
|          | 2  | **THE COURT:**  Is that agreed, Counsel?              |
|          | 3  | **MR. SCHERKENBACH:**  Agreed.                         |
|          | 4  | **MR. JACOBS:**  Yes, Your Honor.                      |
| 12:50:16 | 5  | **THE COURT:**  I'm going to read it in full now.  This |

you should keep in mind throughout the trial, because the more
you hear about the case the more tempting it is going to be to
do something or say something that is not in conformity with
this instruction.

First of all, during the trial, you are not to discuss the
case with anyone or permit anyone to discuss it with you, and
that includes yourselves, your fellow jurors.

You can't get a head start in talking about it, as
tempting as that might be.

When you return to the jury room at the end of the case
that is when you get to talk to each other because you are
going to be deliberating about the verdict.  But other than
that you can't talk about the case.

If any lawyer or party or witness does -- well, if you see
them, you can't really talk to them, even about the time of
day or the weather.

If you have a question about the proceedings, wait and
pose it to Ms. Lucero, who is a fountain of knowledge.  If she
needs to pass the question on to me, she will, any problem or
concern that you have.  But don't -- don't contact the lawyers

12:51:27  1   or the parties.  It puts them in a very awkward position.

2   They don't want to appear rude.

3       You don't know the witnesses.  At least you have told me

4   you don't.  So, before you strike up a conversation in the

12:51:39  5   elevator with some pleasant person, make sure they are not a

6   witness in the case.  All right?

7       And so, if you see the lawyers in the hall -- and you are

8   going to see them perhaps routinely -- just nod, you know,

9   graciously, "hello," and that's it.  And they know that.

12:51:55 10       Witnesses, the same.  And they will instruct their

11   witnesses and also the parties.  You have met one principal,

12   but you will likely others.

13       Now, when I say "don't talk about the case," I'm not just

14   talking about the individual specific facts.  So, you are

12:52:15 15   going to go home tonight.  Some of you have people you share

16   your residence with.

17       They are going to say:

18           "So how did your day go?  What happened?"

19       And you are going to say:

12:52:24 20           "I'm on a jury."

21       What do you think will be the first question they ask?

22           "What's it about?"

23       Okay.  At that point you should just say:

24           "I can't talk to you about the case now.  I'll talk

12:52:36 25   to you about it later.

12:52:39   1        "Who's involved it in?

           2        "Sorry, can't tell you that."

           3        I guess you could mention me, but leave me out, too.  That

           4    will be fine.  I don't have any particular interest in the

12:52:50   5    case, one way or the other.  But, you would be surprised how,

           6    even just the most innocuous comment, can bring forth some

           7    commentary from the other side.  Or not the other side, but

           8    the other side of your conversation.

           9        So, just be alert to that.  And, it is going to be hard to

12:53:10  10    follow, but I just encourage you.  And the easiest thing to

          11    say is:

          12            "I'll talk to you all about it when it's over."  You

          13    know, if you intend to.

          14        Now, you can't read or listen to anything that may bear on

12:53:23  15    this case.  And I have -- I don't anticipate this case is

          16    going to be reported in any way.  I don't know that it ever

          17    has been.

          18        But if there's something that, as you start to read it

          19    sounds like, boy, is that on the subject, put the paper aside

12:53:40  20    or the magazine or the article and read it later.

          21        Please do not try and do any research or make any

          22    investigation on your own part.  And that includes with any

          23    kind of source, whether it be in print, on the Internet,

          24    talking to anyone.  You just can't do that.

12:54:11  25        Even a dictionary, all right?  And the reason I say that

JURY INSTRUCTIONS

```
12:54:14   1   is because there are terms that may come up in this case that

           2   have a specific meaning, either in the law or the particular

           3   area of technology.

           4       And if you go to Webster's and you look something up, you
12:54:28   5   may get the wrong meaning of the word as it's being used here.

           6   Not as they're using it, but as it's being used here, so as

           7   strange as it sounds.

           8       Don't consult dictionaries or reference materials.  Don't

           9   search the Internet, websites, blogs or any other electronic
12:54:46  10   means.  Just don't try and find anything out, outside the

          11   courtroom.  It's really up to these parties to make their

          12   cases, to make them understandable.  And if somebody doesn't,

          13   then the chips will fall however they fall when you go in and

          14   decide whether they have met their respective burdens of proof
12:55:10  15   here.  Okay.  They know that.

          16       Now, to talk just a little bit about electronic devices

          17   I'm sure that many, if not all of you, have cell phones,

          18   BlackBerrys, iPods, iPhones, iPads, the Internet available to

          19   you and other tools of technology.  You can't use those to
12:55:37  20   inform yourself about the case.

          21       Social media sites.  There have been courts that have

          22   actually considered and may have even banned people from using

          23   social media.  Well, an awful lot of people depend on that for

          24   their means of communicating with whoever they want to
12:55:51  25   communicate with.
```

12:55:52  1     I'm not banning you.  But please do not, if you go on,

2     whether it's Facebook or Twitter, any of these sites, don't

3     say anything about the case.  It is the equivalent of talking

4     to people about the case.

12:56:08  5     Sometimes people don't understand it.  They don't really

6     understand the significance.  So I just want to make it clear.

7     I can't imagine any of you wouldn't.  But, nonetheless, in the

8     exercise of caution I'm saying that.

9     There have been cases where they have had to have

12:56:24  10    mistrials because people did things like that.  You just

11    wouldn't believe what they would put out on their pages.

12    Anyway, you won't do that.  Okay.

13    So that includes cell phone, email, BlackBerry, iPhone,

14    text messaging, Twitter, blogs or websites.  They are all off

12:56:43  15    limits.

16    Facebook, MySpace, Linked In, and YouTube.  All off limits

17    in any way commenting about the case or trying to find out

18    information about it.

19    Now, this is important.  During the course of the trial,

12:56:56  20    you are going to make assessments.  I mean, you can't possibly

21    just sort of have everything be a big blur and come in at the

22    end and try and remember what happened.  So you will be making

23    assessments, but these are preliminary.  Do not form an

24    ultimate opinion about this case until all of the evidence is

12:57:14  25    in.  All right?

12:57:16    1         Keep an open mind until you start your deliberations at

            2    the end of the case.

            3         And, I just want to look at one thing, because this is

            4    somewhat duplicative about what I talked to you about note

12:57:35    5    taking.  I don't want to belabor that point too much.

            6         Oh, I do want to say one thing that this particular

            7    general instruction covers, which is there isn't going to be a

            8    booklet of the evidence at the end of trial.  In other words,

            9    a transcript.  It is true that the reporter is taking things

12:58:02   10    down, but this is not going to be prepared, all typed up.

           11         And if you ever looked at what their notes look like, I

           12    mean it could be just -- it is in reporter language.  Okay?

           13    This is not going to be all typed up for you.

           14         So that is why I say, again, it is very important to pay

12:58:17   15    attention -- and I know you will -- to take some notes as you

           16    feel appropriate, if you do.  And then, we will do our best to

           17    help you at the end of the case in any way that you may need.

           18         This is a long trial.  Everyone knows that.  And, it may

           19    tougher at the end to accumulate everything and assimilate it.

12:58:43   20         Okay.  I'm not -- although the parties had some

           21    suggestions of my describing the issues to you, they don't

           22    really agree on them, and I'm not going to at this point try

           23    to resolve that particular disagreement.

           24         They will get up at the next stage of the case, which

12:59:04   25    won't be until Monday.  And that will be opening statements.

12:59:09   1       Now, opening statements are not evidence.  They are a

2    discussion by the lawyers at the outset, to assist you in

3    following the evidence as it comes in.

4       And at the end of the case, you can harken back to

12:59:25   5    whatever you were told and see if it matched up.  But, it is

6    generally helpful to hear these opening statements.  And as

7    you might also expect, evidence on occasion cannot come in, in

8    the most logical order, because of either witness availability

9    or other concerns.

12:59:42  10       And so, sometimes people say it's a little bit like having

11   the picture on the puzzle box, knowing where somebody is

12   trying to go.  And then you create it as you go along.  And it

13   helps to have that picture.

14       So you will hear opening statements.  And before you do,

13:00:01  15   you are going to see the video about the patent system.  And

16   it is about 17 minutes or so.

17       It has background information to help you understand what

18   patents are, why they're needed, the role of the patent

19   office, and why disputes over patents do arise.

13:00:20  20       And so, again, this was prepared by the government, not

21   the parties.

22       So, just to give you a quick outline, and then I'm going

23   to excuse you because you have had a long, condensed morning

24   into the afternoon.

13:00:37  25       After opening statements, we are going start the evidence.

13:00:42  1    And that will be starting with Power Integrations putting in

       2    the evidence as to their patents.

       3        And there will be witnesses called by them.  There will be

       4    cross-examination by counsel for Fairchild.  And, after they

13:00:56  5    rest their case, then Fairchild will go forward with respect

       6    to its infringement contentions as to their protected work.

       7        And, then you will hear cross-examination of their

       8    witnesses.  And that's how we are going to proceed.

       9        At the close of the case, then you will hear closing

13:01:14 10    arguments.  Those are different than opening statements.

      11    Opening statements aren't supposed to be argument, but often

      12    people will try to argue during opening statement then.  But,

      13    essentially, they are going to tell you what they are

      14    intending to prove.

13:01:29 15        Argument, that's going to be a wrap-up where they can

      16    argue about why their case was good and prove why the other

      17    side didn't do whatever it was required to do.  And that is

      18    when you will hear that summation.

      19        And after that, I'll instruct you on the law, and then you

13:01:44 20    will go out and deliberate.  That is a long ways down the

      21    road.  Okay.

      22        During the course of the trial, you may have all manner of

      23    questions.  Ms. Lucero is -- is really very knowledgeable and

      24    can help with all manner of jury concerns.

13:01:59 25        You will have a jury room where you will meet each day.

13:02:02  1   And I'm pointing.  You can't see it, actually.  It is through

       2   that door (Indicating).

       3       So when you come in the mornings, you won't be coming into

       4   the courtroom.  You will go down a secure hallway to the jury

13:02:14  5   room, and then we will call you out.

       6       We will be meeting with the jury (sic) -- and this is

       7   essentially 9:00 to 12:00, 1:00 to 4:00.  But please don't

       8   make very, very important appointments right on top of the

       9   trial day.

13:02:29 10       If, for some reason, we had somebody who came all the way

      11   from wherever, and they could be finished, and they have got a

      12   plane to catch, we might spend ten, 15 minutes, but not much

      13   more, if anymore, to wrap that juror -- or that witness up.

      14       So we don't want you to have of your most important

13:02:49 15   medical appointment, or some other appointment or job

      16   interview or whatever, right on top of the hours.

