VOLUME 8

PAGES 1821 - 2104

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE

POWER INTEGRATIONS, INC., A DELAWARE CORPORATION,

PLAINTIFF,

VS.

FAIRCHILD SEMICONDUCTOR INTERNATIONAL, INC., A DELAWARE CORPORATION, ET AL.

DEFENDANTS.

NO. C 09-05235 MMC

SAN FRANCISCO, CALIFORNIA
THURSDAY, FEBRUARY 20, 2014

TRANSCRIPT OF TRIAL PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF: FISH & RICHARDSON, P.C.
500 ARGUELLO STREET, SUITE 500
REDWOOD CITY, CALIFORNIA 94063
BY: FRANK SCHERKENBACH, ESQ.
HOWARD G. POLLACK, ESQ.
MICHAEL R. HEADLEY, ESQ.
ENRIQUE DUARTE, ESQ.
JONATHAN J. LAMBERSON, ESQ.

REPORTED BY: BELLE BALL, CSR #8785, CRR, RDR
OFFICIAL REPORTER, U.S. DISTRICT COURT

(APPEARANCES CONTINUED, NEXT PAGE)

**APPEARANCES, CONTINUED:**

**FOR DEFENDANTS:**

MC DERMOTT, WILL & EMERY
500 NORTH CAPITOL STREET N.W.
WASHINGTON, D.C. 20001
BY: BLAIR M. JACOBS, ESQ.
CHRISTINA A. ONDRICK, ESQ.
ROBERT J. WALTERS, ESQ.
ALEXANDER PAUL OTT
AND
MC DERMOTT, WILL & EMERY
28 STATE STREET
BOSTON, MASSACHUSETTS 02109
BY: LEIGH J. MARTINSON, ESQ.
AND
MCDERMOTT, WILL & EMERY
275 MIDDLEFIELD ROAD
SUITE 100
MENLO PARK, CALIFORNIA 94025
BY: A. MARISA CHUN, ESQ.
JEREMIAH ARMSTRONG, ESQ.

08:15:55 **THURSDAY, FEBRUARY 20. 2014** **8:30 A.M.**

**P R O C E E D I N G S**

(THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE PRESENCE OF THE JURY)

08:32:10 **THE CLERK:** PLEASE COME TO ORDER.

PLEASE BE SEATED.

**THE COURT:** ALL RIGHT. GOOD MORNING, COUNSEL.

**MR. SCHERKENBACH:** GOOD MORNING.

**THE COURT:** OTHER THAN THIS MOTION THAT WE DISCUSSED 08:32:26 AT THE VERY END OF THE DAY YESTERDAY CONCERNING THE SCOPE OF DR. WEI'S TESTIMONY, WHAT DO WE HAVE COMING UP, PERHAPS, BEFORE THAT?

**MR. JACOBS:** I THINK, YOUR HONOR, WE MAY HAVE A FEW MINOR DISPUTES REGARDING SLIDES THAT ARE INTENDED TO BE USED 08:32:46 WITH DR. WEI'S TESTIMONY. HE IS GOING TO COME ON AFTER MR. HUANG. BUT WE ARE STILL TRYING TO RESOLVE SOME OF THOSE.

**THE COURT:** OKAY.

**MR. SCHERKENBACH:** THEY ARE ACTUALLY FAIRLY SIGNIFICANT ISSUES WITH DR. WEI, APART FROM THE CLAIM 08:32:59 CONSTRUCTION ISSUE. SO --

**THE COURT:** OKAY. WELL, YOU KNOW WHAT MY THOUGHTS WERE, JUST AS TO A CONCERN THAT HE'S ACTUALLY OFFERING THE SAME OPINION THAT --

**MR. SCHERKENBACH:** YES.

08:33:12 **THE COURT:** -- I --

08:33:14 **MR. JACOBS:** CAN I ADDRESS THAT, YOUR HONOR?

**THE COURT:** YOU MAY.

**MR. JACOBS:** ALL RIGHT. DR. WEI WILL NOT TESTIFY THAT THE CLAIM REQUIRES A CURRENT COMPARATOR. I TOOK A LOOK 08:33:23 AT THE COURT'S MOTION IN LIMINE RULING, AND I TOOK A LOOK AT THE PORTION OF THE EXPERT REPORT THAT WAS DISCUSSED.

THIS IS NOT A DISCOVERY ISSUE. IT'S SOMETHING THAT WAS TALKED ABOUT EXTENSIVELY DURING THE DEPOSITIONS OF BOTH OF THE EXPERTS. WHAT IT IS IS IT'S PURE -- IT IS NOT A LITERAL 08:33:43 INFRINGEMENT POINT. IT IS A POINT RELATING TO THE DOCTRINE OF EQUIVALENTS.

DR. KELLEY HAS TESTIFIED ON DIRECT EXAMINATION THAT A VOLTAGE COMPARATOR AND A CURRENT LIMIT COMPARATOR ARE INTERCHANGEABLE. AND DR. WEI DISAGREES UNDER CERTAIN 08:34:00 CONTEXTS.

AND SO, THAT'S AS FAR AS THE TESTIMONY IS GOING TO GO. IT IS A DOCTRINE OF EQUIVALENTS POSITION THAT HE DOES NOT THINK THAT THEY ARE INTERCHANGEABLE.

AS THE COURT IS AWARE, ONE OF THE TESTS -- THE REASON WHY 08:34:14 THE WORD "INTERCHANGEABLE" IS IN THERE IS ONE OF THE TESTS OF THE DOCTRINES OF EQUIVALENTS IS NO INTERCHANGEABILITY.

**THE COURT:** ALL RIGHT.

**MR. JACOBS:** SO THIS IS JUST A PURE DOCTRINE OF EQUIVALENTS RESPONSE.

08:34:23 **THE COURT:** LET ME ASK YOU A COUPLE OF QUESTIONS AND

08:34:25 THEN, OBVIOUSLY, I WANT TO HEAR FROM MR. SCHERKENBACH.

LET ME GET JUDGE WARE'S CONSTRUCTION.

OKAY. ARE WE TALKING ABOUT "CONTROL CIRCUIT?" THAT IS WHAT I UNDERSTAND WE ARE TALKING ABOUT.

08:34:48 **MR. JACOBS:** "CONTROL CIRCUIT" AND THE "CURRENT LIMIT" CONSTRUCTION.

**THE COURT:** OKAY. WELL, HANG ON. LET ME GET THE -- GET THE PATENT, ALSO. I BROUGHT ALL THESE PAPERS OUT --

OKAY. WELL, FIRST OF ALL, WE HAVE GOT THE CONTROL

08:35:09 CIRCUIT. AND THAT, THAT WAS THE SUBJECT, PRIMARILY, OF MOTION IN LIMINE NO. 5 ON BEHALF OF POWER INTEGRATIONS.

**MR. SCHERKENBACH:** (NODS HEAD)

**MR. JACOBS:** (NODS HEAD)

**THE COURT:** WHERE HE CONSTRUED THAT TERM AS -- WAIT A

08:35:25 MINUTE. THAT'S NOT WHAT I WANT. SORRY. FORGET THAT.

I'M GOING TO HAVE TO TURN TO THE MOST RECENT BRIEF, WHICH IS KIND OF A LITTLE HARD TO DEAL WITH BECAUSE OF THE WAY IT WAS PRINTED UP.

OKAY. HE CONSTRUED IT TO MEAN: "A CIRCUIT THAT CONTROLS

08:35:46 THE POWER SWITCH BY GENERATING A WAVEFORM WHICH IS RESPONSIVE TO ELECTRICAL SIGNALS GENERATED WITHIN THE POWER SUPPLY CONTROLLER CIRCUIT."

NOW, WHERE IS THIS COMPARATOR COMING UP IN -- IN THE DISCUSSION?

08:36:03 **MR. JACOBS:** THE COMPARATOR --

08:36:03 **THE COURT:** IN OTHER WORDS, WHERE DOES IT FIT IN? IT'S NOT PART OF THE TERM.

**MR. JACOBS:** RIGHT.

**THE COURT:** RIGHT. OKAY.

08:36:09 **MR. JACOBS:** THE COMPARATOR IS WHAT RECEIVES THE CURRENT LIMIT. AND SO THE CURRENT LIMIT THEN COMES INTO PLAY WITH REGARD TO THE CONSTRUCTION OF THAT TERM. AND IT IS WHAT IS DOING THE COMPARISON THAT'S DESCRIBED IN THE CLAIM.

AND SO THE DISPUTE IS, AS YOU KNOW, YOUR HONOR, WHETHER 08:36:29 VOLTAGE REPRESENTATIVE OF CURRENT --

**THE COURT:** NO, NO, NO. I KNOW THAT.

**MR. JACOBS:** UH-HUH.

**THE COURT:** I GOT THE DISPUTE.

**MR. SCHERKENBACH:** YOUR HONOR, THE CONTROL CIRCUIT 08:36:37 INCLUDES THE COMPARATOR THAT WE HAVE BEEN ARGUING ABOUT.

**THE COURT:** OKAY.

**MR. SCHERKENBACH:** IT'S INSIDE OF THE CONTROL CIRCUIT.

**THE COURT:** ALL RIGHT. EVEN THOUGH IT ISN'T --

08:36:45 **MR. SCHERKENBACH:** EXPLICITLY RECITED.

**THE COURT:** I'M SORRY?

**MR. SCHERKENBACH:** IT IS NOT EXPLICITLY RECITED IN THE CLAIM, COMPARATOR.

**THE COURT:** IT ISN'T EXPLICITLY RECITED, AND SO IT 08:36:55 ISN'T REFERENCED IN JUDGE WARE'S CONSTRUCTION, EITHER.

08:37:01 **MR. SCHERKENBACH:** BECAUSE THIS ISSUE WAS NEVER RAISED THEN.

**THE COURT:** OKAY.

**MR. SCHERKENBACH:** YEAH.

08:37:05 **THE COURT:** ALL RIGHT. SO, IS IT THE COMPARATOR THAT'S RESPONSIVE TO SIGNALS?

**MR. SCHERKENBACH:** YES.

**THE COURT:** OKAY. SO THAT'S THE PART THAT'S RESPONSIVE TO SIGNALS.

08:37:19 **MR. SCHERKENBACH:** YES.

**THE COURT:** NOW, IF THAT'S THE CASE, THEN "SIGNALS" HAS NOT BEEN DEFINED TO BE EXCLUSIVE TO "CURRENT."

**MR. SCHERKENBACH:** CORRECT.

**THE COURT:** AND THAT'S WHERE I THINK WE ARE BACK TO 08:37:34 THE SAME ISSUE AS IN MOTION NO. 5. IF HE SAYS THAT A PERSON OF ORDINARY SKILL IN THE ART WOULDN'T UNDERSTAND "SIGNAL" TO MEAN "CURRENT" OR "VOLTAGE," WHICH HE'S NOT SAYING.

**MR. JACOBS:** TRUE.

**THE COURT:** RIGHT? WHAT IS HE SAYING?

08:38:05 **MR. JACOBS:** HE'S GOING TO -- IF HE'S PRESSED ON THE ISSUE, HE IS GOING TO SAY, FIRST OF ALL, "SIGNAL" IS IRRELEVANT BECAUSE IT IS THE SIGNAL THAT IS OUTSIDE OF THE CONTROLLER.

THAT'S GOING TO BE THE FIRST POSITION. BUT I'M SURE IF 08:38:17 HE'S PUSHED THAT HE WOULD ACKNOWLEDGE THAT IT COULD BE VOLTAGE

08:38:21 OR CURRENT.

**THE COURT:** OKAY.

**MR. JACOBS:** OKAY?

**THE COURT:** IS THIS SIGNAL THE CURRENT LIMIT SIGNAL?

08:38:29 **MR. JACOBS:** IT'S A DIFFERENT SIGNAL, YOUR HONOR.

**THE COURT:** OH. SO IS JUDGE WARE NOT TALKING ABOUT THAT PART AT ALL?

**MR. JACOBS:** THE TERM "SIGNAL" WAS NOT CONSTRUED. "CURRENT LIMIT" --

08:38:41 **THE COURT:** I KNOW THAT.

**MR. JACOBS:** "CURRENT LIMIT ADJUSTED SIGNAL" WAS CONSTRUED. THAT IS, IN OUR VIEW, A DIFFERENT SIGNAL. AND THAT IS WHAT DR. WEI WAS GOING TO EXPLAIN.

**THE COURT:** I AM SORRY. WHAT ARE YOU SAYING WAS

08:38:54 CONSTRUED IN --

**MR. JACOBS:** BY AGREEMENT OF THE PARTIES, "CURRENT LIMIT ADJUSTMENT SIGNAL."

**THE COURT:** SO THAT NEVER BECAME PART OF HIS CONSTRUCTION.

08:39:02 **MR. JACOBS:** ACTUALLY, WHEN THE PARTIES AGREE TO CONSTRUCTIONS, IT DOES BECOME PART OF THE CONSTRUCTION.

**THE COURT:** WELL, THEN, I'LL LOOK AT THE ORDER AGAIN.

BUT HE DOESN'T SAY -- BUT YOU ARE SAYING THAT "CURRENT LIMIT ADJUSTMENT SIGNAL" IS NOT THE, QUOTE, "ELECTRICAL

08:39:17 SIGNALS."

08:39:18 **MR. JACOBS:** ONCE IT'S INSIDE THE CONTROLLER, THINGS HAPPEN. THERE'S A DIFFERENT SIGNAL. THEY HAVE DIFFERENT PROPERTIES.

**THE COURT:** SO WE HAVE SIGNALS.

08:39:25 **MR. JACOBS:** (NODS HEAD).

**THE COURT:** OKAY. BUT THAT IS -- THAT IS THE SIGNAL WE ARE DEALING WITH HERE?

**MR. JACOBS:** THE SAME SIGNAL, THEORETICALLY, IS PROPAGATING THROUGHOUT THE CIRCUIT, YES.

08:39:33 **THE COURT:** OKAY. AND HE IS GOING TO SAY THAT PEOPLE WOULDN'T CONSTRUE THAT -- WOULDN'T UNDERSTAND THAT TO COVER "VOLTAGE"?

**MR. JACOBS:** THE WORD "SIGNAL" AS USED IN THE CLAIM, AGAIN, IS OUTSIDE OF THE CONTROLLER. HE IS GOING TO SAY AT 08:39:47 THAT POINT IN TIME IT COULD BE VOLTAGE OR CURRENT, I WOULD IMAGINE.

WHEN YOU GET TO THE -- THE SIGNAL INSIDE OF THE CURRENT, AND WE'RE GETTING TO THE COMPARATOR, ALL HE'S SAYING IS THAT DR. KELLEY HAS TESTIFIED UNDER THE DOCTRINE OF EQUIVALENTS 08:40:01 THAT A VOLTAGE COMPARATOR AND A CURRENT COMPARATOR ARE THE SAME THING.

HE'S GOING TO SAY HE WOULD DISAGREE WITH THAT. HE THINKS A VOLTAGE COMPARATOR IS DIFFERENT THAN A CURRENT COMPARATOR.

**THE COURT:** IF THAT'S ALL THAT WAS GOING TO HAPPEN, 08:40:12 THAT MIGHT BE OKAY. BUT THIS DOESN'T SAY "OUTSIDE SIGNAL."

08:40:17 IT SAYS: "RESPONSIVE TO ELECTRICAL SIGNALS GENERATED WITHIN THE POWER SUPPLY CONTROLLER."

**MR. JACOBS:** IT'S GOING TO HAVE TO BE WITHIN THE CONTEXT. WE COULDN'T PUT THE ENTIRETY OF HIS TESTIMONY IN

08:40:27 THIS --

**THE COURT:** NO. NO. THIS ISN'T TESTIMONY. THIS IS JUDGE WARE. HIS CONSTRUCTION IS TALKING ABOUT "A SIGNAL GENERATED WITHIN," NOT OUTSIDE.

**MR. JACOBS:** FOR WHICH TERM, YOUR HONOR?

08:40:38 **THE COURT:** "CONTROL CIRCUIT."

**MR. JACOBS:** FOR "CONTROL CIRCUIT."

**THE COURT:** RIGHT.

**MR. JACOBS:** ABSOLUTELY.

**THE COURT:** WELL, THEN, I'M GOING TO HEAR FROM

08:40:46 MR. SCHERKENBACH.

**MR. SCHERKENBACH:** SO, YOUR HONOR, IF I MAY, A COUPLE THINGS. FIRST OF ALL, ON THE TECHNICAL POINT, YOU ASKED THE QUESTION WHETHER THE CURRENT LIMIT ADJUSTMENT SIGNAL IS PART OF THE CONTROL CIRCUIT.

08:40:59 **THE COURT:** RIGHT.

**MR. SCHERKENBACH:** IT IS.

**THE COURT:** OKAY.

**MR. SCHERKENBACH:** IN FACT, IF YOU LOOK AT JUDGE WARE'S OPINION, EVEN WHEN HE'S TALKING ABOUT THE

08:41:06 RATIONALE FOR HIS CONSTRUCTION OF "CURRENT LIMIT," HE ACTUALLY

08:41:12 BEGINS -- THIS IS IN THE THIRD CLAIM CONSTRUCTION ORDER. IT'S THE DOCKET ENTRY 148.

HE ACTUALLY SAYS (AS READ):

"THE CONTROL CIRCUIT GENERATES THE SWITCHING WAVEFORM

08:41:23 TO CONTROL THE POWER SWITCH IN RESPONSE TO CURRENT LIMIT ADJUSTMENT SIGNAL 315."

SO THERE ISN'T ANY QUESTION THE CURRENT LIMIT ADJUSTMENT SIGNAL IS PART OF THE CONTROL CIRCUIT.

THERE ISN'T ANY QUESTION THAT SIGNAL IS A -- IT'S A

08:41:39 SIGNAL. IT DOESN'T SAY "VOLTAGE" OR "CURRENT." AND, ACTUALLY, IN THE EXAMPLE IN THE PATENT IT IS A VOLTAGE.

SO -- SO EVERYTHING WE ARE TALKING ABOUT IS INSIDE THE CHIP. THE DEFINITION -- THE AGREED CONSTRUCTION OF "CURRENT LIMIT ADJUSTMENT SIGNAL" IS:

08:41:53 "A SIGNAL THAT IS TO ADJUST OR VARY THE CURRENT LIMIT VALUE."

THAT'S THE AGREED CONSTRUCTION: "A SIGNAL." DOESN'T HAVE TO BE CURRENT. DOESN'T HAVE TO BE VOLTAGE.

**MR. JACOBS:** WELL, IT'S THE CURRENT LIMIT VALUE.

08:42:08 **THE COURT:** JUST A MOMENT.

**MR. SCHERKENBACH:** IF I COULD JUST FINISH.

**MR. JACOBS:** SURE.

**MR. SCHERKENBACH:** THE "CONTROL CIRCUIT" CONSTRUCTION, AS YOU HAVE ALREADY RECOGNIZED, JUST REFERS TO

08:42:15 "SIGNALS," NOT "CURRENT" OR "VOLTAGE." OKAY?

08:42:19 AND THE OTHER THING, AS TO WHAT DR. WEI IS REALLY GOING TO ARGUE, YOU REALLY NEED TO SEE HIS SLIDES (INDICATING). BECAUSE THERE ARE THREE IN PARTICULAR THAT I --

**THE COURT:** OKAY.

08:42:27 **MR. SCHERKENBACH:** MAY I HAND THEM UP? THANK YOU.

**THE COURT:** YES. OR, I GUESS THERE'S NO WAY TO PUT THEM UP, SO IF YOU WANT TO HAND THEM --

**MR. SCHERKENBACH:** WELL, ACTUALLY, THEY CAN PUT THEM UP.

08:42:36 **MR. JACOBS:** SURE.

**THE COURT:** WELL, THAT IS ALL RIGHT. I'LL LOOK AT THEM.

(DOCUMENT HANDED UP TO THE COURT)

**MR. SCHERKENBACH:** I'VE HANDED YOU THE WHOLE SET ON

08:42:43 '908. BUT THERE ARE THREE IN PARTICULAR I WOULD LIKE TO ADDRESS YOU TO. OKAY?

**THE COURT:** OKAY.

**MR. SCHERKENBACH:** 494. ACTUALLY, I DON'T KNOW IF YOUR CLERK WOULD LIKE A SET.

08:42:54 **THE COURT:** THAT'S OKAY.

**MR. SCHERKENBACH:** 494.

**THE COURT:** I'LL TELL YOU WHAT. MS. LUCERO, TAKE THAT. SO AS LONG AS SHE'S HERE, SHE MAY AS WELL LOOK AT THAT. IT'S ALL RIGHT. SHE'LL GIVE IT TO HER.

08:43:05 ALL RIGHT. GO AHEAD.

08:43:08 **MR. SCHERKENBACH:** SO IF YOU'RE ON 494 --

**THE COURT:** I AM.

**MR. SCHERKENBACH:** I'M SORRY ABOUT THAT. THEY'RE PRESENTING THIS IN THE CONTEXT OF EQUIVALENCE, BUT THAT IS 08:43:15 NEITHER HERE NOR THERE.

**THE COURT:** UH-HUH.

**MR. SCHERKENBACH:** UNDER "NOT THE SAME WAY," THE CLAIMS REQUIRE THAT THE VALUE USED AND ADJUSTED IS THE CURRENT PASSING THROUGH THE POWER SWITCH.

08:43:30 THE CLAIMS REQUIRE NO SUCH THING, EITHER ON THEIR FACE OR AS A RESULT OF THE CLAIM CONSTRUCTION. RIGHT?

THE CLAIM SAYS:

"THE CURRENT LIMIT ADJUSTMENT SIGNAL IS USED TO ADJUST THE CURRENT LIMIT."

08:43:43 AND THAT SIGNAL IS NOT LIMITED TO CURRENT OR VOLTAGE.

THEN, THE NEXT BULLET:

"THE VOLTAGE COMPARATOR IN FAIRCHILD PRODUCTS COMPARES TWO VOLTAGES."

THEY ARE ARGUING A VOLTAGE COMPARATOR IS OUTSIDE THE SCOPE 08:43:59 OF THE CLAIM. RIGHT?

**THE COURT:** WELL, YES, THEY ARE. I MEAN, THAT IS THEIR DEFENSE, BUT THE QUESTION --

**MR. JACOBS:** THAT IS OUR NONINFRINGEMENT ISSUE, YOUR HONOR, AND HAS BEEN --

08:44:11 **THE COURT:** EXCUSE ME. EVERYBODY CANNOT TALK AT

08:44:15 ONCE, AND PARTICULARLY GIVEN THAT WE ARE PRESSED FOR TIME.

ALL RIGHT. THEIR FIRST POINT IS THEY CAN ARGUE THEY HAVE GOT A VOLTAGE COMPARATOR, AND IT IS NOT INFRINGING. BUT THEY CAN'T ARGUE A CONSTRUCTION DIFFERENT THAN JUDGE WARE'S. OKAY?

08:44:31 SO THEN, THE QUESTION IS WHETHER THAT TOP BULLET: "THE CLAIMS REQUIRE" ALL RIGHT -- "THAT THE VALUE USED AND ADJUSTED IS THE CURRENT PASSING THROUGH THE POWER SWITCH WHEN THE POWER SWITCH TURNS OFF."

NOW, WHERE THAT FITS INTO ALL THIS, AGAIN, EVEN THOUGH

08:44:54 SOMETHING IS CALLED A "CURRENT ADJUSTMENT SIGNAL," IT'S APPARENTLY TELLING SOMETHING TO ADJUST SOMETHING BASED ON SOMETHING IT'S GETTING IN, WHICH ACCORDING TO THE CONSTRUCTION THAT WE HAVE SO FAR, DOESN'T HAVE TO BE CURRENT.

**MR. SCHERKENBACH:** YES.

08:45:09 **THE COURT:** THAT'S THE POINT?

**MR. SCHERKENBACH:** YEAH. YES.

**THE COURT:** OKAY.

**MR. JACOBS:** YOUR HONOR --

**MR. POLLACK:** AND I -- I BELIEVE YOU ALREADY -- YOU

08:45:15 ALREADY DECIDED IN THE CONTEXT OF MOTION IN LIMINE NO. 5 THAT THEY CAN'T ARGUE A CURRENT COMPARATOR IS REQUIRED.

**THE COURT:** CORRECT. ALL RIGHT.

**MR. SCHERKENBACH:** IF YOU LOOK AT THEIR NEXT SLIDE (INDICATING) --

08:45:27 **THE COURT:** OKAY.

08:45:27 **MR. SCHERKENBACH:** -- THAT IS WHAT THEY ARE ARGUING.

**THE COURT:** OKAY. THAT IS AN EQUIVALENCY ARGUMENT HERE.

**MR. SCHERKENBACH:** THERE IS NO RELEVANCE. THIS IS

08:45:36 COMPLETELY IRRELEVANT (INDICATING), UNLESS THE CLAIM REQUIRES A CURRENT COMPARATOR. AND THEN, THEY WOULD SAY: "WELL, WE HAVE A VOLTAGE COMPARATOR, AND SO THAT CAN'T BE EQUIVALENT TO THE THING THAT IS LITERALLY REQUIRED, WHICH IS A CURRENT COMPARATOR."

08:45:47 OTHERWISE, THIS ARGUMENT IS (INDICATING), IT'S NEITHER HERE NOR THERE.

**THE COURT:** WELL, DR. KELLEY APPARENTLY DID MAKE AN EQUIVALENCY OR DID OFFER AN EQUIVALENCY OPINION.

**MR. SCHERKENBACH:** HE DID.

08:46:02 **THE COURT:** ALL RIGHT. WELL, WHY WAS HE DOING IT IF THERE WAS NO REASON TO DO IT?

**MR. SCHERKENBACH:** IT'S RESPONSIVE TO THEIR ARGUMENT. HE SAYS, "LOOK, THIS CLAIM DOESN'T REQUIRE A CURRENT COMPARATOR. IN FACT, THAT'S NOT EVEN SHOWN IN THE PATENT.

08:46:14 BUT IF IT WERE, IF DR. WEI'S CLAIM CONSTRUCTION IS CORRECT, IT DOESN'T MATTER. IT IS STILL EQUIVALENT."

**THE COURT:** OKAY. WELL, I HAVE ALREADY RULED HE CAN'T ARGUE IT NEEDS A CURRENT COMPARATOR. THEN, THE QUESTION IS: HOW DOES THIS OPINION WORK AT ALL IF IT DOESN'T REQUIRE A

08:46:31 CURRENT COMPARATOR?

08:46:32 **MR. SCHERKENBACH:** YES.

**MR. JACOBS:** SURE. MAY I RESPOND BRIEFLY?

**THE COURT:** YES, YES.

**MR. JACOBS:** SO THE FIRST BULLET POINT IN 494 COMES

08:46:39 DIRECTLY FROM JUDGE WARE'S CLAIM CONSTRUCTIONS. JUDGE WARE HAS SAID THAT A CURRENT LIMIT MUST REQUIRE A CURRENT LIMIT VALUE AS PART --

**THE COURT:** WAIT A MINUTE.

**MR. JACOBS:** OKAY.

08:46:51 **THE COURT:** YOU CAN'T SAY "IT COMES FROM." IT'S EITHER HIS CONSTRUCTION OR IT ISN'T.

**MR. JACOBS:** IT'S ADOPTED. IT'S ADOPTED AND BASED ON HIS CLAIM CONSTRUCTION.

**THE COURT:** THAT IS WHAT I'M NOT SURE YOU CAN DO.

08:47:03 "THE CLAIMS REQUIRE THAT THE VALUE USED" IS THE CURRENT.

OKAY. WELL, AS I UNDERSTAND IT, SOMEWHERE THE VOLTAGE GETS TURNED INTO CURRENT, AND THEN IT GETS COMPARED HERE?

**MR. JACOBS:** RIGHT.

**MR. SCHERKENBACH:** ACTUALLY, THE OTHER WAY. THE

08:47:17 VALUE OF THE CURRENT GETS REPRESENTED AS A VOLTAGE.

**THE COURT:** OKAY.

**MR. SCHERKENBACH:** YES.

**THE COURT:** ALL RIGHT.

**MR. SCHERKENBACH:** THAT IS THE WAY IT'S ACTUALLY

08:47:23 IMPLEMENTED.

08:47:25 **THE COURT:** WELL, IS POINT NO. 1 INCONSISTENT WITH WHAT JUDGE WARE FOUND? IT MAY NOT BE. IF THE ULTIMATE VALUE IS CURRENT, AND THEN IT TURNS INTO VOLTAGE, IS THAT --

**MR. JACOBS:** YES.

08:47:51 **THE COURT:** OKAY.

**MR. JACOBS:** THAT IS WHAT HE SAID.

**THE COURT:** SO, ALL RIGHT. SO THAT MIGHT NOT BE INCONSISTENT. JUST A MINUTE.

LET'S SEE. WHICH ORDER. "CURRENT LIMIT," I THINK WAS IN 08:48:15 HIS THIRD ORDER.

**MR. SCHERKENBACH:** IT'S IN THE THIRD ORDER, YOUR HONOR.

**THE COURT:** I HAVE IT, YEAH.

**MR. SCHERKENBACH:** PAGES 4 THROUGH 5.

08:48:22 **THE COURT:** RIGHT, OKAY.

ALL RIGHT. CONSTRUED "CURRENT LIMIT" TO MEAN, QUOTE, "A VALUE OF CURRENT THAT CAN BE USED BY THE CONTROL CIRCUIT TO TURN OFF THE POWER SWITCH WHEN THE AMOUNT OF CURRENT PASSING THROUGH THE POWER SWITCH REACHES THE THRESHOLD."

08:48:51 ALL RIGHT. SO HOW -- ALL RIGHT. SO HOW IS BULLET NO. 1 DIFFERENT THAN THAT? I'M ASKING.

**MR. JACOBS:** YOUR HONOR, WE BELIEVE THAT IT --

**THE COURT:** NOT YOU.

**MR. JACOBS:** OKAY.

08:48:59 **THE COURT:** I KNOW YOU THINK IT'S THE SAME. I'M

08:49:01 ASKING MR. SCHERKENBACH.

**MR. SCHERKENBACH:** BECAUSE THE BULLET NO. 1 SAYS THAT THE VALUE USED AND ADJUSTED --

**THE COURT:** AH.

08:49:11 **MR. SCHERKENBACH:** -- IS THE CURRENT. THE CLAIM --

**THE COURT:** OKAY.

**MR. SCHERKENBACH:** RIGHT?

**THE COURT:** IT'S "AND ADJUSTED."

**MR. SCHERKENBACH:** YES.

08:49:17 **THE COURT:** IT IS "THE ADJUSTED." BECAUSE WHAT HAPPENS IS SOMETHING'S GETTING ADJUSTED HERE. WHAT'S GETTING ADJUSTED?

**MR. SCHERKENBACH:** ULTIMATELY, THE CURRENT LIMIT ITSELF, WHICH IS THE VALUE, GETS ADJUSTED. BUT WHAT IS USED 08:49:33 TO ADJUST IT IS A VOLTAGE -- IS ACTUALLY TWO VOLTAGES. ONE REPRESENTING THE CURRENT THROUGH THE SWITCH, THE OTHER REPRESENTING THE -- THE CURRENT LIMIT.

**THE COURT:** ALL RIGHT.

**MR. SCHERKENBACH:** SO --

08:49:47 **THE COURT:** BUT THEY DO USE CURRENT, DON'T THEY? OR NOT?

**MR. SCHERKENBACH:** YOU USE -- YES. YOU USE BOTH. YOU USE CURRENT AND VOLTAGE. I MEAN, THAT IS REALLY OUR POINT. AND THERE'S --

08:49:59 **THE COURT:** WELL, THEN, ARE YOU OBJECTING THAT THE

08:50:01 VALUE USED -- WHEN THEY SAY THE VALUE USED IS CURRENT, THAT'S WRONG? BECAUSE IT'S IN JUDGE WARE'S. HE SAYS: "A VALUE OF CURRENT THAT CAN BE USED."

**MR. SCHERKENBACH:** IT CAN BE USED BY THE CONTROL

08:50:12 CIRCUIT.

**THE COURT:** RIGHT.

**MR. SCHERKENBACH:** AND THE WAY -- THE WAY IT IS USED IS IN THE FORM OF A VOLTAGE. AND THAT WAS NOT --

**THE COURT:** WELL, THAT MAY BE THE CASE, BUT IS WHAT

08:50:22 IS WRITTEN HERE INCONSISTENT?

**MR. SCHERKENBACH:** I THINK IT IS, BECAUSE, AGAIN, THIS SAYS THAT THE VALUE USED AND ADJUSTED IS THE CURRENT PASSING THROUGH THE POWER SWITCH. THAT IS NOT WHAT THE CLAIM CONSTRUCTION SAYS.

08:50:38 **THE COURT:** OKAY. WELL, THEN, WHAT IF YOU JUST USED JUDGE WARE'S CONSTRUCTION IN PLACE OF THAT FIRST BULLET?

**MR. JACOBS:** I THINK WE COULD DO THAT, YOUR HONOR, ABSOLUTELY. THAT AND A CURRENT LIMIT ADJUSTMENT SIGNAL. BOTH OF THOSE CONSTRUCTIONS, I THINK, ARE GOING TO BE CONSISTENT

08:50:53 WITH DR. WEI'S OPINION.

**THE COURT:** WELL, IF YOU WANT TO -- SO THAT YOU DON'T REWRITE IT AND WE DON'T GET INTO SOMEONE ARGUING YOU ARE REWRITING IT IN A WAY THAT HE DIDN'T INTEND IT --

**MR. JACOBS:** UH-HUH.

08:51:07 **THE COURT:** -- I THINK THAT WOULD BE OKAY.

08:51:08 **MR. JACOBS:** OKAY.

**THE COURT:** AND THEN, YOU KEEP SAYING "VOLTAGE" IS A "CURRENT."

**MR. JACOBS:** OKAY. WE CAN DO THAT.

08:51:12 **THE COURT:** ALL RIGHT. BUT THAT IS ONLY AS TO THAT SLIDE.

HOW ABOUT THE OTHERS?

**MR. SCHERKENBACH:** WELL, THERE ARE OTHER DR. WEI SLIDES. ACTUALLY, I THINK MR.-- YEAH, MR. POLLACK IS GOING TO 08:51:22 DEAL WITH THOSE, IF HE CAN.

THEY'RE NOT IN THE SET THAT I HANDED UP (INDICATING). THESE ALL PERTAIN TO THE CLAIM CONSTRUCTION ISSUE.

**THE COURT:** ALL RIGHT. SHOULD I HOLD ONTO THIS, OR --

08:51:31 **MR. JACOBS:** YOU CAN HOLD ONTO IT, IF YOU WANT, YOUR HONOR.

**THE COURT:** DOES SOMEBODY NEED IT?

**MR. SCHERKENBACH:** NO, WE DON'T NEED IT. IT MIGHT BE USED --

08:51:38 **THE COURT:** OKAY.

**MR. JACOBS:** YES.

**THE COURT:** I THINK I'LL KEEP IT WITH THE EVER-GROWING PILE ON THIS PARTICULAR ISSUE.

**MR. SCHERKENBACH:** ALL RIGHT.

08:51:45 **THE COURT:** ALL RIGHT, THANK YOU.

08:51:46 WELL, IS MR. POLLACK GOING TO ADDRESS THIS OTHER MATTER OR ARE WE WAITING ON THAT?

**MR. SCHERKENBACH:** NO, I THINK HE IS, YOUR HONOR.

**THE COURT:** OKAY.

08:51:59 **MR. POLLACK:** YOUR HONOR, I UNDERSTAND WE ONLY HAVE A FEW MINUTES. AND SO WE HAVE TWO CATEGORIES OF OBJECTIONS TO WHAT WE ANTICIPATE IS GOING TO BE DR. WEI'S TESTIMONY.

AND THE FIRST, WE UNDERSTAND THAT -- WE GOT SOME SLIDES ABOUT THIS, AND I HAVE AN EXEMPLAR.

08:52:17 AND OUR CONCERN DOESN'T GO JUST TO THE SLIDES. IT GOES TO THE SUBJECT MATTER OF THE TESTIMONY THAT THE SLIDES ARE SUPPOSED TO BE IN SUPPORT OF.

AND THIS HAS TO DO WITH DR. WEI TESTIFYING ABOUT CHANGES MADE TO THE DATA BEFORE HE GOT HIS REPORT AND THINGS THAT 08:52:36 HAPPENED OUTSIDE OF HIS KNOWLEDGE THAT HE HAS HAD NO KNOWLEDGE OF AT THE TIME HE DID HIS REPORT, AND, IN FACT, DIDN'T HAVE ANY KNOWLEDGE OF UNTIL A FEW WEEKS AGO.

AND IT APPEARS TO US THAT THEY WANT HIM TO COME IN AND TESTIFY THAT: "WELL, NOW I KNOW ABOUT ALL THOSE CHANGES THAT 08:52:52 OCCURRED, AND HERE'S WHY THEY'RE NOT SIGNIFICANT."

AND THOSE ARE NOT OPINIONS THAT HE HAD AT THE TIME HE DID HIS REPORT. THEY ARE NOT OPINIONS THAT HE HAD AT THE TIME HE WAS DEPOSED. AND WE DON'T THINK IT IS APPROPRIATE UNDER RULE 26 TO HAVE HIM COME IN AND PROVIDE NEW OPINIONS ON THE 08:53:09 RELIABILITY OF THE TESTING THAT HE DID NOT PROVIDE DURING

08:53:12 DISCOVERY.

**THE COURT:** LET ME JUST SEE IF I'VE GOT IT CLEAR. HE OFFERED AN OPINION BASED ON HIS UNDERSTANDING OF WHAT WAS DONE, AND WHAT WAS DONE WAS DIFFERENT THAN WHAT HE UNDERSTOOD?

08:53:24 **MR. POLLACK:** CORRECT, YOUR HONOR. HE -- HE RELIED ON SOME -- AS WE HAVE LEARNED, SOME POWERPOINTS THAT COLLECTED SOME DATA.

AND, HE -- HE HAD AN UNDERSTANDING AT THE TIME OF WHAT HE THOUGHT THAT DATA WAS.

08:53:38 **THE COURT:** WELL, WHAT DID HE THINK IT WAS?

**MR. POLLACK:** HE THOUGHT IT WAS A COLLECTION OF TESTING THAT WAS ALL DONE ON A SINGLE DAY.

**THE COURT:** AS OPPOSED TO DIFFERENT DAYS?

**MR. POLLACK:** OVER DIFFERENT DAYS, AND IT HAD VARIOUS

08:53:52 SCREENSHOTS THAT WERE PUT TOGETHER BY, YOU KNOW, MR. HUANG, AND, YOU KNOW, CREATED A PICTURE OF RESULTS THAT WERE NOT THE ACTUAL RAW RESULTS.

**THE COURT:** ALL RIGHT, BUT THE DATE IS THE SAME. IN OTHER WORDS, THE FORM THAT HE GOT IT IN MAY BE DIFFERENT, BUT

08:54:09 THE INFORMATION THAT WAS ON THE DOCUMENTS IS THE SAME, IS IT NOT?

**MR. POLLACK:** NOT -- NOT IN ALL CASES, NO.

**THE COURT:** WHERE DID IT DIFFER? NUMERICALLY IT DIFFERED?

08:54:21 **MR. POLLACK:** SO THE ISSUE IS, YOUR HONOR, THERE IS A

08:54:23 NUMBER OF DIFFERENT TEST RESULTS, AND THERE IS A NUMBER OF DIFFERENT WAYS TO REPRESENT THAT DATA.

AND WHAT HE GOT WAS POWERPOINT SLIDES THAT HAD VARIOUS SCREENSHOTS COLLECTED AND ANNOTATED, AND COMMENTED ON THAT 08:54:43 WERE PRESENTED TO HIM AS IF THIS WAS A SINGLE COLLECTION OF MATERIAL THAT HAD BEEN ALL EXTRACTED OR CAPTURED ON A SINGLE DAY.

**THE COURT:** AND, DOES YOUR EXPERT THINK THAT'S SIGNIFICANT, THAT IT WAS CAPTURED ON DIFFERENT DAYS AS OPPOSED 08:54:59 TO A SINGLE DAY?

**MR. POLLACK:** WELL, IT'S SIGNIFICANT THAT THE WAY IN WHICH THE DATA WAS REPRESENTED AND THE WAY IN WHICH IT WAS CAPTURED IS NOT THE WAY IN WHICH IT WAS PRESENTED. SO --

**THE COURT:** OKAY, I'M LOST. I UNDERSTAND HE GOT 08:55:16 INFORMATION. NUMBERS A, B, C, D, WHATEVER THEY ARE. ALL RIGHT.

THEN, HE FINDS OUT THAT SOMEBODY TOOK THOSE TESTS ON MULTIPLE DAYS VERSUS A SINGLE DAY. AND HE WANTS TO SAY "I DON'T CARE." ALL RIGHT.

08:55:30 I DON'T KNOW. THAT DOESN'T SOUND TERRIBLY SIGNIFICANT TO ME, BUT MAYBE I'M MISSING SOMETHING.

**MR. POLLACK:** WELL, IT'S A MATTER OF HAVING -- AND HERE IS SOME EXAMPLES. AND IF I CAN HAND THIS UP --

**THE COURT:** OKAY.

08:55:46 **MR. POLLACK:** -- OF DR. WEI --

08:55:50 (DOCUMENTS HANDED UP TO THE COURT)

**THE COURT:** OKAY.

**MR. POLLACK:** -- TESTIFYING ESSENTIALLY TO THE HEARSAY THAT HE'S HEARD ABOUT WHY VARIOUS CHANGES WERE MADE

08:56:03 BETWEEN THE -- THE DATA BEING CAPTURED AND WHAT HE SAW.

**THE COURT:** OKAY. I HAVE TO SAY, THIS SOUNDS MORE LIKE ARGUMENT. AN AWFULLY BIG DEAL WAS MADE, FRANKLY, OVER WHAT COULD HAVE BEEN A SIMPLE MATTER, HAD IT BEEN PRESENTED MORE SIMPLY.

08:56:23 IF SOMEBODY JUST SAID TO HIM: "DID YOU TAKE A BUNCH OF SCREENSHOTS?

"YES, I DID.

"DID YOU KEEP MOST OF THEM?

"YES. BUT THERE WERE A COUPLE I DIDN'T KEEP THE ACTUAL

08:56:33 PICTURES. I MADE THEM AS PART OF A DISPLAY THAT I SENT TO DR. WEI, OR WHOEVER. MR HUANG, RATHER, BY EMAIL. AND IT WAS THE EXACT PICTURE. IT JUST HAD OTHER THINGS AROUND IT."

AND THAT WOULD HAVE BEEN IT, AND IT WOULD HAVE GONE ZIP, ZIP, ZIP, ZIP.

08:56:48 AND THEN, HE WOULD HAVE BEEN SHOWN THE GRAPHS WITHOUT ALL OF THE COMMENTARY ON THEM EXCEPT FOR THE LABEL, WHICH IS FINE.

IF EVERYBODY LOOKS AT THESE THINGS THEY ARE NOT GOING TO KNOW WHAT THEY ARE UNLESS IT HAS A LABEL ON IT, SAYING "THIS IS FOR WHATEVER INPUT." "THIS IS FOR A DIFFERENT ONE."

08:57:02 IT WOULD HAVE TAKEN ABOUT FIVE MINUTES. AND THEN, WE

08:57:05 WOULD HAVE BEEN DONE.

INSTEAD, WE SPENT ALL DAY DISCUSSING WHAT WAS HARD ENOUGH WITH SOMEONE WHO HAD TROUBLE WITH AN INTERPRETER. SO WE COULD HAVE GOTTEN THROUGH THIS VERY QUICKLY ON BOTH SIDES.

08:57:20 WE DIDN'T. WE SPENT A WHOLE DAY ON THAT.

TO THE EXTENT THAT THERE ARE VARIATIONS THAT COULD OCCUR OVER DAYS AND THAT, THUS, THE DAYS COULD MAKE A DIFFERENCE IN SOME WAY, NO ONE HAS SAID THAT YET.

TO THE EXTENT SOMEONE PUT SOMETHING IN THE MIDDLE OF THE 08:57:37 PICTURE INSTEAD OF KEEPING IT WITHOUT THE EXTRANEOUS MATERIAL AROUND IT, I DON'T SEE HOW THAT CHANGES WHATEVER INFORMATION DR. WEI GOT.

IT DOES NOT SOUND IMPROPER. IF SOMEONE WANTS TO ASK HIM CLEARLY, IF YOU WERE GOING TO BRING IT UP ON CROSS, THEY'RE 08:57:55 GOING TO BE ABLE TO COME BACK AND SAY: "DID THAT MATTER TO YOU?"

AND HE'LL SAY: "NO."

NOW, IF YOU ARE NOT GOING TO BRING IT UP ON CROSS, AND THEY WANT TO SAY IT DOESN'T MATTER, I DON'T REALLY THINK IT 08:58:06 CHANGES ANYTHING TERRIBLY.

SO, I'M -- TO THE EXTENT HE GOT ANYTHING SUBSTANTIVELY DIFFERENT, HE'S GIVING A WHOLE NEW OPINION ON NEW DATA, NEW FIGURES AND NEW TESTS, THAT WOULD BE DIFFERENT.

THIS, I THINK, GOES TO THE WEIGHT OF WHATEVER WAS 08:58:20 PRESENTED TO HIM. AND I'M GOING TO DENY THE REQUEST TO

08:58:25 PRECLUDE HIM FROM GIVING THE OPINION.

**MR. POLLACK:** OKAY, YOUR HONOR. WE HAVE ANOTHER CLASS THAT I WOULD LIKE TO BRING UP, WHICH HAS TO DO WITH GRAPHICS THAT WERE CREATED THAT ARE NOT IN DR. WEI'S REPORT.

08:58:38 THESE ARE OPINIONS. THESE ARE INTERPRETATIONS OF DATA. THIS IS NOT THE DATA, ITSELF.

THESE WERE NOT IN HIS REPORT. AND, THIS IS A PARTICULAR TYPE OF REPRESENTATION OF THE DATA THAT I ACTUALLY ASKED HIM ABOUT IN HIS DEPOSITION.

08:58:53 **THE COURT:** OKAY.

**MR. POLLACK:** AND HE SAID "WELL, YEAH, I COULD HAVE ASKED FOR THAT. BUT I DIDN'T."

**THE COURT:** OH.

**MR. POLLACK:** AND NOW THEY WANT TO PRESENT IT TO THE

08:59:01 JURY.

**THE COURT:** TELL YOU WHAT. I'LL TRADE YOU SLIDES HERE. I'LL GIVE YOU THE OTHER SLIDES BACK.

MS. LUCERO, WOULD YOU GIVE THESE BACK TO MR. POLLACK, PLEASE?

08:59:08 (DOCUMENT HANDED DOWN)

**THE COURT:** OKAY. AND THEN, THE NEW SET YOU ARE TALKING ABOUT --

(DOCUMENT HANDED UP TO THE COURT)

**THE COURT:** ALL RIGHT. I'M NOT SURE I UNDERSTAND

08:59:15 EXACTLY WHAT THE SCOPE OF THIS PARTICULAR CONCERN IS.

08:59:17 SO DO YOU WANT TO RESPOND IN SOME WAY TO THAT, MS. ONDRICK? AND THEN, I'LL GET A BETTER IDEA.

**MS. ONDRICK:** SURE. SO THIS IS A PLOT THAT DR. WEI CREATED.

08:59:29 **THE COURT:** OKAY? AND, JUST FOR THE RECORD, THIS WOULD BE --

**MS. ONDRICK:** WHICH ONE DID HE HAND YOU?

**THE COURT:** HE GAVE ME DX 4606 AS A BASIS FOR DDX 442. I'M LOOKING AT 442.

08:59:43 **MS. ONDRICK:** OKAY.

**THE COURT:** OKAY.

**MS. ONDRICK:** SO WHAT THIS IS IS A PLOT OF FREQUENCY VERSUS FEEDBACK VALUES THAT COMES FROM THE RAW DATA ON THE OSCILLOSCOPE PLOTS.

08:59:54 SO THIS IS SIMPLY TAKING THE FREQUENCY DATA POINTS AT A PARTICULAR FEEDBACK VOLTAGE (INDICATING), PLOTTING A POINT, AND THEN CONTINUING ALONG FOR ALL THE VARIOUS PLOTS THAT WE HAVE FOR A PARTICULAR TEST CONDITION.

**THE COURT:** ALL RIGHT. GRAPHICALLY SHOWING WHOSE

09:00:11 RESULT?

**MS. ONDRICK:** THE TESTING THAT MR. CHUEH CONDUCTED.

**THE COURT:** DO YOU UNDERSTAND THIS GRAPH TO BE SOMETHING DIFFERENT THAN THAT? IN OTHER WORDS, A PICTORIAL REPRESENTATION OF EVIDENCE ALREADY IN THE RECORD?

09:00:27 **MR. POLLACK:** NO, YOUR HONOR. MY ISSUE HERE IS THAT

09:00:30 IT'S NOT SOMETHING THAT DR. WEI CREATED.

**THE COURT:** WELL, I UNDERSTAND HE DIDN'T MAKE IT BEFORE. OKAY. SO, LET ME ASK YOU, IF -- WE'LL GO BACK TO THE OLD DAYS.

09:00:42 LET'S SAY HE'S ON THE STAND. SOMEBODY GIVES HIM A PIECE OF PAPER AND DRAWS A VERTICAL AXIS, A HORIZONTAL AXIS, AND ASKS HIM IF HE CAN JUST DRAW ON THERE WHERE THESE VARIOUS FIGURES WOULD SHOW UP.

WHAT OBJECTION WOULD YOU HAVE TO THAT?

09:01:01 **MR. POLLACK:** MY OBJECTION WOULD BE THAT IT'S BEYOND THE SCOPE OF HIS OPINIONS. HE'S NEVER RENDERED THAT OPINION BEFORE. HE DIDN'T DO IT --

**THE COURT:** IS THIS AN OPINION? OR IS IT JUST A DRAWING?

09:01:11 **MR. POLLACK:** WELL, IT IS ACTUALLY AN OPINION CHARACTERIZING DATA IN A WAY THAT IS -- IT'S AN INTERPRETATION.

**THE COURT:** WELL, YES. THAT'S WHAT I'M ASKING. IS THERE ANY INTERPRETATION HERE? IN OTHER WORDS, IS HE SIMPLY 09:01:24 TAKING A NUMBER FROM ONE POINT AND DISPLAYING IT?

IS THERE ANY WAY ANYBODY COULD ACTUALLY DISAGREE WITH WHERE HE PUT THESE DOTS?

**MR. POLLACK:** WELL --

**MS. ONDRICK:** TO MY KNOWLEDGE, NO, YOUR HONOR.

09:01:39 **MR. POLLACK:** WELL --

09:01:42 **THE COURT:** LET ME ASK -- WAIT. WAIT.

**MR. POLLACK:** THE PROBLEM IS I HAVE NO WAY OF KNOWING THAT, BECAUSE I DON'T KNOW HOW THIS WAS CREATED. I DON'T KNOW WHAT PLOTTING THEY DID. IT ACTUALLY LOOKS VERY DIFFERENT FROM 09:01:52 THE TYPES OF PLOTS THAT WERE IN HIS ORIGINAL REPORT (INDICATING).

**THE COURT:** OKAY. IN OTHER WORDS, HE'S DONE THIS SAME TYPE OF EXERCISE FOR OTHER DATA EARLIER?

**MR. POLLACK:** EXACTLY.

09:02:07 **THE COURT:** LET ME ASK YOU ABOUT THAT. WHAT PARTICULAR FUNCTION OR BODY OF DATA DID HE DO THIS NEW ONE FOR AS COMPARED TO WHAT HE DID THE OTHER ONES FOR?

**MR. POLLACK:** RIGHT. SO WHAT HE DID WAS HE PLOTTED OR HAD PLOTTED FOR HIM A GRAPH OF FREQUENCY VERSUS LOAD.

09:02:28 **THE COURT:** OKAY.

**MR. POLLACK:** ALL RIGHT? AND HE HAD A DIFFERENT SET OF GRAPHS OF FEEDBACK VERSUS LOAD.

AND I ASKED HIM, YOU KNOW, "DID YOU ASK FOR A GRAPH OF FREQUENCY VERSUS FEEDBACK," THE ONE THAT THEY WANT TO PRESENT 09:02:44 NOW (INDICATING).

AND HE SAID "NO, I DIDN'T."

AND I SAID: "COULD YOU HAVE DONE THAT?"

AND HE SAID: "YEAH, I COULD HAVE, BUT I DIDN'T THINK IT WAS NECESSARY."

09:02:53 AND SO THE CONCERN I HAVE IS I HAD THE OPPORTUNITY TO

09:02:59 EXPLORE IN HIS DEPOSITION THE GRAPHS HE DID INCLUDE AND THE ANALYSIS HE DID DO.

**THE COURT:** RIGHT. WELL, HOW WERE THESE CREATED? DID YOU ASK HIM THAT? IN OTHER WORDS, HOW THESE ARE CREATED,
09:03:08 MR. --

**MR. POLLACK:** I NEVER -- WE DIDN'T SEE THIS (INDICATING). THIS WAS NOT IN HIS REPORT.

**THE COURT:** NO, NOT THIS ONE. JUST IN GENERAL. IN OTHER WORDS, SOME KIND OF A PROGRAM CREATED THIS THING.

09:03:18 **MR. POLLACK:** THERE WAS A -- AND HE SAID EXCEL, IT WAS DONE, USING MICROSOFT EXCEL, I BELIEVE HIS UNDERSTANDING OF THE GRAPHS IN HIS ORIGINAL REPORT WERE.

**THE COURT:** WELL, MAYBE IT ISN'T AS SIMPLE AS PUTTING DOTS ON A PAGE. IF IT ISN'T AS SIMPLE AS PUTTING DOTS ON A
09:03:37 PAGE, THEN PERHAPS HE SHOULDN'T BE ALLOWED TO USE THIS BECAUSE IT MAY INVOLVE SOME DEGREE OF CREATIVITY AND CALCULATION ON HIS PART.

THAT'S WHAT I -- OR ON SOMETHING'S PART. AND SO THAT IS MY ONLY CONCERN. IT'S MORE COMPLICATED THAN IT MIGHT APPEAR
09:04:01 AT FIRST BLUSH. SO, YOU KNOW, IF YOU SEE SOME OF THE SIMPLER CHARTS THAT PEOPLE MIGHT SHOW -- LET'S JUST SAY IT'S A POPULATION CHART. AND IT MAY HAVE YEARS ON THE BOTTOM, AND NUMBERS OF PEOPLE GOING UP VERTICALLY. AND YOU JUST FIND A YEAR AND YOU RUN ACROSS, AND THERE YOU ARE. AND YOU PUT A
09:04:21 DOT, AND YOU KEEP GOING.

09:04:22 AND THEN, YOU CAN SEE IT GOES UP, DOWN, KEEP GOING UP. WHAT'S GOING ON?

IF THIS IS A MORE COMPLICATED PROCESS THAN THAT, ALL RIGHT? THEN PERHAPS HE SHOULDN'T BE ALLOWED TO DO IT. SO

09:04:33 THAT'S THE QUESTION.

**MS. ONDRICK:** IT IS NOT A MORE COMPLICATED PROCESS THAN THAT.

**THE COURT:** THAT, I CAN'T TELL. SO HE IS GOING TO BE ALLOWED TO TESTIFY AS TO OTHER GRAPHS. CORRECT? AS FAR AS WE

09:04:45 KNOW.

**MR. POLLACK:** WELL, THEY DON'T HAVE THEM IN THEIR DEMONSTRATIVES NOW. SO --

**MS. ONDRICK:** WE WOULD HAVE TO PUT -- THE DIFFERENCE HERE IS HE WOULD GRAPH -- SO IF YOU LOOK ON YOUR CHART IT'S

09:04:55 "FREQUENCY VERSUS FEEDBACK VOLTAGE" (INDICATING).

**THE COURT:** ALL RIGHT.

**MS. ONDRICK:** THE GRAPH IN HIS REPORT AND WHAT HE WOULD GRAPH WITH THE DATA POINTS IS HE WOULD GRAPH FREQUENCY VERSUS LOAD (INDICATING).

09:05:05 **THE COURT:** HE DID GRAPH THOSE.

**MS. ONDRICK:** HE DID.

**THE COURT:** IS THAT WHAT YOU MEAN BY "HE WOULD"?

**MS. ONDRICK:** YES. WE HAVE BOTH. AND SO --

**THE COURT:** HE DID. I'M JUST TRYING TO FIGURE OUT

09:05:15 YOUR TENSES. HE DID GRAPH THE OTHERS.

09:05:17 NOW, HE WOULD TRY TO DO THESE? IS THAT IT? OR -- IN OTHER WORDS, WHAT DID HE DO BEFORE?

**MS. ONDRICK:** BEFORE, FAIRCHILD PROVIDED HIM WITH THE GRAPHS OF THE DATA THAT WERE THE SAME PLOTTING.

09:05:31 **THE COURT:** OH. SOMEBODY DID IT FOR HIM.

**MR. POLLACK:** EXACTLY, YOUR HONOR.

**MS. ONDRICK:** (INAUDIBLE)

(REPORTER INTERRUPTION)

**THE COURT:** OH. AND HE CONFIRMED WHAT?

09:05:37 **MS. ONDRICK:** HE CONFIRMED THE POINTS BY LOOKING AT THE GRAPH THAT WAS THERE WITH THE DATA, THE RAW DATA. AND THAT THE POINTS LINED UP.

**THE COURT:** WELL --

**MS. ONDRICK:** AND THAT HE ALSO SAID: "BY LOOKING AT 09:05:49 THE PLOT THAT WAS PROVIDED I CAN ALSO TELL YOU WHAT IT WOULD SHOW FOR FREQUENCY VERSUS VOLTAGE BECAUSE OF THE RELATIONSHIP."

**THE COURT:** OKAY, I CAN'T TELL. IF, AGAIN, THIS IS JUST A FANCY, PRETTY WAY OF MAKING A SIMPLE CHART, THEN I 09:06:06 DON'T THINK THERE'S A PROBLEM.

IF, IN FACT, IT ISN'T THAT, THEN THERE IS A PROBLEM. I CAN'T TELL IF THIS IS AN OPINION. I DON'T EVEN SEE HOW IT'S AN OPINION, BECAUSE HE DIDN'T DO IT. SOMEBODY ELSE DID IT.

SO, AT THIS POINT, I THINK WE WOULD HAVE TO WAIT TO SEE 09:06:24 WHAT FOUNDATION IS LAID.

09:06:26 **MS. ONDRICK:** OKAY.

**THE COURT:** OKAY? ALL RIGHT? I CANNOT AT THIS MOMENT RULE ON THIS WITHOUT KNOWING WHAT HE'S GOING TO SAY. HOWEVER, IT IS NOT TO BE SHOWN TO THE JURY UNLESS AND UNTIL HE 09:06:37 DOES LAY A FOUNDATION FOR IT, BECAUSE EVEN THOUGH IT IS A DEMONSTRATIVE AND NOT AN -- I BELIEVE IT IS ONLY BEING USED AS A DEMONSTRATIVE. IS THAT RIGHT?

**MS. ONDRICK:** THAT'S CORRECT.

**THE COURT:** OKAY. EVEN THOUGH IT IS ONLY A 09:06:51 DEMONSTRATIVE, IT -- THERE IS AN OBJECTION IN THIS INSTANCE.

SO, I'LL JUST PUT IT IN AND ORDER THAT YOU ARE NOT TO SHOW IT UNLESS HE LAYS A FOUNDATION.

LET'S GET THE JURY IN, BECAUSE IT'S ALREADY LATE.

(THE FOLLOWING PROCEEDINGS WERE HELD IN THE PRESENCE OF 09:07:31 THE JURY)

**THE COURT:** OKAY, PLEASE BE SEATED. ALL RIGHT. GOOD MORNING, LADIES AND GENTLEMEN. I KNOW WE WERE A LITTLE DELAYED, BUT I WANT YOU TO KNOW WE WERE WORKING OUT HERE, REGARDING SOME OF THE DISPLAYS THAT MAY BE USED IN TESTIMONY 09:08:03 COMING UP IN A LITTLE WHILE.

WE WEREN'T JUST OUT HERE DRINKING COFFEE AND EATING DOUGHNUTS AND GENERALLY RELAXING.

SO, OKAY. NOW, I THINK WE'RE STILL --

**MR. SCHERKENBACH:** WE ARE IN THE CROSS EXAMINATION OF 09:08:18 MR. HUANG.

09:08:19 **THE COURT:** CROSS-EXAMINATION.

**MR. JACOBS:** YES.

**THE COURT:** OKAY. COULD WE HAVE THE WITNESS BACK ON THE STAND? THANK YOU.

09:08:31 ALL RIGHT, SIR. PLEASE COME BACK TO THE STAND. AND YOU MAY SIMPLY TAKE YOUR SEAT, MR. HUANG.

PLEASE REMEMBER THAT YOU ARE UNDER THE SAME OATH THAT YOU TOOK YESTERDAY. IT'S NOT NECESSARY TO BE RESWORN, HOWEVER.

THANK YOU. ALL RIGHT. THEN, WE WILL CONTINUE WITH THE

09:08:47 CROSS EXAMINATION OF W.H. HUANG.

**MR. SCHERKENBACH:** THANK YOU, YOUR HONOR.

GOOD MORNING, LADIES AND GENTLEMEN.

**WEI-HSUAN HUANG, DEFENDANTS' WITNESS, RECALLED**

**CROSS EXAMINATION**

09:08:54 **BY MR. SCHERKENBACH:**

**Q** GOOD MORNING, MR. HUANG.

**A** GOOD MORNING.

**Q** WHEN WE LEFT OFF YESTERDAY, WE WERE TALKING ABOUT A DECLARATION THAT YOU HAD FILED IN THIS CASE. DO YOU RECALL

09:09:01 THAT DISCUSSION?

**A** YES.

**MR. SCHERKENBACH:** YOUR HONOR, THE PARTIES HAVE AGREED ON THE REDACTED VERSION OF THAT, AND I WOULD LIKE TO MOVE IT INTO EVIDENCE.

09:09:10 **THE COURT:** OH, YES.

**MR. SCHERKENBACH:** IF I MAY?

**THE COURT:** HOLD ON FOR A MINUTE. THAT NUMBER WOULD BE WHAT, THEN?

**MR. SCHERKENBACH:** IT IS DX 3485. AND YOU WILL HAVE R.

**THE COURT:** ALL RIGHT. LET ME JUST FIND IT ON THE LIST HERE. 3485R IS ADMITTED.

(TRIAL EXHIBIT 3485R RECEIVED IN EVIDENCE)

**MR. SCHERKENBACH:** THANK YOU, YOUR HONOR.

**THE COURT:** THANK YOU.

**MR. SCHERKENBACH:** MR. SAYERS, MAY WE HAVE THAT ON THE SCREEN, PLEASE?

(DOCUMENT DISPLAYED)

**BY MR. SCHERKENBACH:**

**Q** YOU DON'T HAVE THERE IN YOUR BOOK, MR. HUANG, BECAUSE IT IS A PARED-DOWN VERSION OF YOUR DECLARATION, OKAY?

**A** OKAY.

**Q** SO YOU CAN EITHER LOOK UP ON THE BIG SCREEN OR YOU CAN LOOK ON YOUR SCREEN BY YOU.

**MR. SCHERKENBACH:** COULD WE HAVE THE NEXT PAGE?

**BY MR. SCHERKENBACH:**

**Q** I JUST HAVE ONE MORE QUESTION ABOUT THIS. WHEN I ASKED YOU YESTERDAY ABOUT THESE NUMBERED PARAGRAPHS 2 THROUGH 4 --

**MR. SCHERKENBACH:** CAN WE JUST PICK -- JUST PICK ONE, MR. SAYERS, AND BLOW IT UP.

09:10:07 (DOCUMENT DISPLAYED)

**BY MR. SCHERKENBACH:**

**Q** OKAY. AND YOU MADE THIS STATEMENT THAT ON A CERTAIN DATE, YOU DIRECTED, SUPERVISED, AND PERSONALLY WITNESSED THE TESTING

09:10:19 OF A SERIES OF PARTS, RIGHT (INDICATING)?

DO YOU RECALL THAT?

**A** YES.

**Q** OKAY. AND YOU AGREED YESTERDAY THAT YOU ACTUALLY WERE NOT THERE FOR THE TESTING ON THE DATES INDICATED IN THIS

09:10:35 DECLARATION. RIGHT?

**A** YES.

**Q** YOU ATTENDED SOME LATER TESTING, BUT NOT ON THESE DAYS, RIGHT?

**A** YES.

09:10:43 **Q** SO WHEN YOU SAID -- I JUST WANT TO MAKE CLEAR WHEN YOU SAY YOU PERSONALLY WITNESSED SOMETHING ON THOSE DAYS, THAT WAS NOT CORRECT AT THE TIME YOU DID YOUR DECLARATION. RIGHT?

**A** YES. I MADE A MISTAKE, YES.

**Q** ALL RIGHT. NOW, ONE LAST TOPIC ON TESTING, THEN WE WILL

09:11:02 MOVE ON TO SOMETHING ELSE. THE ORIGINAL TEST INSTRUCTIONS THAT THE LAWYERS SENT TO YOU ON JULY 25, THEY CONTAINED WHAT WAS CALLED A "TEST 3." DO YOU REMEMBER THAT?

**A** YES.

**Q** OKAY. AND AT SOME POINT LATER, THOUGH, THE LAWYERS TOLD

09:11:24 YOU NOT TO PERFORM TEST 3. TRUE?

09:11:29 **A** YES. IT'S TRUE.

**Q** BUT YOU DON'T RECALL THE LAWYERS TELLING YOU WHY THEY DIDN'T WANT YOU TO DO TEST 3. RIGHT?

**A** YES.

09:11:44 **Q** BUT YOU DO KNOW THAT YOU WERE NOT TOLD IT WAS DR. WEI WHO HAD CHANGED HIS MIND AND DECIDED HE DIDN'T WANT TEST 3. RIGHT?

**A** YEAH. I -- I WAS NOT TOLD THAT WHO -- WHO DECIDE THIS DECISION. BUT I -- I BELIEVE THAT BECAUSE LAYERS, I THINK,

09:12:00 HE'S NOT EXPERTISE. I THINK THIS DECISION SHOULD BE MADE -- SHOULD BE MADE BY EXPERT. YEAH.

**Q** BUT -- BUT YOU DON'T KNOW, SIR, THE REASON YOU WERE TOLD NOT TO DO TEST 3. RIGHT?

**A** YEAH. I DON'T KNOW THE REASONS.

09:12:18 **Q** AND, IN FACT, IT WAS YOUR UNDERSTANDING THAT BECAUSE TEST 3 HAD ORIGINALLY BEEN REQUESTED IN THE JULY 25 EMAIL THAT CAME FROM THE LAWYERS AND THAT YOU UNDERSTOOD THEY WERE RELAYING FROM DR. WEI, IT WAS YOUR UNDERSTANDING DR. WEI WANTED THE TEST 3 DONE. RIGHT? ORIGINALLY.

09:12:35 **A** YEAH. YES.

**Q** ALL RIGHT. BUT IT TURNS OUT THAT BEFORE THE LAWYERS TOLD YOU NOT TO DO THAT TEST, IT HAD BEEN DONE FOR ONE PART. RIGHT? TEST 3?

**A** YOU MEAN, WE -- YEAH, WE -- WE DID THAT TEST AT THE

09:12:55 BEGINNING, YEAH.

09:12:56 **Q** AND -- AND YOU DID THAT TEST -- OR I SHOULD SAY MR. CHUEH PERFORMED TEST 3 ON AT LEAST THE SG6841. RIGHT?

**A** YES.

**Q** BUT YOU DIDN'T TELL THE LAWYERS THAT YOU ACTUALLY HAD

09:13:10 CAPTURED DATA FOR THAT TEST FOR THE 6841. TRUE?

**A** YES.

**Q** AND YOU DIDN'T TELL DR. WEI LATER THAT YOU HAD CAPTURED DATA FOR TEST 3 FOR THE 6841. RIGHT?

**A** YEAH. BECAUSE WE DID A TEST, SO WE ABSOLUTELY WILL

09:13:30 CAPTURE THOSE SCREENSHOT AND THE WAVEFORM, YES.

**Q** SO THAT'S MY QUESTION. YOU -- YOU HAD THE DATA FOR THAT TEST FOR ONE PART. RIGHT?

**A** YES.

**Q** BUT WHEN YOU LATER TALKED TO DR. WEI -- I BELIEVE IT WAS

09:13:44 ON OCTOBER -- OR AUGUST 20TH -- YOU DIDN'T TELL HIM YOU HAD THAT DATA FOR THE TEST 3 TEST. RIGHT?

**A** YES.

**Q** NOW, THIS IS THE LAST TOPIC.

YOU TALKED ABOUT SOME DATASHEETS YESTERDAY. DO YOU

09:14:02 REMEMBER THAT?

**A** YES.

**Q** AND I HAVE SOME QUESTIONS ABOUT THOSE.

**A** OKAY.

**MR. SCHERKENBACH:** CAN WE HAVE DDX 2002, PLEASE.

09:14:10 (DOCUMENT DISPLAYED)

09:14:10 **BY MR. SCHERKENBACH:**

**Q** THIS IS ONE OF YOUR SLIDES FROM YESTERDAY. DO YOU RECOGNIZE THAT?

**A** YES.

09:14:14 **Q** AND YOU TALKED ABOUT THE SG5841 AND 5841J DATASHEET. RIGHT?

**A** YES.

**Q** AND YOU HIGHLIGHTED HERE THIS BULLET.

"PROGRAMMABLE PWM FREQUENCY WITH HOPPING," RIGHT?

09:14:33 **A** YES.

**Q** I WANT TO TALK FIRST ABOUT THE WORD "PROGRAMMABLE." OKAY?

**A** OKAY.

**Q** THAT JUST MEANS THAT THE USER CAN CHOOSE THE PWM 09:14:41 FREQUENCY. RIGHT?

**A** YES.

**Q** AND, IN FACT, IF YOU GO TO YOUR NEXT SLIDE, DDX 2003 --

(DOCUMENT DISPLAYED)

**Q** -- THAT'S ACTUALLY WHAT'S DESCRIBED HERE IS THAT BY 09:14:55 CHOOSING THE VALUE OF A RESISTANCE, THE USER CAN ACTUALLY CHOOSE WHAT THE PWM FREQUENCY WILL BE (INDICATING). RIGHT?

**A** YES.

**Q** AND, BY CHOOSING A RESISTOR VALUE, IN PARTICULAR, THE USER CAN CHOOSE WHETHER THE PWM FREQUENCY IS, SAY, 47 KILOHERTZ, 09:15:15 109 KILOHERTZ, OR SOMEWHERE IN BETWEEN. RIGHT?

09:15:18 **A** YES.

**Q** OKAY. AND ONCE THE USER CHOOSES A RESISTOR AND THAT GETS SOLDERED ON THE BOARD, THAT PWM FREQUENCY IS NOT GOING TO CHANGE UNLESS THE RESISTOR GETS CHANGED. RIGHT?

09:15:35 **A** ACTUALLY, WHEN USER DECIDE TO PUT SOME CERTAIN RESISTANCE ON THIS BOARD, THEN THEY WILL HAVE A -- WE HAVE A FORMULA THAT USER KNOW THAT THEIR TARGET FREQUENCY IS BI-LEVEL. HOWEVER, WE HAVE A RANGE AROUND THIS TARGET FREQUENCY.

SO WE STILL HAVE SOME VARIATION AT LEAST TARGET. AND THAT 09:15:58 IS THE TRUE BEHAVIOR.

**Q** LET ME REPHRASE, BECAUSE THIS IS THE JITTER POINT WHICH I'M COMING TO. BUT WHEN THE USER WANTS TO CHOOSE WHAT YOU CALL THE "TARGET FREQUENCY," OKAY?

**A** YES.

09:16:11 **Q** YOU USED THE PHRASE "TARGET FREQUENCY" IN YOUR ANSWER. RIGHT?

**A** YES.

**Q** OKAY. THE USER CAN CHOOSE THE TARGET FREQUENCY BY SELECTING A RESISTOR VALUE. RIGHT?

09:16:21 **A** YES.

**Q** AND THAT RESISTOR GETS SOLDERED ON THE PRINTED CIRCUIT BOARD OUTSIDE THE CONTROLLER CHIP. RIGHT?

**A** YES.

**Q** AND SO UNLESS THE USER GOES BACK IN LATER AND TAKES THAT 09:16:27 RESISTOR OFF AND PUTS ANOTHER ONE ON, THAT TARGET FREQUENCY

09:16:31 FOR THE PWM IS NOT GOING TO CHANGE. RIGHT?

**A** YEAH. THE TARGET IS THAT. THE TARGET, YES.

**Q** OKAY. NOW, LET'S GET TO THE OTHER PART OF YOUR POINT, I THINK.

09:16:41 **MR. SCHERKENBACH:** CAN WE GO BACK TO 2002?

(DOCUMENT DISPLAYED)

**BY MR. SCHERKENBACH:**

**Q** "HOPPING," "FREQUENCY WITH HOPPING," RIGHT?

**A** YES.

09:16:50 **Q** AND I BELIEVE YOU SAID -- YOU POINTED OUT THAT WHAT THAT MEANS IN YOUR VIEW IS THE FREQUENCY VARIES DUE TO THE JITTER FUNCTION. TRUE?

**A** YES.

**Q** BUT YOU WOULD AGREE THAT THE FREQUENCY VARIATION AS A 09:17:08 RESULT OF JITTER DOES NOT OCCUR IN RESPONSE TO THE FEEDBACK VALUES. RIGHT?

**A** IT -- I'M NOT SO SURE OF WHAT YOU WANT TO -- WHAT YOU MEAN. SORRY.

**Q** LET'S TRY TO DO IT WITH REFERENCE TO THE DATASHEET. SO 09:17:24 LET'S LOOK AT -- AND, BY THE WAY, THIS DOCUMENT IS IN EVIDENCE, SO IT'S CLEAR, DX 4606, THE DATASHEET.

SO LET'S GO TO PAGE 6 OF THE DATASHEET FOR THE 5841, AND 5841J. OKAY?

**A** YES.

09:17:39 (DOCUMENT DISPLAYED)

09:17:40

**Q** YOU ACTUALLY --

**MR. SCHERKENBACH:** THAT'S GOOD RIGHT THERE, MR. SAYERS.

**BY MR. SCHERKENBACH:**

09:17:43

**Q** YOU ACTUALLY HIGHLIGHTED FOR THE JURY, I THINK, SOME OF THE VALUES IN THESE TABLES AT THE TOP? DO YOU REMEMBER THAT?

**A** YES.

**Q** ALL RIGHT. THERE IS ACTUALLY A FIGURE DOWN HERE THAT YOU DIDN'T TALK ABOUT ON DIRECT. ISN'T THAT RIGHT?

09:17:55

**A** YEAH, THIS -- THIS IS ROUGHLY A DESCRIPTION ABOUT THE CENTER TARGET FREQUENCY. HOWEVER, IT WILL HAVE VARIATIONS.

SO, BECAUSE IT'S HARD TO DESCRIBE THE VARIATION ON THIS SINGLE PAGE, BECAUSE THIS SINGLE PAGE IS TO DESCRIBE THE FREQUENCY DECREASING BEHAVIOR. BUT OVER RANGE WE HAVE VARIATIONS.

09:18:19

**Q** ALL RIGHT. I JUST WANT TO TALK ABOUT WHAT'S SHOWN IN THE FIGURE. OKAY?

**A** OKAY.

**Q** IN THE FIGURE, THIS SHOWS FREQUENCY VERSUS FEEDBACK VOLTAGE. RIGHT?

09:18:29

**A** YES.

**Q** AND, IT SHOWS AN OSCILLATOR FREQUENCY HERE OF 65 KILOHERTZ FOR ONE -- ONE LEVEL. TRUE?

**A** YES, A TARGET.

09:18:44

**Q** TARGET?

09:18:45 **A** YES, TARGET.

**Q** AND ANOTHER TARGET AT THE BOTTOM HERE OF 22 KILOHERTZ, RIGHT?

**A** YES.

09:18:51 **Q** AND, FOR A RANGE OF FEEDBACK SIGNALS ON THE RIGHT SIDE OF THIS FIGURE HERE, IN DX 4606, THE FREQUENCY IS SHOWN AS FIXED. TRUE?

**A** IT'S -- ACTUALLY, IT'S NOT FIXED, BECAUSE -- AND ABOVE THERE IS A JITTER RANGE. SO IT'S ACTUALLY -- IT IS A RANGE, 09:19:16 WE SAY "RANGE," BUT NOT A FIXED VALUE.

**Q** SO THIS REALLY SHOULDN'T BE FLAT; IT SHOULD BE JUMPING UP AND DOWN?

**A** YES. THE ACTUAL BEHAVIOR SHOULD BE THAT.

**Q** SO THAT FIGURE, HOW WOULD YOU DESCRIBE THAT? IT'S JUST 09:19:29 WRONG? IT'S INACCURATE? WHAT?

**A** NO, IT'S -- BECAUSE THIS FIGURE, THE PURPOSE IS TO LET CUSTOMER UNDERSTAND FREQUENCY DECREASING. ONLY THIS PURPOSE. BUT THE REAL SITUATION, BECAUSE WE HAD TO DRAW A BAND BECAUSE IT LOOKS NOT -- IN OUR INDUSTRY, NOT USUALLY USE THIS KIND OF 09:19:50 A WIDE BAND TO DRAW THIS KIND OF -- YEAH. SO WE ONLY DRAW THE TARGET.

BUT, HOWEVER, THE CUSTOMER, THEY KNOW ABOUT WHAT WE WANT TO SHOW, WHAT WE WANT TO EXPLAIN FOR THIS FEATURE.

**Q** SO THIS IS THE DATASHEET FOR THE PART, RIGHT? THE 5841?

09:20:07 **A** YES.

09:20:08
**Q** THERE ARE ALSO APPLICATION NOTES FOR THIS PART, RIGHT?

**A** YES.

**Q** FOR BOTH PARTS, I SHOULD SAY, 5841 AND 5841J. TRUE?

**A** TRUE.

09:20:19
**Q** I DON'T THINK YOU -- YOU DIDN'T TALK ABOUT ANY OF THOSE ON YOUR DIRECT, DID YOU? APPLICATION NOTES?

**A** APPLICATION, NO. DIRECT, AS IN YESTERDAY, I DON'T TALK ABOUT THE APPLICATION NOTE, YEAH.

**Q** SO LET'S TAKE A LOOK AT ONE OF THOSE. DX 2037 IS AN APPLICATION NOTE FOR THE SG5841 AND 5841J. DX2037.

09:20:36

**MR. SCHERKENBACH:** I'M NOT ENTIRELY SURE THIS IS IN EVIDENCE. I WOULD LIKE TO MOVE IT IN IF THERE IS NO OBJECTION.

**THE COURT:** WHICH NUMBER?

09:20:51
**MR. SCHERKENBACH:** DX 2037. 2037.

IT IS NOT IN. OKAY.

SO I WOULD MOVE THE ADMISSION OF THAT, YOUR HONOR.

**THE COURT:** IS THERE ANY OBJECTION TO 2037?

**MR. JACOBS:** THERE IS NO OBJECTION, YOUR HONOR.

09:21:00
**THE COURT:** ALL RIGHT. THANK YOU.

DX 2037 IS ADMITTED.

(TRIAL EXHIBIT 2037 RECEIVED IN EVIDENCE)

**MR. SCHERKENBACH:** THANK YOU, YOUR HONOR.

SO NOW WE CAN HAVE THAT ON THE SCREEN.

09:21:12
(DOCUMENT DISPLAYED)

09:21:12 **BY MR. SCHERKENBACH:**

**Q** SO THIS IS AN APPLICATION NOTE FOR THE SG5841. RIGHT?

**A** TRUE.

**Q** OKAY. AND, UNDER "FEATURES" IT HAS THAT SAME LANGUAGE FROM THE DATASHEET WHERE IT SAYS "PROGRAMMABLE PWM FREQUENCY WITH HOPPING"?
09:21:26

**A** YES.

**MR. SCHERKENBACH:** CAN YOU HIGHLIGHT THAT, MR. SAYERS?

09:21:36 (DOCUMENT HIGHLIGHTED)

**MR. SCHERKENBACH:** OKAY. NOW GO BACK TO THE FULL COVER PAGE.

(DOCUMENT DISPLAYED)

**BY MR. SCHERKENBACH:**

09:21:41 **Q** BUT OVER HERE IN THE DESCRIPTION, YOU SEE THIS SENTENCE IN THE MIDDLE, IT SAYS:

"IN NOMINAL LOADING CONDITIONS" --

**MR. SCHERKENBACH:** HIGHLIGHT ALONG WITH ME, MR. SAYERS.

09:21:51 **BY MR. SCHERKENBACH:**

"IN NOMINAL LOADING CONDITIONS, THE SG5841 OPERATES AT FIXED PWM FREQUENCY."

RIGHT?

**A** YEAH. YEAH, I THINK THE FIXED, JUST LIKE YESTERDAY, I MENTIONED IS A ROUGHLY DESCRIPTION. HOWEVER, IT WAS A DETAIL.
09:22:02

09:22:06 THE CUSTOMER THEY WILL REFERENCE FOR THE SPEC ABOUT THE VARIATIONS.

**Q** SO "FIXED" DOESN'T MEAN "REALLY FIXED." IN YOUR VIEW, IT MEANS "ROUGHLY FIXED"?

09:22:16 **A** IT'S ROUGH. IT'S TARGET, YEAH. IT'S TARGET. BUT IT WILL HAVE RANGE, VARIATION RANGES ALWAYS.

**Q** BUT IT'S CLOSE ENOUGH FOR YOU TO DESCRIBE IT IN YOUR DATASHEETS AS "FIXED," RIGHT?

**A** YEAH, BECAUSE IT WILL LET CUSTOMER TO EASY UNDERSTAND OUR

09:22:32 TARGET. HOWEVER, EVERYTHING WE TECHNICALLY ENGINEER, WE WILL REFERENCE FOR THE DETAILED SPEC.

**Q** LET'S LOOK AT THE OTHER DATASHEET YOU TALKED ABOUT ON DIRECT, WHICH IS THE 6841 DATASHEET. OKAY?

**A** OKAY.

09:22:45 **Q** THIS IS DX 4681. AND THIS IS IN EVIDENCE?

**THE COURT:** OKAY. DX 4681.

(DOCUMENT DISPLAYED)

**BY MR. SCHERKENBACH:**

**Q** NOW, FIRST OF ALL, LET'S LOOK AT PAGE 7, HERE. THERE'S A

09:23:04 GRAPH, SIMILAR TO ONE WE JUST SAW.

(DOCUMENT DISPLAYED)

**Q** THIS SHOWS -- AND APOLOGIZE FOR THE QUALITY, BUT IT'S THE BEST WE HAVE.

FREQUENCY VERSUS FEEDBACK VOLTAGE, AGAIN. RIGHT?

09:23:16 **A** YES.

09:23:17 **Q** AND OBVIOUSLY, THERE'S A PORTION HERE WHERE THE LINE IS FLAT (INDICATING). TRUE?

**A** YES.

**Q** AND THAT, AT LEAST GRAPHICALLY, INDICATES THAT THE

09:23:31 FREQUENCY FOR A CERTAIN RANGE OF FEEDBACK VALUES --

**A** YES.

**Q** -- IS CONSTANT, OR FIXED, RIGHT?

**A** YEAH. IT ACTUALLY IS MEAN VALUE. AND "MEAN VALUE" MEANS WE AVERAGE THE MAXIMUM, THE MINIMUM TO GET THE MEAN VALUE.

09:23:45 BUT ACTUALLY, WE WILL HAVE A MAXIMUM-MINIMUM RANGE.

WE USE "MEAN" AS AVERAGE VALUE TO CALCULATE THIS ONE, SO THE RAW DATA WILL SHOW VARIATIONS. I MEAN, WE CANNOT -- BECAUSE WE JUST USE -- YESTERDAY, OSCILLOSCOPE, WE HAVE AREA, MAXIMAL, MINIMAL AND MEAN VALUE.

09:24:11 "MEAN" MEANS AVERAGE. SO WE JUST PUT AVERAGE ON THIS ONE. BUT IF YOU SEE A RAW DATA YOU WILL SEE THE VARIATIONS.

**Q** YOUR POINT IS IF YOU SORT OF ZOOM IN CLOSE ENOUGH, WE ARE GOING TO SEE SOME WIGGLES IN THAT LINE? IS THAT WHAT YOU ARE SAYING?

09:24:28 **A** YES, VARIATIONS, YES.

**Q** BUT AGAIN, FOR PURPOSES OF YOUR CUSTOMERS IN THE DATASHEET -- FOR THE GRAPH, ANYWAY -- YOU SHOW IT AS FLAT?

**A** ACTUALLY, SORRY. AND THIS CONDITION IS ONE INPUT VOLTAGE AND ONE TEMPERATURE. IF WE SHOW DIFFERENT INPUT, INPUT IN

09:24:46 VOLTAGE YOU WILL HAVE DIFFERENT, THE MEAN VALUE. IT WILL

09:24:50 VARY. SO BECAUSE YESTERDAY WE TALK ABOUT WE ALLOW 5 PERCENT VARIATIONS THROUGH THE VDD INPUT VOLTAGE AND THE TEMPERATURE.

**Q** I'M JUST ASKING ABOUT WHAT'S SHOWN HERE (INDICATING). OKAY? NOT WHAT --

09:25:05 **A** OKAY.

**Q** NOT ABOUT WHAT IT COULD LOOK LIKE. OKAY?

**A** OKAY.

**Q** ALL RIGHT. AS SHOWN IN YOUR SG6841 DATASHEET, THE FREQUENCY IS SHOWN AS FIXED OR FLAT FOR A GIVEN RANGE OF

09:25:19 FEEDBACK VOLTAGES. RIGHT?

**A** YEAH. IT'S AVERAGE. I JUST SAY, IT'S AVERAGE, YEAH.

**Q** OKAY. NOW, SO THAT'S THE DATASHEET. THERE ALSO IS AN APPLICATION NOTE FOR THE 6841. RIGHT?

**A** YES.

09:25:37 **Q** AND THIS IS PX 184.

**MR. SCHERKENBACH:** I DON'T KNOW WHETHER THAT'S BEEN ADMITTED. I WOULD LIKE TO MOVE IT, IF IT HASN'T BEEN, YOUR HONOR.

**THE COURT:** JUST A MINUTE, PX 184? OKAY.

09:25:53 **MR. SCHERKENBACH:** I CAN -- I'M SORRY.

**THE COURT:** HMM.

**MR. SCHERKENBACH:** I NEGLECTED TO GIVE COUNSEL A COPY OF IT. I APOLOGIZE.

**THE COURT:** 184 HAS BEEN ADMITTED QUITE SOME TIME

09:26:05 AGO.

09:26:06 **MR. SCHERKENBACH:** VERY GOOD. THANK YOU.

(DOCUMENT DISPLAYED)

**BY MR. SCHERKENBACH:**

**Q** DO YOU RECOGNIZE THIS DOCUMENT, MR. HUANG?

09:26:12 **A** YEAH. THE APPLICATION NOTE, YES.

**Q** OKAY. AND, SO, THIS ONE, IF YOU -- IF WE LOOK AT THE SECOND PAGE --

**A** OKAY.

**Q** -- THERE'S A DESCRIPTION OF THE PART. RIGHT?

09:26:27 (DOCUMENT DISPLAYED)

**Q** AND, SIMILAR TO WHAT WE SAW WITH THE 5841 APPLICATION NOTE, THIS SAYS:

"IN NOMINAL LOADING CONDITIONS, THE SG..."

IT SAYS "4841." THAT SHOULD BE "6841," RIGHT? TYPO.

09:26:46 "... OPERATES AT FIXED PWM FREQUENCY."

RIGHT?

**A** YES, IT -- YES.

**Q** OKAY. NOW, AND FOR THIS PART, YOU ACTUALLY TESTIFIED IN DEPOSITION THAT WHEN THE FEEDBACK VOLTAGE IS ABOVE A CERTAIN 09:27:05 VOLTAGE, 2.6 VOLTS, THE OSCILLATOR FREQUENCY WILL BE FIXED. YOU AGREED WITH THAT. RIGHT?

**A** YEAH. BECAUSE EVERYTHING WE TALK ABOUT THAT, WE -- GENERAL PURPOSE WE TALK ABOUT THE TARGET, BUT -- YEAH.

**Q** ALL RIGHT. NOW, THERE'S ONE OTHER PART OF THIS DATASHEET 09:27:21 YOU SHOWED THE JURY THAT I WANT TO ASK YOU ABOUT. AND THAT

09:27:23 WAS THE SECTION ON CONSTANT OUTPUT POWER. DO YOU RECALL THAT?

**A** YES.

**Q** SORRY. NOT THE AP NOTE; THE DATASHEET. DO YOU RECALL TALKING ABOUT CONSTANT OUTPUT POWER?

09:27:36 **A** YES.

**Q** SO BACK TO DX 4681, PAGE 10.

(DOCUMENT DISPLAYED)

**Q** THERE'S A SECTION HERE ON CONSTANT OUTPUT POWER LIMIT. AND YOU TALKED ABOUT THIS A LITTLE BIT WITH THE JURY, RIGHT?

09:27:51 **A** YES.

**Q** IN FACT, I THINK YOU ACTUALLY HAD HIGHLIGHTED -- OR YOUR COUNSEL HAD -- A REFERENCE TO THE "SENSE VOLTAGE" AT THE TOP. DO YOU SEE THAT?

**A** YES.

09:28:01 **Q** THAT SENSE VOLTAGE REPRESENTS THE CURRENT THROUGH THE POWER SWITCH. RIGHT?

**A** UH, YEAH. YES.

**Q** IN FACT, THE DATASHEET ACTUALLY CALLS THAT VOLTAGE A "CURRENT SENSE SIGNAL." TRUE?

09:28:20 **A** YEAH. BECAUSE WE -- WE MONITOR THE VOLTAGE ON THE CURRENT SENSE PIN. AND ON THE CURRENT, RESISTORS, WE MONITOR THE VOLTAGE.

**Q** RIGHT.

**A** YEAH.

09:28:31 **Q** IN FACT, HOP TO THE COVER OF THIS DOCUMENT, THE FIRST

09:28:35 PAGE.

(DOCUMENT DISPLAYED)

**Q** WHAT YOU JUST DESCRIBED IS ACTUALLY SHOWN IN THIS TYPICAL APPLICATION ON THE COVER. RIGHT?

09:28:42 **A** YEAH. ACTUALLY, YOU CAN THINK ABOUT, WE ALSO MONITOR THE VOLTAGE OF THE INPUT POWER -- INPUT VOLTAGE OF THE Q1, THE OTHER SIDE.

**Q** RIGHT. BUT FOR NOW I JUST WANT TO TALK ABOUT THE CURRENT SENSE SIGNAL. OKAY?

09:28:58 **A** OKAY.

**Q** SO THE JURY UNDERSTANDS WHAT WE ARE TALKING ABOUT, Q1 IS THE POWER SWITCH. RIGHT?

**A** YES.

**Q** "RS" IS A SENSE RESISTOR. RIGHT?

09:29:06 **A** YES.

**Q** WHEN YOU RUN THE CURRENT IN THE SWITCH THROUGH THAT RESISTOR, YOU CREATE A VOLTAGE AT THE SENSE PIN. RIGHT?

**A** YES.

**Q** AND THAT VOLTAGE AT THE SENSE PIN REPRESENTS THE CURRENT FLOWING THROUGH THE POWER SWITCH. RIGHT?

09:29:19 **A** YEAH. IT ALSO REPRESENT THE DRAIN VOLTAGE OF THE Q1, THE MOSFET. IT IS A SENSE, YEAH.

**Q** SO THAT IS WHY --

**MR. SCHERKENBACH:** NOW, GO TO PAGE 9 OF THE

09:29:35 DATASHEET.

09:29:36 (DOCUMENT DISPLAYED)

**BY MR. SCHERKENBACH:**

**Q** -- THE VOLTAGE ON THAT SENSE PIN IS ACTUALLY CALLED --

**MR. SCHERKENBACH:** THE UPPER RIGHT, MR. SAYERS?

09:29:43 (DOCUMENT DISPLAYED)

**BY MR. SCHERKENBACH:**

**Q** -- IS ACTUALLY CALLED A "CURRENT SENSE SIGNAL." DO YOU SEE WHERE I'M POINTING?

**A** YES.

09:29:49 **MR. SCHERKENBACH:** OKAY. "CURRENT" RIGHT THERE IN THE MIDDLE, MR. SAYERS: "CURRENT SENSE SIGNAL."

(DOCUMENT HIGHLIGHTED)

**BY MR. SCHERKENBACH:**

**Q** ALL RIGHT. NOW, IN FACT, IF WE LOOK AT THE TABLE --

09:30:01 THERE'S LOTS OF TABLES IN THESE DATASHEETS. RIGHT?

**A** YES.

**Q** AND ONE OF THE TABLES ACTUALLY TELLS YOU WHAT THE PINS ARE FOR. RIGHT? PIN DESCRIPTION TABLE. FAMILIAR WITH THAT?

**A** YEAH.

09:30:12 **Q** I'LL SHOW IT TO YOU. IT IS ON PAGE 2.

**A** OKAY.

**Q** PAGE 2 OF THE DATASHEET.

(DOCUMENT DISPLAYED)

**MR. SCHERKENBACH:** AND LET'S HIGHLIGHT LINE 6.

**BY MR. SCHERKENBACH:**

**Q** SO PIN 6 IS THE SENSE PIN. RIGHT?

**A** YES.

**Q** AND ITS FUNCTION IS:

"CURRENT SENSE."

CORRECT?

**A** YEAH, IT'S A NAME, ACTUALLY "SENSE VOLTAGE." IT'S A NAME.

**Q** IT SAYS -- THE DESCRIPTION SAYS:

"CURRENT SENSE. THE SENSED VOLTAGE IS USED FOR CURRENT MODE CONTROL AND PULSE-BY-PULSE CURRENT LIMITING."

RIGHT?

**A** YES.

**Q** SO, THE VOLTAGE, THE SENSED VOLTAGE IS USED FOR CURRENT LIMITING. TRUE?

**A** YEAH. FOR CURRENT LIMIT. BUT, AS I TOLD, THAT WE SENSE THE VOLTAGE, YES.

**Q** AND IT'S JUST MORE GENERALLY, MR. HUANG --

**A** OKAY.

**Q** IT'S VERY, VERY COMMON FOR ELECTRICAL ENGINEERS TO USE A VOLTAGE TO REPRESENT THE VALUE OF A CURRENT. RIGHT?

**A** YES.

**Q** AND, IN FACT, THE OPPOSITE IS ALSO TRUE. IT'S COMMON TO USE A CURRENT TO REPRESENT THE VALUE OF A VOLTAGE. RIGHT?

**A** I THINK FROM OUR DESIGNER POINT OF VIEW IT IS MORE EASY TO

09:31:34 USE VOLTAGE TO MONITOR, NO MATTER CURRENT OR VOLTAGE. BUT IT'S MORE HARD TO USE CURRENT TO MONITOR VOLTAGE. IT'S FROM A DESIGN POINT OF VIEW. IT IS EASIER FOR OUR DESIGNER. SO WE PREFER TO USE VOLTAGE.

09:31:52 **Q** FAIR ENOUGH. AND, IN FACT, BECAUSE IT IS EASIER, THAT'S WHY IT IS A LOT MORE COMMON TO ACTUALLY USE A VOLTAGE TO REPRESENT A CURRENT. RIGHT?

**A** YES. YEAH.

**Q** ALL RIGHT.

09:32:03 **MR. SCHERKENBACH:** I DON'T HAVE ANY OTHER QUESTIONS, YOUR HONOR.

**THE COURT:** ALL RIGHT. THANK YOU.

THEN, ANY FURTHER DIRECT? REDIRECT.

**MR. JACOBS:** THANK YOU, YOUR HONOR.

09:32:32 **THE COURT:** READY?

## REDIRECT EXAMINATION

**BY MR. JACOBS:**

**Q** GOOD MORNING, MR. HUANG.

**A** GOOD MORNING.

09:32:36 **Q** MR. SCHERKENBACH, GOING BACK TO YESTERDAY, FIRST ASKED YOU ABOUT THE JULY 25TH EMAIL THAT REQUESTED YOU TO PERFORM SOME TESTING. DO YOU RECALL THAT?

**A** YES.

**Q** AND, HE POINTED OUT THAT DR. WEI WAS NOT IDENTIFIED IN

09:32:52 THAT ORIGINAL EMAIL. DO YOU REMEMBER THAT?

09:32:55
**A** YES.

**Q** NOW, YOU EVENTUALLY PROVIDED RAW DATA ON SCREENSHOTS TO DR. WEI. RIGHT?

**A** YES.

09:33:02
**Q** AND THE RAW DATA THAT YOU PROVIDED TO DR. WEI, WAS THAT CHANGED IN ANY WAY BY HOW YOU FIRST LEARNED ABOUT THE TESTING YOU PERFORMED HERE?

**MR. SCHERKENBACH:** OBJECTION, YOUR HONOR, LEADING.

**THE COURT:** OVERRULED.

09:33:14
**MR. JACOBS:** YEAH. IT'S "YES" OR "NO."

**THE WITNESS:** SORRY. CAN YOU JUST REPEAT IT?

**BY MR. JACOBS:**

**Q** SURE. THE RAW DATA THAT YOU PROVIDED, WAS THAT CHANGED IN ANY WAY BY HOW YOU FIRST LEARNED ABOUT THE TESTING THAT YOU

09:33:26
PERFORMED?

**A** YEAH. THE CONDITION NOT CHANGE. JUST RECAPTURE SCREENSHOT.

**Q** OKAY. NOW, MR. SCHERKENBACH WENT ON TO QUESTION YOU ABOUT THE FACT THAT DR. WEI, YOU DIDN'T MEET HIM UNTIL AUGUST 20TH.

09:33:40
RIGHT?

**A** YES.

**Q** DID THE FACT THAT YOU DID NOT KNOW DR. WEI UNTIL AUGUST 20TH CHANGE THE RAW TEST DATA THAT YOU PROVIDED TO DR. WEI IN ANY WAY?

09:33:52
**A** YEAH. BEFORE THAT DAY, I DIDN'T KNOW DR. WEI. YES.

09:33:56 **Q** THE TEST DATA THAT YOU PROVIDED TO DR. WEI, WAS IT CHANGED IN ANY WAY BY WHEN YOU CAME TO KNOW HIM?

**A** SORRY. CAN YOU SAY AGAIN THIS QUESTION?

**Q** YES. YOU PROVIDED TEST DATA TO DR. WEI. RIGHT?

09:34:10 **A** YES.

**Q** WERE THE VALUES CHANGED IN ANY WAY BY THE DATE THAT YOU CAME TO KNOW DR. WEI?

**A** BY THE DAY I CAME TO KNOW DR. WEI?

**THE COURT:** DID YOU MEET DR. WEI?

09:34:23 **MR. JACOBS:** HE TALKED TO HIM ON THE TELEPHONE, YOUR HONOR.

**THE COURT:** ALL RIGHT. WHY DON'T YOU USE "TALKED ON THE PHONE"? IT MAY BE EASIER.

**BY MR. JACOBS:**

09:34:29 **Q** OKAY. YOU TALKED TO DR. WEI ON THE TELEPHONE AT SOME POINT IN TIME. RIGHT?

**A** YES, YES.

**Q** AND YOU PROVIDED DR. WEI RAW TEST DATA FROM SCREENSHOTS. IS THAT RIGHT?

09:34:36 **A** YES.

**Q** DID THAT TEST DATA GET ALTERED OR CHANGED IN ANY WAY FROM WHEN IT CAME TO THE SCREENSHOT AND WAS PROVIDED TO DR. WEI?

**A** SORRY, I -- I'M NOT SO UNDERSTAND THIS SENTENCE MEANS.

**Q** DID YOU JUST PROVIDE DR. WEI THE TEST DATA THAT WAS ON THE

09:34:57 SCREENSHOTS FROM THE TESTS THAT YOU PERFORMED?

09:35:00
**A** YES. JUST --
**Q** YOU DIDN'T CHANGE THAT DATA IN ANY WAY, DID YOU?
**A** I JUST CHANGE THE SCREENSHOT. BUT THE TESTING, TEST CONDITION IS ALL THE SAME.
09:35:08
**Q** WHAT ABOUT THE RAW DATA? DID YOU CHANGE THE RAW DATA?
**A** "RAW DATA," YOU MEAN --
**Q** THE NUMBERS.
**A** "NUMBERS." YOU MEAN -- BUT WE ONLY TAKE SCREENSHOT, RIGHT?
09:35:20
**Q** YES.
**A** YES. WE ONLY -- YES.
**Q** AND THERE ARE SOME VALUES ON THE SCREENSHOTS?
**A** YEAH, I HAD SOME VALUE, YES. I JUST NOTICED THE VALUE NUMBER. YES.
09:35:31
**Q** OKAY. NOW, MR. SCHERKENBACH ASKED YOU ABOUT YOUR SUGGESTIONS TO PERFORM SURGE TESTS AND ESD TESTS. DO YOU REMEMBER?
**A** YES.
**Q** WHY DID YOU SUGGEST PERFORMING SURGE TESTS AND ESD TESTS?
09:35:42
**A** YEAH, BECAUSE I KNOW THAT CYCLE SKIPPING WILL BE THE ISSUE. AND I THINK THIS KIND OF TEST CAN REPRESENT THE CYCLE SKIPPING.
**Q** DO THE SURGE TEST AND ESD TEST ASSESS THE PERFORMANCE OF FREQUENCY VARIATION IN ANY WAY?
09:36:00
**A** THE SURGE -- THE SURGE AND CYCLE SKIPPING, WE -- I THINK

09:36:06 FOR SURGE, YES. ESD PROTECTION WE ONLY PERFORM THE CYCLE SKIPPING, YEAH.

**Q** YOU WERE ASKED ABOUT DYNAMIC LOAD TESTS BY MR. SCHERKENBACH. RIGHT?

09:36:17 **A** YES.

**Q** AND THE DYNAMIC LOAD TESTS, THEY TEST FOR CYCLE SKIPPING, AS WELL. IS THAT RIGHT?

**A** YES.

**Q** MR. SCHERKENBACH ASKED YOU ABOUT SWAPPING OUT CERTAIN
09:36:28 SCREENSHOTS. DO YOU RECALL THAT?

**A** YES.

**Q** CAN YOU EXPLAIN ONE MORE TIME WHY YOU SWAPPED OUT CERTAIN SCREENSHOTS?

**A** YEAH. BECAUSE JUST I -- I TAKE PHOTOS, AND I THINK THAT
09:36:40 PHOTO MAYBE IS NOT -- DID TRULY REPRESENT THE TEST RESULT. SO I JUST ADJUST THE SETTING, LIKE USE FLASH LIGHT, USE ACCUMULATOR MODE, YEAH, TO PRESENT THE TRUE RESULT. BUT NO CHANGE FOR THE SETTINGS, YEAH.

**Q** SO WHAT WAS PROVIDED TO DR. WEI, THERE WERE NO CHANGES IN
09:37:00 THE SETTINGS. RIGHT?

**A** YES. NO SETTING. NO SETTING CHANGE, JUST CAPTURE, YES.

**Q** SO WHEN DR. WEI FORMED HIS OPINIONS, HE HAD THE DATA THAT WAS COLLECTED BY THE OSCILLOSCOPE BASED ON THE SETTINGS THAT YOU PROVIDED. RIGHT?

09:37:13 **A** YES.

09:37:14

**Q** OKAY. NOW, MR. SCHERKENBACH ASKED YOU A NUMBER OF QUESTIONS ABOUT THE DECLARATION THAT YOU PROVIDED. DO YOU RECALL THAT?

**A** YES.

09:37:22

**Q** I'M SURE THIS WAS NOT THE FIRST MISTAKE YOU HAVE EVER MADE IN YOUR LIFE. IS THAT CORRECT?

**A** YES.

**Q** AND WHEN YOU LEARNED OF THIS MISTAKE, DID YOU BRING IT TO POWER INTEGRATIONS' ATTORNEYS' ATTENTION DURING YOUR

09:37:34

DEPOSITION?

**A** YES.

**Q** HOW DID YOU DO SO?

**A** I SAY THAT I WAS TOO FOCUSED ON THE TEST RESULT. WHEN I SIGNED THIS DECLARATION, I ONLY FOLLOW THE REPORT'S DATE TO

09:37:45

SIGN IT. AND I DIDN'T RECALL THE REPORT DATE SHOULD BE MODIFIED, SHOULD BE UPDATED TO THE DATE THAT I PERSONALLY WITNESSED IT.

**Q** THANK YOU.

**A** SO, I'M SORRY, YEAH.

09:37:54

**Q** YOU WERE ASKED SOME QUESTIONS ABOUT TEST 3. DO YOU RECALL THAT?

**A** YES.

**Q** MR. SCHERKENBACH DIDN'T SHOW YOU WHAT TEST 3 WAS ABOUT DURING YOUR QUESTIONING, DID HE?

09:38:04

**A** NO.

09:38:05
**Q** CAN YOU EXPLAIN WHAT TEST 3 WAS?
**A** AS I RECALL, THE TEST 3 WAS ABOUT MINIMUM "ON" TIME.
**Q** IT WAS ABOUT "ON" TIME VALUES?
**A** YEAH. "ON" TIME VALUES, YES.

09:38:18
**Q** IT WAS NOT ABOUT FREQUENCY VARIATION?
**A** NO.

**MR. JACOBS:** LET'S LOOK, IF WE COULD, AT DX 4608, PLEASE.

**BY MR. JACOBS:**

09:38:34
**Q** YOU WERE ASKED SOME QUESTIONS, MR. HUANG, ABOUT THE SG5841J PRODUCT. CORRECT?
**A** YES.
**Q** OKAY.

**THE CLERK:** I DON'T THINK THIS IS ADMITTED.

09:38:53
**THE COURT:** DX 4608 IS NOT IN YET.

**MR. JACOBS:** LET ME GET THE RIGHT NUMBER, YOUR HONOR.

**THE COURT:** OKAY. IT IS A SCHEMATIC OF SOME SORT FOR J.

**MR. JACOBS:** UH-HUH.

09:39:03
**MR. SCHERKENBACH:** I THINK IT IS 4606.

**MR. JACOBS:** THANK YOU, COUNSEL.

**BY MR. JACOBS:**

**Q** 4606.

**THE COURT:** THAT'S IN EVIDENCE.

09:39:12
(DOCUMENT DISPLAYED)

09:39:20 **MR. JACOBS:** AND CAN YOU PULL UP PAGE 6, PLEASE?

(DOCUMENT DISPLAYED)

**MR. JACOBS:** AND BLOW UP THE OSCILLATOR SECTION, PLEASE.

09:39:32 (DOCUMENT DISPLAYED)

**BY MR. JACOBS:**

**Q** NOW, YOU WERE ASKED SOME QUESTIONS ABOUT CHOOSING A TARGET FREQUENCY. DO YOU RECALL THAT?

**A** YES.

09:39:37 **Q** NOW, ONCE THE TARGET FREQUENCY IS SET, WHAT DOES THE OSCILLATOR SECTION OF THE DATASHEET, PARTICULARLY THE LAST TWO LINES, TELL US ABOUT FREQUENCY VARIATION?

**A** IT MEANS WHEN YOU SET THE TARGET, THE IC WILL STILL PERFORM THE 5 PERCENT VARIATION, NO MATTER THE VDD INPUT

09:40:00 VOLTAGE OR WITHIN TEMPERATURE.

**Q** SO, THE FREQUENCY VARIANCE WILL EXIST ABOVE AND BELOW THE TARGET FREQUENCY?

**A** YES. IT'S VARIED.

**Q** YOU WERE SHOWN AN APPLICATION NOTE FROM THE SG5841J

09:40:17 PRODUCT, AS WELL. DO YOU RECALL THAT?

**A** YES.

**Q** AND MR. SCHERKENBACH POINTED OUT THAT THE WORD "FIXED" WAS USED IN THAT APPLICATION NOTE?

**A** YES.

09:40:26 **Q** IS THAT THE TARGET FREQUENCY THAT YOU HAVE BEEN TALKING

09:40:28 ABOUT?

**A** YES. THE TARGET FREQUENCY.

**Q** AND WHAT DOES THE DATASHEET FREQUENCY VARIATION VERSUS DEVIATION TELL US ABOUT THAT?

09:40:38 **A** IT TELLS ABOUT THAT ON THIS TARGET WE WILL HAVE 5 PERCENT VARIATION THROUGH THE VDD INPUT VOLTAGE AND THE TEMPERATURE.

**Q** AND YOU WERE ASKED SOME QUESTIONS ABOUT THE SG6841, AS WELL. DO YOU RECALL?

**A** YES.

09:40:54 **Q** AND MR. SCHERKENBACH ASKED YOU ABOUT USING THE WORD "FIXED" IN YOUR DEPOSITION?

**A** YES.

**Q** DO YOU RECALL IN YOUR DEPOSITION ALSO TALKING ABOUT SOME OTHER FACTORS THAT WOULD AFFECT THE VARIATION OF THE

09:41:07 FREQUENCY?

**A** YES.

**Q** WHAT DID YOU TALK ABOUT IN YOUR DEPOSITION?

**A** YEAH, DEPOSITION, I SAY THAT EVEN THOUGH WE SAY "FIXED," IT IS NOT REALLY FIXED, ACTUALLY. IT WILL VARY WITH THE

09:41:19 TEMPERATURE AND ABOUT THE SWITCH IN SPIKE NOISE AND THE INPUT VOLTAGE. YEAH.

**Q** JUST FINAL FEW QUESTIONS. YOU WERE ASKED A LITTLE BIT ABOUT THE VOLTAGE AND THE SENSE RESISTOR. DO YOU RECALL?

**A** YES.

09:41:32 **Q** NOW, IN DESIGNING THE FAIRCHILD PRODUCTS, YOU CHOSE TO

09:41:38 SENSE VOLTAGE RATHER THAN CURRENT. IS THAT RIGHT?

**A** YEAH.

**MR. SCHERKENBACH:** YOUR HONOR, LEADING, AND IT'S BEEN LEADING THE WHOLE TIME.

09:41:45 **THE COURT:** WELL, THERE'S BEEN QUITE A BIT OF LEADING.

**MR. JACOBS:** I CAN REPHRASE, YOUR HONOR.

**THE COURT:** ALL RIGHT. I DON'T THINK IT'S IN DISPUTE, BUT I'LL SUSTAIN.

09:41:51 **MR. JACOBS:** I THOUGHT IT WAS FOUNDATIONAL BECAUSE OF LANGUAGE ISSUES, BUT I'M HAPPY TO REPHRASE.

**THE COURT:** WELL, THERE MAY BE SOME DIFFICULTY, BUT OKAY. I'LL SUSTAIN.

**MR. JACOBS:** OKAY.

09:42:00 **BY MR. JACOBS:**

**Q** NOW, WHY DID YOU CHOOSE TO SENSE VOLTAGE RATHER THAN CURRENT IN THE FAIRCHILD PRODUCTS?

**A** YEAH. FROM THE DESIGN POINT OF VIEW, TO SENSE VOLTAGE IS MORE EASY TO DESIGN AND THE -- AND I THINK THE -- THE ACCURACY 09:42:17 IS MORE PRECISE TO SENSE THE VOLTAGE.

**Q** WHEN YOU SAY "THE ACCURACY IS MORE PRECISE," CAN YOU EXPLAIN THAT, PLEASE?

**A** YEAH. WHEN YOU SENSE VOLTAGE, I THINK YOU CAN HAVE A -- A BETTER RESOLUTIONS, IS FROM THE CIRCUIT POINT OF VIEW YOU CAN 09:42:33 HAVE A BETTER RESOLUTION SO YOU CAN CONTROL THE RESULT, YEAH,

BETTER.

**Q** DOES THAT PROVIDE A FEATURE BENEFIT TO THE FAIRCHILD PRODUCTS?

**A** YES.

**Q** OKAY.

**MR. JACOBS:** THANK YOU. I HAVE NO FURTHER QUESTIONS, SIR.

**THE COURT:** ALL RIGHT. ANY RECROSS?

**MR. SCHERKENBACH:** I DO, YOUR HONOR.

**RECROSS EXAMINATION**

**BY MR. SCHERKENBACH:**

**Q** MR. HUANG, ON THIS LAST POINT ABOUT USING A VOLTAGE SIGNAL TO REPRESENT THE CURRENT THROUGH THE SWITCH, YOU'VE DESCRIBED WHY THAT'S A BETTER WAY TO DO IT? IS THAT WHAT YOU'VE JUST SAID?

**A** YEAH. YES.

**Q** YEAH. HAVE YOU SEEN THE POWER INTEGRATIONS '908 PATENT IN THIS CASE?

**A** '908 -- ACTUALLY, I DON'T FULLY UNDERSTAND -- I DON'T -- YEAH, I DON'T -- I DON'T STUDY POWER INTEGRATIONS' PATENTS.

**Q** OKAY. SO YOU DON'T KNOW WHETHER THE POWER INTEGRATIONS' PATENT DESCRIBES JUST EXACTLY THAT SAME IMPLEMENTATION, DO YOU?

**MR. JACOBS:** YOUR HONOR, LACKS FOUNDATION. HE INDICATED HE'S NEVER SEEN THE PATENT.

09:43:21 **THE WITNESS:** YEAH.

**THE COURT:** SUSTAINED.

**THE WITNESS:** YES.

**BY MR. SCHERKENBACH:**

09:43:23 **Q** ALL RIGHT. IT WAS SUSTAINED.

**A** I'M NOT VERY -- I'M NOT VERY FAMILIAR WITH THE PATENTS.

**Q** OKAY. JUST A COUPLE OF OTHER THINGS.

I BELIEVE YOU SAID ON REDIRECT THAT YOU DIDN'T MEET DR. WEI UNTIL AUGUST 20TH. YOU DIDN'T MEET HIM ON 09:43:39 AUGUST 20TH. RIGHT?

**A** YEAH. I HAVE A CONFERENCE CALL WITH --

**Q** TELEPHONE CALL.

**A** TELEPHONE CALL, YES.

**Q** WHEN'S THE FIRST TIME YOU EVER MET DR. WEI?

09:43:49 **A** MY FIRST TIME --

**THE COURT:** IN PERSON?

**MR. SCHERKENBACH:** IN PERSON.

**THE WITNESS:** IN PERSON, I THINK IT'S 2013. AND PROBABLY BE NOVEMBER OR DECEMBER, I THINK. YEAH.

09:44:05 **BY MR. SCHERKENBACH:**

**Q** OKAY. LONG AFTER AUGUST, RIGHT?

**A** YES.

**Q** AND LONG AFTER DR. WEI HAD FILED HIS REPORT IN THIS CASE ON AUGUST 22ND?

09:44:16 **A** YES.

09:44:18 Q YOU ALSO SAID, I THINK, THAT YOU PROVIDED DR. WEI DATA. YOU SENT ALL OF YOUR DATA AND REPORTS TO THE LAWYERS. RIGHT?

A YES.

Q AND THEY, IN SOME WAY, FORWARDED INFORMATION TO DR. WEI.

09:44:33 RIGHT?

A YES.

Q YOU NEVER SENT ANYTHING DIRECTLY TO DR. WEI. RIGHT?

A UH, AS I RECALL, I DON'T SEND -- I DON'T SEND REPORT TO DR. WEI DIRECTLY. I DON'T.

09:44:46 Q OKAY. LAST POINT. YOUR COUNSEL ASKED YOU ABOUT BRINGING THE ERROR IN YOUR DECLARATION TO OUR ATTENTION. DO YOU RECALL THAT?

A CAN YOU SAY AGAIN? SORRY.

Q YOUR COUNSEL ASKED YOU ABOUT WHETHER YOU HAD BROUGHT --

09:45:04 YOU HAD AFFIRMATIVELY BROUGHT TO OUR ATTENTION THE ERROR IN YOUR DECLARATION. DO YOU RECALL THAT TESTIMONY?

A I'M NOT SO SURE I UNDERSTAND WHAT THIS SENTENCE MEANS.

Q OKAY. I'LL REPHRASE IT. OKAY? YOUR DECLARATION THAT WE TALKED ABOUT IS DATED OCTOBER 9TH, 2013.

09:45:27 A YES.

Q OKAY?

A YES.

Q YOUR DEPOSITION IN THIS CASE --

A YES.

09:45:31 Q -- WAS JANUARY 13TH, 2014.

09:45:35

**A** YES.

**Q** SO, IT WAS THREE MONTHS LATER --

**A** YES.

**Q** -- THAT THE DEPOSITION HAPPENED WHERE YOU FIRST SAID ANYTHING ABOUT AN ERROR IN YOUR DECLARATION.

09:45:42

**A** YES. THREE MONTHS LATER. YES. ALMOST.

**MR. SCHERKENBACH:** NO FURTHER QUESTIONS.

**THE COURT:** ANYTHING FURTHER OF MR. HUANG?

**MR. JACOBS:** NOT AT ALL, YOUR HONOR. THANK YOU.

09:45:54

**THE COURT:** THANK YOU.

MR. HUANG, THANK YOU. YOU ARE EXCUSED AT THIS TIME.

**THE WITNESS:** THANK YOU.

(WITNESS EXCUSED)

**THE COURT:** OKAY. THAT CONCLUDES THE TESTIMONY OF MR. HUANG.

09:46:08

WHO WOULD BE THE NEXT WITNESS, MR. JACOBS?

**MR. JACOBS:** THE EXPERT WITNESS ON TECHNICAL ISSUES, DR. WEI.

**THE COURT:** ALL RIGHT. DR. WEI, THEN, IF YOU WILL COME FORWARD, PLEASE.

09:46:19

**GU-YEON WEI, PH.D., DEFENDANTS' WITNESS, SWORN**

**THE CLERK:** PLEASE BE SEATED.

**THE WITNESS:** THANK YOU.

**THE CLERK:** PLEASE STATE YOUR FULL NAME FOR THE RECORD, AND SPELL YOUR LAST NAME, PLEASE.

09:46:56

09:46:59 **THE WITNESS:** MY NAME IS GU-YEON WEI. THAT'S G-U HYPHEN Y-E-O-N. LAST NAME IS W-E-I.

**THE COURT:** OKAY. READY?

**MS. ONDRICK:** MAY I APPROACH, YOUR HONOR?

09:47:14 **THE COURT:** YOU MAY.

**DIRECT EXAMINATION**

**BY MS. ONDRICK:**

**Q** GOOD MORNING, DR. WEI.

**A** GOOD MORNING.

09:47:35 **Q** WOULD YOU PLEASE INTRODUCE YOURSELF TO JUDGE CHESNEY AND THE JURY?

**A** SURE. GOOD MORNING, YOUR HONOR.

**THE COURT:** GOOD MORNING.

**THE WITNESS:** GOOD MORNING, LADIES AND GENTLEMEN. MY 09:47:42 NAME IS GU-YEON WEI. I AM A PROFESSOR OF ELECTRICAL ENGINEERING AND COMPUTER SCIENCE AT HARVARD UNIVERSITY.

**BY MS. ONDRICK:**

**Q** LET'S START WITH YOUR EDUCATIONAL BACKGROUND, IF WE COULD. WHERE DID YOU GO TO SCHOOL?

09:47:56 **A** SO I WENT TO STANFORD FOR MY UNDERGRADUATE DEGREE, MASTER'S AND PH.D.

**Q** AND WHAT DID YOU DO AFTER GRADUATION?

**A** WELL, AFTER GRADUATION I FIRST WORKED AT A STARTUP IN OREGON CALLED ACCELERANT NETWORKS. AND I WORKED THERE FOR 09:48:11 ABOUT A YEAR-AND-A-HALF. I WANTED TO GET SOME INDUSTRY

09:48:15 EXPERIENCE. AND THEN, I WENT TO HARVARD UNIVERSITY TO TEACH.

**Q** WHAT YEAR DID YOU GO TO HARVARD?

**A** I STARTED AT HARVARD IN JANUARY, 2002.

**Q** AND YOU HAVE BEEN THERE EVER SINCE, I TAKE IT?

09:48:25 **A** YEAH, I HAVE BEEN THERE.

**Q** CAN YOU TELL US ABOUT THE RESEARCH THAT YOU CONDUCT AT HARVARD?

**A** I DO RESEARCH IN A VARIETY OF AREAS THAT IS RELATED TO INTEGRATED CIRCUITS, COMPUTERS. SO MY RESEARCH SPANS 09:48:36 EVERYTHING FROM HOW TO BUILD ENERGY-EFFICIENT COMPUTER CHIPS OR MICROPROCESSORS. AND IN ORDER TO DO SO, MY STUDENTS WORK ON PRODUCTS THAT ARE RELATED TO POWER SUPPLIES.

IN ADDITION TO THAT I ALSO WORK ON SOME OTHER INTERESTING PROJECTS THAT RELATE TO MICRO-MECHANICAL SYSTEMS. AND I DON'T 09:48:57 KNOW IF YOU MAY HAVE HEARD OF THIS OR NOT, BUT ONE OF THE PROJECTS THAT WE WORK ON IS SOMETHING CALLED "THE HARVARD ROBOBEES." "ROBO," AS IN "ROBOT."

AND SO, WHAT WE TRY TO DO THERE IS WE ARE BUILDING THESE VERY SMALL ROBOTS THAT FLAP THEIR WINGS AND FLY AROUND. AND 09:49:18 IN ORDER TO GET THOSE WINGS TO FLOP AROUND YOU HAVE TO TAKE A POWER OR ENERGY FROM A 3.7-VOLT BATTERY, LIKE YOU MIGHT FIND IN YOUR CELL PHONE, BUT REALLY, REALLY SMALL.

(REPORTER INTERRUPTION)

**THE WITNESS:** SURE. AND THEN, WE HAVE TO BOOST IT UP 09:49:29 INTO A 200-VOLT VALUE SO THAT WE CAN ACTUALLY DRIVE THE WINGS

09:49:34 AND HAVE THEM FLAP (INDICATING).

AND SO, THOSE ARE POWER CONVERTER CIRCUITRY THAT WE INSERT INTO A VERY SMALL ROBOT.

**BY MS. ONDRICK:**

09:49:44 **Q** WHAT TYPES OF COURSES DO YOU TEACH AT HARVARD?

**A** I TEACH PRIMARILY IN THE AREA OF CIRCUIT DESIGN, INTEGRATED CIRCUIT DESIGN, AND COVER A VARIETY OF TOPICS THAT RELATE TO HOW TO DESIGN CIRCUITS. A LITTLE BIT IN TERMS OF COMPUTER ARCHITECTURE. AND THERE'S ANALOG CIRCUITS, DIGITAL 09:50:01 CIRCUITS AND SOME POWER CONVERTER CIRCUITS, AS WELL.

**Q** AND YOU HAVE ALSO SERVED A PRETTY PRESTIGIOUS ROLE AT HARVARD, TOO, HAVEN'T YOU?

**A** SO I THINK IT WAS ABOUT THREE YEARS AGO. I HAD COME BACK FROM SABBATICAL AFTER I HAD GOTTEN TENURE. AND MY DEAN ASKED 09:50:18 ME TO SERVE IN AN ADMINISTRATIVE ROLE TO BE THE ACADEMIC -- OR THE DEAN FOR ACADEMIC PROGRAMS.

AND SO THAT WAS A LOT OF ADMINISTRATIVE WORK THAT I DID FOR ABOUT A YEAR-AND-A-HALF.

**Q** BUT THAT WAS FOR THE ENTIRE UNIVERSITY -- OR FOR THE 09:50:30 ENTIRE ENGINEERING DEPARTMENT AT HARVARD, CORRECT?

**A** THAT WAS FOR THE SCHOOL OF ENGINEERING.

**Q** OKAY. NOW, HAVE YOU BEEN RETAINED TO PROVIDE TESTIMONY ON BEHALF OF FAIRCHILD IN THIS CASE?

**A** YES, I HAVE.

09:50:42 **Q** SO LET'S JUST GO AHEAD AND GIVE THE JURY A LITTLE ROAD MAP

09:50:45 OF THE TESTIMONY THAT YOU ARE GOING TO BE PROVIDING TODAY. OKAY?

**A** SURE. OH, SURE. SO, FIRST, WHAT WE ARE GOING TO DO IS DO A LITTLE TUTORIAL.

09:50:56 WE HAVE BEEN HEARING ABOUT A LOT OF DIFFERENT TECHNOLOGIES. I CAN UNDERSTAND THAT IT MIGHT BE PRETTY COMPLICATED. AND SO USUALLY WHAT I LIKE TO DO IS TAKE A STEP BACK, KIND OF PRESENT SOME OF THE CONCEPTS THAT RELATE TO THE TECHNOLOGY. SO WE WILL START WITH THE TUTORIAL.

09:51:10 AND THEN, WHAT WE WILL DO IS MOVE ON TO MY OPINIONS IN REGARDS TO THE PATENTS THAT ARE AT ISSUE, THE '908 AND THE '079 PATENT.

AND WE WILL BE LOOKING AT THE TECHNOLOGIES FOR THE ACCUSED PRODUCTS FROM FAIRCHILD. AND I WILL ESSENTIALLY STEP THROUGH 09:51:27 AND EXPLAIN WHY I BELIEVE MY OPINION IS THAT THE FAIRCHILD PRODUCTS DO NOT INFRINGE THOSE TWO PATENTS.

AND THEN, WE ARE GOING TO SHIFT GEARS, AND WE ARE GOING TO TALK ABOUT SOMETHING CALLED "INVALIDITY." AND, THROUGH -- BY STEPPING THROUGH EACH OF THE CLAIMS AND EACH OF THE ELEMENTS 09:51:44 IN THE CLAIM, WHAT I'LL SHOW YOU IS HOW THERE'S PRIOR ART.

THERE IS INFORMATION PROVIDED OR AVAILABLE TO THE PUBLIC PRIOR TO WHEN THESE PATENTS CAME ABOUT, AND HOW ALL THE INVENTIONS THAT ARE DISCLOSED IN THE PATENTS OR IN THE CLAIMS WERE ALREADY AVAILABLE IN THE PUBLIC.

09:52:05 **Q** AND HAVE YOU PREPARED SOME MATERIALS TO HELP US WITH ALL

09:52:07 THAT TODAY?

**A** I HAVE.

**Q** OKAY. WHY DON'T WE GO AHEAD AND GET STARTED.

(DOCUMENT DISPLAYED)

09:52:16 **Q** SO DR. WEI, WHAT IS CURRENT?

**A** RIGHT. SO, WHAT I THOUGHT WOULD BE NICE IS TO TAKE A STEP BACK. WE HAVE BEEN HEARING A LOT ABOUT CURRENTS, A LOT ABOUT VOLTAGES. AND SO WHEN I AM PRESENTING SOME OF THESE CONCEPTS I LIKE TO USE ANALOGIES. OKAY?

09:52:32 SO CURRENT IS ESSENTIALLY A FLOW OF ELECTRONICS. AND SO YOU CAN KIND OF THINK OF IT AS A FAUCET THAT HAS A FLOW OF WATER. WHEN YOU HAVE A TRICKLE COMING DOWN ON THE LEFT, THAT'S A LOW CURRENT.

AND THEN, WHEN YOU TURN ON THE FAUCET YOU GET THIS HIGH 09:52:46 CURRENT. AND THAT IS ESSENTIALLY WHAT YOU CAN THINK ABOUT WHEN WE ARE TALKING ABOUT LOW CURRENTS AND ELECTRICAL CURRENTS IN THIS APPLICATION OR HIGH CURRENTS.

(DOCUMENT DISPLAYED)

**Q** SO YOU HAVE ANOTHER SLIDE HERE, REGARDING VOLTAGE. WHAT 09:53:01 ARE YOU TRYING TO CONVEY?

**A** SO, IN -- IN CONTRAST TO CURRENT, ANOTHER ANALOGY THAT WE CAN USE WHEN WE TALK ABOUT VOLTAGE -- AND I THINK WE HAVE HEARD THIS BEFORE -- IS THERE'S A CAPACITOR AND IT HOLDS ELECTRONS OR HOLDS CHARGE.

09:53:16 SO YOU CAN THINK OF IT AS LIKE A BUCKET OF WATER. SO

09:53:18 USING THAT WATER ANALOGY AGAIN. AND SO, WHEN YOU HAVE A LITTLE BIT OF WATER IN THIS BUCKET, YOU HAVE LOW VOLTAGE. AND THEN, WHEN YOU ACTUALLY HAVE MORE CHARGE OR MORE WATER IN THIS BUCKET YOU HAVE HIGHER VOLTAGE.

09:53:29 SO THAT IS KIND OF A NICE, SIMPLE ANALOGY WHEN YOU ARE THINKING ABOUT CURRENTS AND VOLTAGE.

(DOCUMENT DISPLAYED)

**A** SO THIS IS MEDIUM, YOU KNOW, HIGH.

(DOCUMENT DISPLAYED)

09:53:41 **Q** SO ARE CURRENT AND VOLTAGE RELATED AT ALL?

**A** YES. SO WHEN WE ARE TALKING ABOUT CURRENTS AND VOLTAGE -- AND I THINK YOU HAVE PROBABLY GOTTEN THE FEEL FOR THIS ALREADY SO FAR, LISTENING TO ALL THE DISCUSSIONS OVER THE LAST WEEK AND A HALF.

09:53:53 THERE IS A MATHEMATICAL RELATIONSHIP, SOMETHING CALLED "OHM'S LAW" THAT RELATES CURRENT AND VOLTAGE. AND THAT RELATIONSHIP IN THIS EXAMPLE HERE IS THROUGH SOMETHING CALLED "A RESISTOR." AND WHAT THAT RESISTOR DOES IS IT RESISTS THE PULL OF CURRENT OR ELECTRONS.

09:54:08 AND SO WHAT YOU CAN SEE HERE IS THAT CURRENT IS EQUAL TO VOLTAGE DIVIDED BY THE RESISTANCE. IT'S A VERY SIMPLE MATHEMATICAL FORMULA THAT RELATES THE TWO. AND YOU CAN ALSO CHANGE THE EQUATION AROUND A LITTLE BIT WHERE VOLTAGE EQUALS CURRENT TIMES RESISTANCE.

09:54:26 (DOCUMENT DISPLAYED)

09:54:28 **Q** NOW, ANOTHER CONCEPT WE HAVE HEARD A LOT ABOUT IS AN OSCILLATOR. ARE YOU FAMILIAR WITH OSCILLATORS, DR. WEI?

**A** YES. SO, IN A LOT OF THE CIRCUITS THAT I BUILD, OR MY STUDENTS BUILD OR THE CIRCUITS THAT I'VE BUILT WHILE DOING MY 09:54:43 PH.D. AND ALSO WORKING IN INDUSTRY HAD TO DO WITH OSCILLATORS?

AND I THINK WE HAVE HEARD ABOUT OSCILLATORS A LITTLE BIT WHERE IT'S ESSENTIALLY -- I THINK, LAST WEEK WE HEARD THAT IT IS THE HEARTBEAT. IT IS KIND OF THIS TIME BASE THAT THE CIRCUITRY, THE ENTIRE CIRCUITRY OPERATES WITH RESPECT TO.

09:55:00 AND SO, ANOTHER WAY TO THINK ABOUT IT IS PERHAPS LIKE A PENDULUM CLOCK. RIGHT? YOU SEE THE DIAGRAM ON THE LEFT, THERE IS A LITTLE CLOCK. AND IT'S LIKE AN OLD CLOCK WHERE THAT PENDULUM SWINGS BACK AND FORTH AND BACK AND FORTH. SO THAT IS SETTING THE TIME BASE.

09:55:17 AND AN OSCILLATOR IS VERY SIMILAR TO THAT, BUT INSTEAD WHAT IT DOES IS IT PUTS OUT AN ELECTRICAL SIGNAL. AND THAT ELECTRICAL SIGNAL HAS THESE LITTLE SQUARE BUMPS. AND SO THAT'S ONE CYCLE.

AND SO WHAT HAPPENS IS THAT THE OSCILLATOR PUTS OUT THESE 09:55:34 BUMPS AT A PARTICULAR RATE. IT IS KIND OF A SPEED AT WHICH THESE BUMPS ARE COMING OUT.

(DOCUMENT DISPLAYED)

**Q** NOW, WHAT ARE YOU SHOWING WITH THIS SLIDE, DR. WEI?

**A** SO WE HAD SEEN THOSE SQUARE WAVES IN THE PREVIOUS SLIDE 09:55:52 THAT IS COMING OUT OF THE OSCILLATOR. AND SO I WANTED TO

09:55:55 PROVIDE A LITTLE BIT OF INFORMATION IN TERMS OF THE FREQUENCY OF THOSE BUMPS COMING OUT. SO IF YOU LOOK AT THE MIDDLE PORTION OF THE SLIDE WHERE IT REFERS TO "HIGH FREQUENCY" WE NOTICE THAT THE BUMPS ARE COMING OUT VERY QUICKLY AT A HIGH 09:56:12 RATE.

WHEREAS, IF THERE IS A LOW FREQUENCY AND THE PERIOD OF TIME BETWEEN BUMPS IS LONG, THEN THE FREQUENCY IS LOW. THEY ARE COMING OUT AT A LOWER RATE.

**Q** SO HOW -- ANOTHER WORD WE HAVE HEARD IS "HERTZ."

09:56:25 **A** HERTZ.

**Q** CAN YOU EXPLAIN "HERTZ" IN THE CONTEXT OF THIS SLIDE?

**A** SURE. SO "HERTZ" IS A UNIT OF MEASURE FOR FREQUENCY. SO IT'S CYCLES PER SECOND. ANOTHER UNIT OF MEASURE THAT I FORGOT TO MENTION FOR VOLTAGE IS "VOLTS." AND FOR CURRENT, IT'S 09:56:40 "AMPS" OR "AMPERES."

SO, TYPICALLY, WHEN YOU ARE TALKING ABOUT THESE KIND OF ELECTRICAL SIGNALS YOU ALSO USE THESE UNITS OF MEASURE.

**Q** AND ANOTHER TERM WE HAVE TALKED ABOUT A LOT HERE IS "JITTER."

09:56:53 (DOCUMENT DISPLAYED)

**A** YES.

**Q** CAN YOU TELL US A LITTLE BIT ABOUT "FREQUENCY JITTER"?

**MS. ONDRICK:** MR. BERK, COULD YOU --

**THE WITNESS:** I THINK THERE MIGHT BE A MOVIE THAT 09:57:10 ILLUSTRATES THIS A LITTLE BIT BETTER.

09:57:15 (ANIMATION IS PLAYED)

**A** THERE WE GO. SO WHAT WE ARE LOOKING AT HERE, WE HAVE THOSE PULSES, RIGHT? AND YOU CAN THINK OF THIS, PERHAPS, AS THE CLOCK SIGNAL COMING OUT OF THE OSCILLATOR.

09:57:25 AND, AS WE NOTICED, THE ONE IN THE MIDDLE STAYED THERE BECAUSE THAT'S KIND OF THE FRAME OF REFERENCE. AND THEN, THE OTHER TWO PULSES KIND OF BLUR BACK AND FORTH, BACK AND FORTH.

AND SO WHAT'S HAPPENING HERE IS THAT THE FREQUENCY IS GETTING LOWER, AND THEN GETTING HIGHER AND GETTING LOWER AND 09:57:41 GETTING HIGHER. AND THAT'S WHAT'S SHOWN BY THE TRIANGULAR WAVEFORM ON THE BOTTOM.

SO WHAT WE NOTICED WAS THAT THE FREQUENCY IS GOING DOWN, GOING UP, GOING DOWN, AND GOING UP (INDICATING). AND THAT'S DONE INTENTIONALLY. AND THAT IS SOMETHING THAT WE HAVE BEEN 09:57:58 TALKING ABOUT CALLED "FREQUENCY JITTER" OR "FREQUENCY HOPPING," AS WELL.

**Q** AND SO WHAT YOU HAVE ILLUSTRATED ABOVE IS REALLY AN OSCILLOSCOPE SCREENSHOT OR AN OUTPUT.

**A** THAT'S WHAT I'M SHOWING, LIKE WHAT I THINK -- I THINK WE 09:58:14 SAW THIS YESTERDAY. THERE WERE SOME PULSES. AND THEN, WHEN YOU HAD JITTER IT WAS MOVING AROUND. AND SO THAT -- I THOUGHT THAT MIGHT BE A NICE WAY TO CONNECT WHAT I'M TALKING ABOUT TODAY WITH WHAT YOU HAVE SEEN SO FAR.

**Q** SO, WHEN YOU SEE THE LINES HERE THAT LOOK SORT OF BLURRY 09:58:32 AND THAT MOVEMENT, THAT WAS REPRESENTATIVE OF WHEN THE

09:58:34 FREQUENCY WENT UP, DOWN, UP, DOWN.

**A** YES. THE BLURRING KIND OF SHOWS YOU THAT IT'S MOVING.

**Q** THE VARYING. OKAY. AND MAYBE IT MIGHT BE A LITTLE MORE HELPFUL IF WE CAN PUT SOME NUMBERS TO THIS DEMONSTRATIVE.

09:58:50 (DOCUMENT DISPLAYED)

**A** OKAY. SO IF WE LOOK FOR THE RED LINE, WE NOTICE THAT FOR THAT RED LINE, WHEN IT'S SHORT, IT'S.00001 SECOND. I THINK THAT CORRESPONDS TO THE 100 KILOHERTZ. AND THAT IS A NUMBER THAT WE HAVE BEEN HEARING ABOUT A LOT.

09:59:09 AND THEN, WHEN THAT FREQUENCY CHANGES WITH THAT JITTER AND THE PERIOD EXTENDS, THEN THE TIME PERIOD IS CLOSER TO 0.00000115. AND THAT CORRESPONDS TO ABOUT 91 KILOHERTZ.

AND SO WHAT THIS ILLUSTRATION HERE IS TRYING TO SHOW IS THAT WITH THAT FREQUENCY HOPPING OR FREQUENCY JITTER THE 09:59:33 FREQUENCY IS GOING FROM A HUNDRED KILOHERTZ DOWN TO NINETY KILOHERTZ, BACK UP.

AND IT IS KIND OF LIKE IF YOU LOOK AT THE SPEEDOMETER IN YOUR CAR, AND YOU ARE DRIVING. YOU ARE DRIVING AT A PARTICULAR SPEED, AND THEN YOU CAN SEE THAT YOU ARE KIND OF 09:59:46 SPEEDING UP SOMETIMES. YOU ARE SLOWING DOWN SOMETIMES. AND THAT'S ESSENTIALLY WHAT'S GOING ON HERE.

(DOCUMENT DISPLAYED)

**Q** SO LET'S JUST TALK A LITTLE BIT ABOUT HOW POWER SUPPLY CONTROLLERS WORK NOW, IF WE COULD.

09:59:59 **A** YEAH. SO, I MEAN, I THINK THE CONCEPTS THAT WE HAVE

10:00:03 TALKED ABOUT SO FAR ARE RELATIVELY EASY TO UNDERSTAND. AND THEN, WHEN WE ACTUALLY GET TO THE FULL POWER SUPPLY, IT GETS A LOT MORE COMPLICATED.

AND, PERHAPS WHAT I CAN DO IS AGAIN USE SOME ANALOGIES TO

10:00:15 HELP YOU UNDERSTAND WHAT REALLY IS GOING ON IN TERMS OF THE POWER SUPPLY.

AND SO I'VE TRIED TO MAKE THIS RELATIVELY SIMPLE. WHAT WE CAN SEE IN THE DIAGRAM HERE IS THAT YOU HAVE SOME VOLTAGE COMING IN ON THE LEFT-HAND SIDE. THE VAC. AND THAT IS THE

10:00:31 VOLTAGE THAT'S COMING OUT OF THE WALL OUTLET.

IN THE U.S. AS WE HAVE HEARD IT IS 120 VOLTS. I MEAN, THIS EXAMPLE IS 220, SO THAT MUST BE MAYBE IN EUROPE OR IN ASIA. THAT HAS A HIGHER VOLTAGE ON THE WALL.

AND THEN, IT GOES THROUGH A CIRCUIT CALLED "THE BRIDGE

10:00:47 RECTIFIER." AND WHAT THAT ESSENTIALLY DOES IS IT TAKES THE WAVEFORM OF THE VOLTAGE IN THE WALL AND ACTUALLY CONVERTS IT INTO A VOLTAGE THAT IS RELATIVELY STABLE, AND IT IS A HIGH VOLTAGE.

BUT AS WE HAVE BEEN HEARING, YOU DON'T WANT TO CONNECT

10:01:02 THAT HIGH VOLTAGE DIRECTLY TO YOUR CELL PHONE BECAUSE THEN YOU WILL GET DAMAGE TO YOUR CELL PHONE, ESSENTIALLY.

AND SO WHAT YOU REALLY WANT TO DO IS STEP DOWN THAT VOLTAGE. YOU WANT TO GO FROM THE HIGH VOLTAGE DOWN TO A LOWER VOLTAGE. AND ONE VERY NICE WAY OF DOING THAT IS USING WHAT'S

10:01:19 CALLED A "TRANSFORMER." AND THAT IS THE SQUIGGLY LINES SHOWN

10:01:22 IN THE MIDDLE HERE (INDICATING).

AND ONE EASY WAY TO THINK ABOUT THIS IS IMAGINE THAT YOU HAVE LIKE A BIG RESERVOIR OF CHARGE. MAYBE IT'S LIKE YOU HAVE A SWIMMING POOL. AND YOU WANT TO FILL UP A SMALLER SWIMMING 10:01:36 POOL. AND SO WHAT YOU WOULD DO IS TAKE A BUCKET AND SCOOP WATER FROM THE BIG POOL, DUMP IT INTO THE LITTLE POOL. AND YOU KEEP ON DOING THAT.

SO THAT IS ESSENTIALLY WHAT THAT SWITCH IS DOING. AND THAT IS WHY I USE THE FINGER FOR THE CONTROLLER, BECAUSE IN 10:01:50 THAT CASE, I'M THE CONTROLLER, TAKING WATER FROM A BIG BUCKET, PUTTING IT INTO A LITTLE BUCKET. AND DEPENDING ON HOW QUICKLY I DO IT, IT TELLS ME HOW MUCH WATER I'M TRANSFERRING OVER.

AND ALSO, I CAN TAKE A BIG SCOOP, OR I CAN TAKE A LITTLE SCOOP. AND THAT RELATES TO THE DUTY CYCLE THAT WE HAVE BEEN 10:02:09 TALKING ABOUT.

IF I TAKE A BIG SCOOP EVERY TIME I'M TRANSFERRING A LOT OF WATER. IF I TAKE LITTLE SCOOPS I'M TRANSFERRING LESS WATER. OR IF I DON'T SCOOP THAT OFTEN, THEN, AGAIN, I'M TRANSFERRING LESS WATER.

10:02:23 AND SO THAT'S KIND OF AN ANALOGY THAT WE CAN USE TO TRY TO UNDERSTAND THE POWER SUPPLY CONTROLLER.

**Q** AND THEN, HOW DOES THAT RELATE SORT OF TO THE PULSES THAT YOU HAVE SHOWN UP HERE (INDICATING) ON THIS PART OF THE DEMONSTRATIVE?

10:02:36 **A** RIGHT. SO AS FAR AS THE PULSES ARE CONCERNED, WHEN THE

SWITCH IS CONDUCTING OR WHEN THE SWITCH, POWER SWITCH IS ON, THEN IT'S THAT GREEN LINE.

AND SO THERE'S CURRENT THAT'S CONDUCTING THROUGH THE TRANSFORMER. AND THAT IS EQUIVALENT TO -- I'M TAKING A, YOU KNOW, A SCOOP OF WATER. AND SO, FOR THE WAVEFORMS, THE WIDTH OF THE WAVEFORM, THAT CORRESPONDS TO THAT GREEN PERIOD. THAT'S KIND OF LIKE HOW MUCH WATER I SCOOP.

AND THEN, THE OVERALL TIMING BETWEEN EACH SCOOP IS THAT FREQUENCY. DO I DO IT QUICKLY? OR DO I DO IT SLOWLY?

**Q** OKAY. NOW, DR. WEI, I WOULD LIKE TO TALK ABOUT YOUR ANALYSIS OF THE FAIRCHILD PRODUCTS, AND THE POWER INTEGRATIONS PATENTS, IF WE COULD.

**A** OKAY.

(DOCUMENT DISPLAYED)

**Q** SO, ACTUALLY BEFORE WE GET TO THIS SLIDE, WHAT TYPES OF MATERIALS RELATING TO THE PATENTS DID YOU REVIEW?

**A** SO, IN RELATION TO THE PATENTS FOR THIS LITIGATION, WE HAVE TO LOOK THROUGH A LOT OF DOCUMENTS. I MEAN, THERE IS -- YOU SEE THE STACK OF DOCUMENTS HERE (INDICATING).

LUCKILY NOW WE HAVE COMPUTERS, SO THEY ARE ALL KIND OF IN PDF'S.

SO I LOOKED AT DATASHEETS OF THE PRODUCTS AT ISSUE. I LOOKED AT THE APPLICATION NOTES, WHICH ARE KIND OF LIKE DATASHEETS, BUT THEY PROVIDE ADDITIONAL INFORMATION IN TERMS OF HOW YOU USE THOSE PRODUCTS.

10:04:00 THERE IS THE SCHEMATICS. AND THE SCHEMATICS, BASICALLY YOU CAN THINK ABOUT AS BEING THE BLUEPRINTS OF THE DESIGN. SO IT IS KIND OF LIKE THE BLUEPRINTS FOR YOUR HOME. THESE ARE THE BLUEPRINTS FOR THE DEVICE THAT IS BEING BUILT.

10:04:16 THERE IS ALSO ADDITIONAL INFORMATION THAT YOU CAN GET FROM COMPANIES WITH RESPECT TO KIND OF THE DESIGNS AND HOW TO USE THEM, AS REFERENCE DESIGNS.

AND ALSO THERE IS THE TESTING, THE RESULTS OF THE TESTING THAT WE HAVE BEEN TALKING ABOUT FOR LIKE THE LAST 10:04:28 DAY-AND-A-HALF MAYBE. AND SO, I HAVE LOOKED AT THOSE, AS WELL, AND RELIED ON ALL OF THIS INFORMATION TOGETHER.

AND IT'S FOR A SET OF WHAT WE CALL THE "REPRESENTATIVE" PRODUCTS. THESE ARE THE PRODUCTS THAT DR. KELLEY HAD IDENTIFIED AS BEING REPRESENTATIVE OF A LARGER NUMBER OF 10:04:47 PRODUCTS THAT POWER INTEGRATIONS HAS ACCUSED.

(DOCUMENT DISPLAYED)

**Q** SO, YOU IDENTIFIED A LOT OF DIFFERENT KIND OF DOCUMENTS. BUT YOU ACTUALLY WENT ONE STEP FURTHER, RIGHT? YOU LOOKED AT TESTING.

10:05:01 **A** RIGHT.

**Q** OKAY. SO CAN YOU TELL US A LITTLE BIT ABOUT THE TESTING THAT YOU REQUESTED?

**A** SURE. SO, WHAT WE'RE LOOKING AT HERE IS A SET OF INSTRUCTIONS THAT -- YOU KNOW, THE DESCRIPTION HERE IN THIS 10:05:17 DOCUMENT, WHAT IT'S DOING IS IT'S SUMMARIZING ALL OF THE

10:05:21 INSTRUCTIONS FOR THE TESTING THAT I HAD REQUESTED FROM POWER -- FROM FAIRCHILD.

AND SO, WHAT I THOUGHT WAS: OKAY, LOOKING THROUGH THE DOCUMENTATION, THE SCHEMATICS, THE DATASHEETS, THE APPLICATION 10:05:34 NOTES, YOU CAN GET A LOT OF INFORMATION FROM ALL THAT. AND SO I CAN FORM MY OPINIONS.

AND THEN, I THOUGHT, HMM, IT WOULD BE NICE TO ALSO TEST THESE PRODUCTS AND CONFIRM, YOU KNOW, WHAT THE DATASHEETS ARE SAYING, MY UNDERSTANDING OF HOW THESE DEVICES OPERATE. AND 10:05:49 THEN, KIND OF THE PROOF IS IN THE PUDDING.

**Q** NOW, HOW DID YOU COMMUNICATE THESE INSTRUCTIONS TO THE ENGINEERS AT FAIRCHILD?

**A** SO, INITIALLY WHEN THINKING ABOUT THE TESTING THAT I WAS HOPING TO DO WITH THESE PRODUCTS -- AND KIND OF TIME WAS 10:06:07 SHORT -- WHAT I DID WAS TO DRAFT AN INITIAL EMAIL. AND I SENT IT TO THE FAIRCHILD ATTORNEYS.

**MR. POLLACK:** OBJECTION.

**THE COURT:** EXCUSE ME?

**MR. POLLACK:** OBJECTION. DISPLAYING THINGS THAT 10:06:19 AREN'T IN EVIDENCE.

**THE COURT:** OKAY. NOW --

**MS. ONDRICK:** I TOOK IT DOWN.

**THE COURT:** ALL RIGHT. LET ME ASK YOU, AS LONG AS WE HAVE THE INTERRUPTION -- IT IS ABOUT FIVE AFTER 10:00 -- WERE 10:06:28 YOU GOING INTO THE TESTING SUBJECT AT THIS POINT?

10:06:34 **MS. ONDRICK:** WE WERE JUST GOING TO DO A LITTLE SETUP, AND THEN GO INTO THE OPINIONS. SO, NO, WE ARE NOT GOING DIRECTLY INTO THE TESTING SETUP.

**THE COURT:** OH. WELL, WOULD THIS BE A GOOD TIME TO

10:06:44 BREAK? OR ARE THERE A COUPLE OF QUESTIONS YOU WANT TO FINISH UP YOUR LITTLE MODULE WITH?

**MS. ONDRICK:** YOU KNOW, I THINK IT IS A GOOD TIME TO BREAK, AND THEN WE CAN JUST START FROM HERE. THAT'S FINE.

**THE COURT:** ALL RIGHT. FINE.

10:06:55 SO, LADIES AND GENTLEMEN, WE ARE GOING TO TAKE 15 MINUTES.

DR. WEI, IF YOU WILL STAND BY UNTIL THEY CLEAR PAST YOU.

ALL RIGHT. FIFTEEN MINUTES, LADIES AND GENTLEMEN.

(JURY EXCUSED)

(THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE

10:07:10 PRESENCE OF THE JURY)

**THE COURT:** OKAY. THE JURORS HAVE STEPPED OUT. YOU MAY STEP DOWN, DR. WEI. OKAY.

SO WE WILL BE IN OUR BREAK.

COME BACK, I GUESS, 20 AFTER. THANK YOU,

10:07:29 (RECESS TAKEN FROM 10:05 TO 10:20 A.M.)

(THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE PRESENCE OF THE JURY)

**THE CLERK:** PLEASE COME TO ORDER.

**THE COURT:** ALL RIGHT. IF YOU ARE ALL READY, WE WILL

10:22:23 CALL THE JURY BACK IN.

(THE FOLLOWING PROCEEDINGS WERE HELD IN THE PRESENCE OF THE JURY)

**THE COURT:** PLEASE BE SEATED, AND WE WILL CONTINUE. LET'S SEE WHERE -- DR. WEI, WOULD YOU COME BACK TO THE STAND, PLEASE?

(REQUEST COMPLIED WITH BY THE WITNESS)

**THE COURT:** OKAY.

**THE WITNESS:** THANK YOU, YOUR HONOR.

**THE COURT:** PLEASE BE SEATED.

ALL RIGHT, MS. ONDRICK.

**BY MS. ONDRICK:**

**Q** WELCOME BACK, DR. WEI.

**A** THANK YOU.

**Q** SO LET'S PICK UP WHERE WE LEFT OFF ON THE TESTING INSTRUCTIONS.

**MS. ONDRICK:** AND, YOUR HONOR, I OFFER DX 2706. I DON'T BELIEVE THERE WAS ANY OBJECTION.

**MR. POLLACK:** ACTUALLY, THERE WAS AN OBJECTION. IT WAS OBJECTED TO. IT IS HEARSAY.

**THE COURT:** OH, OKAY. OH, OKAY. IS IT UP THERE OR IS IT OFF NOW?

**MS. ONDRICK:** IT IS OFF NOW.

**THE COURT:** WELL, IF -- DOES THE WITNESS HAVE THE EXHIBIT? YOU COULD TRY TO LAY A FOUNDATION. I'M NOT SURE WHAT IT IS.

10:23:43 **MS. ONDRICK:** YES, HE DOES.

**BY MS. ONDRICK:**

**Q** COULD YOU PLEASE TURN IN YOUR BINDER TO DX 2706?

**A** WHICH VOLUME IS THIS IN? DO WE KNOW?

10:23:55 **Q** LET ME CHECK. SHOULD BE VOLUME 1.

**A** 2706?

**Q** CORRECT.

**A** OKAY. SO I SEE DX 2706.

**Q** AND, IS THIS AN EMAIL THAT YOU PREPARED?

10:24:19 **A** YES, IT IS.

**Q** AND COULD YOU PLEASE TELL US WHAT'S IN THIS EMAIL?

**MR. POLLACK:** OBJECTION, YOUR HONOR.

**THE COURT:** JUST GENERALLY, THE CONTENT OF IT. IN OTHER WORDS, WHAT TYPE OF CONTENT IS IT, NOT WHAT THE EXACT 10:24:31 CONTENT IS.

**THE WITNESS:** OKAY. SO, THIS IS AN EMAIL THAT I SENT JULY 24TH, 2013, TO THE ATTORNEYS AT FAIRCHILD. AND IT IS AN EMAIL THAT DESCRIBES SOME TESTS THAT I WAS REQUESTING.

**THE COURT:** OKAY. BECAUSE I DON'T HAVE THAT IN FRONT 10:24:54 OF ME, I DON'T KNOW IF IT SIMPLY CONTAINS INSTRUCTIONS: "PLEASE RUN THESE TESTS," FOR EXAMPLE, OR WHETHER IT HAS OTHER COMMENTARY AROUND IT. SO I WOULD HAVE TO SEE.

**MS. ONDRICK:** MAY I GRAB A COPY, YOUR HONOR?

**THE COURT:** YOU MAY.

10:25:13 (DOCUMENT HANDED UP TO THE COURT)

10:25:21 **THE COURT:** THANK YOU.

(THE COURT EXAMINES DOCUMENT)

**THE COURT:** IN GENERAL, THERE ARE SIMPLY DIRECTIONS TO DO THINGS. BUT, THERE ARE SOME WHAT I WOULD CALL MORE OR 10:26:11 LESS DECLARATIVE STATEMENTS ALSO ABOUT THE WITNESS'S OPINION ESSENTIALLY, REGARDING THE TEST. NOT MANY SENTENCES OF THAT NATURE, BUT THERE ARE SOME.

ARE YOU LOOKING AT A COPY OF THIS? DOES EVERYBODY HAVE A COPY?

10:26:37 **MR. POLLACK:** I HAVE A COPY, YOUR HONOR.

**THE COURT:** DO YOU HAVE ONE, MS. ONDRICK?

**MS. ONDRICK:** I GAVE YOU MY COPY, YOUR HONOR, BUT I CAN GET ANOTHER ONE.

**THE COURT:** OH, WELL, UNDER "TEST 2," THERE'S A 10:26:46 SENTENCE THAT AT THE TOP, DESCRIBES MORE OR LESS SOMETHING ABOUT THE TEST AS OPPOSED TO JUST SAYING "I WANT YOU TO DO THIS TEST, AND HERE'S HOW I WANT YOU TO DO IT."

I THINK -- SEE IF THERE WAS ONE OTHER -- I SUPPOSE UNDER "TEST 3," THE SECOND SENTENCE MIGHT BE CONSIDERED SOMEWHAT 10:27:20 DESCRIPTIVE. BUT, IT'S MORE OR LESS, I THINK, IN THE FORM OF A DIRECTION.

LET ME ASK YOU, MR. POLLACK, IF I OVERRULE YOUR HEARSAY OBJECTION UNDER RULE 801, ESSENTIALLY, DESCRIBING WHAT A HEARSAY STATEMENT IS, AND FINDING THAT THIS DOES NOT QUALIFY 10:27:44 IN THE MAIN AS A HEARSAY STATEMENT, BUT RATHER, A COMMAND OR

ORDER, SO TO SPEAK, TO DO SOMETHING, AS OPPOSED TO A STATEMENT OF SOME SITUATION OR FACT, WITH THE EXCEPTION OF THAT ONE SENTENCE UNDER "TEST 2," AT THE TOP, DO YOU HAVE ANY PARTICULAR CONCERN ABOUT THAT FIRST SENTENCE?

**MR. POLLACK:** WELL, IT -- IF YOU ARE GOING TO OVERRULE THE OBJECTION AND LET IT IN, ARE YOU SUGGESTING THAT YOU WILL LET IT IN FOR A LIMITED PURPOSE? I JUST WANT TO UNDERSTAND.

**THE COURT:** I'M OVERRULING THE HEARSAY OBJECTION.

**MR. POLLACK:** RIGHT.

**THE COURT:** I DO NOT BELIEVE THAT IT HEARSAY. ALL RIGHT? IT IS NOT AN OUT-OF-COURT STATEMENT OF -- IT IS NOT AN ASSERTION. ALL RIGHT? EXCEPT IN THAT PARTICULAR INSTANCE, AND PERHAPS THE ONE COMMENT THAT IS SOMEWHAT DESCRIPTIVE UNDER "TEST 3" AT THE START OF THE SECOND SENTENCE, IS ALSO A STATEMENT OF FACT, IF YOU WILL.

THE REST ARE NOT STATEMENTS OF FACT. IT'S LIKE SOMEONE SAYS "GO DO THIS." ALL RIGHT? THAT'S NOT HEARSAY. A QUESTION IS NOT HEARSAY. OKAY.

**MR. POLLACK:** AND YOU ARE ASKING IF MY CONCERN IS THAT WE SHOULD EXCLUDE THOSE TWO --

**THE COURT:** YEAH, DO THOSE TWO THINGS REALLY CAUSE YOU ANY CONCERN? IF THEY DO, I CAN HAVE THEM REDACTED. THAT'S NOT TO SUGGEST IF YOU DON'T OBJECT TO THOSE SEPARATELY, THAT YOU ARE WAIVING ANY OBJECTION YOU HAVE ALREADY MADE. I'M

10:29:25 JUST SAYING --

**MR. POLLACK:** FAIR ENOUGH, YOUR HONOR. THE REDACTIONS ARE UNNECESSARY.

**THE COURT:** OKAY. ALL RIGHT. AND IF YOU FIND SOME 10:29:32 AUTHORITY THAT SUGGESTS THAT THE RULE MIGHT COVER THIS TYPE OF A COMMENT OR REMARK, OR WHAT HAVE YOU, THEN I WOULD CERTAINLY BE PREPARED TO RECONSIDER.

AT A MINIMUM, IT WOULD GO TO SHOW THE STATE OF MIND OF THE PEOPLE WHO RAN THE TEST. BUT, THAT WOULD BE AN EXCEPTION TO 10:29:52 THE HEARSAY RULE.

SO IF I'M WRONG ON POINT A, I'LL GO WITH POINT B.

ALL RIGHT.

MS. LUCERO, DO YOU WANT TO GIVE THIS EXHIBIT BACK TO MS. ONDRICK, PLEASE?

10:30:04 (DOCUMENT HANDED DOWN)

**MS. ONDRICK:** YOUR HONOR, I OFFER DX 2706.

**THE COURT:** ALL RIGHT. THEN, OVER THE OBJECTION AND FOR THE REASONS NOTED, I WILL ADMIT DX 2706.

(TRIAL EXHIBIT 2706 RECEIVED IN EVIDENCE)

10:30:16 **BY MS. ONDRICK:**

**Q** SO DR. WEI, I BELIEVE YOU MENTIONED THIS WAS A JULY 24, 2013 EMAIL FROM YOU. CORRECT?

**A** YES, IT IS.

**Q** AND, WHAT ARE YOU REQUESTING IN THIS EMAIL?

10:30:31 (DOCUMENT DISPLAYED)

10:30:33 **A** IN THIS EMAIL I'M REQUESTING TESTS FOR THE FOLLOWING PARTS THAT ARE LISTED UP ON TOP. THE SG6841, FAN103, SG5851, AND THE SG5841J. AND I BELIEVE I MADE A TYPO THERE. IT SHOULD BE SG5841 AND NOT 51.

10:30:53 AND, THE REST OF THE EMAIL GOES THROUGH AND KIND OF DESCRIBES THE DIFFERENT KINDS OF TESTS THAT I WOULD LIKE TO BE DONE. AND, IN THE VERY BEGINNING, SO, IF YOU NOTICE, THIS EMAIL WAS WRITTEN AT 7:00 P.M. IF MY MEMORY SERVES CORRECTLY, I THINK I HAD A CONVERSATION WITH THE ATTORNEYS EARLIER IN THE 10:31:15 EVENING.

I TYPED THIS UP, BUT IT WAS ROUGH. SO I STARTED IT WITH, OR PREFACED IT, WITH: "WE SHOULD PROBABLY ITERATE AT LEAST ONCE A MONTH."

**Q** AND THEN, DID AN ITERATION OF YOUR TEST RESULTS OCCUR?

10:31:29 **A** YES.

**Q** CAN YOU DESCRIBE THAT PROCESS FOR US?

**A** WELL, THE INSTRUCTIONS WERE A BIT ROUGH, AND SO I THINK THERE WERE SOME CLARIFICATIONS REQUESTED. AND SO I HAD SOME CONVERSATIONS ABOUT THAT.

10:31:41 AND THEN, LATER ON, I GOT SOME RESULTS, AND THEN HAD CONVERSATIONS WITH MR. W.H. HUANG.

AND I BELIEVE THERE WERE SOME OTHER PEOPLE ON THE CONFERENCE CALL. I DON'T RECALL EXACTLY WHO THEY WERE.

AND THEN, SOME OTHER TESTS WERE PERFORMED. AND THEN, YOU 10:31:58 KNOW, KIND OF TOWARDS THE DEADLINE IN AUGUST, EVERYTHING GOT

10:32:03 TOGETHER, PUT EVERYTHING INTO THE REPORTS, AND THEN THE REPORTS WERE SERVED.

**Q** SO THERE'S BEEN SOME DISCUSSION ABOUT WHAT TESTS YOU REQUESTED, WHAT TESTS YOU DIDN'T REQUEST. SO LET'S JUST JUMP

10:32:14 INTO THAT, IF WE COULD.

**A** OKAY.

(DOCUMENT DISPLAYED)

**Q** SO, THIS IS YOUR TEST REQUEST.

AND IT'S COMPARED TO THE FINAL TEST INSTRUCTIONS. SO IF

10:32:27 YOU COULD TELL ME, I SEE WE HAVE -- YOU HAVE HIGHLIGHTED THREE DIFFERENT TESTS HERE. SO WHAT IS TEST 1?

**A** SO TEST 1, AS IS LABELED THERE, IT SAYS "FREQUENCY VARIATION TESTS," AND YOU CAN'T SEE THE WORD THAT IS HIGHLIGHTED IN YELLOW, BUT ESSENTIALLY WHAT I'M ASKING FOR IS:

10:32:45 OKAY, SET UP THE EQUIPMENT. SET UP THE BOARD IN A PARTICULAR MANNER. ADJUST THE LOAD CURRENT. OBSERVE THE FREQUENCY, MAKE THOSE MEASUREMENTS, GET THE DATA.

AND I WOULD LIKE TO -- AND ALSO, I THINK, IT WAS ALSO A REQUEST TO PLOT IT OUT, SO THAT I CAN EASILY SEE THE DATA.

10:33:04 **Q** SO THERE IS NO DISPUTE THAT YOU REQUESTED TEST 1, THE FREQUENCY VARIATION TEST. CORRECT?

**A** YES.

**Q** OKAY. LET'S TAKE A LOOK AT TEST 2, THE CYCLE-SKIPPING TEST.

10:33:16 **A** SO, IN CONTRAST TO TEST 1, TEST 2 WERE A DIFFERENT SET OF

10:33:20 TESTS TO KIND OF UNDERSTAND ANOTHER ASPECT OF THESE DEVICES. AND SO, IT'S TO -- AND, I'M ALLOWED TO GO THROUGH THE DETAIL?

**Q** (NODS HEAD)

10:33:34 **A** OKAY. AND SO WHAT I SAY IN TEST 2 IS THAT THIS TEST IS TO SHOW THAT PARTS CYCLE SKIP DURING NO-LOAD CONDITIONS, GREEN MODE. AND SO IT DESCRIBES HOW YOU SET IT UP.

AND THIS IS KIND OF THE FIRST STEP IN TRYING TO EXPLAIN, YOU KNOW, HOW YOU WOULD SET UP THE -- THE SETTINGS IN ORDER TO

10:33:53 GET THIS CYCLE-SKIPPING TEST.

**Q** AND SO, FOR TEST 2, YOU SUGGESTED THE DYNAMIC LOAD TESTING. ISN'T THAT CORRECT?

**A** YES. IF YOU LOOK IN THE EMAIL, THERE IS A DESCRIPTION WHERE I EXPLAIN HOW YOU TAKE THE LOAD CURRENT AND YOU HAVE IT

10:34:14 GO UP AND DOWN. AND THAT WAS THE A DYNAMIC LOAD TEST.

**Q** AND THEN, THERE WAS A LITTLE BIT OF CLARIFICATION ON THE SPECIFICS OF THE DYNAMIC LOAD TEST YOU REQUESTED.

**A** YES.

**Q** OKAY. NOW, WHAT ABOUT THE NO-LOAD OR SURGE TESTING?

10:34:28 **A** SO AS WE HAD HEARD -- I THINK IT WAS YESTERDAY AND A LITTLE BIT THIS MORNING -- THE SURGE -- THE SURGE TEST WAS A TEST THAT MR. W.H. HUANG HAD SUGGESTED.

AND, ONCE I HEARD IT, I THOUGHT THAT WAS A GOOD IDEA. SO I SAID, "YEAH, PLEASE DO THAT TEST SO I CAN SEE THE RESULTS."

10:34:47 YEAH.

10:34:48
**Q** OKAY. AND THEN, NOW LET'S TALK A LITTLE BIT ABOUT TEST 3.

**A** SO TEST 3 IS, YOU KNOW, AS I WAS SITTING THERE THINKING ABOUT THESE VARIOUS TESTS, I JOTTED DOWN ANOTHER DIFFERENT KIND OF TEST, WHICH IS LABELED THERE AS "ON/OFF TESTING."

10:35:04
AND THEN, DIDN'T FOLLOW UP WITH IT AT ALL, AND SO THAT WAS NOT -- THAT IS NOT A PART OF THE RESULTS THAT I RELIED ON, AND THAT WENT INTO MY EXPERT REPORT.

**Q** NOW, DOES TEST 3 RELATE TO A --

(DOCUMENT DISPLAYED)

10:35:21
**Q** SORRY ABOUT THAT.

DOES TEST 3 RELATE TO A PARTICULAR ELEMENT OF THE CLAIMS? DID YOU HAVE SOMETHING IN MIND WHEN YOU REQUESTED TEST 3?

**A** YES. SO, IT'S NOT FOUND IN ALL THE CLAIMS, I DON'T BELIEVE, BUT THERE ARE CERTAIN ELEMENTS IN THE CLAIMS. AND,

10:35:39
IT HAS TO DO WITH MEASURING THE "ON" TIME AND LOOKING AT WHAT IS GOING ON.

AND, I THINK, YOU KNOW, IT'S -- SINCE IT'S NOT ONE OF THE CORE ASPECTS -- TEST 1 AND TEST 2 WERE REALLY LOOKING AT THE CORE ASPECTS OF THE CLAIMS THAT ARE COMMON TO ALL THE CLAIMS.

10:35:56
THOSE ARE THE ONES I WAS REALLY FOCUSING ON.

**Q** SO DID YOU OFFER ANY OPINIONS IN THIS CASE ON THE "ON" TIME/OFF TIME CLAIM LIMITATIONS?

**A** IN TERMS OF NONINFRINGEMENT, NO.

(DOCUMENT DISPLAYED)

10:36:13
**Q** LET'S GO AHEAD AND GO TO THE NEXT SLIDE.

10:36:18 SO YOU WERE HERE YESTERDAY AND SAW THE TEST EQUIPMENT. AND IS THIS THE SAME TEST EQUIPMENT THAT WAS USED FOR THE TESTS YOU HAD CONDUCTED FOR YOU?

**A** I UNDERSTAND THAT THE EQUIPMENT THAT'S SHOWN IN THIS 10:36:32 FIGURE, THAT'S A PICTURE OF THE TEST SETUP WHEN THE ENGINEERS AT FAIRCHILD PERFORMED THE TESTS. AND, IF YOU RECALL, THEY'RE NOT ORGANIZED IN THE SAME WAY I BELIEVE THEY WERE ORGANIZED ON THE CART. BUT THE OSCILLOSCOPE WAS KIND OF FRONT AND CENTER. AND THEN, THERE WERE OTHER EQUIPMENT UNDERNEATH.

10:36:50 AND MY UNDERSTANDING IS THEY BROUGHT THE EXACT EQUIPMENT THAT WAS USED TO TEST HERE.

**Q** SO, LET'S TALK A LITTLE BIT ABOUT THE DATA THAT THE OSCILLOSCOPE CAN COLLECT, AND MAYBE YOU COULD EXPLAIN A LOT OF THAT TEST.

10:37:02 **A** OKAY.

(DOCUMENT DISPLAYED)

**MS. ONDRICK:** AND, FOR THE RECORD, THIS IS DEFENDANTS' EXHIBIT 4288, WHICH COMES FROM DX5709, WHICH IS ALREADY OF RECORD.

10:37:17 **THE WITNESS:** SO, WHAT WE SEE IS -- AND WHAT IS BLOWN UP IS THE SCREENSHOT. AND WE HAVE BEEN HEARING A LOT ABOUT SCREENSHOTS, PROBABLY A LITTLE TOO MUCH ABOUT SCREENSHOTS YESTERDAY.

AND NOTICE THAT THE BACKGROUND IS KIND OF WHITE, AND THAT 10:37:33 IS JUST THE WAY THAT THE OSCILLOSCOPE PUTS OUT THE DATA. IF

10:37:36 YOU ACTUALLY -- WHEN YOU SAW IT ON THE SCREEN YESTERDAY THERE WAS A BLACK BACKGROUND. BUT WHEN THE -- WHEN YOU SAVE THE SCREENSHOT ON THE OSCILLOSCOPE, IT SAVES IT INTO A PDF FORMAT, AND THEN JUST HAS A WHITE BACKGROUND.

10:37:51 PROBABLY IF YOU PRINTED OUT A LOT OF BLACK, THEN YOU WOULD BE WASTING A LOT OF INK. SO IT'S BETTER THAT IT IS WHITE.

AND WHAT YOU SEE IS A NUMBER OF WAVEFORMS. AND WE HAD SEEN THIS BEFORE, AS WELL.

THE RED LINE IS THE SIGNAL THAT IS TURNING THE POWER 10:38:07 SWITCH ON AND OFF. AND THEN, THERE ARE OTHER SIGNALS AS PART OF THAT SCREENSHOT. ONE IS THE -- I THINK THE BLUE LINE IS CALLED THE "BULK VOLTAGE." AND THAT IS JUST KIND OF THE HIGH-VOLTAGE INPUT TO THE POWER CONVERTER.

AND THEN, THERE IS A YELLOW LINE. AND IT IS LABELED 10:38:31 "FEEDBACK." THERE IS ACTUALLY A PIN ON THE PRODUCT THAT WAS BEING TESTED.

AND THEN, THE GREEN LINE CORRESPOND TO THE OUTPUT VOLTAGE. AND SO, YOU SEE THE WAVEFORMS THAT WAS CAPTURED BY THE OSCILLOSCOPE AND THEN WAS JUST ESSENTIALLY TRANSFERRED OVER 10:38:46 INTO THIS FIGURE, FILE FORMAT.

AND THEN, IN ADDITION TO THAT, IF YOU LOOK THERE ARE A SET OF NUMBERS. AND WE SAW THIS YESTERDAY, AS WELL, WHERE THE NUMBERS PROVIDE DATA VALUES IN TERMS OF THE VOLTAGE. IN THIS CASE I'VE HIGHLIGHTED THE MEAN OR THE AVERAGE VOLTAGE 10:39:06 (INDICATING), AND THE FREQUENCY OF THE SWITCHING ACTIVITY THAT

10:39:09 WAS CAPTURED BY THE OSCILLOSCOPE.

SO THAT'S THE DATA THAT I WAS RELYING ON.

AND, WHAT I'LL SHOW YOU LATER ARE -- IS KIND OF A PLOT, USING A SIMPLE PLOTTING TOOL THAT SAID -- THAT PICKS OUT THIS 10:39:22 ONE DATA POINT, PUTS IT ON THE X AXIS, TAKES THIS OTHER DATA, AND THEN I COULD PLOT OUT WHAT THESE NUMBERS ON A NUMBER OF THESE DIFFERENT SHEETS OF PAPER OR PDF FILES, HOW YOU CAN PLOT THOSE OUT.

**Q** THANK YOU, DR. WEI.

10:39:39 SO LET'S GO AHEAD AND MOVE ON TO YOUR OPINIONS IN THIS CASE. AND. HOW ABOUT IF WE START WITH THE '079 PATENT?

**A** OKAY.

(DOCUMENT DISPLAYED)

**Q** DO YOU HAVE AN OPINION WITH REGARD TO WHETHER THE 10:39:51 FAIRCHILD ACCUSED PRODUCTS MEETS THE ASSERTED CLAIMS OF THE '079 PATENT?

**A** YES. SO I'VE LOOKED AT THE PATENT, THE '079 PATENT, AND ALL THE MATERIAL THAT IS RELEVANT TO THE '079, THE PROSECUTION HISTORY.

10:40:06 I'VE ALSO LOOKED AT THE PRODUCTS, THE DATASHEETS, THE APPLICATION NOTES ON THE DATA.

AND THEN, FOR THE ASSERTED CLAIMS, 31, 34, 38 AND 42, IT IS MY OPINION THAT THE ACCUSED PRODUCTS ARE -- DO NOT INFRINGE THESE CLAIMS OF THE '079 PATENT.

10:40:29 **Q** OKAY. DID YOU GET ANY GUIDANCE FROM THE COURT IN

CONDUCTING YOUR ANALYSIS?

**A** YES. SO, WHEN WE LOOK AT THE ASSERTED CLAIMS -- AND I THINK WE HAVE HEARD THIS, YOU KNOW, THROUGHOUT THE LAST WEEK AND A HALF, THERE ARE -- BECAUSE, ESSENTIALLY, WE HAVE TO ABIDE BY THE LANGUAGE, THE WORD IN THE CLAIM. AND, TYPICALLY, WHAT YOU WOULD DO IS JUST GIVE IT AS PLAIN AND ORDINARY MEANING.

BUT THEN, THERE ARE TIMES WHERE CERTAIN TERMS ARE IN DISPUTE, LIKE HOW ONE COULD INTERPRET WHAT THAT TERM MEANS. AND THEN, YOU SEEK GUIDANCE FROM THE COURT AS TO HOW SHOULD ONE UNDERSTAND WHAT THIS TERM MEANS.

AND SO, THE COURT PROVIDES WHAT IS CALLED A COURT'S "CLAIM CONSTRUCTION."

AND THEN, YOU LITERALLY APPLY THAT CONSTRUCTION TO THOSE TERMS IN THE CLAIMS.

**Q** AND DID YOU APPLY THOSE CLAIM CONSTRUCTIONS IN YOUR ANALYSIS?

**A** YES. WE HAVE TO.

(DOCUMENT DISPLAYED)

**Q** NOW, AGAIN, WE ARE SHOWING CLAIM 34.

CAN YOU TELL US WHAT YOU ARE DEMONSTRATING WITH THE HIGHLIGHTING HERE?

**A** SURE. SO RECALL -- I THINK IT WAS LAST WEEK -- WHEN DR. KELLEY WAS TALKING ABOUT THESE CLAIMS AND HOW THE FAIRCHILD PRODUCTS INFRINGE. WHAT HE HAD TO DO WAS

10:41:44 ESSENTIALLY GO THROUGH EVERY SINGLE ELEMENT AND TRY TO IDENTIFY HOW THE PRODUCTS HAVE ALL OF THE ELEMENTS FOR A PARTICULAR CLAIM.

AND, IN THE -- I THINK THE FIRST DAY OF TRIAL, MR. JACOBS 10:41:58 GAVE THAT BOWLING PIN ANALOGY? SO YOU HAD TO HIT A STRIKE IN ORDER TO FIND THAT A -- AN ACCUSED PRODUCT INFRINGES. WHAT I'M GOING TO DO HERE, THOUGH, IS ESSENTIALLY I JUST NEED TO SHOW THAT THERE'S AT LEAST ONE BOWLING PIN REMAINING. YOU DON'T HAVE A STRIKE.

10:42:14 AND SO IN THE INTEREST OF TIME WHAT WE HAVE DONE IS FOCUSED IT TO ESSENTIALLY THREE CONTESTED ELEMENTS. AND SO, THESE ARE THE THREE ELEMENTS THAT ARE KIND OF IN -- IN DISPUTE, I GUESS. AND SO I'LL FOCUS ON THOSE THREE.

(DOCUMENT DISPLAYED)

10:42:35 **Q** AND I SEE HERE YOU HAVE IDENTIFIED THE REPRESENTATIVE PRODUCTS PULLED OUT BY DR. KELLEY.

**A** RIGHT. SO, UP TO THIS POINT, THERE'S ALL THESE PRODUCTS. BUT THEN WHAT WERE IDENTIFIED ARE FIVE REPRESENTATIVE PRODUCTS. SO WE JUST ONLY NEED TO LOOK AT THESE FIVE 10:42:51 PRODUCTS.

AND SO, WHAT I'M JUST SHOWING ON THIS SLIDE IS THAT THE ARGUMENTS THAT I'M GOING TO BE PRESENTING PRETTY MUCH APPLY TO ALL FIVE OF THESE PRODUCTS. AND -- BUT IF THERE'S ANY DIFFERENCES, THEN I'LL NOTE THOSE DIFFERENCES, AS WELL.

10:43:08 **Q** AND SO WE JUST SAW THREE MISSING LIMITATIONS. ARE YOU

10:43:13 JUST REPEATING THEM HERE?

**A** YEAH. SO THIS IS -- THE WORDS WERE DIFFICULT TO SEE WITH THE HIGHLIGHTS BEFORE. SO MAKING IT A LITTLE BIT EASIER TO SEE HERE. SO THE THREE ESSENTIALLY REFERRED TO THE FAIRCHILD 10:43:26 PRODUCTS. THEY'RE NOT COUPLED TO SWITCH. THE POWER SWITCH AT A FIXED SWITCHING FREQUENCY.

AND I'VE HIGHLIGHTED THAT WORD "FIXED" BECAUSE THAT IS REALLY THE MAIN POINT AT ISSUE HERE. THE FAIRCHILD PRODUCTS ALSO, AS WE HAVE HEARD KIND OF THROUGHOUT THE WEEK, DO NOT 10:43:41 INCLUDE A SWITCH IN THE POWER -- IN THE ACCUSED PRODUCTS.

AND THEN, THE FAIRCHILD PRODUCTS ARE NOT COUPLED TO VARY THE SWITCHING CYCLE -- THE SWITCHING FREQUENCY WITHOUT SKIPPING CYCLES. WE'LL DIG INTO THIS MUCH MORE, AS WELL.

**Q** OKAY. AND SO THE FIRST OPINION THAT WE ARE GOING TO TALK 10:44:01 ABOUT RELATES TO THE FIXED SWITCHING FREQUENCY. IS THAT WHAT YOU ARE SHOWING HERE?

(DOCUMENT DISPLAYED)

**A** YES.

**Q** OKAY.

10:44:07 (DOCUMENT DISPLAYED)

**Q** CAN YOU TELL US WHAT YOU ARE DEMONSTRATING HERE WITH YOUR NEXT SLIDE?

**A** SURE. SO KIND OF PROVIDING AN OUTLINE, HIGHLIGHTS IN TERMS OF WHY I DID NOT BELIEVE THAT THE POWER SWITCH SWITCHES 10:44:20 AT THIS FIXED SWITCHING FREQUENCY.

AND WHAT WE CAN DO, WHAT I'LL SHOW IS THAT THE TECHNICAL DOCUMENTS, THE DATASHEETS, THE APPLICATION NOTES THAT WE HAVE BEEN LOOKING AT SO FAR, THEY SHOW THAT THE SWITCHING FREQUENCY VARIES. OKAY? SO THAT IS NUMBER ONE.

THEN, I WILL PROCEED TO SHOW YOU THE TEST RESULTS AND EXPLAIN THE TEST RESULTS, AND WHY THE TEST RESULTS SHOW THAT THE SWITCHING FREQUENCY VARIES.

AND THEN, THERE'S ONE OTHER FOR SOME OF THE -- FOR THE REPRESENTATIVE PRODUCTS, IT DOESN'T -- THE SWITCHING FREQUENCY CANNOT BE FIXED. SO I'LL EXPLAIN THAT, AS WELL.

(DOCUMENT DISPLAYED)

**Q** SO HERE IT LOOKS LIKE YOU ARE SHOWING PART OF A CLAIM CHART. IT LOOKS LIKE YOU HAVE HIGHLIGHTED OUT THE -- OR CALLED OUT THE CONTESTED CLAIM ELEMENTS. IS THAT CORRECT?

**A** SO WE HAVE SEEN CHARTS LIKE THIS BEFORE. AND I THINK THE REASON WE DO THIS IS IT KIND OF MAKES IT A NICE, EASY-TO-REMEMBER GRAPHIC.

BUT REMEMBER, CLAIM 34 HAS A LOT MORE ELEMENTS. BUT THE THREE THAT ARE BEING CONTESTED, THOSE ARE THE ONES THAT I'VE PUT UP HERE. AND I'VE HIGHLIGHTED THE ONE IN THE MIDDLE, BECAUSE THAT IS THE ONE WE WILL START WITH. AND THEN, WE WILL PROCEED TO THE OTHER ONES, AS WELL.

**Q** OKAY. SO WHY DON'T WE GO AHEAD AND GET INTO THAT EXPLANATION?

(DOCUMENT DISPLAYED)

10:45:37
**Q** I SEE HERE YOU HAVE IDENTIFIED THE COURT'S CLAIM CONSTRUCTION.

**A** RIGHT. SO FOR THAT PARTICULAR ELEMENT, THERE ARE TWO TERMS, I BELIEVE, THAT WERE CONSTRUED. AND SO I WANTED TO JUST REMIND US OF WHAT THE COURT'S CLAIM CONSTRUCTIONS WERE.

10:45:48

AND SO, WITH RESPECT TO "SWITCHING FREQUENCY," THE COURT CONSTRUED IT TO MEAN: "THE NUMBER OF SWITCHING CYCLES OF THE POWER SWITCH PER SECOND."

AND THEN, ALSO, FOR THE "FIXED SWITCHING FREQUENCY," THE COURT CONSTRUED IT TO BE "A NON-VARYING NUMBER OF SWITCHING CYCLES PER SECOND."

10:46:05

**Q** SO IS IT EASY FOR US TO THINK OF FIXED FREQUENCY AS NON-VARYING SWITCHING FREQUENCY?

**A** YES.

10:46:21
**Q** AND, COULD WE ALSO THINK OF IT AS NON-VARYING HERTZ?

**A** NON-VARYING HERTZ.

(DOCUMENT DISPLAYED)

**Q** ALL RIGHT. DR. WEI, DO YOU RECALL DR. KELLEY PUTTING UP SOME DOCUMENTS FROM FAIRCHILD? AND HE SAID, YOU KNOW, THE SWITCHING FREQUENCY IS FIXED IN THE FAIRCHILD PRODUCTS?

10:46:38

**A** SO, THIS IS A SLIDE THAT I BELIEVE DR. KELLEY SHOWED DURING HIS TESTIMONY LAST WEEK. AND, IF I RECALL CORRECTLY, WHAT HE WAS DOING WAS HIGHLIGHTING THE DESCRIPTION WITHIN THIS APPLICATION NOTE AND SAYING, "HEY, THE APPLICATION NOTE SAYS 'FIXED FREQUENCY.'"

10:46:58

10:47:00 AND, ACTUALLY, WE JUST SAW THAT THIS MORNING, AS WELL.

SO THAT IS JUST IN THAT DESCRIPTION. AND AS WE HEARD FROM MR. W.H., IT IS KIND OF A GENERAL WAY TO GENERALLY DESCRIBE THE PRODUCTS, BUT IF YOU LOOK FURTHER INTO THE SAME DOCUMENT 10:47:17 OR DOCUMENTS OF THIS TYPE, YOU NOTICE THAT THERE'S ALL THESE CHARTS THAT WERE BROUGHT UP. AND THESE CHARTS HAVE ALL THESE NUMBERS. AND THAT PROVIDES FURTHER INFORMATION, KIND OF THE DETAILS OF WHAT'S GOING ON AND HOW THESE DEVICES OPERATE.

**MS. ONDRICK:** AND, YOUR HONOR, I WOULD LIKE TO OFFER 10:47:34 DX 3107. IT IS A DATASHEET. I DON'T BELIEVE IT IS OBJECTED TO.

**THE COURT:** I'M --

**MR. POLLACK:** NO OBJECTION, YOUR HONOR.

**THE COURT:** ALL RIGHT. DX 3107 MAY BE ADMITTED.

10:47:44 (TRIAL EXHIBIT 3107 RECEIVED IN EVIDENCE)

**THE COURT:** THANK YOU.

(DOCUMENT DISPLAYED)

**BY MS. ONDRICK:**

**Q** SO HERE I SEE YOU HAVE HIGHLIGHTED THE DATASHEET FOR THE 10:47:51 FAN103 PRODUCT. CAN YOU TELL US WHAT YOU ARE SHOWING HERE?

**A** YES. SO THIS IS ACTUALLY A DIFFERENT PRODUCT FROM THE ONE WE JUST SAW. WE WILL ACTUALLY LOOK AT SG6841 A LITTLE BIT LATER.

BUT IF YOU LOOK ON THE COVER OF THE DATASHEET FOR THE 10:48:09 FAN103, WHAT WE SEE IS THAT THERE'S A BULLET POINT. IT SAYS:

10:48:14 "FIXED PWM FREQUENCY," WHICH WE ALSO ALREADY SAW.

AND THEN, AT 50 KILOHERTZ "WITH FREQUENCY HOPPING TO SOLVE EMI PROBLEM."

AND IF YOU LOOK FURTHER INTO THIS PARTICULAR DOCUMENT, FOR EXAMPLE, IF YOU LOOK AT FIGURE 24, IT DESCRIBES USING THIS WAVEFORM, THE FREQUENCY HOPPING.

10:48:26

AND, RECALL, THIS IS SIMILAR TO THE TUTORIAL PORTION WHERE I TALKED ABOUT HOW THE FREQUENCY IS BEING MODULATED. IT IS HOPPING AROUND, KIND OF GETTING WIDER AND NARROWER.

10:48:47 AND SO, YOU KNOW, THE DOCUMENTATION IS ALSO EXPLAINING THIS AND HOW THE FREQUENCY VARIES.

**Q** SO WHY DON'T WE GO AHEAD AND --

(DOCUMENT DISPLAYED)

**Q** -- TAKE A LOOK A LITTLE BIT MORE AT WHAT ELSE THE FAN103 SHOWS ABOUT ITS SWITCHING FREQUENCY?

10:49:04

**A** SO, WE CAN SEE THAT THE CHARTS ARE PROVIDING GUIDANCE TO SOMEONE THAT IS GOING TO BUY AND UTILIZE THESE PRODUCTS AND MAKE POWER SUPPLIES.

THAT THERE'S A CENTER FREQUENCY FOR THE OSCILLATOR. AND ALSO THE OSCILLATOR HAS FREQUENCY HOPPING AND IS HOPPING AROUND AT A PARTICULAR RANGE.

10:49:19

AND SO THE CHART SHOWS THERE IS A MINIMUM, TYPICAL MAXIMUM VALUE OF THAT CENTER FREQUENCY, OR THE TARGET FREQUENCY THAT MR. W.H. HUANG WAS TALKING ABOUT. AND THEN, IF WE ALSO LOOK FURTHER DOWN IN THIS CHART, THE -- OR THE TABLE, WE ALSO SEE

10:49:37

10:49:43 THAT THERE IS FREQUENCY VARIATION WITH RESPECT TO VDD DEVIATION. SO THAT IS THE VOLTAGE AT WHICH THE DEVICE IS OPERATING AT.

AND SO IT VARIES BY 1 TO 2 PERCENT.

10:49:56 AND, FURTHERMORE, THE FREQUENCY ALSO VARIES WITH RESPECT TO TEMPERATURE. AND IN THIS PRODUCT, IT VARIES UP TO 15 PERCENT.

(DOCUMENT DISPLAYED)

**Q** NOW, LET'S TAKE A LOOK AT THE FAN5841J. WHAT DOES THE

10:50:13 DOCUMENTATION TELL US ABOUT THAT PRODUCT?

**A** SO WE ARE LOOKING AT A VERY SIMILAR PORTION OF THE DATASHEET FOR A DIFFERENT PRODUCT: THE 5841J. AND IN THAT OSCILLATOR SECTION, AGAIN, WHAT WE SEE IS THERE IS THE CENTER FREQUENCY OF THE OSCILLATOR. IT ALSO HAS THIS FREQUENCY

10:50:30 HOPPING. AND SO IT'S TELLING US HOW MUCH THE FREQUENCY HOPPING LEADS TO CHANGES IN FREQUENCY.

AND THEN, AGAIN, KIND OF WHEN WE LOOK TOWARDS THE LOWER PORTION OF THIS CHART, THERE'S THE FREQUENCY DEVIATION OR FREQUENCY VARIATION WITH CHANGES IN THE INPUT VOLTAGE OR THE

10:50:47 VDD.

AND THEN, THERE IS FREQUENCY VARIATIONS WITH RESPECT TO TEMPERATURE. AND WE ARE GOING TO SEE THIS AGAIN AND AGAIN FOR ALL OF THE OTHER PRODUCT, AS WELL. AND WE WILL QUICKLY GO THROUGH THOSE.

10:50:56 **Q** AND SO HERE AGAIN, THE DOCUMENT SAYS "FIXED," BUT WHEN YOU

DIG IN, IT'S NOT FIXED?

**A** IT DESCRIBES THE VARIATIONS THAT THE -- THE VARIATIONS OF FREQUENCY.

**Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** AND IF WE COULD GO TO SG6841, COULD YOU PLEASE TELL US WHAT THESE DOCUMENTS TELL US?

**A** YES. I'LL DO THIS PRETTY QUICKLY. THE SAME KIND OF SIMILAR SETS OF CHARTS. THERE'S THE OSCILLATOR FREQUENCY WITH THE MINIMUM, TYPICAL, MAXIMUM. AND ALSO IT DESCRIBES HOW THE FREQUENCY VARIES WITH RESPECT TO VOLTAGE AND TEMPERATURE BY 5 PERCENT.

**Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** AND IF WE COULD NEXT TURN TO THE SG3842.

**MS. ONDRICK:** AND, YOUR HONOR, I WOULD OFFER INTO EVIDENCE DX 2202.

(DOCUMENT DISPLAYED)

**MR. POLLACK:** NO OBJECTION.

**THE COURT:** I'M SORRY, DX 22- --

**MS. ONDRICK:** -02.

**THE COURT:** OKAY. DX 2202 IS ADMITTED.

(TRIAL EXHIBIT 2202 RECEIVED IN EVIDENCE)

**BY MS. ONDRICK:**

**Q** AND CAN YOU TELL US WHAT YOUR OPINIONS ARE WITH REGARD TO

10:52:26 THE SG3842G.

A SURE. SO THE SG3842G, I THINK, IS PERHAPS THE LAST OF THE COLLECTION OF REPRESENTATIVE PRODUCTS.

Q UH-HUH.

10:52:35 A AGAIN, WE SEE THE OSCILLATOR SECTION CHART WHERE THE OSCILLATOR FREQUENCY IS SHOWN TO HAVE THIS MINIMUM, TYPICAL, MAXIMUM VALUE.

AND THEN, IF WE LOOK FURTHER DOWN, THERE IS A FREQUENCY CHANGE WITH VCC, IS ALSO THE INPUT VOLTAGE IN THIS CASE. AND 10:52:52 THE FREQUENCY CHANGE WITH TEMPERATURE.

AND THOSE, THERE'S, I GUESS, SOME EDITS MADE TO THIS DATASHEET. I THINK THAT'S -- THE ORIGINAL DATASHEET IS LIKE THAT.

Q THIS IS A VERY OLD PRODUCT THAT WASN'T MADE FOR A VERY 10:53:09 LONG TIME, SO THAT IS THE CURRENT DATASHEET FOR THE PRODUCT.

A THAT IS MY UNDERSTANDING.

Q SO, FOR THE RECORD, DR. WEI, SOME OF THE ITEMS THAT YOU HAVE HIGHLIGHTED TODAY COME FROM DX 3107 FOR THE FAN103. AND YOU HAD IDENTIFIED FIGURE 24, PAGE 1, AND PAGE -- APPEARING AT 10:53:30 FSG 11898.

AND YOU HAVE ALSO IDENTIFIED, FOR THE RECORD, INFORMATION FOR THE FAN103 ALSO APPEARING AT FSGIV11892.

FOR THE FAN -- SG5841J, YOU HAVE IDENTIFIED DOCUMENTATION FROM DX 4606, APPEARING AT PAGE 6, WHICH IS --

10:53:56 A FOR THAT PRODUCT, I JUST -- I THINK ONE COMMENT IS, IT'S

THE 5841 AND THEN /J IS ACTUALLY THAT DATASHEET. THERE IS A SINGLE DATASHEET THAT COVERS BOTH THE 5841 AND THE 5841J. I JUST WANTED TO MAKE THAT CLEAR.

**Q** THANK YOU. AND THAT WAS ACTUALLY AT PAGE 6 OF THE DATASHEET WHICH COVERED BOTH PRODUCTS.

**THE COURT:** WHAT ARE YOU READING FROM?

**MS. ONDRICK:** JUST THE EXHIBITS THAT HE HAD -- (INDICATING)

**THE COURT:** ARE YOU JUST TRYING TO IDENTIFY AT THIS TIME WHAT HE'S TALKED ABOUT UP THERE?

**MS. ONDRICK:** CORRECT.

**THE COURT:** OH. WELL, IT MAY BE BETTER TO DO IT WHEN HE'S DOING IT.

**MS. ONDRICK:** I AGREE, YOUR HONOR. THAT'S WHY I'M GOING BACK AND DOING IT RIGHT NOW. AND WE'LL DO IT GOING FORWARD.

**THE COURT:** ALL RIGHT. YOU'RE ASKING THAT THE RECORD REFLECT THAT HE HAS IDENTIFIED IN SOME SEQUENCE THE FOLLOWING, WHAT, DATASHEETS?

**MS. ONDRICK:** YES. I CAN -- I'LL GO BACK REALLY QUICK, YOUR HONOR.

(DOCUMENT DISPLAYED)

**THE COURT:** WELL, IF YOU WANTED TO STATE IT FOR THE RECORD, IT LOOKED LIKE YOU WERE JUST TALKING TO HIM.

ALL RIGHT.

(DOCUMENTS DISPLAYED)

**MS. ONDRICK:** ALL RIGHT. AND THEN, JUST FOR THE RECORD, DR. WEI WAS REFERRING TO THE DX 4681 AT PAGE 5, AND -- FOR THE SG6841. AND FOR THE SG3842G, IT WAS DX 2202 AT PAGE 4.

**THE COURT:** OKAY.

**BY MS. ONDRICK:**

**Q** NOW, THAT'S A LOT OF PRELITIGATION EVIDENCE, ISN'T IT, DR. WEI?

**A** YES.

**Q** AND SO, THERE'S PLENTY OF EVIDENCE, PRELITIGATION, TO SAY THAT FIXED FREQUENCY DOESN'T EXIST IN FAIRCHILD PRODUCTS. IS THAT RIGHT?

**A** WHAT WE'VE SEEN FROM ALL OF THE DATASHEETS -- AND THEY WERE REFERRED TO AS THE "PRELITIGATION DATASHEETS," I THINK WHEN WE SAW FROM DR. KELLEY'S SLIDE. SO, ALL OF THEM HAVE ALL OF THESE TABLES.

AND ALL THESE TABLES DESCRIBE HOW -- AND WE HEARD THIS FROM MR. W.H. HUANG, AS WELL -- HOW WHEN A CUSTOMER BUYS THESE PRODUCTS OR THINKS ABOUT USING THEM, THEY UNDERSTAND THAT THE FREQUENCY VARIES. IT VARIES WITH VOLTAGE. IT VARIES WITH TEMPERATURE. AND, THERE'S ALSO OTHER TYPES OF VARIATIONS, AS WELL.

**Q** AND IN REACHING YOUR OPINIONS, DID YOU APPLY THE COURT'S CLAIM CONSTRUCTION OF "FIXED SWITCHING FREQUENCY"?

10:56:13 **A** YES. IF WE -- IF YOU RECALL THE COURT'S CLAIM CONSTRUCTION FOR "FIXED SWITCHING FREQUENCY" IS A "NONVARYING NUMBER OF SWITCHING CYCLES PER SECOND."

**Q** SO WHEN THE COURT SAID "NONVARYING," THAT MEANS NO

10:56:32 VARIATION. IS THAT RIGHT?

**MR. POLLACK:** OBJECTION, YOUR HONOR.

**MS. ONDRICK:** LET ME RESTATE THAT, THEN.

**BY MS. ONDRICK:**

**Q** "FIXED FREQUENCY," THE COURT SAID: "FIXED SWITCHING

10:56:42 FREQUENCY MEANS A NONVARYING NUMBER OF SWITCHING CYCLES PER SECOND." CORRECT?

**A** PRECISELY.

**Q** AND, YOU'VE APPLIED THAT TO THE PRODUCTS IN THIS CASE. CORRECT?

10:56:51 **A** THAT'S CORRECT.

**Q** NOW, LET'S TAKE A LOOK AT DR. KELLEY'S --

(DOCUMENT DISPLAYED)

**Q** -- OPINION IN THIS CASE. YOU WERE HERE IN COURT WHEN HE TESTIFIED. IS THAT RIGHT?

10:57:04 **A** YES, I WAS.

**Q** AND, DID YOU HEAR HIS TESTIMONY WHERE HE WAS ASKED THE FOLLOWING QUESTION:

"QUESTION: AND YOU SAID THAT YOUR UNDERSTANDING WAS THAT THAT

10:57:13 'CYCLES-PER-SECOND' LANGUAGE REQUIRED

COUNTING CYCLES WITHIN A SECOND INTERVAL OF TIME. RIGHT?

"ANSWER: YES."

DID YOU HEAR THAT?

**A** I DID.

**Q** AND DO YOU AGREE WITH THAT?

**A** I DO NOT AGREE WITH THAT.

**Q** WHY?

**A** WELL, DR. KELLEY, HERE, WHAT HE WAS SAYING WAS HIS -- I GUESS HIS UNDERSTANDING OF WHAT THE COURT'S CLAIM CONSTRUCTION MEANT WAS THAT YOU COUNT THE NUMBER OF CYCLES IN A ONE-SECOND INTERVAL, AND THEN YOU HAVE TO KIND OF ALWAYS COUNT THE NUMBER OF CYCLES FROM THIS SECOND TO NEXT SECOND, ET CETERA.

WHEREAS, IF YOU LOOK AT THE COURT'S CLAIM CONSTRUCTION, IT SAYS "A NON-VARYING NUMBER OF SWITCHING CYCLES PER SECOND."

AND IT'S -- IT DOESN'T SAY "COUNTING WITHIN A SECOND." IT SAYS "SWITCHING CYCLES PER SECOND."

(DOCUMENT DISPLAYED)

**Q** SO I THINK IT IS YOUR VIEW THAT DR. KELLEY'S MATH DOESN'T ADD UP. CAN YOU TELL US WHAT YOU ARE SHOWING HERE?

**A** YEAH, SO, PERHAPS ONE WAY WE CAN TRY TO UNDERSTAND THIS AND WHY I DON'T BELIEVE THE MATH ADDS UP, IS THIS IS A FIGURE FROM THE '079 PATENT. IT IS FIGURE 5.

AND WHAT WE SEE HERE IS A -- KIND OF A GRAPHIC THAT SHOWS WHAT I BELIEVE IS A -- THERE IS A FLAT REGION HERE

10:58:45 (INDICATING) AT 100 KILOHERTZ. AND SO THAT WOULD BE THAT FIXED SWITCHING FREQUENCY.

AND THEN, THERE IS ANOTHER PORTION OF THE CURVE THAT GOES DOWN FOR A RANGE OF WHAT ARE CALLED THE "CONTROL TERMINAL 10:59:02 CURRENT." SO FROM ABOUT, LET'S SAY, 5.3 TO 6. OKAY?

AND SO, THESE ARE THE TWO RANGES OF OPERATION THAT THE '079 PATENT DESCRIBES. AND SO LET'S SAY, FOR SAKE OF ARGUMENT, THAT THE CONTROL TERMINAL CURRENT HAPPENS TO BE 5 MILLIAMPS. AND THAT WOULD MEAN THAT THE DEVICE WOULD BE 10:59:25 OPERATING AT 100 KILOHERTZ.

AND SO LET'S IMAGINE THAT IT'S OPERATING AT 100 KILOHERTZ FOR HALF A SECOND. AND THEN, BECAUSE THE LOAD CONDITION CHANGES, THE CONTROL TERMINAL CURRENT ALSO CHANGES. AND SO NOW THE DEVICE IS OPERATING, LET'S SAY, AT 50 KILOHERTZ. AND 10:59:44 LET'S SAY THAT IS HAPPENING FOR HALF -- THE REMAINING OTHER HALF SECOND.

AND THEN, THE LOAD CURRENT CONDITIONS CHANGE AGAIN, SO THAT THE DEVICE GOES BACK TO 100 KILOHERTZ FOR HALF A SECOND. AND LET'S SAY IT'S JUST REPEATING THAT PROCESS BACK AND FORTH, 10:59:59 BACK AND FORTH.

AND YOU CAN IMAGINE THE REASON FOR SOMETHING LIKE THIS IS YOU ARE PLAYING A GAME ON YOUR LAPTOP, RIGHT? AND IT IS GOING KIND OF THROUGH THESE -- THERE ARE PERIODS WHERE YOU ARE SHOOTING A LOT OF THINGS, AND THEN THINGS ARE CHANGING. AND 11:00:15 SO WE ARE GOING THROUGH THIS KIND OF PERIODIC ACTIVITY OF

HIGHER ACTIVITY AND LOWER ACTIVITY.

AND SO, BUT ACCORDING TO DR. KELLEY'S CALCULATIONS, IF I'M COUNTING THOSE CYCLES OVER THE ENTIRE ONE SECOND, THEN I WOULD COUNT 75,000 CYCLES WITHIN THAT ONE SECOND.

BUT IF I LOOK ON THIS CHART, AND I LOOK AT, WELL, IF A DEVICE IS OPERATING AT 75 KILOHERTZ, THAT WOULD PUT ME RIGHT AROUND HERE (INDICATING), FOR A CONTROL TERMINAL CURRENT OF MAYBE 5.4 MILLIAMPS.

BUT IF YOU THINK ABOUT THAT, THAT'S NOT CONSISTENT WITH WHAT I JUST DESCRIBED AS THE SITUATION TO BE. THE DEVICE WAS OPERATING AT 100 KILOHERTZ FOR HALF A SECOND. AND THEN, THE DEVICE WAS OPERATING AT 50 KILOHERTZ FOR HALF A SECOND, AND GOING BACK AND FORTH.

SO, WE ARE, YOU KNOW, COUNTING WITHIN ONE SECOND, THAT'S NOT THE WAY YOU WOULD UNDERSTAND THIS DEVICE TO OPERATE.

**Q** WHAT DOES THE PATENT TEACH US ABOUT THE MATH?

**A** WELL, IF YOU LOOK IN THE PATENT, THERE'S A DESCRIPTION OF HOW YOU COMPUTE THIS FREQUENCY, AND HOW IT IS RELATED TO A PERIOD. SO WHAT WE SEE HERE IS THE LOW-FREQUENCY PERIOD -- JUST ONE OF THE INSTANCES -- OF 41 MICROSECONDS. AND SO THAT MICRO IS ONE MILLIONTH OF A SECOND. SO 41/MILLIONTH OF A SECOND IS THE PERIOD OF TIME THAT IS CORRESPONDING TO THE CYCLE THAT WE HAVE SEEN BEFORE.

AND IF YOU TAKE -- IF YOU COMPUTE THE 1 OVER 41 MICROSECONDS, THAT IS THE FREQUENCY. AND THAT FREQUENCY AS

11:01:57 SHOWN BY THE PATENT IS 24.4 KILOHERTZ.

**Q** THANK YOU, DR. WEI.

NOW, WE HAVE COVERED SOME OF THE PRELITIGATION DOCUMENTATION. NOW, I WOULD LIKE TO TALK ABOUT THE TESTING, 11:02:11 IF WE COULD.

**A** OKAY.

(DOCUMENT DISPLAYED)

**Q** AND YOU HAD FOUR PRODUCTS TESTED IN THIS CASE. IS THAT RIGHT?

11:02:18 **A** THAT'S RIGHT. SO WHAT WE ARE LOOKING AT HERE ARE THE PICTURES OF EACH OF THE PRODUCTS THAT WERE TESTED. SO THE FAN103, THE SG6841, THE SG5841, AND THE SG5841J.

AND, WHAT YOU SEE IN THE MIDDLE, THE SG3842G, THAT WAS SUCH AN OLD PRODUCT WE COULDN'T FIND THAT CHIP AND BE ABLE TO 11:02:43 TEST IT. SO THERE'S NO TEST RESULTS FOR THAT PARTICULAR PRODUCT.

(DOCUMENT DISPLAYED)

**Q** AND WE ARE JUST SHOWING HERE THE TEST SETUP?

**A** IT IS JUST THE TEST SETUP.

11:02:52 (DOCUMENT DISPLAYED)

**Q** THANK YOU.

OKAY. CAN YOU SHOW US -- WE HAVE GOT ON THE SCREEN DX 5709 AND DX 4495. THIS IS A FREQUENCY-VERSUS-LOAD WAVEFORM FOR THE SG6841.

11:03:08 CAN YOU JUST TELL US WHAT'S BEING SHOWN HERE, AND DESCRIBE

11:03:11 THE DATA?

**A** SURE. SO, WHAT'S BEING SHOWN HERE, AGAIN, THIS IS A SCREENSHOT THAT HAS THOSE VARIOUS WAVEFORMS.

AND THE TWO WAVEFORMS, I THINK, THAT ARE OF PARTICULAR 11:03:23 IMPORTANCE HERE IS ONE OF THEM IS THE RED WAVEFORM THAT IS THE SWITCHING OF THE POWER SWITCH. OKAY?

AND SO IF YOU MEASURED THE AMOUNT OF TIME BETWEEN, LET'S SAY, THIS RISING EDGE OF THIS PULSE TO THE NEXT RISING EDGE OF THE PULSE, THAT IS A CYCLE. OKAY?

11:03:44 AND IF YOU TAKE ONE OVER THAT, THAT GIVES YOU THE FREQUENCY. AND, THAT'S FOR THE SWITCHING OF THE POWER SWITCH.

AND THEN, THE YELLOW LINE HERE, THAT, IN THIS CASE, IS THE FEEDBACK VOLTAGE. OKAY? AND THAT IS ANOTHER IMPORTANT ASPECT OF THE '908 PATENT.

11:04:03 AND WHAT WE CAN SEE HERE IS THAT THE OSCILLOSCOPE ALSO PROVIDES MEASUREMENTS (INDICATING). RIGHT? IT LOOKS AT ALL THIS, AND IT IS MUCH BETTER AT LOOKING AT ALL THESE EDGES AND THEN COMPUTING: OKAY. HERE IS WHAT THE FREQUENCY IS. AND HERE IS WHAT THE AVERAGE VOLTAGE OF THE FEEDBACK VOLTAGE IS.

11:04:24 AND SO IF WE LOOK HERE THERE IS A MEAN VOLTAGE AND A MEAN FREQUENCY THAT CORRESPOND TO THE AVERAGE FREQUENCY AND THE AVERAGE VOLTAGE OF THESE TWO WAVEFORMS.

AND THAT'S WHAT'S BEING PROVIDED BY THE OSCILLOSCOPE.

AND THIS IS THE DATA THAT I RELIED ON BY LOOKING AT THESE 11:04:42 NUMBERS. AND WHAT I CAN DO IS I CAN FURTHER JUST TAKE THESE

NUMBERS, THE DATA FROM THE SCREENSHOTS, AND THEN PUT IT INTO A PROGRAM LIKE EXCEL.

ACTUALLY, I LIKE TO USE A DIFFERENT PROGRAM CALLED "MATLAB," JUST BECAUSE I USED IT A LOT IN COLLEGE. I'M KIND OF GEEKY.

BUT, ANYWAY, SO I PLUG IN THESE NUMBERS AND YOU CAN CREATE A PLOT OF WHAT THOSE NUMBERS ARE.

**Q** SO, BASICALLY, LET'S TALK ABOUT WHAT YOU ARE SHOWING RIGHT HERE. YOU HAVE RECEIVED A LOT OF DIFFERENT OSCILLOSCOPE SCREENSHOTS. IS THAT RIGHT?

**A** I DID. SO, LUCKILY, THEY CAME TOGETHER WITH FOUR SCREENSHOTS IN ONE PAGE, WHICH MADE IT A LOT EASIER TO LOOK AT. AND ALSO, THEY CAME WITH SOME LABELS, SO I KNOW WHAT THE CONDITION FOR THIS PARTICULAR SCREENSHOT WAS.

SO, THERE'S THE LOAD CONDITION OF ZERO MILLIAMPS, 15 MILLIAMPS, 30 MILLIAMPS, 45 MILLIAMPS.

AND SO, I KNOW WHAT EACH OF THOSE PLOTS CORRESPOND TO IN TERMS OF THE TEST SETUP.

(DOCUMENT DISPLAYED)

**A** AND THEN, WHAT WE ARE SHOWING HERE -- THERE IS A LOT THAT WE ARE NOT SHOWING HERE -- BUT IT GOES ALL AWAY UP TO 4.5 AND 5 AMPS. SO THAT COVERS A LOT OF DIFFERENT DATA POINTS.

IF YOU REMEMBER YESTERDAY -- I THINK IT WAS MR. CHUEH WHO SHOWED THAT THERE WERE ALL THESE DATA POINTS THAT HE COLLECTED.

SO HE HAD TO SIT IN FRONT OF THAT MACHINE FOR QUITE A BIT OF TIME AND CAPTURE ALL THESE DATA POINTS.

**Q** OKAY. SO WHY DON'T WE GO AHEAD AND TAKE A LOOK --

(DOCUMENT DISPLAYED)

**MR. POLLACK:** OBJECTION, YOUR HONOR.

**BY MS. ONDRICK:**

**Q** -- AT SOME OF THESE DATA POINTS. AND, DR. WEI, CAN YOU PUT THEM INTO A GRAPH AND ACTUALLY PLOT THE TEST RESULTS?

**A** SO, AS I HAD DESCRIBED, WHAT I CAN DO IS USE A PROGRAM LIKE EXCEL. I USED A PROGRAM CALLED "MATLAB."

AND WHAT YOU DO IS YOU CREATE A COLUMN OF NUMBERS THAT YOU PICK UP FROM THE SCREENSHOTS THAT CORRESPOND TO FEEDBACK VOLTAGE. WRITE ALL THOSE DOWN. AND THEN, I CAN ALSO GRAB THE -- I HAVE THE FREQUENCY NUMBERS FROM THE SCREENSHOTS. I'M LOOKING THROUGH EACH AND EVERY PAGE OF THE SCREENSHOTS, WRITE ALL THOSE DOWN IN A SECOND COLUMN.

AND THEN, I USE A TOOL LIKE MATLAB TO SAY: "OKAY. NOW, PLOT ME THE FREQUENCY NUMBERS VERSUS THE FEEDBACK NUMBERS."

**MR. POLLACK:** YOUR HONOR, OBJECTION. I MOVE TO STRIKE. RULE 26, BEYOND THE SCOPE.

**THE COURT:** THE GRAPH ITSELF MAY BE BEYOND THE SCOPE UNDER RULE 26.

YOU WERE ENDEAVORING TO LAY THE FOUNDATION FOR DX 44 -- DDX 442?

**MS. ONDRICK:** SURE, YOUR HONOR. YES.

11:07:36 **THE COURT:** WAIT. NO, I'M ASKING.

**MS. ONDRICK:** YES, YOUR HONOR.

**THE COURT:** OKAY. WELL, I DO HAVE SOME CONCERNS ABOUT THE TIMING OF ITS PRODUCTION, WHICH DOESN'T NECESSARILY 11:07:51 GO ONE WAY OR THE OTHER TO ITS VALIDITY, BUT WAS NOT AVAILABLE EARLIER.

SO AT LEAST FOR NOW I'M GOING TO SUSTAIN THE OBJECTION. WE MAY HAVE A BREAK ALONG THE WAY IF THERE'S ANYTHING ELSE ANYONE WANTS TO ADD TO THIS.

11:08:08 **MS. ONDRICK:** YOUR HONOR, CAN I REQUEST A SIDEBAR, BRIEFLY?

**THE COURT:** NO. WE CAN EITHER SEND THE JURY OUT, OR WE CAN KEEP GOING.

**MS. ONDRICK:** I WOULD REQUEST TO SEND THE JURY OUT, 11:08:19 PLEASE.

**THE COURT:** WELL, ALL RIGHT. LADIES AND GENTLEMEN, PLEASE TAKE A TEN-MINUTE BREAK.

(JURY EXCUSED)

(THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE 11:08:42 PRESENCE OF THE JURY)

**THE COURT:** ALL RIGHT. THE JURORS HAVE STEPPED OUT.

THE CONCERN HERE IS WHAT WAS REQUIRED TO BE DISCLOSED UNDER RULE 26. IF IT INCLUDED ANY DISPLAYS OF THIS NATURE, THAT WOULD BE ONE THING. I THINK THAT YOU AGREED TO EXCHANGE 11:08:59 DISPLAYS, HOWEVER, AT A LATER TIME.

11:09:01 HOWEVER, THIS IS NOT JUST A DEMONSTRATIVE. I THINK IT IS SOMETHING, PERHAPS, BEYOND THAT. THAT IS THE QUESTION.

HE CREATED DOCUMENTS OF THIS SORT FOR OTHER PURPOSES? OR THIS IS THE ONLY ONE?

11:09:15 **MR. POLLACK:** NO, YOUR HONOR. HE DID NOT CREATE ANY OF THE GRAPHS IN HIS REPORT.

**THE COURT:** WELL, EXCEL DID, OR WHATEVER HIS FAVORITE PROGRAM IS.

**MR. POLLACK:** NO, NO, NOT EXCEL. HE DID NOT

11:09:24 PERSONALLY CREATE ANY OF THE PLOTS IN HIS REPORT. HE RECEIVED THEM AS PLOTS. HE DIDN'T CREATE THEM.

**THE COURT:** FROM WHOM?

**MS. ONDRICK:** MR. CHUEH. MR. CHUEH PLOTTED THE SAME DATA.

11:09:36 **THE COURT:** OH, WELL, MR. CHUEH HASN'T TESTIFIED TO THIS.

**MR. POLLACK:** (SHAKES HEAD)

**THE COURT:** OKAY. I UNDERSTOOD FROM THIS WITNESS'S TESTIMONY, I WAS LED TO BELIEVE THAT HE TOOK ALL THOSE

11:09:44 FIGURES, AND PUT THEM INTO HIS FAVORITE PROGRAM.

**MS. ONDRICK:** HE DID. THERE'S TWO ISSUES, IF I MAY SET IT UP.

**THE COURT:** OKAY.

**MS. ONDRICK:** SO, DR. WEI'S REPORT CONTAINS PLOTS

11:09:58 THAT WERE PREPARED IN EXCEL, AND THEY APPEARED IN DR. WEI'S --

11:10:04 AN EXHIBIT TO DR. WEI'S REPORT.

**THE COURT:** YES. AND THOSE WERE DONE BY MR. CHUEH.

**MS. ONDRICK:** MR. CHUEH.

**THE COURT:** OKAY. HE HASN'T TESTIFIED TO THEM.

11:10:15 OKAY. THEN, YOU HAVE THIS PARTICULAR DOCUMENT. WAS IT CREATED IN THE SAME WAY?

(OFF-THE-RECORD DISCUSSION BETWEEN COUNSEL)

**THE COURT:** I'M JUST TRYING TO FIND OUT.

**MS. ONDRICK:** SO THESE WERE CREATED IN THE SAME WAY,

11:10:25 YES. THEY WERE PUT IN A PROGRAM THAT HAS -- ALLOWS YOU TO CREATE A PLOT BY ENTERING DATA.

**THE COURT:** OKAY.

**MS. ONDRICK:** EXCEL AND MATLAB ARE NO DIFFERENT IN THAT FUNCTIONALITY, WHATSOEVER.

11:10:39 **THE COURT:** YEAH. EITHER WAY, HE DIDN'T DO IT. ALL RIGHT? SO, I DON'T KNOW THAT HE IS ABLE TO TESTIFY BASED ON THIS PARTICULAR ITEM --

(OFF-THE-RECORD DISCUSSION BETWEEN COUNSEL)

**THE COURT:** -- BECAUSE IT'S NOT IN EVIDENCE. NOR WAS

11:10:51 THERE ANY FOUNDATION LAID FOR IT.

WHY ARE YOU POPPING UP, MR. WARREN? DID YOU WANT TO TALK TO MR. POLLACK?

**MR. WARREN:** (SHAKES HEAD)

**THE COURT:** NO? OKAY. ALL RIGHT.

11:11:00 **MS. ONDRICK:** THE PLOTS THAT MR. CHUEH PREPARED WERE

11:11:07 DONE AT DR. WEI'S INSTRUCTION, AND HE REQUESTED THEM.

**THE COURT:** HE REQUESTED THAT THIS PARTICULAR 442 DDX BE CREATED?

**MS. ONDRICK:** NO. HE REQUESTED THAT A DIFFERENT PLOT BE CREATED. AND I CAN --

11:11:18

**THE COURT:** OKAY. ALL RIGHT.

**MS. ONDRICK:** WELL, THERE ARE TWO POINTS --

**THE COURT:** OKAY.

**MS. ONDRICK:** -- I THINK WE NEED TO TALK ABOUT. THE FIRST --

11:11:26

**THE COURT:** HOW ABOUT THE FACT THAT YOU SHOWED ALL THE OTHERS TO THE OPPOSING PARTY IN DR. WEI'S REPORT AND NOT THIS ONE?

OKAY. THAT'S WHAT I UNDERSTAND THE MAIN OBJECTION TO BE HERE. IT'S A DISCOVERY OBJECTION.

11:11:37

**MS. ONDRICK:** CORRECT.

**THE COURT:** HE HAD THE OTHERS. HE DOESN'T HAVE THIS.

AND WHEN DID YOU GET THIS, MR. POLLACK?

**MR. POLLACK:** 3:00 A.M. THIS MORNING.

11:11:49 **THE COURT:** PARDON?

**MR. POLLACK:** I THINK IT WAS 3:00 A.M. THIS MORNING.

**THE COURT:** OKAY. YOU GOT IT THIS MORNING.

**MS. ONDRICK:** NO. HE'S HAD THESE SINCE THE DATE OF DISCLOSURE WHEN THEY WERE DUE.

11:11:59 THAT IS INCORRECT.

11:12:00 **THE COURT:** DON'T TALK TO MR. POLLACK. YOU CAN TALK TO THE COURT, BUT YOU ARE NOT TO ENGAGE IN CONVERSATION WITH OPPOSING COUNSEL.

**MR. POLLACK:** THE PARTICULAR VERSION THAT I WAS

11:12:07 OBJECTING TO WAS THE VERSION I RECEIVED THIS MORNING, WHERE THEY CHANGED SOME OF THE REFERENCES THAT ARE IN THE SLIDE.

THEY PROVIDED AN ORIGINAL VERSION A FEW DAYS AGO, WHICH WE ALSO OBJECTED TO.

**THE COURT:** OKAY. AND THIS ONE IS SOMEWHAT

11:12:22 DIFFERENT?

**MS. ONDRICK:** WE JUST ADDED THE CITES FOR THE EVIDENCE THAT WAS ADMITTED INTO THE RECORD YESTERDAY, YOUR HONOR.

**THE COURT:** ALL RIGHT. OKAY. ALL RIGHT. IF HE

11:12:33 WANTED TO SHOW WHAT WAS IN HIS REPORT, HAD YOU PLANNED TO OBJECT TO THOSE?

**MR. POLLACK:** NO. WELL, WE DIDN'T HAVE THEM, SO WE DIDN'T OBJECT TO THEM.

**THE COURT:** NO, NOT THESE.

11:12:44 **MR. POLLACK:** I KNOW.

**THE COURT:** THE ONES YOU DID HAVE, DIDN'T YOU HAVE THEM IN THE REPORT?

**MS. ONDRICK:** (NODS HEAD)

**MR. POLLACK:** WELL, WE HAVE THE REPORTS, YES.

11:12:51 **THE COURT:** AND AREN'T THERE GRAPHS OF SOME SORT

11:12:54 SIMILAR TO THIS, BUT NOT THIS ONE?

**MR. POLLACK:** THERE ARE SOME GRAPHS, YES.

**THE COURT:** ALL RIGHT. IF HE WANTED TO USE THOSE, WOULD YOU BE OBJECTING?

11:13:00 **MR. POLLACK:** NO, YOUR HONOR.

**THE COURT:** ALL RIGHT. SO IT'S PURELY A QUESTION OF DISCOVERY. RIGHT?

**MR. POLLACK:** IT IS, YOUR HONOR.

**THE COURT:** OKAY. HAD YOU QUESTIONED HIM AT HIS

11:13:10 DEPOSITION ABOUT THE OTHER GRAPHS?

**MR. POLLACK:** YES, I HAD.

**THE COURT:** OKAY. YOU HAVE NOT HAD AN OPPORTUNITY TO QUESTION HIM ABOUT THIS ONE (INDICATING).

**MR. POLLACK:** CORRECT, YOUR HONOR.

11:13:19 **THE COURT:** ALL RIGHT. OKAY. I AM INCLINED TO SUSTAIN THE OBJECTION UNDER RULE 26.

**MS. ONDRICK:** YOUR HONOR, THE DATA HAS BEEN PROVIDED. IT'S THE SAME DATA THAT THEY QUESTIONED HIM ON AT THE DEPOSITION. THE FACT THAT IT WASN'T PUT INTO A PRETTY GRAPH

11:13:37 FOR THEM IS NOT A RULE 26 VIOLATION.

**THE COURT:** WELL, IT MIGHT BE, DEPENDING ON WHAT THIS WITNESS SAYS. IT DOESN'T SOUND LIKE IT IS SOMEBODY JUST STICKING DOTS ON A PAGE; THAT THERE HAS TO BE SOME KIND OF A CALCULATION. I'M NOT SURE WHAT IT IS.

11:13:52 (OFF-THE-RECORD DISCUSSION BETWEEN COUNSEL)

11:13:53 **THE COURT:** WHAT WAS THE NATURE OF THE EXAMINATION THAT OCCURRED AT THE DEPOSITION REGARDING THE OTHER GRAPHS?

**MR. POLLACK:** YOUR HONOR, THE GRAPHS THAT WERE PROVIDED IN THE REPORT PLOT TWO DIFFERENT SETS OF DATA: 11:14:05 FREQUENCY VERSUS LOAD, FEEDBACK VOLTAGE VERSUS LOAD.

I ASKED DR. WEI: "WHY DON'T YOU HAVE ONE THAT'S FEEDBACK VERSUS FREQUENCY?"

HE SAID: "I DIDN'T ASK FOR THAT. THIS IS WHAT I ASKED FOR. THIS IS WHAT I GOT."

11:14:19 AND I SAID: "DID YOU GET THE UNDERLYING DATA FROM WHICH THESE WERE GENERATED?"

AND HE SAID: "NO, I DIDN'T ASK FOR THAT. I JUST HAD THE EXCEL."

THAT'S WHAT HIS TESTIMONY WAS IN HIS DEPOSITION. AND I 11:14:32 CAN GIVE YOU THE TESTIMONY, IF YOU WOULD LIKE.

**MS. ONDRICK:** I THINK WE SHOULD HAND THE TESTIMONY UP, BECAUSE THAT IS NOT THE FULL PICTURE.

**THE COURT:** WELL, WHAT DO YOU UNDERSTAND THE FULL PICTURE TO BE?

11:14:45 **MS. ONDRICK:** TWOFOLD. THAT THE REPORTS DO CONTAIN A PLOT LIKE THIS ONE (INDICATING). IF YOU CAN SEE, THIS IS FREQUENCY VERSUS LOAD.

THIS -- THIS IS THE TYPE OF PLOT -- THIS IS THE TYPE OF PLOT THAT'S IN THE REPORT.

11:14:55 SO, DR. WEI WAS QUESTIONED AT HIS DEPOSITION ABOUT PLOTS

11:15:00 LIKE THIS (INDICATING). AND THEN ASKED, "WELL, WHY DIDN'T YOU PREPARE A PLOT OF FREQUENCY VERSUS LOAD?"

AND HE ESSENTIALLY SAID: "I DIDN'T NEED TO. I CAN CORRELATE -- IF I KNOW THE LOAD, I KNOW THE FEEDBACK, I CAN 11:15:13 CORRELATE THE TWO, AND I KNOW THE RESULTS. AND I DIDN'T NEED IT."

THAT'S WHAT HE WAS SAYING. AND HE'D SAID THAT HE DID CHECK. YOU KNOW, WHEN YOU LOOK AT THE PLOTS THAT WERE IN THERE, HE LOOKED AT THE RAW DATA AND DETERMINED THAT THE PLOTS 11:15:24 WERE ACCURATE.

SO IT'S -- AND HE FURTHER STATED THAT IN FORMING HIS OPINIONS IN THIS CASE, HE RELIED ON THE RAW UNDERLYING DATA. AND THESE OPINIONS ALL DO GO TO WHETHER OR NOT THERE'S A FIXED SWITCHING FREQUENCY FOR A RANGE OF FEEDBACK VALUES.

11:15:41 TO SAY THIS IS A NEW OPINION, I DON'T UNDERSTAND THAT.

**THE COURT:** OKAY. WELL, I DON'T THINK THE ARGUMENT IS IT'S NEW OPINION. IT'S A NEW REPRESENTATION OF SOMETHING THAT MAY OR MAY NOT BE ACCURATE, I GATHER. AND HASN'T -- HASN'T BEEN EXPLORED. BUT WAS THAT ESSENTIALLY THE EXTENT OF 11:16:05 THE INQUIRY WITH RESPECT TO THE OTHER GRAPHS?

IN OTHER WORDS, THAT THEY REFLECTED UNDERLYING DATA, IN SOME FASHION? AND HE ASKED THAT THEY BE CREATED TO SHOW IT GRAPHICALLY?

**MS. ONDRICK:** YES. IF I RECALL THE TESTIMONY -- I 11:16:25 DON'T HAVE IT IN FRONT OF ME. BUT HE SAID: "I ASKED FOR" --

I BELIEVE IT WAS NUMBERS 5 AND 6 FROM HIS TEST INSTRUCTIONS.

AND HE SAID: "LOOK. THIS IS WHAT I ASKED FOR. HERE'S WHAT THEY GAVE ME. I DIDN'T NEED TO DO A FREQUENCY VERSUS KILOHERTZ" -- "A FREQUENCY VERSUS FEEDBACK TEST. THIS IS REPRESENTATIVE OF THE SAME THING. I CAN CORRELATE THE TWO. MY OPINIONS ARE BASED ON THAT."

**THE COURT:** YEAH, I GOT THAT. YEAH, I HEARD THAT.

DR. WEI, WHAT IS THIS EXHIBIT 442? I'LL JUST SHOW IT TO YOU, SIR.

**THE WITNESS:** OKAY.

(WITNESS EXAMINES DOCUMENT)

**THE COURT:** WHAT IS IT?

**THE WITNESS:** SO, YOUR HONOR, WHAT'S SHOWN HERE IS THE OUTPUT OF A GRAPHING TOOL WHERE YOU ENTER IN NUMBERS FOR THE X AXIS AND YOU ENTER IN NUMBERS FOR THE Y AXIS, AND THEN IT JUST PUTS THESE DOTS ON, YOU KNOW, ON THE CHART (INDICATING).

**THE COURT:** WHY IS IT ANY BETTER THAN DOING IT BY HAND?

**THE WITNESS:** OH, IT'S MUCH MORE -- IT'S MUCH FASTER THIS WAY.

I MEAN, IF I HAVE TO GET -- DRAW, TO GET GRAPH PAPER AND DO IT BY HAND, BECAUSE THERE IS NOT JUST ONE PLOT, BUT A NUMBER OF PLOTS, IT IS JUST MUCH EASIER TO DO IT USING A COMPUTER THAN TO DO IT BY HAND.

11:17:38 **THE COURT:** AND WHAT DOES THIS PARTICULAR EXHIBIT DEMONSTRATE, THAT YOU COULD NOT -- WELL, FIRST OF ALL, IF YOU WERE GOING TO DESCRIBE IT VERBALLY, WHATEVER THE RESULTS ARE, WHAT WOULD YOU BE SAYING?

11:17:49 **THE WITNESS:** IN TERMS -- SO, WHAT I WOULD BE SAYING IS IF YOU LOOK AT THIS CHART --

**THE COURT:** LET'S SAY YOU DIDN'T HAVE THE CHART.

**THE WITNESS:** OH, OKAY.

**THE COURT:** AND YOU JUST WANTED TO DESCRIBE THE

11:18:00 RESULT. WHAT WOULD YOU SAY?

**THE WITNESS:** WHAT I WOULD SAY IS IF YOU LOOKED AT ALL THE DATA ON ALL OF THE INDIVIDUAL SCREENSHOTS, AND YOU STEP THROUGH THEM ONE-BY-ONE AND YOU WERE TO LOOK AT THE FEEDBACK VALUE, AND YOU WERE TO LOOK AT THE FREQUENCY FOR ONE

11:18:15 SET OF -- ONE SCREENSHOT, AND YOU LOOK AT THE NEXT ONE, AND THEN YOU LOOKED AT THE NEXT ONE, AND THEN YOU LOOKED AT THE NEXT ONE, THAT THE FREQUENCY VARIES. IT'S GOT A MINIMUM VALUE. IT'S GOT A MAXIMUM VALUE. IT'S GOT AN AVERAGE VALUE.

AND THAT THEREFORE, IT IS MY OPINION THAT THE FREQUENCY

11:18:35 VARIES.

**THE COURT:** OKAY. AND THIS WOULD -- EACH SCREENSHOT IS REPRESENTING A DIFFERENT POINT IN TIME WITH THE SAME INPUT. IS THAT THE IDEA?

**THE WITNESS:** IT'S ACTUALLY REPRESENTING A -- THE

11:18:47 DATA POINTS THAT'S SHOWN IN THE GRAPH --

11:18:50 **THE COURT:** NO, FORGET THE GRAPH.

**THE WITNESS:** IT'S SHOWING THE DATA FOR DIFFERENT LOAD --

**THE COURT:** THIS ISN'T A SCREENSHOT. THIS IS

11:18:58 SOMETHING ELSE.

**THE WITNESS:** THIS IS A GRAPHICAL REPRESENTATION.

**THE COURT:** RIGHT. DON'T LOOK AT THAT WHEN WE ARE TALKING ABOUT THE SCREENSHOTS FOR A MINUTE.

**THE WITNESS:** OKAY.

11:19:05 **THE COURT:** THE SCREENSHOTS VARY. IN OTHER WORDS, SOMEBODY'S TAKING A SHOT OF WHAT'S SHOWN ON THE SCREEN AT A PARTICULAR POINT IN TIME.

**THE WITNESS:** RIGHT.

**THE COURT:** RIGHT?

11:19:14 **THE WITNESS:** RIGHT.

**THE COURT:** AND THE SAME CONDITIONS ARGUABLY PERTAIN. AND YET, THERE'S SOME VARIATION.

**THE WITNESS:** THE SCREENSHOT, SO --

**THE COURT:** FOR THE SAME INPUT OF SOME SORT.

11:19:27 **THE WITNESS:** SO EACH SCREENSHOT HAS A PARTICULAR INPUT SETTING.

**THE COURT:** RIGHT.

**THE WITNESS:** SO, FOR EXAMPLE, A LOAD CURRENT. AND THEN, THE NEXT SCREENSHOT HAS A DIFFERENT LOAD CURRENT

11:19:39 SETTING.

11:19:39 **THE COURT:** OKAY. SO THEY ARE VARYING WHEN YOU CHANGE THE INPUT.

**THE WITNESS:** RIGHT.

**THE COURT:** IS THAT RIGHT?

11:19:45 **THE WITNESS:** RIGHT.

**THE COURT:** OKAY. AND, THIS PARTICULAR GRAPH HAS TAKEN THE DIFFERENT TIMES -- WELL, THE DIFFERENT SCREENSHOTS, AND PLOTTED THE RESULTS?

**THE WITNESS:** PRECISELY.

11:19:58 **THE COURT:** OKAY. AND ARE THERE -- ARE THERE LARGE NUMBERS OF DOTS THAT SOMEBODY WOULD HAVE TO PUT ON BY HAND TO CREATE THIS?

**THE WITNESS:** YES.

**THE COURT:** IS THAT THE DIFFERENTIAL?

11:20:12 **THE WITNESS:** YES.

**THE COURT:** WHAT ARE WE TALKING ABOUT IN TERMS OF MAGNITUDE HERE?

**THE WITNESS:** SO WHAT I DID IS I LOOKED THROUGH EACH OF THE SCREENSHOTS --

11:20:18 **THE COURT:** NO. JUST HOW MANY DOTS WOULD YOU HAVE TO DO IF YOU HAD TO DO IT BY HAND?

**THE WITNESS:** LET'S SEE. THERE'S FIVE CHARTS, SO --

**THE COURT:** JUST TALKING --

**THE WITNESS:** MAYBE A HUNDRED.

11:20:27 **THE COURT:** OKAY, A HUNDRED. THAT'S NOT TOO BAD, BUT

11:20:29 A HUNDRED.

**THE WITNESS:** RIGHT.

**THE COURT:** OKAY. BUSY PROFESSOR, OKAY. DON'T HAVE TIME TO MAKE DOTS.

11:20:36 ALL RIGHT. NOW, SO THAT'S WHAT THIS IS?

**THE WITNESS:** YES.

**THE COURT:** IN OTHER WORDS, A COMPUTER HAS DONE WHAT YOU COULD DO BY HAND, IF SOMEBODY TOOK THE TIME -- YOU, IN PARTICULAR -- TO GO DOWN AND PUT IT ON A PIECE OF PAPER.

11:20:49 **THE WITNESS:** CORRECT.

**THE COURT:** ALL RIGHT. AND THE DIFFERENT COLORS REPRESENT WHAT, THEN, ON THAT PARTICULAR EXHIBIT?

**THE WITNESS:** THE DIFFERENT COLORS ARE JUST TO REPRESENT THE DIFFERENT SETS OF DATA THAT WERE FOUND ON A

11:21:01 SINGLE SCREENSHOT.

**THE COURT:** OKAY. EACH COLOR IS A SCREENSHOT. NO?

**THE WITNESS:** THE -- EACH COLOR IS -- ACTUALLY, THE DATA FOR EACH COLOR IS AVAILABLE IN EACH SCREENSHOT. SO --

**THE COURT:** OH, WELL, THEN, WHAT'S EACH COLOR?

11:21:15 **THE WITNESS:** SO IF YOU LOOK AT THE RED, IT CORRESPONDS TO THE MAXIMUM FREQUENCY OF A SINGLE SCREENSHOT THAT WE SEE HERE ON THE CHART (INDICATING).

SO THE RED WOULD CORRESPOND TO THESE NUMBERS (INDICATING). THE BLUE CORRESPONDS TO THE MEAN NUMBERS (INDICATING). AND

11:21:31 THEN, THE GREEN CORRESPONDS TO THE MIN NUMBERS (INDICATING).

11:21:37 **THE COURT:** IT'S TAKING ALL THE SCREENSHOTS AND RUNNING IT IN SOME WAY?

**THE WITNESS:** SO, IF I LOOK AT THE SCREENSHOT HERE, WHAT I CAN SEE FROM THAT IS THE VALUE FOR THE -- THE AVERAGE

11:21:50 VALUE, THE VOLTAGE IS TWO VOLTS, ROUGHLY. RIGHT?

**THE COURT:** OKAY.

**THE WITNESS:** AND IF I LOOK HERE THAT MEANS IT IS TWO VOLTS HERE (INDICATING). SO I'M PLOTTING THE THREE POINTS THAT CORRESPOND TO THE MINIMUM, THE MAXIMUM, AND THE MEAN

11:22:06 FREQUENCY.

SO I'M TAKING A SET OF DATA FROM THAT SCREENSHOT, AND GIVING -- AND PLOTTING THESE THREE POINTS. AND THEN, I'M TAKING ANOTHER SCREENSHOT, PLOTTING THESE THREE POINTS. AND I KEEP ON GOING SCREENSHOT BY SCREENSHOT.

11:22:25 **THE COURT:** IS THIS THE SAME TECHNIQUE THAT WAS DESCRIBED IN CONNECTION WITH EARLIER EXHIBITS OF A SIMILAR NATURE?

**THE WITNESS:** YES. SO THE -- THE WAY WE -- THE WAY THAT THE ORIGINAL PLOTS THAT MR. CHUEH PROVIDED TO ME

11:22:43 ESSENTIALLY TOOK THE NUMBERS FROM THE SCREENSHOTS AND PLOTTED THEM ONTO A PLOT. I JUST REDID THEM.

**MR. POLLACK:** ACTUALLY, DIFFERENT NUMBERS. DIFFERENT PLOTS.

**THE COURT:** BUT FOR THIS PARTICULAR FUNCTION, I

11:23:00 THOUGHT THEY HADN'T DONE ANY, FOR THIS PARTICULAR --

**MR. POLLACK:** CORRECT, YOUR HONOR. THAT'S WHAT I'M SAYING. THAT THIS PARTICULAR RELATIONSHIP WAS NEVER PLOTTED BEFORE.

**THE COURT:** NO, I UNDERSTAND THAT. OKAY. WELL, IT'S A LITTLE BIT MORE COMPLICATED BECAUSE IT ISN'T LIKE ONE SCREENSHOT IS BEING SHOWN ON THERE. YOU'RE TAKING A WHOLE COMPILATION OF SCREENSHOTS.

BUT WAS THAT WHAT WAS DONE FOR THE OTHER CHARTS, AS WELL?

**THE WITNESS:** CORRECT.

**THE COURT:** OKAY. AND YOU -- DID YOU TESTIFY THAT AT YOUR DEPOSITION? DID ANYBODY ASK YOU ABOUT IT?

**THE WITNESS:** MY RECOLLECTION IS THAT MR. POLLACK ASKED ME: "THERE'S -- THERE IS THESE TWO PLOTS. AND WHY DIDN'T YOU ASK FOR A THIRD PLOT?"

AND MY RESPONSE WAS: "ACTUALLY, IF YOU LOOK AT THESE TWO PLOTS, THE THIRD PLOT IS JUST A COMBINATION -- IT IS A SIMPLE COMBINATION OF THESE TWO PLOTS. SO IT WASN'T NECESSARY FOR ME TO ASK FOR AN ADDITIONAL PLOT BECAUSE I CAN EXTRACT THE SAME INFORMATION, I CAN GET THE THIRD PLOT WITHOUT HAVING TO ASK FOR IT."

**THE COURT:** OKAY. WELL, IT IS A LITTLE MORE COMPLICATED THAN JUST PUTTING DOTS ON A BOARD.

WHAT WOULD THIS HELP THE JURY TO SEE?

**THE WITNESS:** INSTEAD OF HAVING TO LOOK AT AND REMEMBER EACH NUMBER FROM 20 SCREENSHOTS, IT PUTS IT ALL

11:24:27 TOGETHER INTO ONE GRAPHIC.

AND SO, WE COULD STEP THROUGH IT ONE-BY-ONE, I SUPPOSE. AND SAY, "OKAY, RECALL FOR THIS VOLTAGE, THE FREQUENCY IS 60, THEN REMEMBER, RECALL NOW THAT FOR THIS NEW VOLTAGE, 2.1, THE 11:24:47 FREQUENCY IS 62," AND KEEP ON GOING AND KEEP ON GOING UNTIL WE HAVE COVERED ALL OF THE SCREENSHOTS.

AND THEN, SAY: "SO, LADIES AND GENTLEMEN, REMEMBER THAT FOR THE RANGE OF FEEDBACK VOLTAGES THAT I JUST PRESENTED TO YOU, THE FREQUENCY WAS NOT A SINGLE NUMBER, BUT IT WAS, YOU 11:25:06 KNOW, MULTIPLE NUMBERS."

**THE COURT:** OKAY. NOW, IS THERE A REASON WHY YOU'RE NOT PUTTING IN WHAT MIGHT BE CONSIDERED THE BASIS FOR THIS PARTICULAR CHART, MS. ONDRICK?

IN OTHER WORDS, THIS IS CREATED. THERE ARE OTHER CHARTS 11:25:21 THAT SHOW INDIVIDUAL ASPECTS THAT HAVE THEN BEEN COMBINED IN THIS CHART. IS THAT RIGHT OR NOT?

**THE WITNESS:** MAY I RESPOND?

**THE COURT:** YES.

**THE WITNESS:** SO, I BELIEVE THAT'S WHAT WE SPENT ALL 11:25:33 OF YESTERDAY DOING; ALL THE SCREENSHOTS THAT WERE ENTERED INTO EVIDENCE.

**THE COURT:** OKAY. OKAY. LAST WORDS ON THIS, ONE WAY OR THE OTHER, MR. POLLACK?

**MR. POLLACK:** SO, YOUR HONOR, I HAVE THE TRANSCRIPT. 11:25:51 I DO WANT TO HAND IT UP, BECAUSE --

11:25:54 **THE COURT:** OKAY.

**MR. POLLACK:** -- AGAIN, THIS IS -- THE WHOLE POINT IS ADEQUATE DISCLOSURE, ADEQUATE ABILITY TO FIGURE OUT WHAT'S REALLY GOING ON AND TO BE ABLE TO PROBE THAT.

11:26:04 AND, THIS IS FROM DR. WEI'S TRANSCRIPT IN SEPTEMBER.

THE DISCUSSION STARTS AT PAGE 139, AT LINE 12, WHERE I ASK HIM, THERE'S NO INSTRUCTION TO DO THIS TYPE OF PLOT. AND THEN, WE HAVE THIS DISCUSSION.

AND THEN I ASK HIM:

11:26:24 "YOU DIDN'T RELY ON THE UNDERLYING DATA OF THE MEASUREMENTS. YOU RELIED WHAT'S SHOWN IN THESE PLOTS, RIGHT?

"I RELIED ON THE DATA WHICH IS REPRESENTED BY THE PLOTS. I MEAN, WE HAVE ALL PLOTTED EXCEL. WE KNOW
11:26:37 WHAT THEY MEAN. BUT THE DATA THAT'S..."

I SAID:

"I WANT TO MAKE SURE I UNDERSTAND, YOU EVALUATED THESE PLOTS..."

**THE COURT:** OKAY. BUT AT THIS POINT, THE REPORTER
11:26:45 CAN'T TELL WHO'S TALKING WHEN.

**MR. POLLACK:** I'M SORRY. WHY DON'T I JUST HAND IT UP, YOUR HONOR?

**THE COURT:** ALL RIGHT. DO YOU WANT TO HAND IT TO ME AND JUST TELL ME THE LINES YOU WOULD LIKE ME TO LOOK AT?

11:26:56 **MR. POLLACK:** YES. I WOULD LIKE YOU TO READ FROM

11:26:58 PAGE 139, LINE 12, SO YOU HAVE THE WHOLE DISCUSSION.

**THE COURT:** OKAY.

**MR. POLLACK:** TO 142, LINE 21.

**THE COURT:** OKAY.

11:28:20 (DOCUMENT HANDED UP TO THE COURT)

(THE COURT EXAMINES DOCUMENT)

**THE COURT:** IF YOU HAD HAD AN OPPORTUNITY TO HAVE THIS EARLIER, WHAT TYPES OF QUESTIONS WOULD YOU ASK THE WITNESS, MR. POLLACK? OR WOULD YOU HAVE ASKED HIM?

11:28:48 **MR. POLLACK:** WHAT I COULD HAVE ASKED IS, IS BASICALLY WHERE THE DATA COME FROM, YOU KNOW: "WHAT'S YOUR UNDERSTANDING OF HOW IT WAS GENERATED?"

YOU KNOW, WHAT -- THE ISSUE WAS EXCEL VERSUS MATLAB. THE INTERPOLATION OF THE DATA IS DIFFERENT. YOU SEE VERY 11:29:06 DIFFERENT REPRESENTATIONS OF IT.

I COULD HAVE EXPLORED THE FOUNDATION FOR WHAT IT WAS --

**THE COURT:** OKAY.

**MR. POLLACK:** -- AND --

**THE COURT:** ALL RIGHT. I'M GOING TO HAND THIS 11:29:16 TRANSCRIPT BACK TO YOU.

(DOCUMENT HANDED DOWN)

**THE COURT:** I CAN JUST SAY THAT IT APPEARS TO ME THAT IF SOMEBODY WANTED TO ADD THIS TO THE OPINION OF THE WITNESS, IT WOULD HAVE BEEN PREFERABLE TO ADD IT BY EITHER SOME 11:29:33 REQUESTED AMENDMENT TO A REPORT. OR OTHERWISE? BUT THAT

11:29:35 WASN'T DONE. SO, AT THIS POINT, I'M GOING TO SUSTAIN THE OBJECTION TO USING THE GRAPH.

**MS. ONDRICK:** CAN I RAISE ONE MORE POINT, YOUR HONOR?

**THE COURT:** OKAY.

11:29:46 **MS. ONDRICK:** SO UNDER FEDERAL RULE OF EVIDENCE 1006, A PROPONENT MAY USE SUMMARIES TO PROVE CONTENT OR CALCULATIONS THAT ARE OTHERWISE TOO VOLUMINOUS TO BE PROVEN.

WE HAVE ALL OF THAT HERE. WE HAVE ALL THIS DATA.

**THE COURT:** OKAY. THIS IS NOT A SUMMARY. THIS IS A 11:30:01 PICTURE. THAT'S DIFFERENT. AND IT CAN HAVE A VERY PERSUASIVE FORCE.

AS THEY SAY, A PICTURE'S WORTH A THOUSAND DOTS. AND WORDS.

AND IN THIS INSTANCE, IT WOULD SEEM TO ME THAT IT WOULD BE 11:30:17 APPROPRIATE TO HAVE GIVEN THE PARTICULAR DOCUMENT TO COUNSEL EARLIER. IT MAY ONLY BE USED HERE AS A DEMONSTRATIVE OR OFFERED AS A DEMONSTRATIVE. BUT THIS IS, IN FACT, ESSENTIALLY EVIDENCE.

AND IT REALLY ISN'T IN ANY WAY DISTINGUISHABLE FROM THAT. 11:30:37 AND UNDER THE CIRCUMSTANCES, I'M GOING TO SUSTAIN THE OBJECTION.

**MS. ONDRICK:** OKAY. THEN, YOUR HONOR, ONE THING WE HAVE DISCUSSED WITH COUNSEL IS THAT THEY HAVE ALLOWED THE FREQUENCY VERSUS LOAD PLOTS (INDICATING).

11:30:46 AND WE HAVE THOSE AS PLOTS THAT WE COULD SUBSTITUTE IN FOR

11:30:50 THE PRESENTATION THEN. AND I -- I UNDERSTAND THAT THEY WOULD NOT HAVE AN OBJECTION TO USING THOSE.

**THE COURT:** YEAH. THAT WAS WHAT I WAS ASKING EARLIER.

11:31:00 **MS. ONDRICK:** YES.

**MR. POLLACK:** IF YOU USE THE ONES FROM THE REPORT --

**THE COURT:** WAIT. DO NOT TALK TO MS. ONDRICK. ALL RIGHT?

**MR. POLLACK:** I AM SORRY, YOUR HONOR.

11:31:06 **THE COURT:** WE ARE NOT AT DEPOSITION. WE ARE IN A TRIAL. WE ARE ON RECORD. I DON'T KNOW HOW MANY TIMES I HAVE TO SAY THIS FOR PEOPLE WHO I'M SURE WERE AT THE TOP OF THEIR CLASS AT THEIR RESPECTIVE LAW SCHOOLS. SO, IT'S A PRETTY SIMPLE POINT.

11:31:18 OKAY. DO YOU WANT TO TRY THAT AGAIN?

**MR. POLLACK:** YOUR HONOR --

**THE COURT:** YOU JUST WON THIS PARTICULAR ARGUMENT. OKAY.

**MR. POLLACK:** WHAT I SAID AND WHAT I AGREE TO IS IF

11:31:24 THEY USE THE PLOTS FROM THE REPORT THAT WE HAD THE OPPORTUNITY TO EXPLORE WITH THE WITNESS, I DON'T HAVE AN OBJECTION TO THAT.

**THE COURT:** FINE.

**MR. POLLACK:** I DON'T BELIEVE THAT WHAT MS. ONDRICK

11:31:32 IS NOW HOLDING IS SUCH A PLOT.

11:31:35 **THE COURT:** OH.

**MR. POLLACK:** THAT'S --

**THE COURT:** OKAY. DO YOU HAVE ANYTHING THAT ALREADY GAVE THEM THAT YOU WANT TO USE?

11:31:44 **MS. ONDRICK:** I DO. BUT THEY HAVEN'T OBJECTED TO THIS ONE (INDICATING), SO I'M A LITTLE CONFUSED.

**THE COURT:** CAN YOU LOOK AT WHATEVER SHE IS SHOWING THERE, MR. POLLACK?

AND, APPARENTLY, BASED ON SOME EARLIER CONVERSATION,
11:31:55 MS. ONDRICK BELIEVES YOU DID NOT HAVE AN OBJECTION TO THIS DOCUMENT.

(MR. POLLACK EXAMINES DOCUMENT)

**MR. POLLACK:** OKAY. THE CONVERSATION, AT LEAST FROM OUR SIDE, IS UNDERSTOOD THAT YOU HAVE SOMETHING LIKE THIS
11:32:06 (INDICATING) FROM THE REPORT. THAT'S WHAT WE --

**THE COURT:** OKAY.

**MR. POLLACK:** THIS IS --

**THE COURT:** EXCUSE ME.

DO YOU HAVE SOMETHING LIKE THAT FROM THE REPORT,
11:32:13 MS. ONDRICK?

**MS. ONDRICK:** WE DO.

**THE COURT:** COULD YOU USE THAT?

**MS. ONDRICK:** WE CAN DO THAT, YES. BUT WE WILL NEED A FEW MINUTES TO FIX THE SLIDES.

11:32:20 **THE COURT:** OKAY. THAT'S FINE. NOW, IT IS 11:30.

11:32:23 WE CAME BACK HERE AT AROUND 10:20 OR SO, I THINK.

COULD YOU HELP ME OUT ON THAT, MS. LUCERO?

**THE CLERK:** THAT'S CORRECT, YOUR HONOR.

**THE COURT:** OKAY. SHE SAYS I'M CORRECT. ALL RIGHT.
11:32:33 SO, WE HAVE BEEN HERE FOR ABOUT AN HOUR, I GUESS. A LITTLE MORE, ABOUT AN HOUR AND TEN MINUTES.

**MS. ONDRICK:** UH-HUH.

**THE COURT:** SO IF WE TOOK A BREAK NOW FOR YOU TO GET WHATEVER YOU WERE GOING TO GET -- IN OTHER WORDS, WE JUST TOOK
11:32:48 15 MINUTES NOW, THEN IT WOULD BE A QUARTER TO 12:00, AND -- WELL, THAT DOESN'T REALLY WORK.

WHY DON'T YOU JUST GET SET UP? WE WILL TELL THE JURY TO TAKE FIVE MINUTES. WE WILL GO TO 12:00, AND WE WILL TAKE A BREAK.

11:33:04 **MS. ONDRICK:** OKAY.

**THE COURT:** OKAY. ALL RIGHT. IF YOU WANT TO STAND DOWN AND --

**MS. ONDRICK:** I'LL GO AHEAD AND GET --

**THE COURT:** -- NOT BE ON DISPLAY, DR. WEI, THAT'S
11:33:11 FINE.

**THE WITNESS:** THANK YOU, YOUR HONOR.

**THE COURT:** OKAY. FIVE MINUTES.

(RECESS TAKEN FROM 11:30 TO 11:40 A.M.)

(THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE
11:42:19 PRESENCE OF THE JURY)

11:42:19 **THE CLERK:** COME TO ORDER.

**THE COURT:** ALL RIGHT.

(THE FOLLOWING PROCEEDINGS WERE HELD IN THE PRESENCE OF THE JURY)

11:42:51 **THE CLERK:** PLEASE BE SEATED.

**THE COURT:** ALL RIGHT. WELL, SO MUCH FOR THE TEN-MINUTE BREAK, LADIES AND GENTLEMEN.

THAT WAS OBVIOUSLY NOT AN ACCURATE ESTIMATE. HOLD ON FOR JUST ONE MOMENT.

11:43:01 MS. LUCERO, COULD I SEE YOU QUICKLY?

(OFF-THE-RECORD DISCUSSION BETWEEN THE COURT AND CLERK)

**THE COURT:** OKAY. PLEASE CONTINUE, MS. ONDRICK.

**BY MS. ONDRICK:**

**Q** SO DR. WEI, LET'S TAKE A LOOK AT THESE SCREENSHOTS ONE MORE TIME.

11:43:23

**A** OKAY.

**Q** SO IF WE LOOK AT ALL THE DATA THAT'S OUTPUT WITH THE OSCILLOSCOPE TO SCREENSHOT CAPTURE, CAN WE PLOT THAT DATA IN A MEANINGFUL WAY?

11:43:42 **A** YES. SO WHAT WE CAN DO IS -- WELL, THERE'S DIFFERENT WAYS IN WHICH YOU CAN PLOT THE DATA IN TERMS OF WHAT YOU PUT ON THE X AXIS, WHAT YOU PUT ON THE Y AXIS.

SO IF WE WERE ACTUALLY TO GO TO THAT OTHER SLIDE WITH ALL FOUR.

11:43:58 (DOCUMENT DISPLAYED)

11:43:59 **A** ONE THING WE CAN DO IS PLOT THE FREQUENCY VALUES ON THE Y AXIS WITH RESPECT TO THE DIFFERENT LOAD CONDITIONS, WHICH IS THE CURRENT, THE LOAD CURRENT. AND THEN, WE CAN, THEREFORE, TAKE THE -- I THINK IT'S MAYBE 30 PAGES OR SO OF DATA, AND

11:44:17 THEN PUT IT ONTO A PLOT.

(DOCUMENT DISPLAYED)

**Q** AND ARE WE SHOWING A PLOT LIKE THAT HERE?

**A** YES. SO WHAT WE SEE HERE IS WITH RESPECT TO DIFFERENT LOAD CURRENT VALUES, WE NOTICE THAT THE MAXIMUM FREQUENCY OF

11:44:33 SWITCHING, THE MEAN OR AVERAGE FREQUENCY OF SWITCHING AND THE MINIMUM FREQUENCY OF SWITCHING -- AND I THINK THE COLORS WERE FLIPPED HERE (INDICATING). BUT THE MAXIMUM, AVERAGE AND MINIMUM FREQUENCY OF SWITCHING FOR THE -- IN THIS CASE, THE SG5841J, YOU CAN SEE THAT THE FREQUENCY IS VARYING.

11:44:53 IT'S GOING FROM MINIMUM TO A MAXIMUM, AND EVERYWHERE IN-BETWEEN.

**Q** SO WOULD YOU HAVE THIS MINIMUM AND MAXIMUM BECAUSE OF JITTER?

**A** YES. WE KNOW FOR THE 5841J IF YOU LOOK IN THE DATASHEET

11:45:09 THERE IS THIS REFERENCE TO THE HOPPING RANGE OF THE FREQUENCY. AND IT SHOWS TYPICALLY PLUS OR MINUS 4.2 KILOHERTZ.

AND IF YOU LOOK, IT IS PLUS OR MINUS FOUR OR FIVE KILOHERTZ. SO THE RESULTS ARE CONFIRMING WHAT THE DATASHEET IS SAYING IN TERMS OF HOW THE FREQUENCY VARIES.

11:45:32 (DOCUMENT DISPLAYED)

11:45:33 **Q** IF WE GO BACK ONE SLIDE FOR A SECOND, IS THIS THE JITTER BEING DISPLAYED ON THE OSCILLOSCOPE, ITSELF?

**A** YES. SO IF YOU LOOK AT THIS PARTICULAR PLOT -- AND I DON'T KNOW IF YOU RECALL, BUT YESTERDAY THERE WAS THAT 11:45:45 ACCUMULATOR FUNCTION WHERE INSTEAD OF JUST TAKING A SINGLE SNAPSHOT OF THE WAVEFORM, WHAT YOU CAN DO IS HAVE THE EQUIPMENT KEEP THE PRIOR WAVEFORMS. AND SO YOU KIND OF ACCUMULATE. IT IS ALSO CALLED "PERSISTENCE MODE" IN OTHER TOOL -- OR OTHER OSCILLOSCOPE, BY OTHER -- IN OTHER TYPES OF 11:46:05 OSCILLOSCOPES.

AND, ESSENTIALLY, WHAT WE ARE SEEING HERE IS NOW THE MULTIPLE WAVEFORMS ARE OVERLAID ON TOP OF EACH OTHER. AND SO WHAT YOU CAN SEE IS THAT THERE'S THAT BLUR. AND THAT IS DEMONSTRATING THE FREQUENCY JITTER OR THE FREQUENCY HOPPING.

11:46:20 (DOCUMENT DISPLAYED)

**Q** LET'S TAKE A LOOK AT THE SG5841, IF WE COULD.

**A** OKAY.

**Q** WHAT ARE YOU SHOWING HERE WITH THIS PLOT?

**A** SO THIS IS A PLOT THAT'S SIMILAR TO THE ONE WE JUST SAW 11:46:31 BEFORE WHERE ON THE X AXIS WE HAVE THE LOAD CURRENT, AND ON THE Y AXIS WE HAVE THE FREQUENCY OF THE SWITCH, AND THE KILOHERTZ RANGE?

AND WE NOTICE THAT AS THE LOAD CURRENT INCREASES, THE FREQUENCY KEEPS ON INCREASING. AND THERE'S A SHARP SLOPE IN 11:46:49 THE BEGINNING AND THEN IT KIND OF TAILS OFF A LITTLE BIT.

11:46:53 BUT IF YOU ACTUALLY LOOK AT THE DATA FROM THE SCREENSHOTS YOU WILL AGAIN SEE THAT THERE IS THIS FREQUENCY VARIATION.

(DOCUMENT DISPLAYED)

**Q** AND SO IF WE LOOK AT THE FAN103, WHAT IS THIS PLOT SHOWING?

11:47:08

**A** SO THE FAN103, AGAIN, IS ANOTHER PART, AND ESSENTIALLY SHOWING THE SAME THING HERE, WHERE IF YOU HAVE -- FOR THE DIFFERENT LOAD CURRENT CONDITIONS, THE FREQUENCY -- AND YOU MEASURE THE FREQUENCY. AND HERE, BECAUSE WE HAVE THAT 11:47:22 FREQUENCY HOPPING, THERE IS A MINIMUM FREQUENCY, A MAXIMUM FREQUENCY.

SO WE KNOW THAT THE FREQUENCY IS HOPPING AROUND BETWEEN THAT MIN AND MAX. AND THEN, THERE'S ALSO THAT MEAN FREQUENCY, WHICH IS THE AVERAGE OF ALL OF THE FREQUENCIES THAT ARE 11:47:36 HOPPING AROUND.

**Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** NOW, LET'S GO TO THE SG6841. WHAT IS THIS PLOT SHOWING?

**A** THE SG6841 IS YET ANOTHER PART. AND ACROSS THE LOAD 11:47:49 CURRENTS WHAT WE SEE IS THAT THE FREQUENCY IS VARYING. IT -- FOR LOW LOAD CURRENTS IT STARTS OUT AT A RELATIVELY LOW FREQUENCY, AND THEN IT RISES.

AND, BASICALLY, AGAIN, YOU KNOW, WHAT'S SHOWING HERE -- WHAT'S SHOWN HERE IS THE AVERAGE FREQUENCY NUMBER THAT WAS 11:48:07 CAPTURED FROM THE OSCILLOSCOPE. AND IF YOU LOOK AT THE RAW

11:48:09 DATA, AND IF YOU WERE ACTUALLY TO LOOK AT THE NUMBERS ON THIS OSCILLOSCOPE, YOU WILL AGAIN SEE THAT THERE IS SOMETHING CALLED A "STANDARD DEVIATION" WHERE THE FREQUENCY IS STILL KIND OF MOVING AROUND LITTLE BY LITTLE AS THE DEVICE IS

11:48:23 OPERATING.

**Q** SO THE FREQUENCY IS VARYING IN EACH OF THESE PLOTS.

**A** CORRECT.

(DOCUMENT DISPLAYED)

**Q** SO HERE YOU HAVE CALLED OUT JITTER, SPECIFICALLY. I GUESS

11:48:33 WE HAVE TALKED ABOUT SOME DIFFERENT KINDS OF FREQUENCY VARIATION IN THE FAIRCHILD PRODUCTS.

**A** YEAH.

**Q** WHY ARE WE SINGLING OUT JITTER HERE?

**A** I THOUGHT IT MIGHT BE ILLUSTRATIVE TO SPEND A LITTLE BIT

11:48:43 OF TIME TALKING ABOUT JITTER YET AGAIN, ALTHOUGH WE HAVE BEEN TALKING ABOUT IT A LOT, THIS NOTION OF FREQUENCY HOPPING. BECAUSE IF YOU LOOK AT THE TWO REPRESENTATIVE PRODUCTS, JITTER WAS ADDED IN AS INTENTIONAL. RIGHT? IT WAS PURPOSEFUL VARYING OF THE FREQUENCY.

11:49:01 **Q** NOW, IN DR. KELLEY'S WORLD, AND IN HIS VIEW OF THE CLAIM LANGUAGE IN THE COURT'S CONSTRUCTION, JITTER IS IRRELEVANT.

**A** THAT IS HOW I UNDERSTAND IT. ACCORDING TO DR. KELLEY FROM WHAT I HEARD LAST WEEK, HE SAID, YES, THERE IS THIS THING CALLED "FREQUENCY JITTER" OR "FREQUENCY HOPPING." BUT FOR THE

11:49:22 PURPOSES OF THIS PATENT, HE SAYS IT DOESN'T MATTER. AND SO

11:49:24 WHAT I'M SAYING HERE IS IT ACTUALLY DOES MATTER. THIS IS WHAT WAS IN THE PRODUCTS. THIS WAS DONE INTENTIONALLY. AND BECAUSE OF THIS, FREQUENCY VARIES.

**Q** OKAY.

11:49:33 (DOCUMENT DISPLAYED) AND SO HERE WE GO

**Q** AND SO HERE WE GO. THIS IS THE FAN103 PRODUCT AT DX 3107.

**A** YES. WE HAVE ALREADY SEEN THIS, SO, AGAIN, LET'S JUST REFRESH OUR MEMORY VERY QUICKLY.

THE FAN103, IN THE SECTION THAT TALKS ABOUT FREQUENCY 11:49:48 HOPPING, WHAT IS SHOWING, AS WE SAW IN ONE OF THE OTHER DEMONSTRATIVES BEFORE, IS THAT THAT FREQUENCY IS NOT STAYING AT A SINGLE VALUE, BUT IT'S GOING UP. IT'S GOING DOWN. IT'S GOING UP. AND IT'S GOING DOWN.

AND THAT'S JUST THE WAY THAT THESE PRODUCTS OPERATE.

11:50:02 **Q** AND IF WE LOOK, THAT'S A PRETTY BIG FREQUENCY VARIATION. THAT IS 6,000 HERTZ, ISN'T IT?

**A** IT IS, BECAUSE IT IS INTENTIONAL. THERE IS A PURPOSE OF DOING THIS IN THESE PRODUCTS.

**Q** THANK YOU, DR. WEI.

11:50:21 (DOCUMENT DISPLAYED)

**Q** AND HERE IS A LITTLE MORE THAT WE HAVE FROM THE FAN103 DATASHEET, AS WELL.

**A** YEAH. IT IS JUST KIND OF RECONFIRMING THAT FREQUENCY HOPPING EXISTS.

11:50:29 **Q** AND THEN, IF WE MOVE ON TO THE SG5841J.

(DOCUMENT DISPLAYED)

**Q** THAT STANDS FOR "JITTER," RIGHT?

**A** SO --

**Q** WHAT ARE YOU SHOWING HERE?

**A** -- AS WE HAVE BEEN HEARING, THERE IS 5841, 5841J. AND THAT "J" STANDS FOR "JITTER." AND THAT JITTER WE HAVE BEEN TALKING ABOUT IS FREQUENCY HOPPING. AND ALL I'M SHOWING HERE IS THAT THERE IS THIS FREQUENCY VARIATION THAT EXISTS BECAUSE OF THAT FREQUENCY HOPPING.

AND THERE IS DATA IN THE DATASHEET THAT DESCRIBES KIND OF HOW IT'S -- HOW IT PERFORMS.

(DOCUMENT DISPLAYED)

**Q** AND THIS IS JUST ANOTHER ONE OF THOSE JITTER SLIDES WE HAVE ALREADY SEEN.

**A** YES.

(DOCUMENT DISPLAYED)

**Q** SO CAN YOU TELL US WHAT YOU ARE SHOWING HERE? YOU HAVE GOT SWITCHING FREQUENCY OVER TIME PLOTTED.

**A** SO, WHAT I'M SHOWING HERE IS KIND OF ANOTHER WAY TO REPRESENT THE DATA THAT'S BEEN COLLECTED. I DON'T KNOW IF YOU RECALL, BUT WHAT YOU CAN DO ON THE OSCILLOSCOPE IS YOU CAN KIND OF ZOOM OUT. INSTEAD OF ZOOMING IN, YOU CAN ZOOM OUT AND SEE A LOT OF CYCLES. OKAY?

AND THEN, WHAT YOU CAN DO IS GO TO MAYBE -- LET'S SAY THE TENTH CYCLE. MEASURE WHAT THE PERIOD OF THE SWITCHING IS

THERE.

AND THEN, YOU CAN GO TO, LET'S SAY, THE 50TH CYCLE. MEASURE THAT TIME PERIOD, AND KIND OF DO IT ACROSS A BIG COLLECTION OF CYCLES. OKAY?

AND SO WHAT'S PLOTTED HERE IS THE FREQUENCY OF ONE PERIOD HERE, THE FREQUENCY OF ANOTHER PERIOD THERE, OVER TIME. BECAUSE BEFORE WE WERE JUST LOOKING AT SNAPSHOTS IN TIME. BUT NOW LET'S LOOK AT WHAT THE FREQUENCY IS DOING OVER, YOU KNOW, ACROSS A PERIOD OF TIME.

AND SO, WHAT'S SHOWN HERE IS THAT THE X AXIS IS TIME. AND THE Y AXIS IS DEMONSTRATING THAT THE FREQUENCY IS MOVING AROUND, UP AND DOWN, UP AND DOWN.

AND THAT'S BECAUSE, FOR THESE TWO PARTS ESPECIALLY, ITS FREQUENCY HOPPING IS IN THERE, SO YOU ARE SEEING THAT FREQUENCY HOPPING IN ACTION IN TIME THROUGH THIS PLOT.

**Q** NOW, YOUR PLOTS DIDN'T CALCULATE THE DATA OVER A FULL SECOND. IS THAT CORRECT?

**A** THE PLOTS DO NOT CALCULATE THE DATA OVER A FULL SECOND. WHAT I'M SHOWING IS UP TO 6.5 MILLISECONDS AND NOT A FULL SECOND.

WHAT IT'S SHOWING IS THE FREQUENCY OF A SWITCHING CYCLE, SWITCHING CYCLE, SWITCHING CYCLE.

**Q** IF YOU HAD PLOTTED THE SWITCHING CYCLES OVER ONE SECOND, WOULD IT HAVE CHANGED YOUR OPINION?

**A** ACTUALLY, IT WOULD HAVE NOT HAVE CHANGED MY OPINION. IT

11:53:05 WOULD HAVE JUST TAKEN A LOT LONGER TO BE ABLE TO COLLECT THAT DATA.

BUT, EFFECTIVELY, IF YOU HAVE THIS -- IF YOU WERE TO TAKE A ONE-SECOND WINDOW AND SLIDE IT ACROSS, AND COMPUTE THIS, YOU 11:53:18 WOULD ALSO, AGAIN, SEE THESE VARIATIONS.

**Q** OKAY. NOW, LET'S MOVE ON TO --

(DOCUMENT DISPLAYED)

**Q** -- THE THIRD BULLET THAT YOU HAD FOR FREQUENCY VARIATIONS.

I BELIEVE YOU OFFERED THE OPINION THAT THE -- THAT THERE 11:53:36 ARE SOME EXAMPLES OF FAIRCHILD PRODUCTS WHERE THEY ARE IN POWER SUPPLIES WHERE THEY'RE COUPLED SUCH THAT THEY DON'T HAVE A FIXED SWITCHING FREQUENCY. IS THAT CORRECT?

**A** THAT'S CORRECT.

**Q** AND CAN YOU TELL US WHAT YOU ARE SHOWING HERE, THIS SLIDE?

11:53:49 **A** WHAT WE ARE LOOKING AT IS A DOCUMENT THAT'S DESCRIBING THE FIVE-WATT CHARGER. AND I BELIEVE THIS IS FOR THE FAN103. WE CAN SEE THAT IN THERE.

AND THEN, THE PICTURES CORRESPOND TO DIAGRAMS OR PICTURES OF THE BOARD. AND I THINK IF WE RECALL, MR. CHUEH YESTERDAY 11:54:09 MENTIONED THAT, YOU KNOW, ONCE THE BOARD HAS BEEN COMPLETED, YOU HAVE THAT GLUE, THAT WHITE GLUE, THAT KIND OF PUTS EVERYTHING IN PLACE.

AND SO THIS IS THE BOARD THAT WAS -- THAT CORRESPONDS TO THIS APPLICATION.

11:54:22 **Q** AND, CAN YOU TELL US WHAT DX 3291 IS?

11:54:26 **A** DX 3291 IS THE -- THE EVALUATION -- IT IS A DESCRIPTION OF THE EVALUATION BOARD. AND I BELIEVE THERE IS TESTING IN THERE, TESTING RESULTS IN THERE, AS WELL, FOR A POWER SUPPLY THAT HAS THIS FAN103 CHIP INSIDE IT.

11:54:43 **Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** SO LET'S GO TO YOUR NEXT SLIDE. WHAT ARE YOU SHOWING HERE WITH RESPECT TO DX 3107 FOR THE FAN103?

**A** SO WHAT'S SHOWN IN HERE, THIS IS NOW INSIDE. I BELIEVE 11:54:59 THIS IS THE DATASHEET FOR THE FAN103.

AND SO, AGAIN, THAT IS THE DOCUMENT THAT DESCRIBES HOW THIS PARTICULAR PRODUCT OPERATES. AND, IF YOU LOOK AT SOME OF THE ILLUSTRATIONS INSIDE THE DATASHEET, WHAT WE SEE, FOR EXAMPLE, IS FIGURE 23. AND I'VE IDENTIFIED THERE IS A 11:55:20 DESCRIPTION OF HOW THIS DEVICE OPERATES.

IT'S GOT A STANDBY MODE. IT'S GOT A GREEN MODE. IT'S GOT THIS HEAVY MODE. AND, FURTHER, THE DATASHEET PROVIDES INFORMATION AS TO HOW YOU DELINEATE THE DIFFERENT MODES OF OPERATION.

11:55:36 OKAY? AND THEN --

**Q** SO LET ME ASK YOU THIS.

**A** OKAY.

**Q** IN A FIVE-VOLT, ONE-AMP MOBILE PHONE BATTERY CHARGER APPLICATION, WOULD THE POWER SUPPLY EVER LEAVE THE GREEN MODE?

11:56:03 **A** I THINK WE WILL TAKE A LOOK AT THE RESULTS. WHEN YOU TAKE

A LOOK AT THE RESULTS, WE CAN CONFIRM THAT IN THIS POWER SUPPLY APPLICATION, ONE -- FIVE WATTS, ONE AMP, THE DEVICE DOES NOT LEAVE THAT GREEN MODE.

**Q** SO IT ALWAYS STAYS HERE. IT NEVER GOES INTO THE IDEALIZED FLAT LINE SHOWN, FIGURE 23. IS THAT CORRECT?

**A** THAT'S CORRECT.

**Q** SO IS THIS ALWAYS THE VARIABLE FREQUENCY OPERATION?

**A** IT ALWAYS HAS THAT VARIABLE FREQUENCY OPERATION, BUT IT DOES NOT HAVE THAT FIXED FREQUENCY OPERATION, NO MATTER HOW YOU WANT TO CALL IT.

**Q** IS THIS PURPLE BOX HIGHLIGHTING THE AREA OF OPERATION OF A FIXED FREQUENCY IDENTIFIED BY DR. KELLEY FOR HIS INFRINGEMENT ANALYSIS?

**A** THAT'S CORRECT.

**Q** SO THE FAN301 NEVER GETS THERE? IS THAT YOUR OPINION?

**A** IT'S THE FAN103 NEVER GETS THERE.

**Q** WHAT ARE YOU SHOWING HERE?

(DOCUMENT DISPLAYED)

**A** WHAT I'M SHOWING HERE, AGAIN, IS -- SINCE THIS IS A PLOT THAT WE HAVE SEEN ALREADY, BUT, AGAIN, WE CAN USE THE SAME PLOT TO MAKE YET ANOTHER POINT, IS IF WE LOOK ACROSS THE FULL RANGE OF LOAD CURRENTS.

SO, REMEMBER, THAT BOARD WAS A FIVE-WATT OR ONE-AMP POWER SUPPLY.

SO IT CAN SUPPLY CURRENTS TO THE LOAD UP TO A MAXIMUM OF

11:57:22 ONE AMP. AND WHAT WE NOTICE IS IF WE LOOK AT THE FREQUENCY, THE SWITCHING FREQUENCY WITH RESPECT TO THAT CURRENT, OVER THAT ENTIRE RANGE, IT'S ALWAYS CHANGING. IT'S GOING UP AND UP AND UP AND UP.

11:57:37 **Q** AND IT'S THE STRUCTURE OF THE POWER SUPPLY ITSELF (INDICATING) THAT KEEPS THE FAN103 ALWAYS IN A VARIABLE FREQUENCY RANGE, EVEN AS IDENTIFIED BY DR. KELLEY.

**A** THAT'S CORRECT.

**Q** SO TO THIS POINT I THINK WE HAVE COVERED OUR OPINIONS ON

11:57:58 INFRINGEMENT. IS THAT RIGHT, DR. WEI?

**A** YES.

**Q** DO YOU HAVE AN UNDERSTANDING OF WHAT INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS IS?

**A** YES. SO IF YOU LOOK INTO A PATENT CLAIM AND YOU FIND THAT

11:58:10 THERE IS A CERTAIN ELEMENT OR A CERTAIN LIMITATION THAT IS NOT MET WITH THIS PARTICULAR PRODUCT, YOU CAN STILL TRY TO -- YOU CAN STILL FIND THAT A PRODUCT INFRINGES UNDER THIS NOTION OF A DOCTRINE OF EQUIVALENTS. OKAY?

AND THERE'S ACTUALLY THREE WAYS IN WHICH YOU CAN APPLY, I

11:58:29 GUESS, OR UTILIZE DOCTRINE OF EQUIVALENTS. ONE IS THERE'S A FUNCTION/WAY/RESULT TEST, WHERE YOU LOOK AT THE PRODUCT, AND THEN YOU LOOK AT THAT ELEMENT. AND THIS HAS TO BE DONE ON A CLAIM-ELEMENT-BY-CLAIM-ELEMENT BASIS.

AND YOU SAY, OKAY, WHAT IS THE FUNCTION? WHAT IS THE WAY

11:58:48 THAT THAT FUNCTION IS IMPLEMENTED? WHAT IS THE RESULT? AND,

IF THE PRODUCT IMPLEMENTS THE FUNCTION IN A -- IN A SUBSTANTIALLY SIMILAR WAY, OR IT IMPLEMENTS A SUBSTANTIALLY -- SUBSTANTIALLY THE SAME FUNCTION, IN SUBSTANTIALLY THE SAME WAY TO ACHIEVE SUBSTANTIALLY THE SAME RESULT, THEN YOU CAN SAY THAT THOSE ARE EQUIVALENT. OKAY?

IT IS A BIT COMPLICATED, BUT ONCE YOU GET USED TO IT, IT WORKS REALLY WELL.

YOU CAN ALSO THINK -- THERE IS ANOTHER WAY, WHICH IS ANOTHER TYPE OF DOCTRINE OF EQUIVALENTS, CALLED "INSUBSTANTIAL DIFFERENCE."

SO YOU LOOK AT THIS PRODUCT. YOU LOOK AT THE ELEMENT, AND YOU SAY: "WELL, IT IS NOT THAT DIFFERENT. IT'S INSUBSTANTIAL."

AND THEN, THE THIRD IS, I THINK, CALLED "INTERCHANGEABILITY." YOU CAN TAKE THIS BLOCK OUT, REPLACE IT WITH ANOTHER ONE. AND IF IT'S STILL ALL OPERATING THE SAME WAY, THEN THESE TWO THINGS ARE EQUIVALENT.

**Q** SO WITH REGARD TO SWITCHED FREQUENCY, DID YOU HEAR DR. KELLEY OFFER THE OPINION, "WELL, IF -- IF THE FAIRCHILD PRODUCTS AREN'T FIXED, THEY'RE CLOSE ENOUGH"?

**A** RIGHT. SO --

**Q** SO WHAT IS YOUR RESPONSE AS TO THAT, DR. WEI?

**A** SO DR. KELLEY, HE HAD GONE THROUGH THE INITIAL -- HIS ANALYSIS FOR LITERAL INFRINGEMENT.

AND THEN, HE SAID: "WELL, IF THIS ELEMENT IS ACTUALLY NOT

12:00:17 THERE, YOU CAN SAY THAT IT'S THERE BECAUSE OF THE DOCTRINE OF EQUIVALENTS."

AND HE USED THE FUNCTION/WAY/RESULT TEST. OKAY?

AND, SO, HE TRIED TO ARGUE THAT THEY'RE EQUIVALENT. BUT

12:00:27 IF WE ACTUALLY LOOK AT THE WAY, THAT WAY DOESN'T WORK, BECAUSE WHAT THE -- THE WAY THAT IS CALLED FOR IS TO NOT VARY THE FREQUENCY WHEN THE FEEDBACK VOLTAGE IS ABOVE A THRESHOLD IN THAT FIRST RANGE. AND THEN IT'S VARYING, THERE IS A VARYING FREQUENCY WHEN IT IS BELOW THE THRESHOLD IN SOME SECOND RANGE.

12:00:48 AND SO, THAT WAY, IT DOESN'T PERMIT VARIATIONS AT ALL WHEN YOU ARE IN THAT FIRST RANGE.

AND SO, WHAT I'M SAYING IS THAT THAT DOESN'T WORK BECAUSE, AS WE SAW, THERE'S VARIATION IN THAT FIRST RANGE.

**Q** AND NOW, WHAT ABOUT THE RESULT?

12:01:07 **A** THE RESULTS, AS WE CAN SEE HERE, THAT'S CALLED FOR IS THAT THE FREQUENCY -- THE SWITCHING FREQUENCY VARIES WHEN THE FEEDBACK SIGNAL'S BELOW A THRESHOLD, AND THAT THE SWITCHING FREQUENCY IS NONVARYING WHEN IT'S ABOVE A THRESHOLD IN THAT FIRST RANGE.

12:01:22 AND THE RESULT IS NOT THE SAME.

**Q** AND SO, IT'S THINGS LIKE TEMPERATURE, INPUT VOLTAGE, JITTER, ALL THESE FACTORS THAT WE HAVE BEEN DISCUSSING THAT HAVE BEEN CAUSING THESE VARIATIONS?

**A** CORRECT. SO BECAUSE OF IS ALL THOSE FACTORS WE SAW THAT

12:01:38 THERE WAS A VARYING OR NOT A NONVARYING FREQUENCY IN THAT

FIRST RANGE.

**Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** AND ARE YOU AWARE OF ANY EVIDENCE THAT WAS PUT FORWARD AT THE PATENT OFFICE TO SHOW HOW SOMEONE SHOULD LOOK AT WHETHER THIS FREQUENCY VARIATION IS MEANINGFUL WHEN YOU ARE LOOKING AT A PARTICULAR CIRCUIT?

**A** YES. SO, AGAIN, WHEN WE ARE TALKING ABOUT THESE PATENTS AND THE CLAIMS AND THE WORDS, I MEAN, IT'S -- DIFFERENCES MATTER. WE HAVE TO BE VERY PRECISE.

AND, BASICALLY, WHAT POWER INTEGRATIONS ARGUED TO THE PATENT OFFICE WAS TO SAY THAT -- THERE WAS ACTUALLY A PRIOR ART REFERENCE THAT WAS BROUGHT FORTH.

AND THE PATENT OFFICE INITIALLY SAID, "YOU KNOW, IF YOU LOOK AT THIS, THIS SEEMS TO BE THE SAME AS WHAT YOUR CLAIM IS SAYING. AND, THEREFORE, I DON'T SEE WHY YOUR CLAIM IS VALID."

AND, THE -- AND POWER INTEGRATIONS CAME BACK AND SAID: "ACTUALLY, IF YOU LOOK AT THIS DOCUMENT, IF YOU UNDERSTAND WHAT THE TECHNOLOGY UNDERLYING IT IS SAYING, IS EVEN THOUGH IT LOOKS LIKE IT'S KIND OF FIXED, IT IS ACTUALLY NOT FIXED. THERE IS A SLOW, GRADUAL SLOPE. AND, THEREFORE, YOU CANNOT SAY THAT THAT'S A FIXED FREQUENCY."

OKAY? SO THEY MADE A VERY CLEAR DISTINCTION THAT THERE IS A DIFFERENCE BETWEEN THESE TWO THINGS.

**Q** AND COULD YOU JUST HIGHLIGHT HERE WHAT YOU ARE SHOWING

12:03:04 RIGHT HERE? THIS IS FROM THE '079 REEXAM FILE HISTORY.

IS THIS POWER INTEGRATIONS' WORDS?

**A** YES. I BELIEVE THIS IS THE -- ONE OF THE RESPONSES THAT POWER INTEGRATIONS GAVE TO THE PATENT OFFICE DURING THAT 12:03:16 REEXAM PROCESS FOR THE '079 PATENT.

AND WHAT IT SAYS HERE IS THAT ZHOU, WHICH IS THAT ARTICLE, IT IS A PAPER THAT WAS WRITTEN BY SOME FOLKS. AND SAYS: "ZHOU'S FIGURE 21 CORRELATES THE FREQUENCY TO THE OUTPUT CURRENT, AND SHOWS THAT THE OUTPUT FREQUENCY CONTINUOUSLY 12:03:36 VARIES. AND AS THE FIGURE SHOWS, UNDER LOW OUTPUT CURRENT, THE FREQUENCY VARIES SUBSTANTIALLY WITH THE LOAD, BUT UNDER LIGHT" -- NO, SORRY.

"UNDER HIGHER OUTPUT CURRENTS, THE FREQUENCY VARIES MORE SLOWLY."

12:03:56 AND THEN, IF WE LOOK AT FIGURE 21, I THINK IT IS MORE ILLUSTRATIVE OF WHAT THAT STATEMENT IS SAYING.

**Q** SO WHY DON'T WE GO THERE?

(DOCUMENT DISPLAYED)

**Q** THIS IS JUST THE COVER OF THE ARTICLE, SO IT'S DX 5445?

12:04:09 **A** YES.

(DOCUMENT DISPLAYED)

**Q** AND HERE WE GO.

**A** AND SO THAT IS THAT FIGURE 21 WHERE POWER INTEGRATIONS ARGUED THAT, YES, THERE IS THIS VARIABLE FREQUENCY RANGE. BUT 12:04:19 IF YOU LOOK HERE, EVEN THOUGH IT LOOKS PRETTY FLAT

12:04:23 (INDICATING), THERE IS A SLIGHT GRADUAL SLOPE. AND THAT IS DIFFERENT.

**Q** AND IT'S NOT PERFECTLY FLAT, IS IT?

(DOCUMENT DISPLAYED)

12:04:33 **A** IT'S NOT PERFECTLY FLAT.

**Q** AND THIS LOOKS PRETTY SIMILAR TO WHAT WE SAW WITH FAIRCHILD'S NONJITTER PRODUCTS.

(DOCUMENT DISPLAYED)

**A** THAT'S CORRECT.

12:04:45 (DOCUMENT DISPLAYED)

**Q** SO, LET'S TALK A LITTLE BIT ABOUT JITTER, SEPARATELY, FOR DOCTRINE OF EQUIVALENTS ANALYSIS. DO YOU HAVE A SEPARATE OPINION UNDER THE DOCTRINE OF EQUIVALENTS, AS IT APPLIES TO JUST THE JITTER PRODUCTS?

12:05:02 **A** YES.

**Q** AND AS I UNDERSTAND IT, WAS JITTER INCLUDED IN YOUR ORIGINAL DOE POSITIONS THAT YOU JUST GAVE, AS WELL?

**A** MY DOE POSITION THAT I JUST DESCRIBED IS FOR ALL THE PRODUCTS. BUT THEN, REMEMBER, THAT THERE IS TWO PRODUCTS THAT 12:05:18 ALSO IMPLEMENT JITTER, THAT FREQUENCY HOPPING FUNCTION. SO I'M JUST ADDRESSING THE DOE POSITION FOR THE FREQUENCY HOPPING.

AND IF WE LOOK HERE, I GUESS WHAT I'M SAYING HERE IS THAT IT'S NOT AN INSUBSTANTIAL DIFFERENCE. THERE'S A BIG 12:05:37 DIFFERENCE BETWEEN A PRODUCT THAT HAS JITTER OR DOES NOT HAVE

JITTER. OKAY?

AND, THE PATENT REQUIRES BOTH VARYING -- AND ACCORDING TO DR. KELLEY, THE PATENT REQUIRES BOTH VARYING THE FREQUENCY BELOW THE THRESHOLD -- SO YOU HAVE THAT REGION WHERE YOU HAVE THE FREQUENCY THAT VARIES -- AND HOLDING THE FREQUENCY FIXED ABOVE THE THRESHOLD.

AND SO IF YOU HAVE TO HOLD THE FREQUENCY FIXED, BUT THEN YOU HAVE A PRODUCT THAT DOESN'T HOLD THE FREQUENCY FIXED, BUT IS PURPOSELY VARYING THE FREQUENCY, THAT'S DIFFERENT.

**Q** ALL RIGHT. THANK YOU, DR. WEI.

(DOCUMENT DISPLAYED)

**Q** SO I THINK WE HAVE DEFINITELY COVERED "FIXED FREQUENCY." SO CAN YOU SUMMARIZE WHAT YOUR OPINION IS FOR THE "CONTROL CIRCUIT COUPLED TO SWITCH THE POWER SWITCH AT A FIXED SWITCHING FREQUENCY FOR A FIRST RANGE OF FEEDBACK VALUES"?

**A** YES. SO, AGAIN, COMING BACK TO THAT FIRST CHART, WE HAVE TO CHECK OFF.

WHAT WE SEE IS FOR CLAIM 34, WITH RESPECT TO THIS PARTICULAR ELEMENT, IT IS MY OPINION THAT THE LIMITATION IS NOT MET FOR THE "FIXED SWITCHING FREQUENCY FOR A FIRST RANGE OF FEEDBACK SIGNAL VALUES."

AND THAT IS BASED ON EVERYTHING THAT WE HAVE SEEN SO FAR. THAT IS TRUE FOR THE SG6841, THE FAN103, THE SG584 -- 5841, THE SG5841J, AND THE SG3842G.

AND BECAUSE, AS WE SAW, THAT THE FREQUENCY VARIES, AND

12:07:08 THEN THE FAN103 AND THE 5841J, THEY BOTH HAVE THAT FREQUENCY HOPPING JITTER FUNCTION.

**THE COURT:** OKAY, NOW, MS. ONDRICK, THE WITNESS IS THEN GOING INTO ANOTHER TOPIC AT THIS POINT?

12:07:22 **MS. ONDRICK:** YES, YOUR HONOR.

**THE COURT:** WELL, ALTHOUGH WE HAD A CHUNK OF TIME THAT WAS TAKEN OUT OF OUR SCHEDULE THIS MORNING, IT IS 12:05, SO WE PROBABLY SHOULD TAKE A BREAK UNLESS SOMETHING IS VERY SHORT, AND I DON'T EXPECT IT WILL BE.

12:07:36 **MS. ONDRICK:** OKAY.

**THE COURT:** SO, LADIES AND GENTLEMEN, WE WILL TAKE OUR HOUR'S NOON BREAK. PLEASE COME BACK AT FIVE AFTER 1:00. THANK YOU.

(JURY EXCUSED)

12:07:48 (THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE PRESENCE OF THE JURY)

**THE COURT:** ALL RIGHT. YOU MAY STEP DOWN, DR. WEI. THANK YOU. PLEASE BE BACK AT 1:05.

(WITNESS EXCUSED FROM THE STAND)

12:08:08 **THE COURT:** ALL RIGHT. HOW LONG DO YOU EXPECT THAT DR. WEI IS GOING TO BE ON? IS HE GOING TO BE ON BEYOND TODAY AT THIS POINT?

**MS. ONDRICK:** NO, I DON'T BELIEVE SO.

**THE COURT:** MR. JACOBS THINKS HE WILL BE.

12:08:18 **MR. JACOBS:** HE WILL BE DONE TODAY.

12:08:19 **THE COURT:** OH, HE WILL BE DONE TODAY?

**MR. JACOBS:** YES, YOUR HONOR.

**THE COURT:** OH, GOOD. ALL RIGHT.

WELL, THEN, WE WILL GO AHEAD AND TAKE THE BREAK. AND 12:08:25 THEN, WE WILL BE BACK AND CONTINUE WITH DR. WEI, I GUESS, AFTER 1:00.

THANK YOU.

(RECESS TAKEN FROM 12:07 TO 1:05 P.M.)

(THE FOLLOWING PROCEEDINGS WERE HELD OUT OF THE PRESENCE 12:11:30 OF THE JURY)

**THE CLERK:** PLEASE COME TO ORDER.

**THE COURT:** EVERYONE READY FOR THE JURY?

**MR. SCHERKENBACH:** WE ARE.

**THE COURT:** ALL RIGHT. PLEASE CALL THEM IN.

01:06:53 (THE FOLLOWING PROCEEDINGS WERE HELD IN THE PRESENCE OF THE JURY)

**THE CLERK:** PLEASE BE SEATED.

**THE COURT:** OKAY. LADIES AND GENTLEMEN, WE WILL BE CONTINUING WITH DR. WEI.

01:07:22 DR. WEI, WOULD YOU PLEASE RETAKE THE STAND?

(REQUEST COMPLIED WITH BY THE WITNESS)

**THE COURT:** THANK YOU. OKAY. WHENEVER YOU ARE READY.

**DIRECT EXAMINATION, RESUMED**

01:07:38 **BY MS. ONDRICK:**

01:07:39 Q WELCOME BACK, DR. WEI.
A THANK YOU.
Q SO LETS'S MOVE ON TO YOUR SECOND OPINION FOR THE '079 PATENT, IF WE COULD.
01:07:43 A OKAY.
Q AND CAN YOU REMIND US WHAT THAT OPINION IS?
A YES. SO, FOR THE SECOND OPINION, THE FAIRCHILD PRODUCTS DO NOT INCLUDE A SWITCH.
(DOCUMENT DISPLAYED)
01:07:57 Q AND SO, WE'RE BACK HERE TO OUR CLAIM CHART. AND, I SEE THAT THE CLAIM ELEMENT IS THE "POWER SWITCH COUPLED BETWEEN THE FIRST AND SECOND TERMINALS." IS THAT CORRECT?
A CORRECT.
Q ALL RIGHT.
01:08:08 (DOCUMENT DISPLAYED)
Q WHAT ARE YOU SHOWING HERE?
A SO, WHAT I'M SHOWING HERE IS -- AND I THINK WE HAVE SEEN THIS ALREADY FOR EACH OF THE REPRESENTATIVE PRODUCTS. AND IF YOU LOOK IN THE DATASHEETS -- AND THIS IS SOMETHING THAT'S 01:08:20 BEEN DISCUSSED -- THERE IS NO POWER SWITCH IN ANY OF THESE PARTICULAR PRODUCTS.
(DOCUMENT DISPLAYED)
Q AND THERE IS REALLY NOT MUCH OF A DISAGREEMENT OVER THAT, IS THERE?
01:08:32 A THAT'S CORRECT. DR. KELLEY, I BELIEVE, DURING TRIAL LAST

01:08:34 WEEK MENTIONED THAT -- AGREED THAT THERE IS NO POWER SWITCH IN THESE DEVICES; THAT THE POWER SWITCH IS EXTERNAL.

(DOCUMENT DISPLAYED)

**Q** SO IF WE GO AHEAD AND CHECK THE BOX FOR THAT ONE.

01:08:50 **A** YES. SO THIS LIMITATION IS NOT MET.

(DOCUMENT DISPLAYED)

**Q** NOW, LET'S TURN ON YOUR THIRD OPINION FOR THE '079 PATENTS. AND COULD YOU TELL US WHAT THAT OPINION IS?

**A** YES. SO IN CONTRAST TO THE FIRST ONE THAT WE DISCUSSED 01:09:06 BEFORE LUNCH, THIS ONE, THIS THIRD OPINION, IT RELATES TO THAT SECOND REGION WHERE WE HAVE THE VARYING FREQUENCY WITH RESPECT TO THE FEEDBACK VOLTAGE. AND, THE CLAIM REQUIRES THAT WITHOUT SKIPPING CYCLES.

(DOCUMENT DISPLAYED)

01:09:23 **Q** AND WE SEE THAT HERE?

**A** THAT'S CORRECT.

**Q** SO LET'S GO AHEAD AND GET INTO THIS ONE.

(DOCUMENT DISPLAYED)

**Q** SO IF WE LOOK AT YOUR NEXT SLIDE WE ARE SHOWING THE 01:09:33 COURT'S CLAIM CONSTRUCTION FOR THIS CLAIM ELEMENT. CAN YOU TELL US WHAT WE SEE HERE?

**A** SURE. SO FOR THIS PARTICULAR ELEMENT, I HAVE APPLIED THE COURT'S CLAIM CONSTRUCTION. AND THE COURT'S CLAIM CONSTRUCTION STATES THAT FOR "VARYING A SWITCHING FREQUENCY OF 01:09:48 THE POWER SWITCH WITHOUT SKIPPING CYCLES," THAT OUGHT TO BE

01:09:52 CONSTRUED AS "CHANGING THE NUMBER OF SWITCHING CYCLES PER SECOND OF THE POWER SWITCH IN RESPONSE TO THE FEEDBACK SIGNAL WHILE CONTINUING TO TURN THE SWITCH ON IN EACH CYCLE."

**Q** AND YOU APPLIED THAT CONSTRUCTION IN YOUR ANALYSIS,

01:10:06 DR. WEI?

**A** YES, I DID.

**Q** AND JUST TO TAKE THIS ONE ON DIRECTLY, IS THERE ANYTHING IN THE PRODUCT DATASHEETS THAT YOU SAW THAT DISCUSSED CYCLE SKIPPING?

01:10:19 **A** IN THE DATASHEETS, NO.

**Q** OKAY. WAS THERE ANYTHING IN ANY OTHER DOCUMENTATION THAT YOU SAW?

(DOCUMENT DISPLAYED)

**A** I DON'T RECALL SEEING THAT IN THE DOCUMENTATION.

01:10:29 (DOCUMENT DISPLAYED)

**Q** OKAY. IF WE LOOK AT THE -- YOUR OPINIONS FOR THIS PARTICULAR CLAIM ELEMENT, THEN IT IS ALL BASED ON THE TESTING. IS THAT RIGHT?

**A** YES. SO IF YOU LOOK AT THE TESTING RESULTS YOU WILL SEE

01:10:44 THE CYCLE SKIPPING.

(DOCUMENT DISPLAYED)

**Q** AND SO WHAT ARE YOU SHOWING HERE WITH REGARD TO THE SG6841?

**A** SO IF YOU LOOK, THIS IS A PAIR OF SCREENSHOTS FROM TESTING

01:10:55 FOR THE SG6841. AND IF YOU LOOK CLOSELY, IT'S ACTUALLY THE

01:11:01 SAME SCREENSHOT, EXCEPT THAT THERE ARE TWO DIFFERENT MEASUREMENTS THAT WERE MADE.

THE MEASUREMENT FOR THE SCREENSHOT ON THE LEFT-HAND SIDE, IT SHOWS THAT THE CYCLE, THE SWITCHING FREQUENCY IS 10.9 01:11:14 KILOHERTZ. AND THEN, ON THE RIGHT-HAND SIDE, WHAT WE SEE IS THAT THE SWITCHING FREQUENCY IS 5.5 KILOHERTZ.

AND FOR THE SG6841, THE MINIMUM FREQUENCY IS AT -- OF THE OSCILLATOR IS AROUND 10 KILOHERTZ. SO WHEN WE SEE THE RESULT ON THE RIGHT-HAND SIDE, WITH A 5.5 KILOHERTZ, THAT MEANS THAT 01:11:37 IT'S MISSING A PULSE IN THE MIDDLE, SO IT'S SKIPPING CYCLES.

**Q** OKAY. SO, NOW, I THINK ONE OF THE THINGS DR. KELLEY HAD TALKED ABOUT IN HIS TESTIMONY WHEN HE DESCRIBED CYCLE SKIPPING WAS YOU HAVE TO KNOW THE FREQUENCY OF THE OSCILLATOR, YOU NEED TO SHOW THAT HERE. NOW, YOU DON'T SHOW THAT HERE ON THIS 01:12:02 TEST. IS THAT RIGHT?

**A** THAT'S CORRECT. SO, THE OSCILLATOR IS A CIRCUIT ELEMENT THAT'S WITHIN THE -- THE CONTROLLER CHIP. AND THE OUTPUT OF THAT OSCILLATOR IS NOT BROUGHT OUT TO ONE OF THE PINS, SO IT'S NOT EASY TO PUT A PROBE AND LOOK AT WHAT THE OSCILLATOR IS 01:12:20 DOING.

IF WE WANTED TO ACTUALLY LOOK AT THE OSCILLATOR, YOU WOULD HAVE TO BREAK OPEN THE CHIP AND TRY TO GET INSIDE THE CHIP. BREAK OPEN THE PACKAGE AND TRY TO GET INSIDE THE CHIP ITSELF?

AND THAT WOULD ACTUALLY END UP DESTROYING THE CHIP. SO 01:12:33 WHAT WE CAN DO IS BY UNDERSTANDING, BY LOOKING AT THE

01:12:36 SCHEMATICS, LOOKING AT THE DATASHEETS AND UNDERSTANDING HOW THIS DEVICE OPERATES, THEN I CAN KNOW WHAT THE -- I CAN KNOW WHAT THE OSCILLATOR IS DOING AND KNOW THAT THE OSCILLATOR, FOR THIS EXAMPLE, THE MINIMUM FREQUENCY, AS SPECIFIED IN THE

01:12:50 DATASHEET, IS 10 KILOHERTZ, OR ROUGHLY 10.9 KILOHERTZ.

AND, THEREFORE, WHEN WE SEE THAT 5 KILOHERTZ, THERE IS A CYCLE THAT'S BEING SKIPPED.

(DOCUMENT DISPLAYED)

**Q** AND IF WE THE TURN TO YOUR NEXT SLIDE, WHAT ARE YOU

01:13:08 SHOWING HERE? LOOKS LIKE SOME OF THE TESTING SETUPS THAT WE SAW WITH MR. CHUEH.

**A** THAT'S RIGHT. SO THIS IS A SCHEMATIC SHOWING THE ENTIRE POWER SUPPLY. AND IT DESCRIBES HOW THAT SURGE/ESD TEST WAS PERFORMED. AND IT'S THE RESULTS OF THIS SURGE/ESD TEST THAT

01:13:28 WE WILL LOOK AT, THAT FURTHER SHOWS CYCLE SKIPPING.

**Q** AND YOU KNOW WHAT, DR. WEI? THAT RAISES A GOOD POINT.

(DOCUMENT DISPLAYED)

(REPORTER INTERRUPTION)

**Q** FOR THE SG6841, DR. WEI, THE CYCLE SKIPPING TEST WE JUST

01:13:46 TALKED ABOUT WAS A CYCLE SKIP BY NO-LOAD TEST. IS THAT RIGHT?

**A** THAT'S CORRECT.

(DOCUMENT DISPLAYED)

**Q** AND SO NOW FOR THE 6841, THERE'S A DIFFERENT TYPE OF TEST.

**A** SO, THESE RESULTS THAT WE'RE LOOKING AT ARE FOR THE

01:14:05 SURGE/ESD TEST THAT YOU HEARD ABOUT.

01:14:08 AND WHAT WE SEE HERE ARE FOUR SCREENSHOTS FROM THE OSCILLATOR PUT TOGETHER. AND IT MAY BE A LITTLE DIFFICULT TO SEE, BUT -- WELL, THE EASIER NUMBERS TO SEE ARE THE FEEDBACK VALUES.

01:14:23 SO THERE IS THE 1.63 VOLTS, A FEEDBACK VALUE OF 1.75, 1.9, 2.4 (INDICATING).

AND SO BY LOOKING AT THE DATASHEET AND UNDERSTANDING HOW THIS DEVICE WORKS, WHEN THE FEEDBACK VOLTAGE IS IN THIS RANGE FROM 1.63 TO 2.4, THEN THE DEVICE IS OPERATING IN THIS

01:14:44 VARIABLE FREQUENCY -- WITH VARIABLE FREQUENCY.

AND THEN, IF WE ZOOM IN A LITTLE BIT, OR JUST TAKE A CLOSE LOOK, WHAT YOU WILL NOTICE IS THE GREEN LINE HERE, IT ACTUALLY IS BUMPING AROUND A LITTLE BIT. AND THEN, THERE'S A LITTLE PULSE, AND THEN IT GOES BACK TO BUMPING AROUND. THAT IS THAT

01:15:05 ESD/SURGE BEING APPLIED.

AND WHEN THAT OCCURS, WHAT WE WILL NOTICE IS THAT THE PULSES THAT ARE COMING ALONG HERE, THERE'S A PAUSE. AND THEN, IT RESUMES. AND SO, THEY'RE CYCLE SKIPPING DURING THAT PERIOD OF TIME.

01:15:22 AND THAT IS TRUE FOR EACH AND EVERY ONE OF THE PLOTS THAT WE ARE LOOKING AT.

**Q** AND SO, LET ME ASK YOU THIS: IS SURGE SOMETHING THAT SOMEONE WOULD CONSIDER A FAULT CONDITION? OR A NORMAL OPERATING CONDITION?

01:15:42 **A** WELL, YOU KNOW, IT'S A POWER SUPPLY THAT I PLUG INTO THE

01:15:45 WALL AND I WANT IT TO OPERATE UNDER A VARIETY OF DIFFERENT CONDITIONS.

I WANT TO MAKE SURE THAT MY DEVICE DOESN'T BLOW UP. I WANT TO MAKE SURE THAT IT'S GOING TO CONTINUE TO WORK. SO 01:15:57 IT'S A PART OF WHAT I WOULD WANT MY DEVICE TO DO.

(DOCUMENT DISPLAYED)

**Q** AND IF WE TAKE A LOOK AT THE FAN103 PRODUCT, WHAT IS THIS OSCILLOSCOPE SCREENSHOT SHOWING?

**A** SO, FOR THE FAN103, WHAT'S SHOWING HERE IS SIMILAR TO 01:16:14 THE -- THE SCREENSHOTS THAT WE SAW IN THE PREVIOUS PAGE. EXCEPT NOW WE ARE JUST LOOKING AT ONE SCREENSHOT. AND THE -- WE CAN SEE THAT PULSE AGAIN. IT IS ACTUALLY NARROW HERE (INDICATING) BECAUSE IN THIS PARTICULAR EXAMPLE, WE'VE KIND OF ZOOMED OUT AS FAR AS THE TIME SCALE IS CONCERNED.

01:16:34 AND, AGAIN, WHAT WE CAN SEE IS THAT WITH THAT PULSE THERE, THE TIME BETWEEN A -- A RED PULSE HERE (INDICATING), TO THE NEXT RED PULSE, THAT PERIOD OF TIME IS 8.49 MILLISECONDS.

AND, 8.49 MILLISECONDS THEN CORRESPONDS TO THE 117 HERTZ. AND FOR THIS PARTICULAR PRODUCT, THE FAN103, THE MINIMUM 01:17:00 FREQUENCY, AS SHOWN IN THE DATASHEET, IS 370 HERTZ.

SO, AGAIN, WE HAVE THE SITUATION WHERE THE OSCILLATOR AT MINIMUM CAN ONLY OPERATE AT 370 HERTZ. BUT THE TIME BETWEEN THE PULSE -- THE RED PULSES IS 117 HERTZ. AND, THEREFORE, THERE MUST BE CYCLE SKIPPING IN-BETWEEN.

01:17:21 **Q** AND THIS (INDICATING) IS ANOTHER CYCLE SKIPPING AT NO-LOAD

TEST, CORRECT?

**A** THIS IS -- THE CONDITION IS NO LOAD AT THE OUTPUT. BUT THERE'S A SURGE/ESD TEST BEING APPLIED.

**MS. ONDRICK:** AND FOR THE RECORD, THAT IS DX5442.26.

(DOCUMENT DISPLAYED)

AND IF WE COULD JUST GO BACK QUICKLY. FOR THE SG6841, NO-LOAD TEST, THAT WAS DX 5441.23-A AND B.

(DOCUMENT DISPLAYED)

AND FOR THE SG6841 SECOND SET OF TESTS, THAT WAS DX 5709 AT DX 4555 TO -58.

(DOCUMENT DISPLAYED)

AND FOR THE FAN103 IT WAS DX 44226.

(DOCUMENT DISPLAYED)

**BY MS. ONDRICK:**

**Q** NOW, LET'S TURN TO THE 5841 PRODUCT, DR. WEI. WHAT IS YOUR OPINION FOR THAT PRODUCT?

**A** SO, IF WE LOOK AT THE TEST RESULTS, NOW, FOR THE 5841, WHICH IS A DIFFERENT PRODUCT FROM THE 5841J, BUT THE SAME TESTS, THE ESD/SURGE TEST WAS PERFORMED.

AND, AGAIN, FOR A RANGE OF FEEDBACK VALUES. AND THIS IS FOR THE RANGE OF FEEDBACK VALUES, YOU CAN SEE THAT THE FREQUENCY WHEN THE FEEDBACK VOLTAGE IS 1.64, THE FREQUENCY IS A LITTLE BIT LOWER.

AND THEN, AS THE FEEDBACK VOLTAGE INCREASES, THE FREQUENCY GETS A LITTLE HIGHER (INDICATING). AND THEN GETS A LITTLE

01:19:06 HIGHER, AND GETS A LITTLE HIGHER (INDICATING).

AND THEN, WITH THAT SURGE TEST APPLIED, WHAT WE NOTICE IS THERE'S THIS GAP HERE IN THE PULSES. AND SO WE KNOW THAT THERE'S CYCLE SKIPPING HERE AGAIN.

01:19:20 **Q** AND, WE KNOW ALSO FROM THESE PLOTS THAT THIS IS WHEN WE'RE IN THE GREEN MODE OF OPERATION, AS WELL, WHEN WE ARE LOOKING AT THESE. IS THAT CORRECT?

**A** THAT IS CORRECT.

**MS. ONDRICK:** AND, FOR THE RECORD, THE SCREENSHOTS

01:19:29 FOR THE SG5841 ARE AT DX 5709, AT DX 4426 THROUGH-29.

(DOCUMENT DISPLAYED)

**BY MS. ONDRICK:**

**Q** OKAY. NOW, WE ARE AT THE DIFFERENT FLAVOR OF THE 5841, WE HAVE THE SG5841J. WHAT IS YOUR OPINION FOR THAT PRODUCT?

01:19:52 **A** SO FOR THE SG5841J, WHICH IS SIMILAR TO THE SG5841, SAME SET OF TESTS WERE APPLIED. AND, AGAIN, WHAT WE WILL NOTICE IS THAT WHEN THERE IS THE SURGE APPLIED, THERE IS THIS GAP HERE (INDICATING). AND THAT SHOWS US THAT THERE'S CYCLE SKIPPING.

**MS. ONDRICK:** AND, FOR THE RECORD THAT'S -- THE

01:20:13 SCREENSHOTS ARE FOUND AT DX 5709, AT DX 4482 TO -85.

**THE COURT:** ARE YOU PLANNING ON PUTTING IN ANY OF THE UNDERLYING EXHIBITS OR NOT?

**MS. ONDRICK:** THEY ARE ALREADY IN, YOUR HONOR.

**THE COURT:** I DON'T KNOW IF ALL OF THEM ARE. SOME OF

01:20:32 THEM THAT YOU REFERENCED BEFORE -- WELL, I WAS JUST LOOKING AT

THE SCREEN. DID YOU REFERENCE 4422?

**MS. ONDRICK:** I BELIEVE, YOUR HONOR, THOSE WERE ALL PUT IN AS PART OF THE DX 5709 EXHIBIT.

**THE COURT:** OKAY, THE COLLECTIVE EXHIBIT. OKAY. THAT'S FINE, THEN. I HAVEN'T CHECKED. I DON'T THINK I HAVE IT, SO I DON'T KNOW WHICH ONES ARE INCLUDED IN IT.

AS LONG AS THEY ARE ALL IN THERE, THAT'S FINE. OKAY.

(DOCUMENTS DISPLAYED)

**MS. ONDRICK:** YES.

(DOCUMENTS DISPLAYED)

**BY MS. ONDRICK:**

**Q** SO IF YOU COULD SUMMARIZE YOUR OPINIONS WITH REGARD TO LITERAL INFRINGEMENT WITH THIS CLAIM LIMITATION.

**A** SO IN TERMS OF LITERAL INFRINGEMENT I FIND THAT THIS LIMITATION IS NOT MET, BECAUSE WHAT WE SAW THE CLAIM REQUIRES IS SECOND -- THIS GREEN MODE -- FOR THE SECOND RANGE OF FEEDBACK SIGNALS, THE FREQUENCY VARIES WITHOUT SKIPPING CYCLES.

ACTUALLY, WE SHOULD GO TO THE CLAIM TERM AGAIN, WHICH IS ESSENTIALLY THE LAST PART OF THAT. THE CLAIM CONSTRUCTION SAYS: "WHILE SWITCHING EACH CYCLE."

AND WHAT WE SAW IS THAT THERE ARE THESE GAPS, AND SO IT'S NOT SWITCHING EACH CYCLE.

(DOCUMENT DISPLAYED)

**A** YEAH, THIS ONE.

01:21:56 SO THE CLAIM CONSTRUCTION -- THE COURT'S CLAIM CONSTRUCTION FOR "VARYING A SWITCHING FREQUENCY OF THE POWER SWITCH WITHOUT SKIPPING CYCLES" IS -- IS CONSTRUED AS BEING "CHANGING THE NUMBER OF SWITCHING CYCLES PER SECOND OF THE 01:22:10 POWER SWITCH IN RESPONSE TO THE FEEDBACK SIGNAL WHILE CONTINUING TO TURN THE SWITCH ON IN EACH CYCLE."

AND WHAT WE SAW FROM THE TEST RESULTS IS THAT IT DOES NOT CONTINUE TO TURN THE SWITCH ON AT EACH CYCLE.

**Q** NOW, DO YOU HAVE AN OPINION ON WHETHER THE FAIRCHILD 01:22:31 PRODUCTS MEET THIS CLAIM LIMITATION UNDER THE DOCTRINE OF EQUIVALENTS?

**A** I DO.

**Q** OKAY.

**MS. ONDRICK:** MR. BERK, COULD WE GO TO DDX 482?

01:23:07 (OFF-THE-RECORD DISCUSSION)

(DOCUMENT DISPLAYED)

**BY MS. ONDRICK:**

**Q** OKAY. AND WHAT IS YOUR OPINION?

**A** SO THIS IS REFERRING BACK TO THE NOTION OF DOCTRINE OF 01:23:16 EQUIVALENTS.

AND "VARYING THE FREQUENCY WITH CYCLE SKIPPING" IS NOT EQUIVALENT TO "WITHOUT CYCLE SKIPPING."

"VARYING THE FREQUENCY WITH CYCLE SKIPPING" IS NOT EQUIVALENT TO "WITHOUT CYCLE SKIPPING." I THINK I MAY HAVE 01:23:34 READ THE WORDS WRONG.

01:23:36 **Q** SO HE DOESN'T SAY AN EQUIVALENT IS TO NOT HAVE CYCLE SKIPPING? IT'S HAVING CYCLE SKIPPING?

**A** WELL, YEAH. THAT'S KIND OF THE CONFUSING PART. BUT EITHER YOU CAN READ IT OR I CAN READ THAT TEXT.

01:23:52 **Q** SURE. SO LET'S GO AHEAD AND READ WHAT DR. KELLEY'S TESTIMONY WAS (AS READ):

"QUESTION: EXPLAIN FOR US WHAT YOUR ANALYSIS IS THERE.

"ANSWER: WELL, HERE IS THE FUNCTION/WAY/RESULT TEST AGAIN. IN EACH OF THESE PRODUCTS, I LOOKED FOR THE FUNCTION, FOUND THE COUPLED TO THE CONTROL SWITCHING FREQUENCY. I FOUND THE VARYING THE SWITCHING FREQUENCY WITHOUT SKIPPING CYCLES IN RESPONSE TO THE FEEDBACK SIGNAL, FOR THIS SECOND RANGE."

01:24:04 01:24:20

SO WHAT IS YOUR UNDERSTANDING OF WHAT HE'S SAYING THERE?

**A** SO, MY UNDERSTANDING IS FOR DR. KELLEY -- FOR DR. KELLEY'S DOCTRINE OF EQUIVALENTS POSITION, IT STILL REQUIRES WITHOUT CYCLE SKIPPING. AND, THERE'S CYCLE SKIPPING.

01:24:35

**Q** OKAY. SO THEN, IS YOUR OPINION --

**A** RIGHT. SO IT'S MY OPINION THAT THIS LIMITATION IS NOT MET WITH RESPECT TO THE DOCTRINE OF EQUIVALENTS.

(DOCUMENT DISPLAYED)

01:24:54 **Q** AND WE CAN GO AHEAD AND MARK THAT OPINION AS NOT MET?

01:24:56

**A** CORRECT.

**Q** SO WE ARE AT THE END OF YOUR OPINIONS FOR THE '079 PATENT, DR. WEI.

**A** YES.

01:25:01

**Q** SO IF WE COULD JUST SUMMARIZE A FEW OF THEM.

**A** SURE. SO IT IS MY OPINION THAT THE ACCUSED PRODUCTS DO NOT INFRINGE CLAIM 34 FOR THE REASONS THAT WE LOOKED THROUGH. THEY'RE THE THREE THAT WE JUST SAW. THE LIMITATIONS ARE NOT MET. THE FIRST, ON TOP WE CAN SEE THAT THERE IS NO POWER SWITCH IN THE FAIRCHILD PRODUCTS. AND THEN, AS FAR AS THE SECOND LIMITATION IS CONCERNED, WHICH REQUIRES "THE CONTROL CIRCUIT COUPLED TO SWITCH THE POWER SWITCH AT A FIXED SWITCHING FREQUENCY FOR A FIRST RANGE OF FEEDBACK SIGNAL VALUES."

01:25:26

AND, OF COURSE, APPLYING THE COURT'S CLAIM CONSTRUCTION WITH RESPECT TO "FIXED SWITCHING FREQUENCY," WHICH, IF YOU RECALL, IT'S A "NONVARYING NUMBER OF SWITCHING CYCLES PER SECOND." AND THAT LIMITATION IS ALSO NOT MET.

01:25:42

AND THEN, WE JUST SAW THE THIRD, WHERE THE ACCUSED FAIRCHILD PRODUCTS SKIP CYCLES.

01:26:02

**Q** AND COULD YOU JUST ONE MORE TIME EXPLAIN FOR US THE DIFFERENCE BETWEEN YOUR OPINION AND DR. KELLEY'S OPINION WITH REGARD TO THE "FIXED SWITCHING FREQUENCY" CLAIM LIMITATION?

**A** SURE. SO, IF YOU RECALL WHAT DR. KELLEY HAD SAID -- I BELIEVE IT WAS LAST WEEK -- AND WE SAW A SNIPPET FROM THE

01:26:21

TRIAL TESTIMONY FROM LAST WEEK. DR. KELLEY SAID THAT FOR "FIXED SWITCHING FREQUENCY," YOU COUNT THE NUMBER OF SWITCHING CYCLES WITHIN ONE SECOND.

AND IF YOU THINK ABOUT THAT CONCEPT -- AND THIS IS WHAT I DISAGREE WITH -- IT'S KIND OF LIKE THE ANALOGY, I THINK, THAT MR. JACOBS BROUGHT UP EARLY ON IN THE TRIAL, WHERE IF YOU'RE DRIVING DOWN 101, RIGHT? AND YOU ARE DRIVING DOWN -- DRIVING TO GO TO THE AIRPORT, IF YOU HIT TRAFFIC -- SO YOU'RE -- LET'S SAY YOU ARE DRIVING AT 70 MILES AN HOUR -- MILES PER HOUR. AND THEN, YOU SLOW DOWN TO 50 MILES PER HOUR. AND THEN, YOU SPEED UP, AND YOU SLOW DOWN, SPEED UP AND SLOW DOWN, THEN YOUR SPEED IS FLUCTUATING BETWEEN 70 MILES PER HOUR AND 50 MILES PER HOUR.

BUT, ACCORDING TO DR. KELLEY'S INTERPRETATION, IF OVER ONE-HOUR PERIOD, YOU TAKE THE AVERAGE -- AND THAT'S 60 MILES PER HOUR -- THAT IT'S FIXED. BUT WE KNOW THAT THE SPEED WAS FLUCTUATING THERE DURING THAT ENTIRE PERIOD OF TIME.

**Q** SO, CAN WE THINK ABOUT THE DIFFERENCE BETWEEN OR THE DISAGREEMENT BETWEEN YOU AND DR. KELLEY AS THE DISTINGUISH -- A DISTINGUISHMENT BETWEEN RATE AND A UNIT OF MEASURE?

**A** SURE. SO SWITCHING, SWITCHING FREQUENCY, CYCLES PER SECOND IS A RATE. WHEREAS, WITH DR. KELLEY, IT IS KIND OF LIKE LOOKING AT YOUR SPEEDOMETER VERSUS LOOKING AT YOUR ODOMETER. RIGHT?

DR. KELLEY SAID YOU DRIVE, LET'S SAY, A HUNDRED MILES.

01:28:01 AND IF YOU DROVE 100 MILES WITHIN AN HOUR, THEN YOU DROVE 100 MILES PER HOUR. WHEREAS, WHAT I'M SAYING IS IF YOU LOOK AT YOUR SPEEDOMETER, YOUR SPEED FLUCTUATES BACK AND FORTH, OR CAN FLUCTUATE BACK AND FORTH.

01:28:19 **Q** THANK YOU, DR. WEI.

(DOCUMENT DISPLAYED)

**Q** SO NOW LET'S TAKE A LOOK AT WHAT YOU ARE SHOWING HERE. I SEE YOU HAVE GOT CLAIM 34 MAPPED AGAINST CLAIMS 31, 38 AND 42, THE OTHER ASSERTED CLAIMS HERE FOR THE '079 PATENT.

01:28:35 WHAT ARE YOU SHOWING?

**A** SO HERE, RECALL THAT WE JUST WENT THROUGH CLAIM 34, BUT THERE ARE THREE OTHER ASSERTED CLAIMS. AND IF WE LOOK AT CLAIM 31, 38 AND 42, WHAT WE SEE IS THAT SAME LIMITATION OF A POWER SWITCH IN EACH OF THE OTHER CLAIMS.

01:28:55 **Q** SO YOUR OPINION IS --

**A** MY OPINION, THEREFORE, IS THAT CLAIMS 31, 38 AND 42, ALSO THAT LIMITATION IS NOT MET.

**Q** IS THAT NOT MET LITERALLY OR UNDER DOCTRINE OF EQUIVALENTS?

01:29:06 **A** THIS IS NOT MET LITERALLY.

(DOCUMENT DISPLAYED)

**Q** NEXT, IF WE COULD TURN TO YOUR NEXT SLIDE, I SEE THAT YOU ARE MAPPING CLAIM ELEMENT 34B AGAINST THE SAME CLAIMS.

CAN YOU DESCRIBE WHAT YOU ARE SHOWING HERE?

01:29:20 **A** YES. SO, THE OTHER TWO DISCUSSIONS THAT WE HAD ARE SHOWN

01:29:25 IN THE GREEN AND THE BLUE. AND IF WE LOOK AT CLAIMS 31, 38 AND 42 -- YEAH, AND 42, WE SEE THAT SAME LANGUAGE AGAIN IN THESE OTHER CLAIMS.

AND BECAUSE WE ALREADY SAW THAT THESE TWO LIMITATIONS IN
01:29:40 CLAIM 34 ARE NOT MET FOR THE ACCUSED REPRESENTATIVE PRODUCTS, THEREFORE IT'S ALSO FURTHER NOT MET FOR CLAIMS 31, 38 AND 42.

**Q** AND THAT IS FOR BOTH LIMITATIONS, CORRECT?

**A** THAT IS FOR BOTH LIMITATIONS.

**Q** AND THAT WOULD BE AN OPINION THAT THERE IS NO LITERAL
01:29:57 INFRINGEMENT OR INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS. IS THAT CORRECT?

**A** THAT IS CORRECT.

**Q** OKAY.

**MS. ONDRICK:** MR. BERK, CAN WE PLEASE GO TO DDX 486,
01:30:27 PLEASE.

(DOCUMENT DISPLAYED)

(DOCUMENT TAKEN OFF DISPLAY)

(DOCUMENT DISPLAYED)

**BY MS. ONDRICK:**

01:30:49 **Q** SO DR. WEI, CAN YOU TELL US YOUR OPINIONS FOR THE '908 PATENT, PLEASE?

**A** SO WE FINISHED UP THE '079, AND NOW WE ARE TRANSITIONING OVER TO THE OTHER PATENT, THE OTHER POWER INTEGRATIONS' PATENT, '908.

01:31:04 AND THE ASSERTED CLAIMS OF THE '908 PATENTS ARE CLAIMS 26

AND 27. AND JUST TO SUMMARIZE, IT IS MY OPINION THAT THE ACCUSED FAIRCHILD PRODUCTS -- AND THERE IS TWO REPRESENTATIVE PRODUCTS THAT WE'LL BE LOOKING AT --

(DOCUMENT DISPLAYED)

**A** -- THEY DO NOT INFRINGE THE ASSERTED CLAIMS OF THE '908 PATENT.

**Q** SO LET'S GO AHEAD AND JUMP INTO THE CLAIM.

(DOCUMENT DISPLAYED)

**Q** AND WHAT ARE YOU SHOWING ON THIS SLIDE WITH RESPECT TO CLAIM 26?

**A** SO WITH CLAIM 26, AGAIN, WE HAVE THE -- THE WORD OF THE CLAIM, AND THE ELEMENTS OF THE CLAIM. AND, WHAT'S HIGHLIGHTED HERE IS THE WORD "CURRENT LIMIT." AND THAT'S SOMETHING THAT WE WILL BE DISCUSSING FURTHER. AND THAT'S A TERM THAT'S BEEN CONSTRUED BY THE COURT.

**Q** AND WE'RE NOT SHOWING CLAIM 27 ON THIS SLIDE, BUT WHAT IS YOUR UNDERSTANDING OF CLAIM 27?

**A** CLAIM 27 IS SOMETHING THAT'S CALLED "A DEPENDENT CLAIM." AND SO IF YOU WERE TO LOOK AT HOW CLAIM 27 BEGINS -- I DON'T KNOW THE WORDS, EXACTLY, BUT IT IS SOMETHING TO THE EFFECT OF EVERYTHING OF CLAIM 26, AND MORE.

SO WHEN YOU THINK ABOUT CLAIM 27, WHICH IS A DEPENDENT CLAIM, YOU ESSENTIALLY WOULD TAKE ALL OF THE LIMITATIONS, THE ELEMENTS OF CLAIM 26, AND THEN ADD IN THE OTHER WORDS THAT'S SHOWN IN CLAIM 27.

SO IT'S COMPREHENSIVE OF BOTH, EVERY -- ALL THE LIMITATIONS OF 26, PLUS MORE LIMITATIONS.

**Q** SO, IF SOMETHING'S MISSING FROM CLAIM 26, IS IT ALSO MISSING FROM CLAIM 27?

**A** THAT'S CORRECT.

**Q** SO THEN WE ONLY NEED TO FOCUS ON CLAIM 26?

**A** WE ONLY NEED TO FOCUS ON CLAIM 26, AND JUST EVEN ON ONE ELEMENT IN ORDER TO FIND THAT IT DOES NOT INFRINGE.

**Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** CAN YOU TELL US WHAT YOU ARE SHOWING HERE WITH REGARD TO THE COURT'S CLAIM CONSTRUCTION?

**A** SO, YOU NOTICE IN CLAIM 26, THERE IS THAT WORD OR PHRASE "CURRENT LIMIT." AND THE COURT HAS CONSTRUED WHAT THAT WORD OR WHAT "CURRENT LIMIT" MEANS.

AND WHAT IT MEANS IS "A VALUE OF CURRENT THAT CAN BE USED BY THE CONTROL CIRCUIT TO TURN OFF THE POWER SWITCH WHEN THE AMOUNT OF CURRENT PASSING THROUGH THE POWER SWITCH REACHES THE THRESHOLD."

AND SO THE -- THERE'S SOME HIGHLIGHTING. IT IS THE VALUE OF CURRENT THAT THE COURT HAS EMPHASIZED, I GUESS.

**Q** AND WE HAVE "CURRENT LIMIT" HIGHLIGHTED HERE IN THE CLAIM. YOU HAVE THE COURT'S CLAIM CONSTRUCTION PULLED OUT. IS THAT BECAUSE THIS IS THE CONTESTED CLAIM ELEMENT?

**A** THIS IS THE CONTESTED CLAIM ELEMENT, SO WE ARE FOCUSING ON

01:33:46 THIS.

**Q** OKAY. SO WHY, DR. WEI, IS IT YOUR OPINION THAT THE FAIRCHILD PRODUCTS DO NOT INFRINGE THE '908 PATENT?

**A** SO JUST QUICKLY TO SUMMARIZE, IF WE LOOK AT THE FAIRCHILD 01:34:00 PRODUCTS, THEY DON'T INFRINGE, BECAUSE THE FAIRCHILD PRODUCTS, WHAT THEY DO IS USE A VALUE OF VOLTAGE AND NOT A VALUE OF CURRENT.

AND WE'LL DIG INTO WHAT THAT MEANS. AND, FURTHERMORE, THIS VOLTAGE IS NOT THE SAME AS CURRENT. WE SAW EARLY ON THIS 01:34:14 MORNING IN MY TUTORIAL IN MY DESCRIPTION OF "VOLTAGE" AND "CURRENT."

**Q** AND HERE WE ARE SHOWING THE TWO ACCUSED REPRESENTATIVE PRODUCTS FOR THE '908 PATENT.

(DOCUMENT DISPLAYED)

01:34:25 **A** THAT'S CORRECT. IT IS SG6841 AND THE FAN6747.

(DOCUMENT DISPLAYED)

**Q** SO LET'S TAKE A LOOK AT THE SG6841. WHAT IS YOUR OPINION WITH REGARD TO THAT PRODUCT?

**A** MY OPINION IS THAT THE 6841 DOES NOT HAVE THE CLAIMED 01:34:44 "CURRENT LIMIT" ACCORDING TO THE COURT'S CLAIM CONSTRUCTION. AND IF WE LOOK INTO THE DATASHEET, THE SG6841, IT HAS -- IT USES A VALUE OF "VOLTAGE," AND NOT A VALUE OF "CURRENT."

AND WE CAN FIND THAT IN AT LEAST ONE SECTION OF THE DATASHEET, THAT "CONSTANT OUTPUT POWER LIMIT" SECTION THAT WE 01:35:04 HAVE HEARD ABOUT, WHERE IT SAYS:

01:35:06 "WHEN THE SENSE VOLTAGE, ACROSS THE SENSE RESISTOR REACHES THE THRESHOLD VOLTAGE..."

AND THEN IT FURTHER GOES ON TO SAY THE SWITCH TURNS OFF.

**MS. ONDRICK:** AND, FOR THE RECORD, WE ARE SHOWING DX 01:35:19 4683 AT -- THE PAGE 10.

**BY MS. ONDRICK:**

**Q** NOW, LET'S TURN TO THE SG -- EXCUSE ME -- THE FAN6747.

(DOCUMENT DISPLAYED)

**Q** WHAT ABOUT THAT PRODUCT, DR. WEI?

01:35:39 **A** FOR THE FAN6747, THIS IS ESSENTIALLY THE SAME AS THE 6841 WHERE THE FAN6747, IT USES THIS VALUE OF VOLTAGE AND NOT A VALUE OF CURRENT. AND, AGAIN, WE SEE THAT -- A SIMILAR FEATURE IN THE 6747, THAT CONSTANT OUTPUT POWER LIMIT. AND THE LANGUAGE IN HERE WHERE THERE'S A SENSE VOLTAGE AND THE 01:36:02 THRESHOLD VOLTAGE, THAT'S ALSO IN THE 6747 AS WE SAW IN THE 6841.

**MS. ONDRICK:** AND, FOR THE RECORD, THE FAN6747 IS AT DX 3184, AT PAGES -- AT PAGE 13.

**BY MS. ONDRICK:**

01:36:19 **Q** NOW, WE'VE JUST SEEN TWO EXAMPLES OF PRELITIGATION DOCUMENTS SHOWING NONINFRINGEMENT. IS THAT CORRECT, DR. WEI?

**A** THAT'S CORRECT.

**Q** IF WE LOOK A LITTLE MORE HERE AT FIGURE 1, WHAT IS IT ABOUT FIGURE 1 THAT LEADS YOU TO BELIEVE WE'RE SEEING A 01:36:40 VOLTAGE INSTEAD OF A CURRENT?

01:36:43 **A** WELL, IF WE LOOK AT THE SCHEMATIC OF THE TYPICAL APPLICATION, WHAT WE SEE IS THAT THERE IS THE POWER SWITCH -- THE POWER SWITCH, RIGHT HERE (INDICATING), WHICH IS EXTERNAL TO THE CONTROLLER CHIP (INDICATING).

01:36:58 AND, THERE'S A RESISTOR HERE (INDICATING). AND THAT POWER SWITCH AND RESISTOR ARE ADDED IN BY THE COMPANY, THE CUSTOMER THAT'S BUILDING THE POWER SUPPLY.

AND, WHAT THE CONTROLLER CHIP UTILIZES IS A VOLTAGE.

**Q** OKAY.

01:37:21 SO, DR. WEI, ARE THERE ANY ADVANTAGES TO USING A VOLTAGE IN THIS TYPE OF APPLICATION?

**A** SO, WE -- I THINK WE HEARD ABOUT THIS A LITTLE BIT AGO. PERHAPS IT WAS EARLIER THIS WEEK WHEN DR. GARY LIN WAS HERE. AND HE TALKED A LITTLE BIT ABOUT WHY FAIRCHILD UTILIZES A 01:37:40 POWER SWITCH ON THE OUTSIDE.

AND I THINK, ALSO, MR. W.H. HUANG MENTIONED THIS, AS WELL.

WELL, IF YOU HAVE THAT RESISTOR, FOR EXAMPLE, OUTSIDE OF THE CONTROLLER CHIP, THEN -- BECAUSE THE MAIN THING IS THAT RESISTORS, WHEN CURRENT FLOWS THROUGH IT, IT GETS HOT. OKAY? 01:37:57 AND SO, BY HAVING IT OUTSIDE IT'S EASIER TO COOL IT. SO THAT IS AN ADVANTAGE.

FURTHERMORE, BY HAVING THAT POWER SWITCH EXTERNALLY, THE CUSTOMER CAN CHOOSE WHAT TYPE OF POWER SWITCH TO USE. AND, THERE ARE DIFFERENT RATINGS FOR THESE POWER SWITCHES.

01:38:15 YOU CAN GET A 1-AMP POWER SWITCH. YOU CAN GET A 5-AMP

POWER SWITCH. AND WHAT THAT TELLS US IS THAT THESE DIFFERENT POWER SWITCHES ARE ALLOWED DIFFERENT MAXIMUM AMOUNTS OF CURRENT TO FLOW THROUGH THEM.

AND SO WITH ONE CONTROLLER, THAT ONE CONTROLLER CHIP, YOU CAN TARGET A VARIETY OF DIFFERENT APPLICATIONS. SO YOU CAN TARGET THE REALLY LOW-POWER APPLICATIONS. ALSO YOU CAN TARGET THE HIGHER POWER APPLICATIONS, WITH ONE CONTROLLER CHIP AND BY APPLYING OR UTILIZING DIFFERENT POWER SWITCHES.

AND SO AN ADVANTAGE OF THAT IS I CAN SELL TO A WIDER NUMBER OF CUSTOMERS, COMPARED TO IF I HAD THE POWER SWITCH EMBEDDED WITHIN THE CONTROLLER CIRCUIT.

**Q** OKAY. AND SO, THE RESISTOR THAT ALLOWS THIS TO HAPPEN WITH THE SELECTION OF ANY TRANSFORMER THAT YOU WANT AND THE RESISTOR THAT WE ARE SEEING HERE THAT'S CONNECTED TO THE CURRENT SENSE PIN, THAT'S WHAT WE ARE TALKING ABOUT THAT GENERATES THE VOLTAGE, RIGHT THERE?

**A** YES.

**Q** AND WE CAN SEE IT IN THIS DOCUMENT. RIGHT?

**A** YOU CAN SEE IT IN THIS DOCUMENT.

**Q** NOW, DR. WEI, THE '908 PATENT, DOES IT TALK ABOUT CURRENT OR VOLTAGE THROUGH THE SWITCH?

**A** IT TALKS ABOUT A CURRENT THROUGH THE SWITCH. IT -- SO IF WE LOOK AT THE CLAIM CONSTRUCTION, THE COURT'S CLAIM CONSTRUCTION FOR "CURRENT LIMIT," AGAIN IT'S "A VALUE OF CURRENT THAT CAN BE USED BY THE CONTROLLER" -- "BY THE CONTROL

01:39:51 CIRCUIT TO TURN OFF THE POWER SWITCH WHEN THE AMOUNT OF CURRENT PASSING THROUGH THE POWER SWITCH REACHES THE THRESHOLD."

AND IF WE LOOK IN THE '908 PATENT WE CAN SEE THAT IT USES

01:40:03 A VALUE OF CURRENT. THERE'S A SHORT EXCERPT FROM THE SPECIFICATION OF THE '908 PATENT, COLUMN 10. I THINK IT IS LINE 31 TO 32, "WHERE THE CURRENT FLOWING THROUGH THE POWER SWITCH, 147, IS INTERNALLY LIMITED OR CLAMPED TO THE VALUE OF 3 AMPS."

01:40:23 **Q** AND IF WE LOOK AT THE FAIRCHILD DATASHEETS, WHAT DO THEY SHOW?

**A** FOR THE FAIRCHILD DATASHEETS WHAT WE SEE IS THAT THE FAIRCHILD CONTROLLER CIRCUIT USES A VALUE OF VOLTAGE. AND THAT'S ALSO SEEN IN THE -- IN THE TABLES THAT'S FOUND IN THE

01:40:44 DATASHEET.

YOU SEE THAT THERE IS A TYPICAL 0.825 VOLTAGE. AND THERE'S THESE RANGES THAT'S TYPICAL FOR THESE KINDS OF DATASHEETS.

AND THAT'S TRUE FOR BOTH THE 6747 DATASHEET ON PAGE 9, I

01:40:57 BELIEVE, AND THE SG6841 DATASHEET AT PAGE 5.

**MS. ONDRICK:** AND THOSE ARE DX 3184, FOR THE RECORD, AND DX 4677.

(DOCUMENT DISPLAYED)

**BY MS. ONDRICK:**

01:41:17 **Q** NOW, DR. WEI, DO YOU RECALL DR. KELLEY'S EARLIER TESTIMONY

01:41:20 THAT THERE'S REALLY NO DIFFERENCE BETWEEN USING VOLTAGE AND CURRENT?

**A** I DO. AND WHAT IS SHOWN ON THE TOP OF THIS PARTICULAR SLIDE ARE TWO SLIDES BORROWED FROM DR. KELLEY WHERE IT

01:41:34 SHOWS -- WHAT HE IS TRYING TO SHOW HERE IS THAT IF YOU HAVE A V SENSE VERSUS IVN RELATIONSHIP -- THAT'S ACTUALLY IN THE DATASHEET -- THAT YOU CAN THEN REPLACE THE NUMBERS ON THE Y AXIS WITH CURRENTS INSTEAD OF VOLTAGES.

AND WHAT HE'S USING HERE IS APPLYING OHM'S LAW, WHICH, I

01:41:57 HAD TALKED ABOUT BEFORE, I EQUALS V OVER R.

(REPORTER INTERRUPTION)

**THE WITNESS:** I EQUALS V OVER R.

**THE COURT REPORTER:** THANK YOU.

**THE WITNESS:** BUT, WHAT YOU HAVE TO LOOK AT HERE IS

01:42:15 IF YOU LOOK AT THE DATASHEETS FOR, IN THIS CASE, THE 6841, AGAIN WE SEE THAT SENSE RESISTOR, WHICH I'VE BLOWN UP HERE JUST TO MAKE AT BIT MORE VISIBLE.

THAT IS CONNECTED TO THE POWER SWITCH, Q1.

AND IT IS THE VOLTAGE GOING INTO THE SENSE PIN OF THE

01:42:34 CONTROLLER CIRCUIT.

**BY MS. ONDRICK:**

**Q** WHY IS THAT IMPORTANT TO YOUR ANALYSIS, AGAIN, DR. WEI?

**A** WELL, AGAIN, AS I MENTIONED BEFORE, THE CUSTOMER CAN SELECT THE APPROPRIATE POWER SWITCH AND RESISTOR VALUE TO

01:42:48 TARGET A WIDE RANGE OF APPLICATIONS.

01:42:49 IT'S NOT LIMITED TO JUST A MAXIMUM OF ONE CURRENT OR TWO CURRENTS. IT'S THE CUSTOMER HAS THE OPTION TO UTILIZE THE APPROPRIATE POWER SWITCH FOR THE APPROPRIATE APPLICATION THAT THEY WANT TO BUILD A POWER SUPPLY FOR.

01:43:04 **Q** AND SO BECAUSE THE FAIRCHILD PRODUCTS HAVE THIS FLEXIBILITY OF DESIGN, DR. KELLEY'S CONVERSION JUST DOESN'T WORK?

**A** YES. IT DOESN'T WORK BECAUSE THE CONTROLLER CIRCUIT, THE FAIRCHILD CONTROLLER CIRCUIT, RELIES ON A VOLTAGE. IT MUST

01:43:19 RELY ON A VOLTAGE.

(DOCUMENT DISPLAYED)

**Q** AND I THINK YOU'RE SHOWING THIS POINT A LITTLE FURTHER HERE WITH THE NEXT SLIDE. WHAT ARE YOU SHOWING HERE?

**A** WHAT I'M SHOWING HERE IS, YOU KNOW, IF YOU HAVE DIFFERENT

01:43:33 POWER SWITCHES THAT HAVE DIFFERENT CURRENT RATINGS, MAXIMUM CURRENT RATING, THEN YOU HAVE TO CHOOSE THE APPROPRIATE SENSE RESISTOR VALUE IN ORDER TO GET TO THE APPROPRIATE THRESHOLD VOLTAGE LEVEL, AND PROVIDE THAT SENSE VOLTAGE TO THE FAIRCHILD CONTROLLER CIRCUIT.

01:43:54 **Q** AND SO IS IT YOUR OPINION THAT THE ASSERTED CLAIMS OF THE '908 PATENT DO NOT LITERALLY INCLUDE A CURRENT LIMIT?

**A** THAT'S CORRECT.

**Q** AND DO YOU HAVE AN OPINION FOR THIS CLAIM LIMITATION UNDER THE DOCTRINE OF EQUIVALENTS?

01:44:08 **A** YES.

01:44:08 **Q** AND WHAT IS THAT OPINION?

(DOCUMENT DISPLAYED)

**A** SO THIS OPINION, AS WE CAN SEE -- SO, AGAIN, FOR THE DOCTRINE OF EQUIVALENTS, THERE WAS THAT FUNCTION/WAY/RESULT TEST. THERE'S THE INSUBSTANTIAL DIFFERENCE. 01:44:16

AND SO I'M ADDRESSING WHAT DR. KELLEY HAD BROUGHT UP IN TERMS OF THE DOCTRINE OF EQUIVALENTS.

AND THIS IS NOT AN INSUBSTANTIAL DIFFERENCE BECAUSE ONE OF ORDINARY SKILL IN THE ART THAT IS LOOKING AT THIS TECHNOLOGY, WOULD KNOW THAT THERE ARE TWO WAYS OF CARRYING OUT THE SWITCHING. 01:44:35

YOU CAN USE A VOLTAGE THRESHOLD, OR YOU CAN USE A CURRENT LIMIT. AND, WE SAW THE CURRENT AND VOLTAGE THERE, TWO SEPARATE THINGS.

01:44:49 AND SO THERE IS A SUBSTANTIAL DIFFERENCE BETWEEN IMPLEMENTING A VOLTAGE THRESHOLD VERSUS IMPLEMENTING A CURRENT LIMIT, A VALUE OF CURRENT IN THE CONTROLLER CIRCUIT.

AND, WE JUST SAW WHY FAIRCHILD CHOSE TO USE A VOLTAGE THRESHOLD, BECAUSE OF THE EXTERNAL POWER SWITCH, AND THAT RESISTOR. 01:45:06

AND, I GO ON FURTHER THAT IN THE COURSE OF THE PROSECUTION OR THE EXAMINATION OF THE PATENT WITH -- AT THE PATENT OFFICE, POWER INTEGRATIONS MADE A COMMENT THAT ESSENTIALLY SAYS THERE IS A SUBSTANTIAL DIFFERENCE BETWEEN "VOLTAGE" AND "CURRENT."

01:45:28 **Q** OKAY. WHY DON'T WE GO AHEAD AND TAKE A LOOK AT THAT?

01:45:31 **A** OKAY.

(DOCUMENT DISPLAYED)

**MS. ONDRICK:** AND, FOR THE RECORD, WE ARE SHOWING DX 5123. IT'S THE '908 FILE HISTORY FOR THE PARENT PATENT. AND 01:45:45 IT'S AT PAGE 30.

**THE WITNESS:** SO, THIS IS -- I BELIEVE WHAT THIS IS IS A RESPONSE FROM POWER INTEGRATIONS TO THE PATENT OFFICE. AND IT'S IN REFERENCE TO THIS *AGIMAN* REFERENCE, OR *AGIMAN* PRIOR ART.

01:46:01 AND WHAT POWER INTEGRATIONS TOLD THE PATENT OFFICE, AS WE CAN SEE IN THE HIGHLIGHTED PORTION, *AGIMAN*'S CIRCUIT MONITORS VOLTAGE RATHER THAN CURRENT. SO IT IS MAKING THIS DISTINCTION BETWEEN "CURRENT" AND "VOLTAGE." MOREOVER, IF WE KEEP ON READING, *AGIMAN* DESCRIBES A CIRCUIT THAT INCLUDES A COMPARATOR 01:46:22 WHICH RECEIVES A SUPPLY MONITORING VOLTAGE AND A THRESHOLD VOLTAGE FOR COMPARISON.

AND THEN, FURTHER ON, WHEN WE LOOK AT THE NEXT HIGHLIGHTED PORTION: *"AGIMAN* FAILS TO DISCLOSE" -- THIS IS POWER INTEGRATIONS TELLING THE PATENT OFFICE -- *"AGIMAN* FAILS TO 01:46:38 DISCLOSE, TEACH OR FAIRLY SUGGEST A CURRENT INPUT CIRCUIT."

SO IT'S MAKING THAT DISTINCTION BETWEEN "VOLTAGE" AND "CURRENT."

AND THEN, THE LAST PIECE IS "WHEN THE CURRENT CROSSES A THRESHOLD..."

**BY MS. ONDRICK:**

**Q** SO IT LOOKS LIKE, DR. WEI, POWER INTEGRATIONS AGREES WITH YOUR POSITION THAT "VOLTAGE" AND "CURRENT" ARE DIFFERENT. ISN'T THAT RIGHT?

**A** THAT IS RIGHT.

(DOCUMENT DISPLAYED)

**Q** NOW, IF WE COULD CONTINUE ON TO YOUR NEXT SLIDE, DR. WEI, WHAT ARE YOU SHOWING HERE WITH REGARD TO 'CURRENT' AND "VOLTAGE"?

**A** SO HERE I'M TALKING -- IT IS NOW LOOKING AT, AGAIN, THIS NOTION OF DOCTRINE OF EQUIVALENTS, AND, WITH RESPECT TO THAT FUNCTION/WAY/RESULT TEST.

AND SO, WHAT I'M STATING HERE IS THAT THE WAY IS NOT THE SAME. CURRENT LIMIT MEANS A VALUE OF CURRENT THAT CAN BE USED BY THE CONTROL CIRCUIT TO TURN OFF THE POWER SWITCH WHEN THE AMOUNT OF CURRENT PASSING THROUGH THE POWER SWITCH REACHES THE THRESHOLD.

AND THEN, THE VOLTAGE COMPARATOR IN FAIRCHILD PRODUCTS COMPARED TWO VOLTAGES: THE VOLTAGE AT THE POWER SWITCH -- THE VOLTAGE AT THE SENSE PIN, AND A THRESHOLD VOLTAGE.

**Q** SO, IT'S YOUR OPINION THAT A VOLTAGE THRESHOLD IS NOT EQUIVALENT TO A CURRENT LIMIT?

**A** THAT'S RIGHT.

(DOCUMENT DISPLAYED)

**Q** AND IF WE CONTINUE ON, WHAT ARE YOU SHOWING HERE, WITH

01:48:04 RESPECT TO THIS SLIDE?

**A** ALL I'M SHOWING HERE ARE DIFFERENT KIND OF COMPARATORS THAT YOU SEE IN THE '908 PATENT. THERE'S A VOLTAGE COMPARATOR, SHOWN ON THE LEFT, WITH THAT LABEL 1 IN THE RED CIRCLE.

01:48:19 AND THEN, IF YOU LOOK IN FIGURE 4 OF THE '908 PATENT ON THE UPPER -- I BELIEVE IF YOU WERE TO ZOOM OUT THAT IS THE UPPER RIGHT-HAND CORNER. THE CIRCUIT SHOWN THERE ON THE UPPER RIGHT-HAND CORNER -- I THINK IT'S LABELED "317" -- THAT IS A CURRENT COMPARATOR AS DESCRIBED IN THE PATENT.

01:48:34 **Q** SO THE PATENT TALKS ABOUT VOLTAGE -- CURRENT COMPARATOR?

**A** THE PATENT DESCRIBES A CURRENT COMPARATOR.

**Q** AND THE FAIRCHILD PRODUCTS HAVE A VOLTAGE COMPARATOR?

**A** THE FAIRCHILD PRODUCTS USE A VOLTAGE COMPARATOR.

01:48:53 (DOCUMENT DISPLAYED)

**Q** NEXT, I SEE YOU HIGHLIGHTED AND PICKED OUT ONE OF DR. KELLEY'S SLIDES FROM HIS PRESENTATION. WHAT ARE YOU SHOWING HERE?

**A** WHAT I'M SHOWING HERE IS THAT THE -- OH, THIS IS FIGURE 4

01:49:10 OF THE '908 PATENT. AND I'M JUST POINTING OUT THE DIFFERENT COMPONENTS THAT DR. KELLEY HAD POINTING TO. AND. THERE IS THAT CURRENT SENSE SIGNAL COMING IN. AND THEN, THERE IS A CONTROL CIRCUIT AND A POWER SWITCH.

**Q** AND DOES FIGURE 4 SHOW A VOLTAGE COMING INTO THE

01:49:28 CONTROLLER?

01:49:30 **A** THE -- THE FIGURE DOES NOT SHOW A VOLTAGE COMING INTO THE CONTROLLER.

**Q** WHAT DOES IT SHOW COMING INTO THE CONTROLLER?

**A** IT IS A -- A CURRENT COMING INTO THE CONTROLLER.

01:49:38 **Q** OKAY.

**A** THE CONTROLLER CHIP.

(DOCUMENT DISPLAYED)

**Q** SO IF YOU COULD, DR. WEI, COULD YOU SUMMARIZE YOUR OPINIONS FOR CLAIMS 26 AND 27 OF THE '908 PATENT?

01:49:53 **A** SURE. SO, FROM WHAT WE JUST SAW, THAT LIMITATION WITH RESPECT TO THE CURRENT LIMITS, THAT'S NOT MET.

AND, THEREFORE, CLAIM 26 -- AND THEN, CLAIM 27, WHICH IS DEPENDENT ON CLAIM 26, ALSO, THAT SAME LIMITATION IS NOT MET. AND, THEREFORE, THE ASSERTED CLAIMS 26 -- OR THE -- THE 01:50:16 ACCUSED FAIRCHILD PRODUCTS DO NOT INFRINGE THE CLAIMS 26 AND 27 OF THE '908 PATENT.

**Q** I HAVE A COUPLE OF QUESTIONS FOR YOU NOW JUST ABOUT SOME OF THE TESTIMONY WE HEARD FROM DR. KELLEY WITH REGARD TO THE '908 PATENT.

01:50:41 **A** OKAY.

**Q** DID YOU HEAR DR. KELLEY TESTIFY THAT BOTH OF THE REPRESENTATIVE ACCUSED FAIRCHILD PARTS USED A COMPARISON INVOLVING A VALUE REPRESENTATIVE OF A VOLTAGE AS PART OF HIS INFRINGEMENT ANALYSIS?

01:50:59 **A** A VALUE REPRESENTATIVE OF A VOLTAGE? I THINK HE WAS

01:51:04 TALKING ABOUT --

**Q** A VALUE OF VOLTAGE REPRESENTATIVE OF A CURRENT. I'M SORRY.

**A** RIGHT. SO DR. KELLEY SAID THAT, OH, YOU KNOW, BY HAVING

01:51:12 THAT -- USING OHM'S LAW, THERE IS A VALUE OF VOLTAGE THAT IS REPRESENTATIVE OF A CURRENT. I DO.

**Q** OKAY. AND DO YOU THINK THAT THIS IS AN APPROPRIATE ANALYSIS WHEN YOU LOOK AT THE '908 PATENT?

**A** I DON'T, BECAUSE FOR THE VARIOUS REASONS THAT I JUST

01:51:26 EXPLAINED, WHEN YOU LOOK AT THE FAIRCHILD PRODUCTS, THE CONTROLLER CHIP THAT IS THE CONTROLLER CHIP, AND IT HAS THAT POWER SWITCH, EXTERNAL, WITH THE SENSE RESISTOR. AND SO WHAT THE CONTROLLER CIRCUIT IS USING IS THE VOLTAGE -- IS A VOLTAGE.

01:51:45 **Q** DID YOU ALSO HEAR DR. KELLEY ADMIT THAT A VOLTAGE COMPARATOR IS DIFFERENT FROM A CURRENT COMPARATOR?

**A** I DO RECALL HEARING THAT. YEAH.

**Q** AND WHAT IS THE IMPORT OF THAT TESTIMONY?

**A** THE IMPORT OF THAT TESTIMONY IS THAT YOU CAN'T JUST SWITCH

01:51:59 THEM. YOU CAN'T TAKE OUT A VOLTAGE COMPARATOR AND PUT IN A CURRENT COMPARATOR INSTEAD, OR VICE-VERSA.

**Q** AND, DID YOU HEAR DR. KELLEY TESTIFY THAT THE VOLTAGE HE POINTED TO FOR THE CURRENT LIMIT WAS THE SENSE PIN THAT WE HAVE BEEN TALKING ABOUT HERE WITHIN FAIRCHILD'S PRODUCTS?

01:52:16 **A** YES.

01:52:17 **Q** AND, DOES THAT TESTIMONY ASSIST YOUR OPINIONS IN ANY WAY?

**A** I THINK IT FURTHER BOLSTERS MY OPINION, EVERYTHING THAT I DESCRIBED. WHEN YOU HAVE THE FAIRCHILD CONTROLLER CIRCUIT AND YOU HAVE THE POWER SWITCH, AND THE SENSE RESISTOR, WAS GOING 01:52:32 IN -- WHAT THE CONTROLLER CIRCUIT IS USING IS A VOLTAGE -- IS A VALUE OF THE VOLTAGE.

**Q** OKAY. THANK YOU, DR. WEI.

NOW, WHAT I WOULD LIKE TO DO IS SHIFT GEARS AND MOVE AWAY FROM NON-INFRINGEMENT. AND LET'S START TALKING ABOUT YOUR 01:52:52 OPINIONS WITH REGARD TO THE INVALIDITY OF THE '908 AND '079 PATENTS, IF WE COULD.

**A** SURE.

(DOCUMENT DISPLAYED)

**Q** DR. WEI, HAVE YOU FORMED ANY OPINIONS ON WHETHER THE 01:53:11 ASSERTED CLAIMS OF THE '908 PATENT ARE INVALID IN VIEW OF THE PRIOR ART?

**A** I HAVE. SO WHAT MY OPINION IS THAT WITH RESPECT TO AT LEAST ONE PIECE OF PRIOR ART. SO "PRIOR ART" MEANS THAT THERE IS A PUBLICATION, OR A PATENT THAT WAS AVAILABLE IN THE PUBLIC 01:53:31 BEFORE THE '908 PATENT. AND, I THINK BEFORE THE '908 PATENT WAS EVEN FILED.

AND WHAT WE CAN DO IS BY LOOKING AT CLAIMS 26 AND 27 AND EACH OF THE ELEMENTS THERE, AND THEN IF YOU LOOK AT ONE OF THESE PRIOR ART REFERENCES, WHAT YOU WILL SEE IS THAT YOU CAN 01:53:52 IDENTIFY EACH AND EVERY ONE OF THOSE LIMITATIONS IN THAT PRIOR

01:53:57 ART REFERENCE FOR ALL THE ELEMENTS IN CLAIMS 26 AND 27.

AND, THEREFORE, IT'S MY OPINION THAT CLAIMS 26 AND 27 OF THE '908 PATENT ARE INVALID.

**MS. ONDRICK:** YOUR HONOR, MAY I APPROACH?

01:54:12 **THE COURT:** YES, YOU MAY.

**MS. ONDRICK:** I HAVE AN INVALIDITY BINDER FOR DR. WEI.

**THE COURT:** ALL RIGHT.

**BY MS. ONDRICK:**

01:54:38 **Q** SO WHEN YOU CONDUCT AN INVALIDITY ANALYSIS, DR. WEI, CAN YOU TELL ME WHAT IT IS THAT YOU ARE REQUIRED TO DO?

**A** SO WHAT I'M REQUIRED TO DO IS LOOK AT THE CLAIMS, LOOK AT THE ELEMENTS, AND IDENTIFY, IF THERE IS ONE AVAILABLE, A PRIOR-ART PIECE OF REFERENCE, WHETHER IT'S A PAPER, PATENT.

01:54:58 AND THEN, LOOK TO SEE IF THE -- THAT PATENT OR PAPER DESCRIBES THE TECHNOLOGY, AND YOU CAN SEE THE LIMITATIONS IN THAT PRIOR ART.

**Q** AND WHAT IS YOUR UNDERSTANDING OF THE WAYS TO SHOW INVALIDITY, DR. WEI?

01:55:15 **A** SO THE WAYS TO SHOW, IT IS KIND OF LIKE THAT BOWLING ANALOGY, ONCE AGAIN. ACTUALLY, WE HAD AN EASY TIME TALKING ABOUT NONINFRINGEMENT FOR THE '079 AND '908 PATENTS.

NOW THAT WE HAVE GONE INTO INVALIDITY, WE HAVE TO IDENTIFY EACH AND EVERY ELEMENT. SO NOW WE HAVE TO MARCH THROUGH ALL

01:55:31 OF THE ELEMENTS FOR THESE -- FOR ALL THE CLAIMS THAT WE HAVE

BEEN TALKING ABOUT.

**Q** AND IF WE DO THAT, WE HAVE TO DO THAT FOR EACH OF THE CLAIMS, CLAIMS 26 --

**A** CLAIMS 26, 27 --

**Q** OKAY.

**A** AND ALL THE ELEMENTS.

**Q** NOW, WHEN YOU CONDUCTED YOUR INVALIDITY ANALYSIS, DID YOU MAKE ANY ASSUMPTIONS?

**A** I DID. SO IN TERMS OF THIS INVALIDITY ANALYSIS, WHAT I ESSENTIALLY ASSUMED WAS DR. KELLEY'S VIEW OF, YOU KNOW, HOW TO CONSTRUE -- HOW TO UNDERSTAND THE CLAIMS. AND, BASICALLY, WHAT IT BOILS DOWN IS, YOU KNOW, WHETHER IT'S A SENSE -- WHETHER IT'S A CURRENT OR A VOLTAGE, YOU KNOW, IT DOESN'T REALLY MATTER. AND, THEREFORE, UNDER THAT UNDERSTANDING, I HAVE LOOKED AT THE PRIOR ART TO SEE IF I CAN IDENTIFY EACH AND EVERY ONE OF THESE -- OF THE LIMITATIONS IN THE PRIOR ART.

**Q** OKAY. AND WHEN YOU IDENTIFY EACH AND EVERY LIMITATION IN ONE PIECE OF PRIOR ART, IS THAT SOMETHING CALLED "ANTICIPATION"?

**A** THAT'S CORRECT. SO -- WELL, THERE'S OTHER -- THERE'S DIFFERENT WAYS IN WHICH YOU CAN FIND THAT A PATENT CLAIM IS INVALID.

ONE IS ANTICIPATION, WHERE A ESSENTIAL PIECE OF PRIOR ART CONTAINS ALL OF THE LIMITATIONS. BUT IF NOT A SINGLE PIECE OF PRIOR ART CONTAINS ALL THE LIMITATIONS, THERE IS SOMETHING

01:57:02 CALLED "OBVIOUSNESS" WHERE YOU CAN TAKE MAYBE TWO PIECES OF PRIOR ART, TWO REFERENCES, AND THEN FIND ALL OF THE PIECES IN THERE.

**Q** NOW, I THINK WE HAVE SOME GOOD NEWS FOR THE JURY TODAY. I
01:57:11 KNOW YOU HAVE SEVERAL OPINIONS ON INVALIDITY, BUT WE ARE ONLY GOING TO BE OFFERING ONE OF THEM HERE TODAY TO TRY AND STREAMLINE THINGS FOR THE JURY AND THE COURT AND THE PARTIES' TIME.

SO CAN YOU PLEASE TELL US THAT, THE POSITION THAT YOU ARE
01:57:25 GOING TO BE PRESENTING HERE TODAY?

**A** SURE. SO, WE ARE GOING TO FOCUS ON ONE PIECE OF PRIOR ART. AND THAT'S CALLED THE "BARROW PATENT." I'LL JUST REFER TO IT AS "BARROW." AND IT IS MY OPINION THAT BARROW ANTICIPATES CLAIM 26 AND 27 OF THE '908 PATENT.

01:57:42 **Q** SO THIS IS WHERE YOU ARE GOING TO BOWL A STRIKE FOR US TODAY, RIGHT?

**A** I'M GOING TO BOWL A STRIKE, BUT WE NEED TO MARCH THROUGH EVERYTHING.

**Q** OKAY. SO, IF YOU COULD TAKE A LOOK AND JUST TELL US A
01:57:52 LITTLE BIT ABOUT THE BARROW PATENT, PLEASE?

**A** SURE. THE BARROW PATENT --

**MS. ONDRICK:** ONE MOMENT.

AND, YOUR HONOR, I OFFER DX5053 INTO EVIDENCE.

**THE COURT:** IS THERE AN OBJECTION TO 5053?

01:58:09 **MR. POLLACK:** NO OBJECTION, YOUR HONOR.

01:58:10 **THE COURT:** ALL RIGHT. DX 5053 MAY BE ADMITTED.

(TRIAL EXHIBIT 5053 RECEIVED IN EVIDENCE)

**BY MS. ONDRICK:**

**Q** IF YOU COULD TELL US A LITTLE BIT ABOUT THE BARROW PATENT,

01:58:28 DR. WEI.

**A** OF COURSE. SO THE BARROW PATENT IS A PATENT, AND THE TITLE OF THE BARROW PATENT IS "QUICK-START AND OVERVOLTAGE PROTECTION FOR A SWITCHING REGULATOR CIRCUIT."

AND I'LL PROVIDE A HIGH-LEVEL OVERVIEW OF WHAT THE

01:58:48 UNDERLYING TECHNOLOGY OF THIS PATENT IS JUST TO FAMILIARIZE US WITH IT.

BUT A COUPLE OF THINGS TO POINT OUT IS THAT THE FILE DATE FOR THIS PARTICULAR PATENT WAS 1992, AND THEN THE DATE OF THE PATENT ITSELF, WHEN IT CAME OUT, WAS IN 1994.

01:59:03 AND SO FROM THOSE DATES WE KNOW THAT THIS IS PRIOR ART TO THE '908 PATENT.

**Q** AND SO DOES THE BARROW PATENT PREDATE THE '908 PATENT?

**A** YES.

**Q** OKAY.

01:59:15 AND I SEE THAT THIS PARTICULAR PATENT IS ASSIGNED TO MOTOROLA. IS THAT RIGHT?

**A** THAT'S CORRECT.

(DOCUMENT DISPLAYED)

**Q** NOW, YOU PULLED OUT FIGURE 3 FROM THE BARROW PATENT. CAN

01:59:31 YOU JUST USE THIS FIGURE TO DESCRIBE WHAT BARROW DISCLOSES?

01:59:36 **A** YES. SO I THOUGHT IT MIGHT BE HELPFUL TO TAKE A STEP BACK, BECAUSE WE HAVE BEEN DIGGING INTO A LOT OF THE TECHNOLOGIES AND FOCUSING ON DIFFERENT PIECES. BUT OFTENTIMES IT IS SOMEWHAT HELPFUL TO TAKE A STEP BACK, LOOK AT WHAT THIS 01:59:49 PARTICULAR PRIOR ART REFERENCE IS TALKING ABOUT.

AND SO, AGAIN, IF YOU LOOK, THIS PROBABLY LOOKS A BIT FAMILIAR. YOU SEE SIMILAR CIRCUIT ELEMENTS. THERE IS A POWER SWITCH (INDICATING), SHOWN OVER HERE (INDICATING).

AND THEN, THERE'S A TRANSFORMER HERE (INDICATING), AND WE 02:00:05 HAVE SEEN THAT, AS WELL. THERE IS A DIODE, AND THEN WE SEE THE OUTPUT. OKAY?

AND ATTACHED TO THE OUTPUT THERE IS A LOAD (INDICATING).

AND IF WE FLIP OVER TO THE LEFT-HAND SIDE, NOTICE THAT THERE IS A VAC, AGAIN, THAT INPUT VOLTAGE WHERE YOU PLUG INTO 02:00:21 THE WALL.

AND WITHIN THE DOTTED BOX SHOWN HERE (INDICATING), THAT IS A CONTROLLER CIRCUIT. AND SO, WHAT WE SEE HERE IS THAT THE INPUT VOLTAGE GOES THROUGH, AGAIN, WHAT I HAD REFERRED TO BEFORE AS THE "BRIDGE RECTIFIER." COMES IN HERE. THERE'S A 02:00:40 NODE, 84 (INDICATING). AND THEN, IT KIND OF SPLITS WHERE THERE IS A PATH GOING DOWN THROUGH RESISTOR 115 (INDICATING), TO RESISTOR 116.

AND THEN, THERE'S AN INPUT TO THE CONTROLLER CHIP. AND IT GOES INTO THIS BLOCK CALLED A "MULTIPLIER." AND IT IS PRETTY 02:01:00 SIMPLE. A MULTIPLIER BLOCK MULTIPLIES TWO SIGNALS COMING IN,

02:01:03 TWO VALUES.

AND SO WHAT THIS BARROW PATENT IS DOING IS IT IS TAKING THE SIGNAL FROM HERE, MULTIPLIES IT WITH ANOTHER SIGNAL COMING IN FROM THE RIGHT-HAND SIDE (INDICATING). AND THAT IS 02:01:17 CONNECTED TO -- ESSENTIALLY THROUGH OTHER CIRCUITRY, ULTIMATELY TO THE OUTPUT VOLTAGE.

AND, IF WE LOOK INSIDE THE CONTROLLER CIRCUIT, WE NOTICE OTHER SQUARES AND TRIANGLES. THEY ARE RIGHT HERE. THERE IS A COMPARATOR 98 (INDICATING). AND WHAT THAT'S -- THAT IS WHAT 02:01:32 THE BARROW PATENT DESCRIBES AS THE "UNDER-VOLTAGE LOCKOUT COMPARATOR."

THERE'S ANOTHER COMPARATOR, 142, THAT'S REFERRED TO AS THE "OVERVOLTAGE COMPARATOR." THERE'S ANOTHER COMPARATOR, 120. AND THERE'S SOME LOGIC GATES.

02:01:49 AND SO IT COULD HAVE A LOT OF THE ELEMENTS AND IT ALSO HAS A LOT OF THE FEATURES AND FUNCTIONS THAT WE HAVE BEEN TALKING ABOUT WITH RESPECT TO THE '908 PATENT.

**Q** YOU MENTIONED SOME OF THESE OTHER FUNCTIONALITIES. I SEE HERE AT THIS NODE 84, YOU WENT TO AN UNDERVOLTAGE LOCKOUT 02:02:11 COMPARATOR?

**A** THAT'S RIGHT.

**Q** WHAT IS THE FUNCTION OF THAT?

**A** SO THE FUNCTION IS -- SO THERE IS A CONNECTION BETWEEN THIS NODE 84, AND IT GOES THROUGH THIS RESISTOR -- I BELIEVE 02:02:20 IT'S 96 (INDICATING). AND THERE'S A CAPACITOR 94. AND THEN,

02:02:28 IT ENTERS INTO THE CHIP, INTO THE POSITIVE INPUT TERMINAL OF THE COMPARATOR, 98.

AND SO WHAT'S HAPPENING HERE IS THERE'S ONE FUNCTION WHERE IF THE INPUT VOLTAGE IS TOO LOW YOU DON'T WANT THE CHIP TO 02:02:43 OPERATE YET. YOU WANT TO WAIT FOR THE INPUT VOLTAGE TO HAVE GOTTEN HIGH ENOUGH FOR THE CIRCUITRY TO OPERATE PROPERLY.

AND YOU CAN IMAGINE THAT ONE SCENARIO HERE IS THAT WHEN YOU FIRST PLUG IN, THERE IS NO POWER THAT WAS INITIALLY PROVIDED TO THE CONTROLLER CHIP.

02:02:59 AND SO WHEN YOU FIRST PLUG IN, ELECTRICITY FLOWS. THE VOLTAGES START RAMPING UP. AND YOU JUST WANT TO WAIT AND LET THINGS -- KIND OF LIKE WARMING UP YOUR CAR. YOU WANT TO WARM UP YOUR CIRCUIT BEFORE IT TURNS ON AND STARTS TO FUNCTION.

**MR. POLLACK:** YOUR HONOR, JUST THE SAME OBJECTION, 02:03:17 RULE 26, TO THAT TESTIMONY. I KNOW THERE'S NOT MUCH YOU CAN DO ABOUT IT RIGHT NOW, BUT I HAVE TO STATE IT FOR THE RECORD. THAT I BELIEVE THAT TESTIMONY IS ALL BEYOND THE SCOPE.

**THE COURT:** OKAY. AT THE MOMENT I HAVE NO WAY OF RESOLVING THAT. I GUESS WE WILL GO ON.

02:03:35 **MR. POLLACK:** I UNDERSTAND, YOUR HONOR. I JUST HAVE TO PRESERVE IT.

**THE COURT:** ALL RIGHT. AT SOME POINT, IF YOU WISH TO BE HEARD, IT WILL HAVE TO BE AFTER I HAVE -- I ASSUME YOU DON'T WANT TO INTERRUPT RIGHT NOW. IS THAT RIGHT?

02:03:49 **MR. POLLACK:** THAT'S RIGHT, YOUR HONOR. I DON'T WANT

02:03:50 TO INTERRUPT THE FLOW. I JUST NEED TO STATE THAT FOR THE RECORD.

**THE COURT:** ALL RIGHT. BUT AT SOME POINT IT IS GOING TO HAVE TO BE RESOLVED.

02:03:58 **MR. POLLACK:** WE CAN TALK ABOUT IT AT THE END OF THE DAY, YOUR HONOR.

**THE COURT:** ALL RIGHT. OKAY, FINE.

**MS. ONDRICK:** YOUR HONOR, WE WERE JUST GOING TO WALK THROUGH THE VARIOUS FUNCTIONALITIES SHOWN ON THE FIGURE, AND 02:04:06 THEN GET INTO THE INVALIDITY ANALYSIS. SO THIS WAS ALL JUST BACKGROUND.

**THE COURT:** OKAY.

**MS. ONDRICK:** OKAY?

**THE COURT:** WE HAVE HAD OBJECTIONS --

02:04:13 **MS. ONDRICK:** BUT WE CAN MOVE ON IF -- IF WE DON'T NEED IT FOR BACKGROUND, I GUESS.

**THE COURT:** I'LL LEAVE THAT TO YOU. I DON'T KNOW WHETHER THIS OBJECTION IS WELL-TAKEN OR NOT. IT'S MADE. I'LL ADDRESS IT AT AN APPROPRIATE TIME WHEN WE WON'T BE 02:04:27 INTERRUPTING THE JURY, WHICH IS THE SUGGESTION OF MR. POLLACK.

**MS. ONDRICK:** NO PROBLEM, YOUR HONOR.

**THE COURT:** SO KEEP GOING, HOWEVER YOU LIKE.

(DOCUMENT DISPLAYED)

**BY MS. ONDRICK:**

02:04:38 **Q** SO, DR. WEI, WHY DON'T WE START OUR WALK-THROUGH OF THE

CLAIMS WITH THE BARROW PATENT?

**A** OKAY.

**Q** WHAT ARE YOU SHOWING HERE? I SEE YOU HAVE CALLED OUT COLUMN 1, LINES 58 TO 63 OF BARROW.

**A** SO WHAT I'VE CALLED OUT HERE IS A SECTION OF THE PATENT SPECIFICATION CALLED "THE SUMMARY OF THE INVENTION."

AND JUST TALKING ABOUT, IN SUMMARY, HERE'S WHAT THIS INVENTION OF BARROW IS ABOUT.

AND WHAT'S SHOWN ON TOP IS FOR CLAIM 26. THIS IS ACTUALLY CALLED THE "PREAMBLE," YOU KNOW, THE BEGINNING OF THE CLAIM. AND IT SAYS:

"A POWER SUPPLY CONTROLLER CIRCUIT COMPRISING."

(DOCUMENT DISPLAYED)

**A** AND THEN, I'M JUST POINTING OUT THAT THE BARROW IS RELATED TO A POWER CONVERTER, SO THERE IS A POWER SUPPLY CONTROLLER CIRCUIT IN THERE.

**Q** SO CAN WE GO AHEAD AND CHECK THE BOX AND SAY THAT BARROW DISCLOSES THE POWER SUPPLY CONTROLLER?

**A** YES.

**Q** LET'S GO TO THE MULTI-FUNCTION CIRCUIT ELEMENT.

**A** OKAY.

(DOCUMENT DISPLAYED)

**Q** CAN YOU REMIND US OF THE COURT'S CLAIM CONSTRUCTION?

**A** YES. SO IN TERMS OF THE MULTI-FUNCTION CIRCUIT WITHIN THIS ELEMENT, THERE'S A COURT'S CLAIM CONSTRUCTION. AND, THE

02:05:43 CONSTRUCTION IS:

"A CIRCUIT WITHIN A POWER SUPPLY CONTROLLER CIRCUIT" THAT IS DESCRIBED IN BARROW -- "THAT IS CAPABLE OF PERFORMING AT LEAST THE FUNCTION OF GENERATING A
02:05:54 CURRENT LIMIT ADJUSTMENT SIGNAL BASED ON A SIGNAL FROM A MULTI-FUNCTION TERMINAL THAT IS ELECTRONICALLY COUPLED TO IT."

SO THERE IS ACTUALLY A BUNCH OF PIECES THAT WE WOULD HAVE TO IDENTIFY TO APPLY THE COURT'S CLAIM CONSTRUCTION, IN
02:06:12 ADDITION TO THE REST OF THIS CLAIM ELEMENT

**Q** HAVE YOU APPLIED THE COURT'S CONSTRUCTION IN FORMULATING YOUR INVALIDITY OPINIONS?

**A** YES, I HAVE.

**Q** OKAY. AND SO I SEE WE HAVE ANOTHER CLAIM CONSTRUCTION YOU
02:06:26 ARE IDENTIFYING.

(DOCUMENT DISPLAYED)

**A** THERE IS ONE MORE CLAIM CONSTRUCTION WITH RESPECT TO "MULTI-FUNCTION TERMINAL," WHICH IS DIFFERENT FROM "MULTI-FUNCTION CIRCUIT."

02:06:33 AND THE MULTI-FUNCTION TERMINAL IS AN ELECTRICAL NODE -- WELL, IS (AS READ):

"AN ELECTRICAL NODE THAT CAN BE CONFIGURED AND INTERCONNECTED BETWEEN COMPONENTS OF THE POWER SUPPLY CIRCUIT..."

02:06:48 SO THERE'S DIFFERENT, I WOULD IMAGINE THERE --

"...COMPONENTS OF A POWER SUPPLY CIRCUIT SO AS TO ENABLE AN ELECTRICAL SIGNAL TO FLOW INTO AND OUT OF THOSE COMPONENTS TO OTHER COMPONENTS."

THERE'S COMPONENTS, ELECTRICITY FLOWS.

**Q** AND HAVE YOU APPLIED THE COURT'S CLAIM CONSTRUCTION IN YOUR ANALYSIS, DR. WEI?

(REPORTER INTERRUPTION)

**BY MS. ONDRICK:**

**Q** AND HAVE YOU APPLIED THE COURT'S CLAIM CONSTRUCTION IN YOUR ANALYSIS, DR. WEI?

**A** YES, I HAVE.

**Q** OKAY. AND WE HAVE ONE MORE.

(DOCUMENT DISPLAYED)

**A** WELL, THIS ONE'S A LITTLE BIT SHORTER. AND IT'S ACTUALLY WITH RESPECT TO THE TERM "COUPLED." AND THIS IS AN AGREED-UPON CONSTRUCTION BETWEEN THE TWO PARTIES.

SO, BETWEEN FAIRCHILD AND POWER INTEGRATIONS, THE TWO PARTIES HAVE AGREED THAT THE "COUPLED" MEANS "A DIRECT OR INDIRECT CONNECTION EXISTS IN ORDER TO BE ABLE TO PERFORM SPECIFIC ACTIVITIES OR ACTIONS."

SO, KIND OF AN EXPANDED DESCRIPTION OF THE WORD "COUPLED."

**Q** AND HAVE YOU APPLIED THAT AGREED-UPON CONSTRUCTION?

**A** YES, I HAVE.

**Q** OKAY.

(DOCUMENT DISPLAYED)

02:07:57 **Q** SO WHY DON'T WE GET INTO THIS CLAIM ELEMENT AND START WITH THE "MULTI-FUNCTION TERMINAL" PIECE, IF WE COULD?

**A** WHAT WE ARE GOING TO DO IS BREAK UP THIS ELEMENT. ALTHOUGH IT'S ONE ELEMENT, THERE IS MANY PIECES TO IT. SO WE 02:08:10 WILL TAKE IT ONE PIECE AT A TIME TO MAKE IT EASIER TO FOLLOW.

SO WE WILL FOCUS FIRST ON THE "MULTI-FUNCTION TERMINAL." AND JUST FOR CONVENIENCE, THE COURT'S CLAIM CONSTRUCTION IS ALSO ADDED HERE ON THIS CHART.

BUT WHAT I'M IDENTIFYING IS NODE 84 THAT'S SHOWN ON FIGURE 02:08:31 3 OF THE BARROW PATENTS. THAT IS WHAT I'M IDENTIFYING AS THE MULTI-FUNCTION TERMINAL.

AND IF WE GO INTO THE SPECIFICATION OF BARROW -- SO IF WE GO TO COLUMN 4, LINES 32 TO 47, IF WE LOOK AT WHAT'S HIGHLIGHTED HERE, THERE IS AN INPUT VOLTAGE $V_{AC}$, RIGHT HERE 02:08:55 (INDICATING), OPERATING AT 120 -- OPERATING AT 120$V_{AC}$IS APPLIED ACROSS FULL-WAVE RECTIFIER 82. THAT IS THE CIRCUITRY RIGHT HERE, (INDICATING) AND PRODUCES A 120 HERTZ HAVERSINE WAVEFORM.

AND WHAT THAT BASICALLY MEANS, WITHOUT BORING YOU TO 02:09:18 DEATH, IS A SINUSOIDAL WAVEFORM. AND THEN, THE BRIDGE RECTIFIER, WHAT IT DOES IS IT GIVES YOU KIND OF THE MAGNITUDE. SO IT KIND OF GIVES YOU THIS FUNNY LOOKING SHAPE, BY FLIPPING THE NEGATIVE VOLTAGES OVER TO THE POSITIVE SIDE.

SO THAT IS WHAT A HAVERSINE IS. AND ALL THAT IS HAPPENING 02:09:37 AND BEING APPLIED TO NODE 84. AND THAT IS WHAT I'VE

IDENTIFIED AS THE "MULTI-FUNCTION TERMINAL."

**Q** SO NODE 84 IS THE MULTI-FUNCTION TERMINAL?

**A** CORRECT.

**Q** LET'S CONTINUE ON TO YOUR NEXT SLIDE.

(DOCUMENT DISPLAYED)

**Q** WHAT YOU ARE CONVEYING HERE, DR. WEI?

**A** THEN, I'M CONVEYING THAT AS NODE 84 IS DESCRIBED IN THE PATENTS IN COLUMN 5, LINES 5 THROUGH 14 IS THE WAVEFORM AT NODE 84 IS DIVIDED DOWN BY RESISTOR 115 AND 116.

SO I'M JUST DESCRIBING -- I'M SHOWING THE PATH HERE AS DESCRIBED IN THE PATENT. AND IT'S GOING TO COME -- IT'S COMING INTO A TERMINAL THAT IS GOING TO THE MULTIPLIER BLOCK THAT WE HAD DISCUSSED A LITTLE BIT BEFORE. AND THEN WE WILL STEP THROUGH OTHER ASPECTS OF THIS.

**Q** AND IS THE PATH YOU JUST IDENTIFIED FROM NODE 84 DOWN INTO THE MULTIPLIER 112?

**A** THAT'S CORRECT.

(DOCUMENT DISPLAYED)

**Q** NOW, LET'S TALK ABOUT THE MULTI-FUNCTION CIRCUIT AND WHERE YOU CAN FIND THAT IN BARROW.

**A** SO, WHAT WE SEE FROM THE ELEMENT, THE CLAIM ELEMENT, IT SAYS: "A MULTI-FUNCTION CIRCUIT" -- OF COURSE, THERE'S THAT COURT'S CLAIM CONSTRUCTION. AND THAT MULTI-FUNCTION CIRCUIT IS COUPLED TO RECEIVE A SIGNAL AT A MULTI-FUNCTION TERMINAL?

AND SO WHAT I'M SHOWING HERE IS THAT THERE IS A

02:11:03 MULTI-FUNCTION CIRCUIT, AND IT'S COUPLED, YOU KNOW, THROUGH THE BLUE ARROWS HERE. AND THE MULTI-FUNCTION CIRCUIT COMPRISES THAT MULTIPLIER, 112. AND THERE'S ALSO A COMPARATOR -- I THINK THAT'S AN AMPLIFIER, 140.

02:11:22 **Q** CAN YOU REMIND US AGAIN WHAT THAT MULTIPLIER IS?

**A** IN THAT MULTIPLIER, WHAT IT IS DOING IS TAKING A VOLTAGE THAT IS -- IT'S LOOKING AT A REDUCED, A SMALLER VERSION OF THE INPUT VOLTAGE. AND IT IS MULTIPLYING IT WITH A VALUE COMING IN FROM THE RIGHT. AND THAT VALUE COMING IN FROM THE RIGHT IS 02:11:43 ACTUALLY COMING THROUGH AN AMPLIFIER, WHICH THEN HAS AN INPUT THAT IS CONNECTED ULTIMATELY TO THE OUTPUT.

SO IT IS TAKING INFORMATION FROM THE INPUT VOLTAGE. IT IS TAKING INFORMATION FROM THE OUTPUT VOLTAGE, MULTIPLYING IT AND THEN DOING SOME ACTIVITY.

02:11:59 (DOCUMENT DISPLAYED)

**Q** AND ARE YOU ALSO ABLE TO FIND A CURRENT LIMIT ADJUSTMENT SIGNAL IN BARROW?

**A** YES. SO, THE CURRENT LIMIT ADJUSTMENT SIGNAL IS THE SIGNAL THAT COMES FROM THE OUTPUT OF THE MULTIPLIER 02:12:17 (INDICATING), AND IT GOES UP INTO A COMPARATOR 120, OVER HERE (INDICATING).

AND WHAT IT'S DOING IS IT'S COMPARING THAT SIGNAL COMING HERE, AND IT'S COMPARING IT TO A SIGNAL THAT I'VE TRACED OUT HERE IN RED. AND, AGAIN, THIS IS VERY SIMILAR. WHAT WE CAN 02:12:34 SEE IS THERE'S A POWER SWITCH. THERE IS A RESISTOR. AND IT'S

02:12:38 TAKING THE SIGNAL AND IT IS COMPARING THOSE TWO.

**Q** AND CAN YOU EXPLAIN FOR US HOW BARROW IS ADJUSTING THE CURRENT LIMIT OF THE POWER SWITCH?

**A** SO THE WAY IT ADJUSTS THE CURRENT LIMITS OF THE POWER 02:12:52 SWITCH IS NOTICE THAT THE OUTPUT OF THIS COMPARATOR, 120, GOES INTO THIS PAIR OF NOR GATES.

AND IT IS GOING -- WITHOUT GOING INTO TOO MUCH DETAIL, IT, IS THIS LATCH. AND THROUGH THE FUNCTION OF THE CIRCUITRY, IT TURNS OFF THAT POWER SWITCH OF 126.

02:13:11 **Q** AND WE'RE GOING TO GET INTO THAT IN A LITTLE MORE DETAIL WITH ELEMENT B, CORRECT?

**A** THAT'S CORRECT.

**Q** OKAY.

(DOCUMENT DISPLAYED)

02:13:20 **Q** SO CAN WE GO AHEAD AND CHECK OFF THAT BARROW INCLUDES CLAIM ELEMENT A, THE MULTI-FUNCTION CIRCUIT?

**A** YES, WE CAN.

**Q** SO LET'S LOOK AT YOUR ANALYSIS FOR THE CONTROL CIRCUIT LIMITATION OF CLAIM 26.

02:13:35 **A** OKAY.

(DOCUMENT DISPLAYED)

**Q** I SEE YOU USED THE COURT'S CLAIM CONSTRUCTION. CAN YOU PLEASE EXPLAIN THAT TO US AGAIN?

**A** SURE. SO, AGAIN, THERE IS A CONSTRUCTION FOR "CONTROL 02:13:45 CIRCUIT" WITH RESPECT TO THIS CLAIM. AND IT IS CONSTRUED AS

"A CIRCUIT THAT CONTROLS THE POWER SWITCH," ESSENTIALLY, "BY GENERATING A WAVEFORM WHICH IS RESPONSIVE TO ELECTRICAL SIGNALS GENERATED WITHIN THE POWER SUPPLY CONTROLLER CIRCUIT."

**Q** AND HAVE YOU APPLIED THAT CONSTRUCTION IN YOUR ANALYSIS, SIR?

**A** YES, I HAVE.

**Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** CAN YOU PLEASE TELL US HOW YOU WERE ABLE TO IDENTIFY THE CONTROL CIRCUIT IN THE BARROW PRIOR ART REFERENCE?

**A** I HAVE. SO, THE CONTROL CIRCUIT IS THE CIRCUIT THAT -- THE CIRCUITRY THAT I'VE OUTLINED HERE IN RED (INDICATING).

AND WHAT WE CAN SEE IS THAT, FOR EXAMPLE, THE OUTPUT OF THIS RED BOX HAS A BLUE ARROW GOING TO THE RIGHT. AND IT'S CONNECTED TO THIS SWITCH. AND, IT'S THIS LINE THAT TURNS THE SWITCH ON AND OFF (INDICATING).

**Q** AND SO, IF WE SEE, IF YOU COULD JUST DESCRIBE FOR US THE -- THE COMPONENTS ACTUALLY MAKING UP THE CONTROL CIRCUIT FOR US.

**A** SURE. SO, THE CONTROL CIRCUIT THAT IS IN THE OUTLINED RED BOX, THAT CIRCUIT CONSISTS OF COMPARATOR 120, 142.

THERE'S A BLOCK CALLED "REFERENCE GENERATOR."

THERE'S A BUFFER, 125, OR A GATE DRIVER. AND THEN, THERE'S A DELAY CIRCUIT, 154. THERE'S -- AND THEN THERE'S A PAIR OF WHAT ARE CALLED "NOR GATES" THAT IMPLEMENT THIS LATCH

FUNCTION.

AND SO, ALL THOSE CIRCUITS CONSTITUTE THE CONTROL CIRCUIT.

**Q** AND I'M NOT SURE IF YOU SAID IT OR NOT, BUT DOES IT ALSO INCLUDE COMPARATOR 152?

**A** I MAY HAVE MISSED IT. IT DOES INCLUDE 152.

**Q** AND I SEE YOU ALSO CALLED OUT SOME LANGUAGE FROM THE BARROW PATENT AT COLUMN 5, LINES 27 TO 35. WHAT ARE YOU SHOWING THERE?

**A** WELL, IF WE LOOK AT THE LANGUAGE THERE, THAT'S FOUND IN THE PATENT, IT SAYS (AS READ):

"THE OUTPUT OF MULTIPLIER 112..."

WHICH IS THE BOX THAT WE HAVE BEEN TALKING ABOUT SHADED IN ORANGE.

"...RANGES FROM 0 TO 1.5 VOLTS..."

SO THAT'S KIND OF THE RANGE OF THE VOLTAGE COMING OUT.

AND IT'S GOING INTO THE INVERTING INPUT OF CURRENT SENSE COMPARATOR 120, RIGHT THERE (INDICATING).

AND THEN, IF WE LOOK AT THE OTHER INPUT TO THIS COMPARATOR 120, WE NOTICE THAT IT COMES BACK THROUGH TO THIS RESISTOR AND POWER SWITCH (INDICATING). AND SO, THAT IS IMPLEMENTING THE CURRENT LIMIT.

**Q** AND WHAT ARE YOU INTENDING TO SHOW HERE WITHIN THAT SLIDE, DR. WEI?

**A** I THINK I MAY HAVE JUMPED THE GUN A LITTLE BIT BEFORE, BUT ALL I'M TRYING TO SHOW HERE IS THAT THE CONTROLLER CIRCUIT

02:16:51 TURNS THIS POWER SWITCH ON AND OFF.

**Q** OKAY. LET'S MOVE TO THE CURRENT LIMIT REQUIREMENT IN ELEMENT B. WHAT ARE YOU SHOWING HERE? YOU CALLED OUT COLUMN 5, LINES 27 TO 48.

02:17:08 (DOCUMENT DISPLAYED)

**A** YES, SO, WITH RESPECT TO THIS, IF WE LOOK AT THE PORTION OF THE BARROW PATENT, COLUMN 5, 27, OR ACTUALLY KIND OF FURTHER DOWN, "WHEN THE VOLTAGE ACROSS RESISTOR 128 EXCEEDS THE OUTPUT SIGNAL OF MULTIPLIER 112, THE OUTPUT OF COMPARATOR 02:17:29 120 GOES HIGH TO RESET LATCHING NOR GATES, 122 AND 124, AND TURN OFF TRANSISTOR 126."

**Q** OKAY. AND SO, WERE YOU ABLE TO FIND ALL OF THE REQUIREMENTS OF ELEMENT B IN THE BARROW PATENT?

**A** I HAVE.

02:17:46 **Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** CAN WE GO AHEAD AND CHECK THAT OFF.

**A** LET'S CHECK THAT OFF.

**Q** OKAY. NOW, BECAUSE WE ARE DOING INVALIDITY WE ARE GOING 02:17:55 TO NEED TO TAKE A LOOK AT CLAIM 27, AS WELL. IS THAT RIGHT?

**A** THAT'S CORRECT.

**Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** AND CAN YOU TELL US WHAT YOU FOUND IN BARROW WITH RESPECT 02:18:04 TO CLAIM 27?

02:18:05 **A** SURE. SO, RECALL THAT CLAIM 27 IS A DEPENDENT CLAIM FROM 26. AND SO, THE HIGHLIGHTED PORTION "WHEREIN THE CONTROL CIRCUIT IS FURTHER COUPLED TO AN OUTPUT OF A POWER SUPPLY THROUGH A CONTROL TERMINAL OF THE POWER SUPPLY CONTROLLER 02:18:22 CIRCUIT."

AND SO WHAT I'VE SHOWN HERE IN FIGURE 3 OF BARROW, WHAT WE NOTICE IS THAT THERE'S THAT OUTPUT OF THE POWER SUPPLY, V OUT THAT IS CONNECTED TO A LOAD. AND THEN, WE CAN FURTHER -- THERE IS A RESISTOR DIVIDER THAT TAKES A -- THAT PROVIDES A 02:18:43 VOLTAGE HERE THAT COMES ACROSS.

AND IF WE TRACE OUT THE BLUE ARROWS, IT GOES INTO THIS COMPARATOR, 142. AND THEN, IF WE WERE TO FURTHER TRACE THAT OUT, IT GOES INTO THIS PAIR OF NOR GATES THAT IMPLEMENT THE LATCHING.

02:18:57 AND, FINALLY, IT COMES BACK AROUND AGAIN TO POWER SWITCH. AND SO, THE SWITCHING OF THE POWER SWITCH IS INFLUENCED BY WHAT'S GOING ON AT THE OUTPUT OF THIS POWER CONVERTER.

**Q** AND I THINK YOU MAY HAVE GOT US THERE ALREADY, DR. WEI.

(DOCUMENT DISPLAYED)

02:19:19 **Q** BUT I THINK YOUR NEXT SLIDE IS INTENDED TO GET TO THAT LAST PIECE, TOO. CORRECT?

**A** THAT IS CORRECT. I MAY HAVE JUMPED THE GUN A LITTLE BIT TO TRY TO EXPLAIN THINGS IN ONE FLOW.

**Q** I THINK WE ALL APPRECIATE THAT, DR. WEI. NO PROBLEM.

02:19:33 SO WERE YOU ABLE TO FIND ALL OF THE REQUIREMENTS OF CLAIM

02:19:37 27 IN THE BARROW PATENT?

**A** I HAVE.

(DOCUMENT DISPLAYED)

**Q** AND CAN WE CHECK THAT BOX OFF?

02:19:43 **A** WE CAN CHECK THAT BOX OFF.

**Q** SO COULD YOU JUST SUMMARIZE YOUR OPINION WITH REGARD TO THE '908 PATENTS AND BARROW?

**A** SURE. SO WHAT WE HAVE JUST DONE IS LOOKED AT THE ELEMENTS OF CLAIM 26 AND CLAIM 27. AND WE WERE ABLE TO IDENTIFY ALL 02:19:57 THE LIMITATIONS FOR CLAIM 26 AND 27 IN BARROW.

AND JUST TO REFRESH OUR MEMORY A LITTLE BIT, WITH RESPECT TO INVALIDITY, I WAS ASSUMING DR. KELLEY'S POSITIONS, INTERPRETATIONS IN TERMS OF "VOLTAGE" AND "CURRENT" AND THEY'RE INTERCHANGEABLE.

02:20:16 AND SO ALL OF THE LIMITATIONS HAVE BEEN FOUND IN BARROW FOR CLAIMS 26 AND 27. AND, THEREFORE, IT IS MY OPINION THAT BARROW ANTICIPATES THE CLAIMS 26 AND 27 OF THE '908 PATENT. AND IT ANTICIPATES BECAUSE WE HAVE JUST BEEN LOOKING AT ONE REFERENCE, THE SINGLE BARROW REFERENCE.

02:20:36 **Q** THANK YOU, DR. WEI. SO NOW LET'S TRANSITION TO THE '079 PATENT AND YOUR OPINIONS THERE, IF WE COULD.

(DOCUMENT DISPLAYED)

**A** SO THE '079 PATENT, I DON'T KNOW IF YOU REMEMBER, THERE WERE MANY MORE ELEMENTS. SO, THE '908 WAS ACTUALLY RELATIVELY 02:20:54 STRAIGHTFORWARD.

02:20:55 THE ASSERTED CLAIMS OF THE '079 ARE CLAIMS 31, 34, 38 AND 42, SO THERE'S A LOT OF GROUND TO COVER.

HOPEFULLY, WE CAN COVER THEM RELATIVELY QUICKLY, BECAUSE AS I'LL EXPLAIN, THERE ARE CERTAIN ELEMENTS THAT I UNDERSTAND 02:21:17 ARE CONTESTED. AND THEN, THERE ARE OTHER ELEMENTS THAT REALLY AREN'T CONTESTED. AND SO THOSE WE CAN GO THROUGH RELATIVELY QUICKLY AND REALLY FOCUS ON THE ONES THAT ARE CONTESTED.

AND AS FAR AS THE '079 PATENT IS CONCERNED, WHAT WE CAN SEE IS THAT THE FILE DATE WAS JUNE 30, 2000 -- OH, NO. OH, 02:21:37 YEAH. IS -- I'LL JUST STOP THERE. THAT'S FINE.

**Q** SO, LET ME JUST ASK YOU THIS, DR. WEI: HAVE YOU FORMED ANY OPINIONS ON WHETHER THE ASSERTED CLAIMS OF THE '079 PATENT ARE INVALID?

**A** YES. GETTING AHEAD OF MYSELF.

02:21:53 **Q** NO PROBLEM.

**A** AS WE WILL SEE, THE ASSERTED CLAIMS, 31, 34, 38 AND 42, ARE INVALID, ARE ANTICIPATED BY A PRIOR ART REFERENCE THAT WE WILL BE TALKING ABOUT.

**Q** SO AS WITH THE PRIOR PATENT ARE WE JUST GOING TO BE 02:22:12 PRESENTING ONE OF YOUR INVALIDITY OPINIONS HERE TODAY?

**A** YES, JUST FOCUSING ON ONE. THERE IS MULTIPLE, BUT WE WILL JUST LOOK AT ONE OF THEM.

**Q** FOR THE SAKE OF TIME AND EFFICIENCY WE WILL PROCEED WITH JUST ONE REFERENCE, THEN.

02:22:24 **A** AND MAYBE MY VOICE, AS WELL.

02:22:25
**Q** DO YOU NEED SOME WATER?
**A** I'M FINE. THANK YOU.
**Q** OKAY. LET'S GO TO YOUR NEXT SLIDE.
(DOCUMENT DISPLAYED)
02:22:32
**Q** AND I SEE YOU CALLED OUT THE ABSTRACT OF THE '079 PATENT. WHAT IS YOUR PURPOSE IN DOING THAT?
**A** AGAIN, I DON'T KNOW. YOU MIGHT HAVE NOTICED THIS. I LIKE TO KIND OF TAKE A STEP BACK, KIND OF REFRESH OUR MEMORY IN TERMS OF WHAT WE'VE BEEN TALKING ABOUT. BECAUSE WE HAVE SPENT A LOT OF TIME TALKING ABOUT '908, AND THEN ALL OF A SUDDEN WE ARE SWITCHING BACK TO '079. 02:22:45

SO THAT IS KIND OF DO A LITTLE CONTEXT SWITCH. WHAT IS '079?

AND SO, WHAT I THOUGHT I WOULD DO IS JUST BRING UP THE ABSTRACT. IT HAD A SUMMARY, IN SOME SENSE, OF WHAT THE '079 PATENT IS ALL ABOUT. AND IF WE JUST LOOK AT THE FIRST SENTENCE, IT SAYS: 02:22:56

"A SWITCHING REGULATOR THAT OPERATES AT A FREQUENCY FOR A FIRST RANGE OF FEEDBACK SIGNAL VALUES AND A VARIABLE FREQUENCY WITHOUT SKIPPING CYCLES FOR A SECOND RANGE OF FEEDBACK SIGNAL VALUES." 02:23:16

AND SO, WHAT WE CAN READ FROM THAT IS THAT, YOU KNOW, THIS IS KIND OF WHAT THE INVENTOR'S THOUGHT WAS, YOU KNOW, THE MAIN INVENTION OF THIS PARTICULAR PATENT.
02:23:32
**Q** OKAY.

02:23:33 **A** SO, AGAIN, WE ARE BACK TO THAT FIXED AND VARIABLE FREQUENCY.

(DOCUMENT DISPLAYED)

**Q** NOW, IF WE TURN TO CLAIM 34, I SEE YOU HAVE DRAWN SOME 02:23:44 GREEN AND RED BOXES AROUND THE CLAIM ELEMENT. WHAT IS YOUR PURPOSE IN DOING THAT?

**A** SURE. SO, IN TERMS OF THE PRIOR ART REFERENCE THAT WE ARE GOING TO LOOK AT -- AND IT IS ACTUALLY A REFERENCE CALLED "SEMMLER" -- AND IF WE LOOK AT CLAIM 34, IT IS THAT LOWER 02:24:02 ELEMENT E THAT IS REALLY THE CONTESTED ELEMENT, AS I UNDERSTAND.

AND THEN, I THOUGHT WHAT WAS ALSO INTERESTING IS THERE IS THIS ELEMENT B.2. AND IF YOU LOOK AT THAT ELEMENT B.2. THAT IS SIMILAR TO THE LANGUAGE THAT WE JUST SAW THAT IS IN THE 02:24:17 ABSTRACT OF THE PATENT.

SO THAT IS THAT INVENTIVE FEATURE OF THIS PATENT. BUT INTERESTINGLY THAT IS NOT REALLY CONTESTED HERE. IT IS ONLY THAT ELEMENT E THAT IS BEING CONTESTED.

**Q** LET'S MOVE ON TO THE SEMMLER PATENT THAT YOU JUST 02:24:31 MENTIONED.

**MS. ONDRICK:** YOUR HONOR, I WOULD OFFER INTO EVIDENCE DX 5085, THE SEMMLER PATENT.

**THE COURT:** ANY OBJECTION?

**MR. POLLACK:** NO OBJECTION, YOUR HONOR.

02:24:39 **THE COURT:** ALL RIGHT. DX 5085 IS ADMITTED.

02:24:42 (TRIAL EXHIBIT 5085 RECEIVED IN EVIDENCE)

**BY MS. ONDRICK:**

**Q** DR. WEI, CAN YOU TELL US A LITTLE BIT ABOUT THE SEMMLER PATENT?

02:24:52 **A** SO THE SEMMLER PATENT HAS A SINGLE INVENTOR, MR. PETER SEMMLER. AND THE FILE DATE FOR THIS PATENT WAS IN 1996. AND I BELIEVE IT WAS ISSUED IN 1998.

AND THOSE ARE DATES PRIOR TO THE FILE OR ISSUE DATES OF THE '079 PATENT.

02:25:09 AND, IT WAS -- THIS PATENT WAS ASSIGNED TO SIEMENS, I GUESS, IN GERMANY.

**Q** AND CAN YOU TELL US WHAT YOUR INVALIDITY OPINION IS BASED ON THE SEMMLER PATENT?

**A** SO, BASED ON THE SEMMLER PATENT -- WHEN WE ACTUALLY WILL 02:25:25 GO THROUGH IT, I'LL SHOW IT. MY OPINION IS THAT SEMMLER ANTICIPATES CLAIM 31, 34, 38 AND 42 OF THE '079 PATENT. SO -- AND THEREFORE, IT'S INVALID.

**Q** OKAY.

**A** OR THESE CLAIMS ARE INVALID.

02:25:44 **Q** THE ASSERTED CLAIMS.

**A** THE ASSERTED CLAIMS.

(DOCUMENT DISPLAYED)

**Q** NEXT WHAT I WOULD ASK YOU TO DO IS SIMILAR TO WHAT YOU DID BEFORE FOR BARROW. IF YOU COULD GIVE US A DESCRIPTION OF 02:25:54 THE '079 PATENT AND WHAT IT'S DISCLOSING.

02:25:56 **A** OKAY. SO, THE SEMMLER PATENT DESCRIBES INTERESTING TECHNOLOGY. AND, WITHIN THERE, IT -- IT DESCRIBES UTILIZING A PART, A SIEMENS PART, CALLED A "TDA4916" -- IT'S16GG," I BELIEVE IS WHAT THE SPECIFICATION CALLS IT.

02:26:19 AND SO, IT'S TAKING AN EXISTING SIEMENS PART, A CONTROLLER CHIP, AND THEN ALSO ADDING ADDITIONAL CIRCUITRY IN ORDER TO GIVE IT SOME INTERESTING FEATURES.

AND SO WHAT WE WILL BE DOING IS LOOKING AT THE WAYS IN WHICH SEMMLER DESCRIBES ITS INVENTION, AND THEN HOW IT RELATES

02:26:42 TO THE ASSERTED CLAIMS.

**Q** SO IF I UNDERSTAND YOU CORRECTLY, THE SEMMLER PATENT ACTUALLY RESULTED IN A PRODUCT.

**A** I'M NOT 100 PERCENT SURE IF IT RESULTED IN A PRODUCT. BUT, IT -- THE SEMMLER INVENTION UTILIZES THIS ONE PARTICULAR

02:27:00 PRODUCT FROM SIEMENS.

**Q** THANK YOU FOR CLARIFYING.

(DOCUMENT DISPLAYED)

**Q** SO IF WE COULD GO TO YOUR NEXT SLIDE, I SEE WE HAVE OUR CLAIM CHART AGAIN. SO LET'S GO AHEAD AND START OUR MARCH

02:27:13 THROUGH THE CLAIMS.

**A** YES, LET'S.

**Q** DOES SEMMLER HAVE A SWITCHING REGULATOR?

**A** YES.

(DOCUMENT DISPLAYED)

02:27:19 **A** SO, AGAIN, WE CAN LOOK AT THE ABSTRACT OF SEMMLER. AND IT

02:27:23 TALKS ABOUT A CONVERTER APPARATUS. AND SO THAT IS A SWITCHING REGULATOR. SO YOU CAN CHECK OFF THAT FIRST BOX.

**Q** AND YOU ARE CITING THE ABSTRACT FOR THAT, CORRECT?

**A** I'M CITING THE ABSTRACT OF THE SEMMLER PATENT.

02:27:33 **Q** WE WILL CHECK THAT OFF.

WERE YOU ABLE TO FIND A POWER SWITCH AS REQUIRED BY ELEMENT A IN SEMMLER?

**A** YES. SO WHAT WE ARE LOOKING AT HERE --

(DOCUMENT DISPLAYED)

02:27:44 **A** -- IS FIGURE 5B OF SEMMLER. AND THERE IS A POWER SWITCH THAT I'VE HIGHLIGHTED IN RED, THAT IS SHOWN IN THE MIDDLE OF FIGURE B, 5B. AND THEN, THERE IS ALSO AN ENERGY TRANSFER ELEMENT THAT I'VE OUTLINED HERE IN GREEN.

SO IF WE GO THROUGH THE ELEMENT HERE, "A POWER SWITCH THAT 02:28:05 IS COUPLED BETWEEN FIRST AND SECOND TERMINALS, THE FIRST TERMINAL TO BE COUPLED TO AN ENERGY TRANSFER ELEMENT." SO THERE IS THAT COUPLING HERE OF THE POWER SUPPLY.

"AND THE SECOND TERMINAL TO BE COUPLED TO A SUPPLY RAIL OF A POWER SUPPLY." SO WE NOTICE ON THE OTHER SIDE IT'S COUPLED 02:28:24 TO THE SUPPLY RAIL, THE INPUT VOLTAGE THAT'S LABELED HERE, "$U_E$."

**Q** CAN WE GO AHEAD AND CHECK OFF ELEMENT A?

**A** YES.

(DOCUMENT DISPLAYED)

02:28:35 **Q** OKAY. NOW, I SEE WE HAVE GOT ELEMENT B BROKEN UP INTO TWO

02:28:38 SECTIONS. WERE YOU ABLE TO FIND THE CONTROL SET -- CONTROL CIRCUIT IN SEMMLER?

(DOCUMENT DISPLAYED)

**A** SO, I HAVE THE CONTROL CIRCUIT. SO, FOR THIS FIRST HALF

02:28:52 OF THE ELEMENT, "CONTROL CIRCUIT COUPLED TO A THIRD TERMINAL AND THE POWER SWITCH, THE THIRD TERMINAL TO BE COUPLED TO AN OUTPUT OF THE POWER SUPPLY, THE CONTROL CIRCUIT COUPLED TO GENERATE A FEEDBACK SIGNAL RESPONSIVE TO THE OUTPUT OF THE POWER SUPPLY, THE CONTROL CIRCUIT COUPLED TO SWITCH THE POWER

02:29:09 SWITCH IN RESPONSE TO THE FEEDBACK SIGNAL."

IF WE LOOK IN SEMMLER THERE IS THAT CONTROL MODULE TDA4916G OF SIEMENS. AND THAT IS THAT CONTROL CIRCUIT THAT WE HAVE BEEN LOOKING AND TALKING ABOUT.

**Q** AND, FOR THE RECORD, YOU HAVE IDENTIFIED COLUMN 5, LINES

02:29:28 44 TO 65 OF SEMMLER.

**A** YES.

**Q** LET'S GET INTO A LITTLE MORE DETAIL FOR THIS CLAIM ELEMENT.

(DOCUMENT DISPLAYED)

02:29:34 **A** OKAY.

**Q** NOW, WHAT WILL YOU SHOWING HERE?

**A** SO, THIS IS KIND OF NOW LOOKING AT MORE OF FIGURE 5B THAN WHAT WE HAD JUST SEEN BEFORE. AGAIN, WE HAVE SEEN THE POWER SWITCH. AND IT IS COUPLED -- THE CONTROL CIRCUIT IS COUPLED

02:29:53 TO THE THIRD TERMINAL AND THE POWER SWITCH. SO HERE'S THE

COUPLING TO THE POWER SWITCH.

AND THE THIRD TERMINAL, WHICH IS OVER HERE (INDICATING) AND IT IS AT NODE 8, THAT IS COUPLED TO THE OUTPUT OF THE POWER SUPPLY.

AND THAT COUPLING OCCURS THROUGH THIS BOX LABELED "F" WHICH THEN CONNECTS TO THE OUTPUT LABELED $U_A$ (INDICATING). AND THE CONTROL CIRCUIT IS COUPLED TO GENERATE A FEEDBACK SIGNAL RESPONSIVE TO THE OUTPUT OF POWER SUPPLY.

WHERE THAT IS, IT COMES IN RIGHT HERE (INDICATING), WHICH IS THE OUTPUT OF COMPARATOR K.

AND, THE CONTROL CIRCUIT COUPLED TO SWITCH THE POWER SWITCH, IF WE TRACE THAT UP, THEN IT GOES THROUGH A DRIVER AND IT IS COUPLED TO SWITCH THE POWER SWITCH. AND THAT IS IN RESPONSE TO THE FEEDBACK SIGNAL.

SO WE CAN SEE THAT EVERYTHING IS FOUND WITHIN THAT YELLOW BOX.

**Q** AND THAT IS WITH REFERENCE TO FIGURE 5B, CORRECT?

**A** THAT'S RIGHT.

**Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** SO CAN WE GO AHEAD AND CHECK OFF ELEMENT B.1?

**A** YES, WE CAN.

**Q** WERE YOU ABLE TO FIND ELEMENT B.2, THE ADDITIONAL CONTROL CIRCUIT REQUIREMENTS IN THE SEMMLER PATENT?

(DOCUMENT DISPLAYED)

02:31:03
**A** YES.

**Q** AND WHAT ARE YOU SHOWING HERE?

**A** SO WHAT I'M SHOWING HERE ABOVE IS THE SECOND PIECE OF THAT ELEMENT B. AND THEN, I'M ALSO POINTING TO THE DESCRIPTION IN THE PATENT, IN THE SEMMLER PATENT. FOR EXAMPLE, IN THE ABSTRACT IT SAYS:

02:31:13

> "AN OBJECT OF THE PRESENT INVENTION IS TO PROVIDE A CONVERTER DEVICE THAT CAN BE OPERATED WITH VARIABLE FREQUENCY IN A LIGHT LOAD OR OVER-LOAD CONDITION AND CAN BE OPERATED WITH A CONSTANT OPERATING FREQUENCY IN A NORMAL OPERATING CONDITION."

02:31:30

**Q** I ACTUALLY THINK THAT IS THE SUMMARY OF THE INVENTION THERE.

**A** OH, YOU ARE RIGHT.

02:31:38
**Q** IT IS MISLABELED.

**A** THAT'S RIGHT.

**Q** OKAY.

**A** AND, ONE THING I'D LIKE TO POINT OUT HERE, AGAIN, AND VERY SIMILAR TO WHAT WE HAD DONE FOR '908, IN TERMS OF MY OPINIONS, IN TERMS OF -- FOR INVALIDITY OF THE '079 CLAIMS, THE ASSUMPTION THAT I MADE WAS THAT I WAS TO ASSUME DR. KELLEY'S POSITION THAT WHEN WE TALK ABOUT "FIXED SWITCHING FREQUENCY," THAT AS WE HAD HEARD LAST WEEK, YOU KNOW, SMALL FLUCTUATIONS HERE AND THERE WITH RESPECT TO TEMPERATURE, JITTER, THAT DOESN'T REALLY MATTER. AND SO, THAT'S THE ASSUMPTIONS THAT I

02:31:51

02:32:16

02:32:20 MADE IN TERMS OF MY INVALIDITY OPINIONS WITH RESPECT TO SEMMLER AND THE '079.

(DOCUMENT DISPLAYED)

**Q** AND SO IF WE COULD DIG IN A LITTLE FURTHER TO SEMMLER, CAN 02:32:33 YOU TELL US WHAT ELSE YOU FOUND?

**A** YES. SO, WHAT WE HAD JUST SEEN WITH RESPECT TO THE SUMMARY OF INVENTION, THERE WERE THOSE TWO MODES OF OPERATION THAT SEMMLER WAS DESCRIBING. THERE'S THE FIXED FREQUENCY, CONSTANT FREQUENCY, AS IT SAID. AND THERE IS THAT VARYING 02:32:49 FREQUENCY THAT WAS IN THERE.

AND THEN, IF WE LOOK FURTHER IN THIS ELEMENT, IT SAYS:

"THE CONTROL CIRCUIT IS COUPLED TO VARY A SWITCHING FREQUENCY OF THE POWER SWITCH, WITHOUT SKIPPING CYCLES."

02:33:00 AND THEN, IF WE LOOK INSIDE THE SEMMLER PATENT, COLUMN 4, LINE 15 TO 37, IF WE ACTUALLY FOCUS ON THE HIGHLIGHTED PORTION, WHAT IT SAYS IS THAT THERE IS THIS DETECTOR CIRCUIT D, AND IT PREVENTS THE CONVERTER FROM REACHING THIS SHORTEST -- SHORTEST POSSIBLE ON-TIME.

02:33:24 AND THEN, IF YOU SQUINT A LITTLE BIT, IT'S "T SUBSCRIPT ONMIN." OKAY?

AND, WE WILL ACTUALLY DIG INTO THIS A LITTLE BIT FURTHER FOR SOME OF THE OTHER ELEMENTS. BUT WHAT THAT IS TELLING US IS THAT THERE IS THIS MINIMUM POSSIBLE TIME -- EXCUSE ME -- 02:33:45 THAT THE SWITCH CAN BE ON.

02:33:46 AND THAT'S: $T_{ONMIN}$."

AND BECAUSE THERE'S THIS MINIMUM POSSIBLE TIME, IT IS ALWAYS SWITCHING. IT CONTINUES TO SWITCH WITHOUT SKIPPING CYCLES.

02:33:58 **Q** AND SO YOU WERE ABLE TO FIND, WITHIN THE SEMMLER PATENT, A CONTROL CIRCUIT THAT HAD A FIXED SWITCHING FREQUENCY APPLYING DR. KELLEY'S UNDERSTANDING OF THAT PHRASE, AS WELL AS A CONTROLLER THAT VARIED A SWITCHING FREQUENCY WITHOUT SKIPPING CYCLES. IS THAT CORRECT?

02:34:18 (DOCUMENT DISPLAYED)

**A** THAT'S CORRECT.

**Q** SO LET'S GO AHEAD AND CHECK OFF THAT BOX.

**A** ALL RIGHT.

**Q** NEXT LET'S TURN TO THE FEEDBACK SIGNAL CIRCUIT.

02:34:24 **A** OKAY.

(DOCUMENT DISPLAYED)

**Q** TELL US WHERE YOU FOUND THAT IN SEMMLER.

**A** SO IN SEMMLER -- AND I DESCRIBED THIS VERY BRIEFLY BEFORE -- BUT THERE IS A FEEDBACK SIGNAL CIRCUIT. AND WHAT 02:34:35 WE CAN SEE HERE IS THE ELEMENT REQUIRES A FEEDBACK SIGNAL CIRCUIT COUPLED TO THE THIRD TERMINAL.

THE FEEDBACK CIRCUIT SIGNAL CIRCUIT COUPLED TO GENERATE THE FEEDBACK SIGNAL. AND THE THIRD TERMINAL IS ACTUALLY THE TERMINAL HERE LABELED WITH THE NO. 8. AND THAT IS COMING INTO 02:34:55 A COMPARATOR K. AND THEN, THE OUTPUT OF THAT, WHICH IS

02:34:59 HIGHLIGHTED IN YELLOW, THAT IS THE FEEDBACK SIGNAL.

AND, WE CAN TRACE THIS -- THE NODE 8 -- BACK THROUGH THIS BLOCK HERE (INDICATING). AND THERE IS AN OPTOCOUPLER INSIDE -- AND WE HAVE HEARD A LOT ABOUT OPTOCOUPLERS -- THAT

02:35:21 THEN FURTHER CONNECTS TO THE OUTPUT THAT IS LABELED $U_A$.

AND SO WE FIND THAT FEEDBACK SIGNAL CIRCUIT, WHICH IS COUPLED TO A THIRD TERMINAL. FEEDBACK SIGNAL CIRCUIT COUPLED TO GENERATE THE FEEDBACK SIGNAL.

**Q** SO CAN WE GO AHEAD AND CHECK THAT CLAIM ELEMENT OFF OUR

02:35:40 LIST?

**A** YES.

**Q** AND JUST TO RECAP, ALL OF THE CLAIM ELEMENTS WE HAVE COVERED SO FAR, TO YOUR UNDERSTANDING THEY ARE NOT CONTESTED. CORRECT?

02:35:47 **A** TO MY UNDERSTANDING THAT IS CORRECT.

**Q** I THINK I'M JUMPING THE GUN NOW. WE HAVE ONE MORE THAT IS NOT CONTESTED.

**A** YES.

(DOCUMENT DISPLAYED)

02:35:56 **Q** LET'S LOOK AT THE PULSE WIDTH MODULATOR.

**A** OKAY. SO WHAT WE CAN SEE HERE -- ACTUALLY, THIS IS A PRETTY EASY ONE.

WHAT WE SEE WITHIN FIGURE 5B OF SEMMLER, THERE IS A BLOCK RIGHT HERE. AND THAT IS LABELED "PULSE WIDTH MODULATOR." AND

02:36:12 THE ELEMENT REQUIRES: "A PULSE WIDTH MODULATOR CIRCUIT

COUPLED TO SWITCH THE POWER SWITCH IN RESPONSE TO THE FEEDBACK SIGNAL."

AND SO WHAT WE SEE HERE IS BEFORE I HAD IDENTIFIED THE OUTPUT OF COMPARATOR K TO BE THE FEEDBACK SIGNAL. IT COMES INTO THIS PULSE WIDTH MODULATOR. AND THEN, THE OUTPUT OF THAT GOES THROUGH A DRIVER AND CONNECTS TO THE POWER SWITCH. AND THAT SIGNAL IS WHAT TURNS THAT POWER SWITCH ON AND OFF.

(DOCUMENT DISPLAYED)

**Q** LET'S GO AHEAD AND CHECK OFF ELEMENT D FROM THE CLAIM.

**A** OKAY.

**Q** NOW, LET'S SEE WHAT YOU HAVE FOR US WITH REGARD TO THE LAST CLAIM ELEMENT, ELEMENT E.

(DOCUMENT DISPLAYED)

**Q** I THINK THE FIRST THING YOU HAVE PULLED OUT HERE WAS AN AGREED-UPON CONSTRUCTION FOR THIS TERM?

**A** YES.

**Q** WHAT ARE YOU SHOWING?

**A** ALL RIGHT.

**Q** GO AHEAD.

**A** LET'S LOOK AT THE ELEMENT. THE ELEMENT STATES:

"WHEREIN ON-TIME AND OFF-TIME VALUES OF A DRIVE SIGNAL GENERATED BY THE PULSE WIDTH MODULATOR CIRCUIT TO SWITCH THE POWER SWITCH VARY SIMULTANEOUSLY."

AND THAT IS THE PHRASE THAT WAS CONSTRUED AND AGREED UPON BY THE TWO PARTIES. AND, THE CONSTRUCTION IS BOTH THE ON-TIME

02:37:29 AND OFF-TIME VALUES, AND NOT JUST THE ON-TIME OR JUST THE OFF-TIME OF THE DRIVE SIGNAL ARE CHANGED.

AND WHEN WE LOOK AT SOME OF THE WAVEFORMS I'LL REMIND US AS TO WHAT "ON-TIME" AND "OFF-TIME" MEANS, BECAUSE IT'S BEEN A

02:37:46 WHILE.

**Q** OKAY. AND SO YOU USE THIS CONSTRUCTION IN FORMING YOUR OPINIONS, CORRECT?

**A** YES, I HAVE.

(DOCUMENT DISPLAYED)

02:37:58 **Q** WHAT ARE YOU SHOWING HERE WITH REGARD TO SEMMLER AT FIGURE 2A?

**A** OKAY. SO, CLAIM ELEMENT E IS THAT CONTESTED ELEMENT. AND SO, I'M GOING TO JUST WARN YOU AHEAD OF TIME, IT'S NOT LIKE -- IT REQUIRES SOME STEPPING THROUGH TO UNDERSTAND WHAT'S GOING

02:38:17 ON. OKAY?

AND, WHAT WE SEE HERE IN FIGURE 2A IS A WAVEFORM OF THE DRIVE SIGNAL THAT GOES INTO THE POWER SWITCH. OKAY? AND, WHEN THE WAVEFORM HERE, 2A, IS HIGH, THAT'S THE ON-TIME. AND THAT'S WHEN THE POWER SWITCH IS ON. AND WHEN THE WAVEFORM

02:38:40 HERE (INDICATING) IS LOW -- RELATIVE TO THAT, IT'S LOW HERE -- THAT'S THE OFF-TIME. OKAY?

AND WHAT THE SEMMLER PATENT DESCRIBES IS THAT WHEN YOU'RE IN THAT SECOND RANGE, THAT VARIABLE FREQUENCY RANGE, THE SEMMLER INVENTION IS DESCRIBING HOW IT VARIES THE FREQUENCY.

02:39:06 OKAY?

AND THE WAY IN WHICH IT VARIES THE FREQUENCY IS THERE IS A VALUE CALLED "$T_{ONMIN*}$."

AND IT'S A NUMBER, ESSENTIALLY -- I THINK IT'S IN FORM OF VOLTAGE -- BUT IT'S IS A NUMBER THAT CORRESPONDS TO KIND OF WHAT THE MINIMUM "ON" TIME OUGHT TO BE. OKAY?

AND SO, WHEN THE CIRCUIT IS IN OPERATION, AND THE ACTUAL "ON" TIME OF THE SWITCH REDUCES DOWN TO BE LESS THAN THE MINIMUM "ON" TIME VALUE THAT IS GENERATED WITHIN SEMMLER, THEN IT TELLS THE OSCILLATOR, "SLOW DOWN." OKAY?

AND THAT IS HOW IT VARIES THE FREQUENCY.

AND SO, WHAT WE CAN SEE HERE IS, FIRST OF ALL -- AND THEN, ACTUALLY, THE SEMMLER PATENT HAS THAT FIXED FREQUENCY MODE OF OPERATION, AND THAT'S PULSE WIDTH MODULATION. AND WHEN YOU HAVE PULSE WIDTH MODULATION, THE CYCLE TIME IS GOING TO BE FIXED. AND YOU ARE ONLY GOING TO BE SHIFTING AROUND HOW LONG OR HOW LONG THE POWER SWITCH IS ON FOR.

SO IF YOU HAVE A FIXED PERIOD, IF THE ON-TIME GETS LARGER, THEN THE OFF-TIME NECESSARILY GETS SMALLER.

AND SO THE ON-TIME AND OFF-TIMES ARE VARYING SIMULTANEOUSLY.

(DOCUMENT DISPLAYED)

**Q** LET'S GO TO YOUR NEXT SLIDE ON THIS POINT, IF WE COULD.

**A** SURE.

**Q** WHAT ARE YOU SHOWING HERE?

**A** WHAT I'M SHOWING HERE IS KIND OF A BLOWUP AND TRYING TO

02:40:46 FURTHER ILLUSTRATE WHAT I HAVE BEEN TALKING ABOUT.

AGAIN, SEMMLER DESCRIBES THE VARIABLE FREQUENCY AND THE CONSTANT FREQUENCY RANGE WITH RESPECT TO THE LOAD. AND THEN, AGAIN, I'VE JUST RECREATED THE WAVEFORMS WE SAW PRIOR TO A.

02:41:02 AND, IN -- IN THIS CASE WHAT I'M SHOWING IS THAT WHEN THE ON-TIME IS LESS THAN THIS VALUE $T_{ONMIN*}$, WHEN THAT HAPPENS, THE DETECTOR CIRCUIT D TELLS THE OSCILLATOR TO REDUCE THE FREQUENCY. AND THAT IS THE INVENTION THAT SEMMLER IS DESCRIBING.

02:41:21 **Q** AND THE DETECTOR CIRCUIT, THAT IS SHOWN IN FIGURE 1. IS THAT CORRECT?

**A** THAT IS, YES. THE DETECTOR CIRCUIT, D, IS SHOWN IN FIGURE 1.

**Q** OKAY. LET'S MOVE ON TO THE NEXT PART OF ELEMENT E, IF WE

02:41:34 COULD.

(DOCUMENT DISPLAYED)

**A** OKAY.

**Q** WHAT ARE YOU SHOWING HERE?

**A** SO, HERE, WHAT I'M SHOWING IS THAT WE JUST DESCRIBED HOW

02:41:43 THE POWER SWITCH, THE ON-AND-OFF TIMES OF THE POWER SWITCH VARY SIMULTANEOUSLY. SO THEY'RE NOT -- THEY ARE CHANGING TOGETHER.

AS A FUNCTION OF A LEVEL OF LOAD CURRENT -- OF LOAD, COUPLED TO THE OUTPUT OF THE POWER SUPPLY TO VARY THE

02:41:59 SWITCHING FREQUENCY OF THE POWER SWITCH WITHOUT SKIPPING

02:42:02 CYCLES FOR THE SECOND RANGE OF FEEDBACK SIGNAL VALUES.

AND SO, WHAT I'VE SHOWN HERE IS -- AND WE CAN LOOK AT EITHER FIGURE, BUT LET'S ACTUALLY LOOK AT FIGURE 5B. WHAT'S SHOWN IS ON THE UPPER RIGHT-HAND CORNER WITH THE RED OUTLINE 02:42:18 (INDICATING), THAT IS THE OUTPUT OF THE POWER SUPPLY.

AND, THAT COMES IN THROUGH THIS BLOCK LABELED "F" (INDICATING), THAT CONTAINS THAT OPTOCOUPLER. THAT COMES IN, AND THAT IS THE -- I THINK THAT IS THE THIRD TERMINAL. AND IT GOES INTO A COMPARATOR K. AND SO IT'S MODULATING. IT'S 02:42:40 PROVIDING THE FEEDBACK SIGNAL IN ORDER TO CHANGE THE PULSE WIDTH, THE ON-TIME, AND THE OFF-TIME.

AND THEN, WHAT WE CAN ALSO SEE IS THERE'S A CONNECTION BETWEEN THE OUTPUT OF THIS PULSE WIDTH MODULATOR BLOCK (INDICATING), WHICH IS THAT ON AND OFF, THE WAVEFORMS OF ON 02:43:01 AND OFF, THAT ARE GOING INTO THIS DETECTOR CIRCUIT D. AND THEN, WE SEE ANOTHER CONNECTION THAT COMES AROUND INTO THE CLOCK GENERATOR, OR THE VCO.

AND SO IT'S KIND OF THIS FUNCTION THAT IS CAUSING THE FREQUENCY TO REDUCE THAT VARIABLE FREQUENCY RANGE.

02:43:22 **Q** AND, FOR THE RECORD, YOU HAVE BEEN DISCUSSING FIGURES 1 AND 5B OF SEMMLER AS WELL AS COLUMN 3, LINES 55 TO 65.

**A** YES.

(REPORTER INTERRUPTION)

(DOCUMENT DISPLAYED)

02:43:41 **Q** AND SO I KNOW PRETTY COMPLICATED, DR. WEI, BUT CAN YOU

02:43:46 TELL US WHAT YOUR OPINION IS WITH REGARD TO CLAIM ELEMENT E?

**A** YES. SO WITH REGARD TO ELEMENT E, WHAT I'VE JUST IDENTIFIED FOR YOU ARE ALL THE DIFFERENT COMPONENTS WITHIN SEMMLER THAT MEET THE -- YEAH, THAT MEET THE LIMITATION OF ELEMENT E. AND, THEREFORE, NOW WE HAVE BEEN ABLE TO CHECK OFF ALL OF THE BOXES FOR CLAIM 34.

02:44:03

AND SO WITH RESPECT TO CLAIM 34, IT IS MY OPINION THAT SEMMLER ANTICIPATES THIS CLAIM OF THE '079 PATENT.

**Q** OKAY.

02:44:18 **THE COURT:** ARE YOU LOOKING FOR A PLACE TO POSSIBLY BREAK, MS. ONDRICK, IN THE NEXT FEW MINUTES?

**MS. ONDRICK:** YES. YOU KNOW WHAT? WHY DON'T WE DO ONE MORE SLIDE, AND THEN WE CAN STOP. AND THEN, IT WILL JUST BE A FEW MORE QUESTIONS AT THE END.

02:44:33 BUT IT'S -- YOU KNOW, NOT TO TIP OUR HAND, BUT THERE ARE THREE OTHER CLAIMS. AND SO THE ON-TIME/OFF-TIME CLAIM LIMITATION MATCHES FOR SOME AND VARIES FOR ANOTHER. SO WE WILL HAVE TO JUST COVER THAT ON-TIME, THE DIFFERENT FLAVOR OF THE ON-TIME CLAIM LIMITATION WITH DR. WEI FOR THOSE OTHER CLAIMS.

02:44:51

BUT WE DON'T HAVE TO DO A MARCH-THROUGH.

**THE COURT:** YES. BUT, IS THERE SOMETHING ELSE? YOU'VE COMPLETED 34.

**MS. ONDRICK:** YES.

02:45:00 **THE COURT:** SO WHERE WERE YOU GOING TO GO IF WE KEPT

02:45:03 GOING?

**MS. ONDRICK:** WELL, WE WOULD LINK THIS TO CLAIM 42. AND THEN, WE WOULD HAVE TO DISCUSS CLAIM 31, WHICH HAS A DIFFERENT FLAVOR OF THE ON-TIME OFF-TIME PIECE.

02:45:14 **THE COURT:** HOW LONG ARE YOU GOING TO TAKE TO LINK 42 TO WHATEVER YOU --

**MS. ONDRICK:** WE ARE GOING TO HAVE TO DO A CLAIM CONSTRUCTION ON A FEW THINGS. SO IF YOU WANT TO TAKE A BREAK NOW, THAT'S FINE.

02:45:26 **THE COURT:** I THINK THAT MIGHT BE A GOOD IDEA.

ALL RIGHT. LADIES AND GENTLEMEN, WE WILL TAKE 15 MINUTES NOW. JUST ROUND IT OFF, AND WE WILL BE READY AT 3:00. OKAY.

**THE COURT:** OKAY. THANK YOU.

(JURY EXCUSED)

02:45:46 (THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE PRESENCE OF THE JURY)

**THE COURT:** ALL RIGHT. I DON'T KNOW THAT WE REALLY HAVE TIME WHILE THE JURY IS TAKING A BREAK TO DEAL WITH WHATEVER YOUR OBJECTION WAS, MR. POLLACK. DO YOU WANT TO

02:45:55 RESERVE THAT UNTIL THE END OF THE DAY OR --

**MR. SCHERKENBACH:** THAT'S FINE, YOUR HONOR.

**THE COURT:** ALL RIGHT. THANK YOU. WE ARE IN RECESS.

(RECESS TAKEN FROM 2:45 TO 3:00 P.M.)

(THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE

03:03:01 PRESENCE OF THE JURY)

03:03:04

**THE CLERK:** PLEASE COME TO ORDER.

**THE COURT:** ALL RIGHT. PLEASE BRING --

**MS. ONDRICK:** YOUR HONOR, WE WANTED TO ALERT YOU TO ONE POSSIBLE ISSUE.

03:03:13

**THE COURT:** YES.

**MS. ONDRICK:** DR. WEI HAS A TRIAL NEXT WEEK AT THE ITC, SO, IF WE'RE -- WE'RE NOT GOING TO IMPEDE CROSS OR THE LENGTH OF CROSS IN ANY WAY. BUT, IF IT DOES LOOK LIKE POWER INTEGRATIONS IS FINISHING UP, IF WE COULD INDULGE THE COURT FOR MAYBE ANOTHER, YOU KNOW, 15 MINUTES FOR REDIRECT AND FINISH THE WITNESS TODAY, WE WOULD LIKE TO DO THAT. BUT, OF COURSE, THAT'S SUBJECT TO THE COURT'S SCHEDULE.

03:03:27

**THE COURT:** WELL, WE'LL SEE HOW IT GOES.

**MS. ONDRICK:** OKAY.

03:03:41

**THE COURT:** ALL RIGHT, THANK YOU.

(THE FOLLOWING PROCEEDINGS WERE HELD IN THE PRESENCE OF THE JURY)

**THE COURT:** OKAY.

**THE CLERK:** PLEASE BE SEATED.

03:04:09

**THE COURT:** WE WILL CONTINUE WITH DR. WEI AT THIS TIME.

**BY MS. ONDRICK:**

**Q** DR. WEI, WE JUST CONCLUDED WITH YOUR OPINION OF INVALIDITY ON CLAIM 34 OF THE '079 PATENT, BASED ON SEMMLER. AND I SEE YOU HAVE A MAPPING OF CLAIM 34 TO CLAIM 42?

03:04:29

**A** YES, SO --

**Q** GO AHEAD.

**A** WHAT WE CAN SEE FROM THIS MAPPING IS THAT THE ELEMENTS HIGHLIGHTED IN BLUE, RED AND YELLOW ARE THE SAME. AND BECAUSE CLAIM 42 IS A SUBSET OF CLAIM 34, IT IS MY OPINION THAT CLAIM 42 IS ALSO INVALID. AND ANTICIPATED BY SEMMLER.

**Q** THANK YOU. AND NOW WE ARE MAPPING CLAIM 34 TO CLAIM 31. AND IT APPEARS THAT ALL OF THE CLAIM ELEMENTS FROM CLAIM 34 MATCH UP TO CLAIM 31 EXCEPT FOR THE "WHEREIN" CLAUSE OF CLAIM 31.

**A** THAT'S CORRECT. THAT LAST ELEMENT OF CLAIM 31.

(DOCUMENT DISPLAYED)

**Q** SO, IF WE COULD, DR. WEI, VERY QUICKLY GO THROUGH THIS WHEREIN CLAUSE ELEMENT E OF CLAIM 31.

**A** OKAY.

(DOCUMENT DISPLAYED)

**Q** AND I SEE YOU PULLED UP THE COURT'S -- OR THE PARTIES' AGREED-UPON CONSTRUCTION. CAN YOU PLEASE IDENTIFY WHAT THIS IS?

**A** SURE. SO THE CLAIM ELEMENT E HERE, REQUIRES (AS READ):

"WHEREIN THE FIRST AND SECOND RANGES OF THE FEEDBACK SIGNAL CORRESPOND TO FIRST AND SECOND RANGES OF ON-TIME VALUES OF A DRIVE SIGNAL GENERATED BY THE PULSE WIDTH MODULATOR CIRCUIT TO SWITCH THE POWER SWITCH..."

03:05:48 AND THE CONSTRUCTION IS WITH RESPECT TO THE HIGHLIGHTED YELLOW. AND IT SAYS:

"THERE IS A FIRST RANGE OF ON-TIME VALUES OF A DRIVE SIGNAL CORRESPONDING TO A FIRST RANGE OF FEEDBACK VALUES AND A SECOND RANGE OF ON-TIME VALUES OF THE DRIVE SIGNAL CORRESPONDING TO A SECOND RANGE OF FEEDBACK VALUES."

03:05:59 AND THAT'S WHAT WE WILL FOCUS ON. AND MOREOVER IF YOU LOOK IN THE NON-HIGHLIGHTED PORTION OF ELEMENT E, "DRIVE SIGNAL GENERATED BY THE PULSE WIDTH MODULATOR CIRCUIT TO SWITCH THE POWER SWITCH," WE'VE ALREADY SEEN THAT PART.

03:06:17 (DOCUMENT DISPLAYED)

**Q** SO LET'S JUMP INTO WHAT YOU HAVE FOUND HERE. IS THIS THE SAME AS WITH A WHAT WE HAVE SEEN BEFORE FOR CLAIM ELEMENT E?

03:06:32 **A** IT IS VERY SIMILAR TO WHAT WE SAW BEFORE IN THE OTHER CLAIM ELEMENT E. SO WHAT I'VE DONE IS BROKEN UP THE FIRST RANGE ON TOP, AND THAT'S DURING THAT FIXED OR CONSTANT FREQUENCY. AND THE SECOND RANGE IS IN THE VARYING FREQUENCY. AND, WHAT WE CAN SEE HERE FROM THE DIAGRAM IS THAT FOR RANGE 1, THE ON-TIME IS BETWEEN A VALUE $T_{ONMIN*}$ TO $T_{ONMAX}$. THERE'S A MAXIMUM ON-TIME FOR THE SWITCH.

03:06:51 AND THEN, FOR THE SECOND RANGE, THE WAVEFORMS ON THE BOTTOM, WHAT WE SEE IS THAT THE RANGE OF ON-TIME VALUES HERE IS BETWEEN $T_{ONMIN}$, WHICH IS ACTUALLY DIFFERENT FROM $T_{ONMIN*}$ UP TO $T_{ONMAX}$. AND FURTHERMORE, THAT $T_{ONMIN*}$ IS GREATER THAN $T_{ON}$

03:07:19

03:07:25 -- THE ABSOLUTE MINIMUM ON-TIME THAT THE SWITCH CAN HAVE.

(DOCUMENT DISPLAYED)

**Q** AND WHAT ARE YOU SHOWING HERE WITH REGARD TO THE NEXT SLIDE? IS THERE ANYTHING DIFFERENT?

03:07:38 **A** WHAT THIS IS SHOWING IS THAT THE CONSTANT ON-TIME AS DESCRIBED BY SEMMLER, THE $T_{ONMIN^*}$ IS -- PREFERABLY LIES SLIGHTLY ABOVE $T_{ONMIN}$. SO AGAIN, GOING BACK TO THAT EQUATION I SHOWED IN THE PREVIOUS SLIDE, $T_{ONMIN^*}$ IS GREATER THAN $T_{ONMIN}$.

03:07:57 **Q** OKAY.

(DOCUMENT DISPLAYED)

**Q** SO, CAN WE GO AHEAD AND CHECK OFF CLAIM ELEMENT E OF CLAIM 31 AS ANTICIPATED BY SEMMLER?

**A** YES. SO, AS I SHOWED, THERE ARE THESE FIRST AND SECOND 03:08:09 RANGES OF ON-TIME THAT CORRESPOND TO THE FIRST AND SECOND RANGES OF FEEDBACK. AND THEREFORE, THAT ELEMENT IS FOUND IN SEMMLER.

(REPORTER INTERRUPTION)

**BY MS. ONDRICK:**

03:08:25 **Q** AND SO, IS IT YOUR OPINION THAT SEMMLER ANTICIPATES CLAIM 31 OF THE '079 PATENT?

**A** YES, IT IS.

(DOCUMENT DISPLAYED)

**Q** AND WE SEE HERE A COMPARISON OF CLAIM 31 TO CLAIM 38 AND 03:08:37 WE SEE A MATCH OF CLAIM ELEMENTS. IS THAT RIGHT?

03:08:40 **A** AGAIN, WE SEE THAT SUBSET. AND SO, IT IS FURTHER MY OPINION THAT CLAIM 38 IS INVALID BECAUSE, AGAIN, IT'S ANTICIPATED BY SEMMLER.

**Q** OKAY. AND I HAVE ONE FINAL SET OF QUESTIONS, DR. WEI.

03:08:54 WE'LL HARKEN BACK QUICKLY TO YOUR NONINFRINGEMENT OPINIONS.

YOUR NONINFRINGEMENT OPINIONS TODAY, WERE THEY BASED ON THE SCREENSHOTS THAT WE HAVE SEEN AND PROVIDED IN THIS CASE, APPEARING AT DX 5709, AND THE VARIOUS INDIVIDUAL SCREENSHOTS WE HAVE SEEN LISTED?

03:09:13 **A** YES. IT'S BASED ON THOSE SCREENSHOTS AND ALSO MY UNDERSTANDING, THE -- THE MATERIALS, THE DATASHEETS, THE SCHEMATICS, ET CETERA.

**MS. ONDRICK:** THANK YOU. I HAVE NO FURTHER QUESTIONS AT THIS TIME.

03:09:25 **THE COURT:** ALL RIGHT. THEN, CROSS-EXAMINATION OF DR. WEI.

**MR. POLLACK:** THANK YOU, YOUR HONOR. HOWARD POLLACK FOR POWER INTEGRATIONS. I WILL JUST BEG THE COURT'S INDULGENCE FOR A MOMENT SO I CAN HAND OUT SOME DOCUMENTS.

03:09:48 **THE COURT:** OKAY.

**MR. POLLACK:** MAY I APPROACH THE WITNESS, YOUR HONOR?

**THE COURT:** YOU MAY. I'M NOT SURE WHAT HE IS GOING TO BRING YOU, DR. WEI.

**CROSS EXAMINATION**

**BY MR. POLLACK:**

03:10:22

**Q** GOOD AFTERNOON, DR. WEI.

**A** GOOD AFTERNOON.

**Q** SO, JUST FOR YOUR REFERENCE, WHAT I HAVE HANDED YOU ARE TWO BINDERS. ONE THAT'S GOT SOME OF THE DOCUMENTS THAT I'M GOING TO ASK YOU ABOUT, EXHIBITS IN THE CASE. THE OTHER HAS, FOR YOUR REFERENCE IF YOU NEED IT, YOUR DEPOSITION TESTIMONY AND EXPERT REPORTS.

03:10:37

**A** GREAT.

**Q** DR. WEI, I WANT TO START AND ASK YOU JUST A FEW QUESTIONS ABOUT YOUR BACKGROUND. AND JUST FOR REFERENCE, THE '908 PATENT IN THIS CASE, THAT WAS FILED IN 1999. CORRECT?

**A** 1999, YES.

03:10:56

**Q** AND THE '079 PATENT, THAT WAS FILED IN THE YEAR 2000, RIGHT?

**A** 2000, YES.

**Q** AND YOU RECEIVED YOUR PH.D. IN 2001. RIGHT?

**A** THAT'S CORRECT.

03:11:07

**Q** SO, IN THE YEAR 2000 YOU WERE STILL IN GRADUATE SCHOOL, FAIR?

**A** UM, IT'S PRETTY FAIR. WHAT HAPPENED WAS I FINISHED ALL OF MY RESEARCH FOR MY THESIS IN 2000, AND THEN, INSTEAD OF STICKING AROUND AT SCHOOL TO JUST WRITE MY THESIS I ACTUALLY ENDED UP GOING TO PORTLAND, OREGON TO JOIN A STARTUP BECAUSE I

03:11:26

03:11:31 WANTED TO GET SOME INDUSTRY EXPERIENCE.

SO I ENDED UP TAKING ABOUT A YEAR TO FINISH OFF ABOUT 20, 30 PERCENT OF MY THESIS. THAT ACTUALLY WAS HARD WRITING THE THESIS, AND WORKING FULL-TIME, BUT -- AND SO I ACTUALLY -- MY 03:11:45 DEGREE SAYS 2001, BUT I WAS PRETTY MUCH DONE WITH MY PH.D. IN 2000.

**Q** OKAY. AND YOU WORKED AT ACCELERANT, THAT WAS THE STARTUP?

**A** YES.

**Q** WHEN YOU WERE THERE YOU DIDN'T WORK ON ANY CHIPS FOR 03:11:56 CONTROLLING SWITCHMODE POWER SUPPLIES, RIGHT?

**A** YEAH. MY -- AT ACCELERANT I DID NOT WORK ON SWITCHMODE POWER SUPPLIES.

**Q** AND WHEN YOU WERE IN GRADUATE SCHOOL YOU ALSO HAD A COUPLE OF INTERNSHIPS, RIGHT?

03:12:11 **A** I DID.

**Q** YOU WORKED AT TEXAS INSTRUMENTS AND SILICON GRAPHICS?

**A** YES.

**Q** BUT AT YOUR TIME IN THOSE COMPANIES, YOU DID NOT WORK ON POWER SUPPLY CONTROLLERS THERE, EITHER, RIGHT?

03:12:21 **A** NO. IN THOSE COMPANIES, I WORKED ON DIFFERENT KIND OF CIRCUITS.

**Q** SO AFTER YOU GOT YOUR DEGREE, YOU WENT TO HARVARD AND BECAME A PROFESSOR THERE, RIGHT?

**A** THAT'S CORRECT.

03:12:33 **Q** AND YOU HAVE BEEN THERE EVER SINCE.

03:12:36 **A** YES.

**Q** SO I WANT TO TURN TO YOUR OPINIONS ON THE '908 PATENT AND ADDRESS THOSE FIRST, AND I WANT TO FOCUS FIRST ON THE QUESTION OF INFRINGEMENT. OKAY?

03:12:48 **A** OKAY.

**Q** AND, I THINK I WANT TO TALK ABOUT SOME THINGS FIRST THAT YOU HAVE NOT OFFERED AN OPINION ON JUST SO WE CAN BE CLEAR?

**A** OKAY.

**Q** YOU HAVE NOT OFFERED AN OPINION THAT THE ACCUSED PRODUCTS
03:12:59 LACK A MULTI-FUNCTION CIRCUIT COUPLED TO RECEIVE A SIGNAL. CORRECT?

**A** I THINK THAT'S CORRECT.

**Q** AND, YOU HAVE ALSO OFFERED NO OPINION ON THE INFRINGEMENT OF THE DEPENDENT CLAIM, CLAIM 27, INDEPENDENT OF YOUR OPINIONS
03:13:15 ON CLAIM 26. RIGHT?

**A** INDEPENDENT, NO, IT'S WITH RESPECT TO THE CLAIM 26.

**Q** RIGHT. OKAY. AND SO YOUR OPINION IS FOCUSED ON THE CONCEPT -- WELL, YOUR NONINFRINGEMENT OPINION IS BECAUSE YOU THINK THAT THE ACCUSED PRODUCTS LACK THE CURRENT LIMIT
03:13:35 ELEMENTS. RIGHT?

**A** THAT'S CORRECT.

**Q** I WANT TO TURN YOUR ATTENTION TO THE DATASHEET FOR ONE OF THE REPRESENTATIVE PARTS THAT WE TALKED ABOUT, THAT'S PX 92 IN YOUR BOOK.

03:13:48 **MR. POLLACK:** AND MR. SAYERS, CAN YOU BRING UP THE

03:13:50 FIRST PAGE OF PX 92? THIS IS ALREADY IN EVIDENCE.

(DOCUMENT DISPLAYED)

**BY MR. POLLACK:**

**Q** DR. WEI, YOU RECOGNIZE THIS IS THE DATASHEET FOR THE

03:14:02 FAN6747, RIGHT?

**A** YES.

**MR. POLLACK:** OKAY. MR. SAYERS, I WANT TO START WITH THE LIST OF FEATURES ON THE LEFT.

(DOCUMENT DISPLAYED)

03:14:12 **MR. POLLACK:** AND COULD YOU HIGHLIGHT THE FEATURE, PEAK CURRENT MODE CONTROL, CYCLE-BY-CYCLE CURRENT LIMITING.

(DOCUMENT HIGHLIGHTED)

**BY MR. POLLACK:**

**Q** DO YOU SEE THAT, DR. WEI?

03:14:23 **A** YES, I DO.

**Q** AND SO ONE OF THE FEATURES OF THIS PART IS CYCLE-BY-CYCLE CURRENT LIMITING, CORRECT?

**A** YES.

**MR. POLLACK:** IF YOU CAN JUMP OVER, MR. SAYERS, TO

03:14:33 THE DESCRIPTION ON THE OTHER SIDE.

(DOCUMENT DISPLAYED)

**MR. POLLACK:** AND BRING UP THE THIRD PARAGRAPH THERE.

(DOCUMENT DISPLAYED)

**BY MR. POLLACK:**

03:14:45 **Q** (AS READ)

03:14:49 "THE FAN6747 IS ESPECIALLY DESIGNED FOR SMPS WITH PEAK-CURRENT OUTPUT. IT INCORPORATES A CYCLE-BY-CYCLE CURRENT LIMITING..."

CORRECT?

03:14:57 **A** THAT'S WHAT IT SAYS.

**MR. POLLACK:** LET'S NEXT GO TO PIN DESCRIPTIONS OF PX 92 ON THE NEXT PAGE, MR. SAYERS.

(DOCUMENT DISPLAYED)

**MR. POLLACK:** AND CAN YOU BLOW UP THE FIRST PART?

03:15:14 (DOCUMENT DISPLAYED)

**MR. POLLACK:** THERE YOU GO.

**BY MR. POLLACK:**

**Q** DR. WEI, DO YOU UNDERSTAND THAT FOR THIS PART, DR. KELLEY'S IDENTIFIED THE HV PIN AS CORRESPONDING TO THE 03:15:27 CLAIM MULTI-FUNCTION TERMINAL? IS THAT YOUR UNDERSTANDING?

**A** YES, I BELIEVE THAT'S TRUE.

**Q** AND LOOKING AT THE HV PIN, THE DESCRIPTION SAYS, AMONG OTHER THINGS, THAT (AS READ):

"HIGH/LOW LINE COMPENSATION DOMINATES THE OCP LEVEL 03:15:44 AND CYCLE-BY-CYCLE CURRENT LIMIT TO SOLVE THE UNEQUAL OCP LEVEL AND POWER LIMIT PROBLEM UNDER UNIVERSAL INPUT."

DO YOU SEE THAT?

**A** YES, I DO.

03:15:56 **Q** AND "OCP" STANDS FOR "OVER CURRENT PROTECTION," RIGHT.

03:15:59 DR. WEI?

**A** I BELIEVE "OCP" STANDS FOR "OVER CURRENT PROTECTION." YES.

**Q** AND IT SAYS THAT THIS FEATURE OF HIGH-LOW LINE

03:16:11 COMPENSATION IS USED TO SOLVE THE POWER LIMIT PROBLEM UNDER UNIVERSAL INPUT, RIGHT?

**A** YES, THAT'S --

**Q** OKAY. I WANT TO LOOK AT ONE OF THE DEMONSTRATIVES YOU *USED DURING YOUR TESTIMONY.

03:16:24 **MR. POLLACK:** MR. SAYERS, CAN YOU BRING UP DDX 497?

(DOCUMENT DISPLAYED)

**BY MR. POLLACK:**

**Q** AND FOCUSING OVER HERE ON THE DATASHEETS -- AND THIS IS THE -- A FAN6747 DATASHEET AT PAGE 9, DO YOU SEE THAT?

03:16:39 **A** YES, I DO.

**Q** AND YOU SEE HOW YOU SHOWED US JUST ONE LITTLE PIECE OF IT OUT OF THAT DATASHEET?

**A** YEAH, WE PROBABLY -- WE SHOULD HAVE EXTENDED IT FURTHER.

**Q** OKAY.

03:16:47 **MR. POLLACK:** SO, MR. SAYERS CAN YOU BRING UP PAGE 9 OF THE DATASHEET, PX 92, PLEASE?

(DOCUMENT DISPLAYED)

**MR. POLLACK:** AND CAN YOU BLOW UP THE "CURRENT SENSE SECTION" UP AT THE TOP THERE? "CURRENT SENSE SECTION"?

03:17:02 (DOCUMENT DISPLAYED)

**BY MR. POLLACK:**

**Q** NOW, DR. WEI, YOU POINTED TO SOME VALUES OVER HERE ON THE RIGHT. DO YOU RECALL THAT?

**A** YES. THAT LINE AND THE LINE BELOW IT ARE THE TWO LINES THAT WE -- THAT HIGHLIGHTED REGION IS WHAT WAS IN THAT SLIDE.

(REPORTER INTERRUPTION)

**THE WITNESS:** "WAS IN THAT SLIDE."

**BY MR. POLLACK:**

**Q** LET'S MOVE OVER AND LOOK AT WHAT THOSE VALUES CORRESPOND TO. YOU SEE THERE IS SOMETHING THAT SAYS "$V_{LIMIT-L}$"?

**A** YES.

**Q** AND THE DESCRIPTION OF THE PARAMETER IS "CURRENT LIMIT AT LOW LINE." DO YOU SEE THAT?

**A** YES. IT'S A VOLTAGE. AND YES, THAT IS WHAT IT SAYS.

**Q** ALL RIGHT. SO IT'S DESCRIBED AS THE CURRENT LIMIT AT LOW LINE. CORRECT?

**A** CORRECT.

**Q** AND BELOW THAT, YOU HAVE $V_{LIMIT-H}$. AND THAT'S DESCRIBED AS THE "CURRENT LIMIT AT HIGH LINE." RIGHT?

**A** RIGHT. SO THOSE ARE CORRESPONDING TO DIFFERENT CONDITIONS ON THE INPUT VOLTAGE.

**Q** RIGHT. AND THE VALUES OF $V_{LIMIT-L}$ AND $V_{LIMIT-H}$ ARE DIFFERENT. CORRECT?

**A** YES. THEY ARE DIFFERENT.

**Q** ALL RIGHT. SO AS REFLECTED IN THIS TABLE, THE CURRENT

LIMIT PARAMETER IS CHANGED WHEN THE INPUT VOLTAGE CHANGES BETWEEN HIGH LINE AND LOW LINE. RIGHT?

**A** THE -- SO, WHAT WE ARE LOOKING AT HERE, WITH RESPECT TO THE CURRENT SENSE SECTION --

(WITNESS EXAMINES DOCUMENT)

**A** RIGHT, SO THERE ARE THESE THRESHOLD VOLTAGES, $V_{LIMIT-L}$, $V_{LIMIT-H}$. AND THE NUMBERS ON THE RIGHT-HAND SIDE CORRESPOND TO THE MIN, TYP, MAX FOR THOSE LEVELS.

**Q** RIGHT. WHAT I ASKED WAS THE VALUE CHANGES, $V_{LIMIT-L}$ AND $V_{LIMIT-H}$, ARE DIFFERENT. AND THAT REPRESENTS THAT THE CURRENT LIMIT PARAMETER CHANGES WHEN THE INPUT GOES FROM HIGH LINE TO LOW LINE. RIGHT?

(DOCUMENT DISPLAYED)

**A** SURE.

**Q** NOW, IN YOUR DIRECT TESTIMONY, DR. WEI, YOU DID NOT DISPUTE DR. KELLEY'S ANALYSIS OF THE INTERNAL CIRCUIT SCHEMATICS THAT SHOW HOW THE INTERNAL SIGNAL LIMIT WAS GENERATED IN RESPONSE TO THE SIGNAL AT THE HV PIN. FAIR?

**A** WITH RESPECT TO THE HV PIN, NO, I DID NOT.

**Q** IN FACT IN YOUR DIRECT TESTIMONY YOU DIDN'T SHOW THE JURY ANY OF THE SCHEMATICS FOR THE ACCUSED REPRESENTATIVE PARTS. RIGHT?

**A** WE DIDN'T LOOK AT ANY SCHEMATICS. THERE WERE SOME SCHEMATICS OF THE POWER SUPPLY WITH THE EXTERNAL COMPONENTS, BUT NOT THE INTERNAL CHIP SCHEMATICS.

03:19:44
Q CORRECT.

**MR. POLLACK:** MR. SAYERS, CAN YOU BRING UP NEXT THE BROWNOUT AND CONSTANT POWER LIMITED HP PIN SECTION? THIS IS ON PAGE 12.

03:19:54
(DOCUMENT DISPLAYED)

Q AND DR. WEI, I WANT TO REFER YOU TO SOME POINTS HERE. IT SAYS (AS READ):

"UNLIKE PREVIOUS PWM CONTROLLERS, FAN6747'S HV PIN ISN'T ONLY USED FOR STARTUP..."

03:20:12
SO DO YOU AGREE THAT HV PIN IS USED FOR STARTUP, AND SOME OTHER THINGS TOO, RIGHT?

A THAT IS WHAT IT SAYS, YEAH.

Q (AS READ)

"IT CAN ALSO DETECT THE AC LINE VOLTAGE TO PERFORM BROWNOUT FUNCTION AND SET THE CURRENT LIMIT LEVEL."

03:20:22

DO YOU SEE THAT?

A THAT'S WHAT IT SAYS.

Q RIGHT. SO ONE OF THE THINGS THE HV PIN CAN DO IS IT CAN DETECT THE AC LINE VOLTAGE TO SET THE CURRENT LIMIT LEVEL. THAT'S WHAT THE DATASHEET SAYS.

03:20:37

A CORRECT.

**MR. POLLACK:** AND MR. SAYERS, CAN WE TURN TO PAGE 13 OF THE 6747 DATASHEET, AND THE CONSTANT OUTPUT POWER LIMIT SECTION.

03:20:47
(DOCUMENT DISPLAYED)

03:20:47 **BY MR. POLLACK:**

**Q** NOW, YOU LOOKED AT A PART OF THIS WHEN YOU WERE ON DIRECT, CORRECT?

**A** YES.

03:20:51 **Q** I WANT TO DIRECT YOU TO A DIFFERENT PART. DOWN HERE, IT SAYS (AS READ):

"TO COMPENSATE THIS VARIATION FOR A WIDE AC INPUT RANGE, A POWER LIMITER IS CONTROLLED BY THE HV PIN TO SOLVE THE UNEQUAL POWER-LIMIT PROBLEM."

03:21:06 DO YOU SEE THAT?

**A** YES, I DO.

**Q** AND THAT'S THE FUNCTION OF THE HV PIN WE WERE JUST TALKING ABOUT FOR SETTING THE CURRENT LIMIT. CORRECT?

**A** THAT IS -- YEAH. THAT'S RELATED TO WHAT WE WERE TALKING 03:21:18 ABOUT WITH RESPECT TO THE HV PIN.

**Q** RIGHT. AND IT SAYS THAT THAT THE RESULTS -- THAT:

"THIS RESULTS IN A LOWER CURRENT LIMIT AT HIGH-LINE INPUT THAN AT LOW-LINE INPUT."

RIGHT?

03:21:29 **A** THAT IS WHAT IT SAYS.

**Q** OKAY.

**MR. POLLACK:** MR. SAYERS, CAN YOU PLEASE BRING UP THE FUNCTIONAL BLOCK DIAGRAM WHICH IS ON PAGE 2 OF THE DATASHEET?

(DOCUMENT DISPLAYED)

**BY MR. POLLACK:**

**Q** NOW, DR. WEI, WE DIDN'T LOOK AT THIS WHEN YOU WERE ON DIRECT EITHER, RIGHT?

(WITNESS EXAMINES DOCUMENT)

**A** OH, YEAH.

**MR. POLLACK:** MR. SAYERS CAN YOU ZOOM IN, ABOUT THIS QUARTER OF THE BLOCK DIAGRAM, INCLUDING THE SENSE PIN?

(DOCUMENT DISPLAYED)

**MR. POLLACK:** YES, THANK YOU.

**BY MR. POLLACK:**

**Q** SO, DR. WEI THERE IS A SENSE INPUT THERE, AT PIN 6. DO YOU SEE THAT?

**A** I DO.

**Q** AND PIN 6 IS THE CURRENT SENSE INPUT, RIGHT?

**A** THAT IS -- YES. THAT'S THE CURRENT SENSE PIN AS DESCRIBED IN THE PIN DEFINITIONS.

**Q** RIGHT. AND YOU AGREE THAT THE SIGNAL AT THIS CURRENT SENSE PIN IS A VOLTAGE THAT'S PROPORTIONAL TO THE CURRENT FLOWING THROUGH THE POWER SWITCH WHEN THE SWITCH IS ON. CORRECT?

**A** THE -- YES, IT IS A VOLTAGE, AND THERE IS -- WELL, ONCE YOU ATTACH THE POWER SWITCH, AND YOU ATTACH THE SENSE RESISTOR, THEN WE KNOW FROM OHM'S LAW THERE IS A VOLTAGE AND CURRENT RELATIONSHIP.

**Q** RIGHT. AND THE VOLTAGE AT THAT PIN, WHEN IT'S SET UP LIKE

03:22:51 IT IS IN THE TYPICAL APPLICATION DIAGRAM, WILL BE PROPORTIONAL TO THE CURRENT FLOWING THROUGH THE POWER SWITCH WHEN THE SWITCH IS ON. RIGHT?

**A** PROPORTIONAL WITH RESPECT TO THAT RESISTOR.

03:23:03 **Q** AND THIS SENSE SIGNAL IS THE INPUT, IS ONE OF THE INPUTS TO A COMPARATOR LABELED THE "CURRENT LIMIT COMPARATOR," RIGHT?

**A** YES.

**Q** AND THERE'S ANOTHER SOFT-START INPUT WE ARE GOING TO PUT THAT ASIDE FOR THE SECOND. THERE IS A NEGATIVE INPUT. YOU

03:23:20 UNDERSTAND THAT TO BE THE THRESHOLD INPUT FOR THE CURRENT LIMIT COMPARATOR, RIGHT?

**A** UH, YEAH. LET ME JUST VERIFY BECAUSE WE HAVE ZOOMED IN SO LET ME JUST ARBITRATE TRACE WHERE THAT IS FROM. OKAY.

**Q** AND YOU DON'T DISPUTE THAT THAT THRESHOLD INPUT TO THE

03:23:36 CURRENT LIMIT COMPARATOR CHANGES IN RESPONSE TO THE CHANGES IN THE INPUT VOLTAGE OF THE POWER SUPPLY. RIGHT?

**A** YES.

**Q** OKAY. AND YOU WOULD ALSO AGREE THAT WHEN THE SENSE VOLTAGE ACROSS THE SENSE RESISTOR REACHES THE THRESHOLD OF THE

03:23:51 CURRENT LIMIT COMPARATOR, THAT WILL CAUSE THE -- THIS POWER SWITCH TO BE TURNED OFF. RIGHT?

**A** SO WHEN THAT VOLTAGE EXCEEDS THE OTHER VOLTAGE, THEN THERE'S CIRCUITRY THAT TURNS THE POWER SWITCH OFF.

**Q** OKAY. NOW I WANT TO LOOK AT THE '908 PATENT ITSELF,

03:24:10 DR. WEI, WHICH IS PX 2. BUT I WANT TO LOOK AT A COUPLE OF

03:24:14 YOUR SLIDES FIRST.

**MR. POLLACK:** DDX 495, PLEASE, MR. SAYERS?

(DOCUMENT DISPLAYED)

**BY MR. POLLACK:**

03:24:21 **Q** YOU RECALL THAT YOU TALKED ABOUT THIS SLIDE ON YOUR DIRECT, RIGHT?

**A** YES, I DO.

**Q** AND YOU REFERRED TO THIS PIECE HERE (INDICATING) AS A CURRENT COMPARATOR, AND YOU SAID THAT'S SHOWN IN FIGURE 4 OF

03:24:30 THE '908 PATENT. RIGHT?

**A** I BELIEVE THAT'S FIGURE 4. YEAH.

**Q** SO LET'S LOOK AT DDX 6.

(DOCUMENT DISPLAYED)

**Q** IT SHOWS FIGURE 4, RIGHT?

03:24:42 **A** RIGHT.

**Q** AND THAT CURRENT COMPARATOR YOU TALKED ABOUT, THAT'S THAT PIECE UP HERE IN THIS UPPER RIGHT CORNER (INDICATING). RIGHT?

**A** YEAH, I THINK I DESCRIBED IT WHEN I WAS TALKING ABOUT IT,

03:24:52 I DID SAID WAS IN THE UPPER RIGHT CORNER. YEAH.

**Q** THAT IS NOT THE PORTION OF THE CIRCUIT THAT IMPLEMENTS THE CURRENT LIMIT ADJUSTMENT FEATURE, RIGHT?

**A** THAT IS NOT. I WAS IDENTIFYING THE CURRENT COMPARATOR THERE.

03:25:05 **Q** THAT RELATES TO AN UNDER-VOLTAGE FEATURE, IT'S NOT REALLY

AT ISSUE HERE. RIGHT?

**A** ONE OF THEM IS UNDER-VOLTAGE FEATURE. I BELIEVE THE OTHER ISN'T. THERE'S TWO OF THEM SIDE BY SIDE. I DON'T RECALL EXACTLY WHICH IS WHICH. BUT, ONE OF THEM IS THE UNDER-VOLTAGE FEATURE.

**Q** AND THE OTHER IS THE OVER-VOLTAGE FEATURE?

**A** THAT'S RIGHT.

**Q** SO I WANT TO FOCUS YOU ON THE OTHER PORTIONS. THIS FIGURE SHOWS A CURRENT LIMIT ADJUSTMENT SIGNAL (INDICATING). YOU DON'T DISPUTE THAT THAT IS THE CURRENT LIMIT ADJUSTMENT SIGNAL AS DESCRIBED IN THE PATENT, RIGHT?

**A** THAT'S CORRECT.

**Q** AND THAT'S A VOLTAGE THAT'S INPUT TO THIS VOLTAGE COMPARATOR, CORRECT?

**A** THAT'S CORRECT.

**Q** AND THE OTHER INPUT TO THAT COMPARATOR, HERE (INDICATING), IS A SENSE VOLTAGE THAT IS PROPORTIONAL TO THE CURRENT FLOWING THROUGH THE POWER SWITCH. CORRECT?

**A** YEAH, I THINK I'LL AGREE WITH THAT. IT IS A RESISTOR DIVIDER THAT IS CONNECTED TO, I BELIEVE, THE POSITIVE INPUT OF THAT COMPARATOR. AND IF WE TRACE THAT AROUND, THERE IS A DRAIN NODE, YEAH.

**Q** AND, YOU WOULD AGREE THAT WHEN THE SENSE VOLTAGE EXCEED THE THRESHOLD SET BY THE CURRENT LIMIT ADJUSTMENT SIGNAL, THE SWITCH, THE POWER SWITCH WILL BE TURNED OFF (INDICATING).

03:26:23 RIGHT?

**A** IF I LOOK THROUGH THAT, YEAH.

**Q** OKAY AND THE '908 PATENT SAYS THAT USING THIS COMPARATOR CIRCUIT, THE SWITCH WILL BE TURNED OFF WHEN THE AMOUNT OF

03:26:33 CURRENT FLOWING THROUGH THE POWER SWITCH RISES ABOVE THE THRESHOLD. RIGHT?

**A** THIS IS, YOU ARE TALKING ABOUT WITHIN THE PATENT, IN THE SPECIFICATION.

**Q** -- YES.

03:26:42 **A** I THINK SO.

**Q** BUT IN YOUR OPINION, THIS DISCLOSED EMBODIMENT IF FIGURE 4 IS NOT COVERED BY THE ASSERTED CLAIM AS YOU'VE APPLIED IT IN THIS CASE. RIGHT?

**A** CORRECT.

03:26:57 **Q** YOUR OPINION IS THAT THE EMBODIMENT DISCLOSED IN FIGURE 7 OF THE '908 PATENT IS ALSO NOT COVERED BY THE ASSERTED CLAIMS, RIGHT?

**A** THAT'S CORRECT.

**Q** AND THE REASON FOR THAT OPINION IS BECAUSE THOSE

03:27:10 EMBODIMENTS COMPARE VOLTAGES THAT REPRESENT CURRENTS RATHER THAN COMPARING CURRENTS THEMSELVES. FAIR?

**A** IT'S -- THE CLAIM REQUIRES -- AND THIS IS THE CLAIM CONSTRUCTION FOR "CURRENT LIMIT" -- A VALUE OF CURRENT.

**Q** SO, IT'S YOUR ASSERTION THAT THE CLAIMS REQUIRE

03:27:29 SPECIFICALLY COMPARING CURRENTS.

03:27:31 **A** A VALUE OF CURRENT.

**Q** AND THERE IS NO EMBODIMENT SHOWN IN THE '908 PATENT THAT INCLUDES A CIRCUIT THAT COMPARES TWO CURRENTS. RIGHT?

**A** THERE'S -- WELL, THE CURRENT COMPARATOR THAT WE JUST POINTED OUT, THERE'S THAT CIRCUITRY. 03:27:46

**Q** WITH REGARD TO IMPLEMENTING THE CURRENT LIMIT FEATURE.

**A** WITH RESPECT TO THE CURRENT LIMIT FEATURE, IT DOESN'T USE THOSE CIRCUIT ELEMENTS.

**Q** SO, THE WAY YOU'VE APPLIED THE CLAIMS OF THE '908 PATENT, THEY DON'T COVER ANY EMBODIMENT THAT IS DESCRIBED IN THE PATENT. RIGHT? 03:28:02

**A** IN TERMS OF -- WE ARE TALKING ABOUT CLAIM 26?

**Q** YES.

**A** YES.

03:28:17 **Q** I WANT TO ALSO ASK YOU SOMETHING ABOUT -- JUST CLARIFY, YOU TALKED ABOUT SOME FILE HISTORY AND AN *AGIMAN* PATENT, DO YOU RECALL THAT?

**A** YES, I DO.

**MR. POLLACK:** CAN I HAVE DDX 493, PLEASE?

03:28:34 (DOCUMENT DISPLAYED)

**BY MR. POLLACK:**

**Q** OKAY. DO YOU RECALL THIS SLIDE?

**A** I DO.

**Q** DOWN THERE IT'S A LITTLE HARD TO READ, THAT SAYS "'908 PARENT FILE HISTORY," RIGHT? 03:28:46

03:28:48 **A** YES.

**Q** YOU UNDERSTAND THAT THIS DISCUSSION DID NOT OCCUR DURING THE PROSECUTION OF THE '908 PATENT, ITSELF, RIGHT?

**A** SO MY UNDERSTANDING IS THE '908 PATENT IS -- IS A CHILD OF A PARENT PATENT. AND IN THIS FAMILY OF PATENTS, I BELIEVE THERE'S ELEVEN PATENTS IN THAT FAMILY.

03:29:00

**Q** OKAY. SO, BUT THIS DISCUSSION HERE (INDICATING), YOU WOULD AGREE WITH ME, IS NOT PART OF THE FILE HISTORY OF THE '908 PATENT ITSELF. RIGHT?

03:29:17 **A** IT'S PART OF THE PARENT -- I DON'T RECALL WHAT THE NUMBER FOR THE PARENT PATENT IS. I THINK IT'S '997, MAYBE, BUT I DON'T RECALL THE EXACT NUMBER.

**Q** NOW, THIS DISCUSSION HERE THAT YOU POINTED TO, THAT WAS NOT ABOUT CLAIM 26 OF THE '908 PATENT, RIGHT?

03:29:39 **A** NOT ABOUT CLAIM 26 OF '908.

**Q** AND IN FACT IT IS ABOUT A LIMITATION OF A CLAIM THAT DOES NOT APPEAR IN THE ASSERTED CLAIMS OF THE '908. CORRECT?

**A** IT IS -- THIS DISCUSSION IS WITH RESPECT TO WHAT POWER INTEGRATIONS PRESENTED TO THE PATENT OFFICE IN TERMS OF CURRENT AND VOLTAGE. AND, SPECIFICALLY, IF I READ THIS AGAIN, I DO NOT BELIEVE THIS IS EXACTLY WITH RESPECT TO CLAIM 26.

03:29:57

**Q** OKAY.

**MR. POLLACK:** DO YOU HAVE DX5123, MR. SAYERS? CAN WE LOOK AT THE ACTUAL EXHIBIT AT PAGE 30?

03:30:27 (DOCUMENT DISPLAYED)

03:30:28 **BY MR. POLLACK:**

**Q** AND I BELIEVE THIS IS THE PORTION THAT YOU HIGHLIGHTED IN YOUR SLIDE. I WANT YOU TO GO UP TO THE PORTION RIGHT ABOVE THAT.

03:30:34 (DOCUMENT DISPLAYED)

**Q** DO YOU SEE WHERE IT SAYS HERE (AS READ):

"EXAMPLE INDEPENDENT CLAIM 1 EXPRESSLY RECITES A POWER SUPPLY CONTROLLER CIRCUIT THAT INCLUDES 'A CURRENT INPUT CIRCUIT COUPLED TO RECEIVE A CURRENT 03:30:47 REPRESENTATIVE OF AN INPUT VOLTAGE, THE CURRENT INPUT CIRCUIT TO GENERATE AN ENABLE/DISABLE SIGNAL WHEN THE CURRENT CROSSES A THRESHOLD.'"

DO YOU SEE THAT?

**A** I DO.

03:30:59 **Q** THAT LANGUAGE DOESN'T APPEAR ANYWHERE IN THE CLAIMS THAT ARE AT ISSUE IN THIS CASE. RIGHT IN?

**A** SO, SO THIS IS -- SO THE -- THE TEXT THAT WE SAW BELOW IN *AGIMAN* IS CLEARLY WITH RESPECT TO THE PORTION THAT WE'VE TALKED -- THAT WE'VE HIGHLIGHTED HERE. AND IT'S TALKING ABOUT 03:31:22 THIS CURRENT INPUT CIRCUIT.

AND IT IS -- SO WHAT HAPPENED, AS I UNDERSTAND, IS THAT *AGIMAN* WAS PRESENTED AS A PRIOR ART. AND WHAT POWER INTEGRATIONS DID WAS TO LOOK THROUGH *AGIMAN* AND ARGUE THAT CURRENT AND VOLTAGE ARE DIFFERENT. AND THEREFORE, *AGIMAN* DOES 03:31:44 NOT INVALIDATE -- OR NOT INVALIDATE, I GUESS, IT'S NOT A

03:31:50 REFERENCE THAT PREVENTS ONE OF THE CLAIMS TO BE GREEN MODE.

**Q** DR. WEI, ISN'T IT TRUE THAT WHAT POWER INTEGRATIONS WAS SAYING IS THAT *AGIMAN* DOESN'T SHOW WHAT THEY RECITED IN THIS CLAIM (INDICATING)?

03:32:04 **A** THAT'S CORRECT. AND, THE REASON FOR IT IS WITH RESPECT TO HOW CURRENT AND VOLTAGES ARE DIFFERENT.

**Q** AND DR. WEI, THE CLAIMS IN THIS CASE RECITE A MULTI-FUNCTION CIRCUIT, DO THEY NOT?

**A** YES, THEY DO.

03:32:17 **Q** AND NOT A CURRENT INPUT CIRCUIT.

**A** IT'S -- IT'S NOT A CURRENT INPUT CIRCUIT AS DESCRIBED IN THIS LANGUAGE HERE. BUT WE'RE ALSO STILL TALKING ABOUT CURRENTS AND VOLTAGES.

**Q** DR. WEI, IN YOUR NONINFRINGEMENT OPINION WITH REGARD TO 03:32:34 THE '908 PATENT, YOU DID NOT RELY ON ANY TESTING OF ANY FAIRCHILD PRODUCTS IN FORMING YOUR OPINIONS. CORRECT?

**A** THAT'S CORRECT. THE '908 PATENT AND IF WE LOOK AT CLAIMS 26 AND 27, IF WE LOOK AT THE PREAMBLE IT SAYS "A POWER CONTROLLER CIRCUIT," I BELIEVE, IT DOESN'T SAY "POWER SUPPLY." 03:32:57 AND SO, I DIDN'T FEEL I NEEDED TO DO TESTING WITH RESPECT TO THE '908.

**Q** WELL, LET'S MOVE ON TO THE '079 PATENT.

**A** OKAY.

**Q** AND LET'S TALK ABOUT YOUR OPINIONS ABOUT NONNER 03:33:11 NONINFRINGEMENT THERE. FIRST OF ALL YOU PROVIDED SOME

TESTIMONY ABOUT THE SWITCH ELEMENT. DO YOU RECALL THAT?

**A** SWITCH ELEMENT. YES. THERE WAS NUMEROUS TESTIMONY.

**Q** OKAY. SO, BUT YOU WOULD AGREE THAT THE ACCUSED DISCRETE CONTROLLERS MUST BE USED WITH A POWER SWITCH, OTHERWISE THEY WOULDN'T WORK IN A POWER SUPPLY. RIGHT?

**A** I AGREE THAT THE POWER SUPPLY REQUIRES AN EXTERNAL POWER SWITCH AS WE HAD DISCUSSED. BUT THAT POWER SWITCH AND THAT SENSE RESISTOR IS OUTSIDE OF THE ACCUSED PRODUCTS.

**Q** BUT YOU CAN'T USE THE CONTROLLER IN POWER SUPPLY WITHOUT THE POWER SWITCH. RIGHT?

**A** RIGHT. YOU NEED THOSE POWER -- THAT POWER SWITCH AND RESISTOR.

**Q** RIGHT. IN FACT IN ORDER TO USE THE DISCRETE CONTROLLERS AND HAVE A POWER SUPPLY THAT DOES THE THINGS THAT POWER SUPPLIES DO, YOU NEED A POWER SWITCH. RIGHT?

**A** YES.

**Q** SO I WANT TO TALK A LITTLE BIT ABOUT THIS TESTING THAT YOU DID, THAT YOU HAD BE DONE. SO IN FORMING YOUR OPINIONS ON THE DISPUTED ELEMENTS OF THE '079 PATENT CLAIMS, YOU RELIED ON SOME DATA THAT WAS PROVIDED BY FAIRCHILD ABOUT PRODUCT TESTING. RIGHT?

**A** I THINK THAT'S FAIR, YEAH.

**Q** OKAY. AND, I JUST WANT TO SEE IF I CAN CLARIFY SOME OF THE FACTS RELATED TO THIS. AND THE TIMELINE, IN PARTICULAR.

**A** OKAY.

03:34:40

Q FIRST OF ALL, YOU SIGNED YOUR REPORT CONTAINING YOUR NON-INFRINGEMENT OPINIONS ON AUGUST 22 OF LAST YEAR. RIGHT?

A THAT IS CORRECT.

Q AND YOU FIRST SUGGESTED IN AN EMAIL TO FAIRCHILD'S COUNSEL ON JULY 24TH THAT THERE WAS SOME TESTING THAT YOU WOULD LIKE TO GET DONE. RIGHT?

03:34:54

A THAT'S CORRECT.

Q BUT YOU DIDN'T PERSONALLY SEND ANY TESTING INSTRUCTIONS TO FAIRCHILD'S EMPLOYEES; YOU JUST COMMUNICATED THROUGH THE ATTORNEYS. RIGHT?

03:35:08

A THAT'S CORRECT. I DIDN'T KNOW EXACTLY WHO, TO WHOM I WOULD SEND THAT EMAIL. AND SO IT WAS RELAYED TO FAIRCHILD THROUGH THE ATTORNEYS.

Q AND AFTER SENDING OFF THE EMAIL TO THE LAWYERS ON JULY 24TH, THE NEXT THING THAT HAPPENED FROM YOUR PERSPECTIVE WAS YOU RECEIVED SOME POWERPOINT REPORTS IN AN EMAIL ON AUGUST 17TH FROM COUNSEL (INDICATING). RIGHT?

03:35:21

A I HAD SOME CONVERSATIONS WITH COUNSEL AND THEN THERE WAS AN -- AFTER SENDING THAT EMAIL, I BELIEVE YOU'RE CORRECT THAT THE NEXT EMAIL CAME BACK ON AUGUST -- I FORGET EXACTLY WHICH DATE. AUGUST 18?

03:35:43

Q 17 SOUND RIGHT?

A AUGUST 17?

Q SO BETWEEN THE TIME YOU SENT THE EMAIL ON JULY 24TH AND RECEIVING SOME REPORTS BACK FROM COUNSEL IN AN EMAIL ON AUGUST

03:36:02

03:36:08 17, YOU DON'T RECALL SPEAKING WITH ANY OF THE FAIRCHILD ENGINEERS ABOUT ANY TESTING THAT THEY WERE DOING. RIGHT?

**A** I DID NOT RECALL. I DO NOT RECALL.

**Q** BUT YOU KNOW THAT W.H. HUANG OF FAIRCHILD TESTIFIED THAT

03:36:23 BETWEEN JULY 25TH AND AUGUST 20TH, THERE WERE NO COMMUNICATIONS FROM YOU GIVING ADDITIONAL INSTRUCTIONS FOR THE TESTING. YOU RECALL THAT TESTIMONY, RIGHT?

**A** IN TERMS OF A DIRECT COMMUNICATION BETWEEN THE TWO OF US?

**Q** WELL, EITHER FROM YOU OR THE LAWYERS. YOU HEARD HIM

03:36:40 TESTIFY ABOUT THAT, RIGHT?

**A** WELL, WELL, I'M NOT SURE, BUT I'LL TAKE YOUR WORD FOR IT. I'M NOT 100 PERCENT SURE IF THAT WAS THE CASE.

**Q** OKAY, WELL, I MEAN THE JURY HEARD HIS TESTIMONY, SO --

**A** GREAT.

03:36:54 **Q** NOW, YOU DIDN'T PERSONALLY PERFORM ANY OF TESTING THAT YOU RELY ON IN FORMING YOUR OPINIONS, RIGHT IF?

**A** NO. THE TESTING WAS DONE IN TAIWAN. AND, I WAS EITHER IN BOSTON OR SOMEWHERE IN THE U.S.

**Q** SO, FAIR ENOUGH, YOU DIDN'T PERSONALLY WITNESS ANY OF THE

03:37:11 TESTING THAT WAS DONE BY FAIRCHILD THAT YOU LATER RELIED ON.

**A** THAT'S CORRECT.

**Q** AND YOU DIDN'T SPEAK WITH THE FAIRCHILD EMPLOYEES THAT WERE DOING THE TESTING WHILE IT WAS ACTUALLY HAPPENING. CORRECT?

03:37:21 **A** IN SITU, NO. THAT'S CORRECT.

03:37:24 **Q** SO YOU CANNOT PERSONALLY VERIFY ANY OF THE TEST CONDITIONS OR HOW THE RESULTS WERE GENERATED BECAUSE YOU WEREN'T PERSONALLY PRESENT. RIGHT?

**A** I GOT THE TEST RESULTS, AND I ALSO GOT A DOCUMENT THAT

03:37:42 CONTAINS THE PHOTOGRAPHS OF THE TEST SETUP, INFORMATION REGARDING, YOU KNOW, THE EQUIPMENT THAT WAS USED AND THINGS LIKE THAT. AND THEN, BASED ON THAT, I ALSO LOOKED AT THE RESULTS. AND SO I WAS LOOKING AT THE RESULTS AND SEEING HOW IT MATCHED UP WITH MY UNDERSTANDING. BUT, I WASN'T PHYSICALLY

03:38:00 THERE.

**Q** OKAY. SO, AFTER GETTING THESE POWERPOINT REPORTS ON AUGUST 17TH, YOU THEREAFTER HAD A PHONE CALL, RIGHT, ON AUGUST 20TH, WITH MR. HUANG AND SOME OF FAIRCHILD'S LAWYERS ABOUT WHAT WAS IN THOSE REPORTS. RIGHT?

03:38:17 **A** YES.

**Q** AND THAT WAS THE ONE TIME BEFORE YOU SERVED YOUR REPORT THAT YOU SPOKE TO MR. HUANG. RIGHT?

**A** I THINK THAT'S CORRECT.

**Q** AND THEN, CAME THE DAY THAT THE REPORT WAS DUE, RIGHT,

03:38:32 AUGUST 22ND?

**A** CORRECT.

**Q** AND ON THAT LAST DAY, YOU RECEIVED SOME UPDATED REPORTS. RIGHT?

**A** I RECEIVED SOME UPDATED POWERPOINTS OR PDF FILES.

03:38:45 **Q** OKAY. AND, YOU UNDERSTOOD THAT, FOR EXAMPLE, THE FAN103

POWERPOINT HAD BEEN CHANGED BY MR. HUANG BETWEEN THE 17TH AND THE 22ND. RIGHT?

**A** THERE WAS -- IF I RECALL CORRECTLY, IN THAT POWERPOINT PRESENTATION, OR SET OF SLIDES, THERE WAS OTHER TEST RESULTS INCLUDED AND THEN THERE WERE SOME OTHER ONES THAT WERE REMOVED.

**Q** OKAY, BUT YOU KNEW THAT AT THE TIME. RIGHT?

**A** WELL, I HAD BOTH AT THE TIME.

**Q** OKAY. AND ALSO, THAT SAME DAY, YOU RECEIVED THE REPORTS FOR THE SG 6841, THE SG 5841, AND THE SG 5841J. RIGHT? IN A SERIES OF EMAILS FROM FAIRCHILD'S COUNSEL.

**A** YES, THERE WAS KIND OF THE FINAL SET OF THOSE CHARTS THAT I RECEIVED. I THINK THAT WAS -- I DO REMEMBER THE SIX OR SEVEN EMAILS THAT CAME IN. AND, I THINK -- I WOULD HAVE TO CHECK MY IN BOX AGAIN BUT I THINK THAT'S RIGHT.

**Q** OKAY. AND THEN, ON THAT SAME DAY, YOU ELECTRONICALLY SIGNED YOUR EXPERT REPORT WHICH ATTACHED VARIOUS POWERPOINT SLIDES, DECKS. RIGHT?

**A** THAT'S CORRECT.

**Q** AND IN THE REPORT THAT YOU SIGNED ON AUGUST 22ND, THE REPORTS INDICATED THAT THE TESTING FOR THE SG 6841 AND 5841 HAD ALL OCCURRED ON AUGUST 1ST. RIGHT?

**A** YOU KNOW, LOOKING, HAVING BEEN SITTING HERE, LOOKING AT ALL THE DEMONSTRATIVES AND DISCUSSIONS, THAT'S WHAT THOSE DATES WERE. TO BE HONEST, WHEN I WAS LOOKING THROUGH THE

03:40:39 RESULTS, I DON'T THINK I EVEN REGISTERED WHAT DATES THEY WERE.

**Q** OKAY. BUT YOU IN FACT LEARNED, JUST A FEW WEEKS AGO, THAT THE -- THE DATA SETS IN THOSE POWERPOINTS ACTUALLY INCLUDED DATA THAT WAS CAPTURED ON A NUMBER OF DIFFERENT DAYS. RIGHT?

03:40:57 **A** OH, YEAH. THAT'S COMMON.

**Q** AND, THAT WAS TRUE FOR ALL OF THE DIFFERENT REPORTS. CORRECT?

**A** I THINK SO. BASED ON THE DISCUSSIONS THAT WE HEARD THIS MORNING AND YESTERDAY WITH MR. W.H. HUANG, I THINK IT WAS

03:41:14 ACTUALLY FOR ALL OF THEM. I MEAN, IN THE WHOLE TESTING PROCESS, YOU DON'T TYPICALLY DO IT ALL IN ONE DAY. IT -- IT DOES TAKE A COUPLE OF DAYS. SOMETIMES IT TAKES WEEKS OR MONTHS.

**Q** OKAY. BUT, WHEN YOU ACTUALLY SIGNED YOUR REPORT, AT THAT

03:41:30 TIME, YOU DIDN'T KNOW THAT THE DATA SETS THAT WERE SHOWN IN THOSE POWERPOINTS HAD BEEN PERFORMED OVER MANY DAYS AND THAT THINGS HAD BEEN SORT OF SWAPPED IN AND OUT AT MR. HUANG'S DIRECTION. FAIR?

**A** YEAH. IT DIDN'T REALLY MAKE A DIFFERENCE TO ME.

03:41:47 **Q** AND YOU DIDN'T KNOW THAT BECAUSE MR. HUANG DIDN'T TELL YOU. RIGHT?

**A** MR. HUANG DID NOT TELL ME.

**Q** NOW, DR. WEI, IN YOUR DIRECT, YOU ALSO TALKED ABOUT TEST INSTRUCTIONS THAT WERE INCLUDED IN YOUR EXPERT REPORT. DO YOU

03:42:05 RECALL THAT?

03:42:05
**A** YES, I DO.

**Q** AND, I BELIEVE YOU SAID THAT THE TESTING THAT FAIRCHILD DID WAS PERFORMED AT YOUR INSTRUCTIONS. RIGHT?

**A** YES.

03:42:16
**Q** AND, IS IT TRUE THAT YOU SAID THAT YOUR SPECIFIC INSTRUCTIONS FOR THE TEST WERE PRESENTED IN THAT LIST OR BULLET POINTS IN EXHIBIT B OF YOUR REPORT? IS THAT RIGHT?

**A** SO, WHAT I SAID WAS THAT THE EXHIBIT B WAS -- IS COMPREHENSIVE IN TERMS OF THE TEST RESULTS THAT ARE ALSO ATTACHED TO MY REPORT.

03:42:37
**Q** WELL, ISN'T IT TRUE, DR. WEI, THAT WHEN YOU WERE ASKED ABOUT THIS IN YOUR DEPOSITION, TAB B OF THE INSTRUCTIONS, YOU SAID THAT YOU HAD PERSONALLY COME UP WITH THE IDEAS FOR THE TESTS THAT WERE DESCRIBED IN THOSE INSTRUCTIONS? RIGHT?

03:43:00
**A** I DON'T RECALL EXACTLY WHAT THAT CONVERSATION WAS. WHAT I DO RECALL WAS THAT THE BASIC CONTENT OF THE INSTRUCTIONS FOR THE TESTS WERE CONTAINED IN THOSE INSTRUCTIONS.

**Q** WELL, WHY DON'T YOU TAKE A LOOK AT YOUR DEPOSITION EXHIBIT -- YOUR DEPOSITION TRANSCRIPT, SORRY, IT'S IN THAT BINDER

03:43:18
(INDICATING). THIS IS FOR YOUR 9-16-13 DEPOSITION. AND I'LL DIRECT YOU TO PAGE 138.

**A** TAB B?

**Q** IT SHOULD BE LABELED "9-16-13 "--

**A** GOT IT.

03:43:41
**Q** -- "DEPOSITION." RIGHT?

03:43:42

**A** AND WHICH PAGE ARE WE LOOKING AT?

**Q** PAGE 1-3-8.

(WITNESS EXAMINES DOCUMENT)

**A** OKAY.

03:43:53

**Q** AND IF YOU LOOK AT LINES 20, TO THE END, AND THEN THE FIRST TWO LINES ON THE NEXT PAGE. CAN YOU READ THOSE?

**A** SURE.

(WITNESS EXAMINES DOCUMENT)

**A** OKAY.

03:44:10

**Q** SO, DOES THAT REFRESH YOUR RECOLLECTION THAT WHEN YOU WERE ASKED IN YOUR FIRST DEPOSITION, "DID YOU PERSONALLY COME UP WITH THE IDEAS FOR THE TESTS THAT ARE DESCRIBED IN THE INSTRUCTIONS," YOUR RESPONSE WAS "YES, I THINK SO, AND I REMEMBER WRITING THEM"?

03:44:27

**A** YES. SO, YEAH.

**Q** BUT THEN, LATER ON, YOU KIND OF CHANGED THAT TESTIMONY WHEN YOU WERE DEPOSED IN FEBRUARY OF THIS YEAR. CORRECT?

**A** YES. THE -- IN THE OTHER DEPOSITION THERE WAS MORE JOGGING OF MEMORY, YES.

03:44:45

**Q** AND SO WHEN YOU WERE ASKED ABOUT IT IN FEBRUARY, YOU AGREED, FOR EXAMPLE, THAT NOT ALL OF THE TESTS LISTED IN TAB B WERE YOUR ORIGINAL IDEA. RIGHT?

**A** I BELIEVE WE DISCUSSED THIS NUMEROUSLY THROUGHOUT TODAY. FOR EXAMPLE, THE ESD/SURGE TEST, THAT WAS A SUGGESTION BY

03:45:06

MR. W.H. HUANG. AND, YOU KNOW, I -- AND THAT I HEARD IT, I

03:45:12 THOUGHT IT WAS A GOOD IDEA. AND SO I ASKED HIM TO DO IT.

**Q** OKAY. AND THERE WERE -- THERE WERE SOME OTHER CLARIFICATIONS OF THE TEST INSTRUCTIONS THAT ALSO CAME FROM MR. HUANG, RIGHT?

03:45:27 **A** OH, OH. IN TERMS OF, I THINK, WE'RE TALKING ABOUT THE DYNAMIC LOAD TESTS?

**Q** RIGHT. OKAY?

**A** RIGHT.

**Q** NOW ON THE OTHER HAND --

03:45:37 **A** SORRY.

**Q** YOU HAD AT -- I'M SORRY, I DIDN'T MEAN TO CUT YOU OFF.

**A** I'M SORRY. IN TERMS OF THE DYNAMIC LOAD TESTS, WHAT MR. HUANG HAS SAID THAT HE HAD SOME QUESTIONS IN TERMS OF WHAT VALUES TO USE, AND THEREFORE HE SOUGHT CLARIFICATION. AND I

03:45:54 DON'T RECALL EXACTLY WHAT HE SAID THEREAFTER.

**Q** OKAY. BUT YOU ONLY SPOKE TO HIM THAT ONE TIME. RIGHT?

**A** ON THE PHONE, I -- BEFORE AUGUST 22ND IT WAS THAT ONE CONVERSATION.

**Q** NOW, YOU HAD ASKED FOR SOME TESTING IN YOUR ORIGINAL EMAIL

03:46:17 TO COUNSEL, THE SO-CALLED TEST NO. 3, FOR WHICH YOU NEVER RECEIVED ANY TEST RESULTS. RIGHT?

**A** THAT IS CORRECT.

**Q** AND, I THINK YOU SAID IN YOUR DIRECT, YOU DIDN'T FOLLOW UP ON THOSE TESTS, RIGHT?

03:46:32 **A** THAT'S CORRECT.

03:46:34 **Q** YOU DIDN'T GET RESULTS FOR TEST NO. 3 BECAUSE THE LAWYERS TOLD W.H. NOT TO DO THAT TESTING. RIGHT?

**A** I DON'T -- UM, I DON'T RECALL EXACTLY WHAT HAPPENED. THIS IS WAS SOMETHING THAT WAS A TOPIC OF THE DEPOSITION, THE
03:46:53 SECOND DEPOSITION. AND, AT THAT TIME, I DIDN'T QUITE RECALL EXACTLY WHAT HAD HAPPENED.

SITTING HERE TODAY, I WAS LISTENING OR SITTING FOR LAST WEEK AND A HALF, WHAT I NOTICED, I REALIZED, REALIZED ESPECIALLY WAS DR. KELLEY HAD DROPPED LIKE SIX OF THE CLAIMS
03:47:15 AND SO WE WERE ONLY TALKING ABOUT FOUR, FOUR ASSERTED CLAIMS NOW.

AND, IT KIND OF REMINDED ME THAT, OH, I WAS REALLY FOCUSED ON THAT FIXED FREQUENCY CLAIM ELEMENT, AND THE CYCLE SKIPPING CLAIM ELEMENT. AND SO, I JUST WAS NOT PAYING ATTENTION EVEN
03:47:32 TO THE LAST ONE. AND THAT INITIAL EMAIL WAS KIND OF MY FIRST ITERATION OF THE TESTS.

**Q** OKAY. SO, IT'S YOUR TESTIMONY THAT YOU KNEW BACK BEFORE YOU DID YOUR REPORT THAT ONLY THE FOUR CLAIMS THAT ARE AT ISSUE IN THE TRIAL WERE THE ONES THAT WERE THE UNIVERSE OF THE
03:47:50 CLAIMS? IS THAT WHAT YOU ARE SAYING?

**A** NO. OF COURSE, I COULD NOT KNOW THAT.

**Q** AND YOU DIDN'T KNOW THAT MR. HUANG HAD ASKED MR. CHUEH TO ACTUALLY TO DO TEST 3 FOR A PART, AND THEY HAD SOME RESULTS. YOU WEREN'T AWARE OF THAT WHEN YOU SIGNED YOUR REPORT ON
03:48:08 AUGUST 22ND, RIGHT?

03:48:10 A THAT IS -- THAT IS CORRECT.

Q SO, DR. WEI, LET'S TALK ABOUT CYCLE SKIPPING FOR A MINUTE. AND, YOUR OPINIONS ON THAT LIMITATION.

NOW, YOU TOLD THE JURY THAT YOU BELIEVE THE ACCUSED

03:48:27 PRODUCTS DON'T INFRINGE THE '079 PATENT CLAIMS BECAUSE THEY SKIPPED CYCLES. RIGHT?

A CORRECT.

Q AND, YOU ARE BASING THAT ON TESTS. RIGHT?

A CORRECT.

03:48:37 Q SO, DURING YOUR DIRECT EXAMINATION, YOU DIDN'T SHOW THE JURY ANY OF THE SCHEMATICS, INTERNAL SCHEMATICS FOR THE ACCUSED PRODUCTS, RIGHT?

A THAT IS CORRECT.

Q AND SO FOR EXAMPLE, TODAY WE HEARD NO DISCUSSION WITH

03:48:50 REFERENCE TO ANY PAGES OF THE SCHEMATICS FOR THE ACCUSED REPRESENTATIVE SG 3842G. RIGHT?

A THAT IS CORRECT.

Q AND SIMILARLY, YOU DIDN'T EXPLAIN WITH REFERENCE TO ANY SCHEMATICS WHAT CIRCUITS INSIDE THE SG5841, THAT YOU BELIEVE

03:49:10 WOULD CAUSE IT TO SKIP CYCLES. CORRECT?

A I WAS SHOWING THE TEST RESULTS. AND I WAS NOT -- I DID NOT GO THROUGH THE SCHEMATICS.

Q OKAY. NOW, WITH REGARD TO THE SG6841, I THINK YOU MENTIONED IT, BUT YOU WOULD AGREE THAT THE DATASHEET FOR THAT

03:49:29 PRODUCT DOESN'T MENTION THE -- THE PART SKIPPING CYCLES IN ANY

03:49:33 WAY. RIGHT?

**A** THE DATASHEET? THAT'S CORRECT.

**Q** RIGHT. AND YOU DIDN'T POINT TO ANYTHING IN THE SCHEMATICS OF THE 6841 THAT WOULD, IN YOUR VIEW, DESCRIBE A CIRCUIT THAT 03:49:44 WOULD CAUSE THE 6841 PART TO SKIP CYCLES. RIGHT?

**A** I JUST OBSERVED IT IN THE TESTS.

**Q** OKAY. AND JUST TO CUT TO THE CHASE, THAT'S TRUE OF ALL THE ACCUSED PRODUCTS. YOU DIDN'T POINT TO ANY SCHEMATICS INSIDE THOSE PRODUCTS THAT YOU SAID, "YEAH, THAT'S THE CIRCUIT 03:50:01 THAT CAUSED CYCLE SKIPPING." RIGHT?

**A** THAT IS CORRECT.

**Q** NOW, YOU AGREE THAT CYCLE SKIPPING IN THE '079 PATENT REFERS TO SKIPPING OSCILLATOR CYCLES, RIGHT?

**A** YES.

03:50:11 **Q** AND, I THINK YOU SAID THIS, BUT NONE OF THE TESTING DATA THAT YOU RELIED ON SHOWS THE ACTUAL OSCILLATOR OUTPUT. RIGHT?

**A** AS I DESCRIBED, YOU CAN'T -- THERE ARE -- THERE IS NO PIN THAT HAS THE OSCILLATOR OUTPUT COMING OUT SO YOU CAN'T PROBE IT AND LOOK AT IT. AND THEREFORE -- AND IT'S INSIDE THE CHIP. 03:50:31 AND SO, YOU HAVE TO UNDERSTAND HOW THE CHIP OPERATES. BASED ON THE SCHEMATICS, DATASHEETS, ET CETERA.

**Q** SO, LET'S LOOK AT IT JUST AN EXAMPLE.

**MR. POLLACK:** AND MR. SAYERS, THIS IS FROM DX 5709. BUT I THINK YOU CAN PROBABLY PICK IT UP MORE QUICKLY IF YOU 03:50:52 LOOK FOR DX 4549.

03:51:07 (DOCUMENT DISPLAYED)

**MR. POLLACK:** THAT'S RIGHT, THERE YOU GO.

**BY MR. POLLACK:**

**Q** SO, YOU SEE --

03:51:14 **MR. POLLACK:** AND YOUR HONOR, I GAVE THE TWO NUMBERS BECAUSE THIS IS FROM THAT COLLECTIVE EXHIBIT, 5709.

**THE COURT:** AT SOME POINT I MIGHT LIKE TO GET THAT JUST TO KIND OF COMPARE WHERE SOME OF THESE EXHIBITS HAVE BEEN IN THE SEPARATE EXHIBIT GROUP.

03:51:30 **MR. POLLACK:** SURE THING, YOUR HONOR.

**THE COURT:** OKAY.

**BY MR. POLLACK:**

**Q** SO, THIS (INDICATING) IS AN OSCILLATOR SCREENSHOT, RIGHT? DO YOU SEE THAT?

03:51:38 **A** NO.

**Q** NOW, WHEN YOU SIGNED YOUR REBUTTAL REPORT ON AUGUST 22, YOU DID NOT HAVE THE ORIGINAL SCREENSHOTS FROM THE OSCILLOSCOPE IN YOUR POSSESSION, RIGHT?

**A** WELL I HAD A SET OF POWERPOINT SLIDES THAT WITHIN THEM HAD

03:52:03 SCREENSHOTS FROM THE OSCILLOSCOPE.

**Q** RIGHT SO THERE WERE SOME SCREENSHOTS WITH SOME ADDITIONAL COMMENTARY ON IT FOR SOME OF THE SLIDES AND THERE WERE SOME SLIDES WITH PICTURES AND THERE WERE SOME SLIDES WITH PLOTS, BUT THAT'S WHAT YOU GOT?

03:52:17 **A** THAT'S CORRECT.

03:52:17 **Q** SO IF YOU WERE TO TAKE A LOOK AT THIS SCREENSHOT, AND IF YOU WERE TO GO TO THE POWERPOINT SLIDE CORRESPONDING TO THIS, THEN ALL OF THIS WAS WITHIN THAT SCREENSHOT. I MEAN, WITHIN THAT POWERPOINT SLIDE.

03:52:31 **Q** DO YOU KNOW WHICH PART TESTING THIS RELATES TO?

**A** I THINK.

**Q** WHICH PART?

**A** THIS IS THE 6841 NO-LOAD CYCLE SKIPPINGS TEST.

**Q** SO THIS IS AT NO LOAD? IS THAT RIGHT?

03:52:47 **A** THAT'S CORRECT.

**Q** OKAY. AND, AGAIN, JUST TO POINT OUT, SO IS THERE'S FOUR TRACES ON THERE AND I BELIEVE YOU EXPLAINED WHY, BUT THERE'S NO OSCILLATOR TRACE SHOWN THERE?

**A** THERE IS NO OSCILLATOR TRACE HERE.

03:53:00 **Q** AND THIS IS NOT THE SURGE TEST, RIGHT? THIS IS NO-LOAD?

**A** THIS IS NOT THE SURGE TEST.

**Q** SO I WANT TO LOOK AT THE SURGE TEST ALSO FOR A MINUTE. AND, AND IF WE CAN BRING UP AN EXAMPLE OF THAT FROM DX 4555.

(DOCUMENT DISPLAYED)

03:53:23 **Q** OKAY. DO YOU RECOGNIZE THAT AS THE SCREENSHOT RELATED TO SOME OF THE SURGE TESTING?

**A** I DO.

**Q** DO YOU KNOW WHICH PART THIS IS FOR?

**A** THIS ONE IS A BIT MORE TRICKY. IT'S DEFINITELY NOT THE FAN103. I KNOW THAT.
03:53:36

03:53:39 (WITNESS EXAMINES DOCUMENT)

**A** AND WHETHER IT'S THE 6841 OR THE 5841, I'M NOT 100 PERCENT SURE.

**Q** OKAY. AGAIN, THE TEST RESULTS, NO OSCILLATOR TRACES

03:53:55 (INDICATING), RIGHT?

**A** THAT'S CORRECT.

**Q** AND WE HAVE TALKED ABOUT THE ORIGINAL IDEA. NOW, YOU AGREE THAT THIS SURGE TEST IS A SIMULATION, RIGHT, THAT WAS PERFORMED FOR THE PURPOSES OF THIS LITIGATION. RIGHT?

03:54:09 **A** IT'S A SIMULATION TEST, YEAH.

**Q** RIGHT. AND YOU UNDERSTAND THAT IT'S SIMULATING A LARGE SURGE LIKE A LIGHTNING STRIKE AT A PARTICULAR POINT IN THE CIRCUIT. RIGHT?

**A** WELL, I THINK IT WASN'T SIMULATING LIGHTNING STRIKING THE

03:54:25 PIN, BUT IT'S -- ONE OF THE EXAMPLES OF THE SURGE/ESD TEST IS IF YOU HAD A LIGHTNING STRIKE AND THEN IT CAUSES A SURGE, A CHARGE, AND IT'S ENTERING INTO THAT PIN.

**Q** SO, FAIR ENOUGH. IT WAS TRYING TO SIMULATE THE NOTION OF A SURGE LIKE IT MIGHT BE CAUSED BY A STRIKE OF LIGHTNING.

03:54:43 RIGHT?

**A** CORRECT.

**Q** OKAY. AND I BELIEVE THAT THAT WOULD HAVE BEEN TRUE FOR ALL THE DIFFERENT SURGE TESTS THAT YOU RELIED ON. RIGHT? THEY WERE ALL DONE THE SAME WAY?

03:54:57 **A** THEY WERE ALL DONE THE SAME WAY.

**Q** SO, DR. WEI, LET'S TALK ABOUT THE FIXED FREQUENCY ISSUE ON THE '079.

**A** OKAY.

**Q** SIMILAR TO THE DISCUSSION WE JUST HAD ABOUT CYCLE SKIPPING, YOU DIDN'T PROVIDE, DURING YOUR DIRECT TESTIMONY, ANY ANALYSIS OF THE SCHEMATICS OF THE INTERNAL CIRCUITS THAT ARE RESPONSIBLE FOR CONTROLLING THE SWITCHING FREQUENCY IN ANY OF THE REPRESENTATIVE PARTS. RIGHT?

**A** IN MY DIRECT TESTIMONY TODAY, THAT'S CORRECT.

**MR. POLLACK:** IF I CAN HAVE THE DDX 429, PLEASE.

(DOCUMENT DISPLAYED)

**BY MR. POLLACK:**

**Q** DR. WEI, THIS IS ANOTHER SLIDE THAT YOU PUT UP DURING YOUR DIRECT. YOU RECOGNIZE THIS AS THE COURT'S CONSTRUCTION OF "FREQUENCY" -- I'M SORRY, "SWITCHING FREQUENCY" AND "FIXED SWITCHING FREQUENCY," RIGHT?

**A** THAT IS CORRECT.

**Q** AND THE DEFINITION OF "FIXED SWITCHING FREQUENCY" IS "A NONVARYING NUMBER OF SWITCHING CYCLES PER SECOND." RIGHT?

**A** YES.

**Q** NOW, NONE OF THE FAIRCHILD TESTING THAT YOU RELIED ON TO SUPPORT YOUR OPINIONS PROVIDE ANY MEASUREMENT OF THE TOTAL NUMBER OF SWITCHING CYCLES IN A SECOND. FAIR?

**A** YEAH. I BELIEVE -- I'VE TALKED ABOUT IT PLENTY, NOW.

**Q** OKAY. BUT WHEN I ASKED YOU IN YOUR DEPOSITION, HOW DO YOU

03:56:14 KNOW FOR ANY OF THE ACCUSED PRODUCTS THAT THE NUMBER OF SWITCHING CYCLES PER SECOND WOULD VARY FROM SECOND TO SECOND, YOU TOLD ME YOU DIDN'T SEE WHY THAT'S IMPORTANT. RIGHT?

**A** CORRECT.

03:56:28 **Q** NOW, ON THIS NOTION OF FIXED SWITCHING FREQUENCY, AS YOU'VE APPLIED IT IN THIS CASE, IS IT CORRECT -- WELL, I'LL ASK YOU THIS: HAVE YOU EVER SEEN IN A REAL-WORLD COMMERCIAL POWER SUPPLY CONTROLLER OPERATION WITH A PERFECTLY NONVARYING FREQUENCY, AS YOU'VE APPLIED THAT REQUIREMENT IN THIS CASE?

03:56:47 **A** SO, I THINK WE'VE DISCUSSED THIS BEFORE AS WELL. AND, I THINK MY ANSWER TODAY IS THE SAME AS BEFORE. THE -- THE CLAIM CONSTRUCTION PROVIDED BY THE COURT IS A NON-VARYING NUMBER OF SWITCHING CYCLES PER SECOND. AND, I DON'T KNOW OF ANY POWER SUPPLY CIRCUITS THAT DON'T HAVE AT LEAST A LITTLE BIT OF

03:57:15 VARIATION.

**Q** OKAY. SO AS YOU'VE APPLIED IT, YOU WOULD AGREE THAT YOU -- YOU DON'T KNOW OF ANY REAL-WORLD COMMERCIAL POWER SUPPLY THAT WOULD MEET THAT CONSTRUCTION?

**A** WELL, IT IS MANDATED BY THE COURT, I BELIEVE, THAT IT'S

03:57:28 THE LAW THAT I APPLY LITERALLY THE COURT'S CLAIM CONSTRUCTION.

**Q** SO AS YOU HAVE APPLIED IT, THOUGH, THE CIRCUIT OF THE PREFERRED EMBODIMENT OF THE '079 PATENT, IF BUILT IN THE REAL WORLD, IT WOULD ALSO NOT SATISFY "FIXED SWITCHING FREQUENCY" AS YOU HAVE APPLIED IT IN THIS CASE. RIGHT?

03:57:49 **A** THAT'S WHAT THE CLAIM CONSTRUCTION TELLS US, YEAH.

03:57:52
**Q** THAT'S A YES? FAIR?

**A** I THINK SO, YES.

**MR. POLLACK:** YOUR HONOR, I'M GOING TO GO ON TO ANOTHER TOPIC. I CAN JUST KEEP GOING. I DON'T WANT TO GO TOO LATE, SO I JUST WANT TO BE RESPECTFUL.

03:58:01

**THE COURT:** LET ME ASK A COUPLE OF QUESTIONS ABOUT HOW LONG DR. WEI IS GOING TO BE ON THE STAND. HE WAS ON THE STAND FOR THE BETTER PART OF THE DAY TODAY, ON DIRECT.

IF YOUR CROSS-EXAMINATION IS GOING TO BE OF ANY CONSIDERABLE LENGTH IN LIGHT OF THAT, THERE IS NO WAY THAT WE WOULD BE ABLE TO FINISH THE TESTIMONY TODAY.

03:58:21

AND, I UNDERSTAND DR. WEI HAS SOME APPEARANCES OR AN APPEARANCE THAT HE NEEDS TO MAKE AT SOME POINT. I'M NOT SURE WHEN HE IS ABLE TO COME BACK, IF IT'S IN ANOTHER COURT, AND HE'S BEEN REQUIRED TO BE THERE FOR THAT PROCEEDING.

03:58:45

WE CAN EITHER SEND THE JURY OUT BRIEFLY OR HE CAN STAND BY AND WE CAN DECIDE AFTER THE JURY GOES. WE HAVE TO DO SOMETHING WITH DR. WEI. HE'S ONLY PARTIALLY THROUGH HIS TESTIMONY.

03:59:05

**MR. POLLACK:** THAT'S RIGHT, YOUR HONOR. I STILL HAVE A CONSIDERABLE AMOUNT OF TOPICS TO COVER.

**THE COURT:** SO THERE'S NO EQUIPMENT THAT THERE WILL BE AN BE A JENSEN COMMITMENT THAT THERE WILL BE AN ABSENCE OF REDIRECT SO THERE'S NOT JUST YOU, THERE'S WHATEVER WE CAN EXPECT OR AT LEAST THINK MIGHT HAPPEN.

03:59:19

OKAY. SHOULD WE DISCUSS THIS WITHOUT THE JURY HERE? DO YOU WISH TO CONFER WITH OPPOSING COUNSEL? WE CAN'T HAVE THE JURY HERE TOMORROW, BECAUSE WE HAVEN'T ASKED THEM DO THAT. I BELIEVE HIS COMMITMENT IS SOMEWHERE NEXT WEEK.

**MR. POLLACK:** I -- I BELIEVE WE CAN EXCUSE THE JURY AND HAVE THIS CONVERSATION, YOUR HONOR. I DON'T THINK THEY NEED TO BE HERE FOR IT.

**THE COURT:** ALL RIGHT, IS WHATEVER ACCOMMODATIONS MADE FOR DR. WEI GOING TO IN ANY WAY CHANGE THE ULTIMATE ANTICIPATED END DATE FOR THE TRIAL? BECAUSE, WE -- WE REALLY CAN'T PUT THE TRIAL OVER TO SOME OTHER TIME PERIOD IN ORDER TO ACCOMMODATE WHATEVER OTHER APPEARANCE HE MIGHT HAVE.

**MR. JACOBS:** YOUR HONOR, I THINK THAT WE NEED TO SPEAK WITH DR. WEI ABOUT THAT, OUTSIDE OF THE PRESENCE OF THE JURY. I HOPE NOT, AND I HOPE AND I EXPECT NOT.

**THE COURT:** WELL, IT'S NOT GOING TO BE. ALL RIGHT? IT ISN'T A QUESTION OF HOPE NOT.

**MR. JACOBS:** I DON'T KNOW HIS SCHEDULE, YOUR HONOR.

**THE COURT:** EITHER HIS TESTIMONY WILL BE IN AS TOTALLY EXPLORED OR HE WOULDN'T HAVE ANY TESTIMONY. ALL RIGHT. SO, WE HAVE TO -- WE HAVE TO DETERMINE THAT. BUT WE CAN'T GO OVER TO SOME OTHER TIME THAT WE WOULDN'T HAVE GOTTEN TO ANYWAY. PUTTING HIM AT THE END OF ORDINARY TIME IS ONE THING, BUT STOPPING AND THEN HAVING A HIATUS AND WAITING FOR DR. WEI, WE CAN'T DO.

04:00:52 **MR. JACOBS:** AGREED.

**THE COURT:** ALL RIGHT. SO, ARE COUNSEL SATISFIED WE CAN EXCUSE THE JURY UNTIL MONDAY?

**MR. JACOBS:** YES, YOUR HONOR.

04:01:00 **MR. SCHERKENBACH:** YES.

**THE COURT:** OKAY. SO LADIES AND GENTLEMEN, AGAIN, NOW THIS HAS BEEN A LONG WEEK, AND I'M SURE A RATHER FATIGUING ONE FOR YOU, WITH ALL THIS VERY TECHNICAL TESTIMONY. MAYBE I'M EXTRAPOLATING FROM MY OWN EXPERIENCE.

04:01:14 BUT, IN ANY EVENT, WHAT I WANT TO DO IS AGAIN THANK YOU ON BEHALF OF THE COURT AND COUNSEL, AND THE PARTIES.

MAYBE WAIT UNTIL MS. LUCERO GETS TO WHERE SHE'S GOING.

I DO WANT TO REMIND YOU OF THE COURT'S ADMONITION. AGAIN, AT THIS POINT YOU HAVE HEARD TESTIMONY AND DISPUTE FROM EXPERT 04:01:40 WITNESSES. YOU HAVEN'T HEARD ALL OF THE CROSS EXAMINATION OF DR. WEI. YOU HAVEN'T HEARD ALL THE REST OF THE CASE.

I DO JUST WANT TO REMIND YOU, YOU CAN'T TRY AND FIND OUT MORE ON YOUR OWN IN ANY WAY, SHAPE OR FORM, NOR CAN YOU FORM AN ULTIMATELY OPINION ABOUT THE CASE.

04:01:58 SO, I HOPE YOU HAVE A VERY NICE BREAK. AND WE WILL SEE YOU AT 9:00 THIS COMING MONDAY. THANK YOU.

(JURY EXCUSED)

(THE FOLLOWING PROCEEDINGS WERE HELD OUTSIDE OF THE PRESENCE OF THE JURY)

04:02:23 **THE COURT:** OKAY. AND DR. WEI, WHY DON'T YOU JUST

04:02:25 HAVE A SEAT FOR A MINUTE WHERE YOU ARE. IN CASE WE HAVE TO ASK YOU ANY QUESTIONS, THE REPORTER WILL BE ABLE TO PICK UP WHATEVER YOU HAVE TO SAY.

DO WE NEED TO POSE ANY QUESTIONS TO DR. WEI RIGHT NOW? OR 04:02:35 DOES COUNSEL WANT TO SPEAK TO HIM OFF THE RECORD?

**MR. JACOBS:** OFF THE RECORD, IF WE COULD, PLEASE, YOUR HONOR.

**THE COURT:** ALL RIGHT. DO YOU WANT TO STEP DOWN FOR A MOMENT, DR. WEI, OR MORE THAN A MOMENT, AND SPEAK TO 04:02:45 MR. JACOBS AND/OR ANYONE ELSE AT COUNSEL TABLE FOR FAIRCHILD?

**THE WITNESS:** THANK YOU, YOUR HONOR.

**THE COURT:** THANK YOU. ALL RIGHT. WE WILL JUST BE ESSENTIALLY AT EASE WHILE THEY DO THAT.

(OFF-THE-RECORD DISCUSSION)

04:03:01 **THE COURT:** YOU KNOW, I SAID EARLIER, "WE'RE NOT GOING TO GET THROUGH HIM TODAY, ARE WE?" AND I WAS ASSURED, "OH, YES, WE WOULD." IT DIDN'T APPEAR AT ALL POSSIBLE THAT THAT WOULD HAPPEN, AND IT DIDN'T.

SO, YES. NOW, MISTER -- YOU CAN WAIT WHERE YOU ARE, 04:03:17 DR. WEI, FOR A MOMENT. DON'T GO TOO FAR, JUST --

**MR. JACOBS:** I WAS GOING TO ASK YOU TO PUT HIM BACK IN THE BOX, YOUR HONOR, BUT IT'S OKAY.

**THE COURT:** SORT OF HANG AROUND THE PODIUM HERE. WHAT I'M TRYING TO FIND OUT IS, ARE YOU GOING TO REPORT WHAT 04:03:31 HIS SITUATION IS, AND WE DON'T NEED HIM TO TELL US DIRECTLY?

04:03:36 **MR. JACOBS:** I CAN REPORT THE SITUATION, YOUR HONOR. HE CAN COME BACK FIRST THING MONDAY MORNING AND WE CAN WRAP UP HIS TESTIMONY MONDAY MORNING.

**THE COURT:** THAT WOULD BE VERY GOOD.

04:03:42 ALL RIGHT. SO DR. WEI, I RECOGNIZE YOU MAYBE HAVE SOME INCONVENIENCE TO YOURSELF AND YOUR SCHEDULE, BUT IT IS IMPORTANT WE TRY COMPLETE YOUR TESTIMONY WITHIN THE CONFINES OF THE TRIAL. SO, I APPRECIATE THAT. THANK YOU.

SO DR. WEI IS EXCUSED UNTIL MONDAY AT 9:00.

04:04:00 (WITNESS EXCUSED)

WHERE ARE WE IN THE CASE? AND I'LL TELL YOU THAT WE CAN USE AT LEAST SOME OF TOMORROW FOR OUR PURPOSES. BUT, WHERE ARE WE IN ALL THIS?

**MR. JACOBS:** YOUR HONOR, I SPOKE A LITTLE BIT WITH 04:04:10 COUNSEL. I THINK WE WOULD LIKE TO SPEAK WITH THE COURT TOMORROW AFTERNOON. WE GOING TO TRY TO GET TOGETHER TOMORROW MORNING TO DISCUSS JURY INSTRUCTIONS AMONGST OURSELVES TO STREAMLINE.

**THE COURT:** OKAY.

04:04:20 **MR. JACOBS:** IF WE CAN COME IN AND HAVE SOME TIME WITH THE COURT TOMORROW AFTERNOON TO GO THROUGH THE DISPUTES, THAT WOULD BE GREAT.

WE ARE GETTING READY, AS SOON AS DR. WEI IS DONE, TO MOVE TO OUR CASE IN CHIEF. AND SO WE'LL HAVE THE INVENTOR FOR THE 04:04:37 '977, PATENT AND THEN OUR EXPERT WITNESS, DR. WOOD.

04:04:40 WE HAVE A FEW DEPOSITION, ABOUT AN HOUR, AN HOUR AND A HALF OF PLAYS. AND THEN MY UNDERSTANDING IS THERE WILL BE A RESPONSIVE CASE FROM POWER INTEGRATIONS. WE STILL HAVE DAMAGES EXPERTS IN BOTH DIRECTION.

04:04:55 PROBABLY, IN MY ESTIMATION, LOOKING LIKE TESTIMONY WILL PROBABLY GO UNTIL WEDNESDAY, AS IT'S LOOKING RIGHT NOW.

**THE COURT:** AND "UNTIL WEDNESDAY," YOU ARE COUNTING WEDNESDAY.

**MR. JACOBS:** I AM, YOUR HONOR.

04:05:05 **THE COURT:** IN OTHER WORDS, TESTIMONY WILL BE TAKEN ON WEDNESDAY.

**MR. JACOBS:** IT JUST SEEMS THAT WAY, UNLESS WE CAN REALLY STREAMLINE ONE WAY OR THE OTHER.

**THE COURT:** OKAY. WELL, THAT'S ALL RIGHT. THEN ARE 04:05:13 YOU ANTICIPATING ON THURSDAY -- WELL, YOU SEE, HERE'S OUR BIT OF OUR PROBLEM WITH THAT.

YOU'RE NOT GOING TO BE ARGUING ON WEDNESDAY, IF YOU HAVE TESTIMONY ON WEDNESDAY, UNLESS IT'S THE BRIEFEST OF TESTIMONY. SO, THEN, YOU WOULD HAVE ARGUMENT, WHICH HAS GOT TO BE AT SOME 04:05:32 LENGTH HERE.

**MR. JACOBS:** (NODS HEAD)

**THE COURT:** AND THEN THERE'S INSTRUCTIONS. WE'RE NOT GOING TO GET THIS CASE TO THE JURY, I DON'T THINK, IN TIME TO MEET OUR SCHEDULE. I'M TRYING TO REMEMBER WHAT WE HAVE ON FOR 04:05:47 THE FOLLOWING FRIDAY.

04:05:49 **MR. SCHERKENBACH:** YOUR HONOR, IF I MAY, I THINK IF YOU DO THE MATH, WITH THE PARTIES' TIME ALLOCATIONS, THAT WE WILL GET IT DONE.

**THE COURT:** SAYING YOU HAVE TO GET IT DONE.

04:06:00 **MR. SCHERKENBACH:** YES. AND I THINK WE SHOULD BE REQUIRED TO, AND I THINK WE WILL. I KNOW WE'RE TRACKING OUR TIME CLOSELY, AND I --

**THE COURT:** I'M NOT ADJUSTING THE TIME LIMITS. BUT, I HAVEN'T TRIED TO COUNT IT UP TO SEE. AND ONE OF YOU THINKS
04:06:12 THEY WOULD ACCOMMODATE PART OF WEDNESDAY, AND THE OTHER OF YOU THINKS WE SHOULD BE THROUGH BY TUESDAY.

**MR. SCHERKENBACH:** I THINK WE WOULD FINISH BY THE END OF THE DAY TUESDAY, AND WE'D BE ABLE TO DO CLOSINGS ON WEDNESDAY. IT MIGHT BE WEDNESDAY AFTERNOON, YOU KNOW, BUT WE
04:06:26 CAN'T AFFORD HALF OF A DAY OFF, I GUESS IS WHAT I'M SAYING. IF WE HAVE EVIDENCE FINISHING WEDNESDAY MORNING, WE SHOULD CLOSE WEDNESDAY AFTERNOON.

**THE COURT:** ALL RIGHT. WELL -- PARDON ME?

**MR. JACOBS:** WEDNESDAY IS THE SHORT DAY. I'M JUST
04:06:37 WONDERING, WITH THE JURY MAKING PLANS FOR ACTIVITIES WEDNESDAY AFTERNOON AND SO FORTH, WHETHER THAT WOULD EVEN BE POSSIBLE.

**THE COURT:** IT MIGHT NOT BE. WE DO HAVE -- MS. LUCERO, COULD I SEE YOU, PLEASE?

(OFF-THE-RECORD DISCUSSION BETWEEN THE COURT AND CLERK)

04:07:43 **THE COURT:** AGAIN, WITHOUT KNOWING WHAT THE JURORS

04:07:47 HAVE COMMITTED TO, I DON'T KNOW IF WE COULD EXPAND WEDNESDAY EVEN IF WE, YOU KNOW --

(OFF-THE-RECORD DISCUSSION BETWEEN THE COURT AND CLERK)

**THE COURT:** WELL, WHAT I CAN DO THE, I WOULD HAVE

04:08:30 ASKED THEM -- PERHAPS WE SHOULD HAVE GOTTEN A LITTLE HEAD START ON THIS CONVERSATION. BUT I MIGHT HAVE ASKED THEM AT THE END OF THE DAY TODAY TO GIVE THEM MORE ADVANCE NOTICE OF PERHAPS BEING ABLE TO ADJUST AS TO WEDNESDAY.

THERE'S A POSSIBILITY WE COULD TRY AND REACH THEM

04:08:52 TELEPHONICALLY BUT IT BECOMES VERY AWKWARD BECAUSE IT ISN'T THE KIND OF THING WHERE YOU CAN LEAVE THEM A MESSAGE AND SAY WE ARE STARTING A HALF HOUR EARLIER. IT REALLY REQUIRES AN INQUIRY.

**MR. JACOBS:** I WANT TO CLARIFY SOMETHING ON THE

04:09:04 RECORD. COUNSEL REMINDED ME OF THIS. I WANT TO BE SURE IT'S CLEAR, BECAUSE I DON'T WANT THERE TO BE ANY UNCLARITY HERE.

SO THE WAY THIS IS GOING TO FINISH UP IS WE ARE GOING TO PUT ON OUR EXPERT ON THE '977, AND WE HAVE A FEW DEPOSITION PLAYS.

04:09:18 AND THEN, YOU RECALL, DR. PUTNAM WAS CUT OFF ALMOST TOWARD THE END OF THE HIS CROSS-EXAMINATION ON THEIR PATENTS. WE'RE GOING TO BRING DR. PUTNAM BACK TO FINISH THAT CROSS-EXAMINATION UP. AND THEN OUR DAMAGES EXPERT, MR. MALACKOWSKI, WILL TESTIFY.

04:09:30 AND THEN THEY WILL BE PERMITTED TO PUT ON THEIR TECHNICAL

04:09:33 CASE WITH REGARD TO THE '977 AND ANY REBUTTAL THAT THEY HAVE AT THE END. DR. WOOD MAY COME BACK AT THE VERY END.

**THE COURT:** OKAY. YEAH, I MEAN, THAT WAS KIND OF THE PREVIEW ANYWAY.

04:09:42 **MR. JACOBS:** OKAY.

**THE COURT:** THE POINT IS NOT WHO'S GOING TO FILL UP THE GOOD AFTERNOON, YOUR HONOR, IT'S HOW LONG THEY'RE GOING TO GO ON FOR.

**MR. JACOBS:** THE GAPS.

04:09:49 **THE COURT:** AND WE CAN TRY TO SPEAK TO THE JURY ON MONDAY. I CAN TRY TO MAKE SOME ARRANGEMENTS TO TRY AND FREE UP WEDNESDAY AS A FULLER DAY, THAN NOT. WE DON'T KNOW WHERE WE'LL BE, EXACTLY.

YOU MIGHT HAVE TO BE READY TO ARGUE. WHO'S AT THE VERY 04:10:07 END, AGAIN?

**MR. JACOBS:** IT WILL BE THE END OF THEIR TECHNICAL CASE, AND THEN THEIR DAMAGES EXPERT WILL GET TO COME BACK ON OUR PATENT. AND THEN TO THE EXTENT WE HAVE TIME --

**THE COURT:** NO, JUST LIKE THE VERY END.

04:10:18 **MR. JACOBS:** THE VERY END WILL BE OUR RESPONSE ON THE '977, DR. WOOD, AND MR. MALACKOWSKI.

**THE COURT:** WELL, THOSE ARE EXPERTS. IT MIGHT BE HARD TO PREPARE A CLOSING WITHOUT THEIR TESTIMONY IN THE RECORD. IT ISN'T JUST SOME, YOU KNOW, PASSING COMMENT.

04:10:35 **MR. JACOBS:** I WOULD LIKE A NIGHT, JUST ONE EVENING,

04:10:38 TO DO THAT, YOUR HONOR.

**THE COURT:** WELL, IT PROBABLY WOULD BE APPROPRIATE NOT TO MAKE EVERYONE DEAL WITH IT ON THE FLY. BUT I'M JUST, YOU KNOW, CONCERNED HERE. YOU DO KNOW WHAT THEY'RE GOING TO 04:10:50 SAY.

**MR. SCHERKENBACH:** WE USED TO DO IT IN THE OLD DAYS, YOU KNOW. STAND UP AND --

**MR. JACOBS:** IF IT WORKS, WE DO KNOW WHAT THEY ARE GOING TO SAY, LARGELY.

04:10:58 **THE COURT:** YOU DO KNOW WHAT HER GOING TO SAY SO I GUESS YOU WOULD HAVE TO AT LEAST BE SORT OF FLEXIBLE.

**MR. JACOBS:** SURE WE ARE FLEXIBLE.

**MR. SCHERKENBACH:** WE COULD HAVE OF THE OTHER 85 SLIDES READY TO GO.

04:11:08 **MR. JACOBS:** I THINK WE CAN DO THAT.

**THE COURT:** I MEAN, TODAY WAS REALLY VERY TIRING. JUST FOLLOWING ALL OF THESE THINGS. AND THESE -- THESE GRAPHS AND THE OTHER PATENTS AND WHATEVER. AND, AND I HOPE, ALL OF YOU, I'M SURE YOU UNDERSTAND, AND YOU'VE ALL BEEN DOING THIS 04:11:25 FOR A LONG TIME. THESE ARE NOT PHYSICISTS. THESE ARE NOT ELECTRICAL ENGINEERS, LET ALONE ENGINEERS WITH PH.D.S AND WHATEVER ELSE AND PROFESSORSHIPS AND WHAT HAVE YOU. NOR IS THE COURT. AND THEY ARE GOING TO HAVE TO UNDERSTAND ALL OF THIS TECHNICAL TESTIMONY.

04:11:48 NOW YOUR PRINCIPALS ARE HERE, AND I UNDERSTAND THEY

04:11:52 UNDERSTAND IT. THEY MAY BE LOOKING AT ALL OF THIS AND SAYING, "YES, YES THAT MAKES A LOT OF SENSE TO ME," OKAY, OR "THAT WAS A REALLY GOOD POINT."

I DON'T KNOW HOW MUCH THAT'S GOING OVER WITH THE JURY.

04:12:05 AND I GATHER WITH THE AMOUNT OF TIME AND EFFORT YOU HAVE PUT IN THIS ALREADY THAT YOU ARE NOT INCLINED TO TRY AND DO ANYTHING BUT TAKE IT TO THE BLOODY END.

BUT, IT JUST SEEMS TO ME THAT THIS IS A HERCULEAN TASK FOR LAYPERSONS, NO MATTER HOW SMART THEY ARE AND HOW COMMITTED

04:12:27 THEY ARE, TO ABSORB ALL OF THIS. IT'S ONE THING TO ABSORB SOMETHING FROM SOMEONE WHO ISN'T DISPUTED. ALL RIGHT? AND THEY TELL YOU SOMETHING, AND YOU'RE IN THEIR CLASS OR WHATEVER, AND YOU SAY, "YES, THAT'S FINE," AND MAYBE YOU QUESTION A COUPLE OF THINGS, BUT THAT WOULD BE BASED ON ONE'S

04:12:43 ALREADY HAVING SOME KNOWLEDGE IN THE AREA.

THIS IS LIKE THEY'RE GOING TO HAVE TO DECIDE WHICH OF TWO QUALIFIED PEOPLE IS TELLING THEM THE CORRECT RESULT HERE, IN EFFECT. THIS IS LEAVING OUT DAMAGES THAT BOTH OF YOU ARE CLAIMING. ALL RIGHT? SO, JUST, YOU KNOW, KIND OF PUTTING

04:13:04 THIS IN PERSPECTIVE. ALL RIGHT.

ANYWAY, TOMORROW. I DO THINK IT WOULD BE HELPFUL IF YOU HAD A CHANCE TO SIT BACK, CATCH YOUR BREATH, LOOK AT WHERE THE EVIDENCE IS THUS FAR, BEFORE PURSUING ANY PARTICULAR DISPUTE FULLY ON THE INSTRUCTIONS.

04:13:26 I THREW OUT A COUPLE OF CONCERNS AND IDEAS I HAD. I COULD

04:13:31 PROBABLY GIVE YOU MORE, BUT MAYBE WE SHOULDN'T DO THAT AT THIS POINT.

**MR. SCHERKENBACH:** OUR SENSE WAS WE COULD GET TO A VERY SMALL SET OF THINGS THAT WE HAVE TO ADDRESS.

04:13:46 **THE COURT:** WELL, THAT WOULD BE FINE. MY THOUGHT IS IF YOU HAVE A TRIED AND TRUE PATTERN INSTRUCTION AND ONE OR THE OTHER OF YOU IS TRYING TO CHANGE IT IN SOME SIGNIFICANT, YOU KNOW, SUBSTANTIVE WAY, THAT YOU WOULD HAVE TO POINT CAREFULLY TO WHERE THE JURY MIGHT, GIVEN THE PARTICULAR 04:14:06 POSTURE OF OUR CASE, NOT UNDERSTAND IT, TO, TO BE COVERING OR NOT COVERING A PARTICULAR POINT THAT NEEDS CALLING OUT SPECIFICALLY, RATHER THAN HAVING ME CHOOSE A ONE-OFF, ESSENTIALLY. EVEN ONE THAT ONE OF YOU OR THE OTHER OR BOTH OF YOU MIGHT HAVE AGREED TO OR GOT USED IN ANOTHER CASE, IN 04:14:29 ANOTHER -- YOU KNOW, DISTRICT. ALTHOUGH, IF IT WENT THE FULL ROUTE IN THE OTHER CIRCUIT, THAT MIGHT BE, AT LEAST, SOMETHING TO SUGGEST THAT IT'S MORE VALID THAN NOT.

HOWEVER, EVERY CASE IS DIFFERENT, AND THE PURPOSE OF ANY GIVEN INSTRUCTION IN ANY GIVEN CASE MAY BE MORE APPROPRIATE, 04:14:51 YOU KNOW, THE CONSTRUCTION MAY BE MORE APPROPRIATE FOR THAT SET OF FACTS THAN OURS.

ANYWAY, OKAY. SO, WHAT TIME ARE YOU THINKING OF? 1:30?

**MR. JACOBS:** 1:30 WOULD BE PERFECT, YOUR HONOR.

**MR. SCHERKENBACH:** SURE.

04:15:02 **THE COURT:** ALL RIGHT. SO WE'LL SHOOT FOR 1:30 HERE.

04:15:05 WE WILL NEED, I GUESS, A REPORTER FOR THAT.

AND THEN, WHETHER WE ARE GOING TO KEEP THE REPORTER FOR ALL OF THE JUST PLAY-BY-PLAY OF TALKING ABOUT THE MATTERS, I DON'T KNOW WHICH WOULD BE THE FASTEST. WE MIGHT KEEP THE 04:15:21 REPORTER, SEE HOW IT'S GOING.

**MR. JACOBS:** (NODS HEAD)

**THE COURT:** BUT THEN POSSIBLY, IF IT -- IF IT'S TOO MUCH CHATTING ABOUT EACH ONE WITHOUT A RESULT IMMEDIATELY, THEN SENDING THE REPORTER BACK TO BE ON STANDBY, JUST 04:15:39 DISCUSSING FULLY, AND THEN YOU'LL PUT YOUR BEST POINTS ON THE RECORD IF YOU DIDN'T GET WHAT YOU WANTED.

**MR. JACOBS:** THAT SOUNDS GOOD.

**THE COURT:** A WAY TO POSSIBLY DO IT.

**MR. SCHERKENBACH:** THAT'S AGREEABLE.

04:15:51 **THE COURT:** OKAY. ALL RIGHT. WELL, SEE YOU TOMORROW. 1:30.

**MR. JACOBS:** THANK YOU, YOUR HONOR.

**MR. SCHERKENBACH:** THANK YOU, YOUR HONOR.

(PROCEEDINGS CONCLUDED AT 4:14 P.M.)

## INDEX

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| HUANG, WEI-HSUAN | | |
| (RECALLED) | 1854 | 8 |
| CROSS EXAMINATION BY MR. SCHERKENBACH | 1854 | 8 |
| REDIRECT EXAMINATION BY MR. JACOBS | 1874 | 8 |
| RECROSS EXAMINATION BY MR. SCHERKENBACH | 1884 | 8 |
| WEI, GU-YEON | | |
| (SWORN) | 1887 | 8 |
| DIRECT EXAMINATION BY MS. ONDRICK | 1888 | 8 |
| CROSS EXAMINATION BY MR. POLLACK | 2054 | 8 |

# EXHIBITS

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 3485R | | | 1855 | 8 |
| 2037 | | | 1864 | 8 |
| 2706 | | | 1908 | 8 |
| 3107 | | | 1921 | 8 |
| 2202 | | | 1924 | 8 |
| 5053 | | | 2013 | 8 |
| 5085 | | | 2033 | 8 |

**CERTIFICATE OF REPORTER**

I, BELLE BALL, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

*/S/ BELLE BALL*

FRIDAY, FEBRUARY 21, 2014

BELLE BALL, CSR 8785, CRR, RDR