      17       As far as the lunch hour, it goes by pretty fast, so you

      18   are probably going to want to either bring your lunch, which

      19   you are welcome to do or go to the cafeteria, which is pretty

13:03:09 20   good and relatively reasonable.

      21       There are a number of restaurants in the area.  There are

      22   all manner of Asian restaurants on Larkin Street.  And then,

      23   there are other restaurants that are close by, including a

      24   deli that is pretty good at Turk and Larkin Streets.

13:03:25 25       And what's going to happen is that we are going to make

JURY INSTRUCTIONS

13:03:28  1   every effort to start promptly at 9:00.

       2            **THE COURT:**  I'm having the lawyers come earlier so

       3   that if matters come up over the evening we can try and

       4   address those before you get here so that we do not keep you

13:03:45  5   waiting.

       6        During the trial there may be issues that arise that may

       7   have to be resolved outside your presence.  We will try to

       8   keep those to a minimum.  There have been very lengthy

       9   proceedings beforehand to raise as many of those issues as

13:03:57 10   could be foreseen and dealt with and have rulings in advance

      11   so as to keep the case moving along and not bog down in the

      12   middle of witnesses' testimony.

      13        Counsel have made a real effort to try to bring as much as

      14   they could of that matter in dispute, if it exists, to the

13:04:16 15   Court's attention.

      16        Aside from the one brief conference I had over here

      17   (Indicating), I don't expect we will be having what sometimes

      18   are called "bench conferences."

      19        They will look a lot like kind of a rugby huddle.  More,

13:04:33 20   because they are trying to not be heard, and you are trying to

      21   hear.  And so, what we will likely do is ask you to go back to

      22   the jury room, and then we will try and deal with it out here

      23   where nobody has to whisper, and it works better.

      24        So that's a general idea of how we are going proceed.

13:04:51 25        I want to find out if Counsel have any suggestions or

13:04:55   1   thoughts or matters that should be taken up before I excuse

           2   the jurors.

           3       Let me make sure I covered what else I wanted to.

           4       I think I have.  I'm not sure how you wanted me to handle

13:05:09   5   the glossary that you gave me, Counsel.  I meant to ask you

           6   that earlier.

           7       At the back of one of your filings, it has a number of

           8   different terms.  I'm not sure how you wanted to deal with

           9   those.

13:05:25  10       Did you want those read to the jury?  I could wait to do

          11   it.  I don't think I would do it today.  It is not going to be

          12   meaningful to them.  It is all in the abstract.

          13           MR. SCHERKENBACH:  In the past, we haven't read them

          14   to the jury.  We have provided them as part of the final jury

13:05:42  15   instructions.

          16           THE COURT:  Okay, all right.  So then, anything

          17   further that we need to take up with these eight nice people?

          18           MR. SCHERKENBACH:  One suggestion.  I'm not -- I

          19   don't know if the ladies and gentlemen have been told what

13:05:53  20   your weekly schedule is in terms of --

          21           THE COURT:  Well, I think they were in the jury

          22   office, but let me clarify it.  It is a little bit variable,

          23   regrettably.

          24       Okay.  First of all, we are not meeting on Friday except

13:06:11  25   if we got close to the end of the trial and you could be

13:06:14   1    deliberating.  And the reason for that is that on Fridays, I

2    have a number of other proceedings that have to be conducted,

3    because if everything waited until we were through with a

4    trial, a lot of work would just build up.  So there are

13:06:30   5    various hearings and matters that are conducted on Friday.

6         That means we can't have the jury trial at the same time.

7    However, if you were deliberating, you would be in the jury

8    room, and it would not conflict with whatever was happening in

9    the courtroom.

13:06:43  10         If you had a question, or needed assistance, you would

11    take precedence.  They would go away, and you would come out.

12         Okay.  So, it is possible that you will want to, and will

13    be able to, and may be required to deliberate on a Friday.

14         But other than that, no.  So let's say next week you don't

13:07:06  15    need to be here on Friday.  But you do need to be here Monday

16    through Thursday.  Those are going to be our regular days.

17         And the most -- most of those days will be -- in other

18    words, three out of four of those days is 9:00 to 12:00, 1:00

19    to 4:00.

13:07:23  20         And this could be, I want to say, "ish" at the end,

21    because maybe it will be 9:00 to 12:15, and then it will be

22    1:15 to 4:00, something like that.

23         Anyway, that's the regular day.  On Wednesdays, I have a

24    criminal calendar every Wednesday afternoon.  And we have to

13:07:46  25    have those because criminal Defendants, many of whom are in

13:07:49   1    custody, are entitled to have their case moved forward and

2    not -- not wait while everything else goes on.

3        So, to avoid having to be off on Wednesday, which would be

4    a very sketchy trial week, we plan to meet from 8:30 to 1:30

13:08:08   5    with two 15-minute breaks.

6        Now, I'm not sure if the jury office made that clear.  But

7    so you would come a half hour earlier.  And, it's a little bit

8    tough, but I have used both processes where in some trials we

9    have just had 8:30 to 1:30.

13:08:30  10        So on those days bring something to snack on.  You are

11    going to want it.  Even if you are planning on having a full

12    lunch after, bring something.  And, I will talk to counsel

13    about how early they have to be here on the Wednesdays.  Okay.

14        But that is the best we can do in order to get as much out

13:08:54  15    of each day.  It nets out a good number of hours, even though

16    there is a shorter span on the clock.

17        And it also leaves you free to do -- if you don't have to

18    travel too far -- and some of you are traveling pretty far --

19    but if you did have to you might be able to make some

13:09:12  20    appointments in the afternoon.  That would be good during the

21    course.  But I know some of you are coming a pretty long

22    distance.  And some can't even rely on public transportation

23    like -- I don't think Ms. Zapparelli can, can you?

24            **JUROR ZAPPARELLI:**  No, (Inaudible).  But I'll get

13:09:27  25    here.

13:09:27   1         **THE COURT:** And probably not Mr. De Graca, either.

2   Yeah. I don't know about -- Ms. Wong, you can get BART, I

3   guess.

4         **JUROR WONG:** Samtrans and Bart.

13:09:39   5         **THE COURT:** Samtrans. Okay.

6     And Mr. Dang, how are you planning on getting here?

7         **JUROR DANG:** By BART.

8         **THE COURT:** Bus or BART?

9         **JUROR DANG:** BART.

13:09:49 10         **THE COURT:** Yeah. That is what I thought you said.

11   East Bay people or Contra Costa can probably use BART if they

12   need to.

13     And I don't know about Bethel Island.

14         **JUROR CUNNINGHAM:** BART, by Pittsburg. It starts

13:10:04 15   there.

16         **THE COURT:** You can get a seat. Okay, good.

17     All right. Well, I do want to thank all of you.

18     Are there any other matters?

19         **MR. JACOBS:** Nothing for Fairchild.

13:10:12 20         **THE COURT:** No.

21         **MR. SCHERKENBACH:** No, Your Honor.

22         **THE COURT:** All right. I want to thank all of you.

23     Did you have a question?

24         **JUROR FONACIER:** May I? It would be fair to say that

13:10:17 25   Thursday afternoon we would know if we needed to be here on

13:10:20  1    Friday?

2              **THE COURT:**  Yes.  I think that would be fair to say.

3    And I don't think you would be needed.  Even the second week,

4    I doubt very much if you would need to be here on Friday.

13:10:28  5              **JUROR FONACIER:**  Okay.  I could go to work.

6        And then.  Secondly, would it also be true or not that the

7    trial is over and done on the 27th like we were told in the

8    assembly?

9              **THE COURT:**  Did they tell you the 27th?  That wasn't

13:10:44 10    what I told him.

11             **PROSPECTIVE JUROR FONACIER:**  Okay.  We don't know.

12    I'm fine.

13             **THE COURT:**  I think what I told them was we

14    anticipated to be -- well, the 27th is the Thursday.  But you

13:10:52 15    may be deliberating --

16             **JUROR FONACIER:**  On Friday.

17             **THE COURT:**  -- on that Friday, the 28th.

18             **JUROR FONACIER:**  I have something to cancel.

19             **THE COURT:**  I didn't ask you earlier.  Does anyone

13:11:03 20    have like their dream cruise sailing out the following week?

21             **JUROR CUNNINGHAM:**  Or a dream exam?  I'm going to

22    change it for you.  But --

23             **THE COURT:**  Do you have?  Well, at least that is one

24    day or one session, I'm hoping.  I don't expect it to go

13:11:16 25    beyond that.

JURY INSTRUCTIONS

13:11:17   1       I will tell you that the attorneys have been given time

2       limits that -- within which they have to try their cases.

3                   JUROR FONACIER:  Uh-huh.

4                   THE COURT:  In other words, a limited number of

13:11:26   5    hours.  What can't always be predicted is some problem that

6       might arise in a juror's life where they -- we don't want to

7       excuse them and lose them, or we might have a gap.

8            Or it could be that time gets taken up with something

9       interstitially, essentially, and we can't predict what that

13:11:48  10   might be.  That is why we have tried to be generous with an

11      estimate.  We have overestimated a bit, but we're not certain.

12      And so that's -- if something came up in the following week we

13      would try to accommodate you.  But if somebody were going away

14      for two weeks to Italy, or something, that could be a problem,

13:12:03  15   and I didn't ask you about that earlier.

16                  JUROR FONACIER:  Thank you.

17                  JUROR ZAPPARELLI:  I know we can't eat in here, but

18      can we drink water from like our water bottles?

19                  THE COURT:  You can drink water from a cup.

13:12:17  20                 JUROR ZAPPARELLI:  Okay.

21                  THE COURT:  And we have got bottled water, actually.

22      In other words, it is not tap water that is in the jury room.

23      Or you can bring your own water, if you like it better.

24                  PROSPECTIVE JUROR ZAPPARELLI:  Okay.

13:12:27  25                 THE COURT:  And pour it in a cup.  But, if you can

13:12:31  1   kind of picture, it is kind of distracting.  And you can tell

2   your people, too, I guess, if you have technical people that

3   are going to be here, Counsel, very distracting.

4       People, you know, water bottles, it is like oh, so

13:12:44  5   healthy. but it really doesn't look any better if somebody is

6   swigging out of a water bottle than a Coke bottle.  I mean, it

7   is a bottle.

8       So I suggest you can bring water out here.  And, that's

9   fine.  But bring it in a cup.  Okay.

13:12:59  10          **JUROR ZAPPARELLI:**  Uh-huh.

11          **THE COURT:**  Okay.  And I don't know.  That is kind of

12   a minor thing.  Anything else that -- and by the way, this

13   isn't like it's the end of the -- you know, the course.  And

14   now we are going to have an exam on it.

13:13:12  15      So, anything that comes up, please be -- feel free to

16   present those questions to Ms. Lucero or myself, directly if

17   that's appropriate.

18      Okay.  Again, I want to say once more, everybody was very

19   pleased, really, with the geniality of the panel, the

13:13:32  20   qualifications of the panel that we have that were called

21   forward.

22      And I'm hoping that in return, you will be given a case

23   that keeps your interest, and that you -- you learn something.

24   Not just about the justice system, but about the subject.  And

13:13:54  25   I just want to thank you very much for your -- for your good

PROCEEDINGS

```
13:13:59   1   will and your patience with us, and your willingness to serve.

           2       So, have a very nice break, and be ready to work on

           3   Monday.  And we will have you go back to the jury room with

           4   Ms.  Lucero for a very brief orientation.  And then, you will

13:14:16   5   be free to go.

           6       Counsel, please stand by.  And we will see you on Monday,

           7   ladies and gentlemen.  Thank you.

           8       (The jury was excused.)

           9       (The following proceedings were held outside of the

13:14:24  10   presence of the Jury)

          11       THE COURT:  Okay.  I still feel a little bit bad

          12   about not talking to Mr. Mortimer earlier.  But is there

          13   anybody who really wanted to get off that jury after

          14   Mr. Mortimer?  I mean, everybody else was pretty much

13:14:55  15   cipher-ish in that respect.

          16       Okay.  Counsel and anyone who wants to sit down.  Maybe we

          17   will have Mr. Scherkenbach and Mr. Jacobs just come up here

          18   for a sec so we can hear them.

          19       But we have got some work left to do.  The -- the one

13:15:15  20   large matter that remains is the '700.  It turned out that the

          21   opposition to the motion for reconsideration, although it

          22   shows filed at -- on the 5th, which would have been yesterday,

          23   probably was -- was begun as an entry on the 5th.

          24       By the time it was actually entered it was after midnight

13:15:42  25   today.  Okay.  So it was really essentially available today
```

PROCEEDINGS

13:15:47  1   and not until midnight.  And so I've only had a very brief

        2   opportunity to go over it.

        3       It has some technical material in it very nicely produced

        4   in color and graphics and all as exhibits to it or an exhibit.

13:16:01  5       The thrust of the opposition is, I guess, twofold.  One is

        6   that no record was made to contradict in any way the assertion

        7   that Fairchild needed the amended contentions to go forward

        8   under the '700 and, in fact, there was an affirmative

        9   acknowledgment made of that point.

13:16:33 10       And according to Power Integrations they can't just use

       11   all their witnesses in some kind of fungible fashion to cover

       12   the '700, and that they would need to prepare.

       13       And they've got their case together within time limits

       14   without the '700 in it because that's what they were doing,

13:16:51 15   and understood.

       16       The second part, as I understand it, is that even if the

       17   Court reconsiders, they're still wrong because the particular

       18   elements that are now being relied upon were not relied upon

       19   in the original contentions.  Or I guess the originals are

13:17:12 20   really the amendeds and the new one it is supplemental.

       21       But just to keep the record straight, I can say "old" and

       22   "new."  And the old contentions, according to Power

       23   Integrations, didn't really point to this particular component

       24   for purposes of the claim at issue, but for some other

13:17:32 25   purpose.

PROCEEDINGS                                                    164

13:17:32   1        And so, it may have been in the contentions, but not

           2   pointed to the particular concern that's been raised about the

           3   sampling circuit.  That I haven't figured out yet, but those

           4   are the two points.

13:17:45   5        So, I'm -- I don't know at that I'm in a complete

           6   position, having just gotten, frankly, the opposition, to make

           7   a ruling on this.  And I'm not sure when you feel it might be

           8   most appropriate to do it under the circumstances, because we

           9   are going to start a trial on Monday.

13:18:08  10        MR. JACOBS:  Your Honor, we are perfectly comfortable

          11   relying on the papers that have been filed.  We have examined

          12   their papers.  The issues are laid out in the papers with some

          13   specificity.

          14        If the Court has questions, we are certainly willing,

13:18:21  15   after you have reviewed it, to come back at any point in time

          16   that is convenient to the Court.

          17        But having read the briefs, it appears to me that it is in

          18   a position where the Court can review and resolve the issue at

          19   this point.

13:18:32  20        THE COURT:  Well, I would ask whether you have got a

          21   response to the argument that the flip-flop, which apparently

          22   Fairchild wants to rely on now, was in any way pointed out in

          23   the old contentions in connection with meeting the sampling

          24   circuit requirement, or whether it was only pointed out in

13:18:54  25   connection with something else.

13:18:56   1          MR. JACOBS:  I'm going to let Mr. Martinson talk

           2   about that.

           3          THE COURT:  Okay.  I don't have the papers here now,

           4   but as long as we are all here, maybe I can at least get a

13:19:05   5   preview, and then decide whether I might want you to come back

           6   on the matter.

           7      Okay.  Mr. Martinson?

           8          MR. MARTINSON:  Mr. Martinson.  I wouldn't quite

           9   characterize the argument that way, Your Honor.  What I would

13:19:17  10   say is, yes --

          11          THE COURT:  Whose argument, yours or theirs?

          12          MR. MARTINSON:  The argument that you just put

          13   forward that we are relying solely on the flip-flop for --

          14          THE COURT:  Okay.  Are you relying on the comparator

13:19:31  15   plus flip-flop?  Is that it?

          16          MR. MARTINSON:  Yes.  And it is this combination of

          17   elements that starts at the feedback pan through the

          18   comparator into a sampling unit or a sampling -- I just want

          19   to look at the picture for a moment.

13:19:45  20      There is a flip-flop that is sampled at a specific time.

          21          THE COURT:  Okay.  Now, one of the arguments that was

          22   made by Power Integrations, if I have it straight on the brief

          23   and in my head, was in the old contentions you pointed to a

          24   resistor, a single element, and in the new ones you pointed to

13:20:06  25   a combination of elements, a comparator and flip-flop.  And so

13:20:12  1    that was new and not part of the -- I'll just called them "old

2    contentions."

3         MR. MARTINSON:  And that is just wrong, Your Honor,

4    if you look at the words that are in the contentions, the

13:20:26  5    original contentions, the old ones, if that is what you would

6    like to call them --

7         THE COURT:  Well, only because they were amended.  I

8    guess we could call them "original" and "amended."  But the

9    originals are the amended.  And the amended are the

13:20:35 10    supplemental, and --

11         MR. MARTINSON:  I will refer to them any way it is

12    easy for you.

13         THE COURT:  It doesn't matter.  We know what we are

14    talking about.

13:20:41 15         MR. MARTINSON:  All right.  So the old contentions do

16    specify a resistor in combination with other components, such

17    as the comparator.

18         THE COURT:  But that is the resistor and the

19    comparator, and not the flip-flop and the comparator.

13:20:54 20         MR. MARTINSON:  That's correct.  And if you look

21    later in the claim, when we talk about the sampling unit --

22    so we have got the sample circuit, this broad concept.

23         THE COURT:  Right.

24         MR. MARTINSON:  Then, we have further details of that

13:21:06 25    sampling circuit.  And in those further details of the

PROCEEDINGS

13:21:09  1   original contentions on the '700 patent, we identified this

2   exact same chain from the feedback pan through the comparator,

3   through the flip-flop, into the state machine and everything

4   else around it.

13:21:22  5        THE COURT:  Well, that is what I would have to go

6   over step-by-step with you, exhibit-by-exhibit with you, to

7   see if that's the case.  If it is, then that might address the

8   second prong of their argument.  But it doesn't at the moment

9   address the first prong, which is that there was a tactical

13:21:42  10  decision made by Fairchild, essentially, to get the best

11  position that they thought they could on the motion to

12  reconsider Magistrate Judge James' order denying the amended

13  contentions.

14       And in order to do that, to state that you could not go

13:22:04  15  forward if you were not allowed to amend.  It came up so many

16  times, as they point out -- Power Integrations does in their

17  papers -- that it doesn't just look like an oversight.

18       It looks like somebody made a calculation that the best

19  way to handle it would be to argue the motion to amend the

13:22:32  20  infringement contentions rather than go forward under -- even

21  if you could go forward -- a less likely successful

22  presentation.  So --

23       MR. MARTINSON:  I'm happy to speak to that.

24       THE COURT:  Well, you can., but -- okay.  Go ahead.

13:22:55  25       MR. MARTINSON:  I have the cited portions before me,

PROCEEDINGS

13:22:58  1   and I believe Ms. Ondrick was the one who was arguing for

2   that --

3             THE COURT:  Well, that is just the argument.  But I

4   pointed out at the last calling, as well, that it's not just

13:23:09  5   the argument.  Or maybe not the last calling.  Maybe this

6   morning.  But everything starts to blur after awhile.

7        But, essentially, that the issue was raised very, very

8   clearly in the moving papers on summary judgment, and very

9   clearly argued.  You got a resistor.  A resistor doesn't make

13:23:30 10   it.  Your expert is relying on this new stuff.  You can't do

11   it because the new stuff is too late, and there you go.

12        And nobody said:

13             "No, that isn't what we were doing."  That was not in

14   the papers in any way.

13:23:47 15        And if someone had said that I would have looked at it.

16   They could have addressed that point in reply, one way or the

17   other, and the issue could have been addressed then.

18        But, no one said it.  Even if you are saying it now, and

19   even if you are right, nobody said it then.

13:24:07 20             MR. MARTINSON:  I --

21             THE COURT:  I'm not just laying all this on

22   Ms. Ondrick's doorstep here, because as I say, it looks like

23   that was the whole thrust of the presentation.

24             MR. MARTINSON:  Just a few moments on that,

13:24:21 25   Your Honor.

13:24:21  1              THE COURT:  Okay.

         2              MR. MARTINSON:  What I believe is the case, is when

         3     presented with that question, the very specific question is:

         4                "Can your expert opine on whether or not this element

13:24:32  5     would be found if you have to rely on your old contentions?"

         6          And what that means is:  Can Dr. Wood say he applied your

         7     claim construction for the sample of the circuit.

         8              THE COURT:  Are you talking about the original papers

         9     that were filed in the briefing or are you talking about your

13:24:48 10     argument now?

        11              MR. MARTINSON:  I'm talking about what Ms. Ondrick

        12     conceded, arguably on the record, that we could not go

        13     forward, and why that was.

        14              THE COURT:  Well, whatever, it was pretty clear she

13:24:58 15     said:  "We can't go forward."

        16              MR. MARTINSON:  Right.  And I believe the context of

        17     why she would say that is our expert, under your ruling,

        18     cannot say he applied your construction.

        19              THE COURT:  That wasn't really the context.  And

13:25:11 20     there was another quote, also, that actually Power

        21     Integrations found in the record, that was pretty straight

        22     forward.  And as I say, I'm not blaming her for this.

        23          And I don't think your office should or the client should

        24     because it looks to me like it was a group decision not to

13:25:29 25     raise this point.

13:25:30  1        Now, you could have had it both ways if it went like this:

        2   First, you try the idea out on the motion for reconsideration

        3   of Judge James.  And if that didn't fly, then you come back

        4   and say:

13:25:44  5            "Oh, we made a mistake.  Now we are doing summary

        6   judgment," if those had been staggered.  But they weren't

        7   staggered.   They were all heard at one time.  So under those

        8   circumstances you were kind of stuck.  I assume you took what

        9   you thought was your strongest position.

13:26:02 10        The problem is that if you switch gears now, it's not

       11   really going to be fair to the other side that figured you

       12   were out of the case.

       13        And if you thought there was an ambiguity in the order,

       14   really, that could have been cleared up.  You know?  I wasn't

13:26:17 15   going anywhere.

       16        So, but, I still want to look at the idea of whether you

       17   are even right today as to what the history was of the

       18   contentions, and the report to the extent that it addressed

       19   them.

13:26:33 20            **MR. MARTINSON:**  All right.  Just one quick point,

       21   Your Honor.

       22            **THE COURT:**  Sure.

       23            **MR. MARTINSON:**  On your question about the context --

       24   and I'm reading from Power Integrations' opposition.  And the

13:26:41 25   quote is:

PROCEEDINGS

13:26:42   1          "THE COURT:  I'm assuming you can't go forward under

           2   the claim construction that the Court issued if you can't

           3   amend."

           4        And Ms. Ondrick said:

13:26:52   5          "That is correct.  We cannot have our expert apply

           6   your Court's construction."

           7          **THE COURT:**  I just asked, I assume you can't go

           8   forward with what we have got.  In other words, what had been

           9   said was this.  Under the claim construction that you wanted

13:27:05  10   for the particular term, what you had disclosed was fine.

          11   Okay?  But you got essentially kind of a narrower construction

          12   than you wanted.  And then you -- you found this other, I

          13   guess, component that you thought would meet it.  But I

          14   thought it was pretty clear.

13:27:23  15        Again, I don't want to focus just on Ms. Ondrick.  It just

          16   clarified, if you will, the whole position that was taken in

          17   the papers themselves, which was not to counter a very clear

          18   assertion made that -- and I think they said it like this:

          19          "You can't make it under your original contentions.

13:27:45  20   you have come up with something new in the new ones, but you

          21   can't make it under that, either."

          22        But they said very clearly:

          23          "You have come up with something new."  Nobody said:

          24          "No.  This isn't new.  This is what we have been

13:27:58  25   saying all along."

13:27:59  1       And if it was, they why -- of course, they say if it was,

2    why did you have to amend?  If it was good to start with, what

3    were you amending for?

4       But I do want to look at it, because, as I said, I want to

13:28:12  5    take a look at it as an equitable issue.  And, in looking at

6    it from that standpoint, I had said before there was ever any

7    response, that there's going to be something said about the

8    equities on the other side.  And, there was.

9       And so, even if you are right that you can go forward now

13:28:31 10    or that you could have made the other argument that you didn't

11    really make, I think -- I think that's the best way to put it.

12       Even if you could make the argument you didn't make, and

13    have it be accepted, it's not clear that it should be, at his

14    point in the litigation.

13:28:51 15       So the question is:  Should we come back, for example,

16    everybody's here, rather in than come back and try and do this

17    on the morning of trial?  Or even, let's say, the afternoon

18    tomorrow.  And I have a big hearing tomorrow morning.  So it

19    would have to be in the afternoon.

13:29:10 20       Maybe we should come back this afternoon and address this

21    after lunch.  And I would hope that you can just walk me

22    through it at that point.  I won't try and figure it all out

23    for myself in advance, because I don't think I can.

24            **MR. MARTINSON:**  I'm here at your convenience, Your

13:29:29 25    Honor.  And if you would like two words on the equities

13:29:31   1   involved here.  I can address Power Integrations' argument

           2   from their papers right now.

           3           THE COURT:  Well, that is true.  But that may be moot

           4   if you are essentially -- if it's still not -- I think I have

13:29:43   5   to look at it.  Okay?

           6           MR. MARTINSON:  Okay.

           7           THE COURT:  With you, if you feel that you actually

           8   disclosed in your contentions -- because, remember, the

           9   amended contentions aren't allowed.  So whatever equities

13:29:55  10   applied there or didn't apply, that is out of the picture.  We

          11   are only dealing with:  Did you have to amend at all?  Okay?

          12   And that's why I'm saying that it's possible that you had to

          13   amend.  They're arguing you did.

          14       I need to look at that and see whether or not you actually

13:30:13  15   had -- and this isn't what you could have done.  This is what

          16   was said.  Okay?

          17           MR. MARTINSON:  Right, I --

          18           THE COURT:  So I have to see what you said.  And I

          19   will look at that, if we are going to do that, after lunch.

13:30:26  20   Keep in mind you could have made this motion a month ago.

          21   Whenever my order came out, if you looked and you said:

          22           "Gee.  I am not so sure what that means with that

          23   first point, coupled with the last line."

          24       Nobody came back.

13:30:37  25       And they're happy with the way it read at the bottom line,

```
13:30:40   1   so they're not coming back.
           2       So, I think the burden was on the loser, if you will, to
           3   argue that it wasn't clear.  And we could have cleared it up
           4   and then you could have made the point you did, and we would
13:30:54   5   be talking about this a month earlier instead of now.
           6       I'm happy to go to lunch and come back, because I would
           7   like to get this off of my desk, one way or the other.
           8       I might also want to discuss with you very briefly when
           9   these people who are not coming in live are expected to be
13:31:11  10   presented.  And when I am supposed to review their testimony
          11   and figure out whether the hundreds of objections being made
          12   and counters ought to be acknowledged or not.
          13       So, yeah, Mr. Jacobs, do you have any comment on that last
          14   point?
13:31:31  15           MR. JACOBS:  I do.
          16           THE COURT:  I will let Mr. Martinson off the hook for
          17   the moment, okay?
          18           MR. MARTINSON:  I like it over here.
          19           THE COURT:  Okay.
13:31:37  20           MR. JACOBS:  I think Mr. Headley can help with this.
          21   We have a process in place, Your Honor, where two nights
          22   before, typically, the deposition, the real deposition
          23   testimony is going to be provided is sent to the other party.
          24       We then exchange objections that are beyond protecting the
13:31:56  25   record, real objections, and bring them to your attention to
```

PROCEEDINGS

13:31:59   1    the extent that we believe we should advance them 24 hours

2    before playing.

3        There will not be in our experience lines and lines and

4    lines of objections that need to be dealt with.

13:32:11   5        **THE COURT:**  Well, why -- what role do you perceive

6    the Court is playing in quote-unquote "protecting the record"?

7        **MR. JACOBS:**  So, there are certain periods of

8    deposition testimony that have been designated that are, in

9    fact, objectionable.  Those will be provided to the Court so

13:32:26  10    the Court can tell us in advance of the playing:

11            "I grant the objection.  Don't play that portion of

12    the deposition designation."

13        And then, we can make that change on the fly.

14        **THE COURT:**  Give me an example of what you are

13:32:38  15    talking about, very briefly.

16        **MR. JACOBS:**  Sure.

17        **THE COURT:**  And then, I think we do have to break,

18    because, see, this is all very interesting.  And you kind of

19    suck me into talking about it.  But they are going to close

13:32:47  20    whatever downstairs.  I don't know where you -- I mean, you

21    could go somewhere else, but I don't even know if they have

22    dropped that metal chain, gate down yet or not.

23        So make it a quick example.

24        **MR. JACOBS:**  So here is the example.  Say Power

13:33:01  25    Integrations designated a deposition and has some testimony

```
13:33:04   1   about inducement and inducing activities in the United States.

           2   And then, it also has designated --

           3           THE COURT:  Slow down a little bit.

           4           MR. JACOBS:  Sure.

13:33:11   5           THE COURT:  Okay.

           6           MR. JACOBS:  And then, it also has designated in it

           7   some testimony about the Delaware I itigation.  When we

           8   received that -- they have designated that at this point in

           9   time.

13:33:22  10       When we received it, we would bring it to the Court's

          11   attention, and we would say:

          12           "We don't object to the testimony relating to

          13   inducement, but we do object, if they don't withdraw that

          14   portion, to the testimony relating to this old litigation.  We

13:33:35  15   believe it is irrelevant and subject to the Court's order."

          16       You would then rule upon and tell us:

          17           "You can play this portion.  You can't play that

          18   portion.  Or you can play both portions."

          19           THE COURT:  Okay.  These are witnesses being called

13:33:48  20   in this case by deposition who also testified in Delaware?

          21           MR. JACOBS:  Delaware, the ITC, everywhere,

          22   Your Honor.

          23           THE COURT:  And when they were deposed, or they have

          24   been deposed in this case?

13:34:00  25           MR. JACOBS:  Not --
```

PROCEEDINGS

13:34:00   1            THE COURT:  Or you are only using their other

           2   proceeding testimony?

           3            MR. JACOBS:  Yes.

           4            THE COURT:  Okay.  So let's say, then, you are

13:34:07   5   looking at a Rule 804 issue, in the first instance.  And, the

           6   question of whether -- assuming they are unavailable, all

           7   right?

           8       This is testimony that the opposing party would have had

           9   the same interest as they would have if the witness were

13:34:24  10   called today, the same interest in exploring and

          11   cross-examining.  Right?

          12            MR. JACOBS:  (Nods head).

          13            THE COURT:  Is that a preliminary issue or just

          14   relevance?

13:34:33  15            MR. JACOBS:  That will often be a preliminary issue.

          16   Again, there's 33 depositions designated, so we have to

          17   look at them.

          18            THE COURT:  One of the reasons I'm concerned --

          19            MR. JACOBS:  We have to look at them one at a time to

13:34:45  20   raise it to your attention.  But I do think it would sort

          21   itself out, because, obviously, they don't plan on using 33

          22   depositions.  They will tell us in advance, two days, three

          23   day, which ones their going to use.

          24            THE COURT:  So what you are doing is simply saying --

13:34:59  25   this is almost an alert to the other side as to what you are

PROCEEDINGS

13:35:03  1    unhappy with.

2            MR. JACOBS:  Yes, Your Honor.

3            THE COURT:  Okay.  That is how I'm going to treat it

4    for the moment.  In other words, that nobody wants me to rule

13:35:11  5    on something in the abstract that may never be produced at

6    all.

7            MR. HEADLEY:  Exactly.

8            THE COURT:  Okay.  If after they read whatever

9    arguments you make, and you read whatever arguments they make,

13:35:23  10   you think anybody's out-of-line, or it's not a well-taken

11   objection, or whatever, those will be narrowed down and

12   presented to me.

13       And then, in enough time for me to rule so that if you

14   have to edit you have got to edit these things.

13:35:37  15           MR. HEADLEY:  Yes, Your Honor.  That was my one

16   question.  Our procedure as outlined in the pretrial order

17   says that we do this three nights before we would use any

18   transcripts and provide them to --

19           THE COURT:  That should be okay, depending on the

13:35:47  20   volume.  You know, that's the thing I am a little concerned

21   about.  So just keep that in mind.

22           MR. HEADLEY:  And what we traditionally do is 48

23   hours before the day starts in court, so 9:00 a.m., Saturday

24   for Monday, Sunday for Tuesday, on a rolling basis, we would

13:36:02  25   submit them to the Court with just the narrow part that is

13:36:06  1    objected to with a short write-up what each side's objection

2    is.

3             **THE COURT:**  That would be helpful.

4             **MR. HEADLEY:**  Traditionally, we emailed them to

13:36:12  5    chambers directly because there is no chambers copy quickly

6    that we can run over on odd days or something like that.  So I

7    wanted to inquire about the Court's preference for how we get

8    you that narrow subset.

9             **THE COURT:**  Send us an email.  Haven't really thought

13:36:24 10    about it, but maybe I'll have you send it to the

11    administrative assistant in chambers, and -- because, Tracy --

12    well, I will talk to her about it to see.

13        Maybe it should go to Ms. Lucero.  The question is then:

14    How I can get my hands on it, if it's at an odd point, you

13:36:44 15    know.

16             **MR. HEADLEY:**  Right.

17             **THE COURT:**  Because she may not be here.

18             (Off-the-Record discussion between the Court and

19    Clerk)

13:37:02 20             **THE COURT:**  Very quickly, then, we are taking a

21    break.  And I -- I recommend we take about -- oh, let's just

22    take an hour and a quarter.  Okay?  Because you are going to

23    have to deal with something else.

24        There's a truck down at the loading dock.  There is no

13:37:14 25    order for them to come in.  So, they're sitting there with

```
13:37:18    1    their motor running, and can't get in the building with

            2    whoever's exhibits are in that truck.

            3        Nobody gave me an order yet to give to the moving van, to

            4    give to whoever needs to have it downstairs so they can come

13:37:36    5    in where deliveries are made.

            6        Okay.  We going to take a break.  I'll make it an hour and

            7    a quarter.  Just round it off.  Let's say -- where are we now?

            8    We're at 25 to 2:00.  Just come back at 3:00.  Okay?  Come

            9    back at 3:00.  Yes, come back at 3:00.  That is about an hour

13:38:00   10    and 25 minutes.

           11            MR. HEADLEY:  Thank you, Your Honor.

           12            MR. JACOBS:  Okay, thank you.

           13            THE COURT:  All right.  That is the best I can do.

           14        (Recess taken from 1:35 o'clock p.m. to 3:00 o'clock p.m.)

14:56:44   15            THE CLERK:  PLease come to order.  Please be seated.

           16        (The following proceedings were held outside of the

           17    presence of the Jury)

           18            THE COURT:  Okay.  We are returning to the record

           19    outside the presence of the jury in Power Integrations v.

15:02:51   20    Fairchild primarily to take up the motion for reconsideration

           21    filed by Fairchild with respect to the Court's granting of

           22    summary judgment on the '700 patent in favor of Power

           23    Integrations.

           24        Okay.  Now, getting back to where we left off, it is Power

15:03:18   25    Integrations' position that the reference to the flip-flop in
```

15:03:28 1    the contentions as initially made was not in connection with

2    the sampling circuit, but in connection with a different claim

3    term or limitation.

4        And do you want to just summarize that argument, briefly,

15:03:44 5    Mr. Scherkenbach?  And then -- or whoever was going to make

6    it.  I don't know if it was you or one of the other counsel.

7    And then, I'm going to turn to -- f it's Mr. Martinson, or

8    whoever is responding, to address that particular point.

9        **MR. SCHERKENBACH:**  Yes, Your Honor.  Frank

15:04:03 10   Scherkenbach.

11       I think the first point I would like to make is we have

12   been focused on this flip-flop involving the flip-flop, if I

13   can put it that way, which actually pertains to only one of

14   the elements of one of the claims at issue here.

15:04:21 15      And it's gotten a lot of air time.  This sampling circuit

16   limitation, for example the second limitation of Claim 1.

17   But, in fact, there are other changes that are wholesale

18   changes for the other elements of the claim, as well.  So --

19       **THE COURT:**  Are you talking about the report or are

15:04:39 20   you talking about the contentions?

21       **MR. SCHERKENBACH:**  Both.  Both in Dr. Wood's expert

22   reports and in the amended contentions.

23       **THE COURT:**  Let's narrow this down a bit.

24       **MR. SCHERKENBACH:**  Okay.

15:04:53 25      **THE COURT:**  The issue here was -- essentially what

15:04:54   1    the Court was saying in its order was you could go forward

2    with respect to the minimum on time, but you can't go forward

3    with respect to sampling circuit.  And so, therefore, you

4    lose.

15:05:13   5        And that was because the arguments focused on those two

6    limitations in the motion for summary judgment.  The motion

7    may have commented that you could have said more, but in the

8    interest of focusing brevity, you relied on minimum on time

9    and sampling circuit.

15:05:33  10        And then, the question was whether or not -- the question

11   is -- all I want to talk about is whether now, if one looked

12   at it and argued it fresh without any of the prior baggage,

13   okay, we even have a situation where the initial contentions,

14   or I guess the amended ones which are actually the initial,

15:06:01  15   and the supplemental are the amended.  But, anyway, I'm just

16   going to call them the "initial contentions," actually laid

17   out what ultimately was made clear in the supplemental.

18        And, your argument was with respect -- sorry -- with

19   respect to the sampling circuit, that they did not mention in

15:06:27  20   any way the flip-flop or whatever they are now relying on.

21   That that came up for the first time in the amended

22   contentions.  And that in the initial contentions -- I guess I

23   should say in the supplemental contentions it came up for the

24   first time, and in the initial ones it wasn't contained there,

15:06:48  25   because the only reference to flip-flop was with respect to a

15:06:53   1    different limitation.

           2         That's what I thought you were saying.

           3         MR. SCHERKENBACH:  Well, it is.  And, actually, I

           4    don't even think it was fairly -- the flip-flop was fairly

15:07:01   5    disclosed with respect to another limitation.

           6         But certainly --

           7         THE COURT:  But this is the one we are talking about.

           8         MR. SCHERKENBACH:  Well, as to this one there isn't

           9    any question they never identified the flip-flop, and they

15:07:10  10    have never argued otherwise.

          11         THE COURT:  Well, that is what I'm asking you to just

          12    summarize.

          13         MR. SCHERKENBACH:  Okay.

          14         THE COURT:  All right.  As simply as you can, for the

15:07:18  15    record.

          16         MR. SCHERKENBACH:  Okay.

          17         THE COURT:  Because there seemed to be two different

          18    terms.  There's a sampling circuit.  And it is made up of a

          19    sample unit.  And then, there is a sample signal that is also

15:07:31  20    there.  And there appeared to be two limitations.

          21         And why don't you make your argument so that then we have

          22    it, and they can address it, and I can move on.

          23         MR. SCHERKENBACH:  Okay?  So to summarize, both for

          24    sampling circuit, which, for example, is in claim element 1B,

15:07:49  25    and for sampling unit, which, for example, is claim element

15:07:53   1    1F, Fairchild in its operative contentions, if I can put it

           2    that way, identified a resistor, okay?

           3        And for sampling unit in addition they identified a

           4    comparator.  But for neither did they identify a flip-flop in

15:08:10   5    any way, shape or form.  And I don't understand them to have

           6    argued otherwise.

           7        Now, if you look at their proposed amended contentions, or

           8    Dr. Wood's reports based on the proposed amended contentions,

           9    the resistor for those elements is nowhere in sight.  It's not

15:08:31  10    as though they're even adding disclosure to the resistor.

          11        The resistor's off the table.  They are now pointing to

          12    completely different structures.  Namely, for the sampling

          13    circuit, a comparator and this flip-flop which they did not

          14    point to before.

15:08:46  15              THE COURT:  Right.  Okay.  But, I understand that's

          16    your argument.  But in the attachment, or I guess it's Exhibit

          17    A.

          18              MR. SCHERKENBACH:  Exhibit A, yes.

          19              THE COURT:  Right.  You were trying to point out

15:09:01  20    those distinctions.  And I -- I think I may be following your

          21    argument.  If you look at Page 8, there the resistor is set

          22    out as a -- it says "e.g., a resistor."  Right?

          23              MR. SCHERKENBACH:  Yes.

          24              THE COURT:  Figure 1?

15:09:23  25              MR. SCHERKENBACH:  Yes.

15:09:23    1          THE COURT:   And this particular claim language is:

            2          "Wherein the sampling circuit comprises:  A sample

            3     unit coupled to the transformer to generate the voltage signal

            4     by sampling the reflected voltage of the transformer."

15:09:39    5          The Court ultimately construed "sampling" as "measure and

            6     hold."

            7          Okay.  So that is really what we're dealing with here.

            8          MR. SCHERKENBACH:   Correct.

            9          THE COURT:   And what they -- what they used was

15:09:48   10     "resistor."  Then, if you go two pages after that, you have a

           11     different term that says:

           12           "A sample signal generation circuit," which

           13     apparently is the other part of the sampling circuit, I

           14     gather.  Is that right?

15:10:05   15          So it's a sampling circuit that's comprised of a sample

           16     unit and a sample signal generation circuit.  We're on

           17     Page 10.

           18          MR. SCHERKENBACH:   Yes.

           19          THE COURT:   Okay.  In that one, they then describe a

15:10:20   20     logic circuit.  They don't mention flip-flop.  But, part of

           21     that is apparently the flip-flop.

           22          But that's a different claim term.

           23          MR. SCHERKENBACH:   Yes.

           24          THE COURT:   Is that the point you were trying to

15:10:40   25     make?

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

PROCEEDINGS

15:10:41  1          MR. SCHERKENBACH:  Yes.  These are different

2      elements.  They require different things.  And there was no

3      identification of that flip-flop in connection with "sampling

4      circuit."

15:10:51  5          THE COURT:  Well, the unit that is part of the

6      circuit or --

7          MR. SCHERKENBACH:  Or claim element 1B, sampling

8      circuit, there is no reference to flip-flop.

9          THE COURT:  All right.

15:11:00 10          MR. SCHERKENBACH:  There is another -- and it's

11     not -- i was going to say "subtlety," but it is not a

12     subtlety, but it is an important point.  They say -- in their

13     briefing they say:

14          "Well, even as to claim element 1B," if you go back

15:11:12 15     to that initial page that you asked me about, they say:

16          "Figure 1 shows that a circuit, e.g., a resistor" --

17          THE COURT:  Yes, that is what I --

18          MR. SCHERKENBACH:  -- "samples the reflected

19     voltage."  Okay?

15:11:23 20      The claim element as you just read it, Your Honor,

21     requires two different things.  It says you have a sampling

22     circuit for sampling a reflected voltage.  Okay?

23          THE COURT:  Uh-huh.

24          MR. SCHERKENBACH:  For that they identified the

15:11:35 25     resistor.

PROCEEDINGS

15:11:35   1           THE COURT:  Yes.

           2           MR. SCHERKENBACH:  Then it requires generating a

           3   voltage signal in accordance with a reflected voltage.  All

           4   right?

15:11:43   5           THE COURT:  Okay.

           6           MR. SCHERKENBACH:  So when they go on in their

           7   description and say that the voltage signal is sampled by the

           8   comparator --

           9           THE COURT:  Where are you?

15:11:58  10           MR. SCHERKENBACH:  That's a -- I'm at the -- well, on

          11   our Exhibit A, it is at the bottom of the column on the

          12   left-hand side of Page 2.  I think it is the same

          13   (Indicating).

          14           THE COURT:  Page 2.

15:12:09  15           MR. SCHERKENBACH:  Page 2 of our Exhibit A, the

          16   left-hand column.

          17           THE COURT:  Well, mine's numbered -- just so that

          18   we're clear let me go back.  That is just earlier.

          19           MR. SCHERKENBACH:  Yes.  If you flip back.

15:12:22  20           THE COURT:  Let me flip back to that.

          21           MR. SCHERKENBACH:  It is actually the first

          22   substantive page of Exhibit A.

          23           THE COURT:  Yes, okay.  Now, where do you want me to

          24   look there?

15:12:29  25           MR. SCHERKENBACH:  So the lower left, the text below

15:12:31  1    there what they call "Figure 1A."

          2                **THE COURT:**  Yes.

          3                **MR. SCHERKENBACH:**  From the data sheet.  Okay?

          4                **THE COURT:**  Uh-huh.

15:12:35  5                **MR. SCHERKENBACH:**  And they identify the resistor as

          6    the thing that samples the reflected voltage.  All right?

          7                **THE COURT:**  Let's see.

          8                **MR. SCHERKENBACH:**  In this sort of small text under

          9    the figure there.  "Figure 1 shows that".... Do you see

15:12:50 10    where --

         11                **THE COURT:**  Maybe I'm not on the same page.  Does

         12    this have claim language of "switch coupled," because that is

         13    on Page 2.

         14                **MR. SCHERKENBACH:**  No, flip back one page.  I

15:13:02 15    apologize.

         16                **THE COURT:**  Okay.

         17                **MR. SCHERKENBACH:**  The sampling circuit limitation.

         18    Sampling circuit.

         19                **THE COURT:**  They are not there either.  Let's see

15:13:07 20    what you have got and what I've got.  I've got an Exhibit A to

         21    the -- wait a minute.  I may be in the wrong -- wrong --

         22                **MR. SCHERKENBACH:**  It is attached to Mr. Duarte's

         23    declaration, Exhibit A.

         24                **THE COURT:**  No.  Wait a minute.  That is missing. I'm

15:13:29 25    in the wrong exhibit, sorry.  Let me go back.

PROCEEDINGS

15:13:31  1      Now, what page am I on in this exhibit?

       2           MR. SCHERKENBACH:  Just the first substantive page of

       3  Exhibit A.

       4           THE COURT:  Okay.  Wait a minute.

15:13:40  5           MR. SCHERKENBACH:  When it got filed it is Page 2,

       6  but it is really the first substantive page.

       7           THE COURT:  Okay.  Hold on.  Let me go back to that.

       8  I've got too many exhibits marked "A."

       9      Okay.  Now, first substantive page.  And, yes, it says

15:13:55 10  "Page 2 of 6" you are talking about at the top?

      11           MR. SCHERKENBACH:  Yes, correct, correct.

      12           THE COURT:  Now, where do you want me to look there?

      13           MR. SCHERKENBACH:  All right.  Now, so let's start

      14  with the claim language, claim element 1B.  Okay?  You have to

15:14:07 15  have a sampling circuit coupled to the transformer.

      16           THE COURT:  Uh-huh.

      17           MR. SCHERKENBACH:  "For sampling a reflected voltage

      18  of the transformer."  All right?  So you sample the reflected

      19  voltage.

15:14:18 20           THE COURT:  Right?

      21           MR. SCHERKENBACH:  And then, you generate a voltage

      22  signal --

      23           THE COURT:  Right.

      24           MR. SCHERKENBACH:  -- in accordance with that

15:14:23 25  reflected voltage.  Two things.  Okay?

15:14:25  1          **THE COURT:**  Okay.

2          **MR. SCHERKENBACH:**  Now, you go down to the figure.

3     There is a figure from the data sheet.  And below that figure

4     they identify only the resistor as sampling the reflected

15:14:39  5     voltage.

6          **THE COURT:**  Uh-huh.

7          **MR. SCHERKENBACH:**  Okay?

8          **THE COURT:**  Right.

9          **MR. SCHERKENBACH:**  And they do ultimately refer to

15:14:43 10     the comparator.  But they only refer to that in the context of

11     the voltage signal --

12          **THE COURT:**  Yes.  Now --

13          **MR. SCHERKENBACH:**  -- that results.  Okay?

14          **THE COURT:**  That is what I was talking about earlier,

15:14:53 15     but where are you now looking in your --

16          **MR. SCHERKENBACH:**  It's the same.  It's just further

17     down.  It is the next sentence below that Figure 1.

18        So the first sentence says the resistor satisfies the

19     first part of the claim.

15:15:07 20          **THE COURT:**  Uh-huh.

21          **MR. SCHERKENBACH:**  Which is the thing that is

22     sampling the reflected voltage.

23          **THE COURT:**  Correct.

24          **MR. SCHERKENBACH:**  Okay.  And then, for the second

15:15:13 25     piece of the claim that says you have a voltage signal.

15:15:15  1    Right?  They say the resistor generates the voltage signal

2    that's proportional to the reflected voltage.

3        Do you see where I am?

4            **THE COURT:**  Yes.

15:15:28  5            **MR. SCHERKENBACH:**  Okay.  "Which is, in term, sampled

6    by other components."  Right?

7            **THE COURT:**  Right?

8            **MR. SCHERKENBACH:**  So they are not relying on the

9    comparator as the thing that samples the reflected voltage in

15:15:43 10   the claim.

11       My point is even there when they are pointing to the

12   comparator, it is not doing the sampling of the reflected

13   voltage.

14           **THE COURT:**  Yes.  And so that's what I think I was

15:15:53 15   talking about when I was looking at the other exhibit to see

16   if that was what you are referring to.  It is just bigger.

17   Okay?

18           **MR. SCHERKENBACH:**  Okay.

19           **THE COURT:**  All right.  So, you have -- just a

15:16:10 20   moment -- the signal.  Now, was that one of the terms that we

21   were dealing with here?

22           **MR. SCHERKENBACH:**  I don't believe so.

23           **THE COURT:**  Well, there is -- you have 1G, a sample

24   signal, on Page 5 of 6.  And there they've circled the logic

15:16:33 25   circuit.  And that includes what I think they are calling the

15:16:35  1   "flip-flop."

2         **MR. SCHERKENBACH:**  Well, yes.  I thought -- I took

3   you to be asking whether you construed sample signal.  I don't

4   believe you construed it.

15:16:45  5         **THE COURT:**  No.  It says "was not construed."

6         **MR. SCHERKENBACH:**  Right.

7         **THE COURT:**  I am sorry.  But it is part of the

8   contentions.

9         **MR. SCHERKENBACH:**  Oh, clearly, it is.  It is part of

15:16:53 10  the contentions.  And this actually, the page that you have

11  now turned to, Element 1G, sample signal generation circuit,

12  is an example of the point, the larger point I was making,

13  which is if you look at any of these elements, even for that

14  one, they have wholesale changed what it is they point to for

15:17:11 15  that element, also.  Right?

16      You can see in their original contentions, they circled

17  the comparator and a flip-flop in a particular signal.

18         **THE COURT:**  Uh-huh.

19         **MR. SCHERKENBACH:**  And then, if you go to the middle

15:17:26 20  column, or the right column -- the middle couple is

21  clearest -- they have entirely changed their theory of what

22  the sample signal generation circuit is.

23      It is now the sample delay block and a different signal

24  altogether.  So this is not a -- it is not a windage call.

15:17:46 25  They just completely changed their theory.

15:17:48   1          **THE COURT:**  All right.  Well, let me go to

2   Mr. Martinson, then, on this point.  That is the one I said I

3   wanted to start with, because irrespective of then getting to

4   the other points, if this one doesn't even work we don't

15:18:01   5   really have to get to the other points.

6          **MR. SCHERKENBACH:**  That's right.

7          **THE COURT:**  Yes.  So Mr. Martinson, we are now

8   talking about whether the original contentions, I guess we

9   could say, called out the same components that are -- or

15:18:18  10   called out the components that you say you are relying on at

11   this point.

12          **MR. MARTINSON:**  Simple answer is absolutely,

13   Your Honor.

14          **THE COURT:**  Yes.  Where?

15:18:29  15          **MR. MARTINSON:**  That despite Mr. Scherkenbach's

16   confusion because of where Dr. Wood drew the boxes later on

17   in his amended contentions, the exact same components have

18   been identified all the way through.

19          **THE COURT:**  Okay.  Were they identified, though, for

15:18:44  20   the same limitation?  In other words, in the declaration that

21   was made by Mr. Jacobs, and has the exhibit that I think I was

22   actually looking at because it was easier to read --

23          **MR. MARTINSON:**  Yes.

24          **THE COURT:**  Exhibit A to his declaration.  Then, if

15:19:04  25   we look at, for example, Page 10 of that Exhibit A, it says:

PROCEEDINGS

15:19:10  1              "The sample signal generation circuit."

       2         And then, underneath, it says:  "A logic circuit."

       3         And there they circled what turns out to include a

       4    flip-flop.  But when one was looking at the sampling unit for

15:19:34  5    the sampling circuit, there it said "a resistor samples."

       6         And so, ultimately you are not relying on the resistor as

       7    sampling.  You are relying on what was relied on for the

       8    signal, but not the sampler, as best as I can tell.

       9         **MR. MARTINSON:**  Okay.  I'm going to respectfully

15:20:00 10    disagree with that, Your Honor.

      11         **THE COURT:**  Okay.

      12         **MR. MARTINSON:**  And I understand where the confusion

      13    comes from.

      14         **THE COURT:**  Okay.

15:20:04 15         **MR. MARTINSON:**  Because we spent a lot of time

      16    talking about what this resistor does.  And all it does is

      17    exactly what was described in the very first element we talked

      18    about, which is -- let me just make sure I get the right one

      19    for you here.  I guess it would be on Page 5, the sampling

15:20:24 20    circuit.

      21         **THE COURT:**  Okay.  Just a minute.  Of Exhibit A to

      22    Mr. Jacobs?

      23         **MR. MARTINSON:**  Yeah, the big picture, that's

      24    correct.

15:20:32 25         **THE COURT:**  Hang on.  Am I on page 5.  Is that it?

PROCEEDINGS                                           195

```
15:20:38   1              MR. MARTINSON:  Page number 4.

           2              THE COURT:  Oh, Page 4.

           3              MR. SCHERKENBACH:  Well, as filed.  It would say

           4     "Page 5 of 34."

15:20:42   5              THE COURT:  Well, mine doesn't say "of" anything on

           6     this particular exhibit.

           7              MR. MARTINSON:  Okay.

           8              THE COURT:  But the typed, if you will, page number.

           9              MR. MARTINSON:  Is 4.

15:20:52  10              THE COURT:  Is 4, okay.  Yes.

          11              MR. MARTINSON:  It shows Figure 1?

          12              THE COURT:  Yes.

          13              MR. MARTINSON:  Okay.

          14              THE COURT:  1A.

15:20:59  15              MR. MARTINSON:  And the description that is

          16     associated therewith, below the picture, says:

          17                 "The resistor samples the reflected voltage at the

          18     transformer."

          19         No debate there.  That's what happens.  That voltage

15:21:11  20     across the resistor, see how it goes into that pin called

          21     "FB"?  You follow the little line from FB out.

          22              THE COURT:  Yes.

          23              MR. MARTINSON:  Okay.  And then, there's the resistor

          24     above and the resistor below.  If you look on Page 3, right

15:21:27  25     before Page 4, you will see where "FB" shows up.  Okay?
```

15:21:33  1              THE COURT:  Wait a minute.  Page right before?

        2              MR. MARTINSON:  Yeah.  If you look at Page 3.

        3              THE COURT:  Okay.

        4              MR. MARTINSON:  Just so you can have Figure 1 and

15:21:39  5     Figure 2 right by each other.

        6              THE COURT:  All right.  And what --

        7              MR. MARTINSON:  See where FB comes in on Figure 2?

        8              THE COURT:  Where it says "fault auto restart open

        9     loop"?

15:21:51 10              MR. MARTINSON:  No.  It will be in the upper

       11     left-hand corner, "FB."

       12              THE COURT:  Okay.  Hang on.  I can see "FB out."

       13              MR. MARTINSON:  Okay.  So go to the left.

       14              THE COURT:  Go to the left of that?

15:22:02 15              MR. MARTINSON:  Yeah.  That's where it says "D."

       16     Well, it will say "Q" and then it says "D" as you move to the

       17     left.  That is the flip-flop.

       18              THE COURT:  Wait a minute.  Okay.  Looking to the

       19     left there's that "DQ," yes.  That square thing is the

15:22:17 20     flip-flop.

       21              MR. MARTINSON:  That is the flip-flop.

       22              THE COURT:  Okay.

       23              MR. MARTINSON:  And if we go one step to the left of

       24     that, we have the triangular looking device.

15:22:24 25              THE COURT:  It is the comparator.

15:22:27  1              MR. MARTINSON:  That is the comparator.  And if you

       2   go to left of the comparator, you follow the top line out of

       3   the comparator where the little plus is, you will see a little

       4   circle that says "feedback, FB" below it.

15:22:36  5              THE COURT:  Okay.

       6              MR. MARTINSON:  You follow that?

       7              THE COURT:  I can see it.

       8              MR. MARTINSON:  When I talk about the resistor

       9   generating a voltage, that's where that voltage shows up.

15:22:46 10   It's right there.

      11              THE COURT:  What I'm trying to understand here is

      12   that you have sampling circuit claim language.  All right?

      13              MR. MARTINSON:  Correct.

      14              THE COURT:  And, there, you say the resistor samples,

15:23:03 15   and then it generates a signal, which is, in turn, sampled by

      16   other components, e.g., the comparator.

      17       So that is farther down the line, as I understand it.

      18   But -- and I'm not sure where -- now, where did figure 3 fit

      19   into the contention, then?  Was that --

15:23:25 20              MR. MARTINSON:  Figure 2?  I'm sorry.

      21              THE COURT:  Figure 2 -- I'm sorry -- on Page 3.

      22              MR. MARTINSON:  So Figure 2 shows up when we -- it

      23   shows up many times.  But in the context which I think you

      24   will be interested in, you are going to turn to Page -- if we

15:23:47 25   go to Page 8, Your Honor.

PROCEEDINGS

```
15:23:49   1              THE COURT:  Of that same exhibit?

           2              MR. JACOBS:  Yeah, of the Jacobs declaration.

           3              THE COURT:  Okay.  Just a minute.  Of the -- Exhibit

           4    2 of the Jacobs?

15:23:57   5              MR. MARTINSON:  Yes.

           6              THE COURT:  Yeah, all right.  Just a minute.  I just

           7    lost it.

           8              MR. MARTINSON:  Sorry.

           9              THE COURT:  It's okay.

15:24:04  10              MR. MARTINSON:  I understand.  And you won't see

          11    Figure 2 there, but we will take you to it on the next page.

          12              THE COURT:  Yeah, I don't say Page 2.

          13              MR. MARTINSON:  All right.  So if we are on Page 8,

          14    you will see the figure again.  And we have the "wherein"

15:24:18  15    clause on the left side.

          16              THE COURT:  Yes.

          17              MR. MARTINSON:  So "wherein this sampling circuit

          18    comprises."

          19              THE COURT:  Right.

15:24:23  20              MR. MARTINSON:  So you and I were just discussing the

          21    sampling circuit in the context --

          22              THE COURT:  Exactly.

          23              MR. MARTINSON:  And now you asked:

          24              "Where is Figure 2 going to show up with respect to

15:24:28  25    the sampling circuit?"
```

15:24:30   1         That is the question I understand.

           2              THE COURT:  Uh-huh.

           3              MR. MARTINSON:  If we flip the page to Page 9, there

           4    is your Figure 2.

15:24:41   5              THE COURT:  Okay.

           6              MR. MARTINSON:  And we're still talking about the

           7    same claim element.  We are talking about the sampling, the

           8    further details of the sampling circuit.

           9              THE COURT:  Well, interestingly, the flip-flop isn't

15:24:53  10    circled there.  I am not sure whose -- these circles are what

          11    Fairchild is saying one should look at, I believe.  And that

          12    stops at the comparator.  In other words, before the

          13    flip-flop.

          14         And then, the flip-flop, which is never mentioned as a

15:25:10  15    word, but is there, doesn't get -- oh, hold on -- doesn't get

          16    circled until we get to the signal generation circuit, which I

          17    understand to be a different limitation.

          18         So that's why it looks like it is not part of the

          19    particular element that was -- or limitation that was being --

15:25:40  20              MR. MARTINSON:  Okay.  So here's -- so remember we

          21    are talking about at a broad level, the sample, the sampling

          22    circuit.

          23              THE COURT:  Well, it has multiple components.

          24              MR. MARTINSON:  That's right.  So for the sampling

15:25:50  25    circuit, which we talked about first -- I think it is Element

15:25:54  1   1B -- we said it is the resistor and other things, the

2   comparator, and other things on down the line.

3       So now when we talk about the specifics of what's in the

4   sampling circuit, we are going to step through that.  And you

15:26:05  5   are correct.  The first element points to the feedback signal

6   and the comparator.

7       And the very next element of that claim, which is still

8   part of the sampling circuit itself --

9           THE COURT:  Yeah, but a different part.  No?

15:26:20 10           MR. MARTINSON:  But it all works together to do the

11  very -- the very basic function of Element 1B.  Right?

12           THE COURT:  Yeah, all right.

13           MR. MARTINSON:  1B says we have got a sampling

14  circuit to generate a sampling -- and to sample the reflected

15:26:34 15  voltage.

16           THE COURT:  Okay.

17           MR. MARTINSON:  So we have identified the same train

18  of components from start to finish.

19           THE COURT:  Okay.  Do you want to also address the

15:26:44 20  equitable matter?  You had wanted to do that before the break.

21           MR. MARTINSON:  I would be happy to.  So the thrust

22  of Power Integrations' argument, as I understand it, they are

23  going to be prejudiced in two ways.

24       One is they would have -- they want Tom Yang to come here

15:26:58 25  and testify, because he is the inventor of the patent.  Well,

15:27:02  1  Mr. Yang no longer works with our company.  He is in Taiwan.

2  So he is -- they can't make him come here.  So I think that is

3  a nonissue.

4      The second issue they wanted to take all kinds of

15:27:13  5  additional discovery with respect to Mr. Yang and the '700

6  patent.  Mr. Yang was deposed in this case, deposed as

7  recently as -- when were we over there?  In December?  They

8  chose not to ask him any questions about the '700 patent.

9  Just like they chose not to ask Dr. Wood any questions about

15:27:28 10  the '700 patent in his deposition.

11      How can they claim prejudice when they have had full on

12  discovery in this matter?

13              **THE COURT:**  Okay .

14          **MR. MARTINSON:**  And discovery is long since closed.

15:27:38 15          **THE COURT:**  Okay.  I'll ask them about it.

16      Is there some reason that your office waited until

17  essentially we were practically in trial to move for

18  reconsideration or to raise the concern you had about the

19  meaning of the order?

15:27:53 20          **MR. MARTINSON:**  I'm not aware of any, Your Honor,

21  other than the fact that we operated under obviously the wrong

22  assumption, just like Power Integrations did.  That, you know,

23  we thought we understood your order, as if -- as if --

24          **THE COURT:**  No, no.  They didn't misunderstand it.

15:28:06 25          **MR. MARTINSON:**  Well, that is clear now.   But there

```
15:28:08   1    was clearly a disagreement among the parties.

           2            THE COURT:  Well, okay.

           3            MR. MARTINSON:  And when it came to light we brought

           4    it to your attention.

15:28:13   5       (Off-the-Record discussion between counsel)

           6            MR. MARTINSON:  Yeah.  And this was addressed, as I

           7    understand it at the pretrial conference.  Maybe Mr. Jacobs

           8    could further explain that.  I was down the hall that way

           9    (Indicating).

15:28:24  10            THE COURT:  Well, your office seemed to be relying on

          11    the fact that I had said that the ruling by Magistrate Judge

          12    James was not dispositive.  And that you were interpreting

          13    that to mean then, of course, you could go forward in some

          14    way.

15:28:40  15       But I had said before and I think many times, and will say

          16    again that the basis of my ruling was that it was not

          17    dispositive, because as a matter of law you could go forward.

          18       The fact that you might have a weak case, or even no case

          19    factually is not a legal matter.  That's a factual one.

15:29:02  20       So the orders were not inconsistent.  And the only

          21    ambiguity, if you want to call it that -- and I guess you

          22    could rightly -- was that I said that you had raised a triable

          23    issue to the extent he was relying on the older components.

          24    But then the parenthetical was as to that other element,

15:29:22  25    essentially, the one about the minimum on time.
```

15:29:27   1        And I was really talking about the two different elements

        2   and thinking that everybody understood that at the time

        3   because of the fact that I had multiple assertions in the

        4   hearing that you couldn't go forward if you couldn't amend the

15:29:46   5   contentions.  So, in any event, okay.

        6        You have explained that you thought you were right and

        7   they thought they were right, and you would just wait and let

        8   the dust settle at trial.  Okay.

        9        Now, do you want to respond at all, Mr. Scherkenbach?

15:30:01  10   Either as to the -- I think you have described your position

       11   as to the -- yes, the factual issue of whether the original

       12   contentions do contain a reliance on the components that

       13   ultimately were relied on in the supplemental contentions.

       14        But, on the equitable, there were arguments made that you

15:30:32  15   wouldn't have done anything differently, even if the '700 were

       16   in the case.

       17        **MR. SCHERKENBACH:**  Well, I mean, of course we would

       18   have.  We didn't ask Mr. Yang anything about this because you

       19   had ruled that the '700 patent wasn't in the case.

15:30:46  20        So, to say that we could have and should have taken his

       21   deposition on an issue that was resolved by your order is a

       22   really hard position for us to understand, with all due

       23   respect.

       24        We had no business asking him questions about a patent

15:31:04  25   that wasn't in the case.  And just, by the way, this harkens

15:31:07   1    back to an observation you made.  If they had thought there

           2    was any ambiguity about that order at all -- and we don't

           3    think there is, as you know -- it should have been raised in

           4    November.

15:31:18   5         You ruled in November.  Why are we here in the first week

           6    of February.  Trial starts Monday, and we are going to put

           7    this patent back in the case when my client's been operating

           8    on the assumption that it is not in the case?

           9         The opening statement is more or less in the can.  Our

15:31:33  10    witnesses have been prepared.  I mean, this would be a

          11    wholesale change in the case at this -- at this juncture.

          12         Just one other point that I don't want to have lost sight

          13    of.  You may recall when we first argued about whether they

          14    should be allowed to amend their contentions, a significant

15:31:53  15    component of our prejudice that I believe the Court relied on,

          16    in part, in denying their amendment was that if we had known

          17    about these new contentions, we would have taken fact

          18    discovery directed toward those contentions.

          19         In other words, if that's what you say infringes, if

15:32:11  20    that's your theory, well, then, there is significant other

          21    prior art, for example, we could have developed.

          22         We could have deposed your expert on that basis, and so

          23    forth.  So the prejudice is not limited to a single deposition

          24    of Mr. Yang.  Okay?

15:32:33  25              **THE COURT:**  All right, thank you.  I think that I've

15:32:39   1   heard both your positions, and certainly I don't like to see a

           2   very significant ruling being made solely on procedural

           3   grounds, if there are other grounds.

           4        In this instance, I'm -- first of all, just to say -- and

15:32:52   5   I've taken it under submission.  I'm not satisfied that the

           6   original contentions did identify the components that are

           7   being relied on now for the purpose that they're being relied

           8   on now.

           9        I grant you that it is reasonably complex for someone who

15:33:13  10   doesn't deal in the sciences routinely.  But it seems to me

          11   that they are divisible.  And that the flip-flop, even if not

          12   identified by name, did show up.  But it showed up on the

          13   other side of the divider.

          14        Even if I'm incorrect in that regard, it does not seem

15:33:34  15   appropriate to the Court to -- to bring the patent back in

          16   now.  Aside from what I've pointed out as -- as to the

          17   position that Fairchild took at the time that the Court heard

          18   both the motion that they made to reconsider Magistrate Judge

          19   James' denial of the supplemental contentions, and the

15:34:04  20   summary-judgment motion, aside from what I said about that in

          21   the moving papers, and aside from what Ms. Ondrick said, which

          22   has also been quoted at some length, there's even

          23   Mr. Martinson, okay, in that very hearing on the dual issues.

          24        Mr. Martinson was responding to Mr. Scherkenbach who had

15:34:37  25   been making his argument which has been pretty consistent,

PROCEEDINGS

15:34:42  1   about the different structures that are now being brought up

2   in his opinion for the first time in the amended or

3   supplemental contentions.

4       And in response to that, Mr. Martinson, you said:

15:34:54  5       "The last thing he said with respect to the sample

6   and hold circuit, he said, 'without the amended contentions,

7   Fairchild can't talk about that.'"

8       Now, we talked about *de novo* review this morning. I just

9   want you to keep that in mind when you are going back today.

15:35:13 10   Without our amended contentions, we can't talk about sample

11   and hold. Now, that is a pretty strong statement that goes

12   right along with what Ms. Ondrick said and right along with

13   essentially the entire thrust of the opposition to the motion

14   for summary judgment, and opposition to the -- and the

15:35:41 15   argument on amending the contentions.

16       And it -- frankly, it seems to me that Fairchild was in

17   something of a box. It had two different things that it

18   wanted to do. The stronger point was to get the amended

19   contentions into the case, the supplemental contentions into

15:36:03 20   the case.

21       Then they had a stronger case against Power Integrations.

22   If they had to go forward on the original contentions, if they

23   felt they could, it was going to be a weaker case. So, I

24   think that they made a conscious decision to sacrifice that

15:36:24 25   position and go with -- go for broke, basically, on getting

PROCEEDINGS

15:36:28  1    their better case in front of the jury, which did not succeed.

2         I don't think this was an oversight on anyone's part.

3    Certainly not on Ms. Ondrick's.  Or a misstatement, as it had

4    been described.  She just misspoke.  She wasn't really

15:36:45  5    thinking about what she was saying.

6         No, I don't think that really was the case.

7         I do think that there is -- even if the original

8    contentions contained this particular element, which, frankly,

9    I don't think it does.  But if they did, I think at this

15:37:02 10    point, to allow everyone to -- to really change their

11    argument, now that they're left with just the summary

12    judgment, and -- and to bring this particular matter at this

13    late stage of the game into the case just does not appear to

14    be appropriate and would work, I believe, to the prejudice of

15:37:25 15    Power Integrations unfairly.

16         So it's a significant decision.  But, nonetheless, that is

17    going to be my -- my ruling.  So, the '700, I am denying the

18    motion to reconsider.  I've looked at it, but I'm not going to

19    change the ruling.  I have reconsidered to the extent of

15:37:46 20    considering it at great length whether I should change the

21    ruling.

22         So the motion is denied.  And that means that to the

23    extent that Dr. Wood's report relies on the '700 in any way it

24    is really moot.  And I don't know that he has really changed

15:38:02 25    anything else other than to tailor whatever he needs to tailor

15:38:05  1    to whatever other rulings were made.  And so to the extent

       2    that Dr. Woods is not addressing the '700, the motion to

       3    strike his supplemental report is denied.

       4        And then, that leaves us to go forward with the case with

15:38:29  5    the two Power Integrations and the one Fairchild patent.  I

       6    don't think the jury is going to be so, frankly,

       7    unsophisticated as to feel that everybody has to have the same

       8    number of patents in the case to be absolutely fair contenders

       9    here.

15:38:48 10        In any event, I don't know if there's anything else we can

      11    take up today.  It's been a long day.  You have a jury.  And,

      12    they look like pretty good people.  So, that's fine.

      13        And I have -- I don't know, I think maybe we should just

      14    break.

15:39:05 15            MR. SCHERKENBACH:  I agree.  Can I ask one unrelated

      16    and hopefully not random question --

      17            THE COURT:  Sure.

      18            MR. SCHERKENBACH:  -- about the jury?  How do you

      19    have determine who the foreperson is?  And I apologize if

15:39:16 20    you --

      21            THE COURT:  They do.

      22            MR. SCHERKENBACH:  They vote, okay.

      23            THE COURT:  At the end of the case when they go out

      24    they go in the jury room and they pick who they feel should be

15:39:26 25    the foreperson.  So, but we don't do that.

15:39:30  1          MR. SCHERKENBACH:  Very good.  Thank you.

2          THE COURT:  Okay.  Any other questions or -- or

3    matters?

4          MR. SCHERKENBACH:  Nothing from Fairchild,

15:39:36  5    Your Honor.

6          THE COURT:  No.  Okay.  Well, then, I'm going to call

7    it a day for today.  We will be in recess.  And, I'll see you

8    at 8:30 on Monday.  There may be nothing that's cropped up in

9    the interim.  If -- if Mr. Jacobs looking like:  "Oh,

15:39:56 10    optimistic person."  But --

11          MR. JACOBS:  That would be a first.

12          THE COURT:  That might be a first.  But whatever

13    comes up we will try to do -- keep in mind if multiple things

14    come up that the things that take priority, even if not the

15:40:12 15    most important, would be the things that might have to be

16    decided before you make your opening statements.

17       Other things we will find some gap to deal with.  Okay.

18    Now, did you get -- whoever had the truck downstairs, has then

19    been resolved?

15:40:29 20          MR. HEADLEY:  Yes, Your Honor.

21          MR. SCHERKENBACH:  Thank you.

22          MR. JACOBS:  Thank you.

23          THE COURT:  Yes.  I signed an order.  And I guess

24    they interpreted it as truck can come in.

15:40:38 25          MR. JACOBS:  We will get another order for the

PROCEEDINGS                                                210

```
15:40:39    1    loading docks, Your Honor.

            2            THE COURT:  Fine.  If you need help with the

            3    logistics, I think as you have seen Ms. Lucero is great, and

            4    very helpful.  And, we will both do what we can to help you.

15:40:51    5    I know it is going to be a lot of work just getting everything

            6    together for trial.

            7        Okay.  Thank you, Your Honor.

            8            MR. HEADLEY:  Thank you.

            9            MR. JACOBS:  Thank you, Your Honor.

15:40:59   10            MR. SCHERKENBACH:  Thank you, Your Honor.

           11            THE COURT:  Okay.  If you can, have a good weekend.

           12    All right.  Thank you.

           13            (Proceedings concluded at 3:38 o'clock p.m.)

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25
```

**INDEX**

|                    | **PAGE** | **VOL.** |
|--------------------|----------|----------|
| Jury Voir Dire     | 26       | 1        |
| Jury Instructions  | 134      | 1        |

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Friday, February 7, 2014

Belle Ball, CSR 8785, CRR, RDR